1  DAVID CHIU, SBN 189542
   City Attorney
2  YVONNE MERÉ, SBN 189542
   Chief Deputy City Attorney
3  JENNIFER CHOI, SBN 184058
   Chief Trial Deputy
4  KARUN A. TILAK, SBN 323939
   Deputy City Attorney
5  Fox Plaza
   1390 Market Street, 6th Fl.
6  San Francisco, California 94102-5408
   Telephone:    (415) 554-3308
7  Facsimile:    (415) 437-4644
   E-Mail:        Karun.Tilak@sfcityatty.org
8

9  *Attorneys for Defendants*
   CITY AND COUNTY OF SAN FRANCISCO,
10 SAN FRANCISCO DISTRICT ATTORNEY'S
   OFFICE, CHESA BOUDIN, DANA DRUSINSKY,
11 STEPHANIE LACAMBRA, LATEEF GRAY,
   REBECCA YOUNG, and ANDREW KOLTUNIAK
12

13

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16 KENNETH CHA,                          Case No. 24-CV-04700-PHK

17         Plaintiff,                     **DECLARATION OF KARUN TILAK IN
                                          SUPPORT OF DEFENDANTS' MOTION TO
18     vs.                                DISMISS**

19 CITY AND COUNTY OF SAN                 Judge:           Peter H. Kang
   FRANCISCO, SAN FRANCISCO DISTRICT      Hearing Date:    April 10, 2025
20 ATTORNEY'S OFFICE, CHESA BOUDIN,       Place:           Courtroom F, 15th Fl.
   DANA DRUSINSKY, STEPHANIE              Time:            1:00 p.m.
21 LACAMBRA, LATEEF GRAY, REBECCA
   YOUNG, ANDREW KOLTUNIAK, and
22 DOES 1-100,

23         Defendants.

24

25

26

27

28

## DECLARATION OF KARUN TILAK

I, Karun Tilak, declare as follows:

1.     I am an attorney duly licensed to practice law in California and a Deputy City Attorney for the City and County of San Francisco.  I am counsel to Defendants City and County of San Francisco, San Francisco District Attorney's Office, Chesa Boudin, Dana Drusinsky, Stephanie Lacambra, Lateef Gray, Rebecca Young, and Andrew Koltuniak.

2.     Attached hereto as Exhibit A is a true and correct certified copy of excerpts of the felony complaint, arrest warrant, and arrest warrant application with exhibits on file with the San Francisco Superior Court in *People v. Cha*, S.F. Superior Court No. CRI-21010958 (filed Nov. 4, 2021).  Paragraphs 7-9 on page 13 of the arrest warrant application were redacted in the version provided by the Superior Court.  Limited additional information—specifically the Plaintiff's birth date and driver's license number, the name and address of the reporting party, and certain private phone numbers—have been redacted in order to be consistent with the information publicly disclosed in the Superior Court.

3.     Attached hereto as Exhibit B is a true and correct copy of unsealed excerpts of Volume I of IV of the grand jury proceedings on file with the Superior Court in *People v. Cha*.

4.     Attached hereto as Exhibit C is a true and correct copy of unsealed excerpts of Volume II of IV of the grand jury proceedings on file with the Superior Court in *People v. Cha*.

5.     Attached hereto as Exhibit D is a true and correct copy of unsealed excerpts of Volume III of IV of the grand jury proceedings on file with the Superior Court in *People v. Cha*.

6.     Attached hereto as Exhibit E is a true and correct copy of unsealed excerpts of Volume IV of IV of the grand jury proceedings on file with the Superior Court in *People v. Cha*.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 31st day of January 2025 in San Francisco, California.

_____
KARUN A. TILAK

# EXHIBIT A

602

CHESA BOUDIN, SB# 284577
District Attorney
San Francisco District Attorney's Office
350 Rhode Island, Suite 400N
San Francisco, CA  94103
Telephone:  (628) 652-4000

**F I L E D**
Superior Court of California
County of San Francisco

NOV 04 2021

CLERK OF THE COURT
BY: _____
Deputy Clerk

ATTORNEYS FOR THE PEOPLE

DAW# 51983 H

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br>Plaintiff,<br><br>v.<br><br>KENNETH CHA<br>Defendant. | FELONY COMPLAINT<br>ARREST WARRANT<br><br>CASE NUMBER:<br>21010958<br>11/4/21 at 1:30 Pm |

The Undersigned, being sworn says, on information and belief, that: M09

### COUNT: I

The said defendant, KENNETH CHA, did in the City and County of San Francisco, State of California, on or about the **6th day of January, 2017 through the 20th day of January, 2020**, commit the crime of VOLUNTARY MANSLAUGHTER, to wit: Violating Section 192(a) of the Penal Code, a Felony, in that the said defendant did willfully, unlawfully, and without malice kill SEAN WENDELL MOORE, a human being, upon a sudden quarrel and heat of passion.

### ALLEGATION OF USE OF FIREARM PURSUANT TO PENAL CODE SECTION 12022.5(a)
It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally used a firearm, to wit: .40 CALIBER PISTOL, within the meaning of Penal Code section 12022.5(a).

### COUNT: II

The said defendant, KENNETH CHA, did in the City and County of San Francisco, State of California, on or about the **6th day of January, 2017**, commit the crime of ASSAULT WITH A SEMIAUTOMATIC FIREARM, to wit: Violating Section 245(b) of the Penal Code, a Felony, in that the said defendant did willfully, unlawfully and personally commit an assault on SEAN WENDELL MOORE, with a semi-automatic firearm, to wit: .40 CALIBER PISTOL.

THIS IS A TRUE COPY OF THE ORIGINAL ON FILE IN MY OFFICE.
ATTEST. CERTIFIED

DEC 0 5 2024

CLERK OF THE COURT
Superior Court of California, County of San Francisco
BY: _____
DEPUTY CLERK
Ex. A-001

1

## ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5(d)

It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally used a firearm, to wit: .40 CALIBER PISTOL, within the meaning of Penal Code section 12022.5(d).

## ALLEGATION OF GREAT BODILY INJURY PURSUANT TO PENAL CODE SECTION 12022.7(a)

It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally inflicts great bodily injury, within the meaning of Penal Code Section 12022.7(a).

Pursuant to Penal Code sections 1054 through 1054.7, the People request that, within fifteen (15) days, the defendant and/or his/her attorney disclose: (A) the names and addresses of persons, other than the defendant, he/she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements, of those persons including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial; (B) Any real evidence which the defendant intends to offer in evidence at the trial.  This request is a continuing request, to cover not only all such material currently in existence, but all material which comes into existence to the conclusion of this case.

### MARSY'S LAW

Information contained in the reports being distributed as discovery in this case may contain confidential information protected by Marsy's Law and the amendments to the California Constitution Section 28. Any victim(s) in any above referenced charge(s) is entitled to be free from intimidation, harassment, and abuse.  It is unlawful for defendant(s), defense counsel, and any other person acting on behalf of the defendant(s) to use any information contained in the reports to locate or harass any victim(s) or the victim(s)'s family or to disclose any information that is otherwise privileged and confidential by law.  Additionally, it is a misdemeanor violation of California Penal Code § 1054.2(a)(3) to disclose the address and telephone number of a victim or witness to a defendant, defendant's family member or anyone else.  Note exceptions in California Penal Code § 1054.2(a)(2).

**AFFIDAVIT ATTACHED HERETO AND INCORPORATED HEREIN SETS FORTH THE UNDERLYING FACTS ESTABLISHING PROBABLE CAUSE FOR THE ARREST OF THE DEFENDANT NAMED IN THIS COMPLAINT.**



I state, declare, verify and certify under the penalty of perjury that the foregoing is true and correct.  Executed in San Francisco, California on November 1, 2021.

cf/DAW-170014484

INSPECTOR ANDREW KOLTUNIAK, STAR #113

2

CHESA BOUDIN (SBN 284577)
District Attorney
Stephanie Lacambra (SBN 232517)
Dana Drusinsky (SBN 294063)
Assistant District Attorneys
350 Rhode Island Street
North Building, Suite 400N
San Francisco, California 94103
Telephone: 628-652-4231
Facsimile: 628-652-4001

Attorneys for the People

**F I L E D**
San Francisco County Superior Court

NOV 01 2021

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

IN RE: ARREST WARRANT OF

KENNETH CHA

Warrant No:

[~~PROPOSED~~] SEALING ORDER

IT IS HEREBY ORDERED that the ARREST WARRANT AFFIDAVIT be sealed on page 13, items 7-9 and that EXHIBIT 5 are SEALED until further order of the Court. This Application and the supporting documents are also SEALED until further order of the Court.

Date: 10/29/2021

Hon. _____ Harold Kahn

6

SF Superior Court Register No. *DWCH 51983 F*

# WARRANT OF ARREST

**In the Superior Court of California
City and County of San Francisco**

8 2 1 0 2 7   2021 -1 25

The People of the State of California to any Peace Officer of this State:

Complaint upon oath having this day been laid before me that the offense of **Felony**, to wit:

Violating Section **192(a)** of the Penal Code, a Felony; **245(b)** of the Penal Code, a Felony has been committed and accusing **KENNETH CHA** thereof, you are therefore commanded forthwith to arrest the above named defendant and bring same before the Superior Court in the City and County of San Francisco, California, at the Hall of Justice, 850 Bryant Street, San Francisco, California.

**The defendant is to be admitted to bail in the sum of $** *$0 SW*   *"ZERO BAIL"*

**This warrant may be served day or night.**

**Witness my hand and the seal of said court on** _____ *10/29* , 20 *21* .

_____

**Judge of the Superior Court, City and County of San Francisco**

| RETURN THIS WARRANT TO CLERK OF THE SUPERIOR COURT ROOM , HALL OF JUSTICE |
| --- |

## SUPERIOR COURT CITY AND COUNTY OF SAN FRANCISCO

## REQUEST TO ISSUE ARREST WARRANT

### THE PEOPLE OF CALIFORNIA

vs.

### KENNETH CHA

## APPLICABLE STATUTES/LAW

**Penal Code §192(a)** – Manslaughter is the unlawful killing of a human being without malice. Subsection: (a) Voluntary – Upon a sudden quarrel or heat of passion or imperfect self-defense.[1]

**Penal Code § 245(b)** – Assault with a deadly weapon likely to cause great bodily injury is the willful, unlawful, and personal commission of an assault with a semi-automatic firearm.

**Penal Code § 196** – Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, in either of the following circumstances:
  (1) in obedience to any judgement of a competent court;
  (2) necessarily committed in overcoming actual resistance to the exception of some legal process, or in the discharge of any other legal duty, or
  (3) when necessarily committed in retaking felons who have been rescued or have escaped and are fleeing from justice or resisting such arrest.[2]



---

[1] *People v. Flannel* (1979) 25 Cal. 3d 668, 674 [160 Cal. Rptr. 84, 603 P. 2d 1].
[2] Penal Code § 196 (as it existed in 2017). *See also* CALCRIM 507.

1

## AFFIDAVIT IN SUPPORT OF REQUEST TO ISSUE ARREST WARRANT

### AFFIANT'S BACKGROUND

I, Inspector Andrew Koltuniak, Star #113, your affiant, have been employed as an investigator with the City and County of San Francisco District Attorney's Office (SFDA) since October of 2020.

I am currently assigned to the Independent Investigations Bureau, where I investigate police officer involved shootings, police use of force, and in-custody deaths. As a District Attorney Inspector, I am a designated Peace Officer and have peace officer authority as articulated in sections 830 and 830.1 of the California Penal Code. The cases I have investigated since joining the SFDA include several officer involved shootings, possible excessive uses of force, and post-conviction reviews of homicides. I have also investigated allegations of public corruption.

I began my career as an investigator in 1997, when I became an assistant to a Private Investigator in San Francisco, California. In 2004 I was hired by the San Francisco Public Defender's Office and worked in their Investigation Unit. In 2007 I became a licensed Private Investigator, #25582, and have remained licensed to the present date with no disciplinary actions or complaints. During my tenure with the San Francisco Public Defender, I worked in several positions, including: the Domestic Violence Unit, the General Felony Unit, the General Misdemeanor Unit, and the Homicide Unit. My responsibilities included locating and interviewing witnesses, preparing investigative reports, and testifying in court.

In 2012, I went into private practice where I investigated more than 100 cases involving organized crime, distribution and sales of narcotics, human trafficking, and homicide. I have investigated criminal cases filed in state and federal courts nationwide. During my time in private practice, I had been retained to work with prosecutors and law enforcement. In 2018, I returned to the San Francisco Public Defender as an investigator in the Pre-Trial Release Unit and worked there until my departure in 2020.

My law enforcement career began in 2021, when I graduated from a twenty-two-week POST-certified basic police officer training academy at the Napa Valley Criminal Justice Training Center in Napa, California. I was sworn in as a peace officer in June of 2021.

Over the 17 years I have worked as an investigator, I have investigated over 100 homicides and more than 500 felony crimes, ranging from narcotics trafficking, assault, rape, human trafficking, child molestation, fraud, larceny, and robbery. My investigations have contributed to the exoneration of over 20 defendants facing potential life sentences.

2

Further, I have experience working in an undercover capacity, conducting surveillance, reverse sting operations, and identifying witnesses and suspects. I have interviewed more than 1000 suspected felons, and developed informants who have provided reliable information and testimony.

A partial list of the investigative and law enforcement training I have received includes:

- **Interviewing Child Witnesses**
  Chris Gauger, San Francisco Public Defender        8 hours        September 2004
- **National Defense Investigator Annual Conference**
  National Defense Investigator Association        32 hours        April 2006
- **Introduction to Brain Imaging, PET, and CAT Scans**
  Dr. Daniel Amen        4 hours        January 2008
- **Capital Case Defense Seminar**
  California Public Defender's Association        16 hours        February 2008
- **Forensic Blood Spatter Training**
  Louis Akin        8 hours        March 2008
- **The Science of Gun Shot Wounds**
  Dr. Judy Melenek, SF Medical Examiner        4 hours        March 2008
- **Understanding the Static 99 / Sex Offender Re-Offense Assessment**
  Dr. Charles Flinton        4 hours        April 2008
- **Assault Weapons in California**
  Chuck Michel, Chief Attorney for NRA        4 hours        May 2008
- **DNA Analysis Basics**
  Bicka Barlow, San Francisco Public Defender        4 hours        June 2008
- **Forensic Investigation of Homicide**
  National Defense investigator Association        32 hours        November 2008
- **Eyewitness Identification Training**
  Kathy Pezdek        4 hours        March 2009
- **Juror Psychology and Opening Statements**
  Christopher Ritter, Focal Point        4 hours        May 2010
- **EMT/Paramedic Certification Course**
  Skyline College        192 hours        Spring 2015
- **Implicit Bias Workshop**
  Dante King        24 hours        September 2019
- **Basic Police Academy**
  Napa Valley Criminal Justice Training Center        896 hours        Spring 2021
- **District Attorney Investigator Transition Course**
  South Bay Regional Training Center        40 hours        August 2021

3

## INTRODUCTION

I was assigned to review the facts of this case to determine whether there was probable cause to believe that any crimes were committed when San Francisco Police Officer Kenneth Cha shot Sean Moore twice in the abdomen on January 6, 2017. I familiarized myself with the facts of the case by reviewing the associated police-related documents, body worn camera recordings, and other evidence obtained during the investigation. The information below is given solely for the purpose of providing the Court with evidence to determine whether probable cause exists for the issuance of an Arrest Warrant; it does not represent all of the evidence the SFDA or I possess about the facts of the case. I am aware that there are compelled statements taken by SFPD internal affairs that are not available to me for review.

## STATEMENT OF PROBABLE CAUSE

### SUMMARY

An unarmed man, Sean Moore, was shot twice in the abdomen on the threshold of his home by Defendant Officer Kenneth Cha on January 6, 2017, during an investigation of a neighbor's noise complaint. Sean Moore died from the gunshot wounds three years later, on January 20, 2020.

### STATEMENT OF FACTS

On January 6th, 2017, at approximately 03:51 AM, San Francisco Police Department (SFPD) Officers Kenneth Cha (Star #1206) and Colin Patino (Star #1310), responded to Redacted San Francisco, California, to investigate a report by                that his next door neighbor, Sean Moore, had violated a temporary restraining order.

This temporary restraining order prohibited Moore from noise harassment toward the residence        Redacted        reported to SFPD dispatch that Moore hit their adjoining wall, disturbing his family.

515 Capitol Avenue and                    are east facing, mid-century style single family homes located in a residential area of San Francisco. The two homes are joined together with no set back between the respective property lines. Both addresses are similar structures consisting of a street level garage with living quarters above that is accessed by its own separate concrete staircase that leads from the sidewalk to the upper front door landing area. The front stairs of 515 Capitol Avenue are abutted by the southern exterior wall of 21 Redacted Redacted The entrance to the Moore residence was located on the second floor at the top of a 47-inch wide, concrete staircase. The front door was located behind a locked metal security gate at the top of the staircase.

4

## Body Worn Camera Footage

Based on review of the Body Worn Camera ("BWC") footage from Patino and Cha:

Officers Cha and Patino responded and arrived at the neighboring residences of ▮ and Moore at approximately 04:20 AM. Initially, Cha contacted Moore at 515 Capitol Avenue and Patino contacted ▮ at ▮Redacted▮.

Patino's BWC footage showed him talking with ▮ for approximately 9 seconds before he went next door to join Cha in contacting Moore. ▮ gave Officer Patino a copy of the restraining order and proof of service. ▮ did not ask Patino to facilitate a citizen's arrest of Moore.

Upon arrival, Cha rang the doorbell and Moore opened his front door, but remained behind the metal security gate. Moore repeatedly told the officers that he did not want to speak to them and wanted them to leave. Moore demanded the officers get off his stairs and denied any harassment of ▮. Moore explained that he had taken out his garbage and swept his staircase. Moore went inside his home, Patino called him back to the front door and began reading the elements of the temporary restraining order to Moore who yelled, "I heard you", and continued to demand that both officers vacate the staircase. When both officers refused to leave, Moore retrieved a mobile phone and told the officers he was going to call and have them removed.

Moore entered his home and Cha and Patino descended the stairs to the sidewalk. At the bottom of the stairs, Cha and Patino reviewed the court order while continuing to shine their flashlights into Moore's home through the windows and doors.

Moore walked out his front door but remained on the top landing behind the security gate and again demanded the officers leave. Patino and Cha walked back up Moore's staircase a second time. Moore asked Patino for his star number while holding his phone in his right hand. Moore repeated his demand that the officers leave his home and said, "It's a goddamn court date on the eleventh. Get your fucking ass off my stair."

When the officers refused to leave, Moore opened the security gate and stood at the top of the staircase with his right arm extended and waving his right, open hand in a horizontal motion from left to right while telling the officers to leave. Moore's left hand held a phone against his waist. Cha did not leave Moore's property. Instead, Cha said to Moore, "You want to get sprayed?" and "You're gonna get sprayed."

Moore remained in his position at the top of the staircase and continued telling the officers to get off his stairs. Cha ignored Moore's demands to leave and sprayed him in the face with

5

pepper spray. As Moore tried to retreat behind his security gate, Cha and Patino advanced upon Moore. Patino grabbed Moore before he could retreat further into his home. Moore stated, "Get the fuck off my stairs," and kicked out once with his left foot. Pepper spray appeared to enter Patino's eyes, causing him to drop the restraining order papers and retreat down the stairs. Officer Cha followed.

Moore picked up the fallen papers and retreated into his home. Patino demanded Moore return the papers. In response, Moore came out to the stairs from behind his gate with the papers in hand. Cha said: "Fuck you," and "Mother-fucker. What's up? C'mon." Moore responded by retreating into his home.

Cha notified SFPD dispatch that he needed an ambulance for pepper spray exposure sustained by Patino and Moore. Patino ordered Moore to exit his home, return the papers and advised Moore that he was under arrest. Moore came out of his house and dropped the papers down the stairs from behind the security gate. Moore then went inside his home.

From the sidewalk at the bottom of Moore's staircase, Cha and Patino told Moore he was under arrest and he would receive medical treatment if he exited his home and surrendered. The officers did not advise Moore of what they were attempting to arrest him for. Cha threatened to kick in the gate if Moore did not exit voluntarily. Moore stated he could not see and exited his home again to stand behind the security gate and stated: "Let's get this resolved," and "I can't see, I need some medical attention."

Patino began to ascend the stairs a third time to retrieve the papers but stopped when Moore opened his security gate. Moore remained at the top of the stairs and stated: "C'mon, I'm gonna kick your ass punk, you're leaving here."

Moore dropped what appeared to be a plastic piece of his phone and took four steps down the stairs to retrieve it. Cha and Patino ran up the stairs a third time with their batons raised over their heads while ordering Moore to "Get on the ground."

Moore retreated by walking backwards up four steps toward his security gate, as Patino advanced and struck Moore with his metal baton, striking him at least twice on his legs and torso. Moore responded by striking Patino, who then fell down the stairs.

Cha then drew his handgun, pointed it at Moore, and advanced up the stairs towards Moore. Moore reacted to Cha's advance by kicking towards Cha. Cha shot Moore twice in the abdomen. Cha stopped shooting when he reached the sidewalk and stood at the bottom of the stairs for approximately 3 seconds. Approximately eight minutes elapsed from the time that officers Cha and Patino arrived on scene to the time that Officer Cha shot Moore.

Ex. A-010

Cha notified SFPD dispatch that shots had been fired, both officers and Moore had sustained injuries, and Moore had retreated into his residence.

## Response by SFPD

Numerous SFPD officers and Hostage Negotiations Team officers responded. SFPD Tactical and Specialist units made entry and took Moore into custody without incident at approximately 05:45 AM. Moore was arrested and brought to San Francisco General Hospital. Both bullets fired by Cha entered Moore's abdomen. These wounds lacerated Moore's liver and pierced his right colon, scarring his internal organs and resulting in severe abdominal adhesions. Officer Cha was transported to SFGH with complaints of pain in his right calf and the front of his face and was discharged the same day. Officer Patino was transported to SFGH for treatment of pepper spray exposure, abrasions to his left knee and a broken nose and discharged the same day.

## Coroner's Report

Sean Moore died on January 20, 2020. The cause of death was determined to be a homicide based on the findings of the Marin County Coroner's Office, which concluded that Moore died from the bullet wounds inflicted by Cha on January 6, 2017. Moore died from Acute Intestinal Obstruction as a result of severe abdominal adhesions from remote gunshot wounds to his abdomen sustained on January 6, 2017.

## DEFENDANT

At the time of the incident, Kenneth Cha was a police officer employed by and on duty for the San Francisco Police Department as defined in sections 830 and 830.1 of the California Penal Code. According to the California Department of Motor Vehicles, his date of birth is ▇Redacted▇ and his driver license number is ▇Redacted▇.

## EXHIBITS

The following exhibits are attached to this affidavit and incorporated herein for the court's consideration:

1. Temporary Restraining Order dated 12-20-16 attached as Exhibit 1
2. Kenneth Cha's Body Worn Camera (BWC) video attached as Exhibit 2. On January 6th, 2017, Cha engaged his Body Worn Camera for approximately forty minutes and recorded the events that occurred.

    a. Transcript of Kenneth Cha's BWC footage

7



b.  Still image taken from Exhibit 2 at 12:21:44 depicting: Moore gesturing with his hand approximately 4 seconds before Cha pepper sprayed Moore and Patino.



c.  Still image taken from Exhibit 2 at 12:24:46 depicting: Patino approaching with his baton raised in strike position while Moore stood at the top of his stairs approximately 3 seconds before Patino began striking Moore with his baton.

8



d.  Still image taken from Exhibit 2 at 12:24:52 depicting: Cha advancing up the stairs with his firearm pointed as Moore stood with both feet on the ground at the top landing of the stairs.



e.  Still image taken from Exhibit 2 at 12:24:53 depicting: The muzzle flash from the first shot fired by Cha less than 1 second (17 frames) after the previous image 2d



2017-01-06 T12:24:53Z
AXON BODY 2 X81013587

      f.  Still image taken from Exhibit 2 at 12:24:53 depicting: The muzzle flash from the second shot fired by Cha as he descends the stairs less than 0.5 second (12 frames) after previous image 2e.

3. Colin Patino's Body Worn Camera (BWC) footage
    a. Transcript of Colin Patino's BWC footage
4. Kenneth Cha's voluntary, videotaped statement to Homicide Investigators on 01-07-17
    a. Transcript of Kenneth Cha's voluntary, videotaped statement to Homicide Investigators on 01-07-17
5. Marin County Coroner's Autopsy Report & Determination in the Death of Sean Moore (Exhibit 5 filed under seal due to protected HIPAA information)
6. *People v. Moore*, First Appellate District decision affirming Superior Court's dismissal of Moore's criminal case. App. Ct. No A151276 (San Francisco City and County Super. Ct. No. SCN 227235) (Cal. Ct. App. May 1, 2018)
7. United States District Court, Northern District of California order re cross-motions for summary judgement in *Sean Moore v. City and County of San Francisco et al.*



10

Ex. A-014

**OTHER EVIDENCE**

<u>Dispatch and Radio Traffic Transcripts</u>

According to dispatch recordings prepared by the San Francisco Department of Emergency Management, at approximately 03:51 hours on January 6th, 2017, SFPD Non-Emergency Dispatch received a call reporting a violation of a Temporary Restraining Order at ████Redacted████ ████, San Francisco, California. The caller, ████████████, identified the suspect as Sean Moore and provided a description and address for Moore. At the time, Moore lived at 515 Capitol Avenue. ████ stated that Moore was hitting the exterior wall of ████ s home, causing noise and disturbance in violation of the restraining order.

Transcripts of the radio traffic for this incident indicate SFPD officer's Cha and Patino responded to ██Redacted██ at approximately 04:20 hours and contacted Sean Moore. At approximately 04:22 hours, Cha contacted dispatch to request medical response for treatment of Patino and Moore's exposure to pepper spray. At approximately 04:24 hours, Cha notified dispatch of Moore's description. At approximately 04:25 hours, Cha notified dispatch that shots had been fired.

<u>Defendant's and Witnesses' Statements</u>

On January 7th, 2017, Cha gave a voluntary statement to Sergeant Kyra Delaney (Star #520) and Sergeant Gary Watts (Star #1594) of the San Francisco Police Department's Homicide Unit. York Tsuruta of the San Francisco District Attorney's Office was also present. The interview was audio and video recorded. Cha's attorney, Scott Burrell was present during the interview. I viewed the interview recording and transcript. A flash drive with a full copy of Cha's statement is attached to this affidavit and incorporated herein as Exhibit 2a.

After giving his initial statement, Cha provided his badge number (# 1206), length of time in his current assignment (3-4 months) and shift hours (21:00 – 07:00). Cha and his attorney asked to view the video evidence in the case, his own body worn camera footage, before proceeding with the rest of the interview, citing SFPD policy. Sergeants Delaney and Watts allowed Cha and his lawyer to view the video evidence off the record. When the interview resumed, Cha acknowledged having watched his body worn camera footage and agreed to provide further details of the incident.



Ex. A-015

## Evidence Collected from the Scene by SFPD

The SFPD Crime Scene Investigations Unit Scene Report for case # 170 014 484, prepared by Officer Shanahan (Star #1818) stated, among other findings:

- Two .40 Cal S&W casing cartridges, item #2 located on the sidewalk in front of 515 Capitol Avenue and item #8 located on the third step of the front exterior staircase.
- Clothing items, a hammer, and bloodstains from inside 515 Capitol Avenue.
- A bloodstain on the eleventh step of the front exterior staircase of 515 Capitol Avenue labeled item #9.
- A bloodstain on the first step of the front exterior staircase of 515 Capitol Avenue labeled item #7.
- Four blood stains in the street on the 500 block of Capitol Avenue labeled A, B, C, and D.
- A metal collapsible baton in the extended position located on the sidewalk in front of 515 Capitol Avenue labeled item #1.
- A metal collapsible baton in the extended position located in the driveway in front of the garage door of 515 Capitol Avenue labeled item #4.

## The Medical Examiner's Report

Sean Moore died on January 20th, 2020, while he was in the custody of the California Department of Corrections and Rehabilitation (CDCR). A flash drive with a full copy of the Coroner's Report is attached to this affidavit and incorporated herein as Exhibit 5. According to the Marin County Coroner's Office autopsy report # CR20-017, Chief Forensic Pathologist Dr. Joseph Cohen performed an autopsy on Moore on January 23, 2020. Dr. Cohen concluded Moore's manner of death was homicide. Moore died from Acute Intestinal Obstruction as a result of severe abdominal adhesions from remote gunshot wounds to the abdomen.

## Potentially Exculpatory Information

I am informed and believe the following potentially exculpatory evidence exists:

1. Sgt. Bodisco's opinion that Officer Cha has more use of force incidents than the average officer because he was a "pro-active" officer who is more likely to engage in incidents.
2. Sgt. Bodisco had to investigate Officer Cha's use of force as part of the Early Intervention System, which is a program designed to identify and address officers who engage in more use of force incidents than the average officer. At the end of the limited investigation, Sgt. Bodisco did not find enough sustained complaints to support a pattern of excessive use of force.

12

Ex. A-016

3. Upon arrival at the scene, Sgt. Anderson observed that Cha appeared shaken and needed help with holstering his weapon.
4. Officer Patino now believes he attempted to arrest Moore not for violation of the TRO, but for violation of Penal Code section 69. The conduct warranting that arrest, according to Officer Patino, was Moore telling the officers "You're getting off my stairs", opening the security gate and appearing aggressive to Patino.
5. Officer Cha has complimentary reports in his personnel file.
6. Moore was criminally charged with Penal Codes 243(C), 245(A), 422, 69(A), 148(A), 166(A) as a result of Cha's shooting on January 6, 2017. However, all the charges were dismissed after the Superior Court granted Moore's 995 motion and the Appellate Court affirmed the Superior Court's decision.



10. Sean Moore died 3 years and 14 days after Cha shot him.

13

**PRIOR COURT DECISIONS**

## Officers Cha and Patino were not in lawful performance of their duties when they ascended Moore's staircase the second and third time.

Previous courts determined that Cha and Patino were not lawfully performing their duties as police officers when they used force against Moore by deploying pepper spray, their batons, and drawing a firearm and shooting Moore. By the time Cha and Patino first descended Moore's staircase, the courts reasoned the officers had obtained Moore's name, confirmed he was the restrained party in the order, and confirmed he had been served, but had not personally witnessed any violation of the restraining order or obtained authority to make a citizen's arrest. In the criminal prosecution of Moore for battery on Patino and Cha, the First Appellate District Court affirmed on appeal the Superior Court's finding that Cha and Patino were not acting lawfully when they ascended the staircase a second and third time.[3]

The court reasoned that even if the officers initially had the right to be on the stairway to investigate an alleged violation of the restraining order, the investigation was completed by the time they first descended the stairs as Moore had identified himself, acknowledged the restraining order, and said he had not violated it because he had simply taken out his garbage and swept his stairs.[4] The officers did not ask ██████ to authorize a citizen's arrest. Even if the officers had lawfully reascended the stairs, they had no right to refuse Moore's demands that they leave, order Moore out of his home, or use pepper spray or other force against him. The court disagreed that Moore's comment, "You're done," was a criminal threat in the circumstances, or that Moore criminally assaulted the officers just prior to Cha's deployment of pepper spray.[5]

When Cha and Patino ascended Moore's staircase for the second time, Moore was not obligated to submit to further questioning within his home, and the officers could not arrest Moore for a misdemeanor violation of a restraining order not committed in their presence.[6] Moore's offensive language did not justify the officers continued presence in the curtilage of Moore's home or Moore's detention.[7] Cha and Patino were therefore criminally trespassing on Moore's property when they ascended his stairway a second time. Because Cha and Patino were trespassing, Moore not only had the right to use reasonable force to defend against Cha

---

[3] People v. Moore, App. Ct. No. A151276 (San Francisco City and County Super. Ct. No. SCN 22735) (Cal. Ct. App. May 1, 2018) 2018 Cal. App. Unpub. LEXIS 2966, *1, 2018 WL 2016792 at p.8 (unpublished decision affirming Superior Court's finding of insufficient evidence that the officers were lawfully performing their duties when Moore committed alleged crimes and set aside eight counts.)

[4] *Id.* at 8 ("Even if the officers initially had the right to be on the stairway to investigate an alleged violation of the restraining order, the investigation was completed by the time they first descended the stairs as Moore had identified himself, acknowledged the restraining order, and said he had not violated it because he had simply taken out his garbage.").

[5] *Id.*

[6] *Id.* at 13.

[7] *Id.*

14

Ex. A-018

and Patino's unreasonable force, but he also had a right to use reasonable force to eject the trespassers.[8]

It should be noted that in *Sean Moore v. City of San Francisco et al.*, the United States District Court of Northern California agreed and cited the Court of Appeal's opinion above when it granted the plaintiff's motion for summary adjudication.[9] The court found that as a matter of law, the defendant officers were not in legal performance of their duties when they re-entered Moore's stairway after descending the first time.[10]

<u>Officer Cha's explanation for shooting Moore is inconsistent<br>with the BWC footage of the event</u>

--" *I just see this guy just so enraged coming at me in a violent matter, throwing his hands and-and-and his feet towards me. And, uh, I just remember retreating down the stairs. I'm about to fall down, and I had nothing else to do but I was in fear for my, uh, for my life. [It was a knee-jerk], you know, [unintelligible]. I don't even know [what happened to call them]. And so I -- so I shot him."*

Cha's BWC does not depict Moore throwing his hands or feet towards Cha. Cha was not retreating down the stairs, he was advancing up them with his handgun drawn and pointed at Moore.

As Cha and Patino ascended the stairs the third time, Moore did not take a fighting stance in response to Cha and Patino's advance and attack. Police officers are trained to look for behavioral indicators that a person is preparing to fight, which include: assuming a bladed stance fighting position and raising their fists and shoulders. Moore did not exhibit any of these traits prior to Cha and Patino's physical attack. To the contrary, Moore attempted to retreat into his home by walking backwards up four steps toward his security gate. As Moore retreated, Patino advanced up the stairs a third time and struck Moore with his metal baton, striking him at least twice on his legs and torso. Moore defended himself by striking Patino, who then fell down the stairs.

Police Officer Standards and Training courses at the Police Academy instruct that it takes approximately ¾ of a second to perceive a threat and ¾ of a second to physically react to a threat. I reviewed Officer Cha's BWC frame by frame and pulled out still images that are attached and referenced below as Exhibits 2b-2f. Thirty still images equal one second so the timing can be determined as each still image representing .033 seconds.

---

[8] *See* CALCRIM 3475.<br>
[9] Case No. 18-cv-00634-SI (N.D. Cal. Dec. 10, 2020).<br>
[10] *Id.* at 9.

Ex. A-019

Exhibit 2d depicts Cha advancing up the stairs with his firearm pointed at Moore, who is standing with both feet on the ground at the top landing of the stairs with a timestamp of 12:24:52. Less than 1 second (19 frames) later, Cha fires his first shot as depicted in 2e with a timestamp of 12:24:53. Cha fired his second shot into Moore's abdomen less than 0.5 second (12 frames) later as depicted in 2f with a timestamp of 12:24:53. Cha drew his weapon, advanced toward Moore, and began firing at Moore in less than 1.5 seconds (45 frames) after Moore attempted to defend himself by kicking away at Cha.

<u>CONCLUSION</u>

Because Cha's use of deadly force was excessive given that Moore was unarmed in his own home defending himself against excessive force by the trespassing officers, there is probable cause to arrest Cha for manslaughter.

<u>Presumption that killing is not criminal is rebutted by the evidence</u>

Penal Code § 194 states that if a death occurs beyond the time of three years and a day, there shall be a rebuttable presumption that the killing was not criminal. Here, the death occurred on January 20, 2020, more than three years and a day from the January 6, 2017 incident. However, the presumption in Penal Code § 194 is rebutted in this case by the Marin County Coroner's Office's report. The report determined that Moore's death was a homicide caused by an acute intestinal obstruction resulting from abdominal adhesions from remote gun-shot wounds to his abdomen sustained on January 6, 2017.

**Findings**

Based on the above-described investigation, and on my training and experience, it is my opinion there is probable cause to believe KENNETH CHA committed the following felonies:

**COUNT 1**

The said defendant, KENNETH CHA, did in the City and County of San Francisco, State of California, on or about the 6th day of 2017, through and including the 20th day of January, 2020, commit the crime of VOLUNTARY MANSLAUGHTER, to wit: Violating Section **192(a)** of the Penal Code, a Felony, in that the said defendant did willfully, unlawfully and without malice kill SEAN WENDELL MOORE, a human being, upon a sudden quarrel and heat of passion.

Ex. A-020

**ALLEGATION OF USE OF A FIREARM PURSUANT TO PENAL CODE SECTION 12022.5(a)**

It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally used a firearm, to wit: .40 CALIBER PISTOL, within the meaning of Penal Code section 12022.5(a)

## COUNT 2

The said defendant, KENNETH CHA, did in the City and County of San Francisco, State of California, on or about the 6th day of January, 2017, commit the crime of ASSAULT WITH A SEMIAUTOMATIC FIREARM to wit: Violating Section **245(b)** of the Penal Code, a Felony, in that said defendant did willfully, unlawfully, and personally commit an assault on SEAN WENDELL MOORE, with a semi-automatic firearm, to wit: .40 CALIBER PISTOL.

**ALLEGATION OF USE OF FIREARM PURSUANT TO PENAL CODE SECTION 12022.5(d)**

It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally used a firearm, to wit: .40 CALIBER PISTOL, within the meaning of Penal Code section 12022.5(d).

**ALLEGATION OF PERSONAL INFLICTION OF GREAT BODILY INJURY PURSUANT TO PENAL CODE SECTION 12022.7(a)**

It is further alleged that in the commission and attempted commission of the above felony offense, the said defendant, KENNETH CHA, personally inflicts great bodily injury, within the meaning of Penal Code section 12022.7(a).



17

I have disclosed to the Court and the Office of the District Attorney, City and County of San Francisco, all material information known to me which may be exculpatory, and said information is contained in this Affidavit of Support of Request for Arrest Warrant. I state, verify and certify under penalty of perjury that the foregoing is true and correct under the laws of the State of California.

Wherefore, I pray that a warrant of arrest be issued for the person of Kenneth Cha, date of birth, Redacted California Driver's License Card number Redacted.

Executed in San Francisco California on October 29th, 2021.

Inspector Andrew Koltuniak, Star #113
San Francisco District Attorney
City and County of San Francisco

*Subscribed and sworn before me*

*On this 29th day of October 2021, in the City and County of San Francisco*

Print Name: _____ Harold Kahn _____ Dep. 505

*Judge of the Superior Court of the*
*City and County of San Francisco*

# EXHIBIT 1



Ex. A-023

# EXHIBITS 2-4

# (See USB drive)



Ex. A-024

# EXHIBIT 2A



1   **STATEMENT OF BODY CAM - VIDEO 1**
    **DATE: 01/06/2017**

2

3   **POLICE INCIDENT REPORT NO:  170 014 484**

4   Cops approach front door with flashlights.

5   Sean Moore comes out of his front door and stands behind his gate with the Officers' flashlights

6   in his face.

7   *beep* (0:30)

8   OFFICER CHA: What's going on?

9   SEAN MOORE: What's going on? What the fuck you show up out here at this time of morning

10  about?!

11  OFFICER CHA: I got a call for a service. Are you ok?

12  MOORE: I don't give a fuck! I didn't call you. Quit showing up at my house and I didn't call

13  you!

14  OFFICER CHA: Woah! Woah! Chill out!

15  MOORE: Get the fuck off my stair.

16  OFFICER CHA: Hey! Chill out!

17  MOORE: Get the fuck off my stair! I didn't call you.

18  OFFICER CHA: I got a call.

19  MOORE: I don't give a fuck who called you!

20  OFFICER CHA: What the hell is your problem?!

21  MOORE: I didn't call you. I just put my garbage out. Get the fuck off my stair.

22  OFFICER CHA: Hey! Don't spit on me! (0:54) Don't spit on me!

23  MOORE: I didn't spit on you!

24  OFFICER CHA: You did spit on me! Alright?

25  MOORE: Bullshit! Fuck your face, man!

26  OFFICER CHA: Don't spit on me, alright?!

27  MOORE: Don't fuckin' get on my stair and I didn't call you!

28  OFFICER CHA: Alright, I'm right here.



1

Ex. A-026

1  MOORE: Get the fuck off my stair.

2  OFFICER PATINO: Hey! (1:06)

3  MOORE: Get the fuck off my stair. (pointing at Officer 2)

4  OFFICER PATINO: Nope, I'm not going to. (1:08)

5  MOORE: Get the fuck off my stair.

6  OFFICER PATINO: Are you going to listen to what I have to say?

7  MOORE: Say your shit and get the fuck on, bitch.

8  OFFICER PATINO: Are you—

9  OFFICER CHA: Is that served?

10  OFFICER PATINO: Are you— yeah. Are you Sean Wendell Moore?

11  MOORE: Yeah, I'm Sean Wendell Moore.

12  OFFICER PATINO: Okay.  Do you know that you have a, uh, restraining order --

13  MOORE: Do you know that you're a fucking liar, nigga?

14  OFFICER CHA: SSSHHHHHHHH!

15  OFFICER PATINO: Hey, well, this paper doesn't lie -

16  MOORE: I don't a give a fuck about that shit.  I just put my garbage out.  Get the fuck off my

17  stair.

18  OFFICER PATINO: No, uh, no. Not going to do that.

19  MOORE: Yeah. You're getting off my stair.

20  OFFICER PATINO: Or--or else what?

21  MOORE: Or I'm a remove you.

22  OFFICER PATINO: Okay.

23  OFFICER CHA: Are you threatening us?!

24  MOORE: I ain't threatening shit.  Get the fuck off my stair.

25  OFFICER CHA: You just threatened us! (1:37)

26  MOORE: I ain't threatening shit.

27  OFFICER CHA: I'm not leaving!

28  OFFICER PATINO: Sounds like--sounds like--



2

1   MOORE: You're gonna leave. I ain't threaten shit.

2   OFFICER CHA: You are.

3   MOORE: Get off my stair. And I'm through talking to you.

4   OFFICER CHA: Just relax, alright?

5   MOORE: I'm through talking to you, bitch.

6   OFFICER CHA: SSSHHHHHHHH!

7   MOORE: Get off my stair.

8   OFFICER CHA: Listen.

9   MOORE: Get the fuck off my stair.

10   OFFICER CHA: Listen.

11   MOORE: Fuck your order. Get off my stair. I didn't--

12   OFFICER CHA: It's not our orders. It's a court order.

13   MOORE: I didn't--Fuck your court. I didn't call you. I just put my garbage out.

14   OFFICER CHA: Well, someone called us.

15   MOORE: Fuck your call.

16   OFFICER CHA: Okay.

17   MOORE: Fuck your call, bitch.

18   OFFICER CHA: I appreciate that.

19   MOORE: I'm tired of your fucking bullshit.

20   OFFICER CHA: I've never met you before.

21   MOORE: Get off my stair.

22   OFFICER PATINO: I never met you, sir.

23   MOORE: I don't give a fuck who you met.

24   OFFICER PATINO: Why-- why--

25   MOORE: Get the fuck off my--you're intoxicated. Get the fuck off my stair.

26   OFFICER PATINO: I'm not intoxicated.

27   MOORE: Yeah, you're high. Get off my stair.

28   OFFICER PATINO: No.



3

1   MOORE: Fuck your Choy.

2   OFFICER PATINO: Are you high?

3   MOORE: Are you?

4   OFFICER PATINO: No.

5   MOORE: Get your fucking ass off my stair and I'm through talkin' to you.

6   OFFICER PATINO: No.

7   MOORE: Bullshit. Talk to you. [Turns and goes back through interior door]

8   OFFICER PATINO: Hey, sir, come back.

9   MOORE: [Coming back out] Fuck you people.

10  OFFICER PATINO: Sir, come back, please.

11  OFFICER CHA: We just wanna talk, man!

12  MOORE: Hurry up with this shit and get off my stair. I didn't talk to you.

13  OFFICER CHA: Just relax.

14  OFFICER PATINO: Hey, so were you violating the restraining order today?

15  MOORE: Fuck your order.

16  OFFICER PATINO: Today?

17  MOORE: Hell no.

18  OFFICER PATINO: No? Well --

19  MOORE: Do you seen me around a ▇▇▇? You ain't kickin' shit, punk.

20  OFFICER PATINO: No, not yet.

21  MOORE: Not ya ever. Now get your punk ass on.

22  OFFICER PATINO: So it says that you must not, uh--

23  MOORE: I don't give a fuck what it said--

24  OFFICER PATINO: Harass, imitate, molest, attack...

25  MOORE: Do you seen me harassing, imitating or fucking with ▇▇▇?

26  OFFICER PATINO: Well, I wasn't here.

27  MOORE: I don't give a fuck. You see a ▇▇▇ out here?

28  OFFICER PATINO: Yeah. I just talked to him and he said--



4

Ex. A-029

1    MOORE: Where--I don't give a fuck who--go fucking put my garbage on the truck.

2    OFFICER PATINO: No.

3    MOORE: Fuck your garbage, man. I'm a go put my garbage can in--

4    OFFICER PATINO: So here's the thing. If you--

5    MOORE: He'd better put all of it in the truck, too.

6    OFFICER PATINO: What--why are you yelling?

7    MOORE: Why are you on my stair?

8    OFFICER PATINO: Because I'm here to investigate a crime that has possibly occurred--

9    MOORE: You ain't investigating shit. Ain't no crime here.

10   OFFICER PATINO: I am an investigator. Yes, I am.

11   MOORE: I'm gonna call and remove you.

12   OFFICER PATINO: All right. Who you gonna call? [Moore goes back into his house behind the

13   gate. Door closes.] [Officer laughs] Oh Jeez! What--what is up with this week, man?

14   OFFICER CHA: What does this say?

15   OFFICER PATINO: All right. Let's get out of here before he blasts us with a shotgun. [Officers

16   turn around and retreat down the stairs]

17   OFFICER CHA: What does it say?

18   OFFICER PATINO: It says he's got to stay 25 feet. It says he gotta stay-[radio interruption

19   while officers are on the front lawn]

20   [Officer CHA looks back and continues to shine flashlight on Moore's front door and entry.]

21   [Moore re-emerges from his house.] (3:46)

22   OFFICER PATINO: -all right. All right.

23   MOORE: You've better get your faggot asses on—[barely audible from top of the stairs]

24   OFFICER CHA: What's that? [Officer starts climbing back up stairs to confront Moore, who is

25   still behind his gate]

26   MOORE: Get your gay ass off my stair.

27   OFFICER CHA: Why--why did you call me those slurs?

28   MOORE: Get the fuck from 'round here. And I ain't gonna tell you no more, bitch. [Officers are

Ex. A-030

1   at the top of the stairs again confronting Moore]. (3:56)

2   OFFICER PATINO: Hey, sir. So I gotta tell you--

3   MOORE: I gotta tell you, get your faggot ass from 'round here, punk.

4   OFFICER PATINO: No, I'm not gonna leave yet.

5   MOORE: You're done. [Moore retreats inside his house]

6   OFFICER PATINO: All right.

7   OFFICER CHA: How are we done?

8   [Moore comes back out of his house, left hand by his pocket, right hand holding a cell phone]

9   MOORE: What's his star number? (4:08)

10  OFFICER PATINO: Is that--is that--

11  MOORE: What's your - Well --show it in the light. [Moore has his cell phone out in his right

12  hand].

13  OFFICER PATINO: 1310.

14  MOORE: Fuck your star. [Moore has his cell phone in his right hand and holds the cell phone to

15  his left ear.] (4:14)

16  OFFICER PATINO: Star 1310, Officer Patino.

17  MOORE: Fuck 1310.

18  OFFICER PATINO: Yeah.

19  MOORE: Get your faggot ass out, bitch. [Moore begins dialing on his cell phone with his right

20  hand].

21  OFFICER PATINO: No.

22  OFFICER CHA: [into radio] Yeah, we're attempting to make contact with the subject right now.

23  MOORE: Fuck you. You ain't making shit.

24  OFFICER PATINO: So are you gonna listen to me or you gonna keep on--[UNINTELLIGIBLE]

25  MOORE: I heard you. Now get on.

26  OFFICER PATINO: Well, what did I say?

27  MOORE: Didn't you get off my stair once?

28  OFFICER PATINO: What--what did I say?

Ex. A-031

1  MOORE: Where were you going?  Get on back--

2  OFFICER PATINO:  Well, you walked away.

3  MOORE: Get on back where you're going, fake cop.

4  OFFICER CHA: [into radio][UNINTELLIGIBLE]

5  OFFICER PATINO: So it says right here, if you're not--are you gonna let me finish?

6  MOORE: Are you gonna get off my stair?

7  OFFICER PATINO: Yeah, I mean -

8  MOORE: I didn't call--

9  OFFICER PATINO: Eventually I will get off your stair.

10  MOORE: Well, get off of it now.  I don't want to hear that shit. I ain't fucked with your ▮▮▮. I

11  put my garbage out. I'm sweeping my fucking stair.

12  OFFICER PATINO: All right.

13  MOORE: Get your fucking gay ass on, bitch.  And I ain't gonna tell you no more.

14  [unintelligible sound from radio]

15  OFFICER PATINO: So, uh-- It says right here, you must--

16  MOORE: Yeah, I heard all of that.  Fuck your cop.

17  OFFICER PATINO: No, I don't think you did.

18  OFFICER CHA: Just let him finish…

19  MOORE: It's a goddamn court date on the eleventh! Get your fucking ass off my stair!

20  OFFICER CHA: Listen! Shh. People are sleeping.

21  MOORE: Fuck your people.  Get off my stair. [Moore bangs on his gate from the inside] And

22  I'm through talking to you, bitch.

23  OFFICER CHA: Obviously you're not!

24  MOORE: Get off my - Get off my stair, bitch.

25  OFFICER CHA: No, we're not.

26  MOORE: You are.

27  OFFICER PATINO: Actually we're--actually we're not.

28  OFFICER CHA: We're not.



7

1  MOORE: You're gonna--you're on my stair. (5:16) [Moore opens his gate and begins to step

2  onto the threshold of the top of the stairs, waving at Officers] Get the fuck off my stair.

3  OFFICER CHA: Hey, get the... [Officers raise their flashlights and pepper spray]

4  MOORE: Get off my stair.

5  OFFICER CHA: Hey, do you want to get sprayed?

6  MOORE: Get off my stair. [Moore starts to walk toward officers on the stairs]

7  OFFICER: You come any closer you're gonna get pepper sprayed!

8  MOORE: Get off my stair.

9  OFFICER CHA: Listen, listen.

10  MOORE: Fuck your spray. Get off my stair.

11  [Officer CHA discharges spray at Moore, but hits his partner.] (5:23)

12  [Moore waves his right hand and retreats past the gate towards the door into his house. Officer

13  PATINO charges at Moore right into the cloud of spray.]

14  OFFICER CHA: Get it open. Keep it open.

15  [Moore pushes Officer PATINO back as he tries to retreat behind his gate. Both officers retreat

16  down the stairs. Moore stoops to pick up papers dropped at his gate.]

17  MOORE: ...fuck off my stair

18  OFFICER CHA: Fuck you!

19  MOORE: Fuck you.

20  OFFICER PATINO: Hey! Ah, fuck.

21  MOORE: Fuck you.

22  OFFICER PATINO: Hey.  Give me the paper back.  Fuck.

23  MOORE: Fuck you.

24  OFFICER PATINO: Ah, shit.

25  [Moore opens gate and moves towards top of the stairs]

26  OFFICER CHA [Raising pepper spray in his left hand and retreating down the stairs]:

27  Motherfucker!

28  MOORE [waving paper]: Fuck your paper.



8

Ex. A-033

1   OFFICER CHA: What's up? Come on!

2   MOORE: Get off my stair.

3   OFFICER PATINO: Ah, fuck!

4   OFFICER CHA: Come here!

5   MOORE: Fuck you. [unintelligible]

6   OFFICER PATINO: Man. Ah, shit.

7   MOORE: Get off my stair. Man. Get off my stairs. [unintelligible]

8   OFFICERS CHA and PATINO [simultaneously]: Ida 1 6 Edward, (5:49)

9   OFFICER PATINO: Can we get a 408 -

10  OFFICER CHA: I got it, got it. I got it. Ida 1 6 Edward.

11  RADIO DISPATCHER: For a 408 request? Go ahead.

12  OFFICER CHA: Yeah, let me get the air real quick. Ida 1 6 Edward to headquarters?

13  RADIO: Yeah, this is headquarters, go ahead. (6:01)

14  OFFICER CHA: Yeah, so the uh, subject, we're trying to make contact and uh -

15  OFFICER PATINO: I can't see. I can't see. I need some water. Fuck.

16  OFFICER CHA: - go over the, uh, protective order again. Uh, he made, uh, aggressive

17  movements toward us so uh... pepper spray was deployed against the subject. He then, uh,

18  proceeded to continue to, uh, confront us. And, uh, I'm going to need a 408 for my partner for

19  pepper spray. He's a, uh, 26-year-old, conscious and breathing. Pepper spray to the face.

20  OFFICER PATINO: Ah, fuck.

21  *beep*

22  DISPATCHER: Copy that Redacted .

23  OFFICER CHA: It will be at in front of 515. And the, uh, subject was pepper sprayed as well.

24  But, uh, he was able to crawl back into his house and lock the door.

25  MOORE [Appearing in window and opening it]: Go.

26  OFFICER PATINO [Shining flashlight on door]: Hey, sir, you need to give those papers back,

27  all right?

28  MOORE: Fine. Are you gonna go?

9

1  OFFICER PATINO: No.  You need to give those papers back now.

2  MOORE: [UNINTELLIGIBLE]

3  OFFICER PATINO: That is an order.  I'm ordering you to come outside, all right?  And give

4  yourself up.

5  MOORE: No. I'm not.

6  OFFICER PATINO: 'Cause you are under arrest!  Yes.

7  MOORE: Fuck your arrest.

8  OFFICER PATINO: Sir, you are under arrest right now.

9  MOORE: I can't see.

10  OFFICER PATINO: Neither can I.

11  MOORE: I need medical attention. [speaking through window]

12  OFFICER PATINO: All right.  Well--

13  OFFICER CHA: Come out of the house. Right now.

14  OFFICER PATINO: Come out of the house.

15  MOORE: [UNINTELLIGIBLE] You're gonna leave from here!  Fuck your papers.

16  RADIO: 12 Edward, Code 3 [UNINTELLIGIBLE] and 21st.

17  DISPATCHER: 11 Edward, [UNINTELLIGIBLE] to Company.

18  OFFICER CHA: You all right?

19  OFFICER PATINO: Yeah.  I can see now.

20  OFFICER CHA: Where did you get sprayed?

21  OFFICER PATINO: Dude, I--I just--I just meant like I got hit.

22  OFFICER CHA: Uh-huh.



23  OFFICER PATINO: In the eyes.  I'm fine right now.  I thought I got hit a lot worse than I did.

24  [Door opens.]

25  OFFICER CHA: Come on out!  Come on out.  Come on out.

26  MOORE: Here's your papers.[Moore tosses papers through the gate](7:30)

27  OFFICER PATINO: Hey, come on out, sir.

28  OFFICER CHA: Come on out or I'm going to kick the gate open!

Ex. A-035

1   MOORE: Fuck you...[unintelligible]

2   OFFICER PATINO: Hey, let's wait till, uh--

3   OFFICER CHA: Yeah.

4   MOORE: I can't see, Off--

5   OFFICER CHA: Well, then come on out so I can get some medical help for you.

6   MOORE: Let's get this resolved.

7   OFFICER CHA: Come on out so I can get the ambulance for you.

8   MOORE: Let's get this resolved! I can't see!

9   OFFICER CHA: Then come out!

10   [Moore opens gate]

11   OFFICER PATINO: Yeah, you know what? [Officer Patino climbs stairs and retrieves papers]

12   (7:43)

13   [Moore comes out from behind his gate and stands at the top of the stairs as Officer 1 raises his

14   arm and flashlight toward Moore].

15   MOORE: [UNINTELLIGIBLE]

16   OFFICER CHA: HEY YOU! ALRIGHT, COME OUT, HEY!

17   MOORE: Fuck you!  Fuck you! Fuck you!

18   OFFICER CHA: Come out! Come out! (7:46)

19   MOORE: Fuck you.

20   OFFICER PATINO: Come here. [Officer PATINO has billy club raised over his right shoulder]

21   (7:50)

22   MOORE: Fuck you punk.

23   OFFICER CHA: Get over here. Get back. Get back.

24   MOORE: C'mon. I'm a kick your ass, punk.

25   OFFICER CHA: All right.  Let's go.

26   MOORE: You're leaving from here. [Bends down and picks something up with his right hand

27   from stairs]

28   OFFICER CHA: Come out.



11

1    MOORE: You're leaving here.

2    OFFICER CHA: Come out.

3    MOORE: You're leaving from here. [Drops something plastic, which bounces down several

4    steps]

5    OFFICER CHA: Come out.

6    MOORE: [Takes one step down towards the dropped object] Fuck your papers...

7    [inaudible sound from radio]

8    OFFICER CHA: Hey, get on the ground. Get on the ground!

9    OFFICER PATINO: Get on the ground before you get[UNINTELLIGIBLE]

10    MOORE: I ain't getting on shit.

11    OFFICER CHA: Get on the ground.

12    OFFICER PATINO: Get on the--

13    MOORE: I ain't getting on shit.

14    OFFICER: [into radio]Yeah, the subject's going to be about-- he's going to be BM about 6'4",

15    about 275.

16    MOORE: You're a liar.

17    OFFICER PATINO: He's got something in his hand, he's got something in his hand -

18    OFFICER CHA: And, uh, he's got something in his hand.

19    MOORE: Six feet, 210 [UNINTELLIGIBLE] fuck it.

20    OFFICER CHA: He's got something in his hand right now.

21    [Moore takes a few steps down the staircase]

22    OFFICER CHA: Hey! Come out![Moore bends over on the staircase to pick up a piece of paper]

23    Get--get over here. [Officer CHA rushes toward Moore on the staircase. Moore retreats up the

24    staircase.] Get on the ground. Hey, come here. Get on the--get on the ground.

25    OFFICER PATINO: Come here. [Officer PATINO also climbs the stairs ahead of Officer CHA

26    and charges toward Moore, who has retreated to the door, while raising his baton and then starts

27    hitting Moore]. (8:20)

28    OFFICER CHA: Get on the ground. Fuck. Get on the ground. Fuck.

1    [Moore pushes Officer PATINO back down the staircase and steps forward, while Officer CHA

2    raises his gun and fires twice before falling back down the stairs]

3    OFFICER CHA: Shots--

4    OFFICER PATINO: Shots fired.

5    OFFICER CHA: Shots fired!  Shots fired!  Shots fired.

6    RADIO:  Shots fired, shots fired.

7    OFFICER CHA: Get back! [UNINTELLIGIBLE]

8    OFFICER PATINO: Are you OK?

9    OFFICER CHA: Yeah.

10   OFFICER PATINO: Did you get hit?  Did you get hit?

11   OFFICER CHA [into radio]: Ida 1 6 Edward -

12   MOORE: [UNINTELLIGIBLE] oh, you hit me.

13   OFFICER CHA: Give me a POA Rep?

14   MOORE: No, no.

15   OFFICER CHA: Give me a 408.

16   OFFICER PATINO: Are you okay?  Are you okay?

17   OFFICER CHA: Yeah, I'm okay.

18   OFFICER PATINO: Did you get hit?

19   OFFICER CHA: No.  I'm standing my ground.

20   OFFICER PATINO: All right.

21   OFFICER CHA: I'm standing my ground.  I'm standing my ground.  Are you okay?

22   OFFICER PATINO: [holding gun extended, pointed in the direction of Moore. Officer Cha is on

23   the ground.] Yeah.

24   [Radio beeps]

25   OFFICER CHA: I got it, I got it, I got--

26   OFFICER CHA: [Into radio] Hello? [To Officer Patino] Let me get it.  It's my turn.

27   OFFICER PATINO: Okay.

28   OFFICER CHA: 515 Capitol.  Scene is not safe for 408.  Scene is not safe for 408.



13

1  DISPATCHER: I copy that.

2  OFFICER CHA: Hey. Get cover. Get cover.

3  [SIREN]

4  [Officer Patino is standing with gun trained in the direction of Moore. (9:29)]

5  OFFICER PATINO: Ah, fuck, my face.

6  OFFICER CHA: Are you okay?

7  OFFICER PATINO: Yeah, my face is fucked right now, dude.

8  OFFICER CHA: Alright. Get cover.  Get cover.

9  OFFICER PATINO: I got cover.  I got cover.

10  OFFICER CHA: Get cover.

11  OFFICER PATINO: I got cover.

12  OFFICER CHA [into radio]: Hey, uh, hey, guys.  Where you at?

13  RADIO: So we're a block away.

14  OFFICER CHA: All right. Come on.  Step it up.  Step it up, bro.

15  RADIO: [UNINTELLIGIBLE]- eleven over we are a block away as well...eleven edwards, block

16  away

17  OFFICER CHA: Get cover, Colin.

18  OFFICER PATINO: I got it, bro, I--

19  OFFICER CHA: Hey bro, get cover.

20  OFFICER PATINO: I--I got cover.  I got [UNINTELLIGIBLE]--

21  OFFICER CHA: You can't see. Get cover.

22  OFFICER PATINO: I got cover.

23  OFFICER CHA: Get cover.



24  Radio: [UNINTELLIGIBLE] The guy's still in the house? You guys have him?

25  [UNINTELLIGIBLE]—

26  OFFICER PATINO: He's still in the house -

27  OFFICER CHA: Negative, barricaded subject.  Get--barricaded subject.  Get [SPECS] out here.

28  Barricaded subject.

Ex. A-039

1  DISPATCHER: Barricaded subject. We'll get [SPECS] out there.

2  OFFICER CHA [into radio]: I know I got him. At least one time. As he was assaulting my

3  partner with fists and feet. He came at me. We lost our batons in the fight. I was getting over-

4  powered so I--so I discharged my weapon.

5  OFFICER PATINO: Hey, hey, hey, don't, don't say that. Don't—just, just -

6  FEMALE OFFICER: Do you have anyone on the back?

7  OFFICER PATINO: No.

8  RADIO: Hey, whoever's responding, somebody's set up on, uh Fairlawn, got a perimeter around

9  this house [UNINTELLIGIBLE] copy

10  MALE OFFICER: Hey, 515, right? This white one right here with the gate?

11  OFFICER CHA: Yeah.

12  RADIO: 17 Edward. We'll go to Fairlawn.

13  DISPATCHER: 17 Edward, copy that.

14  MALE OFFICER: Hey, hey, hey, can you guys move?

15  OFFICER PATINO: Yeah.

16  MALE OFFICER: Hey, hey. Get that--get that – get them outta here, get them outta here.

17  RADIO: [UNINTELLIGIBLE] command post

18  OFFICER PATINO: Yeah.

19  MALE OFFICER: Are you guys hit?

20  OFFICER PATINO: I just got punched – I got -

21  MALE OFFICER: Are you hit?

22  OFFICER PATINO: I got punched in the face.

23  MALE OFFICER: Okay, back up.



24  OFFICER CHA: Hey, guys. We're both hit with pepper spray. I need--I--I need two brothers to,

25  uh, help drag us out to--to get us safe. All right?

26  MALE OFFICER: Colin, back up?

27  RADIO: [UNINTELLIGIBLE]

28  OFFICER CHA: All right.

Ex. A-040

1  MALE OFFICER: Back up.

2  OFFICER CHA: Just get me by the shoulders and, and drag me behind a car.  I'm not--I'm not

3  MALE OFFICER: I got you [beginning to drag Officer Cha].

4  OFFICER CHA: Give me cover.  Give me cover, bro.

5  MALE OFFICER: I got you. I got you. I got you, alright? Right here. Alright. Right here. I'll

6  have to look for water. What do you need, what do you need, what do you need?

7  OFFICER CHA: Hey, get, uh, get VSU here and a POA rep. Get on the air, bro.

8  MALE OFFICER: Yeah, yeah, yeah.

9  OFFICER CHA: Get VSU and a POA rep.

10  [SIREN]

11  MALE OFFICER: You alright? Did you get hit?

12  OFFICER CHA: I'm alright.

13  MALE OFFICER: You been shot?

14  RADIO: POA rep [UNINTELLIGIBLE]

15  MALE OFFICER: [UNINTELLIGIBLE, something about a camera]

16  OFFICER CHA: That's okay.

17  MALE OFFICER: [UNINTELLIGIBLE]Have you been shot?

18  OFFICER CHA: No, I haven't been shot.

19  DISPATCHER: [UNINTELLIGIBLE] 05 [UNINTELLIGIBLE] copy that.

20  MALE OFFICER: You got blood on you, dude.

21  OFFICER CHA: All right.

22  RADIO: Are they locking down the premise –

23  RADIO: We're locking down, where's our 408?

24  DISPATCHER: [UNINTELLIGIBLE] We were advised it was not safe.

25  OFFICER CHA: Send a 408 a block away from me and Colin.

26  MALE OFFICER: Yeah [UNINTELLIGIBLE] You're behind cover dude.

27  OFFICER CHA: Get cover [UNINTELLIGIBLE]

28  MALE OFFICER: [UNINTELLIGIBLE] Put your gun away! I got you.

1    OFFICER CHA: I'm not putting my gun away, dude.

2    MALE OFFICER: Bro, we gotta check you – hey, are you hit, Colin?

3    OFFICER PATINO: No.

4    OFFICER CHA: I'm not hit.

5    SECOND MALE OFFICER (possibly SERGEANT ANDERSON): What do we have here? Is

6    that Cha? Pull him out, man. Pull him out.

7    OFFICER CHA: Yes, sir.

8    MALE OFFICER: He has blood on his [UNINTELLIGIBLE] I can't see if he's been injured, sir.

9    OFFICER CHA: Tell me what to do with the camera. [UNINTELLIGIBLE] my camera.

10   SEVERAL OFFICERS: Let's get you out of here. We gotta get you out of here. C'mon.

11   [UNINTELLIGIBLE] Put it away, put it away, put it away. Over here, here – let me help ya, let

12   me help ya. Alright, c'mon. Can you walk? Can you walk?

13   OFFICER: Hold on, hold on

14   OFFICER: Help me drag him.

15   OFFICER CHA: Get my camera.

16   [UNINTELLIGIBLE bits of conversation]

17   OFFICER CHA: Get Colin! Get my fucking brother, Colin!

18   OFFICER: Where's he at?

19   OFFICER CHA: Hey Colin! Get over here.

20   OFFICER: Colin, where you at?

21   OFFICER: We got him.

22   OFFICER: Hold on, Cha, Cha!

23   OFFICER: It's correct.

24   OFFICER: It's correct.

25   OFFICER: It's cool.

26   OFFICER: It's alright...give me your hand [UNINTELLIGIBLE]

27   OFFICER: Are you shot?

28   OFFICER CHA: No.



1  OFFICER: Where's your partner?

2  OFFICER: 115, do we have units on Lobos yet?

3  OFFICER: [UNINTELLIGIBLE] Come on.

4  [Officers pick up body cam and zip it into a bag. Video goes dark (14:15)]

5  OFFICERS: [UNINTELLIGIBLE] ...Yeah that's Cha's

6  RADIO: [UNINTELLIGIBLE] over here.  [UNINTELLIGIBLE]

7  OFFICER: What is it, two houses in?

8  OFFICER: 515.

9  OFFICER: Is that two houses in?

10  OFFICER: It's the first house from the corner of, uh, Lobos.

11  RADIO: [UNINTELLIGIBLE] to, uh, 911.  [UNINTELLIGIBLE] details.

12  OFFICER: Ida 115 regarding, is he, uh, willing to come outside?

13  DISPATCHER: He just hung up.

14  RADIO: Officers are here.  They're conscious, breathing, walking, but they have, uh--some

15  complaints of pain and one of them was pepper-sprayed.  We need a 408 staged.  But, uh, on

16  Minerva and Capitol, about a block away.

17  OFFICER: Calvin.  Let's pull it back.  Pull it back. Pull it back. You guys got good cover over

18  there?

19  OFFICER: Yeah.  We're good.

20  OFFICER: Get behind the engine block.  All right?  Pull it back if you need to a little bit. How

21  about over here, Calvin, behind the, uh, cars.

22  [Some of the preceding exchange appears to have been picked up by Officer Patino's bodycam,

23  which was lying on the ground in front of 515 Capitol, but not Officer Cha's]

24  DISPATCHER: Send one more unit to the back of, uh, Redacted.

25  RADIO: Henry 115. All responding units [UNINTELLIGIBLE] 515. I don't know if we have

26  containment set up yet.

27  OFFICER: Not yet.

28  DISPTACHER: [UNINTELLIGIBLE]

1  RADIO: Setting up a temporary command post. Take this down: Capitol and Lobos, Capitol and

2  Lobos.

3  DISPATCHER: Capitol and Lobos is for the command post, copy.

4  [UNINTELLIGIBLE chatter over radio/dispatch and officers on scene] (15:50 -16:05]

5  OFFICER: What's the next block?

6  OFFICER: I'm not sure.

7  OFFICER: What's the next block over?

8  OFFICER: [UNINTELLIGIBLE] all the way down to Orizaba. Yeah, this goes all the way down

9  to Orizaba.

10  DISPTACHER: [UNINTELLIGIBLE] ...call it in...are you ready...

11  OFFICER: 115, go with that number.

12  DISPATCHER: ▇ Redacted ▇

13  OFFICER: Last four?

14  DISPATCHER: 1284.

15  OFFICER: Copy.

16  OFFICER: Grab the medics and come – come here.

17  OFFICER: No, I did

18  RADIO: [UNINTELLIGIBLE radio chatter] backyard

19  OFFICER: You have anyone else down here?

20  OFFICER: No. You have, uh, helmet service cards available? So I can deal with this?

21  OFFICER: No I don't. No I don't. Not on me.

22  [UNINTELLIGIBLE radio chatter]

23  OFFICER: Hey Simon can you...Can you have him Code 3 that, please? Can you have him Code

24  3 that?

25  [UNINTELLIGIBLE radio chatter]

26  RADIO: [UNINTELLIGIBLE] how'd you get in?

27  RADIO: Yeah, house next door. I think the, ▇ where the original 99[UNINTELLIGIBLE]

28  OFFICER (CHA?): Hey, I'm sorry. (17:22)



19                                                    Ex. A-044

1 | SERGEANT ANDERSON: Hey, hey, don't say anything yet man. I got a second

2 | [UNINTELLIGIBLE] for you.

3 | [UNINTELLIGIBLE radio and officer chatter]

4 | OFFICER: There are two cameras.

5 | [UNINTELLIGIBLE noises]

6 | OFFICER: Okay. Okay.

7 | [UNINTELLIGIBLE radio and officer chatter]

8 | SERGEANT ANDERSON [into phone]: Hello, sir. San Francisco Police Department. Um, we

9 | know why you're shot [UNINTELLIGIBLE]call us back and we can get to you and help you,

10 | okay? Give me a call back at this phone number: ███Redacted███ . Give me a call back. (17:57-

11 | 18:15).

12 | [UNINTELLIGIBLE radio chatter]

13 | DISPATCHER: ...copy that...[UNINTELLIGIBLE] the call stated that he had no weapons,

14 | [UNINTELLIGIBLE] a call saying that he had no weapons. [UNINTELLIGIBLE radio

15 | chatter/shuffling/beeping]

16 | SERGEANT ANDERSON: 115, [UNINTELLIGIBLE]

17 | DISPATCHER: That was the information we had.

18 | SERGEANT ANDERSON: Got it. Can I get a 115 [UNINTELLIGIBLE] 200

19 | RADIO: Go ahead.

20 | SERGEANT ANDERSON: [UNINTELLIGIBLE] suggestion there for a command post, you

21 | wanna move it up to uh, Minerva, at Capitol?

22 | OFFICER: [Groans]

23 | RADIO: Is that where you are right now?

24 | SERGEANT ANDERSON: Yeah, [UNINTELLIGIBLE] two officers, waiting for a 408 for 'em.

25 | RADIO: [UNINTELLIGIBLE]

26 | SERGEANT ANDERSON: Dispatch, copy that.

27 | DISPATCHER: [UNINTELLIGIBLE]

28 | SERGEANT ANDERSON: Minerva at Capitol [UNINTELLIGIBLE] approaching southbound,

1    southbound on Capitol.

2    [UNINTELLIGIBLE chatter and engine noises (19:20-19:38)]

3    OFFICER: I don't know what kind of perimeter we have at this point.

4    [UNINTELLIGIBLE radio/officer chatter and engine noise (19:40-20:55)]

5    [UNINTELLIGIBLE radio chatter and engine noises (20:55-21:18)]

6    DISPATCHER: [UNINTELLIGIBLE] twenty....copy that...over

7    SERGEANT ANDERSON: Alright [UNINTELLIGIBLE]

8    OFFICER CHA: Oh, I'm not sure yet [UNINTELLIGIBLE]pepper spray residue

9    [UNINTELLIGIBLE] on my face.

10    DISPATCHER: [UNINTELLIGIBLE]

11    SERGEANT ANDERSON: [UNINTELLIGIBLE]

12    OFFICER CHA: [UNINTELLIGIBLE]

13    SERGEANT ANDERSON: All right. Any, uh, so anyone else besides the, uh, suspect inside the

14    house? (21:53)

15    OFFICER CHA:I don't know, sir.

16    SERGEANT ANDERSON: Okay. So just the guy in the house?

17    OFFICER CHA: Yes sir.

18    SERGEANT ANDERSON: What's his description?

19    OFFICER CHA: Uh, he's about 6'4", 275. He's wearing, uh, gray colored sweats, and a white,

20    uh, I'm not sure what kind of top. It was a loose top. (22:08)

21    SERGEANT ANDERSON: Unknown color?

22    OFFICER CHA: Um, yeah [UNINTELLIGIBLE]

23    DISPATCHER: [UNINTELLIGIBLE]

24    SERGEANT ANDERSON: Black male?

25    OFFICER CHA: Definite.



26    SERGEANT ANDERSON: How old?

27    OFFICER CHA: Uh, he's about 20 to 45.

28    SERGEANT ANDERSON: Are there any other witnesses besides you and your partner?

1  OFFICER CHA: No, I don't believe so.

2  [UNINTELLIGIBLE radio chatter and engine noises]

3  SERGEANT ANDERSON: What, uh, were you the shooter, or was your partner?

4  [UNINTELLIGIBLE]What's that going through?

5  OFFICER CHA: Oh, uh before the subject[UNINTELLIGIBLE]

6  SERGEANT ANDERSON: We'll just, uh, go in -

7  OFFICER CHA: Westbound.

8  SERGEANT ANDERSON: Westbound? Do you have any idea how many shots?

9  OFFICER CHA: Uh, possibly 2.

10  [UNINTELLIGIBLE radio chatter]

11  SERGEANT ANDERSON: Was this at the top of the stairs?

12  OFFICER CHA: Uh, yes sir. I was, I was [UNINTELLIGIBLE] retreating backwards.

13  SERGEANT ANDERSON: Okay, got it. Alright, so he's upstairs?

14  OFFICER CHA: Uh-huh.

15  SERGEANT ANDERSON: No one else was [UNINTELLIGIBLE] as far as you know?

16  OFFICER CHA: I don't know.

17  DISPATCHER: I don't want to see what you're pointing –

18  RADIO: Minerva and Capitol.

19  DISPATCHER: Minerva and Capitol?

20  RADIO: [UNINTELLIGIBLE]

21  DISPATCHER: [UNINTELLIGIBLE]



22  SERGEANT ANDERSON: Alright. And, uh, you're not sure of injuries, nothing else. Pepper

23  spray residue that's on your face. Uh, suspect 6'4", 275, gray sweats, [UNINTELLIGIBLE]

24  Alright, I'll tell her, uh, cop, black male, 30-45, no other witnesses besides you – you and your

25  partner. Alright, get ready to [UNINTELLIGIBLE] We're gonna get you guys

26  [UNINTELLIGIBLE]

27  OFFICER CHA: We'll try to get her? Cool cool.(24:02)

28  [UNINTELLIGIBLE radio chatter and engine noises, officers talking (24:05-24:45)]

1  DISPATCHER: Hi, this is 115, I sent out your last - (24:47)

2  RADIO: [UNINTELLIGIBLE] ▇Redacted▇

3  RADIO: At the back of▇▇▇, you have [UNINTELLIGIBLE]

4  DISPATCHER: [UNINTELLIGIBLE]115 copy, keep movements to the back of ▇Redacted▇.

5  [UNINTELLIGIBLE radio chatter and engine noises]

6  SERGEANT ANDERSON [on phone]: Okay, alright. Yeah. (25:55). Uh, not that I know of

7  [UNINTELLIGIBLE](26:10). Yeah, well we could try that (26:25). Mmm-hmmm. Yep. Alright

8  (26:43). Uh, no – as far as I know [UNINTELLIGIBLE]from the officer, I didn't get anything

9  like that(26:50). I – I didn't get the whole story, I just got the time of day, got the involved

10  officer, uh, just what was on the questionnaire (27:07). Yeah. Yeah. (27:14). Alright. Let me, uh,

11  let me, uh, let me just get the public safety statement [UNINTELLIGIBLE] and, uh, both

12  attorneys (27:34). Yeah, I got the [UNINTELLIGIBLE](27:40). Alright. Yeah, good enough.

13  Alright, thanks. Bye (27:47).

14  OFFICER: Okay, so we got this [UNINTELLIGIBLE]contained.

15  SERGEANT ANDERSON: Alright, so we have a perimeter?

16  OFFICER: Okay, yeah.

17  SERGEANT ANDERSON [to OFFICER CHA]: Um, so then he went to put his hand to

18  [UNINTELLIGIBLE]

19  OFFICER CHA: I don't know. He had a – he had a dark object, uh, in his left hand – I'm not

20  sure what it was (27:56).

21  OFFICER: Okay.

22  RADIO: Do we have any [UNINTELLIGIBLE] supervisor? 901[UNINTELLIGIBLE], ASAP?

23  OFFICER: Okay. And you just [UNINTELLIGIBLE] description?

24  OFFICER CHA: Uh, I gave it to my partner.

25  OFFICER: Okay, we got it. You got all of that somewhere.

26  OFFICER: You took the statement already?

27  SERGEANT ANDERSON: I'm gonna go up there with a bullhorn and see if this guy comes out.

28  OFFICER: okay [UNINTELLIGIBLE]

1   SERGEANT ANDERSON: Yeah.

2   [UNINTELLIGIBLE radio chatter]

3   SERGEANT ANDERSON: So, uh, your partner [UNINTELLIGIBLE] I gotta write the, uh,

4   statement of him before publication.

5   OFFICER: Yeah.

6   OFFICER CHA: Yeah.

7   SERGEANT ANDERSON: Just you when you shot him in the direction where were you – out

8   the door?

9   OFFICER CHA: Towards the subject.

10   SERGEANT ANDERSON: Was the subject inside of the house, or outside?

11   OFFICER CHA: No no, it was outside. On the stairway.

12   SERGEANT ANDERSON: Okay, well, were there any other, were there any other people –

13   were there any other people?

14   OFFICER CHA: No sir.

15   SERGEANT ANDERSON: What direction did you – what direction did you shoot?

16   OFFICER CHA: Towards the subject.

17   SERGEANT ANDERSON: About – about approximately [UNINTELLIGIBLE]

18   OFFICER CHA: Westbound.

19   SERGEANT ANDERSON: In –

20   OFFICER CHA: I, I, I [UNINTELLIGIBLE]

21   SERGEANT ANDERSON: [UNINTELLIGIBLE]

22   OFFICER (CHA?): It's on the RO papers. On the RO paperwork [UNINTELLIGIBLE]

23   SERGEANT ANDERSON: Okay.

24   SERGEANT ANDERSON: Let me try calling one more time, then I'm gonna go there and see if

25   he'll come out.

26   OFFICER: Okay, get him back to [UNINTELLIGIBLE]

27   SERGEANT ANDERSON: Yeah. I mean, uh –

28   [UNINTELLIGIBLE radio chatter]

1    OFFICER: Uh, take one of the officers [UNINTELLIGIBLE]

2    SERGEANT ANDERSON: No, you have to call her (29:30).

3    OFFICER: Do you have a – my telephone, I left and I just ran over here.

4    OFFICER: Just call her number.

5    OFFICER: Yeah, call her number now.

6    OFFICER: It's five – 515 Lobos, right?

7    RADIO: [UNINTELLIGIBLE]

8    OFFICERS: [UNINTELLIGIBLE] ...ambulance....

9    SERGEANT ANDERSON: I'm gonna try to make contact with him now.

10    OFFICER: Okay, I think we have some pretty good containment set up.

11    SERGEANT ANDERSON: Alright, appreciate it.

12    [Camera is removed from bag by Sergeant Anderson and placed on front seat of police car

13    (30:15)]

14    RADIO: [UNINTELLIGIBLE] ...Lobos

15    OFFICER: Was your [UNINTELLIGIBLE] called about [UNINTELLIGIBLE]?

16    SERGEANT ANDERSON: Ah, he's over there – I don't know if he has.

17    OFFICER: Who is he?

18    SERGEANT ANDERSON: Manic – he's right there.

19    DISPATCHER: Minerva and Lobos.

20    [Car engine starts]

21    [SERGEANT ANDERSON gets into driver seat, searches with flashlight, picks up radio receiver

22    in car (30:40-31:12)]

23    RADIO: Command post Minerva at Capitol, Minerva southbound on Capitol at

24    [UNINTELLIGIBLE]

25    DISPATCHER: Minerva and Capitol command post, copy. Southbound on Capitol towards

26    Montana.

27    SERGEANT ANDERSON [into radio (31:25)]: Testing, testing. Ida 115, I'm gonna try to make

28    contact with the subject over the – at the EA. If I can talk him out, do I have a red team at

1    Capitol and Lobos?

2    RADIO: [UNINTELLIGIBLE] Yeah, X-Ray 301, I'm trying to get to the command post, but I

3    think I now have the correct address. [UNINTELLIGIBLE] has got me blocked down – I'll be

4    up there ASAP.

5    SERGEANT ANDERSON [into radio]: Ida 115 – how many officers do I have at, uh, Capitol

6    and Lobos?

7    DISPATCHER: Four.

8    SERGEANT ANDERSON [into radio]: Ida 115 – ah, if I could use those four as an arrest team,

9    and, uh, get maybe two more officers down there just to hold the, uh, perimeter.

10    DISPATCHER: Copy. It's two more units to Capitol and Lobos.

11    SERGEANT ANDERSON [into radio]: Copy that. Um, so just confirming that I'll have four

12    officers there to help out with uh, red team. [could be saying "arrest him"]

13    DISPATCHER: You have four units.

14    SERGEANT ANDERSON [into radio] Alright, I'm gonna approach southbound on Capitol from

15    Minerva with my patrol vehicle and see if I can talk him out. Uh, Ida 115, is there any kind of

16    name in the cat for this guy?

17    [Sergeant Anderson begins driving (33:05)]

18    DISPATCHER: I think [UNINTELLIGIBLE] ▮ is the RP, but then there's another RP

19    named Sean. Looks like the suspect is Sean Moore and - again he's a black male. Six feet,

20    heavyset.

21    SERGEANT ANDERSON [into radio]: Copy, I'm approaching now in the vehicle.

22    [Sergeant Anderson opens door and steps out of car (33:45)]

23    SERGEANT ANDERSON [into bullhorn]: Sean! Can you hear me inside? Sean, can you hear

24    me inside 515 Capitol?

25    [Gets back into car and drives a short distance, gets out again (34:00)]

26    OFFICER: [UNINTELLIGIBLE] at the window (34:33)

27    SERGEANT ANDERSON: At the window? [Into bullhorn:] Sean. Sergeant Anderson, San

28    Francisco Police Department. We believe you've been shot, we want you to come out. We have

1  an ambulance ready to serve you, okay? You ready to come out for us? [Pause.] Sean, I need you

2  to come to the door so you can talk to me, okay? We want to get you some help, some medical

3  help. [Pause.] Sean, are you gonna come to the door so we can help you? I can't hear you

4  through the window, boss.

5  [Radio chatter]

6  SERGEANT ANDERSON [into radio]: Ida 115, um, he's in the window, but so far he's been

7  unwilling to come to the door. I'm still talking to him.

8  [Radio chatter]

9  SERGEANT ANDERSON [into bullhorn]: Sean, I need you to come to the door, okay? Come to

10  the gate so I can talk to you. You need help, let us help you.

11  MOORE: What is it, officer. (35:30).

12  SERGEANT ANDERSON: Sean, we're - we're here to help you, alright? Are you willing to

13  come out for us?

14  MOORE: [UNINTELLIGBLE] no ambulance? Could you come up here?

15  SERGEANT ANDERSON: No, we need you to come out so we can take care of ya.

16  MOORE: I don't want to.

17  SERGEANT ANDERSON: We need to take care of you, boss. I see blood on ya.

18  MOORE: I don't care, I'm alright, I can take care of myself.

19  SERGEANT ANDERSON: Sean, where are you shot at, Sean?

20  MOORE: Thank you for coming, Sergeant.

21  SERGEANT ANDERSON: Sean, where are you shot at?

22  MOORE: I'm not shot. I [UNINTELLIGBLE] in my chest and in my leg, but I don't care for

23  that. I'm alright.

24  SERGEANT ANDERSON: Sean, we need you to come out. You're – you're gonna bleed out.

25  MOORE: ALRIGHT! I'm not gonna bleed out.

26  SERGEANT ANDERSON: You are.

27  MOORE: Go ahead on, man!

28  SERGEANT ANDERSON: Sean, we're here to help.



Ex. A-052

1   MOORE: I don't want your help! I didn't call you.

2   SERGEANT ANDERSON: I understand, but we need to help you.

3   MOORE: Just go ahead and leave, man!

4   SERGEANT ANDERSON: We need to help you.

5   MOORE: Just leave. I don't want your help!

6   SERGEANT ANDERSON: Sean, we're not gonna leave.

7   MOORE: Well, stay there, 'cause I don't want your help.

8   SERGEANT ANDERSON: We need you – Sean, we have an ambulance here ready to take care

9   of ya.

10  MOORE: I don't want your care.

11  SERGEANT ANDERSON: Come out and let us take care of you.

12  MOORE: I don't want your care!

13  SERGEANT ANDERSON: We have to take care of ya.

14  MOORE: Well -

15  SERGEANT ANDERSON: We're past that point.

16  MOORE: Nah, I talked to you, man. I tried to talk to you. You been wanting to talk -

17  SERGEANT ANDERSON [to another officer]: His parents?

18  OFFICER: Yeah.

19  SERGEANT ANDERSON: Right here, right now?

20  [Radio chatter]

21  SERGEANT ANDERSON [to Moore]: Sean, we have your parents out here, are you willing to

22  come out and meet with them?

23  MOORE: Bring em up, tell em to come to the door.

24  SERGEANT ANDERSON: You have to come out here and talk to them, they're here waiting for

25  you.

26  MOORE: Tell em to come to the stairs here –

27  SERGEANT ANDERSON: No, I can't. We're – we're worried, we don't know what you have

28  up there, we want them to come and take care of ya, alright?

1  MOORE: I don't care for that.

2  [INAUDIBLE radio chatter]

3  SERGEANT ANDERSON: Sean, c'mon. Come out and let them help ya.

4  MOORE: Where is my mother at?

5  SERGEANT ANDERSON: She's down the street.

6  MOORE: Well, let her stay down there.

7  SERGEANT ANDERSON: You don't wanna come out and let us help ya?

8  Radio: [UNINTELLIGIBLE] lock it down where you are, then you come over here, we need you

9  to, uh –

10  MOORE: [UNINTELLIGIBLE]

11  SERGEANT ANDERSON: Sean, come out. Let us help you.

12  MOORE: [UNINTELLIGIBLE] stay here, and I'm gonna help myself.

13  SERGEANT ANDERSON: You're not gonna be able to help yourself, you're not a doctor. You

14  need to go to the hospital.

15  MOORE: I'd rather stay here, and I'll help myself.

16  SERGEANT ANDERSON: You can't help yourself. You've been shot.

17  MOORE: [UNINTELLIGIBLE] I'm letting you know I'm tired of you. I'm cold. I'll stay in my

18  home.

19  SERGEANT ANDERSON: Me too. We're here to help ya.

20  MOORE: I'll stay in my home! Take a walk, man. Leave from here!

21  SERGEANT ANDERSON: We have a – we have an ambulance here waiting to take you –

22  MOORE: You're gonna leave from here!

23  SERGEANT ANDERSON: We have your family here.

24  MOORE: I don't care.

25  SERGEANT ANDERSON: Ready to take care of you.

26  MOORE: I don't care. I don't want this.

27  SERGEANT ANDERSON: Sean, do you have any weapons up there?

28  MOORE: No, I don't.



29

1  SERGEANT ANDERSON: Okay. So why won't you let us take care of you?

2  MOORE: I DON'T WANT YOUR CARE! DO YOU HEAR ME? I DON'T WANT IT!

3  SERGEANT ANDERSON: I hear you. But we have to take care of you.

4  MOORE: I don't want it!

5  SERGEANT ANDERSON: We're past that point. We have your family here –

6  MOORE: I don't give a fuck where you are.

7  SERGEANT ANDERSON: You have to be seen by an ambulance.

8  MOORE: I don't have [UNINTELLIGIBLE] I don't care, you do what you're gonna do. I don't

9  give a FUCK about you. I'm not going.

10  SERGEANT ANDERSON: Okay. I understand, but we – we can't go anywhere, we gotta get

11  you seen, boss.

12  MOORE: I'm seen already.

13  SERGEANT ANDERSON: So you been shot where, in the chest, in the leg?

14  MOORE: Yeah, I'm good. Go fuck yourself.

15  SERGEANT ANDERSON: You're good? That doesn't sound good.

16  MOORE: I don't care what it sounds like.

17  SERGEANT ANDERSON: How long you are you gonna give this, until you come out and let us

18  take care of you?

19  MOORE: [UNINTELLIGIBLE] I'm not gonna argue with you, bro! Fuck you.

20  SERGEANT ANDERSON: Okay.

21  MOORE: Fuck you.

22  SERGEANT ANDERSON: Sean.

23  RADIO: He's been shot in the leg and the chest, copy that.

24  [Sergeant Anderson opens car door, gets in, and closes it, and starts driving(38:40)]

25  SERGEANT ANDERSON [into radio]: Ida 115, so no luck, like you said uh, he's claiming he

26  was shot in the chest and the leg. He does have some blood on him. Uh, very confrontational,

27  telling us he's not gonna come out, and he wants to be left alone.

28  RADIO: Copy that.

Ex. A-055

1  RADIO: X-ray 301, [UNINTELLGIBLE] our negotiators are heavily initiated in each MT, call

2  out.

3  [UNINTELLIGIBLE radio chatter]

4  [Sergeant Anderson stops car, opens driver side door, and gets out (39:45)]

5  [Sergeant Anderson enters passenger door, shines flashlight towards camera, and grabs it

6  (40:05)]

7  RADIO: Just west of Capitol, up about a half a block, on Minerva.

8  DISPATCHER: Okay, moving command post to Minerva and Capitol, west of Capitol, half a

9  block –

10  [Camera stops recording]

11  **END OF DOCUMENT**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3A



22

# PEOPLE V. SEAN MOORE

## STATEMENT OF BODY CAM – VIDEO 2
### DATE: 01/06/2017

COURT CASE NO:  17000423
POLICE INCIDENT REPORT NO:  170 014 484

1 | OFFICER:  Hey.  What's going on?

5 | OFFICER:  Hey.  What's going on?

6 | MOORE:    What's going on?  What the fuck you show up out
7 here at this time of morning--

8 | OFFICER:  I got a call for service.  Are you okay?

9 | MOORE:    I don't give a fuck--I didn't call.  You quit
10 showing up at my house and I didn't call you.

11 | OFFICER:  Whoa, whoa, chill out!

12 | MOORE:    Get the fuck off my stair.

13 | OFFICER:  Hey--chill out!

14 | MOORE:    Get the fuck off my stair.  I didn't call you.

15 | OFFICER:  I got a call.

16 | MOORE:    I don't give a fuck who called you.

17 | OFFICER:  The hell's your [UNINTELLIGIBLE].

18 | MOORE:    I didn't call you.  I just put my garbage out.
19 Get the fuck off my stair.

20 | OFFICER:  Hey.  Don't spit on me.  Don't spit on me.

21 | MOORE:    I didn't spit on you.

22 | OFFICER:  You did spit on me.

23 | MOORE:    Bullshit.

24 | OFFICER:  All right?

25 | MOORE:    Fuck your face.

26 | OFFICER:  Don't spit on me.  All right?

27 | MOORE:    Don't fucking get on my stair and I didn't call
28 you.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-058

| | | |
|---|---|---|
| 1 | OFFICER: | All right.  I'm right here. |
| 2 | MOORE: | Get the fuck off my stair. |
| 3 | OFFICER: | Hey. |
| 4 | MOORE: | Get the fuck off my stair. |
| 5 | OFFICER: | I'm a goin'-- |
| 6 | MOORE: | Get the fuck off my stair. |
| 7 | OFFICER: | Don't you want to hear what I have to say? |
| 8 | MOORE: | Say your shit and get the fuck on, bitch. |
| 9 | OFFICER: | Are you-- |
| 10 | OFFICER: | Served? |
| 11 | OFFICER: | Are you, yeah.  Are you Sean Wendell Moore? |
| 12 | MOORE: | Yeah, I'm Sean Wendell Moore. |
| 13 | OFFICER: | Okay.  Do you know that you have a, uh-- |
| 14 | MOORE: | Do you know that you're a fucking liar, nigger? |
| 15 | OFFICER: | Hey, well, let's-- |
| 16 | MOORE: | I don't a give a fuck about that shit.  I just |

17  put my garbage out.  Get the fuck off my stair.

| | | |
|---|---|---|
| 18 | OFFICER: | No, uh, no. |
| 19 | MOORE: | Yeah. |
| 20 | OFFICER: | Not, neither. |
| 21 | MOORE: | You're getting off my stair. |
| 22 | OFFICER: | Or--or else what? |
| 23 | MOORE: | Or I'm a remove you. |
| 24 | OFFICER: | Okay. |
| 25 | OFFICER: | Are you threatening us? |
| 26 | MOORE: | I ain't threatening shit. |
| 27 | OFFICER: | You just threatened us. |
| 28 | MOORE: | Get the fuck off my stair.  I ain't threatening |

GEORGE
GASCÓN
DISTRICT
ATTORNEY

2

1 | shit.
2 |     OFFICER:   Sounds--sounds--
3 |     MOORE:     You're gonna leave.  I ain't threaten shit.
4 |     OFFICER:   I'm not leaving.  You're threatening us.
5 |     MOORE:     You're gonna leave.  I ain't threaten shit.
6 |     OFFICER:   You are.
7 |     MOORE:     Get off my stair.  And I'm through talking to
8 |     you.
9 |     OFFICER:   [UNINTELLIGIBLE]
10 |    MOORE:     I'm through talking to you, bitch.  Get off my
11 | stair.
12 |    OFFICER:   Listen.
13 |    MOORE:     Get the fuck off my stair.
14 |    OFFICER:   Listen.
15 |    MOORE:     Fuck your order.  Get off my stair.  I didn't--
16 |    OFFICER:   It's not our orders.
17 |    MOORE:     I didn't--
18 |    OFFICER:   What order?
19 |    MOORE:     Fuck your court.  I didn't call you.  I just put
20 | my garbage out.
21 |    OFFICER:   [UNINTELLIGIBLE]
22 |    MOORE:     Fuck your call.
23 |    OFFICER:   Okay.
24 |    MOORE:     Fuck your call, bitch.
25 |    OFFICER:   I appreciate that.
26 |    MOORE:     I'm tired of your fucking bullshit.
27 |    OFFICER:   I never met you before.
28 |    MOORE:     Get off my stair.

GEORGE
GASCON
DISTRICT
ATTORNEY

3

Ex. A-060

1    OFFICER:  I never met you, sir.

2    MOORE:  I don't give a fuck who you met.

3    OFFICER:  Why--

4    MOORE:  Get the fuck off my--you're intoxicated.  Get the

5 fuck off my stair.

6    OFFICER:  I'm not intoxicated.

7    MOORE:  Yeah, you're high.  Get off my stair.

8    OFFICER:  No.

9    MOORE:  Fuck you [UNINTELLIGIBLE].

10    OFFICER:  Are you high?

11    MOORE:  Are you?

12    OFFICER:  No.

13    MOORE:  Get your fucking ass off my stair and I'm through

14 talkin' to you.

15    OFFICER:  No.

16    MOORE:  Bullshit.  Talk to you.

17    OFFICER:  Hey, sir, come back.

18    MOORE:  Fuck you people.

19    OFFICER:  Sir, come back, please.

20    MOORE:  Hurry up with this shit and get off my stair.  I

21 didn't talk to you.

22    OFFICER:  Hey, so were you violating the restraining order

23 today?

24    MOORE:  Fuck your order.

25    OFFICER:  Today?

26    MOORE:  Hell, no.

27    OFFICER:  No?  Well, these are--

28    MOORE:  You seen me around the [UNINTELLIGIBLE].  You

GEORGE
GASCÓN
DISTRICT
ATTORNEY

4

Ex. A-061

1   ain't kickin' shit, punk.

2        OFFICER:   No, I'm not yet.

3        MOORE:     Not ever.  Now get your punk ass out.

4        OFFICER:   So it says that you must not, uh--

5        MOORE:     I don't give a fuck what it said--

6        OFFICER:   [UNINTELLIGIBLE]

7        MOORE:     Do you seen me harassing, imitating a fucking

8   [UNINTELLIGIBLE].

9        OFFICER:   I wasn't here.

10       MOORE:     I don't give a fuck.  You see a [█████] out here?

11       OFFICER:   Yeah.  I just talked to him and he said--

12       MOORE:     Where--I don't give a fuck who--go fucking put my

13  garbage on the truck.

14       OFFICER:   No.

15       MOORE:     Fuck your garbage, man.  I'm a go put my garbage

16  in--

17       OFFICER:   So here's the thing.  If you--

18       MOORE:     You'd better put all of it in the truck, too.

19       OFFICER:   What--why are you yelling?

20       MOORE:     Why are you on my stair?

21       OFFICER:   Because I'm here to investigate a crime

22  [UNINTELLIGIBLE]--

23       MOORE:     You ain't investigating shit.  Ain't no crime

24  here.

25       OFFICER:   Yes, I am.

26       MOORE:     I'm call and remove you.

27       OFFICER:   All right.  Who you gonna call?  Jeez.  What--

28  what is up with this weed, man?  What does this say?  All right.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

5

1  Let's get out before he blasts us with a shotgun.

2      OFFICER:   What's it say?

3      OFFICER:   It says he's got to stay 25 feet.  Say's he gotta

4  stay--all right.  All right.

5      MOORE:   You've gotta get your faggot ass on--

6      OFFICER:   What's that?

7      MOORE:   Get your gay ass off my stair.

8      OFFICER:   Why--why did you call me those slurs?

9      MOORE:   Get the fuck from 'round here.  And I ain't gonna

10  tell you no more, bitch.

11      OFFICER:   Hey, sir.  So I gotta tell you--

12      MOORE:   I gotta tell you, get your faggot ass from 'round

13  here, punk.

14      OFFICER:   No, I'm not gonna leave yet.

15      MOORE:   You're gonna.

16      OFFICER:   All right.  Is that--

17      OFFICER:   All we done--

18      MOORE:   Once you starting them.

19      OFFICER:   Is that--is that--

20      MOORE:   What you--show him--showing him the light.

21      OFFICER:   1310.

22      MOORE:   Fuck you.

23      OFFICER:   So 1310, Officer, now.

24      MOORE:   Fuck 1310.

25      OFFICER:   Yeah.

26      MOORE:   Get your faggot ass home, bitch.

27      OFFICER:   No.

28      OFFICER:   Yeah, we're trying to make contact with the, uh,

GEORGE
GASCÓN
DISTRICT
ATTORNEY

6

1 | subject right--

2 |     MOORE:    Fuck you.  You ain't making shit.

3 |     OFFICER:  So are you gonna listen to me or you gonna keep

4 | on--

5 |     MOORE:    I heard you.

6 |     OFFICER:  [UNINTELLIGIBLE]

7 |     MOORE:    Now get on.

8 |     OFFICER:  Well, what did I say?

9 |     MOORE:    Get off my stair, what--

10 |     OFFICER:  What--what did I say?

11 |     MOORE:    Where were you going?  Get on back--

12 |     OFFICER:  [UNINTELLIGIBLE]

13 |     MOORE:    Get on back where you're going, fake cop.

14 |     OFFICER:  [UNINTELLIGIBLE]  So it says right here, if

15 | you're not--are you gonna let me finish?

16 |     MOORE:    Are you gonna get off my stair?

17 |     OFFICER:  Yeah.

18 |     MOORE:    Because I didn't call.

19 |     OFFICER:  Eventually I will get off your stair.

20 |     MOORE:    Well, get off of it now.  I don't want to hear

21 | that shit.  I ain't fucked with you, ███.  I put my garbage

22 | out.  I'm sweeping my fucking stair.

23 |     OFFICER:  All right.

24 |     MOORE:    Get your fucking gay ass on, bitch.  And I ain't-

25 | -

26 |     OFFICER:  So, uh--

27 |     MOORE:    Gonna tell you no more.

28 |     OFFICER:  It says right here, you must--

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-064

| | | |
|---|---|---|
| 1 | MOORE: | Yeah, I heard all of that.  Fuck you, pal. |
| 2 | OFFICER: | No, I don't think you did. |
| 3 | OFFICER: | Just let him finish talking [UNINTELLIGIBLE]. |
| 4 | MOORE: | It's the court date on the left.  Get your |

5  fucking ass off my stair.

| | | |
|---|---|---|
| 6 | OFFICER: | Shh.  People are sleeping. |
| 7 | MOORE: | Fuck your people.  Get off my stair.  And I'm |

8  through talking to you, bitch.  Get off my stair.

| | | |
|---|---|---|
| 9 | OFFICER: | Obviously you're not. |
| 10 | MOORE: | Get off my stair, bitch. |
| 11 | OFFICER: | No, we're not. |
| 12 | MOORE: | You are. |
| 13 | OFFICER: | Actually we're--actually we're not. |
| 14 | OFFICER: | We're not. |
| 15 | MOORE: | You're gonna--you're on my stair.  Get the fuck |

16  off my stair.

| | | |
|---|---|---|
| 17 | OFFICER: | Hey, that's o--hey. |
| 18 | OFFICER: | Hey, hey. |
| 19 | OFFICER: | That's all--hey.  You want my spray? |
| 20 | MOORE: | Get off my stair. |
| 21 | OFFICER: | You come [UNINTELLIGIBLE]-- |
| 22 | MOORE: | Get off my stair. |
| 23 | OFFICER: | Listen. |
| 24 | MOORE: | Fuck your spray.  Get off my stair.  The fuck. |
| 25 | OFFICER: | Keep moving. |
| 26 | MOORE: | Fuck off, my-- |
| 27 | OFFICER: | Fuck you. |
| 28 | MOORE: | Fuck you. |

GEORGE
GASCÓN
DISTRICT
ATTORNEY

8

1    OFFICER:   Hey.

2    OFFICER:   Ah, fuck.

3    MOORE:     Fuck you.

4    OFFICER:   Hey.  Give me the paper back.  Fuck.

5    MOORE:     Fuck you.

6    OFFICER:   Ah, shit.  Motherfucker.

7    MOORE:     Fuck your paper.

8    OFFICER:   What's up?  Come on.

9    MOORE:     Get off my stair.

10    OFFICER:   Ah, fuck!

11    MOORE:     Fuck you.

12    OFFICER:   Come here.

13    OFFICER:   Ah, shit.

14    MOORE:     Man.  Get off my stair, dude.

15    OFFICER:   Ida 16 Edward.  I got--I got it, got it, I got

16  it.  Ida 16 Edward.

17    DISPATCHER:   For a 408 request.  Go ahead.

18    OFFICER:   Yeah.  Let me get the air real quick.  Ida 16

19  Edward, Headquarters.

20    DISPATCH: Yeah, this is Headquarters.  Go ahead.

21    OFFICER:   Yeah.  So the, uh, subject we tried to make

22  contact and, uh, go over the, uh, protective order against, uh,

23  he made, uh, aggressive movements toward us so, uh, pepper spray

24  was deployed against the subject.  He then, uh, proceeded to,

25  uh, confront us.  And, uh, I may need a 408 for my partner for a

26  pepper spray.  He's a, uh, 26-year-old, conscious and breathing,

27  pepper spray to the face.

28    OFFICER:   Oh, fuck.  [BEEP]

GEORGE
GASCÓN
DISTRICT
ATTORNEY

9

Ex. A-066

1    DISPATCH: Copy that.    ▮Redacted▮

2    OFFICER:  It will be in front 515 and the, uh, subject was

3    pepper sprayed as well.  But he, uh, he was able to crawl back

4    into his house.  He locked the door.

5    OFFICER:  No!  Hey, sir, you need to give those papers

6    back, all right?

7    MOORE:    I know.  You gonna go?

8    OFFICER:  No.  You need to give those papers back now.

9    MOORE:    Can't see.

10    OFFICER:  That is an order.  I'm ordering you to come

11    outside.  All right.  And give yourself up.

12    MOORE:    No.

13    OFFICER:  'Cause you are under arrest.  Yes.

14    MOORE:    Fuck you.

15    OFFICER:  Sir, you are under arrest right now.

16    MOORE:    I can't see.

17    OFFICER:  Neither can I.

18    MOORE:    Medical attention.

19    OFFICER:  All right.

20    OFFICER:  Come out of the house right now.

21    OFFICER:  Come out of the house.

22    MOORE:    If you're gonna leave from here!  Fuck your

23    papers.

24    RADIO:    12 Edward, Code 3 [UNINTELLIGIBLE] and 21st.

25    RADIO:    [UNINTELLIGIBLE] 11 Edward, [UNINTELLIGIBLE] to

26    Company.

27    OFFICER:  You all right?

28    OFFICER:  Yeah.  I can see now.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

10

1   OFFICER:  Where did you get sprayed?

2   OFFICER:  [UNINTELLIGIBLE]

3   OFFICER:  Hm-hmm.

4   OFFICER:  In the eyes.  I'm fine right now.  I thought I
5   got hit a lot worse than I did.

6   OFFICER:  Come on out!  Come on out.  Come on out.

7   OFFICER:  Hey, come on out, sir.

8   OFFICER:  Come out.  I'm going to kick the gate open.

9   MOORE:    Fuck you, bitch.

10  OFFICER:  Hey, let's wait till, uh--

11  MOORE:    I can't see, Off--

12  OFFICER:  Well, then come out so I can get some medical for
13  you.

14  MOORE:    Let's get this [UNINTELLIGIBLE].

15  OFFICER:  Come on out so I can get the ambulance for you.

16  MOORE:    Let's get this resolved.  I can't--

17  OFFICER:  Yeah.

18  MOORE:    Come out!

19  OFFICER:  Yeah, you know what?

20  MOORE:    [UNINTELLIGIBLE]

21  OFFICER:  Hey!  You!  You gotta come out.

22  MOORE:    Fuck you!  Fuck you!

23  OFFICER:  Come out.

24  MOORE:    Fuck you.

25  OFFICER:  Come here.

26  MOORE:    Fuck you.

27  OFFICER:  Come out.

28  OFFICER:  Come here.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-068

1    OFFICER:  Come out.

2    OFFICER:  Get over here.  Go back--get back.

3    MOORE:    I'm a kick your ass, punk.

4    OFFICER:  Let's go.

5    MOORE:    You need to leave from here.

6    OFFICER:  Come out.

7    MOORE:    You need to leave from here.

8    OFFICER:  Come out.

9    MOORE:    You need to leave from here.

10    OFFICER:  Come out.

11    MOORE:    Fuck you, babe.

12    OFFICER:  Hey, get on the ground.

13    OFFICER:  Get on the ground.

14    OFFICER:  Get on the ground!

15    MOORE:    I ain't getting no shit.

16    OFFICER:  Get on the ground.

17    MOORE:    I ain't getting no shit.

18    OFFICER:  Yeah, that subjects gonna be by the--he's going

19 to be an BM about 6'4", about 275.

20    MOORE:    You're a liar.

21    OFFICER:  And, uh--

22    OFFICER:  He's got something in his hand.

23    MOORE:    210 [UNINTELLIGIBLE] fuck you.

24    OFFICER:  Hey!  Come out!  Get--get over here.  Get on the

25 ground.  Hey, come here.  Get out!  Get on the ground.

26    OFFICER:  Come here.

27    OFFICER:  Get on the ground.  Fuck.  Get on the ground.

28 Fuck.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-069

| | |
|---|---|
| 1 | OFFICER:  What's that? |
| 2 | OFFICER:  Don't fire. |
| 3 | OFFICER:  Shots fired!  Shots fired!  Shots fired. |
| 4 | DISPATCH: Shots fired. |
| 5 | OFFICER:  Hey, get back. |
| 6 | OFFICER:  Yeah.  Oh. |
| 7 | OFFICER:  [UNINTELLIGIBLE] |
| 8 | OFFICER:  Bro, are you okay? |
| 9 | OFFICER:  Yeah. |
| 10 | OFFICER:  Did you get hit?  Did you get hit?  Ida 16 |
| 11 | Edward. |
| 12 | OFFICER:  Are you--are you hit? |
| 13 | OFFICER:  I need a POA rep. |
| 14 | OFFICER:  No, no. |
| 15 | OFFICER:  Give me a 408. |
| 16 | DISPATCH: Copy. |
| 17 | OFFICER:  Are you okay?  Are you okay? |
| 18 | OFFICER:  I'm okay. |
| 19 | OFFICER:  Did you get hit? |
| 20 | OFFICER:  No.  I'm standing my ground. |
| 21 | OFFICER:  All right. |
| 22 | OFFICER:  I'm standing my ground.  I'm standing my ground. |
| 23 | Are you okay? |
| 24 | OFFICER:  Yeah.  [BUZZ]  I got it. |
| 25 | OFFICER:  I got it, I got-- |
| 26 | OFFICER:  We're off--let me get it.  It's my turn. |
| 27 | OFFICER:  Okay. |
| 28 | OFFICER:  Okay. |

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-070

1      OFFICER:  515 Capitol.  Scene is not safe for 408.  Scene

2 is not safe for 408.

3      DISPATCHER:    I copy that.

4      OFFICER:  Hey.  Get cover.  Get cover.  [SIREN]

5      OFFICER:  Oh, fuck.

6      OFFICER:  Are you okay?

7      OFFICER:  Yeah, my face--

8      OFFICER:  All right.

9      OFFICER:  Right now, dude.

10      OFFICER:  Get cover.  Get cover.

11      OFFICER:  I got cover.  I got cover.

12      OFFICER:  Get cover.

13      OFFICER:  I got cover.

14      OFFICER:  Hey, uh, hey, guys.  Where you at?

15      RADIO:    12 Edward, we're a block away.

16      OFFICER:  All right. Come on.  Step it up.  Step it up,

17 bro.

18      RADIO:    [UNINTELLIGIBLE] on Capitol.  [UNINTELLIGIBLE] on

19 Capitol.  [UNINTELLIGIBLE] 4 Edward.  [UNINTELLIGIBLE]

20      OFFICER:  Hey--

21      DISPATCH: 12 Edward, we're a block away.  We are--11

22 Edward, block away.

23      OFFICER:  Get cover, Colin.  Hey, bro, get cover.

24      OFFICER:  I--I got cover.

25      OFFICER:  You can't see.  Get cover.

26      OFFICER:  I got cover.

27      OFFICER:  Get cover.

28      RADIO:    [UNINTELLIGIBLE] 6 Edward, is the guy still in

GEORGE
GASCÓN
DISTRICT
ATTORNEY

14

1   the house?  You guys have him?

2   OFFICER:  No, we have barricaded subject.  Get--barricaded

3   subject.  Get [SPECS] out here.  Barricaded subject.

4   DISPATCHER:    Barricaded subject.  We'll get [SPECS] out

5   there.

6   OFFICER:  I know I got him.  At least one time.  As he was

7   assaulting my partner with fists and feet.  He came at me.  We

8   lost our batons in the fight.  I was getting over-powered so I--

9   so I discharged my weapon.

10  OFFICER:  Hey, hey, hey, don't go through that.  Just--just

11  a--so--

12  FEOFFICER:    Do you have anyone on the back?

13  OFFICER:  No.

14  RADIO:    Hey, whoever's responding.  Someone set up on,

15  uh, Fairlawn.  Get a perimeter on this house.

16  DISPATCH: Copy.

17  OFFICER:  [UNINTELLIGIBLE]

18  OFFICER:  Yeah.

19  RADIO:    17 Edward, we'll go to Fairlawn.

20  DISPATCHER:    17 Edward, copy back.

21  OFFICER:  Hey, hey, hey, can you guys move?

22  OFFICER:  Yeah.

23  OFFICER:  Hey, hey.

24  RADIO:    [UNINTELLIGIBLE] I got the rear.  Uh, Ida, uh,

25  631 to Ida 15.  Can you set up a command post?  [UNINTELLIGIBLE]

26  OFFICER:  Punched in the face.

27  OFFICER:  Okay, back up.

28  OFFICER:  Hey, guys.  We're both hit with pepper spray.  I

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-072

1    need--I--I need two brothers to, uh, help drag us out to--to get

2    us safe.  All right?

3        OFFICER:  Call it, back up?

4        RADIO:    Yeah, Ida 15 Edward.  98, bro.

5        OFFICER:  All right.  Just get me by the shoulders and--and

6    drag me behind the car.

7        OFFICER:  I'm not--I'm not [UNINTELLIGIBLE].  Get me cover.

8    Get me cover, bro.

9        OFFICER:  I got you.  I got you.  I got you.  Here.

10       OFFICER:  [UNINTELLIGIBLE]

11       OFFICER:  What do you--what do you need--

12       OFFICER:  Hey, get, uh, get BSU here and the PO rep.  Get

13       on the air, bro.

14       OFFICER:  Yeah.

15       OFFICER:  BS unit, POA rep.

16       OFFICER:  You all right?

17       OFFICER:  I'm all right.

18       [SIREN]

19       OFFICER:  [UNINTELLIGIBLE]

20       RADIO:    Ida 15 Edward.

21       RADIO:    [UNINTELLIGIBLE] POA rep [UNINTELLIGIBLE].

22   [SIREN]

23       OFFICER:  Fucking [UNINTELLIGIBLE]--

24       RADIO:    POA to rep on--

25       OFFICER:  That's okay.  You been shot.

26       OFFICER:  No, I haven't been shot.

27       RADIO:    Hey, bro.

28       OFFICER:  You got blood on you, dude.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-073

1    OFFICER:    All right.

2    RADIO:    Are you locking down the premise?  [BEEP]

3    RADIO:    Yeah, we're locking down.  Waiting for a 408.

4    RADIO:    [UNINTELLIGIBLE] we were advised it was no safe.

5    OFFICER:    Say to 4 to block away from me to Colin.

6    RADIO:    [UNINTELLIGIBLE] block away. [UNINTELLIGIBLE]

7    OFFICER:    Get under cover, dude.

8    RADIO:    [UNINTELLIGIBLE]

9    OFFICER:    Get cover. Colin.  There's the crews.  Come on.

10    RADIO:    [UNINTELLIGIBLE] we got [UNINTELLIGIBLE] on, uh,

11    [UNINTELLIGIBLE] yet.

12    OFFICER:    Why don't you come on?

13    OFFICER:    I got you.

14    OFFICER:    I'm not putting my gun away, dude.

15    OFFICER:    Oh.

16    RADIO:    We got [UNINTELLIGIBLE] 11 Edward and

17    [UNINTELLIGIBLE].

18    OFFICER:    I'm not hit.  Yes, sir.

19    RADIO:    [UNINTELLIGIBLE]

20    OFFICER:    He has blood on his hands.  [UNINTELLIGIBLE]

21    OFFICER:    [UNINTELLIGIBLE]  Bring me my camera.

22    OFFICER:    [UNINTELLIGIBLE]  We're gonna get you out of

23    here.

24    OFFICER:    Okay.

25    OFFICER:    Come on.

26    OFFICER:    [UNINTELLIGIBLE]

27    OFFICER:    What's your [UNINTELLIGIBLE].  Put it away, put

28    it away, put it away.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

17

1    OFFICER:   Yeah.

2    OFFICER:   Put it away.  Over here.  Here.  Can you help--

3    can you help--let me help you.  All right.  Come on.  Can you

4    walk?

5    OFFICER:   Hold on, hold on.  Can you walk?

6    OFFICER:   He walked [UNINTELLIGIBLE].

7    OFFICER:   All right.

8    OFFICER:   Get my camera.

9    OFFICER:   All right.

10   OFFICER:   We got it.

11   OFFICER:   Hey, Colin.

12   OFFICER:   Come on.

13   OFFICER:   Where's he at?  Where's--

14   OFFICER:   Colin!  Get over here!

15   OFFICER:   Where's he at?

16   OFFICER:   We've got it.

17   OFFICER:   Hold on.  [Cha, cha].

18   OFFICER:   Correct.

19   OFFICER:   That's all right.

20   OFFICER:   Cool.

21   OFFICER:   That's all right.

22   OFFICER:   Give me your hand.  Your hand.

23   RADIO:     [UNINTELLIGIBLE] and they're pulling an officer

24   over here.

25   OFFICER:   Are you shot?

26   OFFICER:   No.

27   OFFICER:   [UNINTELLIGIBLE]  We have [UNINTELLIGIBLE] on

28   that [UNINTELLIGIBLE].  All right, [UNINTELLIGIBLE].

GEORGE
GASCÓN
DISTRICT
ATTORNEY

18

```
1      RADIO:      [UNINTELLIGIBLE]

2      OFFICER:  What's the house [UNINTELLIGIBLE].

3      OFFICER:  515.

4      OFFICER:  Is that two houses in?

5      OFFICER:  It's the first house from the corner of, uh,

6   Lobos.

7      RADIO:      [UNINTELLIGIBLE] Capital run by a, uh,

8   [UNINTELLIGIBLE] called [UNINTELLIGIBLE] 911.  [UNINTELLIGIBLE]

9   details.

10     OFFICER:  Ida 115, we're guarding it.  Is he, uh, willing

11  to come outside?  [BEEP]

12     DISPATCHER:    He just hung up.

13     RADIO:    Call of the search here.  They're conscious,

14  breathing, walking, but they have, uh--some complaints of pain

15  and one of them was pepper-sprayed.  We need a 408 staged.  But,

16  uh, on Minerva and Capitol.

17     OFFICER:  Calvin.

18     RADIO:    About a block away.

19     OFFICER:  Pull it back.  Pull it back.  Pull it back.  You

20  guys got good cover over there?

21     OFFICER:  Uh, 12 Edward.

22     OFFICER:  Get behind the engine block.  All right?  Pull it

23  back if you need to a little bit.

24     OFFICER:  How about over here, Calvin, behind the, uh,

25  cars?

26     RADIO:    Need one more unit to the--[UNINTELLIGIBLE]

27  Capitol.

28     OFFICER:  Edward 115--
```

GEORGE
GASCÓN
DISTRICT
ATTORNEY

19

1    [UNINTELLIGIBLE TRANSMISSIONS]

2    OFFICER:  I'm not sure.  The next block over.  All the way

3    down [UNINTELLIGIBLE] yeah, it's all the way down horizontal.

4    RADIO:    [UNINTELLIGIBLE] called in.  [UNINTELLIGIBLE]

5    ready to come deliver it.

6    OFFICER:  115, go with that number.

7    RADIO:    ▮Redacted▮

8    OFFICER:  [UNINTELLIGIBLE] the medic.

9    OFFICER:  Last four.

10   RADIO:    1284.

11   OFFICER:  Copy.

12   OFFICER:  [UNINTELLIGIBLE]

13   OFFICER:  Anyone else down here?

14   OFFICER:  You have, uh, open service to--car

15   [UNINTELLIGIBLE]?

16   OFFICER:  No, I don't.

17   OFFICER:  You be able to text?

18   OFFICER:  No, I do not on--

19   RADIO:    [UNINTELLIGIBLE]

20   OFFICER:  Okay, sorry.  Did you have [UNINTELLIGIBLE].

21   Could you have them Code 3 that?

22   RADIO:    [UNINTELLIGIBLE] how'd you get in?

23   RADIO:    Yeah, house next door.  I think it's a ▮Redacted▮ with,

24   uh, original 99 approach [UNINTELLIGIBLE].

25   OFFICER:  I'm sorry.

26   OFFICER:  Hey, don't--don't say anything down there.  The

27   guy fucking [UNINTELLIGIBLE].

28   RADIO:    [UNINTELLIGIBLE]

GEORGE
GASCÓN
DISTRICT
ATTORNEY

20

1    OFFICER:    [UNINTELLIGIBLE] department.

2    OFFICER:    Um, no, while you're stopped [UNINTELLIGIBLE]

3  they can call us back.  [UNINTELLIGIBLE] talk to you, okay?

4  Give me a call back, phone number.    ▮Redacted▮    Give me a

5  call back.

6    RADIO:    [UNINTELLIGIBLE] call back.

7    RADIO:    [UNINTELLIGIBLE] stated that he had no weapons.

8  [UNINTELLIGIBLE]  No, it's, uh, information at [UNINTELLIGIBLE]

9  [BEEPS]--

10    OFFICER:    [UNINTELLIGIBLE] 15 Edward, 200.

11    DISPATCH: Go ahead.

12    OFFICER:    Okay.  You have [UNINTELLIGIBLE] you want to load

13  it up to, uh, Minerva and Capitol?

14    OFFICER:    That where you are right now?

15    OFFICER:    Yeah, [UNINTELLIGIBLE] two officers waiting for

16  the 404.  Dispatch copy that?

17    DISPATCH: [UNINTELLIGIBLE] at where?

18    OFFICER:    Minerva at Capitol.  You might want to approach

19  the, uh, [UNINTELLIGIBLE] on Capitol from [UNINTELLIGIBLE].

20    OFFICER:    I don't know what kind of perimeter we have

21  [UNINTELLIGIBLE].  Minerva.  [UNINTELLIGIBLE]

22    OFFICER:    [UNINTELLIGIBLE] please [UNINTELLIGIBLE].

23    FEOFFICER:    Yeah.  [UNINTELLIGIBLE]

24    RADIO:    [UNINTELLIGIBLE] [BEEPING]

25    DISPATCH: Copy.  [UNINTELLIGIBLE]

26    RADIO:    [UNINTELLIGIBLE]

27    DISPATCH: Copy that.  Thank you.

28    RADIO:    [UNINTELLIGIBLE]

GEORGE
GASCÓN
DISTRICT
ATTORNEY

21

1        DISPATCH: Okay.  [UNINTELLIGIBLE] 16 Edward, 20.

2   [UNINTELLIGIBLE] 20.  [UNINTELLIGIBLE] Copy that.  U] 4 Edward.

3   Henry 4 Edward, you're 20.

4        OFFICER:  All right.

5        OFFICER:  [UNINTELLIGIBLE]

6        OFFICER:  Oh, I'm not sure.  [UNINTELLIGIBLE] residue?

7        RADIO:    [UNINTELLIGIBLE], you're 20.

8        OFFICER:  [UNINTELLIGIBLE] on the face, just--

9        RADIO:    [UNINTELLIGIBLE] 20.

10       OFFICER:  All right.

11       OFFICER:  Uh, the, uh--so anyone else besides the, uh,

12  suspect inside the house?

13       OFFICER:  I don't know, sir.

14       OFFICER:  Okay.  So just the guy in the house?

15       OFFICER:  Yes, sir.

16       OFFICER:  What's the description?

17       OFFICER:  Um, he's about 6'4", 275.  He's wearing, uh,

18  gray-colored sweats.  And a white, uh, I'm not sure what kind of

19  top.  It was a loose top.

20       OFFICER:  [UNINTELLIGIBLE] color?

21       OFFICER:  Oh, yeah.  [UNINTELLIGIBLE]

22       OFFICER:  Black male?

23       OFFICER:  Black male.

24       OFFICER:  How old?

25       OFFICER:  Oh, about 40--45.

26       OFFICER:  [UNINTELLIGIBLE]

27       OFFICER:  [UNINTELLIGIBLE]

28       RADIO:    403 cancelled, copy.  [BEEPS]

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-079

1 OFFICER:  And what, uh, were you [UNINTELLIGIBLE]--

2 OFFICER:  [UNINTELLIGIBLE]  Oh, uh, before the subject, he

3 was, uh, [UNINTELLIGIBLE].

4 OFFICER:  Uh, was it going--

5 OFFICER:  Westbound.

6 OFFICER:  Westbound?

7 OFFICER:  [UNINTELLIGIBLE]  Oh, Officer [UNINTELLIGIBLE].

8 RADIO:    [UNINTELLIGIBLE]

9 OFFICER:  And was [UNINTELLIGIBLE]?

10 OFFICER:  [UNINTELLIGIBLE]

11 OFFICER:  Oh, oh, [UNINTELLIGIBLE] backwards.

12 OFFICER:  Okay.  That was--so he's upstairs?

13 OFFICER:  Hm-hmm.

14 OFFICER:  No one else inside as far as you know?

15 OFFICER:  I don't know.

16 RADIO:    Ida 115, what's your 20?

17 OFFICER:  [UNINTELLIGIBLE]

18 RADIO:    I know they cancelled.

19 OFFICER:  [UNINTELLIGIBLE]

20 RADIO:    [UNINTELLIGIBLE] Edward.

21 OFFICER:  All right.  And, uh, you're not sure of injuries

22 [UNINTELLIGIBLE] on your face.  [UNINTELLIGIBLE] 64275

23 [UNINTELLIGIBLE] unknown color, uh, top, black male, 40 to 45,

24 other witness [UNINTELLIGIBLE], all right.  All right.

25 [UNINTELLIGIBLE]

26 OFFICER:  You try to get her?

27 OFFICER:  This one?

28 OFFICER:  Yeah, yeah.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-080

1     OFFICER:    Okay.  Okay.  [BEEP]

2     RADIO:     Ida 116, turn on your left.

3     OFFICER:    Ida [UNINTELLIGIBLE].

4     RADIO:     ██████ Redacted ██████

5     RADIO:     Henry 115, possibly [UNINTELLIGIBLE] Capitol.

6     RADIO:     Ida 17 Edward [UNINTELLIGIBLE].

7     OFFICER:    Okay.  All right.

8     RADIO:     [UNINTELLIGIBLE]

9     OFFICER:    Yes.

10    OFFICER:    [UNINTELLIGIBLE]

11    OFFICER:    Uh, not that I know of.

12    OFFICER:    Yeah.  Suppose we could try that.

13    [UNINTELLIGIBLE]  Yep.  [BEEP] Uh, no.  As far as I know, uh,

14    [UNINTELLIGIBLE] officer [UNINTELLIGIBLE].  Besides, I--I didn't

15    get to look [UNINTELLIGIBLE] time of day [UNINTELLIGIBLE] falls

16    off and so, uh, this [UNINTELLIGIBLE] was on the, uh,

17    [UNINTELLIGIBLE].  Yeah.  Yeah.  All right.  Let me, uh--let me,

18    uh, pick you up.  Get, uh, [UNINTELLIGIBLE].  Yeah, I got that

19    from 200 just came in [UNINTELLIGIBLE].  All right.  Yeah, good

20    enough.  All right.  Thanks.  Bye.

21    OFFICER:    [UNINTELLIGIBLE]

22    OFFICER:    All right.  So we have a perimeter

23    OFFICER:    Okay, yeah.

24    OFFICER:    Um, any gun [UNINTELLIGIBLE].

25    OFFICER:    No, he had a--he had a [UNINTELLIGIBLE] in his

26    left hand.  I'm not sure what it was.

27    OFFICER:    Okay.

28    RADIO:     We have, uh, any [UY] supervisors

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-081

1  [UNINTELLIGIBLE].

2       OFFICER:  Okay, did you get a--a description?

3       OFFICER:  Uh, I gave it to Sergeant [UNINTELLIGIBLE].

4       OFFICER:  You had all that stuff.

5       OFFICER:  Yeah.  He took a statement already?

6       OFFICER:  I'm going to go up [UNINTELLIGIBLE] turns out.

7       OFFICER:  Oh, you want pizza?

8       OFFICER:  Yeah.

9       OFFICER:  So, uh, your partner [UNINTELLIGIBLE]--

10      OFFICER:  [UNINTELLIGIBLE] statement [UNINTELLIGIBLE].

11      OFFICER:  Yeah.

12      OFFICER:  Yeah.  Just you and you shot him in the direction

13  where--where you [UNINTELLIGIBLE]--

14      OFFICER:  [UNINTELLIGIBLE]

15      OFFICER:  Was the subject inside of the house or outside?

16      OFFICER:  No, no, no.  It was outside.

17      OFFICER:  Okay.  And where there any other--

18      OFFICER:  On the stairway--

19      OFFICER:  There any other people [UNINTELLIGIBLE]--

20      OFFICER:  It was just simple.

21      OFFICER:  [UNINTELLIGIBLE]

22      OFFICER:  [UNINTELLIGIBLE] [BEEP]

23      OFFICER:  That's fine.  Okay.

24      OFFICER:  The other side.

25      OFFICER:  It's on the RO page.  RO paperwork.  It's in the

26  cab.

27      OFFICER:  All right.

28      OFFICER:  Okay.  Let me try calling one more time.  They'll

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-082

1    have me go there [UNINTELLIGIBLE].

2        OFFICER:   [UNINTELLIGIBLE] back to the station--

3        OFFICER:   Yeah, I'm going to, uh--we--I got two

4    [UNINTELLIGIBLE].

5        OFFICER:   [UNINTELLIGIBLE]

6        [UNINTELLIGIBLE CONVERSATION AT DISTANCE]

7        OFFICER:   My telephone.  I left it.  I just ran over.

8    [UNINTELLIGIBLE]   It's 5--515 [UNINTELLIGIBLE], right?

9        OFFICER:   [UNINTELLIGIBLE]

10       OFFICER:   Okay.

11       OFFICER:   I'm just trying to make contact [UNINTELLIGIBLE].

12       OFFICER:   Okay.  We have some pretty good containment, sir.

13       OFFICER:   All right.  Appreciate it.

14       [TONES]

15       OFFICER:   Where's Mannox?

16       OFFICER:   He's right there.

17       [TONES] [ENGINE] [BEEPS]

18       RADIO:    Dispatch, [UNINTELLIGIBLE] cross,

19       [BEEPS]

20       RADIO:    [UNINTELLIGIBLE] Capitol, Santos,

21   [UNINTELLIGIBLE] southbound Capitol from [UNINTELLIGIBLE].

22   [BEEPS]

23       OFFICER:   Testing, testing.  Ida 15 [UNINTELLIGIBLE].  I

24   tried to make contact with the subject over the FPA.  If I can

25   talk him out, do I have a, uh, arrest team at, uh, Capitol and

26   Redacted?

27       RADIO:    [UNINTELLIGIBLE]

28       OFFICER:   300 to 200 3 X-ray.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

26

1    OFFICER:  300.

2    OFFICER:  Yeah, X-ray 301.  I'm trying to get the command

3  [UNINTELLIGIBLE] I think I now have that correct address.

4  [UNINTELLIGIBLE] got me blocked in.  I'll be up there ASAP.

5  [BEEP]

6    IDA 115:  Ida 115.  How many officers do I have at, uh,

7  Capitol and Lobos?

8    DISPATCH: Four.  [BEEPS]

9    IDA 115:  Ida 115, uh, if I can use those four as an arrest

10  team and, uh, get maybe two more officers down there just to

11  hold the, uh, perimeter.  [BEEP]

12    DISPATCH: [UNINTELLIGIBLE]  [BEEP]  [UNINTELLIGIBLE] to

13  Capitol and Lobos?  [BEEP]

14    IDA 115:  Copy that um, so just confirming.  I'll have, uh,

15  four officers [BEEPS] to help out as, uh, arrest team.  [BEEP]

16    DISPATCH: You have four units.

17    IDA 115:  All right.  I'm going to approach southbound on

18  Capitol from Minerva with my, uh, patrol vehicle, see if I can

19  talk him out.  Uh, Ida 115, is there any kind of name in the CAD

20  for this guy?

21    DISPATCH: [UNINTELLIGIBLE]  ███  is the RP but then there's

22  another RP named Sean.  Looks like the suspect is Sean Moore and

23  again he's a Black male.  Six feet, heavyset.  [TONES]

24    IDA 115:  Copy.  I'm approaching now in the vehicle.

25  [BEEPS]  Sean, can you hear me inside?  Sean, can you hear me

26  inside 515 Capitol?

27    OFFICER:  [UNINTELLIGIBLE] 97.

28    OFFICER:  At the window.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

1    IDA 115:  At the window?  Sean, Sergeant Anderson, San

2  Francisco Police Department.  We believe you've been shot.  We

3  want you to come out.  We have an ambulance ready to serve you,

4  okay?  You ready to come out for us?  [BEEP]  Sean.  I need you

5  to come to the door so you can talk to me, okay?  We want to get

6  you some help, some medical help.  [BEEP]  Sean.  Are you gonna

7  come to the door so we can help you?  I can't hear you through

8  the window box.  [BEEP]  Ida 115.  Um, he's in the window but,

9  uh, so far he's unwilling to come to the door.  I'm still

10  talking to him.  [BEEP]

11    DISPATCH: [UNINTELLIGIBLE]

12    OFFICER:  [UNINTELLIGIBLE] 87.

13    IDA 115:  Sean, I need you to come to the door.  Okay?

14  Come to the gate so I can talk to you.  You need help.  Let us

15  help you.

16    MOORE:    [UNINTELLIGIBLE]

17    IDA 115:  Sean!  We're right here to help you, all right?

18  Are you willing to come out for us?

19    MOORE:    [UNINTELLIGIBLE] You come up here.

20    IDA 115:  No.  We need you to come out so we can take care

21  of you.

22    MOORE:    I don't want to.

23    IDA 115:  We need to take care of your bods.  I see blood

24  on ya.

25    MOORE:    I don't care.  I'm all right.  I--

26    IDA 115:  Sean.  Where are you shot at, Sean?

27    MOORE:    Thank you for coming, Sergeant.

28    IDA 115:  Sean, where are you shot at?

GEORGE
GASCÓN
DISTRICT
ATTORNEY

28

1     MOORE:    I'm not shot.  I--I shot in my chest and on my

2 leg.  But I don't care for that.  I'm all right.

3     IDA 115:  Sean, we need you to come out--

4     MOORE:    All right!

5     IDA 115:  You're gonna bleed out.

6     MOORE:    I'm not gonna bleed out.

7     IDA 115:  You are.

8     MOORE:    [UNINTELLIGIBLE] on, man.

9     IDA 115:  Sean, we're here to help.

10     MOORE:    I'm not want your help.  I didn't call you.

11     IDA 115:  I understand.  But we need to help you.

12     MOORE:    Just leave, man.

13     IDA 115:  We need to help you.

14     MOORE:    Just leave.  I don't want your help.

15     IDA 115:  Sean, we're not gonna leave.

16     MOORE:    Well, stay there.

17     IDA 115:  We need to--Sean.  We have an ambulance here

18 ready to take care of you.

19     MOORE:    I don't want your care.

20     IDA 115:  Come out and let us take care of you.

21     MOORE:    I don't want your care.

22     IDA 115:  We have to take care of you.  We're past that

23 point.

24     MOORE:    I talked [UNINTELLIGIBLE], man.  I tried to talk

25 to you.  They want to talk--

26     IDA 115:  His parents?  Right here, right now?

27     OFFICER:  [UNINTELLIGIBLE]

28     IDA 115:  Sean, we have your parents out here.  You want to

GEORGE
GASCÓN
DISTRICT
ATTORNEY

1  come out and be with them?

2      MOORE:    Let me talk to them.  Tell them to come to this--

3      IDA 115:  You have to come out here and talk to them.

4  They're here waiting for ya.

5      MOORE:    Come to the stair here [UNINTELLIGIBLE].

6      IDA 115:  I can't.  We're--we're worried.  We don't know

7  what you have up there.  We want them to come and take care of

8  you, all right?

9      MOORE:    I don't care if [UNINTELLIGIBLE].

10      IDA 115:  Sean.  Come on.  Come out and let us help you.

11  She's down the street.  You don't want to come out and let us

12  help you?  Sean.  Come out.  Let us help you.  You're not gonna

13  be able to help yourself.  You're not a doctor.  You need to go

14  to the hospital.

15      MOORE:    Let her stay here and I'll help myself.

16      IDA 115:  You can't help yourself.  You've been shot.

17      MOORE:    I--I'll let you know.  All right.  Go.

18  [UNINTELLIGIBLE]

19      IDA 115:  Me, too.  We're here to help you.

20      MOORE:    I'll stay in my home.  Okay?  I'll walk, man.

21      IDA 115:  We have a--we have an ambulance here, waiting to

22  take care of you.

23      MOORE:    I'm not going to leave from here.

24      IDA 115:  We have your family here.

25      MOORE:    I don't care.

26      IDA 115:  Ready to take care of you.

27      MOORE:    I don't care.  I don't want them to take care of

28  me.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

1  IDA 115:  Sean, do you have any weapons up there?

2  MOORE:    Oh, I don't.

3  IDA 115:  Okay.  So why won't you let us take care of you?

4  MOORE:    I don't want your care.  Do you hear me?  I don't

5  want--

6  IDA 115:  I hear you.  But we have to take care of you.

7  MOORE:    I don't want it.

8  IDA 115:  We're past that point.  We have your family here.

9  MOORE:    I don't care fucking where you are.

10  IDA 115:  You have to be seen by an ambulance.

11  MOORE:    I don't care.  You--do what you're gonna do.  I

12  don't give a fuck about you.  I'm not going.

13  IDA 115:  Okay.  I understand.  But we--we can't go

14  anywhere.  We got to get you seen, boss.

15  MOORE:    I seen already.

16  IDA 115:  So you've been shot.  Where?  In the chest?  In

17  the leg?

18  MOORE:    Yeah, I'm good.

19  IDA 115:  You're good?

20  MOORE:    [UNINTELLIGIBLE] myself.

21  IDA 115:  That doesn't sound good.

22  MOORE:    I don't care what it sounds like.

23  IDA 115:  How long you gonna give this until you come out

24  and let us take care of you?

25  MOORE:    I'm not gonna argue with you, punk.  Fuck you.

26  IDA 115:  Okay.

27  MOORE:    Fuck you.

28  IDA 115:  Sean.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

Ex. A-088

1    DISPATCH: He's been shot to the leg and the chest
2    [UNINTELLIGIBLE].   [BEEP]

3    IDA 115:   Ida 115.  So no luck.  Like he said, um, he's
4    claiming he was shot in the chest and the leg.  He does have
5    some blood on him.  [BEEP]  Very confrontational, telling us,
6    uh, he's not gonna come out and he wants to be left alone.

7    OFFICER:   [UNINTELLIGIBLE]

8    OFFICER:   X-ray 301.  Yeah, we gone out, turn it off.  The
9    negotiators are--have we initiated any GMT.   [BEEP]

10    OFFICER:   5 X-ray [UNINTELLIGIBLE].

11    OFFICER:   3 X-ray.  Yes, we have [UNINTELLIGIBLE] call off
12    [UNINTELLIGIBLE].

13    OFFICER:   I'll get those [UNINTELLIGIBLE].   [BEEPS]

14    OFFICER:   [UNINTELLIGIBLE] 497.

15    DISPATCH: 10-34, 97.

16    OFFICER:   [UNINTELLIGIBLE] [TONES, BEEPS]

17    DISPATCH: [UNINTELLIGIBLE] [BEEPS]

18    OFFICER:   Just left from Capitol, about a half a block on
19    Minerva.

20    DISPATCH: Okay.  Moving command post to Minerva, Capitol,
21    left of Capitol, half a block--

22    **END OF DOCUMENT**

23
24
25
26
27
28

GEORGE
GASCÓN
DISTRICT
ATTORNEY

32

# EXHIBIT 4A



23

cha mp3



# Tigerfish®
Transcribing·Editing

203 Columbus Avenue · San Francisco  94133
toll-free 877-TIGERFISH

**www.tigerfish.com**



Ex. A-091

**cha mp3**

[Beginning of recorded material]

Gary Watts:         [Clears throat] Go into the [unintelligible] there.

Kenneth Cha:        You mind if I take off my jacket?

Gary Watts:         Yeah, help yourself. Okay. So I'm going to, um, introduce
                    ourselves. I'm going to read some admonitions. Um, understand
                    from counsel you're going to read the statement. And after the
                    statement, you and counsel can go view the video and have time
                    with the counsel, and then we'll talk about events after that.

                    Um, so I'm just going to read the admonition, ask you some brief
                    questions of who you are, assignment and stuff like that, and then
                    you can go ahead and read your statement. We'll introduce
                    ourselves. He'll tell you when-when to read the statement.

Kenneth Cha:        Yeah.

Gary Watts:         Um, let me see, 1424 hours, 7th of January, 2017. Sergeant Gary
                    Watts, 1594 SFPD Homicide Division. To my right is --

Sergeant [Delaney]:  Sergeant [Cara Delaney], uh, Homicide Detail, star number [520].

[York Serta];       York Serta, [unintelligible] D.A.'s office.

Ex. A-092

[Scott Burrell]:      Scott Burrell here representing, uh, Officer [unintelligible].

Gary Watts:      I'm Sergeant Gary Watts with the San Francisco Police Department, SFPD. I'm with the [SFDA] and SFDAI and conducting the criminal portion of an officer-involved shooting investigation involving a member employed by SFPD.

The incident occurred on 6th of January 2017 at approximately 0420 hours in the City and County of San Francisco. The following interview will be both audio and video-recorded.

I would like to ask you some questions regarding this incident. Before I do, I want you to know you are not under arrest. You do not have to answer my questions. Do you understand?

Kenneth Cha:      Yes.

Gary Watts:      You can stop answering questions and are free to leave anytime. Do you understand?

Kenneth Cha:      Yes.

Gary Watts:      Have you been ordered to give a statement regarding this incident by anyone?

Kenneth Cha:      No.

cha mp3
Page 3

Gary Watts:          Have you been compelled by anyone to give a statement?

Kenneth Cha:         No.

Gary Watts:          Is this a free and voluntary statement?

Kenneth Cha:         Yes.

Gary Watts:          In this case, there is video evidence that you will have an
                     opportunity to view after you have given your initial statement.
                     Video evidence has limitations and may depict the events
                     differently than you recall and may not depict all the events as seen
                     or heard by you. Video has a limited field of view and may not
                     capture events normally seen by the human eye. The frame rate of
                     video may limit the camera's ability to capture movements normally
                     seen by the human eye.

                     Lighting as seen on the video may be different than what is seen by
                     the human eye. Videos are a two-dimensional medium and may not
                     capture depth, distance or positional orientation as well as the
                     human eye.

                     Remember, the video evidence is intended to assist your memory
                     and ensure that your initial statement explains your state of mind at
                     the time of the incident.

                     And your full name is . . .

Ex. A-094

Kenneth Cha:     Kenneth, K-E-N-N-E-T-H.

Gary Watts:      Cha?

Kenneth Cha:     C-H-A.

Gary Watts:      Star number?

Kenneth Cha:     1206.

Gary Watts:      Date of birth?

Kenneth Cha:     Redacted

Gary Watts:      Date of entry, month and year, approximately?

Kenneth Cha:     Uh, September 2014, I believe.

Gary Watts:      Do you have an assignment?

Kenneth Cha:     Um, [Terwell] Station.

Gary Watts:      Company [I]?

Kenneth Cha:     Yes, sir.



Gary Watts:        And how long [unintelligible] assignment?

Kenneth Cha:       Mm, I want to say maybe three to four months.

Gary Watts:        And your current shift?

Kenneth Cha:       Uh, midnight.

Gary Watts:        [2127]?

Kenneth Cha:       Uh, yes, 9:00 to 7:00, 9:00 p.m. to 7:00 a.m.

Gary Watts:        And uniform or plain clothes assignment?

Kenneth Cha:       Uniform patrol.

Gary Watts:        And your partner yesterday?

Kenneth Cha:       Yesterday was, uh, Officer Colin Patino.

Gary Watts:        Your [call sign]?

Kenneth Cha:       Uh, we were in the 3 [Ida] 1-6 Edward.

Gary Watts:        And what file are you issued?

Kenneth Cha:       Excuse me, sir?



Gary Watts:          What [unintelligible]?

Kenneth Cha:         Uh, [unintelligible] P226.

Gary Watts:          [Unintelligible]?

Kenneth Cha:         Yes, sir.

Gary Watts:          Do you carry any second firearm?

Kenneth Cha:         While on duty?

Gary Watts:          Yes.

Kenneth Cha:         I do not.

Gary Watts:          And were you the driver or passenger in the vehicle yesterday?

Kenneth Cha:         I was the passenger.

Gary Watts:          And was that vehicle marked?

Kenneth Cha:         Uh, it was a marked police-police vehicle.

Gary Watts:          And prior to yesterday's shift, do you know approximately how many hours' sleep you got and when you went to bed?

Kenneth Cha:      Uh, let's see. I usually get about seven to eight hours of sleep before work.

Gary Watts:       Do you wear prescription glasses?

Kenneth Cha:      I do.

Gary Watts:       What kind of lenses? Is it for near-sighted, far-sightedness?

Kenneth Cha:      I'm near-sighted.

Gary Watts:       Near-sighted?

Kenneth Cha:      But they're mainly night glasses. I don't have [unintelligible].

Gary Watts:       Okay. And your last qualification date and the, uh, range?

Kenneth Cha:      Um, I believe I -- I-I believe I qual -- uh, Oct-October. Uh, I-I last [qualed] October, uh, 2016.

Gary Watts:       In-in uniform [unintelligible]?

Kenneth Cha:      Um, uniform, yes.

Gary Watts:       Okay. I understand you have a statement you want to read [out]. So please go ahead.

Kenneth Cha:        [Clears throat] You ready, Sergeant?

Gary Watts:         Sure.

Kenneth Cha:        So early in the morning on January 6, 2017, Officer Colin Patino
                    and I respond to a call regarding a violation of a restraining order.
                    While attempting to discuss the matter with the s -- with the
                    suspect, he became irate, aggressive and violent. During the
                    encounter, the suspect, who was a large man, [made] threats of
                    violence. At one point, he charged at us, and I used pepper spray.
                    He charged at us a second time and [unintelligible] violent physical
                    attack. He assaulted Officer Patino by punching him and kicking
                    him in the face and knocking him down a flight of stairs. The
                    suspect -- the suspect continued charging him. I shot the suspect
                    two times with my firearm in order to defend myself and my partner
                    from [unintelligible] harm or [death].

Gary Watts:         Okay. So we'll leave this running and go view the video, and then,
                    uh, you guys can get together. We'll come back and ask questions
                    [unintelligible].

[Break]

Gary Watts:         Okay.

Female Voice:       [Unintelligible].

Ex. A-099

Gary Watts:        [Unintelligible] it's, uh, 1456. So, uh, I was just trying to get a
                   chance to review video with your counsel?

Kenneth Cha:       Yes, sir.

Gary Watts:        Okay. So, um, just want you to go over the-the event that happened
                   yesterday, uh, what-what you remember, how you felt,
                   observations.

Kenneth Cha:       Um, so Officer Patino and I, we get a dispatch to, uh, [          ]
                   regarding a 911 call that was, um, [unintelligible] report of a
                   restraining order violation against a neighbor [unintelligible]
                   Capitol. Uh, Officer Patino and I, we ran on scene, and, uh, Officer
                   Patino went to go meet with the 911 caller, and I went to go make
                   contact with the, uh, with the subject. Um, it's something we
                   commonly do --

Gary Watts:        Mm-hmm. [Affirmative]

Kenneth Cha:       -- because, uh, I'll get one story, he'll get one story, and then we'll
                   switch, and then he'll get the other story and I'll get the other story,
                   and then we'll-we'll-we'll strategize. 'Cause we feel like or I feel like
                   there's-there's always a story too -- there's always two sides to a
                   story. So, anyways, I go upstairs. I ring the doorbell. Um, and I get
                   to hear, uh, "Who the fuck is it? What the fuck do you want?" And I
                   say, "[unintelligible] talk to." And he goes, "Get the fuck off my

steps. Get the fuck off my steps." "Sir, I just want to talk to you." And he was very irate. He was -- from the beginning, he was like from a 10 to a 10 -- 10 out of 10 in terms of, um, anger.

Um, he, uh, rips-rips the front door open and then comes out to the porch, and I'm trying to talk to him. I'm-I'm-I'm trying to do my best to calm him down. Um, I'm trying to diffuse the situation, deescalate it by talking at a normal, adequate voice while he was yelling at me.

He's continuing making, uh, threats, "Get the fuck off my steps. Get the fuck off my steps. I don't give a fuck," just-just-just using every cuss word in the book. Um, Officer Patino comes to my left, and, uh, I see that he has a piece of paper in his hand. I believe that was the restraining order that he had received from the 911 caller.

So it sounds like, uh, Officer Patino is trying to read over the restraining order with him. He confirms his name, and then the subject confirmed with Officer Patino that that was his name.

[Sighs] And the, uh, whole time, he's just yelling at the top of his lungs, "Get the fuck off my steps. Get the fuck off my steps," continuously making implied-implied threats to us. I'm still trying to calm him down. Um, at the time, throughout this incident, I felt like we had enough time and distance because we were behind a -- we had a locked gate between us. And I looked at that it was kind of

Ex. A-101

like a typical San Francisco front space gate where you need to [flip] the-the knob in order to open it.

Um, so he slams the door on us so, um, we go back to the sidewalk, kind of strategize [unintelligible].

Gary Watts:        [Coughs]

Kenneth Cha:        And then, um, he starts making more threats to us to get the fuck out of here. "Look, we're investigating a situation, right? We were dispatched [unintelligible]." And so, uh, we go back upstairs, and, uh, he starts making more threats to us. And then, uh, and then ripping open the front gate. And, um, his eyes were huge. His chest was puffed out. His chin was high. I mean, just your textbook, uh, threatening [cadence] that he's going to be assaultive.

And, uh, I give him a warning that I didn't -- you know, if-if he was going to attack us, I was going to have to pepper spray him. And, uh, unfortunately, he did just that. He, uh, he tried to attack Officer Patino, and-and, uh, he, uh, he kicked me in the, uh, in the face and then -- while I was pepper spraying him, um, during the -- while Officer Patino and I were trying to retreat down the -- down the stairs. It's, uh -- it was really hard to retreat backwards 'cause the stairs were really -- it was really -- it was -- it wasn't wide at all. And, uh, I believe, uh, I, uh, I-I-I passed Officer Patino while going down the stairs, and I -- and I may have, uh, I did contaminate him with the pepper spray.

So, uh, I told Colin that I was going to get the radio, but he didn't hear that. [Unintelligible] which is the ambulance. Um, so we were on the sidewalk at the time to get enough distance between the guy because he was -- I could just hear him just yelling at the top of his lungs inside the house, pacing back and forth, banging on the wall, banging on the window. And, uh, I was like, "Dude, I need an ambulance, not just for one person, but for two now 'cause I [unintelligible] regular medical aid if someone's been, uh, contaminated with pepper spray." So my concern was [not] really one out of two ambulances, but you've got to make sure the scene is safe because we can't have an ambulance come if-if the scene is still hot. This guy was infuriated.

And, uh, I don't know how, but he had ripped the, uh, restraining order from Officer Patino's hand. [Sighs] And, uh, so we were trying to talk him back down, and I needed to get him some medical aid. And, uh, Officer Patino said, "Hey, are you going to shoot him with a [bag]? And he came out violently and threw the restraining order on-on the steps.

Um, so, uh, the guy -- the guy [sniffs] [clears throat] [sniffs] [clears throat] -- sorry.

Gary Watts:                    It's all right.



Kenneth Cha:   The guy, uh, comes out -- comes out of the house like-like a monster, just [sniffs] -- this guy was huge, man. This guy was like huge. And, uh, he rips open the door, rips open the front gate, and he like threatens us that he's gonna, you know, kick our ass or-or whatever, "Get the fuck out of here" [unintelligible]. I'm just trying to help him out at this point. [Sniffs] And, uh, he goes mid -- midway to the stairway and, uh, he kneels down. I believe he was kneeling down to retrieve the restraining order from the 9 -- the 911 caller's restraining order. And, um, I see Officer Patino -- I know, 'cause I -- 'cause I work with Officer Patino every day, I know that, you know, that was his [unintelligible] this was the perfect time to get him 'cause he's making -- his attention was on the restraining order.

So [unintelligible] so as we come up to make the arrest, um, he sees us. He backs up a little bit to -- what I think he backed up to get more of an advantage on us because the higher you are on someone, you have a tactical advantage. I see Officer Patino, um, conduct a-a [unintelligible] a baton strike to the guy's lower extremity, and it-it [unintelligible]; it just made him [unintelligible]. And, uh, he, uh, he's like, um -- then, uh, he just overwhelms Officer Patino. And, uh, uh, and I hit his mouth, but I didn't see him, uh, make impact with, uh, Officer Patino's face with his hand. And I just hear Officer Patino drop [unintelligible] like, "Oh fuck." And I knew at that point that my partner was done. [Sniffs] And I see him rolling down the stairs.

And, uh, at that point, I lose my baton somehow. I'm not sure if it was -- if it was when the suspect tried to attack me or, uh, um, Officer Patino's, uh, body rolling down the stairs, uh, making me lose it. And, uh, I just see him -- I just see this guy just so enraged coming at me in a violent matter, throwing his hands and-and-and his feet towards me.

And, uh, I just remember retreating down the stairs. I'm about to fall down, and I had nothing else to do but I was in fear for my, uh, for my life. [It was a knee-jerk], you know, [unintelligible]. I don't even know [what happened to call them]. And so I -- so I shot him. And, uh, when I discharged the firearm, it was like, uh, it was like he, uh -- it was like he had hit a-an invisible wall. Like I was like, "Holy shit. That-that fucking worked." Like he's not coming towards me anymore. I remember him saying, "Oh fuck." And he ran back in the house. And, uh, at that point, I just remember laying on the -- on the sidewalk on my back. I don't know how I got on my back.

I was worried about Colin. And, uh, just asked for help at that point, that, uh, we had a-a [unintelligible] suspect who I had shot. [Sniffs] I just remember like -- I remember there was an email that came out from, uh, Captain Clark [unintelligible] about two weeks ago saying that we can't get an ambulance on scene unless the scene is safe. And I just remember being so pissed off because Colin was fucked up. And the ambulance wasn't going to come until the scene was fucking safe. I was fucking pissed! [Crying] Sorry.

Gary Watts:          That's all right.

Kenneth Cha:         [Unintelligible] I just remember just kept asking -- calling if he was all right, if he was all right. I told him to crawl back behind a -- behind a car. I seen all this blood come out of his face. And, uh [sighs] and I just remember somehow I ended up behind a car. And I kept pointing my pistol at the front door. I was so locked in. And then, uh, [clears throat] I just remember hearing, uh, my [unintelligible], "Kenny, it's Brett. You're going to be all right. It's Brett. You're going to be okay." At that time, I was like, all right.

Gary Watts:          Pretty good. Um, just got some questions I want to ask you, okay? Just want to think about it real quick. Um, you said you landed on your back. Is that right?

Kenneth Cha:         On the -- on the sidewalk.

Gary Watts:          On the sidewalk, okay. Um, when-when you landed on your back, did you hit your head at all? Did you --

Kenneth Cha:         I don't know.

Gary Watts:          -- get any other injuries? You don't remember?

Kenneth Cha:         I don't remember.

Gary Watts:       Um, you said you took out your OC spray, your pepper spray. Um, you mentioned that your partner got some of this pepper spray. Did the, uh, did the suspect get sprayed as well?

Kenneth Cha:      Yes.

Gary Watts:       Did you see any reaction from the suspect when he was -- when he was sprayed?

Kenneth Cha:      Yes. Um, it-it actually, uh, made him back up and-and-and went back to his house. The only reason I deployed the pepper spray is because he made, um, a very -- he ripped open the front gate and-and started charging us. So [unintelligible] our safety, um, as we retreated, I [think] I pepper sprayed him.

Gary Watts:       Have you ever had any prior calls to that same residence at 515 Capitol?

Kenneth Cha:      I recall maybe having-having one r -- one dispatch call to the, uh -- to ▮ Capitol, not 515.

Gary Watts:       When was that?

Kenneth Cha:      It may have been maybe one or two months ago.

Gary Watts:       And what was that call for?

Ex. A-107

Kenneth Cha:     Um, the, uh, the neighbor had asked what he should do in terms of his neighbor. He said that, um, he-he thinks he made a dent in his car with his foot. I said, "Do you have any way to prove that?" He said he didn't. He said the neighbor's like verbally a-abusive to everybody in the neighborhood.

Gary Watts:       You said this is ▮▮ neighbor, right?

Kenneth Cha:     Yes, the next-door neighbor.

Gary Watts:       Is he also the victim in this restraining order?

Kenneth Cha:     Yes, sir. That, uh, the suspect made a -- put a hole on his wall. He asked, you know, what-what-what should be done. And I advised [unintelligible] to get a civil restraining order against him if he feels threatened in any way. And, um, once he gets the restraining order and it's signed by the judge, if anything happens after that, we can take, um -- [unintelligible] we-we can conduct, uh, further police intervention.

Gary Watts:       Sure.

Kenneth Cha:     And I believe that may have been why he got the restraining order.

Gary Watts:       Okay. [Unintelligible] any prior contacts with Sean Moore?

Kenneth Cha:     Never.

| Gary Watts: | Was Moore holding anything in his hands during the contact? |
|---|---|
| Kenneth Cha: | He had, um, something -- uh, he had a [unintelligible] in his hand. And, um, this was after he had been pepper sprayed. I remember him coming out of the house with something in his hand. And I just remember thinking, like-like, "What is that?" |
| Gary Watts: | Mm-hmm. [Affirmative] |
| Kenneth Cha: | Like I-I -- I was -- I remember like my-my-my brain just trying to like just think, like what-what -- I-I've got to slow this down. Like what is he holding? You know, I've got to get him aid. Colin's sprayed. Now-now what's going on? I'm trying to assess the situation. And I don't know what that was. |
| Gary Watts: | And it was you who used the OC pepper spray? |
| Kenneth Cha: | It was. |
| Gary Watts: | Did you use your department-issued baton? |
| Kenneth Cha: | I attempted to. |
| Gary Watts: | Okay. What training have you had for that, uh, baton? |
| Kenneth Cha: | Uh, department-issued training with the [unintelligible]. |

Gary Watts:        Okay. And when was that training?

Kenneth Cha:       Mm, a year ago maybe.

Gary Watts:        How many times have you used the [unintelligible] baton? What were the results if you used it?

Kenneth Cha:       I had used it about one-and-a-half months prior to this, and, uh, it resulted in, uh, compliance with the, uh, with the armed suspect.

Gary Watts:        And effecting an arrest?

Kenneth Cha:       Yes, sir.

Gary Watts:        Okay. Did you request backup patrol?

Kenneth Cha:       I didn't because I-I-I was already hearing on the radio that everybody was coming Code 3 to our location.

Gary Watts:        Did you request a supervisor to the scene?

Kenneth Cha:       I had already heard that my, uh, sergeant -- the, uh -- I remember hearing his call sign [Ida 115] that, uh, he was responding to Code 3.

Gary Watts:        And that was on the airway?

Kenneth Cha:      Yes, sir.

Gary Watts:       Did Moore ever respond to your verbal commands?

Kenneth Cha:      No.

Gary Watts:       Did you use your baton?

Kenneth Cha:      Yes.

Gary Watts:       Did you strike the subject with a baton at any time?

Kenneth Cha:      No.

Gary Watts:       Did you ever see the su-sus-suspect pick up the baton?

Kenneth Cha:      [Sighs] I don't know. I -- the suspect, Colin and I, we were so close
                  to each other. It was [unintelligible]. [Sighs]

Gary Watts:       How many shots did you fire?

Kenneth Cha:      I believe I shot him twice. I shot twice.

Gary Watts:       And what happened to the -- after that? After you shot twice, what
                  did you see?

Kenneth Cha:     I remember -- I just remember like the echo because it was such close quarters. And, um, I just remember him saying, "Oh fuck" or something to that extreme. And, uh, he immediately stopped coming after me. And he made a quick turn and ran right back into his house. And then somehow, I ended up on my back on the sidewalk.

Gary Watts:     [Sighs] What injuries did you receive?

Kenneth Cha:     Um, at that time, I had like, um -- it's hard to explain. I had blunt pain to my face. I had, um, pepper spray irritation. And I still have, um, right leg -- right lower leg pain.

Gary Watts:     [Sighs] Nothing else.

Sergeant Delaney:     [Unintelligible] question. Um, just going back, when you said, um, there -- at the same time where, um, um, um – when he – when you, um – it was before or during the time that you deployed your OC, and you said he kicked you. Did-did he make impact with you?

Kenneth Cha:     I believe so. And-and -yes.

Sergeant Delaney:     Okay. And was that – do you remember, was it your face or your leg or –

Kenneth Cha:     My face.

Sergeant Delaney:    Okay. Um . . .

Kenneth Cha:    I don't know if you – did-did you say before? I-I don't [unintelligible].

Sergeant Delaney:    So-so I was just going back in his – in his statement where you said – you know, he said, um, after – I was going to get the timing of, um, was it at the same time he was pepper – you know, that he said he gave a verbal warning and, um, and then he advanced. And-and did he – w – did, um, Mr. – uh, Mr. Moore kick you before, during or after –

Kenneth Cha:    During.

Sergeant Delaney:    -- the pepper spray?

Kenneth Cha:    During.

Sergeant Delaney:    I-I was just kind of getting [unintelligible].

Kenneth Cha:    Okay. Yeah, yeah, during.

Sergeant Delaney:    I'm sorry, to-to make that clear.

Kenneth Cha:    During-during the incident.

Sergeant Delaney:    Okay. So as you're pepper spraying him, he kicked you in the face?

Kenneth Cha:         Yes, ma'am.

Officer Delaney:      All right.

Male Voice:          Along that same subject, when he kicked you in the face, do you
                     remember, was he -- has he got shoes on or barefoot or socks?

Kenneth Cha:         I don't know. I just -- I just remember seeing a big -- sorry, I just
                     remember seeing a big-ass foot.

Male Voice:          And did you feel that was a significant collision? I mean, was it a
                     brush, glimpse, was it -- how would you describe the contact?

Kenneth Cha:         Violent. It was violent.

Male Voice:          Okay. And, um, [clears throat] when you were up -- I believe you
                     said you were [unintelligible] the stairs, at some point, you lost your
                     baton. Was that on the stairs, at the top of the stairs, at the bottom?
                     Do you -- do you have a recollection?

Kenneth Cha:         I don't remember. It was -- I remember going up the stairs to bring
                     the guy under arrest. And I just remember the -- I just remember the
                     violent melee between, um, Officer Patino and the suspect. And at
                     that time, I don't know what happened to the baton. I don't know if
                     he ripped it out, if when Colin got knocked out or whatever, he

started [unintelligible] upstairs, and I lost it at that point. I just know I-I lost my baton.

Male Voice:    And did you have it out in your hand or was it in the scabbard?

Kenneth Cha:    I had it in my hand getting ready to assist.

Male Voice:    Okay. And then -- and you -- then you said you fell down. You were at the bottom. You don't know how you -- how you went down? At some point, you end up on the ground, on your back?

Kenneth Cha:    The last thing I remember is-is-is firing-firing my weapon. And I just remember being on my back with my gun towards the door. I was on the -- I was on the sidewalk on my back. [Clears throat]

Male Voice:    And when you were down on the ground now, you're waiting for backup, did you have any time to take an assessment of-of your injuries, of your status?

Kenneth Cha:    No.

Male Voice:    And you could -- you could look over, and you could see Colin. You said there was blood coming from his face?

Kenneth Cha:    He was -- yeah, he was just jacked up.

Male Voice:    But you couldn't move over to him?

cha mp3
Page 25

Kenneth Cha:       No, because I'm trying to -- I'm trying to make sure that he doesn't
                   come back out and-and attack us. That's why I was telling Colin to
                   get cover.

Male Voice:        And, um, at some point, when backup got there, they dragged you
                   back? Is that correct?

Kenneth Cha:       Yes.

Male Voice:        Um, did you feel you could move at that point?

Kenneth Cha:       I was -- I was just -- I don't know if I was just in shock or what, but
                   I was -- I was -- I-I-I felt frozen. I don't know what it is -- what it's
                   called, but I was stressed. I don't know.

Gary Watts:        Good. Just give us two minutes and then come back. It's still
                   recording. [Sighs]

[Break]

Gary Watts:        All right, just couple of questions just to clarify. And I meant to ask
                   before, but, um, I wrote it down. Illumination -- did you have your
                   flashlight out?

Kenneth Cha:       I did.

Ex. A-116

Gary Watts:          Okay. And then, uh, where were you directing that beam of light?

Kenneth Cha:         Uh, towards the porch.

Gary Watts:          Towards the porch?

Kenneth Cha:         Yeah, and the subject.

Gary Watts:          And the subject? And whereabouts were you directing the-the light? It's -- was it center mass, was it low, was it in his face?

Kenneth Cha:         You mean --

Gary Watts:          Yeah.

Kenneth Cha:         At --

Gary Watts:          At Moore?

Kenneth Cha:         Right-right, is this throughout the whole encounter or what are you talking about?

Gary Watts:          Well, how about – how about for the whole encounter? I mean --

Kenneth Cha:         I had my flashlight on.

Gary Watts:          Right, okay. Was it ever in his face or was it – or was it –

Male Voice:          Were you directing it at [unintelligible]?

Kenneth Cha:         No, it was not at his face.

Gary Watts:          Okay, good, yeah.

Kenneth Cha:         Yeah.

Gary Watts:          All right.

Kenneth Cha:         No, that-that would piss someone off. So I'm not -- I'm not trying to
                     [unintelligible].

Gary Watts:          Okay. And then I asked for the -- I asked if you ever -- if you did --
                     if you remember receiving any head injuries. You were kicked --

Kenneth Cha:         Mm-hmm. [Affirmative]

Gary Watts:          And you were kicked where?

Kenneth Cha:         In the front-front of the face.

Gary Watts:          Okay, all right. And that was during the OC deployment?

Kenneth Cha:         Yes, deployment.

Gary Watts:   All right. Did you ever lose conscious-consciousness at all during the [unintelligible]?

Kenneth Cha:  No.

Gary Watts:   Okay. [Clears throat] Colin's been struck in the face. He's going down the stairs. You lose your baton. You said you feared for Colin. You're in fear for your life. Tell me what was going through your mind after you lost your baton and you lose sight of your partner.

Kenneth Cha:  I thought I was going to die. I thought -- I thought this guy was going to just-just go to town on me. Like the-the look on his face, like if I close my eyes, it's like literally burned in my eyeball. Like the -- his huge eyes, his -- Sergeant, when he was coming down the stairs, it was like this big tidal wave. I -- in my heart, I knew that Colin and I, our lives were in -- were in -- were-were in great bodily harm or we were going to die. And I already-already know, just hearing Colin, that he was already in great bodily harm. And –

Gary Watts:   Did you ever lose your balance at any point?

Kenneth Cha:  I believe I had because I don't remember how I ended up on my back to get on the sidewalk.

Gary Watts:   Was that after you pulled your service weapon?

Kenneth Cha:          Yes.

Gary Watts:           And after you fired?

Kenneth Cha:          And then the next thing I remember, I'm-I'm on my back. I'm not
                      sure if it was from tumbling or from the, uh, recoil. I don't know.

Gary Watts:           You just remember being on your back after you fired, and then the
                      subject going inside the house?

Kenneth Cha:          Yeah.

Gary Watts:           "Oh fuck," [unintelligible].

Kenneth Cha:          And was he going to come back out with a -- with a freaking gun, a
                      knife? Like I-I've got to hold my stance because Colin, he's out of
                      the game. He's out of the fight because it's just me.

Sergeant Delaney:     [Unintelligible].

Male Voice:           Um, once backup's there, you're on the ground, your back. It's just
                      the two of you. The [ambulance] shows up. They dragged you back.
                      Do you remember the officers, uh, telling you the whole story or do
                      you remember what happened when you were – when you were
                      holstering your weapon or securing your firearm at some point?

Kenneth Cha:          Yeah. Someone, uh, had secured my weapon in my holster for me.

Ex. A-120

Male Voice:          Why is that?

Kenneth Cha:         What?

Male Voice:          Why did someone have to do it for you?

Kenneth Cha:         Because -- probably because I was under a lot of stress at the time. I was -- I was fixated on the house. I was worried he was going to come back out and --

Sergeant Delaney:    Um, when -- I know he went -- you said he went back in a couple times, and you could hear him yelling. When he was going back in, what-what's going through your mind or what are -- what -- I know you said you could hear him yelling and banging.

Kenneth Cha:         Mm-hmm. [Affirmative]

Sergeant Delaney:    Did you hear anything else or what -- can you talk a little more about that or --

Kenneth Cha:         At-at which point?

Sergeant Delaney:    So, when he's going back in the house, how-how long are the periods he's going back in the house, and what are you thinking when he goes back in? Is there --

Kenneth Cha:        I was -- I was -- I was going to -- just trying to assess the whole situation.

Sergeant Delaney:   Okay.

Kenneth Cha:        Like-like, honestly, I just wanted to get his side of the story. I -- my whole concern was, "Hey, let's-let-let's deescalate the situation, you know, with using good time and distance." We're retreating back to the sidewalk. We're going back up to talk to him. He's going back in the house just cursing us non-stop. And I'm like, okay, what's going on? Let's-let's -- how are we going to resolve this? That's what I'm thinking.

Gary Watts:         Was there ever a concern there was another person in the house?

Kenneth Cha:        It was never my concern until the shots were fired. And then at that point, I didn't know what was going to happen.

Gary Watts:         Okay. Well, good. Thanks, [unintelligible]. Thanks, [unintelligible].

Sergeant Delaney:   Thank you.

[End of recorded material]

Ex. A-122

# EXHIBIT 6



Ex. A-123

Filed 5/1/18  P. v. Moore CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SEAN MOORE,<br><br>    Defendant and Appellant. | A151276<br><br>(San Francisco City and County<br>Super. Ct. No. SCN227235) |

   Sean Moore was charged with felonious assaults on two San Francisco police officers.  At the preliminary hearing on these and other charges, the defense argued the arresting officers were not acting "in the performance of [their lawful] duties"—a required element for several charges.  The preliminary hearing magistrate ruled that factual disputes about whether Moore assaulted the officers and whether the officers used reasonable force to arrest him for the assaults should be submitted to a jury.  Moore was held to answer on most of the charges, and he renewed his arguments before the superior court in a Penal Code section 995 motion.[1]  The superior court found insufficient evidence that the officers were lawfully performing their duties when Moore committed the alleged crimes and set aside eight counts.  The People appeal.  On the factual record before us, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

1

# I. BACKGROUND

Moore was charged by felony information with offenses stemming from an incident on January 6, 2017:  felony assault on a peace officer with force likely to cause great bodily injury against Officers Colin Patino and Kenneth Cha (§ 245, subd. (c); counts 1, 2); felony battery with serious bodily injury against Patino (§ 243, subd. (d); count 3); felony battery with injury on a peace officer against both officers (§ 243, subd. (c)(2); counts 4, 5); felony threat to an executive officer against both officers (§ 69, subd. (a); counts 6, 7); felony resisting a peace officer causing serious bodily injury against Patino (§ 148.10, subd. (a); count 8); misdemeanor resisting, obstructing or delaying a peace officer against both officers (§ 148, subd. (a)(1); count 9).  Moore was also charged with misdemeanor contempt of a court order (§ 166, subd. (a)(4); count 10). It was further alleged that Moore personally inflicted great bodily injury on Patino as to count 1 (§ 12022.7, subd. (a)) and that Moore had two prior felony assault convictions within the meaning of section 1203, subdivision (e)(4).[2]

The question raised in this appeal is whether sufficient evidence exists to prosecute Moore on counts 1, 2, and 4 through 9, all of which require proof that the targeted peace officer was engaged "in the performance of [his] duties" at the time of the alleged criminal conduct.  (§§ 245, subd. (c); 243, subd. (c)(2), 69, subd. (a); see §§ 148.10, subd. (a) ["in the discharge or attempt to discharge any duty of his or her office or employment"], 148, subd. (a)(1) [same].)  "[T]he long-standing rule in California . . . [is] that although one is not immune from criminal liability for his resistance to an invalid police action, he cannot be convicted of an offense *against a peace officer 'engaged in . . . the performance of . . . duties'* unless the *officer* was acting lawfully at the time.  [Citations.]  The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful."  (*People v. Gonzalez*

---

[2] The preliminary hearing magistrate dismissed two counts of felony criminal threats (§ 422) and special allegations as to count 3 from the original felony complaint. None of these are at issue here.

Ex. A-125

(1990) 51 Cal.3d 1179, 1217 [applying § 245, subd. (c)], superseded by statute on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691; *In re Manuel G.* (1997) 16 Cal.4th 805, 817 [applying same operative language in former § 69 where defendant allegedly used threat to deter officer's performance of duties]; *In re Joseph F.* (2000) 85 Cal.App.4th 975, 982 [applying same operative language in former §§ 243, 148].)

A.    *Preliminary Hearing Evidence*

The preliminary hearing magistrate admitted videorecordings from Cha's and Patino's body cameras, videorecordings of interviews of these officers the day after the incident, and testimony of several witnesses.

Christopher Choy testified that he lived next to Moore. In December 2016, he obtained a temporary restraining order prohibiting Moore from harassing him, and a court hearing on the matter was scheduled for January 11, 2017. On January 6, 2017, at approximately 3:45 a.m., Choy's wife woke him and said, "[H]ey, he's hitting the wall again." Choy then heard something hit the wall of his home that was adjacent to Moore's house. The wall had been previously damaged in that location, and Choy surmised that Moore had hit the wall because Moore often came out in the middle of the night. Choy called the police. At about 4:15 a.m., Patino and Cha responded to the call. Patino approached Choy's home and Cha approached Moore's. Choy told Patino that Moore had been hitting the wall of his house, and he gave Patino a copy of the restraining order with a proof of service on Moore. As Patino reviewed the order, he heard a loud voice coming from Moore's home and went to assist Cha. Neither Patino nor Cha gathered more information about the alleged restraining order violation or asked Choy to authorize a citizen's arrest.

1.    *Encounter Prior to Moore's First Exit Through Gate*

Cha climbed a stairway to Moore's front gate and rang the doorbell. The stairway was walled on both sides and ended in a landing that extended to the front door. A floor-to-ceiling metal gate separated the landing area in front of the door from the rest of the landing and stairway. Moore, who Cha estimated was six feet four inches tall and

3

Ex. A-126

weighed 275 pounds, opened the door and stepped partway onto the landing behind the gate. He appeared to be holding up his pants with his left hand.

Moore made repeated hostile, belligerent and profane comments to Cha insisting he leave the premises. The following was a typical exchange between the men:

"MOORE: What's going on? What the fuck you show up out here at this time of morning about.

"OFFICER: I got a call for service. Are you okay?

"MOORE: I don't give a fuck—I didn't call. You quit showing up at my house and I didn't call you.

"OFFICER: Whoa, whoa, chill out!

"MOORE: Get the fuck off my stair.

"OFFICER: Hey—chill out!

"MOORE: Get the fuck off my stair. I didn't call you.

"OFFICER: I got a call.

"MOORE: I don't give a fuck who called you.

"OFFICER: The hell's your problem.

"MOORE: [(*loud and angry*)] I don't give a fuck who called you. . . . I just put my garbage out. Get the fuck off my stair."[3] Patino arrived about a minute into the encounter, and Moore proceeded to insult both officers and demand they leave. At one point, Moore said, "I'm a remove your ass." When the officers asked if he was threatening them, he said "I ain't threatening shit." He continued to insist the officers "get the fuck off my stair" while he remained behind the gate.

Patino had Moore confirm he was the person subject to Choy's restraining order, and the following exchange occurred:

"OFFICER: Hey, so were you violating the restraining order today?

"MOORE: Fuck your order. [¶] . . . [¶] . . . Hell, no. [¶] . . . [¶]

---

[3] Cha accused Moore of spitting on him, but the People do not argue that the officers had probable cause to arrest Moore for assault based on the spitting.

"OFFICER:  So it says that you must not, uh –

"MOORE:  I don't give a fuck what it said –

"OFFICER:  You must not harass, intimidate, molest, attack.

"MOORE:  You seen me harassing, imitating or fucking with a Choy[?]"  After about three minutes of talking to the officers and multiple demands that they leave his stairway, Moore said, "I'm gonna call and remove you," and he walked inside his home. The officers descended the stairs to the sidewalk while discussing the restraining order. In his interview, Patino said he believed by this point he had probable cause to arrest Moore for violating the restraining order.

Moore stepped back onto the landing carrying what appeared to be a phone and stood behind the gate.  He insulted the officers again.  Cha said, "Why did you call me those slurs?" and ascended the stairs, followed by Patino.  Moore said, "You're done," and asked for Patino's badge number, which Patino provided.  While apparently dialing his phone, Moore continued to demand the officers get off his stairs and remained behind the gate.  Patino attempted to read to Moore from the restraining order.  Moore said, "I ain't fucked with your Choy.  I put my garbage out.  I'm sweeping my fucking stair." Seconds later, Moore loudly yelled, "It's a goddamn court date on the 11th."  He banged on the gate while demanding, "Get off my stair," and gestured in a cross-wise fashion with his forearms while saying, "I'm through talking to you, bitch.  Get off.  Get off my stair."  He remained otherwise stationary behind the gate.  The officers said they would not leave.

2.    *Encounter After Moore's First Exit Through Gate*

Moore then pulled open the gate, stepped through the gateway while remaining on the landing, and waving his right hand while telling the officers to get off his stairs.  One of the officers said, "You wanna get sprayed?" and Moore said, "Fuck your spray," while continuing to wave his hand and insist they leave.  Cha then sprayed pepper spray in



Ex. A-128

Moore's direction.[4]  Moore turned and stood sideways in the gateway with his left foot raised as if kicking.  Cha said in his interview that Moore kicked him in the face.  The officers partially descended the stairs.  Moore bent over to pick up a piece of paper, closed the gate, entered his doorway, then reemerged, holding a paper in his right hand.  The officers appeared to be on the sidewalk where Cha made a radio report of the incident.

About a minute and a half after the pepper spraying, Moore could be seen inside the home through a window.[5]  Patino ordered him to return the restraining order papers and come outside because he was under arrest.  Patino also said he would get Moore medical attention for the effects of the pepper spray.  Moore closed the window.  As the officers insisted he come out, Moore exited, tossed papers through the gate, and reentered his home.  After the officers continued to insist he come out or they would "kick the gate open," Moore again stepped onto the landing, complaining he could not see.  Moore then suddenly opened the gate, stepped forward, squatted, clenched his fists, and then said:  "Fuck you. [¶] . . .[¶] . . . Fuck you. . . . I'ma kick your ass, punk."

Moore bent over to pick something up, which appeared to fall from his hand.  He took a step down toward the papers on the stairs.  Cha and Patino ordered Moore to get on the ground, but he did not comply.  He took a few steps down and reached to pick up something.  The officers said in their interviews they thought this was a good opportunity to arrest Moore.  Moore retreated up the stairs as the officers advanced toward him.  Patino swung his night stick at Moore at least twice and reached for Moore, then fell backward down the stairs.  Patino said during his interview that Moore had tried to block

---

[4] Cha said in his interview it was difficult to retreat because the stairway was narrow and the pepper spray was deployed for safety while he retreated.

[5] Cha said during his interview that he could hear Moore "yelling at the top of his lungs inside the house, pacing back and forth, banging on the wall, banging on the window."  This conduct is not discernable on the videorecordings.

the baton and punched him in the face with a fist, breaking Patino's nose.[6]  Cha pointed a gun at Moore and fired twice.  Moore was shot in the abdomen and the leg.

### 3.    *Parties' Arguments*

The relevant disputed issue at the preliminary hearing was whether Patino and Cha were engaged in the lawful performance of their duties at the time Moore allegedly resisted, threatened, and assaulted the officers.  The prosecution argued the officers were lawfully investigating an alleged violation of the restraining order throughout the encounter; they had probable cause to arrest Moore for violating the restraining order from the beginning of the encounter; and they had probable cause to arrest Moore for resisting, obstructing or delaying the officers' performance of their duties (§§ 148, 148.10), making criminal threats (§ 69) or assaulting the officers (§§ 243, 245) based on Moore's conduct during the encounter.  The defense argued the officers were not lawfully performing their duties once Moore ordered them to leave his stairway, which was within the curtilage of his home, and they refused to do so even though they lacked an arrest warrant or exigent circumstances to justify a warrantless seizure.  The defense also argued Moore was unlawfully detained once the officers ordered him out of his house, and the use of pepper spray (and inferably Patino's use of the night stick) was an excessive use of force that entitled Moore to use reasonable force in resistance (assuming he actually kicked or punched the officers—actions not clearly shown on the body camera footage).

### 4.    *Magistrate's Ruling*

The magistrate ruled that the officers were engaged in the lawful performance of their duties during the initial encounter (before the alleged assaultive conduct that preceded use of pepper spray) because they were not inside Moore's home and were simply asking questions to investigate a crime.  The officers, however, did not have the right to effect a warrantless arrest of Moore for violating the restraining order and did not

---

[6] Patino is seen later in the videos bleeding in the area of his nose and spitting out blood.  Other evidence established that he suffered a broken nose.

7

have probable cause to arrest Moore for resisting, obstructing or delaying arrest early in the encounter. Regarding the later part of the encounter, the magistrate ruled there was substantial evidence that Cha believed Moore was in the process of assaulting the officers when he first exited the gate, and Cha therefore acted lawfully when he deployed to pepper spray to arrest Moore for assault. However, factual disputes about whether Moore assaulted the officers and whether the officers used reasonable force to arrest Moore for such an assault should be submitted to a jury. Moore was held over on the charges and allegations reflected in the felony information filed thereafter (see fn. 2).

B.    *Section 995 Motion*

Moore filed a section 995 motion to set aside counts 1, 2 and 4 through 9 of the information. He again argued the evidence was insufficient to establish that the officers were lawfully performing their duties when the alleged assaultive acts were committed. The superior court granted the motion.

The court ruled as a matter of law, based on undisputed evidence of the officers' conduct, that the officers were not lawfully performing their duties after they ignored Moore's repeated demands to leave his stairway, which was either part of Moore's home or its curtilage. At that point, they were trespassing on Moore's property. (See § 602, subd. (m).) Even if the officers initially had the right to be on the stairway to investigate an alleged violation of the restraining order, the investigation was completed by the time they first descended the stairs as Moore had identified himself, acknowledged the restraining order, and said he had not violated it because he had simply taken out his garbage. The officers did not ask Choy to authorize a citizen's arrest. Even if the officers lawfully reascended the stairs, they had no probable cause to arrest Moore at that time. Thus, they had no right to refuse Moore's demands that they leave, order Moore out of his home, or use pepper spray or other force against him. The court disagreed that Moore's comment, "You're done," was a criminal threat in the circumstances, or that Moore criminally assaulted the officers just prior to Cha's deployment of the pepper spray. The prosecution dismissed the remaining counts in order to bring this appeal.

8

## II.    DISCUSSION

"[S]ection 995 allows a defendant to challenge an information based on the sufficiency of the record made before the magistrate at the preliminary hearing." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1071–1072; see *People v. Herrera* (2006) 136 Cal.App.4th 1191, 1202 [preliminary hearings and § 995 motions provide " ' "a judicial check on the exercise of prosecutorial discretion" ' and help ensure ' "the defendant [is] not . . . charged excessively" ' "].) An information "shall be set aside" if the defendant has been "committed without reasonable or probable cause." (§ 995.)

A.    *Standard of Review*

Appellate review of a section 995 determination, " 'in effect disregard[s] the ruling of the superior court and directly review[s] the determination of the magistrate holding the defendant to answer.' [Citations.] Insofar as the . . . section 995 motion rests on issues of statutory interpretation, our review is de novo. [Citation.] Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendant[] to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt' " (*Lexin v. Superior Court, supra,* 47 Cal.4th at p. 1072.) Neither the superior court nor the reviewing court may substitute its judgment for that of the committing magistrate concerning the weight of the evidence or the credibility of the witnesses. (*People v. Block* (1971) 6 Cal.3d 239, 245.)

Where, as here, the "engaged-in-duty element" is in dispute, material "disputed facts bearing on the issue of legal cause must be submitted to the jury . . . since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez, supra,* 51 Cal.3d at p. 1217; accord, *People v. Soto* (1969) 276 Cal.App.2d 81, 87 [conflict in evidence "as to whether a peace officer was making an unlawful or lawful arrest when assaulted by a person accused of a felony under section 243 . . . must be resolved by the jury"].) However, "the court, not the jury, usually decides whether police action was supported by legal cause" on a given set of facts (*Gonzales*, at p. 1217), and where there is no conflict in the evidence about the material

facts, the issue presents a pure question of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

B.    *Encounter Prior to Moore's First Exit Through Gate*

The People argue there is substantial evidence that the officers were engaged in the lawful performance of their duties when they walked up Moore's stairs to question him about the alleged restraining order violation and in continuing that investigation despite Moore's insistence that they leave. Because the officers' and Moore's actions up to the point of Moore's first exit through the gate are well documented and not materially disputed, this issue presents a pure question of law we review independently.

1.    *Legal Standards*

"'[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' [Citation.] This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. [¶] *We therefore regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'* "[7] (*Florida v. Jardines* (2013) 569 U.S. 1, 6, italics added.)

Ordinarily, government officials may not physically intrude into a home or its curtilage for a search or seizure without the resident's consent unless they have a warrant or exigent circumstances permit warrantless entry. (*Payton v. New York* (1980) 445 U.S. 573, 590; *Welsh v. Wisconsin* (1984) 466 U.S. 740, 741–742.) The warrant exception for investigative detentions " 'does not apply to in-home searches and seizures,' " and "to fall within the exigent circumstances exception to the warrant requirement, an arrest or

---

[7] It is not disputed on appeal that Moore's stairway, which led only to his front door and landing, fell within the curtilage and is part of Moore's home for Fourth Amendment purposes.

detention within a home . . . must be supported by *both* probable cause *and* the existence of exigent circumstances." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 182–183), final italics added.)  While the " 'exigency' exception" derives from the investigatory function, it allows warrantless entry into a home only if police "have both probable cause to believe that a crime has been or is being committed *and* a reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " (*U.S. v. Struckman* (9th Cir. 2010) 603 F.3d 731, 738, italics added.)

   However, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (*Florida v. Jardines, supra,* 569 U.S. at p. 8.)  " '[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.]  This implicit license typically permits the visitor to approach the home by the front path, knock promptly, *wait briefly to be received, and then (absent invitation to linger longer) leave.*" (*Ibid.,* italics added; see *People v. Rivera* (2007) 41 Cal.4th 304, 308 ["[e]ven if acting on an anonymous, uncorroborated tip, police may knock on the door of a residence, speak with the occupant, and request permission to enter and search"].)

   2.   *Analysis*

   We agree that Cha's *initial* approach to Moore's residence was lawful.  Cha exercised the license available to any private citizen to approach the home from the front path (the stairway), knock or ring the doorbell promptly, and wait to be received.  The officers' undisputed purpose was to question Moore about the alleged restraining order violation, not to detain or arrest Moore or search his residence.  The officers were acting lawfully as long as the encounter was consensual.  However, the encounter unquestionably became nonconsensual almost immediately with Moore's repeated and consistent demands that they leave.  The People argue Cha and Patino did not need to accept Moore's denials of culpability at face value or accede to his efforts to cut off

11

questioning, and they had the right to continue their investigation until satisfied with its results. We disagree.

Cha's and Patino's refusal to leave Moore's home when he repeatedly demanded that they do so, and their insistence on continuing questioning, transformed an attempt at a consensual encounter into an investigatory detention. A factually analogous case from the federal Seventh Circuit aptly illustrates the point. In *United States v. Jerez* (7th Cir. 1997) 108 F.3d 684 (*Jerez*), officers approached a motel room at about 11:00 p.m. to speak with the occupants despite lacking probable cause or reasonable suspicion they were involved in criminal activity. (*Id.* at pp. 686–687, 693; see *U.S. v. Cormier* (9th Cir. 2000) 220 F.3d 1103, 1108–1109 [Fourth Amendment protections apply to motel room occupants like residents in their homes].) Officers knocked on the motel room door for several minutes and said, "Police. Open up the door. We'd like to talk to you." When they received no response, one officer knocked on the motel room's window while another kept knocking on the door. After about two minutes, the officer knocking on the window saw movement in the room and shone a light into the room. An occupant pulled open the drapes and let them in the room after an officer showed his law enforcement insignia and said, "Sheriff's Department. Can we talk to you? Would you open the door?" (*Jerez*, at p. 687.) The court held the encounter was not consensual. (*Id.* at pp. 690–692.) "The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop. . . . [¶] . . . [¶] Simply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer" and " 'convey[ed] a message that compliance with their requests [was] required.' " (*Id.* at p. 692.)[8]

_____

[8] *Jerez* arose within the context of a motion to suppress evidence obtained during a search of the motel room and raised the distinct but related issues of whether the officers unreasonably "seized" the defendants, thus vitiating their consent to the search. (*Jerez, supra,* 108 F.3d at pp. 688, 694–695.) Here, we consider whether the officers were engaged in the lawful performance of their duties when Moore committed the alleged criminal acts. *Jerez* is nonetheless relevant and persuasive authority because both

Moore was not obligated to submit to further questioning within his home, and the
officers could not arrest Moore for a misdemeanor violation of a restraining order not
committed in their presence.[9]  (See § 836 [warrantless arrest permissible when officer
"has probable cause to believe that the person to be arrested has committed a public
offense in his presence"]; *People v. Welsch* (1984) 151 Cal.App.3d 1038, 1042 ["[i]f the
officer cannot testify, based on his or her senses, to acts which constitute every material
element of the misdemeanor, it cannot be said that the officer has reasonable cause to
believe that the misdemeanor was committed *in his presence*"].)  Moore's offensive
language and defiance of police authority also failed to justify the officers' continued
presence in the curtilage of Moore's home or Moore's detention.  (See *In re Chase C.*
(2015) 243 Cal.App.4th 107, 115 [" '[s]peech is generally protected by the First
Amendment, even if it is intended to interfere with the performance of an officer's duty,
provided no physical interference results' "].)

C.   *Encounter After Moore's First Exit Through Gate*

The People argue that even if Cha's and Patino's refusal to leave violated the
Fourth Amendment, their subsequent actions were not automatically rendered unlawful,
nor was Moore given immunity to thereafter break the law.  (*In re Richard G.* (2009)
173 Cal.App.4th 1252, 1262 ["individual's decision to commit a new and distinct crime,
even if made during or immediately after an unlawful detention, is an intervening act

---

inquiries turn on whether the officers violated the Fourth Amendment when entering the
defendants' motel room or residence.

[9] The People have not preserved the prosecution's trial court argument that the
officers had probable cause to arrest Moore for violating the restraining order.  In a
footnote in their opening brief, they state, "Arguably, the preliminary hearing presented
other disputed issues to be determined by the jury," including the issue of whether the
officers could lawfully arrest Moore in his home based on "Choy's implied request for a
citizen's arrest."  In their reply brief, they fault Moore for not responding to this theory of
probable cause.  However, poorly developed arguments raised only in a footnote are
deemed forfeited.  (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106, fn. 6.)  In any
event, the People's cited authority for an implied citizen's arrest is distinguishable
because there the defendant was arrested on a public street, not in his home.  (*People v.
Johnson* (1981) 123 Cal.App.3d 495, 498.)

sufficient to purge the 'taint' of a theoretically illegal detention"].)  Specifically, the People argue the officers had probable cause to arrest Moore for his allegedly assaultive behavior after he first stepped out from behind the gate, and therefore lawfully performed their duties thereafter.[10]

We first agree with the People—and Moore readily acknowledges—the officers' alleged constitutional violations do not immunize Moore from criminal liability for all subsequent conduct, including his alleged acts of physical violence.  If Patino was not engaged in the performance of his law enforcement duties when Moore allegedly punched him, Moore was not immune from prosecution for battery (§ 243, subds. (a), (d)); he simply cannot be convicted of battery of a peace officer engaged in the performance of his duties (§ 243, subds. (b), (c)).

We also agree with the People that an officer's unlawful performance of his or her duties at one moment does not dictate that all of the officer's subsequent conduct in the same encounter is likewise unlawful.[11]  They correctly observe that "convict[ion] of an offense against a peace officer ' "engaged in . . . the performance of . . . [his or her] duties" ' " depends on whether "the officer was acting lawfully *at the time the offense against the officer was committed.*"  (*In re Manuel G., supra,* 16 Cal.4th at p. 815, italics omitted & added.)  *Prior* unlawful conduct by the officer does not prevent a conviction if the officer was lawfully performing his duties at the time of an alleged offense.  The People argue that, even if the officers were no longer lawfully investigating the alleged restraining order violation when reascending the stairway following the initial encounter

---

[10] At oral argument, the People clarified that, in their view, Moore's conduct after he first stepped out from behind the gate was an *uncharged* assault that gave the officers probable cause to arrest Moore, and so the officers were lawfully performing their duties (in attempting to arrest Moore) when he committed his *subsequent charged* crimes (which included the alleged kicking and punching of the officers).

[11] We further agree with the People that Moore's implied provocation theory of unlawfulness ("officers were not in the lawful performance of their duties when they bait[ed] Moore to come out of his home and eject them as trespassers . . . leading to the alleged assault and resistance") is invalid under *County of Los Angeles v. Mendez* (2017) ___ U.S. ___, ___ (137 S.Ct. 1539, 1543–1544).

14

with Moore, the officers were nevertheless lawfully performing their duties when they attempted to apprehend Moore following Moore's alleged assaultive behavior after he first emerged from behind the gate.[12]

But Moore does not challenge the officers' probable cause to arrest him for the aggravated assault. As he correctly notes, the issue before us is not the lawfulness of his arrest, and his guilt or innocence does not depend on the peace officer status of the victims. The question is simply whether the officers could lawfully intrude into the curtilage of the home over Moore's vociferously expressed objection, and in the absence of probable cause, or other justification, *at the time of the entry* to do so. They could not. The officers were therefore not lawfully engaged in the performance of their duties *at the time* the alleged crimes occurred, even if their subsequent actions in effecting the arrest were lawful.

### III.    DISPOSITION

The judgment is affirmed.



---

[12] The People reasonably argue that the trial court failed to analyze events that occurred after Moore first emerged from the gate. The court said it was not ruling on whether Cha lawfully deployed pepper spray and did not know whether Moore kicked Cha at that point. The trial court's failure to address the issue, however, is immaterial because our review is de novo. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.)

15

_____

BRUINIERS, J.


WE CONCUR:


_____

SIMONS, Acting P. J.


_____

NEEDHAM, J.



16

# EXHIBIT 7



26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOYCE AMOS MOORE, et al., | Case No. 18-cv-00634-SI |
| Plaintiffs, | |
| v. | **ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | |

On October 30, 2020, the parties filed cross motions for summary judgment. Dkt. Nos. 94 (Defs' Mtn.) and 99 (Pltfs' Mtn.). Defendants filed a motion for summary judgment on all nine[1] of plaintiffs' claims. Dkt. No. 94 at 11[2] (Defs Mtn). Plaintiffs[3] brought a partial motion for summary adjudication of two discrete issues: (1) that the defendant officers were not in legal performance of

---

[1] The 9 causes of action are:
(1) 4th Amendment Violation – Unlawful Search and Seizure (no probable cause to arrest)
(2) 4th Amendment Violation – Excessive Force (pepper spray, baton, shooting)
(3) §1983 – Violation of First Amendment (Questioning Police Action – Retaliation)
(4) *Monell* Violation
(5) Violation of California Code §52.1
(6) Negligence
(7) ADA Violation
(8) Assault
(9) Battery

[2] For ease of reference, page numbers refer to the ECF branded number in the upper righthand corner of the page.

[3] On January 20, 2020, the original plaintiff, Sean Moore, died while incarcerated in San Quentin State Prison. Dkt. No. 100-1 at 7 (Unredacted Pltfs' Mtn). Sean Moore's parents, Loyce Amos Moore and Cleo Moore, were substituted in as plaintiffs in February 2020 as successors in interest. Dkt. No. 71 (February 2020 Order Granting Unopposed Motion to Substitute).

United States District Court
Northern District of California

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

1     their duties when they re-entered Mr. Moore's stairway after descending the first time and (2) the

2     officers used excessive force as a matter of law when the officers pepper sprayed Mr. Moore. Dkt.

3     No. 99 (Pltfs Mtn.). On December 4, 2020, the Court held oral argument on the motions.[4] Dkt. No

4     114 (Minute Entry from 12/4/20 Hearing).

5          Based on the papers and accompanying evidence submitted, as well as arguments made

6     during the hearing, the Court hereby GRANTS defendants' motion with respect to plaintiffs' fourth

7     cause of action (*Monell* claim) but otherwise DENIES defendants' motion.

8          The Court GRANTS in part and DENIES in part plaintiffs' motion as discussed below.

9

10                             **BACKGROUND**[5]

11          This case arises from a January 20, 2017 incident between Sean Moore and defendant

12     Officers Cha and Patino. The officers were called out by Mr. Moore's next-door neighbor,

13     Christopher Choy, at approximately four in the morning. Dkt. No. 100-1 at 7 (Pltfs' Unredacted

14     Mtn.). Mr. Choy held a temporary restraining order ("TRO") against Mr. Moore and told the officers

15     Mr. Moore had been banging on their shared wall. *Id.* Mr. Choy did not ask the officers to effect a

16     citizen's arrest nor did the officers witness Mr. Moore violating the restraining order. Dkt. No 100-

17     1 at 7 (Pltfs' Unredacted Mtn.); Dkt. No. 94 at 13. Mr. Moore's home had approximately ten steps

18     leading up to a shallow porch. At the top of the porch is a metal gated door to which Mr. Moore's

19     front door was immediately to the left – perpendicular to the gated door.

20     **The First Ascent Up Stairs**. The officers ascended the stairs and stood outside the closed

21     metal gated door. It is undisputed that the officers had the right to make this first approach and were

22     in legal performance of their duties in doing so. Dkt. No. 100-1 at 17 (Pltfs' Unredacted Mtn.). The

23

24          [4] The Court would like to note how well counsel for defendants and counsel for plaintiffs

25     argued their respective motions during the December 4, 2020 hearing. In a particularly tough case, counsel for both sides advocated ardently, effectively, and respectfully. The hearing was very

26     helpful for the Court.

27          [5] Unless otherwise noted, the facts in the background section are taken from the body worn camera videos of Officers Cha and Patino. See .Dkt. Nos 100-3 (Cha Body Cam) and 100-4 (Patino

28     Body Cam) (Manually Filed Exhibits 3 and 4 to Patrick Buelna's Declaration in Support of Plfs' Mtn).

officers, standing at the top of the stairs, tried to speak with Mr. Moore about the alleged TRO violation, while Mr. Moore was behind the metal gate. Mr. Moore told the officers in no uncertain terms, in expletive laden language, to "get off his stair." The officers asked Mr. Moore if he had violated the restraining order; Mr. Moore vociferously denied doing so. Cha 2:43; Patino 1:59 ("Hell no"). After this initial exchange with the officers, Mr. Moore went into his house and the officers descended the stairs.

**Second Ascent Up Stairs.** After the officers descend the stairs for the first time, they conferred with one another briefly on the sidewalk, reviewing the TRO. Mr. Moore reappeared on the stoop at the top of the stairs, still behind the metal door, and demanded the officers leave, calling them gay slurs. (Cha 3:48; Patino 3:12 -- "You better get your faggot asses out of here. Get your gay asses off my stairs"). Officer Cha responded "What's that?" and the officers immediately ascended the stairs again. (Cha 3:49; Patino 3:12). Mr. Moore continued telling the officers to leave, swearing at them, and making clear he was aware of the TRO and upcoming TRO hearing. (Cha 4:38; Patino 4:23) ("IT'S THE GODDAMN COURT DATE ON THE ELEVENTH" and then yells "Get off my stair, I'm through talking to you." One of the officers responded sarcastically, saying "Obviously you're not [finished talking to us]. And no, we're not [going to leave]." (Cha 5:08).

Mr. Moore then suddenly opened the metal door, saying "Get the fuck off my stair." (Cha 5:15; Patino 4:41). While Mr. Moore forcefully opened the metal gate, he initially remained behind it and then just barely crossed the threshold saying "Get off my stair" over and over.[6] Seconds later the officers deployed pepper spray. (Cha 5:24; Patino 4:49). One of the officers said "Keep it open," seemingly speaking to his partner about keeping the metal door open. Mr. Moore kicked out, grabbed the dropped hard copy of the TRO, said "fuck you" to the officers, and retreated momentarily into the house. The officers went partway down the stairs. One of the officers responded "fuck you" and Officer Patino said "Hey! Give me the paper back!" (Cha 5:29; Patino

---

[6] Defendants argue Mr. Moore was coming towards the officers and behaving aggressively at the time the pepper spray was deployed. Dkt. No. 94 at 20 ("In the moments before Officer Cha used his pepper spray, Moore was approaching the officers and ignoring their commands.")... While the videos clearly show Mr. Moore opened the door, he did not seem to be moving towards the officers at the time the pepper spray was deployed. (Cha 5:20; Patino 4:48).

3

4:57). Mr. Moore walked back onto the stoop and said "Fuck your paper." One of the officers said "Motherfucker! What's up? Come on? … Come 'ere!" (Cha 5:37 – 5:42).   Mr. Moore retreated into the house and the officers went to the bottom of the stairs. (Cha 5:44). Officer Patino was hit badly with pepper spray and said "I can't see, I can't see. I need some water, fuck." (Patino 5:28)

The officers stayed at the bottom of the stairs and Mr. Moore remained inside his house for approximately one minute. (Cha 5:43-6:45). Officer Patino was clearly distressed and in pain. Mr. Moore called out from inside the house saying what sounds like "Are you going to go?" (Cha 6:45). Officer Patino called out angrily in response, and still in pain, saying "Hey, sir, you need to give those papers back, alright?!" Mr. Moore kept asking if the officers were going to leave.   Officer Patino, became increasingly animated, responding:

> Officer Patino: "No! You need to give those papers back, NOW. That is an order! I am ordering you to come outside and give yourself up because you are under arrest! Yes! Sir you are under arrest right now!"
> Mr. Moore: I can't see!
> Officer Patino: Neither can I.
> Mr. Moore: I need medical attention.

(Patino 6:12).  The officers then told Mr. Moore to come out of the house multiple times and Mr. Moore did not do so.  While the officers were still at the bottom of the stairs, Mr. Moore reappeared behind the metal door and Officer Cha began yelling, getting increasingly louder: "Come on out! Come on out! Come on OUT!" One of the officers said "come on out or I'm going to kick the gate open!" Mr. Moore threw the hard copy of the TRO through the closed metal door onto the stairs and then retreated back into his house.  (Cha 7:30).

Officer Cha told Mr. Moore to come out so the officers can get him medical attention. (Cha 7:35). Mr. Moore said "Let's get this resolved. Let's get this resolved; I can't see!" (Patino 7:05). The officers continue yelling "COME OUT!"

**Third Ascent Up Stairs:** Mr. Moore then opened his metal gate and screamed very loudly "FUCK YOU" several times and then appeared to calm down.  The officers drew their batons, still at the bottom of the stairs, and continued saying "Come out! Let's go!" Mr. Moore was standing at the top of the stairs and dropped something small, black, and plastic sounding (based on the sound it makes hitting the ground) that bounced halfway down the stairs.  The officers screamed at Mr.

4

United States District Court
Northern District of California

1    Moore to "GET ON THE GROUND." (Cha 7:58). Officer Patino said "Get on the ground before

2    you get batoned." (Patino 7:27). Mr. Moore responded he "isn't getting on shit." Mr. Moore slowly

3    went down the stairs to pick up whatever it was he dropped. (Cha 8:14). The officers screamed

4    "HEY! GET OVER HERE! GET ON THE GROUND," Mr. Moore quickly moved back up to his

5    stoop, and the officers ascended the stairs, batons drawn. (Cha 8:14). Mr. Moore crossed the

6    threshold behind the open metal door. The officers were screaming 'GET ON THE GROUND."

7    (Cha 8:20). Officer Patino was in front of Officer Cha. Officer Patino hit Mr. Moore with his baton.

8    Mr. Moore punched Officer Patino in the face and Officer Patino fell backwards down the stairs.

9    (Cha 8:24). Mr. Moore was still on the top stoop. Officer Cha fired two shots, both hit Mr. Moore

10    at point blank range. Mr. Moore retreated into his house.

11

12                                    **LEGAL STANDARD**

13         Summary judgment is proper where the pleadings, discovery, and affidavits show that there

14    is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as

15    a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who

16    fails to make a showing sufficient to establish the existence of an element essential to that party's

17    case, and on which that party will bear the burden of proof at trial . . . since a complete failure of

18    proof concerning an essential element of the nonmoving party's case necessarily renders all other

19    facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it

20    might affect the outcome of the suit under governing law, and a dispute about a material fact is

21    genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

22    party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

23         The court's function on a summary judgment motion is not to make credibility

24    determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W.

25    Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence

26    must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

27    from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

28

United States District Court
Northern District of California

5

**DISCUSSION**

### I.    Defendants' Motion

While the incident is captured on the officers' body cameras, the parties hotly dispute how to interpret the video footage. Where a videotape captures the events in question, and there is no indication that the videotape has been doctored or altered in any way, a court should look to the videotape as direct evidence of the events. See *Scott*, 550 U.S. at 378-80. On a motion for summary judgment, the court should view the facts and draw reasonable inferences in the light most favorable to the non-moving party; but where a videotape of the events "blatantly contradicts" or "utterly discredit[s]" the account of a party such that "no reasonable jury could believe it," the court "should not adopt that version of the facts for purposes of ruling a motion for summary judgment." *Id.* Where video footage is "susceptible to more than one interpretation," summary judgment may not be appropriate. *Branscum v. San Ramon Police Dept.*, 606 Fed. App'x. 860, 862 (9th Cir. 2015) (affirming denial of summary judgment where video footage of officers' use of force raised genuine disputes as to whether the plaintiff resisted arrest, and if so, to what extent).

Defendants argue the officers had probable cause and used reasonable force with respect to the pepper spray, baton hits, and shooting because of Mr. Moore's combative, threatening, and uncooperative behavior. Dkt. No. 94 at 17-22. Plaintiffs argue Mr. Moore had no legal obligation to be cooperative and was retaliated against for so vociferously voicing his displeasure with the officers' presence. Dkt. No. 100-1 at 20-26. Plaintiffs also argue the officers provoked, taunted, and harassed Mr. Moore in direct contravention of their training. *Id.*

Here, factual disputes exist as to the reasonableness of parties' actions during the incident – that is, whether excessive force was used when deploying pepper spray, use of the baton, and the shooting. *See Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) ("[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh their way through the factbound morass of 'reasonableness.'" (*citing Scott v. Harris*, 550 U.S. 372, 383 (2007))); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing [of the individual's liberty against the government's interest] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary

1    judgment or judgment as a matter of law in excessive force cases should be granted sparingly. This
2    is because police misconduct cases almost always turn on a jury's credibility determinations."). The
3    body cam evidence is subject to varying interpretation and reasonable minds can differ about critical
4    aspects of the approximately 12 minute encounter, including whether the officers had grounds to
5    arrest Mr. Moore and whether/to what extent Mr. Moore was a threat to the officers.

6          Other disputes of fact include: Did the officers egg Mr. Moore on, looking for threats, and
7    asking for a fight? Or, were the officers simply trying to effectuate an investigation? Did the
8    officers know or should they have known Mr. Moore was mentally disabled based on his behavior?
9    Defendants argue they were trying to "control" Mr. Moore when the pepper spray was deployed,
10   but would a reasonable juror agree? Was Mr. Moore behaving in a, perhaps regrettable, but perfectly
11   legal manner just before being hit with pepper spray? After the pepper spray was deployed, what
12   was the basis for placing Mr. Moore under arrest? Were the officers enforcing the law or was Officer
13   Patino angry and in pain after getting hit with pepper spray? When the officers ascended the stairs
14   a third time, and Officer Patino hit Mr. Moore with his baton, was Mr. Moore advancing towards
15   the officers (as defendants argue) or was he retreating into his home (as plaintiffs argue)? Was it
16   reasonable given all the preceding events for Officer Cha to shoot Mr. Moore?[7] These are only a
17   sampling of the questions in need of resolution. These disputed facts go to whether the officers had
18   probable cause at each stage of the incident as well as whether the officers' force was reasonable.

19         Defendants also argue they are entitled to qualified immunity. "Qualified immunity shields
20   government officials from civil damages liability unless the official violated a statutory or
21   constitutional right that was clearly established at the time of the challenged conduct." *Reichle v.*
22   *Howards*, 132 U.S., 2088, 2093 (2012). The application of qualified immunity depends upon: (1)
23   whether the government actor's conduct violated a constitutional right; and (2) whether the
24   unlawfulness of the conduct was apparent under existing law. *Saucier v. Katz*, 533 U.S. 194, 201,
25   (2001). As to element (1), the court must take the facts in the light most favorable to the injured

26

27         [7] Defendants argue Mr. Moore was moving towards Officer Cha when Officer Cha fired but
28   that is not clear from the video footage.

7

United States District Court
Northern District of California

1  party and consider if "the facts alleged show the officer's conduct violated a constitutional right[.]"

2  *Id*. As to element (2), the Supreme Court has instructed courts "not to define clearly established law

3  at a high level of generality," stating that the dispositive question as to element (2) is "whether the

4  violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731

5  (2011). The Court "do[es] not require a case directly on point, but existing precedent must have

6  placed the statutory or constitutional question beyond debate." *Id*. at 2083.

7       Resolution of defendants' qualified immunity defense requires determination of numerous

8  factual disputes. *See Saucier*, 533 U.S. at 201 ("A court required to rule upon the qualified immunity

9  issue must consider . . . this threshold question: Taken in the light most favorable to the party

10  asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?

11  This must be the initial inquiry."). Use of excessive force is clearly unconstitutional; the question

12  is whether this use of force was excessive. This cause of action, and the inferences to be drawn

13  from the facts alleged by the opposing parties, is particularly well-suited for a jury's determination.

14  *See, e.g., Ruiz v. Sawaya*, No. 11-CV-03126-JST (PR), 2013 U.S. Dist. LEXIS 148388, 2013 WL

15  5665404, at *4 (N.D. Cal. Oct. 15, 2013) ("[E]valuation of plaintiff's excessive force claim depends

16  principally on credibility determinations and the drawing of factual inferences from circumstantial

17  evidence, both of which are the traditional functions of the jury . . . because questions of

18  reasonableness are not well-suited to precise legal determination . . .; the jury should be allowed to

19  assess whether the force used by the officers was excessive. Accordingly, the Court rejects Sawaya's

20  assertion of qualified immunity." (citations omitted)). So here, the qualified immunity question

21  cannot be resolved on the record at this time.

22       Therefore, defendants' motion is DENIED for all causes of action except the fourth[8] (*Monell*

23  violation).

24

25

26

_____

27       [8] Plaintiffs did not object to granting summary judgment with respect to their *Monell* claim,

28  the fourth cause of action.

United States District Court
Northern District of California

## II.   Plaintiffs' Motion[9]

Plaintiffs move for partial summary adjudication on two discrete issues: (1) that the defendant officers were not in legal performance of their duties when they re-entered Mr. Moore's stairway after descending the first time and (2) the officers used excessive force as a matter of law when the officers pepper sprayed Mr. Moore.

With respect to the second point, though it is quite a close call, the Court DENIES plaintiffs' motion for the reasons stated above with respect to the disputed facts.

With respect to the first point, the Court GRANTS the motion, finding the officers were not in legal performance of their duties when they ascended the stairs the second time. This conclusion is in accordance with the California's First Appellate District decision in *People v. Moore*, 2018 Cal. App. Unpub. LEXIS 2966, *1, 2018 WL 2016792. In that case, Mr. Moore was prosecuted by the state on various charges arising from this same incident at issue in the instant action, including assault and battery on a police officer. The charges were dismissed because the trial court found, and the appellate court affirmed, that the officers were not in legal performance of their duties for at least part of the encounter. Specifically the appellate court found:

> …**Cha's initial approach to Moore's residence was lawful**… The People argue Cha and Patino did not need to accept Moore's denials of culpability at face value or accede to his efforts to cut off questioning, and they had the right to continue their investigation until satisfied with its results. We disagree…
>
> **Cha's and Patino's refusal to leave Moore's home when he repeatedly demanded that they do so, and their insistence on continuing questioning, transformed an attempt at a consensual encounter into an investigatory detention**…
>
> **Moore was not obligated to submit to further questioning within his home**, and the officers could not arrest Moore for a misdemeanor violation of a restraining order not committed in their presence. … Moore's offensive language and defiance of

---

[9] Defendants argue plaintiffs cannot bring their motion for partial summary judgment for three main reasons: (1) they did not provide necessary documentation to act as Mr. Moore's successors in interest, (2) they failed to join a necessary party, Mr. Moore's brother, and (3) Loyce Moore cannot pursue any claims against defendants because he is sick and elderly. Dkt. No. 105-5 at (Unredacted Def. Opp to MSJ). However, defendants did not oppose the substitution of plaintiffs back in January 2020 (either by filing an opposition or by raising the issue during the February 14, 2020 CMC) and have not raised an issue with the substitution until November 2020. Dkt. No. 71 (Order Granting Unopposed Mtn to Substitute). Plaintiffs filed affidavits in conjunction with their reply brief in support of summary judgment affirming their ability to substitute in. Dkt. No. 110 (Pltfs' Affidavits). The Court is satisfied that plaintiffs are capable of litigating the matter and no other parties need be joined.

9

police authority also failed to justify the officers' continued presence in the curtilage of Moore's home or Moore's detention....

The People argue that even if Cha's and Patino's refusal to leave violated the Fourth Amendment, their subsequent actions were not automatically rendered unlawful, nor was Moore given immunity to thereafter break the law....Specifically, the People argue the officers had probable cause to arrest Moore for his allegedly assaultive behavior after he first stepped out from behind the gate, and therefore lawfully performed their duties thereafter.

We first agree with the People—and Moore readily acknowledges—the officers' alleged constitutional violations do not immunize Moore from criminal liability for all subsequent conduct, including his alleged acts of physical violence. If Patino was not engaged in the performance of his law enforcement duties when Moore allegedly punched him, Moore was not immune from prosecution for battery (§ 243, subds. (a), (d)); he simply cannot be convicted of battery of a peace officer engaged in the performance of his duties (§ 243, subds. (b), (c)).

We also agree with the People that an officer's unlawful performance of his or her duties at one moment does not dictate that all of the officer's subsequent conduct in the same encounter is likewise unlawful. They correctly observe that "convict[ion] of an offense against a peace officer '"engaged in . . . the performance of . . . [his or her] duties"'" depends on whether "the officer was acting lawfully at the time the offense against the officer was committed." (In re Manuel G., supra, 16 Cal.4th at p. 815, italics omitted & added.) Prior unlawful conduct by the officer does not prevent a conviction if the officer was lawfully performing his duties at the time of an alleged offense. The People argue that, even if the officers were no longer lawfully investigating the alleged restraining order violation when reascending the stairway following the initial encounter with Moore, the officers were nevertheless lawfully performing their duties when they attempted to apprehend Moore following Moore's alleged assaultive behavior after he first emerged from behind the gate.

But Moore does not challenge the officers' probable cause to arrest him for the aggravated assault. As he correctly notes, the issue before us is not the lawfulness of his arrest, and his guilt or innocence does not depend on the peace officer status of the victims. **The question is simply whether the officers could lawfully intrude into the curtilage of the home over Moore's vociferously expressed objection, and in the absence of probable cause, or other justification, at the time of the entry to do so. They could not. The officers were therefore not lawfully engaged in the performance of their duties at the time the alleged crimes occurred, even if their subsequent actions in effecting the arrest were lawful.**

*People v. Moore*, 2018 Cal. App. Unpub. LEXIS 2966, *17-22, 2018 WL 2016792 (emphasis added).

///

///

10



### III.    Motions to Seal

Defendants move to seal the body camera footage as well as various other materials related to the police investigation that took place subsequent to the incident. Dkt. Nos. 98, 100, 105, 107, 112. However, Cal. Penal Code Section 832.7(b) states

> …the following peace officer or custodial officer personnel records … shall not be confidential and shall be made available for public inspection …(A) A record relating to the report, investigation, or findings of any of the following:
>
> (i)    An incident involving the discharge of a firearm at a person by a peace officer or custodial officer.
>
> (ii)    (ii) An incident in which the use of force by a peace officer or custodial officer against a person resulted in death, or in great bodily injury.

Without question this case falls within both (i) and (ii) above and therefore the materials marked "Confidential" by defendants and designated to be filed under seal in support of defendants' and plaintiffs' motions should be made public. During the December 4, 2020 hearing defendants' counsel made clear the only part of the body cam footage they sought to keep under seal was footage at the beginning of the video in which Mr. Choy is identified and/or footage after Mr. Moore was shot. Pursuant to California Penal Code 832.7(b), the relevant footage and other materials regarding the incident (interviews of the officers, summary report of the incident, etc.) must be made public. Indeed, these should have been made public well before now. As such, defendants shall re-file the exhibits currently filed under seal publicly on or before Monday December 14, 2020 at 5pm with any necessary redactions to protect third parties or other sensitive information (addresses, phone numbers, etc.).[10]

The motions to seal are DENIED.

### CONCLUSION[11]

As discussed above, defendants' motion for summary judgment is DENIED except with respect to plaintiffs' fourth cause of action for which the motion is GRANTED.

---

[10] Note – defendants must not only file the exhibits they lodged under seal publicly, but also those filed by plaintiffs.

[11] Defendants' request for judicial notice is granted. Dkt. No. 95.

11

United States District Court
Northern District of California

1    Plaintiffs' motion is DENIED with respect to the use of pepper spray being excessive force

2    as a matter of law.  Plaintiffs' motion is GRANTED in so far as the officers were not in lawful

3    performance of their duties when they ascended the stairs a second time.

4    The motions to seal are DENIED.

5

6    **IT IS SO ORDERED**.

7    Dated: December 10, 2020

8    SUSAN ILLSTON
     United States District Judge

9

10

11

12

13

14                                          

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

Ex. A-152

# EXHIBIT B

1          SUPERIOR COURT OF CALIFORNIA

2          CITY AND COUNTY OF SAN FRANCISCO,

3                   ---o0o---

4

5   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
6              Plaintiff,             )
                                      )   CTN No.
7   vs.                               )
                                      )   **GRAND JURY**
8   KENNETH CHA,                      )
                                      )        GJT- 8
9              Defendant.             )
    _____   )    Grand Jury Number: 2021-A

10

11

12      **Reporter's Transcript of Grand Jury Proceedings**

13          **\* INVESTIGATIVE HEARING TRANSCRIPT \***

14

15              Tuesday, July 20, 2021

16                 Volume 1 of 4

17

18                 Pages 1 - 168

19

20

21   **APPEARANCES OF COUNSEL:**

22       For the People:

23           OFFICE OF THE DISTRICT ATTORNEY
             County of San Francisco
24           850 Bryant Street, 3rd Floor
             San Francisco, California 94103
25           By:  **Stephanie Lacambra, Assistant District Attorney**
             By:  **Dana Drusinsky, Assistant District Attorney**
26           By:  **Brian Bringardner, Grand Jury Legal Adviser**

27

28   Reported By:  JULIE L. BOZAICH, CSR No. 13604

1

**I N D E X**

2

Tuesday, July 20, 2021

3

**PEOPLE'S WITNESSES**                                    **PAGE**  **VOL.**

4

**PATINO, COLIN**
(SWORN)                                                    15      1

5

Direct Examination by Ms. Drusinsky                        16      1

6

**TINDALL, ERIC M.**
(SWORN)                                                    17      1

7

Direct Examination resumed by Ms. Drusinsky               18      1

8

**DOMIN, PATRICK**
(SWORN)                                                    58      1

9

Direct Examination by Ms. Drusinsky                        58      1

10

**BODISCO, RICHARD**
(SWORN)                                                    62      1

11

Direct Examination by Ms. Lacambra                         63      1
Direct Examination by Ms. Drusinsky                        87      1

12

**PATINO, COLIN (RECALLED)**

13

(PREVIOUSLY SWORN)                                        109      1
Direct Examination by Ms. Drusinsky                       110      1

14

Direct Examination by Ms. Lacambra                        146      1

15

**E X H I B I T S**

16

**PEOPLE'S EXHIBITS**                               **IDEN**  **EVID**  **VOL.**

17

1                     Body-Worn Camera Clip       29                 1

18

                      [Tindall]

19

1A                    Transcript [Body-Worn       39                 1
                      Camera, Exhibit 1]

20

1B                    Transcript [Body-Worn       39                 1

21

                      Camera, Exhibit 1]

22

1C                    Transcript [Body-Worn       80                 1
                      Camera, Exhibit 1]

23

2                     Thumb Drive                 61                 1

24

3                     Body-Worn Camera           119                 1

25

                      Footage

26

3A                    Transcript [Body-Worn      119                 1
                      Camera, Exhibit 3]

27

28

1

**I N D E X**

2

**E X H I B I T S**

3

| PEOPLE'S EXHIBITS | | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 4 | Body-Worn Camera Footage | 122 | | 1 |
| 4A | Transcript [Body Worn Camera, Exhibit 4] | 122 | | 1 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---o0o---

1  going to ask that at 1:30 this afternoon, you report to Judge

2  Bank's courtroom, which is 206.  You can bring your attorney

3  with you.  I will be there as well as the other two attorneys.

4  The Grand Jurors will not be there.  So for the moment you are,

5  excused, but we would ask that at 1:30, you report to Judge

6  Banks.

7          THE WITNESS:  Yes, sir.  I will be there.

8          MR. BRINGARDNER:  Thank you very much.

9          MS. LACAMBRA:  Thank you so much.

10                          (Witness excused.)

11          MS. DRUSINSKY:  All right.  You can go sit at the witness

12  stand.

13          THE GRAND JURY FOREPERSON:  I need you to be sworn.

14          This one goes under your chin.

15          THE WITNESS:  Like this?

16          THE GRAND JURY FOREPERSON:  There you go.

17          THE WITNESS:  Like this.  All right.

18          THE GRAND JURY FOREPERSON:  Okay.

19                          ERIC M. TINDALL,

20  called as a witness for the People, having been duly sworn,

21  testified as follows:

22          THE WITNESS:  Yes.

23          THE GRAND JURY FOREPERSON:  Please be seated, and please

24  state your name and spell it, for the record.

25          THE WITNESS:  It's Eric M. Tindall; E-R-I-C, M, Tindall,

26  T-I-N-D-A-L-L.

27          MR. BRINGARDNER:  And, Mr. Tindall, I'm Brian

28  Bringardner.  I work in the District Attorney's Office.  Also in

                                                              17

1  the courtroom today is Stephanie Lacambra, Assistant DA and

2  Assistant DA Dana Drusinsky.  In front of you is our court

3  reporter.  The remainder of the people in this courtroom,

4  including the folks in the gallery are our grand jurors.  Our

5  foreperson is seated at the bench in front of you and the

6  secretary is seated at this table.

7       I do want the record to reflect, this witness is wearing

8  a clear mask so all the jurors are able to see the witness' face

9  and mouth while he testifies.

10      Also, for the record, I am leaving the room, and

11 Ms. Lacambra and Ms. Drusinsky will continue guiding you through

12 this investigation.  Thank you very much.  I will see you again,

13 but probably not today.

14      **MS. DRUSINSKY:**  Thanks, Brian.

15                    **DIRECT EXAMINATION** (resumed)

16 BY MS. DRUSINSKY:

17 **Q.**  Okay.  Good morning, Officer.

18 **A.**  Good morning.

19 **Q.**  How are you doing today?

20 **A.**  Good.

21      How are you doing?

22 **Q.**  I'm doing good.  Thanks.

23      So I'd like to start off by going through what you reviewed

24 before testifying today.

25      What did you review in preparation for this hearing?

26 **A.**  A supplemental that I wrote as well as my body-worn camera

27 video.

28 **Q.**  Okay.  How many times do you think you've seen the body-worn

1   A.   That is correct.

2   Q.   How long had you been a police officer as of January 6,

3   2017?

4   A.   I think 11 years at that point.

5   Q.   Okay.  How long have you had the assignment of patrol?

6   A.   Fifteen years.

7   Q.   Wait.  So say that again.  So how long have you -- oh, as of

8   now you've had the assignment of patrol for 15 years?

9   A.   Fifteen years as of today.

10  Q.   So how long had you had the assignment as of January 6,

11  2017?

12  A.   Eleven years --

13  Q.   Yeah.  Okay.

14  A.   -- or so.

15  Q.   When did you graduate from the academy?

16  A.   Sometime in 2007.

17  Q.   And who was your field training officer, do you remember?

18  A.   Yeah.  There was three of them.  First one was Glen Sherry,

19  second one was Officer Simmons, and the third one was Cesar

20  Perez.

21  Q.   Does court reporter need him to spell any of those?

22       **THE COURT REPORTER:**  The first one.

23  BY MS. DRUSINSKY:

24  Q.   That was, I think, Glen Sherry.

25  A.   Glen Sherry; G-L-E-N, S-H-E-R-R-Y.

26  Q.   Okay.  Have you ever meet Sean Wendell Moore prior to

27  January 6, 2017?

28  A.   Yes.

1  **Q.**  When?

2  **A.**  It was a few years prior.

3  **Q.**  Do you recall where?

4  **A.**  At his residence.

5  **Q.**  Do you remember how you came to meet him?

6  **A.**  Yes.  It was a call for service.

7  **Q.**  What kind of call?  Do you remember?

8  **A.**  Um, it was a call where somebody called the police because,

9  as he walked by the residence, a person sitting on the porch of

10  the residence started yelling profanities at him, I believe

11  racial slurs, and was aggressive towards him.

12  **Q.**  So did you appear that day to investigate the incident?

13  **A.**  Yes, I did.

14  **Q.**  Okay.  What did you do to investigate the incident?

15  **A.**  I went to the address with my partner at that time.

16  **Q.**  Do you remember who your partner was?

17  **A.**  Yes, it was Alan Mulliken.

18  **Q.**  Can you spell that for the court reporter.

19  **A.**  A-L-A-N, M-U-L-L-I-K-E-N.

20  **Q.**  Okay.  So continue.

21  What did you do to investigate the incident?

22  **A.**  We rang the doorbell or knocked on the door -- I don't

23  remember which one -- and a gentleman answered the door.  And --

24  **Q.**  Do you recall who that gentleman was?

25  **A.**  It was -- later I found out his name was Sean Moore.

26  **Q.**  Okay.  And what happened when he answered the door?

27  **A.**  He was cussing and belligerent.

28  **Q.**  And this, you said, was a few years before 2017?

1    A.  Yes.

2    Q.  Okay.  Do you remember, like, what time of day this was?

3    Was it at night?  Was it during the day?

4    A.  It was probably around 6:00 p.m.

5    Q.  Okay.  So how did you deal with the situation?

6    A.  Um, seeing that he was aggressive and he didn't seem right,

7    I just told him:  Just leave people alone if they're walking

8    down the street.  Just leave people alone and don't yell names

9    at them, and -- you know.  Then we left.

10   Q.  And then you left?

11   A.  Yes.

12   Q.  You said the sentence that he didn't seem right.  Can you

13   tell us a little bit more about what you mean by that.

14   A.  When he answered the door -- you know, lots of times when we

15   go to people's addresses or we bang on the door and we talk to

16   someone, you know, they kind of question why we are there,

17   what's going on.  They want to know why police are at their

18   door.  And you are able to communicate with them and have

19   conversation back and forth.

20       With him, he just -- as soon as he opened the door, he just

21   started screaming and yelling and getting really aggressive.  He

22   was still behind a gate, I believe, so we were between him and

23   the gate.  And that's not normal behavior when we encounter

24   people.

25   Q.  Can I just clarify.

26       So he was behind the gate --

27   A.  Yes.

28   Q.  -- and you were on top of the stairway on the other side of

1  the gate?

2  **A.**  Yeah.  So we were on the stoop.  There was a gate, and

3  behind the gate he was there.

4  **Q.**  Okay.  And I think what you're getting at, you're kind of

5  saying he wasn't exhibiting normal behavior.

6      Did you come to suspect that he might suffer from some sort

7  of mental illness?

8  **A.**  At the time -- at the time, no.

9  **Q.**  Okay.

10  **A.**  We didn't know what his issue was.

11  **Q.**  Okay.  Now, how long do you think that whole interaction

12  lasted?

13  **A.**  About 20 to 30 seconds.

14  **Q.**  Can you tell us, like, how did your training and experience

15  inform how you dealt with Mr. Moore?

16  **A.**  At that time?

17  **Q.**  Yeah.  I know it was a long time ago.  To the best of your

18  knowledge.

19  **A.**  I don't think -- I don't really remember what our training

20  was at that time.

21  **Q.**  Okay.  So as soon as you told him to kind of leave people

22  alone, you felt like the scene was safe enough for you to leave?

23  **A.**  Yeah.  We didn't have a witness who was willing to come and

24  meet us.  They were gone, and there was nothing more to do.

25  **Q.**  Okay.  Any other time that you met Sean Wendell Moore?

26  **A.**  Prior to the --

27  **Q.**  Prior to January 6, 2017.

28  **A.**  That's the only time.

1    **AFTERNOON SESSION**                                    **2:02 p.m.**

2                    (Whereupon, roll call was taken.)

3         **THE GRAND JURY SECRETARY:**  We have all 17.

4         **MS. LACAMBRA:**  For the record, all 17 jurors are present

5    and in court along with the two District Attorneys,

6    Ms. Drusinsky and myself, Ms. Lacambra.  At this time, we are

7    prepared to recall witness Colin Patino.

8                         **COLIN PATINO**,

9    called as a witness for the People, having been previously duly

10   sworn, testified further as follows:

11        **THE WITNESS:**  Yes, ma'am.

12        **THE GRAND JURY FOREPERSON:**  Please be seated.  Please

13   state your name and spell it, for the record.

14        **THE WITNESS:**  My name is Colin Patino; Colin, C-O-L-I-N,

15   P-A-T-I-N-O.

16        **MS. DRUSINSKY:**  Good afternoon, Officer.  Before I get

17   into your question, I'm just going admonish the jurors really

18   quickly.

19        So Colin Patino was given use immunity in order to

20   testify fully in this grand jury investigation.  Use immunity

21   prevents the prosecution from using a witness' statements

22   against him or her in a criminal prosecution.  As a result of

23   this order, no testimony or other information compelled under

24   the order may be used against him in a criminal case.  Do not

25   make any negative or positive inferences from the fact that

26   Colin Patino invoked his Fifth Amendment right against

27   self-incrimination or the fact that he was given immunity.

28   ///

1  <u>**DIRECT EXAMINATION**</u>

2  **BY MS. DRUSINSKY:**

3  **Q.**  Okay.  So good afternoon again.

4  **A.**  Good afternoon.

5  **Q.**  Okay.  So, Officer, can you tell us what you do for a

6  living.

7  **A.**  I am a police officer for the City and County of San

8  Francisco.

9  **Q.**  How long have you been a police officer for?

10  **A.**  I've been employed with the police department since the

11  academy, which was September of 2014; and I've been a sworn

12  member as a police officer with the City and County of San

13  Francisco since May of 2015, so a little over six years.

14  **Q.**  Thank you.  What did you review in preparation for this

15  hearing?

16  **A.**  I reviewed the police report; I reviewed body-worn camera

17  footages; I reviewed depositions and interviews --

18  transcripts -- of my interviews from the difference agencies.

19  **Q.**  And when you said body-worn camera footages, are those -- is

20  that your body-worn camera footage and Officer Cha's body-worn

21  camera footages?

22  **A.**  That's correct.  Both mine and Officer Cha.

23  **Q.**  Any others?

24  **A.**  No.

25  **Q.**  Can you estimate how many times you've seen the footage from

26  your body-worn camera before coming in here today?

27  **A.**  I could not.  It's been four-and-a-half-plus years since, so

28  I don't know.

1    **Q.**  Okay.  Did you review the body-worn camera footage with

2    anyone other than your attorney?

3    **A.**  No.

4    **Q.**  Did you review any other police reports prepared in

5    connection with this shooting of Sean Moore?

6    **A.**  No.

7    **Q.**  And did you review any recording of notes you took, or have

8    in your possession, regarding the incident from January 6, 2017,

9    at 515 Capitol Street?

10   **A.**  No, because I don't have any notes from that night.

11   **Q.**  Okay.  And have you discussed this grand jury proceeding

12   with anyone other than your attorney?

13   **A.**  No.

14   **Q.**  And have you heard of any reference of this grand jury from

15   anyone other than your attorney?

16   **A.**  No.

17   **Q.**  Okay.  I want to ask about the weapons placement on your

18   utility belt.

19       Can you describe your utility belt for us, like what weapons

20   you carry on your person.

21   **A.**  Yes.  Specifically, weapons on our utility belt/gun belt --

22   it's a Sam Browne belt -- it's the belt that we use that was

23   given to us in the academy.  It's department-issued.  We all are

24   issued a firearm .40 caliber, SIG SAUER, model 226; we're issued

25   a baton, and we're able to use a wood baton or a metal baton, if

26   we're trained in that; we are given an OC spray, which is a

27   really, really effective pepper spray; and we're also given two

28   magazines for additional ammunition.  That's 12 bullets per

1   magazine, plus the magazine, that's in our gun belt.  So we have

2   12 in the gun, plus one in the chamber, plus another 24.

3   Q.  Can you describe where all of the items are located on your

4   belt.

5   A.  Yes.  Depending if you're right-handed or left-handed, the

6   firearm will be on that side.  For me personally, I'm a

7   right-handed shooter; my firearm was on my right hand.  They

8   trained us to keep the baton on the other side; they also train

9   us to keep the OC on the other side; and our magazine is towards

10  the front because it's easier to gravitate to, if you need to do

11  a magazine change.

12  Q.  And at the time of this incident, you didn't have Tasers;

13  right?

14  A.  We've never had Tasers.  San Francisco Police Department has

15  refused to give us Tasers.

16  Q.  Okay.  So your specific arrangement is gun on the right side

17  and then baton and OC on the left side; correct?

18  A.  Correct.  And that night, I was using a retractable, metal

19  baton, not the wood baton.

20  Q.  Okay.  So I take it you took extra training to be able to

21  use that baton?

22  A.  That's correct.

23  Q.  Do you happen to know Officer Cha's utility belt

24  arrangement?

25  A.  I don't remember what his -- no, I don't remember what it

26  was.  But I remember it was something similar.  Same amount of

27  weapons.

28  Q.  Do you know if Officer Cha is right- or left-handed?

1  A.  I believe he's right-handed.

2  Q.  Okay.  Do you have a San Francisco Police Department, like,

3  department-issued cell phone?

4  A.  I do.

5  Q.  Okay.  Did you ever use either your department-issued cell

6  phone or your personal cell phone to discuss this incident with

7  Officer Cha?

8  A.  No.  We were ordered to not talk about the incident.  And

9  through prior training in our academy through our DGOs, it

10  explicitly states you shall not talk about this incident with

11  anybody else unless it's an investigator or your lawyer.

12  Q.  Do you remember when you were given the order to not discuss

13  the case with Officer Cha?

14  A.  I think -- I don't remember.  I do know when I did speak to

15  my lawyer for the first time at Taraval Station, he said --

16  Q.  Okay --

17  A.  -- do not speak to this.  And it is a running general order.

18  Just because no one has explicitly said, don't talk about this,

19  is a DGO, a general order.

20  Q.  Okay.  Great.

21      Do you know or have any reason to believe that Officer Cha

22  discussed this incident with anyone other than his attorney on

23  his department-issued cell phone?

24  A.  No.

25  Q.  Do you have any reason to believe that he discussed this

26  incident with anyone other than his attorney on his personal

27  cell phone?

28  A.  I do not.

1  **Q.**  And so I take it you've never discussed this case with

2  Officer Cha?

3  **A.**  Absolutely not.

4  **Q.**  Did you ever author an incident report for this case?

5  **A.**  No.

6  **Q.**  You didn't author any report related to this case; right?

7  **A.**  That's correct.  We are strictly prohibited from writing

8  reports if you are involved in an incident like an

9  officer-involved shooting.

10  **Q.**  And when you say you're strictly prohibited, is that, like,

11  a general order?  Who prohibits you?

12  **A.**  I don't know.  I just know you're not going to write that --

13  if there's a shooting, you're not going to write that report.

14  **Q.**  I take it you did not document your use of force in writing

15  in this case?

16  **A.**  That's correct.

17  **Q.**  Did you complete any writing at all related to this case

18  aside from privileged materials from your attorney?

19  **A.**  I provided an initial written statement to homicide --

20  **Q.**  Okay.

21  **A.**  -- and that's it.

22  **Q.**  So you provided the initial statement?

23  **A.**  So because of our general orders --

24  **Q.**  Yeah.

25  **A.**  -- the first step in that during a homicide investigation

26  is -- a written statement of your recollection is given to

27  homicide prior to viewing the body-worn camera -- your own

28  body-worn camera footage; and in order to do that -- well, my

1  lawyer provided a statement.  So I told my lawyer what I

2  recalled, what I remembered of that incident, and he wrote down

3  what I said.  I read that statement, and I believed that

4  statement was factual in what I had said.  I believed it, I

5  signed it, and that's what was given to my -- or that's what I

6  gave to the homicide investigators.

7  **Q.**  To homicide, okay.

8      Okay.  So I take the answer to this is, no, but to your

9  knowledge, did Officer Cha document his use of force in writing

10 for this incident?

11 **A.**  I don't know what Officer Cha did.

12 **Q.**  To your knowledge, did he ever write a report in this

13 incident at all?

14 **A.**  I don't know.

15 **Q.**  Can you let us know the dates of all the interviews you

16 participated in for this case with the San Francisco Police

17 Department as well as who interviewed you -- approximately.

18 **A.**  A day or two after we had the initial homicide, I believe it

19 was Sergeant Watts and Sergeant Delaney, they asked me; and then

20 they followed up on the injuries that I received.  And I know

21 that was in the latter of that month.

22     I spoke to -- specifically San Francisco Police Department

23 personnel; correct?

24 **Q.**  Yeah.

25 **A.**  I also spoke to our Internal Affairs Administration Bureau.

26 **Q.**  You don't have to tell us who you spoke to there.

27 **A.**  And I believe there were two investigator sergeants who

28 interviewed us there.

1    Q.  Anything else?

2    A.  That's it.

3    Q.  Okay.  Can you let us know the dates of all interviews you

4    participated in for the San Francisco District Attorney's

5    Office.

6    A.  I did not.

7    Q.  Okay.  So on January 6, 2017, what was your job?

8    A.  I was assigned uniform patrol, San Francisco Police

9    Department, Taraval Station.

10   Q.  And at that point, how long had you been a police officer?

11   A.  Sworn?

12   Q.  Yeah.

13   A.  A little over a year and a half.

14   Q.  How long have you had the assignment of patrol?

15   A.  Since I graduated the academy, so a year and a half.

16   Q.  Do you remember who your field training officer was?

17   A.  I had two field training officers.

18   Q.  Do you remember them?

19   A.  Yes.  Kenyon Bowers and --

20   Q.  Do you think you can spell it for the court reporter.

21   A.  I'm sorry.  Officer Kenyon Bowers.  That's going to be

22   K-E-N-Y-O-N, Bowers, B-O-W-E-R-S.  My second field training

23   officer was Michael Grande; Michael, common spelling, Grande,

24   G-R-A-N-D-E.  And my third training officer was now Sergeant

25   Donald Jackson, common spelling.

26   Q.  And on January 6, 2017, who was your partner?

27   A.  Officer Kenny Cha.

28   Q.  How long had he been your partner at that time?

1    A.   About five, six months.

2    Q.   Can you estimate how many calls you responded to with him as

3    your partner by January 6, 2017?

4    A.   Hundreds.   Probably close to a thousand.

5    Q.   Do you feel like you worked well together?

6    A.   Yes.

7    Q.   Do you trust Officer Cha?

8    A.   Yes.

9    Q.   Can you describe your relationship with Officer Cha now.

10   Are you still close?   Still partners?

11   A.   We are not -- we don't have a relationship.   Due to the fact

12   of this investigation, it's -- we can't talk.

13   Q.   So I take it you did not stay partners after the incident?

14   A.   That's correct.

15   Q.   Did your opinion or trust of Officer Cha change after the

16   shooting?

17   A.   No.

18   Q.   Did you learn anything about the second fatal shooting that

19   he had with -- a few months later with Nicholas Flusche,

20   F-L-U-S-C-H-E?

21   A.   No.

22   Q.   Did that change your opinion or trust of Officer Cha?

23   A.   No.

24   Q.   So on January 6, 2017, when did your shift begin?

25   A.   It began at 2100, so at 9:00 p.m.

26   Q.   Is that generally when your shift began during that

27   assignment?

28   A.   Yes.

1  Q.  How many hours of sleep did you get before your shift that

2  day?

3  A.  I don't remember.

4  Q.  Does it sound familiar that you went to bed at 7:00 a.m. and

5  woke up at 6:00 p.m -- or do you need me to refresh your

6  recollection?

7  A.  If that's written down and I can read that -- I don't

8  remember how many hours of sleep I got.

9  Q.  Fair enough.

10 A.  Generally, that sounds like a lot of sleep for a midnight

11 officer -- for any officer on the beat.

12 Q.  Let me know if this refreshes your recollection.  And I'm

13 just showing you a transcript of your interview with homicide.

14 A.  Okay.

15 Q.  So I'll turn to page 8.

16 A.  I believe -- I don't -- sitting here right now

17 four-and-a-half years later, I don't remember; but I believe if

18 that's what I said then, then that's how many hours of sleep I

19 got.

20 Q.  Okay.  So it sounds right that you woke up at approximately

21 6:00 p.m., and you went to bed at approximately 7:00 a.m?

22 A.  Yes.

23 Q.  And you stated that you got a lot of sleep.

24     Do you agree with that statement?

25 A.  That sounds like a lot of sleep, yes.

26 Q.  Okay.

27 A.  For anybody.

28 Q.  Yeah.  All right.

1      So were you wearing a body-worn camera when you responded to

2  the call at 515 Capitol Street on January 6, 2017?

3  **A.**  Yes.

4  **Q.**  Did you turn the camera on -- so your body camera on --

5  immediately after arriving at 515 Capitol Street?

6  **A.**  It was -- I didn't activate it until I started hearing Sean

7  Moore yell.

8  **Q.**  How long did that take?

9  **A.**  I don't remember, maybe 15, 20 seconds.

10  **Q.**  Okay.  And are you required to turn a body-worn camera on

11  when you're investigating a crime?

12  **A.**  Yes.

13  **Q.**  And did your partner, Officer Cha, wear a body-worn camera

14  as well on January 6, 2017?

15  **A.**  He did.

16  **Q.**  Okay.  So I'd like to play the body-worn camera for the

17  jurors now.  So I'm going to pass out a transcript, so the court

18  reporter does not need to transcribe this.  So just give me a

19  moment.  I'm going to give you a transcript also.

20  **A.**  Okay.

21      **MS. LACAMBRA:**  For the record, we are marking this as

22  Exhibit 3, and the transcript, Exhibit 3A.

23                          (Grand Jury Exhibits 3 and 3A were

24                          marked for identification.)

25      **MS. LACAMBRA:**  I apologize.  What was previously marked

26  as 3A will actually be 4A, the transcript.

27      We're now playing what has been previously marked as

28  Exhibit 3.

1          (Whereupon, video played, unreported.)

2          **MS. DRUSINSKY:**  Can you pause it.  So we just started the

3    beginning of the body-worn camera footage that you were wearing

4    on that?

5    **Q.**  Does this appear to be the video of the body-worn camera

6    that you wore when you arrived at the scene of 515 Capitol

7    Street on January 6, 2017 -- Officer?

8    **A.**  I'm sorry.

9    **Q.**  I'll play it again.  I don't think you were watching.

10   **A.**  Do you mind if I stand up?

11   **Q.**  Of course you can stand up.  You can move.

12         **MS. LACAMBRA:**  Can you now see the screen?

13         **THE WITNESS:**  I'm good.

14         **MS. DRUSINSKY:**  Can you pause.

15         **THE WITNESS:**  Yeah, that's my video.

16   BY MS. DRUSINSKY:

17   **Q.**  Does that appear to be the video from the body-worn camera

18   you wore when you arrived at the scene of 515 Capitol Street on

19   January 6, 2017?

20   **A.**  Yes.

21   **Q.**  Does this video fairly and accurately depict the scene as

22   you saw it that day?

23   **A.**  Yes and no -- if I could explain.

24   **Q.**  Okay.

25   **A.**  So what you have here is a body-worn camera.  It's not -- it

26   captures only what it can see.  It's not going to capture me

27   looking to my left, looking to my right.  It's not going to

28   capture the spit that's hitting my face.  It's not going to

1  capture -- there's a lot that it doesn't capture.  It's grainy.

2  It would be like taking a picture of a sunset, right; so that

3  picture of a sunset is never going to look at beautiful in your

4  iPhone or a nice camera as in your own eyes and your own

5  experience.  So, yes, this is the body-worn camera footage that

6  was on me that captured the incident, but it's not going to

7  capture everything that I saw, that I felt, that night.

8  Q.  Of course.  And I understand.  I just need to clarify, for

9  the record, so that we can use this video.

10      So this was the video that you wore, and did it fairly and

11  accurately depict the scene with the limitations of a body-worn

12  camera that we all understand as you saw it that day?

13  A.  Correct.

14      MS. DRUSINSKY:  Okay.  So we can play it.

15          (Whereupon, video played, unreported.)

16      MS. LACAMBRA:  We're stopping the video at time 12:25:26

17  in the top right corner, for the record.

18  BY MS. DRUSINSKY:

19  Q.  Let me turn on the lights.

20      Okay.  So in the beginning of the video -- so specifically

21  your body-worn camera --

22  A.  Uh-huh.

23  Q.  -- did you notice that something was kind of blocking the

24  vision of the camera a little bit?

25  A.  It was my jacket.

26  Q.  It was your jacket, okay.

27      Okay.  And then you stated that you've also seen Officer

28  Cha's body-worn camera footage?

1    **A.**   Yes.

2    **Q.**   So we're going to play that as well. So I'm going to turn

3    the lights off again.

4         **MS. LACAMBRA:**   And, for the record, we have marked this

5    as Exhibit 4, and the transcript you have is of this video,

6    Exhibit 4A.

7                     (Grand Jury Exhibits 4 and 4A were

8                     marked for identification.)

9             (Whereupon, video played, unreported.)

10   **BY MS. DRUSINSKY:**

11    **Q.**   Okay. I waited until the part where it appears like you

12    arrived on the scene.

13       So does the video fairly and accurately depict the scene

14    from the angle of Officer Cha's body-worn camera as you observed

15    it that day?

16    **A.**   Yes.

17         **MS. DRUSINSKY:**   And specifically, I'm referring to

18    Officer Cha's body-worn camera.

19        Okay. So we can play the video. And the court reporter

20    does not need to report the transcript.

21            (Whereupon, video played, unreported.)

22         **MS. LACAMBRA:**   For the record, we have stopped the

23    recording at 12:27:26 in the upper right corner.

24   **BY MS. DRUSINSKY:**

25    **Q.**   Okay. So going from the beginning, around 3:51 a.m. on

26    January 6, 2017, did you receive a dispatch call to respond to

27    515 Capitol Street in San Francisco, California?

28    **A.**   Yes.

1  **Q.** Were you informed that a man named Christopher Choy had a

2  temporary restraining order against his neighbor?

3  **A.** I didn't realize that until we read the CAD.

4  **Q.** Can you just tell us a timeframe.

5  Were you reading the CAD? When would that have happened?

6  **A.** When we got into the radio car, or patrol vehicle, every

7  patrol vehicle has a computer -- it's called the CAD system --

8  and every call that you're on, you're able to read the details

9  of that call. So I do recall on the CAD -- it's like a

10  message -- stating Christopher Choy has a restraining order

11  against his -- an active restraining order -- against his

12  neighbor Sean Moore, gave a description, and said "active."

13  Just because you see it in CAD -- you know, there's a lot of --

14  we get a lot of calls that where just because something says

15  something doesn't actually mean it is. That's why we go there

16  to investigate it.

17  **Q.** Okay. So by the time you got in the patrol car to head over

18  to 515 Capitol Street, you were informed a man named ▆▆▆▆▆

19  ▆▆▆ had a temporary restraining order against his neighbor?

20  **A.** Yes.

21  **Q.** And the neighbor's name was Sean Moore?

22  **A.** Yes.

23  **Q.** Was ▆▆▆▆▆▆▆ living at ▆▆▆▆▆▆▆▆▆?

24  **A.** Yes.

25  **Q.** And Sean Moore was living at 515 Capitol Street?

26  **A.** Yes.

27  **Q.** And ▆▆▆▆▆▆ called the non-emergency line to

28  complain that Sean Moore was hitting the wall between

123

1  residences; is that right?

2  A.  I don't know if he called 911 or he called the non-emergency

3  line, but all I know is we got a call for service.  I don't

4  remember what it said on CAD, whether it was a 911 call or not.

5  Q.  Would it say that on the CAD?

6  A.  Sometimes.

7  Q.  Would it refresh your recollection to look at the CAD?

8  A.  Sure.

9  Q.  I don't know that it says that, so you can look at the CAD.

10 A.  Okay.

11 Q.  So I'm approaching with the CAD.  It's several pages.  Don't

12 mind the highlight.

13 A.  Right.

14 Q.  Just let me know if that refreshes your recollection.

15      MS. LACAMBRA:  And for the record, if you could explain

16 what CAD stands for.

17      THE WITNESS:  Computer Automated Dispatch.  Every time

18 you call the police, or you call dispatch, it automatically

19 generates a number.  And that's the -- that is the call log, I

20 guess.  Not every CAD is going to have an associated case

21 number, which would be the report number.  So sometimes you call

22 the police and say, hey, can you talk to my neighbor?  Sure.

23 Talk to neighbor.  If there's no report, then there's no case

24 number, just to clear up "CAD" and "case."

25 BY MS. DRUSINSKY:

26 Q.  Yep.

27 A.  I don't see where it would say "non-emergency."

28 Q.  Okay.  Does it say emergency, or does it just not say either

1  way?

2  A.  It doesn't say either.

3  Q.  Okay.  I'll just grab the binder back.  Thank you very much.

4  A.  Uh-huh.

5  Q.  Okay.  So when you went into the patrol vehicle, were you

6  aware that ███████████ basically called to complain that

7  Sean Moore was hitting the wall between residences?

8  A.  Yes.

9  Q.  Okay.  This is more or less, like, a noise complaint, would

10  you agree?

11  A.  It's more than a noise complaint, if there is a served

12  criminal order restraining someone's freedom, which isn't taken

13  lightly.  There's a lot that goes through trying to get a

14  restraining order, essentially restricting someone's freedom.

15  And there has to be documented instances why somebody may have a

16  restraining order against someone.  It may be because of

17  harassment, it may be because of violence, it may be because of

18  both.  And then a judge has to issue the order.  So I would say

19  it's a higher priority than a noise complaint.

20  Q.  Okay.  So a regular noise complaint -- how would you respond

21  to a regular noise complaint?

22  A.  Contact the person who is calling, contact the alleged noise

23  complaint person, ask them to turn your music down or whatever

24  you're doing.  And that's it.

25  Q.  And how would you respond to a violation of a restraining

26  order?

27  A.  You get statements from both parties, if time allows it.  If

28  you're able to, try to get both statements; verify that there is

1   a restraining order, and see if one party has been served or

2   not.  And if not, we'll take that restraining order -- I believe

3   it's a 200 form, I'm not sure -- and you read the admonishment

4   to the person who is being restrained.  You tell them, hey, do

5   not harass, strike, talk to this person at this date until this

6   time, signed by this judge.  And then give both parties a copy

7   of the served restraining order, and then tell the courts that

8   you served it.

9   Q.  Would you agree that there is different levels of severity

10  for just a violation of a restraining order?

11  A.  There's different steps, yes.

12  Q.  So for example, there could be a violation of a restraining

13  order that's violent, would you agree?

14  A.  Yes.

15  Q.  Like an act of violence is violating the restraining order?

16  A.  Correct.

17  Q.  There could be an instance of stalking; that's a violation

18  of a restraining order?

19  A.  Correct.

20  Q.  Those two instances are pretty severe in nature; right?

21  A.  Uh-huh.

22  Q.  Is that a "yes"?

23  A.  Yes.

24  Q.  Now, on a noise-complaint basis, for a violation of a

25  restraining order, would you agree that that is less severe?

26  A.  On the face of it, yes.

27  Q.  So when you arrived -- or before you arrived -- what your

28  understanding was -- the basis of the request for service -- let

1    me ask this differently.

2        There was no violence alleged that you were aware of --

3    A.  That I was aware of.

4    Q.  -- before you even got to the scene?

5    A.  Correct.

6    Q.  There was no information that anyone's life was at risk;

7    correct?

8    A.  Correct.

9    Q.  You arrived at the location at, like, 4:15 a.m?

10   A.  Yes, approximately.

11   Q.  And you arrived with your partner, Officer Cha?

12   A.  Yes.

13   Q.  Would agree at that time, there was no urgency to the call?

14   A.  It's hard to judge someone's urgency when you're calling at

15   4:15 -- or what time did the call come out, 3:51 -- so there's

16   some act of desperation for someone.  It's not a big deal for

17   me; but for someone calling at 3:51 in the morning, I would say

18   that's a big deal.  I wouldn't take it lightly.

19   Q.  And if you were called for a loud party at 3:51 a.m., would

20   that be urgent to you?

21   A.  If it was a loud party and there was a restraining order, I

22   would -- it would be a lower-priority call.

23   Q.  Now, when you arrived at the scene, the street was quiet?

24   A.  Yes.

25   Q.  Were there any loud sounds coming from 515 Capitol Street?

26   A.  I don't remember.

27   Q.  Did watching the body-worn cameras refresh your recollection

28   at all?  There was, like, a part before Sean Moore opens the

1  door, does that refresh your recollection as to whether or not

2  you heard any loud sounds coming from 515 Capitol?

3  A.  I heard yelling from 515 Capitol while I was speaking to

4  ███ --

5  Q.  Okay.

6  A.  -- from ███, and that yelling was not my partner's voice.

7  Q.  Right.

8      And I guess I'm asking if the body-worn camera refreshes

9  your recollection about the noise coming from 515 Capitol before

10  Officer Cha knocked on the door?

11  A.  No, because there's no sound.  There's no audio associated

12  with this prior to us.

13  Q.  Okay.  So it doesn't refresh your recollection?

14  A.  I don't remember any sound.

15  Q.  Okay.  Do you recall hearing any banging sounds coming from

16  515 Capitol?

17  A.  I don't remember.

18  Q.  Do you remember any loud sounds from ███████████████?

19  A.  Other than the interaction with Sean Moore -- oh, I'm sorry.

20      You said ████?

21  Q.  Yes.

22  A.  Where ██████ lives?

23  Q.  Yes.

24  A.  No.

25  Q.  So would it be fair to say that whatever the basis for the

26  restraining order, by the time you arrived, as far as you could

27  tell, was no longer present?

28  A.  Correct.

1  **Q.**  Now, immediately after you arrived, you split from your

2  partner Kenneth Cha; correct?

3  **A.**  Yes.

4  **Q.**  So Officer Cha went to 515 Capitol Street to talk to Sean

5  Moore at the same time that you went over to ████████████

6  talk to ███████████████?

7  **A.**  Correct.

8  **Q.**  Do you and Officer Cha usually split up when you first

9  arrived at the scene to investigate a possible crime?

10 **A.**  Yes.  That is common tactic used in law enforcement for

11 scenes that are -- where there isn't an active crime happening,

12 where there isn't any exigency, one partner will talk to party

13 one, the other partner will talk to party two; and then

14 hopefully everything is good.  We switch.  We figure out both

15 sides of the story so both can hear party one, party two, each

16 officer.  And then we can try and get a conclusion based on the

17 information that we get from both party one and party two.  It's

18 just basic investigative techniques.

19 **Q.**  And shortly after arriving at the scene, had you or Officer

20 Cha discussed, like, what strategy or tactics you were going to

21 employ to investigate the complaint?

22 **A.**  Other than saying -- and I don't remember, but I do believe

23 I said, "I'm going to talk to ████," and Kenny goes, "I'm going

24 to go talk to the guy at 515 Capitol" -- Sean Moore.

25     That's all I remember.

26 **Q.**  Okay.  So we kind of went over that you turned on your

27 body-worn camera within 15 to 20 seconds of arriving at the

28 scene; right?

1    A.  Yes.

2    Q.  And did you speak with ▆▆▆▆▆ before turning on your

3    body-worn camera?

4    A.  I did.

5    Q.  Do you recall for about how long you spoke to him before

6    turning on your body camera?

7    A.  I don't, no.

8    Q.  I'm sorry?

9    A.  I don't recollect, no.

10   Q.  Okay.  So on your body-worn camera, it shows you speaking to

11   ▆▆▆▆▆ for about 13 seconds.

12       Can you estimate how long you spoke to him that day?

13   A.  More than 13 seconds.  More than that.

14   Q.  Was it around 30 seconds?  Was it less than that?

15   A.  Maybe 45 seconds.  I don't know.

16   Q.  Yeah, okay.

17   A.  Yeah.  I don't know, and I don't remember.

18   Q.  Okay.  And ▆▆▆▆▆ indicated to you that he heard a banging

19   noise from next door?

20   A.  Correct.

21   Q.  And did ▆▆▆▆▆ say whether he saw Sean Moore do this

22   banging?

23   A.  Whether he saw him banging through the wall?

24   Q.  Yes.

25   A.  No.

26   Q.  Okay.  Did he tell you any other details about the banging

27   noise?

28   A.  He said -- I said:  Hey, are you ▆▆▆▆▆?  Yes.  What's

130

1   going on?  Man -- and I'm repeating what I remember him

2   saying -- man, I just want to get some sleep.  I'm tired.  My

3   neighbor Sean Moore he's banging on the door.  I just want him

4   to stop.  Can you please get him to stop.

5        And I asked him, "Do you have a restraining order?"  He

6   grabbed it, gave it to me, and then I heard Sean Moore yelling.

7   And I didn't have to ask ████, and ████ said, "Yeah, that's

8   probably him yelling."  I said," Okay.  I'll be right back."

9        And that was the last thing that happened.

10  Q.  Thank you for that.

11       Did he tell you if it was one bang or more than one?

12  A.  He said "banging," so he didn't specify how many bangs there

13  were.

14  Q.  And you didn't hear any banging while you were on-scene;

15  right?

16  A.  I didn't hear any banging.  That's correct.

17  Q.  Did you learn whether -- and maybe the answer is no -- did

18  you learn whether the banging was coming from inside or outside

19  Sean Moore's house?

20  A.  No, I don't remember.

21  Q.  Okay.  And then you stated that ████ told you he had a

22  temporary restraining order against his neighbor Sean Moore;

23  right?

24  A.  Correct.

25  Q.  And he told you he complained that Sean Moore violated the

26  order by banging on the wall; is that right?

27  A.  Correct.

28  Q.  And that was basis of his complaint --

1   **A.**  Yes.

2   **Q.**  -- right?

3      As far as you know, he had not been injured in any way?  And

4  by "him," I'm referring to ███████████.

5   **A.**  At that time, I had no knowledge of him being injured or

6  not.

7   **Q.**  ███████████ didn't indicate his life had been

8  threatened in any way?

9   **A.**  No -- I don't remember.

10  **Q.**  You don't remember him indicating that --

11  **A.**  I do not remember him indicating that his life was in any

12  threat.

13  **Q.**  And as far as you are aware, no one was at risk of being

14  hurt in that moment; right?

15  **A.**  Correct.

16  **Q.**  Okay.  I think you kind of summarized your conversation with

17  ███████, but is there anything else you recall ███████ saying

18  while you spoke to him?

19  **A.**  Not saying, but I remember his appearance.  He looked tired;

20  he looked frustrated, sad, and like he needed some sleep.  He

21  looked desperate.

22  **Q.**  And at that point, you didn't ask ███████ if he wanted you

23  to arrest Sean Moore; right?

24  **A.**  No.  I remember that was probably my next question, but due

25  to me hearing a voice yelling -- and it not being my partner I

26  was concerned about that.  So I said, "I'm going to be right

27  back."  So my intention was, we're going to talk about this

28  after; I'll be right back; we are going to handle this.

1    Q.   So you did not ask ████████ to sign a citizen's arrest form?

2    A.   Correct.

3    Q.   But you said ████████ had a copy of the temporary

4    restraining order?

5    A.   Which he gave me.

6    Q.   Which he gave you.

7         And so you took it?

8    A.   Yes.

9    Q.   Then you headed over next door and --

10   A.   I didn't take it.

11   Q.   You received it?

12   A.   I received it, yes.

13   Q.   Then you headed over next door to Officer Cha to investigate

14   the order?

15   A.   Yes.

16   Q.   And when you went next door, you saw Officer Cha at the top

17   of the stairway to Sean Moore's house?

18   A.   Uh-huh.

19   Q.   Is that a "yes"?

20   A.   Yes.

21   Q.   Sean Moore was standing behind the metal gate to his front

22   porch while speaking to Officer Cha when you arrived?

23   A.   Yes.

24   Q.   Is it fair to say Sean Moore appeared to be upset or

25   agitated?

26   A.   Yes.

27   Q.   Moore was ordering you both to leave his house?

28   A.   He was -- yeah, requesting that we leave.

1  **Q.** He raised his voice?

2  **A.** Yes.

3  **Q.** And he was using curse words to emphasize his demand that

4  you leave his stairwell; right?

5  **A.** That's correct.

6  **Q.** On January 6, 2017, you had been trained on making contacts

7  with people who are mentally ill; correct?

8  **A.** I was not trained under the 40-hour CIT program until a year

9  and a half after that.  We had some general training in the

10  academy.  The rest was life experience of trying to talk to

11  people and calm them down.

12  **Q.** And through the academy, you had received training on how to

13  deal with people who are mentally ill; correct?

14  **A.** Yes.  It was minimal training.  It was more of an exposure

15  to -- there are people who have mental health issues, and that's

16  a basic list of what type of mental health issues people may --

17  that you might talk to you.  It lists how you should act with

18  people.  And then there is an 40-hour advance class, which I

19  wasn't enrolled in or wasn't able to take until a year and a

20  half after this incident.

21  **Q.** And the 40-hour class you're referring to is the crisis

22  intervention training?

23  **A.** That's correct.

24  **Q.** And you gave a statement in a deposition in this case;

25  correct?

26  **A.** I did.

27  **Q.** And in the deposition, you were asked:  Have you received

28  training on making contacts with people who are mentally ill;

134

1    right?

2    **A.**  I did, yes.

3    **Q.**  And you were specifically asked about your training back on

4    January 6, 2017?

5    **A.**  Yes.

6    **Q.**  And you said, yes, you had received training; right?

7    **A.**  The training that I'm explaining to you from the academy.

8    In that same deposition, I also made clear that during that

9    deposition in September of 2019, I believe, I explained, hey, I

10    hadn't been to the crisis intervention team training yet as

11    well.

12    **Q.**  I understand.

13        But as of January 6, 2017, you had been trained to

14    recognize, based on behavioral cues and other indicators, people

15    with mental illness; correct?

16    **A.**  Yes.

17    **Q.**  And one indicator you were trained to consider when

18    determining whether someone is mentally ill is whether a person

19    becomes aggressive without apparent provocation; is that right?

20    **A.**  Yes.

21    **Q.**  And another indicator you were trained to consider is a

22    person who is easily frustrated; right?

23    **A.**  Yes.  Those are all indicators.  People -- I mean, we come

24    in contact with people who are angry all the time; people who

25    exhibit those exact behaviors every single day.  It's not

26    necessarily that they are, you know, bipolar, schizophrenic, or

27    any other disability; it's that people are just angry.  So, yes,

28    I was trained in that.

1    **Q.**  You're not a doctor, I understand.

2    **A.**  I'm not a clinician.  I'm a police officer who is trying to

3    deescalate each situation to the best of my ability.

4    **Q.**  Okay.  I appreciate that.

5        And then another indicator that you were trained on is short

6    temper and argumentative speech.

7    **A.**  I don't recall that.

8    **Q.**  Okay.  Would it refresh your recollection to look at the

9    student domain you were trained on in the academy?

10    **A.**  Yes.

11    **Q.**  Okay.  I'm approaching with Learning Domain 37, People with

12    Disabilities.  And, specifically, I'll refer to chapter 4,

13    page 4-7.  You can look at the date too.  It's over here.  Just

14    let me know if that refreshes your recollection.

15    **A.**  Okay.

16    **Q.**  Does that refresh your recollection?

17    **A.**  Yes.

18    **Q.**  Okay.  Thank you.

19    **A.**  Uh-huh.

20    **Q.**  Okay.  So you agree that short temper and argumentative

21    speech is another indicator of someone who could be mentally

22    ill?

23    **A.**  That is one indicator, correct.

24    **Q.**  Do you agree that several indicators were present,

25    suggesting Mr. Moore suffered from mental illness at the time of

26    the incident?

27    **A.**  Okay.  Looking back on it, I can absolutely see that.  At

28    the time that -- I didn't see it, and I don't know why.  But

1   that wasn't going through my head at that time.

2   Q.   Okay.  So at the time, as you observed Mr. Moore in his

3   agitated state, did you believe he could be suffering from

4   mental illness?

5   A.   No.

6   Q.   At any point during your interaction that day, did you come

7   to believe he might be suffering from cognitive impairment or

8   mental illness?

9   A.   At that time, January 6, 2017, no, I did not.

10  Q.   But now you say that you can see it?

11  A.   Having the training that I've had, having the experience

12  going on probably close to tens of thousands of calls regarding

13  mental health, people with mental health issues, and receiving

14  the training, I can see that, at that time, he was probably

15  suffering from a mental health crisis.

16  Q.   Okay.  That makes sense.  And at the time, you had responded

17  to quite a few incidents involving people suffering from mental

18  illness; right?

19  A.   Yes.

20  Q.   I believe you stated something like hundreds in your

21  deposition; is that right?

22  A.   Yes.

23  Q.   Okay.  Okay.  So the first thing you heard Sean Moore say

24  when you arrived at his stairwell was to get off his stairs;

25  right?

26  A.   Can you repeat the question.

27  Q.   Yeah.  Yeah.

28       The first thing you heard Sean Moore say when you arrived at

1    his stairwell was to get off his stairs; right?

2    A.  Uh-huh, yes.

3    Q.  And you told him, no, you were not going to leave; right?

4    A.  Yes.

5    Q.  At this point, when Sean Moore told you to leave his stairs

6    and you said you were not going to leave, were you detaining

7    Mr. Moore in your mind?

8    A.  Well, detain means that someone is not free to go, and we

9    have control over them.  At this point, we just wanted to --

10   we're investigating, we're trying figure out what we have

11   because all I had was an unknown amount of time with ███████,

12   which was under a minute; and then on the other hand, we have

13   Sean Moore who is yelling at us, telling us to get off the

14   stairs.  We wouldn't be doing our job if we didn't try to ask

15   him some more questions.

16   Q.  Was he detained at that point?

17   A.  At that point, no.

18   Q.  Do you agree you were standing in front of this threshold to

19   Mr. Moore's home?

20   A.  Threshold?

21   Q.  You were standing in front of his doorway?

22   A.  We were standing in front of his security gate.

23   Q.  And his doorway is right before his security gate; right?

24   A.  Yeah.  So you had a door, a security gate, and then you had

25   a couple steps, and then you have had Officer Cha and myself.

26   Q.  So you were standing in the entryway to his house; right?

27   A.  Yes.

28   Q.  And you were at the top of the staircase between Mr. Moore

1  and the street; correct?

2  A.  Yes.

3  Q.  Mr. Moore would have had to walk past you to get down his

4  front steps and reach the street?

5  A.  You can also go back -- yes.  He could also go back into his

6  house, through the house, to the garage.

7  Q.  So were you blocking him from leaving through his front

8  door?

9  A.  No.

10 Q.  So he could have just left, and you would have been okay

11 with that?

12 A.  I don't understand the question.  And I'm not trying to be

13 difficult.

14 Q.  Yeah, yeah, yeah.

15 A.  I just don't understand the question.

16 Q.  I guess I'm just trying to figure out, if you're standing in

17 front of an entryway and you're telling him you're not going to

18 leave, was he free to leave?

19 A.  He can go back in his house, yes.

20 Q.  Could he leave his house?

21 A.  He could leave his house.

22 Q.  Just through the garage though?

23 A.  Correct.

24 Q.  Okay.  So then he again told you to get off his stairs;

25 right?

26 A.  Yes, numerous times.

27 Q.  Numerous times.

28   And you asked if he was going to listen to what you had to

1  say; right?

2  **A.**  Correct.

3  **Q.**  And he told you to, "Say your shit and get the fuck on";

4  right?

5  **A.**  Correct.

6  **Q.**  And at that point, you tried to gather information related

7  to the restraining order; correct?

8  **A.**  Is this when we get down to the street for the first time?

9  **Q.**  No.

10  **A.**  Okay.

11  **Q.**  This is before.

12       If you want, I can refer you to page 2, line 10.

13  **A.**  Two, line ten, okay.

14  **Q.**  So you asked him to confirm his name?

15  **A.**  Yes.

16  **Q.**  He confirmed his name for you?

17  **A.**  Yes.

18  **Q.**  You asked if he had violated the restraining order that day?

19  **A.**  Yes.

20  **Q.**  He denied violating the order?

21  **A.**  Correct.

22  **Q.**  Mr. Moore repeatedly ordered you to leave his stairs, like

23  you just said?

24  **A.**  Yes.

25  **Q.**  Mr. Moore said he would call and remove you?

26  **A.**  Yes.

27  **Q.**  You asked him who he was going to call?

28  **A.**  Yeah -- yes.

1   Q.  He walked inside and closed his front door?

2   A.  Yes.

3   Q.  And after he walked inside and closed his front door,

4   Officer Cha for the first time asked you what the order said;

5   right?

6   A.  Yes.

7   Q.  And you told him, "Let's get out of here"; right?

8   A.  That's correct.

9   Q.  Both of you walked down the stairs to the sidewalk?

10  A.  Correct.

11  Q.  Was this the first time you read the order to yourself?

12  A.  Yes.

13  Q.  And as you were standing on the sidewalk, aside from the

14  garbage truck, the neighborhood was quiet?

15  A.  Yes.

16  Q.  No one's life had been threatened?

17  A.  To the best of my ability and from what I remember that

18  night, no.

19  Q.  No one had been injured?

20  A.  Correct.

21  Q.  And no one was yelling for help; right?

22  A.  Correct.

23  Q.  You had confirmed Mr. Moore was a restrained party in the

24  restraining order?

25  A.  Yes.

26  Q.  And he had denied violating the restraining order; right?

27  A.  Correct.

28  Q.  And like you told us, you had not personally observed any

```
 1   banging on ████████ wall; right?

 2   A.   Correct.

 3   Q.   You had not personally observed Mr. Moore harass, annoy, or

 4   molest ████; correct?

 5   A.   Yes.

 6   Q.   And by the point in time where you walked downstairs from

 7   Moore's house and were standing on the sidewalk, Moore had told

 8   you to leave 16 times.

 9        Is that somewhat consistent with your memory?

10   A.   Yes.

11   Q.   Okay.  At this point, do you agree it was feasible for you

12   to leave the scene and return at a different time?

13   A.   Well, so I understand that at the time, my partner and I, we

14   didn't believe we were trespassing.  We were there to

15   investigate a possible crime.  And I understand that since then,

16   it's been litigated heavily; but at that time, Officer Cha --

17   well, I can't speak for him, but I can speak for myself -- that

18   due to the significance, because there was a restraining order,

19   because we wanted to investigate -- you know, just because

20   someone says, get off my fucking steps, calls me a bunch of

21   slurs, is yelling at me, that doesn't mean now the investigation

22   is over, right.  It would be a dereliction of duty if we were to

23   leave at that point.

24   Q.   Why do you say that?

25   A.   Because of the fact that there is a restraining order on

26   file.  I don't know why there was a restraining order.  But like

27   I said earlier, restraining orders are not given lightly.

28   Restraining orders restrict our freedom, which means that
```

1  someone must have done something in order to get that

2  restraining order.  I don't know what the reason was.  I still

3  don't know what the reason is.  But at that time, I still needed

4  and wanted more information from both parties, both ████, both

5  Sean Moore, in order to complete this investigation.

6  Q.  But can you tell us what other information you were seeking

7  at this time?

8  A.  What other information I was seeking?

9  Q.  Yeah, to complete your investigation.

10  A.  I was trying to get just an honest conversation without

11  somebody yelling, spitting at me, banging the gate at me, and

12  calling me epithets.  That's what I -- like, we went there

13  with -- doing our best to be with the utmost respect, trying to

14  be professional, trying to investigate something.  Hey, we know

15  it's late, we know you want to get to sleep; but your neighbor

16  is accusing you of doing something that could land you in jail.

17  So let's talk like adults.  That's what my intention was at

18  least.

19  Q.  Okay.  So you wanted to continue conversing with Sean Moore

20  until he, kind of, showed you more respect, and you were able to

21  have a discussion with him?

22  A.  Maybe not respect.  Just have a discussion.

23  Q.  Okay.  Is there any specific information you were still

24  seeking, or did you get all the information you needed?

25  A.  Maybe his ID to ensure that he was Sean Moore.

26  Q.  Okay.  But he had told you he was Sean Moore?

27  A.  Correct.

28  Q.  Other than that, anything else?

1    A.    I can't remember at this time.

2    Q.    Okay.  No problem.

3          And so at this point in time, you're telling us you don't

4    believe it was feasible for you to leave the scene and return at

5    a different time because you were dealing with a restraining

6    order situation?

7    A.    Correct.

8    Q.    Okay.  So in any call with a restraining order, you're not

9    just going to leave the scene --

10   A.    Correct.

11   Q.    -- even after the investigation is complete?

12   A.    I haven't been in a situation like that, since or before

13   that.

14   Q.    Okay.

15         So on January 6, 2017, you have been trained that when you

16   receive a call about a violation of a restraining order, you

17   need so speak with the complainant and verify about the

18   complaint and restraining order; right?

19   A.    Yes.

20   Q.    And here, you spoke to ▮▮▮▮▮▮, the neighbor?

21   A.    Correct.

22   Q.    And you verified the restraining order?

23   A.    Yes.

24   Q.    And you verified the complaint; right?

25   A.    Correct.

26   Q.    So aside from maybe seeing his ID, you're saying there was

27   basically nothing left to investigate regarding the violation of

28   the restraining order after you verified those things?

1    A.   There's -- a citizen's arrest at least needs to be signed by

2    the complaining party.  We are peace officers, we can't have our

3    peace disturbed no matter how foul someone's language is or what

4    they're going -- a misdemeanor not committed in our presence, we

5    cannot arrest.  So if it's a misdemeanor outside of our

6    presence, we have to have either verbal agreement or, in this --

7    with our agency -- it has to be a signed, written form which we

8    call a citizen's arrest form.  So if we were able to complete

9    our investigation, that's what would have been one of the

10   checkmarks to complete this investigation.

11   Q.   Well, that would have just been a way for you to arrest

12   Mr. Moore?

13   A.   That's correct.

14   Q.   But in terms of the investigation, there was nothing left to

15   investigate --

16   A.   Um --

17   Q.   -- other than maybe seeing his ID?

18   A.   I don't know.  You know what?  There's a lot that you got to

19   do.

20   Q.   Can you think of anything else that you needed to do?

21   A.   I can't think of anything.

22        Do you mind if we take a break?

23   Q.   Yeah, we could take a break.

24        MS. DRUSINSKY:  Five minutes for everyone?  Okay.

25   Five-minute break.

26                    (Recess taken at 3:21 p.m.)

27               (Proceedings resumed at 3:27 p.m.)

28        MS. DRUSINSKY:  Are we ready?

1    THE WITNESS:  Yes.

2    MS. LACAMBRA:  Back on the record.  We have all returned

3    to the courtroom.  The 17 grand jurors are present; the witness,

4    Officer Patino, is present as well as counsel Ms. Drusinsky and

5    myself.  We're resuming the questioning of Officer Patino.

6    And, Officer Patino, you understand you're still under

7    oath?

8    THE WITNESS:  Yes.

9    ### DIRECT EXAMINATION

10   BY MS. LACAMBRA:

11   Q.  Now, Officer Patino, I have a couple of follow-up questions.

12   I'm going to go all the way back to --

13   A.  Can I finish my last answer about further investigative

14   reasoning why we were still there?

15   Q.  Oh, sure.

16   A.  Looking back on the video, looking back on the incident

17   four-and-a-half years later, at this time, oh, you've got all

18   the information.  At that time in my frame of mind, he's yelling

19   at us.  So when people are yelling at you, you're not really

20   getting a lot of information.  You're, kind of, getting bits and

21   pieces of the whole picture.  So the reason why we stayed was

22   because we didn't have the whole picture.  Like I said, we're

23   investigators.  We need to figure out what's going on.  You

24   know, maybe this guy is angry because -- who knows why.  But I

25   needed to stay to figure out his side of the story and get more

26   information.  Because at that time, I've got the paper; I'm

27   reading it; I'm listening to this guy; I'm making sure this guy

28   isn't banging on the wall.  There's a lot going on.  So there's

1   a lot that's going in one ear and going out the other.  There's

2   a lot that I'm not comprehending.  At the same time, I've got my

3   radio going on, got my partner next to me talking as well.  So

4   we still needed to gather more information.  When you

5   investigate a crime, when you interview somebody, you ask people

6   typically at least three times for the same story because their

7   stories can change; their stories can say, oh, you know what, I

8   do remember that, I do remember this, this is why.

9       So our investigation wasn't over then because there was

10  still a lot of pieces missing.  At that point, my frame of mind,

11  all I hear is some guy yelling epithets at me.  And, yeah, he

12  says he identifies himself, but there's really not a clear

13  picture of his side of the story.  And it would be unfair to

14  leave at that time with an incomplete investigation and story

15  from him.

16      That's it.

17  Q.  Thank you.  I appreciate that.

18      And I -- well, that's actually a great segue because I do

19  want to talk to you about your training from the academy

20  specifically with regard to TROs.

21      There's a difference between a temporary restraining order

22  and a criminal protective order; right?

23  A.  Yes.

24  Q.  So a temporary restraining order is by definition

25  temporary --

26  A.  Uh-huh.

27  Q.  -- is that correct?

28  A.  Yes.

1    **Q.**  Just for record, an "uh-huh" can't be recorded, so I need

2    you to you say "yes" or "no."

3    **A.**  Yes.

4    **Q.**  So a temporary restraining order is actually that one party

5    can get without having to present, or confront, any evidence

6    from the other party; right?  They can just tell their side of

7    the story, and a judge will review their affidavit and provide

8    one, and then actually set a hearing to see if a permanent

9    criminal protective order should be issued; is that correct?

10   **A.**  To my understanding, yes.

11   **Q.**  So when you were talking about, you know, how serious this

12   TRO is -- the temporary restraining order -- it is -- again,

13   this is basically an order that's issued with only the story

14   from one side; right?

15   **A.**  Yes.

16   **Q.**  And you heard on the video; and if you recall in your

17   interaction with Mr. Moore, he actually said:  There's a future

18   court date.  I know that there's a future court date?

19   **A.**  Right.

20   **Q.**  Okay.  And that would be when he would present whatever his

21   side of the story is to the Court, and the Court would decide

22   whether to issue an actual permanent protective order?

23   **A.**  Correct.

24   **Q.**  Now --

25   **A.**  During that night, during my whole interaction, what I

26   recall is ▬▬▬ just saying "restraining order."  So there was

27   no -- from what I remember no -- I don't remember reading

28   temporary restraining order on it.  My memory right now from

148

1  that night is just seeing restraining order, him -- █████ --

2  saying, "I have a restraining order against my neighbor."

3     And all I remember is "restraining order." I don't remember

4  if it was a temporary restraining order or permanent restraining

5  order. All I remember was "restraining order."

6  Q. Okay. So what did you think it meant when Mr. Moore said,

7  there is a court date on January 11?

8  A. Um, I honestly don't remember thinking about that.

9     Are you asking me what I thought then, or what I think now?

10  Q. Well, first, what you thought then. And I think you

11  answered that question; but if you have anything to add, please

12  do so.

13  A. Now, listening to it, it's him acknowledging that there is a

14  restraining order -- or a temporary restraining order -- and

15  that there will be a future date, because everything has an

16  expiration date; right. I mean, even from what I believe, even

17  a permanent restraining order, there is some sort of expiration

18  date, so I'm not aware of what kind of restraining order it is.

19  Q. Okay. And when you -- you actually didn't read through the

20  restraining order in its entirety until you came down the stairs

21  the first time; is that fair to say?

22  A. When I came down the stairs the first time.

23  Q. Came down Mr. Moore's stairs the first time.

24  A. Yes. When I came down Mr. Moore's stairs, that is the first

25  time I read the restraining order -- in hand.

26  Q. I'm sorry. What was that?

27  A. In hand. The first time that I had read the restraining

28  order was when I walked down Mr. Moore's stairs the first time.

1  Q.  And that was the restraining order that you received from

2  ▇▇▇▇▇▇?

3  A.  Correct.

4  Q.  And were you reading it, and it had, like, a distance -- you

5  know, in the order Mr. Moore was to stay, was it 25 feet or

6  45 feet?

7  A.  I believe it was 25 feet, 2-5.

8  Q.  Twenty-five feet.

9      And you were on the scene, so you saw that they were

10  next-door neighbors; like, literally their homes were adjoining

11  each other?

12  A.  Yes.  The typical San Francisco house where the single

13  family homes are right next to each other, so you're sharing the

14  same wall.

15  Q.  So as the crow flies, it's actually less than 25 feet

16  between Mr. Moore's staircase and ▇▇▇▇▇▇ staircase?

17  A.  Crow flies, yes; walking feet, more.

18  Q.  So but technically speaking, technically speaking, if

19  Mr. Moore was on his front staircase or front stoop, he would be

20  in violation of the temporary restraining order, as written, if

21  it wasn't by walking feet?

22  A.  Are you asking me?

23  Q.  Yes.

24  A.  I disagree with that, because I don't think anyone would

25  reasonably give a restraining order for 25 feet for someone that

26  lives next to them and think that just because you're walking

27  outside of your house, that you're in violation of a restraining

28  order.  I don't think any police officer would arrest anybody

1    just because they are walking outside their front step and there

2    is a 25-foot restraining order.  You would have to be banging,

3    yelling, calling someone an epithet to actually do that.  So,

4    no, I don't think it would be -- if you were outside of his

5    first step, no, I don't think he is.

6    Q.  Well, so I guess -- I'm not asking what an officer might do

7    in response to the restraining order; I'm asking if,

8    technically, as written, it said 25 feet away, right --

9    Mr. Moore was ordered under the temporary restraining order that

10   you've read, he was to stay 25 feet away from ████████; is that

11   correct?

12   A.  Yes.

13   Q.  And so technically, if ████████ house is less than 25 feet

14   away from his neighbor Mr -- I'm sorry -- Mr. Moore's house is

15   less than 25 feet away from his neighbor ████████, who was the

16   person that's protected by the restraining order; is that

17   correct?

18   A.  I guess technically, that's less than 25 feet.

19   Q.  So it could be that the temporary restraining order was

20   actually illegal, as written, because there was no way for

21   Mr. Moore to be at his home and not be in violation of this

22   restraining order?

23   A.  Like I said, I don't believe that, because --

24   Q.  I'm not asking what you believe.

25       I'm just asking, technically, as written, is that a

26   possibility?  Like, have you -- in your hundreds -- at this

27   time -- of calls, did you encounter restraining orders that were

28   later shown to be illegal or invalid?

1    **A.**  No.

2    **Q.**  Okay.  Have you ever in your training heard of orders that

3    were issued that were later to be found to be illegal or

4    invalid?

5    **A.**  I don't know.

6    **Q.**  How many cases would you say that you've investigated where

7    there was a search warrant involved?

8    **A.**  Where a search warrant was involved?

9    **Q.**  Yes.  Just ballpark, just an estimate.

10   **A.**  A dozen.

11   **Q.**  A dozen.

12       And of those dozen cases, were any of those search warrants

13   later held invalid?

14   **A.**  That I don't know, because I've never written a search

15   warrant.

16   **Q.**  But you, in the course of your investigation, never came to

17   know what happened in court; whether -- I mean you've testified

18   at motion to suppress?

19   **A.**  Oh, absolutely.

20   **Q.**  Well, there is a hearing where the person that is being

21   accused of having violated a court order is saying, hey, this

22   order is not valid; right?

23   **A.**  I understand what you're saying.  But to the best of my

24   ability, I don't know if there's anything that's been -- that

25   I've worked on that said this is invalid.

26   **Q.**  Yes, I understand that.  I'm just saying that you -- at the

27   time that you were investigating this, you were trying to figure

28   out --

1    A.  Uh-huh.

2    Q.  -- what was happening, but as you were looking at this

3    order --

4    A.  Uh-huh.

5    Q.  -- technically it could have been held -- someone could be

6    held in violation, as it was written, for being within 25 feet

7    of ███████.  And Mr. Moore's house was within 25 feet of

8    ███████ house?  That's all I'm asking.

9    A.  Right.  But if the distance -- it's different if there's a

10   wall.

11   Q.  Did it say that on the order?

12   A.  You're absolutely right.  It didn't say.

13   Q.  I'm just asking if -- I think Mr. Moore could have been in

14   his home and be held in violation of the order, as it was

15   written; true?

16   A.  I don't think he could be because he's in his own house.  I

17   apologize, I'm not trying to be difficult.

18   Q.  I know that you don't think it would be a violation of it,

19   but I'm just saying if, under the language of the order, it's a

20   technical violation, as the order was written and as you read it

21   that evening?

22   A.  Yes.  But I wouldn't -- I don't think any reasonable person

23   would think that he would be in violation because he was in his

24   house, even if he's within 25 feet of an order that says don't

25   be within 25 feet.

26   Q.  Okay.  Now, you also said that you didn't have a clear

27   enough picture -- and that's why you state -- you said that the

28   reason that you said was because you wanted to get Mr. Moore's

1  side of things; right?

2  **A.**  Uh-huh.

3  **Q.**  Now, would it be fair to say that you were able to develop a

4  good enough rapport with Mr. Moore that you felt that he was

5  actually willing to answer your questions after you were told 16

6  times to leave his house?

7  **A.**  I didn't know that then, because I think if we were to have

8  left at that time, we wouldn't have got an answer.  Sometimes

9  there's is a little cooling-off period.  People get into

10  arguments, people get a little bit of space, a little bit of

11  time, he may be ready to talk.  I didn't know Sean Moore up

12  until this point.  This is the only time I've ever come in

13  contact with him, so at that point, let's say, hey, let's just

14  step down, let's read these orders, and we'll talk to him again.

15  **Q.**  Well, so at that point, the first time that you came down

16  the stairs, would it have been feasible to create time and

17  distance to return at a later time to further investigate?

18  **A.**  It's feasible, yes.  Looking back on it now, it's feasible.

19  **Q.**  And on January 6, 2017, had you been trained that a detained

20  person is not obligated to answer any questions an officer may

21  ask during a lawful detention?

22  **A.**  Correct.

23  **Q.**  Okay.  So even if you felt at the time that you had the

24  right to detain Mr. Moore, his refusal to answer your questions

25  is not evidence one way or the other of anything further for you

26  to investigate; he can just make the choice not to talk to you?

27  **A.**  Absolutely.

28  **Q.**  Now, I want to talk to you about your training on

1    establishing effective communication.

2    **A.**  Okay.

3    **Q.**  Okay.  And so this is part of the training that you received

4    at the academy.

5        And the academy is a police academy?

6    **A.**  Correct.

7    **Q.**  And it's the Police Officer's Standards and Training

8    academy, and it lasts -- approximately, how many hours is that?

9    **A.**  I don't remember.

10   **Q.**  Do you recall how many days?  Weeks?

11   **A.**  Almost nine months.

12   **Q.**  Almost nine months, okay.

13       And you said -- well, we'll get back to that actually later.

14       Now, according to your understanding of San Francisco Police

15   Department General Order 5.01:  Communication with a

16   non-compliant subject is often most effective when officers are

17   able to establish a rapport; is that true?

18   **A.**  Yes.

19   **Q.**  And communication is most effective when you use the proper

20   voice intonation?

21   **A.**  Yes.

22   **Q.**  When you ask questions versus giving commands?

23   **A.**  Correct.

24   **Q.**  And communication is most effective when you provide advice

25   and try to defuse the conflict and try to achieve voluntary

26   compliance before resorting to the use of force?

27   **A.**  Yes.

28   **Q.**  Now, were you trained to employ deescalation techniques to

1   decrease the likelihood of the need to use force during an

2   incident and to increase the likelihood of voluntary compliance?

3   A.  Yes.

4   Q.  Were you trained that officers shall attempt to understand

5   and consider the possible reason why a subject may be

6   noncompliant?

7   A.  Yes.

8   Q.  Were you trained that a noncompliant subject may not be

9   capable of understanding or acting as expected in a particular

10  situation because of mental, physical, or even a hearing

11  impairment?

12  A.  That's true.

13  Q.  Were you trained that a subject may not be capable of

14  understanding or acting as expected in a particular situation

15  because of an emotional crisis?

16  A.  Yes.

17  Q.  And were you trained that a subject may not be capable of

18  understanding or acting as expected in a particular situation

19  because of a mental health issue?

20  A.  Yes.

21  Q.  Now, were you trained that officers who deescalate an

22  incident by delaying arrest while keeping the public and

23  officers safe will not be found to have neglected their duty?

24  A.  That's correct.

25  Q.  Unfortunately, that's not what Officer Cha chose to do.

26  Instead, Officer Cha, when you were at the bottom of the

27  staircase, he continued to shine his flashlight into the home of

28  Mr. Moore.

1  **A.**  We both had our flashlights shined in the area of a home

2  that we don't know if there's any weapons.  It's not to

3  intimidate, not to harass, annoy; it's to light up potential --

4  where there may be a threat.

5  **Q.**  So Officer Patino, I'm talking specifically about when you

6  were at in the bottom of Mr. Moore's staircase the first time;

7  the first kind of retreat down the staircase, you're reading the

8  temporary restraining order with your flashlight.  So that's

9  where your flashlight is pointed.

10 **A.**  At that point.

11 **Q.**  At that point.

12 **A.**  Yes.

13 **Q.**  At the time that you're reading the restraining order -- the

14 temporary restraining order, Officer Cha, instead of looking at

15 it with you, is shining his light up the staircase into the home

16 of Mr. Moore?

17 **A.**  Correct.

18 **Q.**  Now, after that, Mr. Moore came out and said, "You better

19 get your fagot asses on."

20 **A.**  Yes.

21 **Q.**  Did Moore's use of this insult appear to upset Officer Cha?

22 **A.**  I don't know how that affected him emotionally.  I never

23 asked Officer Cha.

24 **Q.**  Well, I'm asking, based on your observations -- because

25 Officer Cha was either in front of or right next to you at that

26 time --

27 **A.**  Can you point to me the page and line number.

28 **Q.**  I would refer you in the transcript --

1  A.  Right.

2  Q.  -- to page 5, line 23.

3  A.  Ah, got it.

4  Q.  So at that point, you hear Mr. Moore say, "You better get

5  your fagot asses on."  And then Officer Cha responded with,

6  "What's that," and then appears to ask him about the racial

7  slurs.

8      Do you see that part?

9  A.  Yeah, I see it.

10  Q.  So based on Officer Cha's behavior at that point in time, so

11  right after you were at the bottom --

12  A.  Uh-huh.

13  Q.  -- did he appear to be upset by Mr. Moore's use of the

14  epithet against him?

15  A.  Did he appear to be upset by being called a homophobic

16  epithet?

17  Q.  Yes.

18  A.  They are upsetting, but I don't know if it upset him.

19  Q.  Well, based on your memory, how did Officer Cha react at

20  that point?

21  A.  He asked, "Excuse me.  What did you say?"

22  Q.  But then he proceeded back up the stairs.  You'd already

23  created time and distance, but he chose to reengage Mr. Moore by

24  going back up the staircase?

25  A.  Correct.

26  Q.  What did that indicate to you?  How does that reflect on

27  what your opinion was of how he reacted?

28  A.  At this time?

1   **Q.**   Yes.

2   **A.**   I believe he was trying to continue to engage in a

3   conversation.

4   **Q.**   Okay.  So his charging back up the steps was trying to

5   engage Mr. Moore in conversation despite the experience you had

6   already had at the top of the stairs with Mr. Moore?

7   **A.**   Right.  So like you said, our main goal is to end every

8   single encounter without ever having to use force.  We were

9   doing our best to communicate stuff to him no matter how violent

10  or upsetting -- or no matter how, even sometimes, assaultive

11  they can be.

12  **Q.**   Now, as part of your training, were you taught that

13  uncontrolled fear and anger tend to decrease an officer's

14  ability to make sound judgment and decisions?

15  **A.**   Yes.

16  **Q.**   Were you taught that uncontrolled fear and anger tend to

17  increase verbal abuse by the officer?

18  **A.**   I don't know.

19  **Q.**   Were you taught that uncontrolled fear and anger tend to

20  increase the use of unreasonable force by an officer?

21  **A.**   I don't know where this training is coming from.

22  **Q.**   So you're trained as part of your academy training --

23  **A.**   Correct.

24  **Q.**   -- that, you know, you are going to encounter situations

25  that will cause a normal person, an average person, to react or

26  feel anger or fear --

27  **A.**   Uh-huh.

28  **Q.**   -- is that fair to say?

1  A.  Yes.

2  Q.  I mean, you are expected to sometimes engage in situations

3  that are inherently dangerous, and it would be normal for

4  someone to react with either fear or anger when threatened in a

5  certain situation?

6  A.  Yep.  Fight or flight.

7  Q.  But you're also trained to try to control those emotions

8  because you understand that you're, as an officer, given a lot

9  of privilege and power in maintaining public peace and safety?

10  A.  That's correct.

11  Q.  So you're trained that you need to recognize the onset of

12  these emotions in order to control them so that you do not react

13  with uncontrolled anger or fear because of the special privilege

14  and power that you have as an officer?

15  A.  We are trained to do our best in that situation.

16  Q.  Yes.  But you're trained, to the extent that you can

17  recognize the onsets of anger or other uncontrollable fear, and

18  to have tools to try and manager that anger or fear so that you

19  do not abuse the power that has been invested in you as an

20  officer; is that fair to say?

21  A.  It's fair to say that -- it's fair to say that we're held to

22  a higher standard, and we are trained to control our emotions

23  and to be aware of certain situations.  But there are some times

24  where things may happen that we may do unconsciously.  So, yes,

25  we are told to keep those things in mind; but when stressful

26  situations happen, our senses kind of tunnel vision and we focus

27  on one thing.

28  Q.  And that's precisely why you receive this training, right,

1  is to try and prevent you from getting into that tunnel vision

2  so that you can still have the mindfulness to try and control

3  the situation, most of all your own reaction to it?  I mean,

4  that's part of the training?

5  A.  Yes.

6  Q.  Now, you were taught that there are two types of fear:

7  There's reasonable fear and unreasonable fear; right?

8  A.  I don't remember that.

9  Q.  So this is part of Learning Domain 20.

10     Would it refresh your recollection to review Learning Domain

11  20, which is part of the training that you receive at the POST

12  academy, the police academy?

13  A.  Yes.

14  Q.  And I would refer you to page 5-9.

15  A.  Right.  Okay.

16  Q.  Great.

17     So having reviewed that, do you recall that, in the academy,

18  you are taught that there are two types of fear:  Reasonable

19  fear and unreasonable fear?

20  A.  That's correct.

21  Q.  And you're taught that reasonable fear is a controlled and

22  legitimate fear?

23  A.  That's correct.

24  Q.  And you're taught that an unreasonable fear is fear with no

25  direct correlation to the facts and situation?

26  A.  Correct.

27  Q.  Now, were you taught that unreasonable fear includes

28  overreactions to potentially true threats?

1   A.   Yes.

2   Q.   And were you taught that unreasonable fear also includes

3   overreactions to unreal threats that may be based on prejudice

4   or poor application of past experience?

5   A.   Yes.

6   Q.   Were you trained that some situations may generate

7   unreasonable fear?

8   A.   Yes.

9   Q.   And were you trained that you may experience unreasonable

10  fear as a result of personal prejudice?

11  A.   Yes.

12  Q.   Or as a result of explicit or implicit bias?

13  A.   Yes.

14  Q.   Or as the result of bias against people of a particular

15  race?

16  A.   Yes.

17  Q.   Now, were you trained that you might experience unreasonable

18  fear as a result of -- actually, I'll withdraw that.

19       Were you trained that unreasonable fear may be responsible

20  for inappropriate responses made by officers?

21  A.   Yes.

22  Q.   And inappropriate response by at that officer may be using

23  unreasonable force?

24  A.   Yes.

25  Q.   An inappropriate response by an officer may be unreasonable

26  anger or aggression?

27  A.   Yes.

28  Q.   Inappropriate response by an officer may be goading a

1  suspect or a subject or escalating the tension of the situation?

2  A.  Yes.

3  Q.  Now, were you trained that when anger is inappropriate or

4  out of control, it becomes a liability and may result in poor

5  decision-making?

6  A.  That's correct.

7  Q.  Were you trained that you should not be influenced by anger

8  in your decision-making as an officer?

9  A.  Yes.

10  Q.  And were you trained that few people can exercise effective

11  emotional self-control when they are extremely angry?

12  A.  Yes.

13  Q.  Were you trained that to avoid becoming extremely angry, you

14  need to prepare yourself for dealing with situations that make

15  you angry?

16  A.  Yes.

17  Q.  Were you trained that you can manage your anger by not

18  internalizing what people say or do?

19  A.  Yes.

20  Q.  By identifying anger-inducing scenarios?

21  A.  Anger-inducing scenarios?

22  Q.  Yes.  Were you trained that you can manage your anger by

23  identifying anger-inducing scenarios?

24  A.  Correct.

25  Q.  Were you trained that you can manage your anger by

26  developing problem-solving solutions?

27  A.  Yes.

28  Q.  And one of those might be to create time and distance

1    between you and whatever the source of that ager or anxiety

2    might be?

3    A.   Yes.

4    Q.   And were you trained that you can manage your anger by

5    recognizing the onset or unreasonable or uncontrolled ager?

6    A.   Yes.

7    Q.   I actually -- well -- we have a couple of follow-up

8    questions, but we might be ready to break very shortly.

9        With regard to Officer Cha's weapons placement, you said

10   that he is right-handed?

11   A.   I believe he's right-handed.

12   Q.   And you're trained at the academy that you should have your

13   gun on your dominant side.

14   A.   Absolutely.

15   Q.   So if your right-handed, it would be reasonable -- you're

16   trained, if you're right-handed, to have your gun on the right

17   side?

18   A.   More than reasonable.  It's "you shall."

19   Q.   Well, is it fair to say that Officer Cha have been trained

20   to have his belt aligned the same way you do because you're both

21   right-handed?

22   A.   Correct.

23   Q.   And then -- oh, you said earlier in your questioning about

24   mental health -- dealing with people with mental health, you had

25   very limited training with regard to that; right?

26   A.   Correct.  Just if I recall, just the learning domain from

27   the academy.

28   Q.   Well, the academy was nine months long; right?

1  **A.**  Yes, but the mental health -- correct.  The academy was nine

2  months long.

3  **Q.**  So how many days or weeks of that nine months was devoted to

4  interacting with individuals who present with mental health or

5  cognitive impairment or disability?

6  **A.**  I don't remember.

7  **Q.**  Do you recall if it was, like, a day?  A week?

8  **A.**  I'm not going to speculate.  I don't remember.

9  **Q.**  Okay.  Okay.  I think this is a good place to stop for

10  today.  We are going to have ask you to return tomorrow to

11  finish the question.

12  **A.**  I have two doctor's appointments tomorrow.

13      **MS. LACAMBRA:**  Okay.  If we can take a short break, and

14  we can talk about scheduling.  But we do need the admonition

15  about secrecy.

16      **THE GRAND JURY FOREPERSON:**  So we're taking a break?

17      **MS. LACAMBRA:**  Yes.  We're going to take a break and

18  determine questioning for when you should return.

19      **THE GRAND JURY FOREPERSON:**  All right.  So you've heard

20  this one before.

21      You are admonished not to discuss or impart at any time

22  outside of this jury room the questions that have been asked of

23  you in regard to this matter or your answers until authorized by

24  this grand jury or the court to discuss or impart such matters.

25  You will understand that a violation of these instructions on

26  your part may be the basis for a charge against you of contempt

27  of court.  This admonition, of course, does not preclude you

28  from discussing your legal rights with any legally employed

1    attorney should you feel that your own personal rights are in

2    any way in jeopardy.

3            THE WITNESS:  I agree.

4            THE GRAND JURY FOREPERSON:  Okay.  Thank you.

5        MS. LACAMBRA:  And, for the record, the witness did have

6    a clear mask on the entire time of his testimony so that the

7    jurors could see the entirety of his face, including his mouth.

8    So if we could take a short break off the record, let's talk

9    about scheduling.

10       MS. DRUSINSKY:  Does everyone want to come back in about

11   five minutes again, and then we'll be done for the day after

12   that.

13           So just remember, don't talk to each other or anyone else

14   about the cases and don't look anything up on the Internet.

15                    (Recess taken at 4:00 p.m.)

16               (Proceedings resumed at 4:08 p.m.)

17       MS. LACAMBRA:  Thank you, all.  Back on the record.  By

18   my headcount, we have all 17 jurors present; the witness,

19   Officer Patino; ADA Drusinsky and myself, Stephanie Lacambra.

20           At this time, we're going ask the witness, Officer

21   Patino, return to us on Thursday, January 22nd, at 9:30, in the

22   morning -- or sorry -- July 22nd.  And, yes, I believe we need

23   that to officially come from our foreperson.

24       MS. DRUSINSKY:  You need to order him to come back

25   Thursday at 9:30.

26           THE GRAND JURY FOREPERSON:  Okay.  Yes.

27           Will you, please, come back at 9:00 to continue this.

28           THE WITNESS:  I'll be here.  I acknowledge I'll be here.

# EXHIBIT C

1          SUPERIOR COURT OF CALIFORNIA

2        CITY AND COUNTY OF SAN FRANCISCO,

3                 ---oOo---

4

5   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
6              Plaintiff,            )
                                      )   CTN No.
7   vs.                               )
                                      )   **GRAND JURY**
8   KENNETH CHA,                      )
                                      )   GJT-8
9              Defendant.            )   Grand Jury Number-2021-A
    _____)

10

11

12      **Reporter's Transcript of Grand Jury Proceedings**

13        * INVESTIGATIVE HEARING TRANSCRIPT *

14

15             Wednesday, July 21, 2021

16                Volume 2 of 4

17

18              Pages 169 - 210

19

20

21  **APPEARANCES OF COUNSEL:**

22       For the People:

23          OFFICE OF THE DISTRICT ATTORNEY
            County of San Francisco
24          850 Bryant Street, 3rd Floor
            San Francisco, California 94103
25          By:  **Stephanie Lacambra, Assistant District Attorney**
            By:  **Dana Drusinsky, Assistant District Attorney**
26

27

28  Reported By:  JULIE L. BOZAICH, CSR No. 13604

1

# I N D E X

2  Wednesday, July 21, 2021

3  **PEOPLE'S WITNESSES**                                          **PAGE**  **VOL.**

4  Kresley, Wallace
   (SWORN)                                                        180     2
5  Direct Examination by Ms. Lacambra                             180     2
   Direct Examination by Ms. Drusinsky                            197     2
6  Direct Examination resumed by Ms. Lacambra                     198     2
   Direct Examination resumed by Ms. Drusinsky                    200     2
7  Direct Examination resumed by Ms. Lacambra                     201     2
   Direct Examination resumed by Ms. Drusinsky                    206     2
8  Direct Examination resumed by Ms. Lacambra                     207     2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                            ---o0o---

1      **MS. LACAMBRA:**  And for the record, the witness is being

2   given a clear mask that will permit the jury to be able to see

3   his face while testifying, including his mouth.

4             **WALLACE KRESLEY**,

5   called as a witness for the People, having been duly sworn,

6   testified as follows:

7      **THE WITNESS:**  I do.

8      **THE GRAND JURY FOREPERSON:**  Please be seated, and would

9   you please state your name and spell it.

10     **THE WITNESS:**  Officer Wallace Kresley.  That's

11  W-A-L-L-A-C-E, K-R-E-S-L-E-Y.

12          **DIRECT EXAMINATION**

13  BY MS. LACAMBRA:

14  **Q.**  Good morning, Officer.

15  **A.**  Good morning.

16  **Q.**  Officer, where do you currently work?

17  **A.**  Excuse me?

18  **Q.**  Where do you currently work?

19  **A.**  I currently work at Central Police Station.

20  **Q.**  And for what agency?

21  **A.**  The San Francisco Police Department.

22  **Q.**  And how long have you been working for the San Francisco

23  Police Department?

24  **A.**  I entered the department in 2013.

25  **Q.**  So have you ever met Sean Wendell Moore?

26  **A.**  Yes.

27  **Q.**  Okay.  And when was that?

28  **A.**  It was on a call.  I believe, January 8th of 2015, we were

1    called to a dispute between neighbors.

2    Q.   And do you know where Mr. Moore lived?

3    A.   I don't remember the exact address.

4    Q.   Would it refresh your recollection to review the report

5    written --

6    A.   Yes, I have it.

7    Q.   Okay.

8         -- by your partner?

9         If you can just review that and let me know when you've had

10   a chance to refresh your recollection.

11   A.   Yeah.   It was 1515 -- 515 Capitol Avenue in San Francisco.

12   Q.   Okay.   515 Capitol Avenue?

13   A.   5-1-5, exactly.

14   Q.   And did you -- what -- I'm sorry.

15        You said you were called because there was a dispute between

16   neighbors.

17   A.   Yes.   That's what I remember.

18   Q.   And what happened when you responded to that call?

19   A.   From my recollection, I remember Mr. Moore basically locking

20   himself behind a gate that enters into his house at the top of

21   his stairs; being uncooperative; not wanting to talk to us;

22   telling us to leave; yelling at us -- I can't remember specific

23   things he said, but he was generally uncooperative.

24   Q.   So when you say he was uncooperative, would you classify his

25   behavior as irate or angry?

26   A.   Yes.

27   Q.   So what did you do when he reacted that way?

28   A.   We just gave him his room, gave him space.   And were trying

1  to figure out, you know, who -- you know, what happened with the

2  victim; someone was getting his statement, and my kind of

3  specific role was just keeping an eye on Mr. Moore and seeing if

4  he would talk to me.

5  Q.  And where was Mr. Moore when you were keeping an eye on him?

6  A.  He was behind his gate.

7  Q.  And where were you when you were keeping an eye on him?

8  A.  I was kind of a combination of on his stairs, leading up to

9  his house, and then at the bottom of the stairs.  At times, I

10 would walk up close to the gate to where he was.  From what I

11 remember, the closer I got to him, the more irate or upset he

12 got, so I would back down to the bottom of the stairs and

13 continued to try to talk to him.

14 Q.  And are you trained in deescalation to create time and

15 distance when you're engaging with an uncooperative subject?

16 A.  Yes.  However, that training didn't come until after this

17 date.

18 Q.  So back when you were there on January 8, 2015 -- when did

19 you go to the academy?

20 A.  Excuse me?  When did I go to the academy?

21 Q.  Yes.

22 A.  Gosh, I'm trying to remember.  It was 2013.  I believe I

23 graduated in May of 2013.

24 Q.  And --

25 A.  And I believe I got into it the September prior, I think.

26 Q.  So September of 2012?

27 A.  '12.

28 Q.  Okay.  And how long was the academy then for you?

1    **A.**   I believe it was seven or eight months.

2    **Q.**   And as part of that training, you were trained in how to

3    create time and distance to  defuse a situation?

4    **A.**   Yes, yes.  Although there's been more inclusive classes

5    since that date that we've had to attend.

6    **Q.**   I'm just going ask you questions based on your training

7    prior to your interaction with Mr. Moore that was part of your

8    academy training?

9    **A.**   Yeah.

10   **Q.**   I understand there's been subsequent trainings that have

11   increased awareness about deescalation techniques, especially

12   recently, but I want to talk to you about what you were trained

13   in the academy to do and how that affected your interaction with

14   Mr. Moore.

15   **A.**   Understood.

16   **Q.**   So you noticed that the closer you got to Mr. Moore, the

17   more upset he would become?

18   **A.**   Yes.

19   **Q.**   So as a result of that, your training taught you, if you

20   create time and distance, that is a mechanism -- or a way to --

21   or a method -- to decrease the escalation of the incident?

22   **A.**   Absolutely.

23   **Q.**   Now, when you were interacting with Mr. Moore, he was -- was

24   he using epithets or racial slurs?

25   **A.**   I know he was using foul language.  I would classify it as

26   somewhat threatening.  I don't remember racial slurs being

27   thrown out.  I just don't remember that.

28   **Q.**   Did his behavior appear inappropriate or out of step with

1  the situation you were investigating?

2  **A.**  Yes -- yeah.  He was at a higher level than what you would

3  expect in that situation.

4  **Q.**  And as part of your training at the academy, are you trained

5  to look for certain cues that might indicate an individual who

6  might be suffering from a cognitive impairment or a mental

7  illness or disability?

8  **A.**  Yes.

9  **Q.**  What are some of those factors that you're trained to look

10  for?

11  **A.**  Behavior that doesn't match the situation.  It can be many

12  things:  You know, talking to themselves, grandiose ideations of

13  things that aren't happening.  We see a lot of inappropriate

14  behavior that doesn't match the situation.

15  **Q.**  So did you notice that his behavior matched any of those

16  cues that you were trained to look for?

17  **A.**  Yes, yes.

18  **Q.**  What were the cues that's matched?

19  **A.**  Mostly, his demeanor -- his general misdemeanor.  He was

20  angry -- he seemed angry to a level that really didn't merit his

21  behavior.

22  **Q.**  And --

23  **A.**  And we were trying to explain to him, of course, hey, we're

24  not here to hurt you; we just want to talk to you.  And, you

25  know, from my recollection, he just wouldn't calm down.

26  **Q.**  Eventually, were you and your partner able to create enough

27  time and distance that he did have the space to calm down?

28  **A.**  Yeah.  I mean, we were there for quite a while on-scene.

1   Other units arrived, and other officers tried to talk to him.  I

2   know a supervisor arrived on-scene, and he attempted to talk to

3   him.  So there was many other people involved where, you know, I

4   was taking a step back with helping my partner with someone

5   else, not really paying attention to that specific -- to

6   Mr. Moore, specifically.  But many officers were involved in

7   trying to talk to him.

8   Q.  So was it you or your partner that called for a supervisor

9   or other trained units to respond to the scene?

10  A.  I can't remember honestly.  I believe it was my partner.

11  Q.  But it had to have been one of you that would have called

12  for backup?

13  A.  Yes.  And I just honestly don't remember.  You know, it is

14  pretty common practice sometimes that if units are available,

15  they would give us backup in this kind of situation.  And I'm

16  sure maybe one or two of them were in that capacity, just

17  responding as backup.

18  Q.  Did you call any crisis-intervention trained officers to

19  intervene?

20  A.  Not that I remember.

21  Q.  But you don't know what the training was of the other

22  officers that responded?

23  A.  Yes.  No, I don't.

24  Q.  And at any point, did you and your partner actually get to

25  speak to Mr. Moore after he had called down?

26  A.  No, not that I remember.  As far as myself, I don't remember

27  speaking to him after he had calmed down.  I do remember a

28  sergeant -- I believe it was Sergeant Frias -- kind of taking

1  over; and I think he ended up being the one that mostly

2  communicated with him, from what I remember.

3  Q.  Do you remember if your partner spoke to Mr. Moore?

4  A.  I don't.

5  Q.  Would it refresh your recollection to review his report?

6  A.  Sure.  Yeah.  I'm reading the report.  Officer Wasserman

7  said he did contact him later and he was calmer at that point

8  and provided a statement to him.

9  Q.  And was there anything unusual in that statement that would

10  have kind of coincided with those kind of delusions or grandiose

11  ideations that you look for?

12  A.  Yes.  Getting a totality of everything of why we were there,

13  I came to understand that Mr. Moore was upset that his neighbor

14  was washing his car, and the water -- the soapy water -- was

15  draining into his drain and polluting his drinking water.  And

16  that's why he was upset with his neighbor.

17  Q.  Is that consistent with your training as one of the cues you

18  might be on the lookout for --

19  A.  Yes.

20  Q.  -- with a cognitive impairment or a mental illness?

21  A.  Yes.  Yes.

22  Q.  Did Moore say or do anything to you that led you to believe

23  he may have some kind of cognitive impairment or mental illness?

24  A.  No.  I mean, just his general behavior towards me was really

25  no different -- you know, when arriving on-scene -- I had most

26  of my contact with him in the early stages when we first

27  arrived; and then after that, like I said, other units stepped

28  in.  But I would say, no, he was generally uncooperative and

1  verbally somewhat abusive to me in the beginning.  And I didn't

2  have much contact with him after he had calmed down.

3  Q.  Now, do you recall, was there any alleged violence in the

4  call for dispatch?

5  A.  Yes.

6  Q.  And what was that?

7  A.  Yes.  The report we were getting from dispatch is that

8  someone had punched -- the neighbors had gotten into a physical

9  altercation.  Someone had punched someone else.

10  Q.  So you were responding to investigate what had been reported

11  to you as a physical altercation?

12  A.  Yes.

13  Q.  But even with that severity of crime being alleged, you

14  still were able to create time and distance in your interaction

15  with Mr. Moore?

16  A.  Yes.  Yes.  When we're arrived on-scene, there was no

17  physical altercation happening while we were there.

18  Q.  And I'm sorry, you mentioned your sergeant's name who

19  responded to the scene.

20      Could you spell his name, for the record?

21  A.  I believe it was Frias, F-R-I-A-S.

22  Q.  First name?

23  A.  I don't remember his first name.  I'd have to look it up.

24  Yeah, it's not documented in the report as far as his fist name.

25  My partner just refers to him as Sergeant Frias.

26  Q.  That's fine.  Thank you.

27      So, Officer, I want to talk to you about your training.

28  It's the same training you receive at the academy, so I just

# EXHIBIT D

1          SUPERIOR COURT OF CALIFORNIA

2          CITY AND COUNTY OF SAN FRANCISCO,

3                    ---o0o---

4

5   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
6              Plaintiff,             )
                                      )   CTN No.
7   vs.                               )
                                      )   **GRAND JURY**
8   KENNETH CHA,                      )   GJ T-8
                                      )   GRAND JURY NUMBER 2021-A
9              Defendant.             )
    _____   )

10

11

12     **Reporter's Transcript of Grand Jury Proceedings**

13        **\* INVESTIGATIVE HEARING TRANSCRIPT \***

14

15              Thursday, July 22, 2021

16                 Volume 3 of 4

17

18               Pages 211 - 411

19

20

21   **APPEARANCES OF COUNSEL:**

22      For the People:

23         OFFICE OF THE DISTRICT ATTORNEY
           County of San Francisco
24         850 Bryant Street, 3rd Floor
           San Francisco, California 94103
25         By:  **Stephanie Lacambra, Assistant District Attorney**
           By:  **Dana Drusinsky, Assistant District Attorney**

26

27

28   Reported By:  JULIE L. BOZAICH, CSR No. 13604

1  **Thursday - July 22, 2021**                              **xxx.m.**

2                    P R O C E E D I N G S

3                        ---o0o---

4            (Whereupon, roll call taken.)

5        **MS. LACAMBRA:**  Good morning, everyone.  We have all 17

6  jurors present as well as ADA Drusinsky and myself ADA Lacambra.

7            And we are going to call our continued witness, Officer

8  Patino.

9                        **COLIN PATINO,**

10  called as a witness for the People, having been previously duly

11  sworn, testified further as follows:

12        **THE WITNESS:**  Yes, ma'am.

13        **THE GRAND JURY FOREPERSON:**  Please be seated and then say

14  your name and spell it, for the record.

15        **THE WITNESS:**  My name is Colin Patino; COLIN, last name,

16  P-A-T-I-N-O.

17        **MS. LACAMBRA:**  And for the record, Officer Patino is

18  wearing a clear mask that allows the jury to see the entirety of

19  his face including his mouth.

20  BY MS. LACAMBRA:

21  **Q.**  Good morning, Officer Patino.

22  **A.**  Good morning.

23  **Q.**  I would like to return to the second time that you and

24  Officer Cha went back up Mr. Moore's staircase after you had a

25  chance to read the TRO, okay.

26  **A.**  I would like to make it clear that I never fully read -- the

27  time that we were down there, I never had a chance to actually

28  read the entire TRO.  And if I can clarify something from a few

                                                                    212

1  days ago, if that's all right.

2  **Q.**  Please.  Go ahead.

3  **A.**  I had time to think about it since then.  When you asked the

4  question, was Sean Moore detained at the time when we were

5  talking to him?

6      Well, he wasn't detained; he was free to go.  But -- and

7  this didn't happen -- but I believe that if he did try to walk

8  down the stairs, I probably would have detained him because I

9  had reasonable suspicion to believe that a crime may have

10  occurred, is occurring, or about to occur due to the fact of the

11  restraining order, right.  So I wouldn't have felt comfortable

12  letting him walk down the steps and possibly violate the

13  restraining order in our presence.

14      I wanted to make that clear.  He wasn't detained at the

15  time; but if he were to walk down the steps, I probably would

16  have detained him.  But that didn't happen.

17  **Q.**  Are you familiar with the acronym "TRO"?

18  **A.**  Temporary restraining order.

19  **Q.**  Now -- and I'm so glad that you took in a moment to clarify

20  that.  I have some follow-up questions about that a little bit

21  later.

22  **A.**  Absolutely.

23  **Q.**  Well, I understand you didn't get a chance to thoroughly

24  read and comprehend all of the pages of the TRO that you were

25  given by ██ ████.

26      But just as a point of reference, when you're at the bottom

27  of the stairs and you're shining your flashlight to be able to

28  read what you could of the TRO --

1 **A.** Uh-huh.

2 **Q.** -- and Officer Cha is standing next to you, shining his

3 light back up the staircase of Mr. Moore's home.  That's the

4 point of reference of where we're going to begin.

5 **A.** Right.

6 **Q.** In response to Officer Cha shining his light flashlight into

7 his house, Mr. Moore reemerged from his front door, but he

8 remained behind that locked gate; is that correct?

9 **A.** That's what I remember, yes.

10 **Q.** And that gate was metal, but you could seed Mr. Moore

11 through the gate?

12 **A.** Correct.

13 **Q.** And you could hear Mr. Moore through the gate?

14 **A.** Correct.

15 **Q.** Now, Mr. Moore said, "You better get your fagot asses on,"

16 while you were at the bottom of the stairs the first time?

17 **A.** Yes.

18 **Q.** And Cha responded with, "What's that," and then began to go

19 back up the stairs to confront Moore a second time?

20 **A.** Yes.

21 **Q.** Now, did you recognize the onset of Officer Cha's anger at

22 that time when he went up the stairs the second time?

23 **A.** At that time, I didn't recognize any anger in that frame of

24 mind.

25 **Q.** Okay.  So at what type point did you recognize the onset of

26 Officer Cha's anger during the encounter with Mr. Moore?

27 **A.** I can honestly say if he was angry or not.  I never asked

28 Cha if he was angry.  It could look like he was.  But I've never

1  had that chance to talk to him.  And watching the video hundreds

2  of times in the last four-and-a-half years, I could see how

3  someone would maybe say, hey, he had a reaction from that.  But

4  I didn't have that reaction, and I never had the chance to speak

5  to Officer Cha about what reaction or what he felt.

6  Q.  Well, I guess going back to your training at the POST

7  academy --

8  A.  Right.

9  Q.  -- at the police academy where you're trained to recognize

10 the onset of anger or fear -- because you're trained on how to

11 deal with those emotions -- they expect you to deal with those

12 emotions when you're on duty; right?

13 A.  Correct.  We're going to feel emotions just as you and I and

14 people in the jury box will.

15 Q.  Exactly.  In the academy, they want to give you tools so

16 that you can control those emotions because they understand

17 you're going to be given certain powers and privileges in your

18 role as a police officer; right?

19 A.  Absolutely.

20 Q.  So I guess going back to that training, you're trained to

21 recognize certainly when you have an onset of anger or fear

22 because you're supposed to try and control those emotions when

23 they happen; right?

24 A.  Right.  Because I wasn't angry at the time.

25 Q.  Yeah.  And so you're able to do that.

26     And so now I'm asking, based on your observations and your

27 training, did you recognize the onset of Cha's anger when he

28 raised his pepper spray?  At that point, did you feel like

1    Officer Cha was upset or angry?

2    **A.**  No.  I think at that point, based on our training that we

3    had, that's a self-defense mechanism that we're allowed to use

4    force in self-defense of others, themselves, or if they perceive

5    a threat is about to happen.

6    **Q.**  Okay.  And we'll go over some of the use-of-force training

7    as well.

8        But did you recognize the onset of Officer Cha's anger when

9    he yelled the word "motherfucker" at Mr. Moore?

10   **A.**  Can you repeat the question.

11   **Q.**  Did you recognize the onset of Cha's anger when he yelled

12   the word "motherfucker" at Mr. Moore?

13   **A.**  At that time, no, I didn't.  I wasn't thinking that Cha was

14   angry.

15   **Q.**  So even based on your training and experience, when a fellow

16   officer has raised OC spray and called a citizen an epithet,

17   that's not an indicator of anger?

18   **A.**  At that time when he said "motherfucker," I think I already

19   had pepper spray in my eyes, so my thought was, I need to get

20   pepper spray out of my eyes.  So I wasn't responding to what

21   Officer Cha could have, or may have, been feeling; I was

22   affected by the fire in my eyes that I wanted to get off.

23   **Q.**  Okay.  Well, then based on your training and experience now

24   looking at the situation, if this had been a training

25   scenario --

26   **A.**  Okay.

27   **Q.**  -- that you had been presented with, would you be trained to

28   recognize the onset of anger at the point when a fellow officer

1    raises a weapon like OC spray and then calls a citizen an

2    epithet?

3    A.   Possibly, yes.

4    Q.   In what situation would that not be indicative of the onset

5    of anger?

6    A.   I think we have all used the word motherfucker before.  You

7    can use the word, calling someone a motherfucker; or if you bang

8    your knee, and it's like, ah, motherfucker, right.

9        So I don't know -- he never said, Sean Moore, you're a

10   motherfucker.

11       I'm not minimizing the word motherfucker.  Watching the

12   video, he says "motherfucker."

13       It's -- I never asked Officer Cha, hey, did you call him a

14   motherfucker; or were you saying out loud motherfucker during

15   that time?  Because that could be an exclamation, like, fuck,

16   motherfucker, shit.

17   Q.   But, Officer, you were there.  So I'm not asking you to

18   comment on Officer Cha's state of mind; I'm asking you to

19   evaluate based on your training and experience and having been

20   there and witnessed the incident between Mr. Moore and Officer

21   Cha, the tone of voice, the body language, everything you saw

22   and observed that night, based on your training and experience,

23   was -- I mean, and you saw the body-worn camera footage as

24   well -- even just on viewing the body-worn camera footage, is it

25   clear to you that Officer Cha is addressing Mr. Moore when he

26   says the word "motherfucker"?

27   A.   I could see -- yes.

28   Q.   And so based on your training and experience, when a -- are

1  you trained to address civilians, even for emphasis using

2  terminology like that?

3  **A.**  What are you --

4  **Q.**  Are you ever trained as part your job to address -- like, is

5  there ever a situation where it's justified to be calling

6  civilians' names as part of your job?

7  **A.**  Is it justified?  I think every scenario is different,

8  right.

9  **Q.**  Certainly.

10  **A.**  I think --

11  **Q.**  But --

12  **A.**  -- there's a point where you could say that cursing is a

13  form of verbal persuasion.

14  **Q.**  Are you telling me that as part of the academy --

15  **A.**  No, absolutely not.  I'm talking about -- because the

16  academy is not real life, right.  The academy gives you

17  guidelines on how to do your job.  But when you're in the real

18  world and there's someone attacking you, there are people who

19  will respond better to certain words, certain expletives, or

20  tones in voice.

21      Ah, I don't believe cursing at the public is okay at all.

22  But in real-life situations when you believe you're about to be

23  hurt, we're humans, words come out.  And I think that's a fair

24  assessment of what happened.

25  **Q.**  And so I'm asking, based on your observations, that word

26  came out; right?

27  **A.**  Correct.

28  **Q.**  Was that indicative to you of Officer Cha's onset of anger?

1  A.  I'm telling you, at the time --

2  Q.  I'm --

3  A.  -- I had --

4  Q.  -- talking about at that time?

5  A.  Okay.  At that time, looking back on it, I can see where he

6  could have been angry.

7  Q.  Yes.  The question -- and to be clear -- is reflect now on

8  your training and experience which you're supposed to carry with

9  you into every contact you have with the public, was that an

10  indicator -- Officer Cha's use of the word motherfucker -- was

11  that an indicator of the onset of anger, based on your training?

12  A.  Yes.

13  Q.  Now, later, Officer Cha actually uses the words, "What's up.

14  Come on.  Come here." He uses these words as he's confronting

15  Mr. Moore.

16      Did it appear to you from these fighting words that Cha was

17  challenging Moore to a fight at that time?

18  A.  No.  At that time, it looked as if he was ordering him.

19  Q.  He was ordering him to do what?

20  A.  Come down the stairs.

21  Q.  Okay.

22  A.  Because I believe at that time, he had already used pepper

23  spray; correct?

24  Q.  Okay.  And does challenging a civilian to fight comport with

25  your training and experience?

26  A.  Does what?

27  Q.  Does challenging a civilian to a fight comport with your

28  training?

1  **A.**  No.

2  **Q.**  And so is it reasonable for an officer to challenge a

3  civilian to a fight?

4  **A.**  No.

5  **Q.**  How wide was the staircase that you were on in front of

6  Mr. Moore's house?

7  **A.**  I don't know.  But I would say it's less than five feet.

8  **Q.**  Less than five feet.  Hold on.

9      I just want to be able to show it so that we can all kind of

10  have a point of reference.

11      **MS. LACAMBRA:**  Everyone should be able to see that.

12      And, for the record, we'll mark this exhibit next in

13  order which is Exhibit No. 5.

14                              (Grand Jury Exhibit 5 was marked for

15                              identification.)

16  **BY MS. LACAMBRA:**

17  **Q.**  This is just to help you.

18      So the staircase leading up to Sean Moore's home it's less

19  than five feet.

20      Would you say it's wide enough for two people to be

21  side-by-side, like two adult males to be side-by-side walking

22  up?

23  **A.**  Ah, possibly.

24  **Q.**  Possibly.

25  **A.**  Short, small --

26  **Q.**  When you were --

27  **A.**  -- adult males but not with gear that is going add six

28  inches side-by-side.

1  **Q.**  Okay.  And you and your partner, Officer Cha, had your gear

2  on?

3  **A.**  Correct.

4  **Q.**  So when you went up the second time, how were you

5  positioned?  Were your side-by-side or one in front of the

6  other?

7  **A.**  Ah, I think we were staggered the entire time -- I believe.

8  **Q.**  And so the second time you went up the stairs, how were you

9  staggered?  Who was in front and who was in back.

10  **A.**  I don't remember.

11  **Q.**  So I guess if you think back to this section as --

12  **A.**  Correct.

13  **Q.**  -- the section where the OC spray was deployed, do you

14  recall if Officer Cha was ahead of you or behind you?

15  **A.**  During the OC spray?

16  **Q.**  Well, just prior to the use of the OC spray?

17  **A.**  I believe I was in front.

18  **Q.**  And were you to the right, or were you to the left?

19  **A.**  The left, looking up towards the door.

20  **Q.**  And now, when you and Officer Cha are toward the top of

21  staircases and you're on the left-hand side, so you would have

22  been over on this side of the doorway on the left-hand side of

23  the doorway --

24  **A.**  Correct.

25  **Q.**  -- and then Officer Cha would have been on the right side of

26  the doorway, do you remember how many steps below you he was or,

27  like, how far from you he was?

28  **A.**  A few steps I believe.

1    **Q.**  So probably around the third or fourth step here?

2    **A.**  Correct.

3    **Q.**  Now, if Mr. Moore at that point -- and we'll talk about that

4    full detention part -- in order to leave his house through the

5    front door and walk down his steps, Mr. Moore would have had to

6    get by you Officer Cha to reach the street?

7    **A.**  If he wanted to leave his house to go down to the street, he

8    would have to --

9    **Q.**  Through his front door?

10   **A.**  Through his front gate down to the street, he would have to

11   go past us.

12   **Q.**  And you already said at that point, you wouldn't have

13   permitted him to leave?

14   **A.**  At that point, correct -- if he were to have done that, I

15   would have detained him -- we would have.

16   **Q.**  And by the time Cha went up the stairs with you that second

17   time, Moore had already ordered Cha to leave his stairs about 19

18   times; is that fair to say?

19   **A.**  At that time, I wasn't counting how many times he was

20   telling us to get off the stairs.  Looking back on it, looking

21   at the transcript, it's easy to count how many times that he

22   said that.  But at the time, you're listening to it, but I'm not

23   saying there's, one, two, three; but after four-and-a-half years

24   later, watching the video, looking at transcripts, he did tell

25   us to get off the stairs numerous times.

26   **Q.**  Fair to say that he had told Officer Cha multiple times to

27   leave his house?

28   **A.**  Correct.

1  **Q.** And Cha disregarded those repeated orders to leave the

2  house?

3  **A.** We -- yeah, he asked us to leave numerous times.  And

4  it's -- we were investigating a crime.

5  **Q.** So is that a "yes," that Cha refused to leave after being

6  repeatedly told to leave?

7  **A.** Correct.

8  **Q.** And Cha, in going up the staircase the second time, actually

9  diminished the time and distance between himself and Mr. Moore?

10  **A.** Diminished distance.

11  **Q.** Time and distance.

12  **A.** Time and distance, correct.

13  **Q.** He actually made the distance between him and Mr. Moore

14  smaller, and that also reduced the amount of reaction time in

15  any given situation; right?

16  **A.** Correct.

17  **Q.** I mean, that's one of the deescalation techniques you're

18  taught at the academy is to create time and distance when you

19  feel like things are escalating, you deescalate them and give

20  yourself more time to react appropriately?

21  **A.** Yes.

22  **Q.** Now, so Cha actually eliminated the reactionary gap that had

23  been -- that he had been trained to create in order to protect

24  the public and preserve officer safety?

25  **A.** There was less distance between us and Cha.

26  **Q.** So he eliminated that reactionary gap that you're trained to

27  create?

28  **A.** Ah, yes.

1  Q.  Now, when Cha confronted Mr. Moore with the restraining

2  order, Moore denied violating the restraining order at least

3  three times?

4  A.  Ah, yes.

5  Q.  And Moore explained he had just taken his garbage out?

6  A.  That's what Moore was saying, yes.

7  Q.  And, in fact, when you went down the stairs the first time,

8  you can actually see on the body-worn camera footage, the

9  garbage truck on the street, and you can hear the audio of the

10  trash collectors working?

11  A.  Yep.

12  Q.  Is that a "yes"?

13  A.  Yes.

14  Q.  Okay.  And Moore, in his interaction with you, actually

15  yelled across the street to the garbage collectors to put his

16  garbage on the truck?

17  A.  I remember that, yes.

18  Q.  But you did not actually personally observe Moore banging on

19  the shared wall of ██ ██████ residence?

20  A.  That is correct.

21  Q.  And Cha never said anything to you about personally

22  observing Mr. Moore banging on the shared wall before you joined

23  him on the staircase?

24  A.  That's correct.

25  Q.  Now, during your interaction with Mr. Moore, he confirmed

26  that he knew about a future court date on the 11th?

27  A.  Ah, yes.

28  Q.  But it was your intention to arrest Mr. Moore at that time?

1    A.   For?

2    Q.   Well, so that would be my next question is, you know, you

3    were -- at some point during the encounters, I believe it's the

4    second time you go up the stairs, at that point you have the

5    intention to actually arrest Moore for violation of something;

6    and I wanted to know what that was.

7    A.   It was my intention to continue the investigation to figure

8    out what had transpired before we were there.   Banging on the

9    door or banging on his gate is -- that early in the morning --

10   yelling -- his neighbor heard it -- ██████ heard it -- and so he's

11   making a lot of noise, banging, annoying, harassing his

12   neighbor.   So he's making a lot of noise in our presence, which

13   I believe ██████ probably could have heard at that time.

14        But I still needed a citizen's arrest.   So my intention was

15   not to arrest him for a violation of the restraining order, even

16   though I believed it was happening right in front of me at that

17   time.

18   Q.   I mean, so now we are getting to the reaction to your

19   presence on his staircase.   You're talking about the banging

20   that you observed is your reaction to your and Officer Cha being

21   on Mr. Moore's steps?

22   A.   Excuse me?

23   Q.   The banging you were just referencing as being the source of

24   annoyance that you --

25   A.   It's also assaultive behavior.   He was continuing to say,

26   "You're going to get off my steps.   You're going to get off my

27   steps."   And I let him say that a couple of times; and at that

28   time, I believe maybe he wanted to physically remove us off the

1    steps.  But I wasn't going to arrest him at that time for him

2    threatening or violating the restraining order.

3    Q.  Well, at some point you do form the intent to arrest him.

4        Because at some point you do say, "You are under arrest";

5    right?

6    A.  I said he's under arrest after he was banging on the door,

7    after he said, "You're getting off my steps," to that degree.

8    He opens the door, comes towards us, and he's going like this,

9    going like.  This is when Officer Cha has his spray out -- I

10   believe it's in defense of himself, in defense of myself.  And

11   as he swatted his hand towards my direction -- you got to

12   understand, Sean Moore is a big guy.  He's big, he's large, he's

13   yelling at us, he's showing a lot of aggressive assaultive

14   behaviors towards us.  And that's when the pepper spray was

15   deployed.  And him going towards me, that's assault on a police

16   officer.  At that point, he's under arrest.

17   Q.  Officer Patino, would it be fair to say that the closer you

18   got to Mr. Moore, the more agitated he became?

19   A.  Looking back on it, yes.

20   Q.  But even in the moment, when you were at the bottom of the

21   stairs, and you were, I guess -- at least during the course of

22   the video -- the furthest away from Mr. Moore during that eight-

23   or nine-minute period of time --

24   A.  Uh-huh.

25   Q.  -- and you're reading the TRO, Mr. Moore is not banging on

26   his gate -- and he's still yelling -- but he's not banging on

27   his gate, and he actually goes inside his house; right?

28   A.  Correct.

1    Q.  But every time you go up the staircase, Mr. Moore gets more

2    irate and more agitated, yelling at you, ordering you, and

3    telling you to leave?

4    A.  Correct.

5    Q.  And then making more noise by banging on his front gate?

6    A.  Correct.

7    Q.  Now, one of the things that you're trained to investigate is

8    trespass.

9        That's a crime in the state of California?

10   A.  Yes.

11   Q.  So a homeowner, a property owner, has the right to eject

12   trespassers from their property?

13   A.  Uh-huh.

14   Q.  So when you came to investigate the TRO --

15   A.  Yes.

16   Q.  -- Mr. Moore denied it three times; right?

17   A.  Yes.

18   Q.  And at that point, you had his name, right?  You had -- is

19   that correct?

20   A.  Yes.

21   Q.  You had his address?

22   A.  Yes.

23   Q.  So you knew where he lived?

24   A.  Yes.

25   Q.  Okay.  And you knew that there was a future court date?

26   A.  Yes.

27   Q.  He had acknowledged that future court date?

28   A.  Yes.

1  Q.  And you hadn't -- you weren't able, after several minutes of

2  trying to engage him, get him to speak with you after those

3  three denials; right?

4  A.  Yes.

5  Q.  So at that point, what else were you investigating with

6  regard to the violation of the TRO?

7  A.  So at that time, yes, you're right, he did say all those

8  things within a few minutes.  But a lot of that information is

9  kind of going in one ear and out the other.  When someone is

10 yelling at you, I'm not fully comprehending what's going on, and

11 that's a sign of a threat indicator.

12 Q.  So you're saying --

13 A.  So --

14 Q.  -- you are the one that's not comprehending?

15 A.  When someone is yelling at you, it's hard to understand.

16 What did he just say?  Is he saying this?  Is he saying that?

17 And you notice in the video, we are asking, hey, can you just

18 let us speak, let us talk?  And the entire time, he's banging on

19 the door.  So it's difficult to listen.  You can hear it on the

20 video fine; but when you're getting sprayed by his spit, when

21 you're hearing the banging of the gate and him yelling, it's

22 difficult to understand exactly what he's saying.

23     So after watching the video numerous times, you can

24 comprehend what he's saying, you can take notes and you can

25 figure out what's going on.  But at that time, I wasn't taking

26 notes down.  I had my eyes on Sean Moore, who's a bigger guy,

27 who's yelling at me.  I've been punched before; I've been

28 attacked before.  There are all threat indicators leading me to

1  believe that there could be an assaultive suspect behind that

2  gate.

3      So I do have my guard up because I don't like being punched,

4  I don't like being hurt, and I don't want my partner being hurt

5  either.  And the whole reason why we are there is because we're

6  investigating a temporary restraining order, which is a court

7  order.  And I don't know why the order was there, but

8  essentially his behavior has created the restraining order.

9      What was your question?

10  **Q.**  Well, I actually want to follow up on that.  I just want to

11  clarify.

12      So when you say it goes in one ear and out the other --

13  **A.**  I wouldn't say that everything goes in one ear and out the

14  other, but there are certain things where, hey, you know, your

15  auditory, your hearing, your vision -- it's called tunnel

16  vision, right.  So when you see a threat, you zoom into that

17  threat.  You make sure that, hey, I'm looking at this guy's

18  hands; I'm trying to hear what he's saying; I'm trying to look

19  at clenched fists and stuff, which are all indicators -- banging

20  on objects, those are all threat indicators that someone -- that

21  an attack upon you could be imminent.

22  **Q.**  And the first thing you're taught at the academy when you

23  see those indicators is to create time and distance in order to

24  create a buffer zone so that you elongate the reaction time to

25  react appropriately?

26  **A.**  Correct.  And we had the gate between us.

27  **Q.**  Yes.  But you said yourself, you're worried.  He has a point

28  of advantage, he's above you, he's a bigger guy.  If he opens

1  the gate, you're at a disadvantage because you're at a lower

2  level of elevation; right?

3  **A.**  Absolutely.

4  **Q.**  He had momentum and gravity working on his side?

5  **A.**  Correct.

6  **Q.**  So the first thing your training tells you to do is to

7  create a distance that gives you more time to react so that you

8  can rationally and effectively be able to take in, right --

9  **A.**  Absolutely.

10  **Q.**  -- so it's not just in one ear and out the other, but you're

11  actually being able to mindfully assess the situation and react

12  appropriately?

13  **A.**  That's the idea is to try to get a bigger picture and -- try

14  and step back, if you can think about it.

15  **Q.**  But Officer Cha did not actually do that, did not actually

16  go down the stairs to create more distance and time when he felt

17  threatened; instead he took out his pepper spray --

18  **A.**  He did take out his pepper spray, correct.

19  **Q.**  -- instead of going down the stairs?

20  **A.**  Correct.

21  **Q.**  And the follow-up question I had -- I just wanted to make

22  sure.  When you were talking about information going in one ear

23  and out the other, you're talking about yourself?

24  **A.**  Yes.

25  **Q.**  Now, when did you first observe Officer Cha with the pepper

26  spray in his hand?

27  **A.**  I believe it was -- what I recall of the incident and not

28  just watching the video.  I remember him having the pepper spray

1  out.  Maybe when Sean Moore opened the gate, at that point, I

2  think he had the pepper spray out.  I think.  I don't remember.

3  Q.  And so -- I'm sorry.  You don't remember, or you think it

4  was when he opened the gate?

5  A.  I believe it's when he opened the gate.

6  Q.  And do you recall approximately -- was Officer Cha still on

7  that third or fourth step from the top?

8  A.  I don't remember.

9  Q.  Do you recall him being closer to you -- because by this

10  point --

11  A.  I remember him being to my right.  I don't remember what

12  step he was on.

13  Q.  But when Sean Moore comes out, you're close to the top of

14  the stairs; you're on, like, the first or second step from the

15  top; right?

16  A.  I wasn't that high.

17  Q.  So maybe you'd be on the third or fourth step from the top?

18  A.  I think that's as far as I would have gone, yes.

19  Q.  So then Officer Cha would have had to have been below you

20  because you were in front of him?

21  A.  I believe he was below me, but I don't remember how many

22  stairs.

23  Q.  Now, when you walked back up the stairs that second time,

24  Moore continued to yell at you and Officer Cha to leave his

25  stairs?

26  A.  Yes.

27  Q.  And Cha actually told him that he wasn't going to leave?

28  A.  Correct.

1  Q.  Now, I want to talk to you about your deescalation training

2  from the academy.

3  A.  Okay.

4  Q.  Were you trained that when encountering a noncompliant

5  subject or a subject armed with a weapon other than a firearm,

6  you shall use deescalation tactics in an effort to reduce the

7  need for and degree of force?

8  A.  Yes.

9  Q.  Were you trained to isolate and contain a subject as a form

10  of deescalation?

11  A.  Yes.

12  Q.  Would it be fair to say that Moore was isolated and

13  contained while behind the metal gate?

14  A.  That's correct.

15  Q.  Were you trained to create time and distance from the

16  subject by establishing a buffer zone as a form of deescalation?

17  A.  Yes.

18  Q.  And were you trained to tactically reposition yourself as

19  necessary to maintain the reactionary gap, protect the public,

20  and preserve officer safety as a form of deescalation?

21  A.  Yes.

22  Q.  Were you trained to continue using deescalation techniques

23  that take as much time as reasonably necessary to resolve the

24  incident without having to use force?

25  A.  Yes.

26  Q.  Would you agree that it was feasible for you to create time

27  and distance from Moore, creating a buffer zone to separate you

28  and Officer Cha from his presence and property?

1  **A.** Are you asking that as looking back on it four-and-a-half

2  years ago or at that time?

3  **Q.** Based on your training and what you're expected to do, was

4  it feasible for you and Officer Cha to create that time and

5  distance from Moore by establishing that buffer zone?

6  **A.** Was it feasible to create time and distance to act as a

7  buffer zone from us and Sean Moore?

8  **Q.** Yes.

9  **A.** At that time, I didn't think it was necessary.

10 **Q.** I'm asking not whether it was necessary; I'm asking whether

11 it was feasible.

12 **A.** At that time, I did not believe it was feasible.

13 **Q.** So you didn't feel it was feasible for you to walk down the

14 stairs with Officer Cha to create time and distance?

15 **A.** I'm telling you, yes, that's what I felt at that time.

16 **Q.** Okay. Now, you could have chosen to return at a later time

17 when Mr. Moore had calmed down to continue your investigation?

18 That's something that you could have done; right? I mean, you

19 physically could have walked down the stairs, ended the contact,

20 and returned at a later time?

21 **A.** At that time, I didn't believe that was an option. Because

22 if we would have left, I was fearful for ██ ████. I mean, what

23 happens if we leave and he continues to bang on the wall, or

24 worse, he bangs on the door.

25 **Q.** At any point during your interaction with Mr. Moore, did you

26 see him interact with ██ ████

27 **A.** No.

28 **Q.** Did you see him hit the shared wall between him and

1   ███ ███   residence?

2   A.  No.

3   Q.  So I'm asking -- actually, so you'd actually gone down the

4   stairs once before you deployed the pepper spray; right?

5   A.  Uh-huh.

6   Q.  You went down the stairs a second time after the pepper

7   spray was deployed; right?

8   A.  Yes.

9   Q.  So twice you were able to create more time and distance

10  between you and Mr. Moore?

11  A.  Uh-huh.

12  Q.  I'm asking, could you have completely walked away and just

13  returned at a different time to finish your investigation?

14  A.  After he had tried to assault us?

15  Q.  After you -- he had told you to leave his property three

16  times, and you had the information that you needed to be able to

17  go back to ███ ███ and ask if he wanted to sign a citizen's

18  arrest?

19  A.  No, because we were still investigating it.  And I didn't

20  have all the facts.  I didn't have the luxury of re-watching the

21  video, listening to it.  I'm living it in real time.  So I

22  didn't have all of the information to just walk away.

23  Q.  So let's go back to that.

24      What was the additional information that you were waiting

25  for or looking for?

26  A.  I wanted to try and get a normal conversation from Sean

27  Moore, trying to get his side of the story, and then gather more

28  information, what's -- had he been served?  Do you have your

1  copy?  There's a lot of other questions that we need.  I was

2  trying to at least get information from Sean and try to have a

3  reasonable conversation with him.

4  Q.  Well, so having a reasonable conversation with someone isn't

5  one of the elements that you're supposed to be investigating as

6  part of whether or not a TRO has been violated.

7      Mr. Moore had told you three times the explanation that he

8  was taking out his garbage; right?

9  A.  Uh-huh.

10  Q.  Is that right?

11  A.  That he took out his garbage, correct.

12  Q.  So he had told you his side of story three times?

13  A.  Correct.

14  Q.  And at that point, you had also talked to -- or Officer Cha

15  had asked you, is the order good, as in had it been served;

16  right?

17  A.  Yes.

18  Q.  And that was one of the things that you checked for at the

19  bottom of the staircase, the proof of service?

20  A.  Yes.

21  Q.  To confirm that it had been served; right?

22  A.  Correct.

23  Q.  So even if Mr. Moore had said, no, I have not been served or

24  I don't have the copy, you have the copy that shows the proof of

25  service?

26  A.  Correct.

27  Q.  So you didn't need to investigate that either.

28      So I guess you could have gone to ██  ██ and asked him to

235

1  sign a citizen's arrest once you knew those things, but you

2  chose not to do that?

3  **A.**  At that time, as I was reading the restraining order, I

4  didn't have time because Sean Moore continued to engage with us.

5  That's why I walked up to try to talk to him again.

6  **Q.**  And Mr. Moore's repeated orders to leave you understood to

7  be him trying to engage you in conversation?

8  **A.**  I don't know what was going through Mr. Moore's mind.  I

9  have had lots of people say they don't want to talk to me

10  numerous times; and by the end of it, they say you know what,

11  I've cooled down, and you know what, we'll talk to you.

12      And we went there -- we didn't want to get in a fight; we

13  didn't want anybody to get hurt.  I wasn't upset until got

14  punched in the face or pepper sprayed.

15  **Q.**  Well so --

16  **A.**  I'm trying to get both sides of the story, and it's hard to

17  get both sides of the story when one of the parties is

18  assaultive and yelling.

19  **Q.**  Well, before Mr. Moore came out of his gate to try and make

20  you leave the stairs, he had told you his side of the story

21  three times and then repeatedly told you to leave; is that fair

22  to say?

23  **A.**  That's correct, yes.

24  **Q.**  Now, if you really felt threatened like it was going to

25  escalate to the point where he was demonstrating assaultive

26  behavior and indicating to you that your safety might be

27  compromised --

28  **A.**  Yes.

1    **Q.**  -- you're trained to utilize cover to avoid creating an

2    immediate threat that may require the use of force as a form of

3    deescalation?

4    **A.**  Can you repeat that, please.

5    **Q.**  Were you trained to utilize cover to avoid creating an

6    immediate threat that may require the use of force as a form of

7    deescalation?

8    **A.**  Yes.

9    **Q.**  Were you trained to request additional resources such as a

10   crisis intervention team, trained officers as a form of

11   deescalation?

12   **A.**  Ah, yes.  And there were officers who were already

13   responding, and I knew that they were en route during that call.

14   So I knew that we had officers en route so that we had our

15   backup.

16   **Q.**  When did you become aware that officers were coming to the

17   scene?

18   **A.**  That I don't remember.

19   **Q.**  Was it prior to Officer Cha deploying his OC spray or was it

20   after?

21   **A.**  I don't remember.  And as to the CIT portion, the critical

22   incident trained officers --

23   **Q.**  So one moment.  If we can go back.

24   **A.**  Yes.

25   **Q.**  So how did you become aware that backup was coming?

26   **A.**  I believe I heard them over the radio.

27   **Q.**  Okay.  So at what point were you able to listen to the

28   radio?  Were you able to listen to the radio at the top of the

1    stairs when you were interacting with Mr. Moore?

2    A.  I don't remember.

3    Q.  Were you able to listen to the radio at the bottom of the

4    stairs when you were further away from Mr. Moore?

5    A.  I don't remember.  I don't remember when I heard that there

6    were officers en route for backup.  I just remember hearing that

7    on the radio.

8    Q.  Do you remember your partner, Officer Cha, calling for a

9    medic for you after you were hit with the OC spray?

10   A.  Yes.

11   Q.  Okay.  Do you recall hearing any of that at the top of the

12   stairs prior to leaving after being hit with the OC spray?

13   A.  No.

14   Q.  Now, were you trained to designate an officer to establish

15   rapport and engage in communication with the subject as a form

16   of deescalation?

17   A.  Yes.

18   Q.  Would it be fair to say that you and Officer Cha had failed

19   to establish a good rapport with Mr. Moore in light of the -- I

20   believe, it was 34 times he ordered you to leave his house?

21   A.  Looking back on it today, I can see that he did not want to

22   talk to us.

23   Q.  Well, even on the night, I mean, it was clear to you that he

24   didn't want to talk to you; he kept ordering you to get off his

25   stairs; right?

26   A.  That's correct.

27   Q.  So would it have been feasible for you to request a

28   supervisor trained in crisis intervention training to respond

1  with backup?

2  **A.**  As to that question, I need to consult my counsel about a

3  legal question, and he's outside.

4       **MS. LACAMBRA:**  Sure.  We can do that.  The time is now

5  10:14, and we'll wait while the witness consults with his

6  counsel.

7              (Brief Pause in Proceedings.)

8       **MS. LACAMBRA:**  The time is now 10:21, and the witness has

9  rejoined us.  All jurors are present along with ADA Drusinsky,

10  myself, and Officer Patino.

11  **Q.**  So, Officer, I'm going to repeat the question --

12  **A.**  Please.

13  **Q.**  -- that I asked last, which was would it have been feasible

14  to request a supervisor trained in crisis intervention training

15  to respond to backup?

16  **A.**  It would have been feasible; but at that time, I didn't

17  believe that it was necessary because I still thought that maybe

18  I could still -- maybe we could still -- communicate with Sean

19  Moore and get -- I mean, when I told him to give back the

20  restraining orders, he threw them back.  So I knew that there

21  was some sort of cognitive, sensory going on there with him, but

22  I didn't believe.  I still -- at that point, I didn't think that

23  he was in a mental health crisis.

24      And, feasible?  Yes, it is feasible.  Looking back on it,

25  absolutely.  But at that time, I still believe I could get

26  through to him.  We deal -- I have dealt with hundreds of people

27  that don't want to talk to us, who are angry, who are

28  belligerent, who aren't going through a mental health crisis.

1  And I believed, at that time, before knowing what's going on

2  now, that we could have still talked to him and ordered him out.

3  Q.  And would it have been -- well, all right.

4      You said that you noticed that there was something kind of

5  cognitive -- he might not be been in a mental health crisis, but

6  what did you notice about the impairment at that time, even if

7  he wasn't in crisis?

8  A.  I didn't believe he was impaired at all at that time.

9  Q.  You did not believe that Mr. Moore had exhibited cues that

10  would indicate -- or that you've been trained to look for, for

11  someone who might be suffering from a cognitive impairment?

12  A.  At that time, no.

13      In real-life time, January 6, 2017, no, that did not go

14  through my head.  Looking back on it and having dealt with those

15  situations hundreds of times, thousands of times after,

16  absolutely; but in that moment in time, that short amount of

17  time, I didn't believe so.

18      **MS. LACAMBRA:**  Okay.  Officer, we'll need to take a break

19  between now and 11:00, so if you could return here at 11:00.

20  And you're still under the admonition of secrecy.  Do not share

21  this with anyone.

22          (Whereupon, witness exited the courtroom.)

23      **MS. DRUSINSKY:**  Okay.  So same rule as always, don't

24  discuss this case with yourselves or anyone else; don't look

25  anything up on the Internet, then we'll see you guys at 11:00.

26      So can you just flip all your stuff so that it's not

27  visible to anyone else coming in this room.

28          (Recess taken at 10:26 a.m.)

1          (Proceedings resumed at 11:02 a.m.)

2          **MS. LACAMBRA:**  Back on the record.  We have all 17 jurors

3    present as well as ADA Drusinsky and myself ADA Lacambra, and we

4    are going to recall Officer Patino.

5          **THE GRAND JURY FOREPERSON:**  I remind you that you are

6    still under oath.

7          **THE WITNESS:**  I understand.

8          **MS. LACAMBRA:**  And for the record, the officer has

9    rejoined us, and he's still wearing his clear mask which allows

10   all the jurors to see his face and mouth.

11                        **DIRECT EXAMINATION**

12   BY MS. DRUSINSKY:

13   **Q.**  Good morning again.

14   **A.**  Good morning.

15   **Q.**  I'm sorry.  We had to take a break.

16        So I just wanted to confirm something that you said

17   yesterday.

18   **A.**  Two days ago.

19   **Q.**  Two days ago.  You're right.

20        So I think you told us two days ago that on January 6, 2017,

21   you had been trained that a detained person is not obligated to

22   answer any questions an officer may asking during a lawful

23   detention?

24   **A.**  That's correct.  Not obligated to do so, correct.

25   **Q.**  And then you also started explaining this two days ago, and

26   I think you didn't really get into it.  And you don't really

27   need to get into it right now, but I just want to clarify for

28   the jurors.

1    If you have no basis -- so if an officer doesn't have a
2  basis to make an arrest and if an investigation is complete, at
3  some point if you don't leave a person's residence after they
4  ask you repeatedly to leave, you're trespassing; is that fair to
5  say?
6  **A.**  If -- yes, if you've done your due diligence, you've asked
7  your questions, you feel like the investigation is over, and if
8  you feel like you're not getting anywhere and someone asks you
9  to leave, then that would be trespassing.  That's my
10 understanding.
11 **Q.**  Okay.  Thank you.
12    So I want to go back to when Moore went inside his house.
13 This is all before the pepper spray.
14 **A.**  Okay.
15 **Q.**  So he went back inside his house and he told you I think
16 earlier, he said:  I'm going to call and remove you, something
17 along those like.
18    Do you remember that?
19 **A.**  Yes.
20 **Q.**  And then he came back out with a phone or a cell phone or
21 something.
22    Do you remember that?
23 **A.**  Yes.
24 **Q.**  And he asked you what your star number was.
25    Do you remember?
26 **A.**  Yes.
27 **Q.**  And I think he was holding a phone while he was asking for
28 your star number; is that right?

1   **A.**   Yes.

2   **Q.**   And he asked you to show, maybe your star, in the light?

3   **A.**   Show it in the light.

4   **Q.**   What did he ask you to show him in the light?

5   **A.**   My star maybe.  Because I was wearing a jacket which has --

6   our star is a badge, essentially.  So what you see me wearing

7   right here other agencies call them badges; we call them stars

8   here.  And in our Class B uniforms, they are placed on our

9   uniform, on our BDUs, which are cotton uniforms.  They are not

10  illuminated; they are stitched on.  So he wanted me to

11  illuminate the stitching.

12  **Q.**   Okay.  He was kind of acting as though he was going to make

13  a call and reference your star number in the call.

14       Do you agree with that?

15  **A.**   I think he wanted my star -- yes, something like that.

16  **Q.**   And he had his cell phone in his right hand.

17       Do you recall that?

18  **A.**   I don't remember what hand it was.

19  **Q.**   So I took some screen shots.  You tell me if they refresh

20  your recollection or not.

21  **A.**   Okay.

22  **Q.**   And just tell me if it refreshes your recollection about

23  whether or not the cell phone is in his right hand.

24            **MS. LACAMBRA:**  This will be marked Exhibit 6.

25                          (Grand Jury Exhibit 6 was marked for

26                          identification.)

27  **BY MS. DRUSINSKY:**

28  **Q.**   If it's too small I'll just hand it to you.

1  **A.**  I still have Exhibit 5 up here.

2       **MS. DRUSINSKY:**  Which one was that?

3       **MS. LACAMBRA:**  That was the staircase.

4  **BY MS. DRUSINSKY:**

5  **Q.**  Can you see this a little bit, like right here?

6  **A.**  I can see -- I know that's him.  It's hard to see exactly

7  what his --

8  **Q.**  Okay.  I'm just going hand it to you.

9  **A.**  Yeah.

10  **Q.**  Just tell me if this refreshes your recollection about which

11  hand his phone was in.

12  **A.**  It looks like it was in his right hand.

13  **Q.**  Okay.  Thank you.

14       Okay.  And then you told him your star number at least once,

15  maybe twice; right?

16  **A.**  Maybe twice, at least once.  You're correct.

17  **Q.**  Okay.  And then he held his cell phone with his right hand

18  to his left year?

19  **A.**  Yes.

20  **Q.**  Yes?  Okay.

21       And it looked like he was starting to dial a number on his

22  phone.

23       Do you recall that?

24  **A.**  I do recall that.

25  **Q.**  And you asked him if he was going to listen to you; right?

26  **A.**  Uh-huh.

27  **Q.**  Is that a "yes"?

28  **A.**  Yes.  That is a yes.

1  Q.  And is it fair to say you were trying to continue and engage

2  in just talks with him?

3  A.  Absolutely.

4  Q.  And he called you a fake cop?

5  A.  He did call me a fake cop.

6  Q.  Do you believe this comment insulted Cha at all?

7  A.  I don't know if it insulted him at all.  It didn't insult

8  me.

9  Q.  Okay.  And then Moore switched hands and put his cell phone

10  in his left hand and took his right hand out of his pocket?

11  A.  Yes.

12  Q.  And do you recall nothing else was in his right hand?

13  A.  I don't recall anything else in his right hand.

14  Q.  So is it fair to say he didn't appear to be holding any

15  weapons at this point?

16  A.  Correct.

17  Q.  This might sound like a silly question.

18     Can you describe how you knew the item that he was using was

19  a phone.

20  A.  Because I've seen phones before, and it looked like a phone

21  to me; and the nature of his holding the phone looked as if it

22  was a phone; and him saying, I'm going to call to have you

23  removed, to that extent; based on my life experience, I believe

24  that it was a phone.

25  Q.  So it was, like, the shape of a phone?

26  A.  Yes.

27  Q.  It was the size of a phone?

28  A.  Yes.

1  Q.  And the manner that he was holding it looked like a phone?

2  A.  Correct.

3  Q.  Okay.  Now, he told you and Officer Cha several more times

4  to leave his stairs; right?

5  A.  Yes.

6  Q.  And Officer Cha continued telling him that you weren't going

7  to leave?

8  A.  Yes.  He did say that.

9  Q.  And you think you already told us this -- at this point,

10  this is before the pepper spray -- the purpose of you being on

11  the stairs was to continue with the investigation?

12  A.  So we're going back to the second time we're on the stairs?

13  Q.  This is the second time you're on the stairs.

14  A.  Yes.

15  Q.  So it was to continue the investigation?

16  A.  Yes.

17  Q.  So at this point, you had not formed the mindset of

18  arresting him yet; is that fair?

19  A.  Correct.

20  Q.  Okay.

21  A.  That's what I believe.

22  Q.  Okay.  Yeah.

23  A.  Yes.

24  Q.  Okay.  So after Mr. Moore repeatedly asked that you and

25  Officer Cha get off his stairs, Moore opened his gate; right?

26  A.  Yes.  He opened the gate after he said, "You're going to get

27  off my stairs."

28  Q.  And at this point, his cell phone was still in his left

1   hand; right?

2   **A.**   I don't remember.

3   **Q.**   I'm asking you very specific questions, so...

4   **A.**   Right.

5   **Q.**   Okay.  Well, is it fair to say his right hand opened the

6   gate; do you recall?

7   **A.**   I don't remember what hand opened the gate.

8   **Q.**   I think we should just play it in the video.

9       We're just going to show a clip of the video.

10  **A.**   Yes.  May I stand up?

11  **Q.**   Yeah.  Definitely.

12      **MS. LACAMBRA:**  We are at 5:11.

13           (Whereupon video played, unreported.)

14  **BY MS. DRUSINSKY:**

15  **Q.**   Okay.  So I think right there, we can see his right hand

16  open the gate; right?

17  **A.**   Right.  Right hand opened the gate.  And I believe his

18  phone, while he's holding up his pants, on the left side.

19  **Q.**   And then he stepped forward; right?

20  **A.**   Correct.

21  **Q.**   So nothing is in his right hand at this point?

22  **A.**   Correct.

23  **Q.**   And then he extended his right hand in, like, a stop

24  gesture -- he stepped forward, and then he extended his hand in

25  a stop gesture?

26  **A.**   That's what it looks like now after watching the video.  At

27  that time, I believed he was coming out to attack us.

28      **MS. DRUSINSKY:**  So let's just play this a little longer.

1            (Whereupon, video played, unreported.)

2  BY MS. DRUSINSKY:

3    Q.  So he stepped forward, nothing was in his right hand, and he

4    extended his right hand, now you can see, in a stop gesture.

5    A.  Yeah.  Like, swatting a fly away.  That's what it looks like

6    in this video.

7    Q.  After he does the stop gesture, was it more swatting back

8    and forth or left to right?

9    A.  Swatting --

10   Q.  Let's just look at it one more time, and then you can tell

11   me.

12   A.  Sure.

13            (Whereupon video played, unreported.)

14  BY MS. DRUSINSKY:

15   Q.  Okay.  So --

16   A.  He goes like this, and then he goes like this.

17   Q.  Just for the record, I'm going to describe what you're

18   saying.  So in the beginning, you're going with your hand left

19   to right kind of like a windshield wiper; and then you're saying

20   afterwards, with his hand, he kind of went forwards and

21   backwards?

22   A.  Correct.

23        MS. LACAMBRA:  And for the record, we played from

24   approximately 4:58 to 5:22 on the video, which is Exhibit 4.

25  BY MS. DRUSINSKY:

26   Q.  Okay.  And I think we can see it a little bit here, his

27   phone is still in his left hand; right?

28   A.  Yes.

1  **Q.**  You agree this is right before Officer Cha pepper sprays

2  Sean Moore?

3  **A.**  Yes.

4  **Q.**  So right before Officer Cha pepper sprays Sean Moore, you

5  didn't observe him with any weapons; right?

6  **A.**  Correct.

7  **Q.**  Okay.  So as Sean Moore took a step towards you and Officer

8  Cha -- you already said this actually.

9       Okay.  So right before Officer Cha pepper sprays Sean Moore,

10  you actually didn't take out any of your department-issued

11  weapons yet; right?

12  **A.**  That's correct.

13  **Q.**  But Officer Cha pepper sprays him; right?

14  **A.**  Yes.

15  **Q.**  And then Sean Moore retreats back to his house; right?

16  **A.**  Correct.

17  **Q.**  Okay.  And then do you recall walking towards Sean Moore as

18  he was retreating back to his house?

19  **A.**  I do.

20  **Q.**  Can you tell us what you were doing when you were walking

21  towards him.

22  **A.**  In my frame of mind, from what I remember, is based on the

23  threat indicators that he had previously expressed to us,

24  yelling at us, banging, telling us that:  You're going to get

25  off my stars.

26       And then we told him, no, we're not.  We're the police.  We

27  are here to investigate.  We are not leaving.  And then when he

28  opens that gate and comes towards us, that's him carrying a

1   threat -- I believed at that time he was carrying out a threat

2   to the either remove me, harm me, or hurt me.  And that subtle

3   behavior of him walking towards me was what I needed for what I

4   had in front of me, probable cause -- the 69 PC -- assault --

5   more than a battery --

6   **Q.**  Can I maybe make this easier?

7   **A.**  Yeah.

8   **Q.**  Were you walking towards him to arrest him at this point?

9   **A.**  Once he was sprayed, yes.

10  **Q.**  Okay.

11  **A.**  Because I believe maybe the spray would have been effective

12  for me to go hands on without using weapons --

13  **Q.**  To effectuate the arrest?

14  **A.**  Exactly.

15  **Q.**  Okay.  So he was pepper sprayed, you take a walk towards him

16  to arrest him, and I think what you're saying is you believe the

17  pepper spray subdued him enough that you could just arrest him

18  more easily, I guess?

19  **A.**  Correct.

20  **Q.**  I just want to kind of clarify -- and you started explaining

21  this -- exactly what you were arresting him for.

22      So it wasn't at this point for the violation of the

23  restraining order?

24  **A.**  No.  It was the threats towards us and the assaultive

25  behavior.

26  **Q.**  Okay.  So can you tell me all the things that you were

27  arresting him for?

28  **A.**  At that point?

1  **Q.**  Yeah.  You can say the PC numbers; you can say the

2  violations of the Penal Code; whatever it was; all the basis for

3  the arrest?

4  **A.**  69 PC.

5  **Q.**  So for the jurors clarification, 69 PC is, like, battery on

6  an officer, assault on an officer.

7  **A.**  It's threats along with violence against an officer for

8  someone who's doing a job; and part of the elements of the crime

9  is a person knowingly knowing -- or them knowingly -- saying

10  those threats to the officer.

11  **Q.**  Yeah.  Okay.

12     **GRAND JUROR:**  Can the witness repeat that number.

13  **BY MS. DRUSINSKY:**

14  **Q.**  It's PC 69; correct?

15  **A.**  That's correct.

16  **Q.**  PC is short for Penal Code?

17  **A.**  Penal Code.

18     **GRAND JUROR:**  69, okay.

19  **BY MS. DRUSINSKY:**

20  **Q.**  Okay.  And was that all you were arresting him for at this

21  point, just 69; so not for the violation of the restraining

22  order?

23  **A.**  Yes.  From what I remember, that's it.

24  **Q.**  There's fine.  That's fine.

25     So Officer Cha -- so then, as you walked towards Sean Moore

26  to effectuate the arrest, did the pepper spray hit your eyes?

27  **A.**  Yes.

28  **Q.**  And it impaired your vision at this point?

1    **A.**  Yes.

2    **Q.**  So you retreated down the stairs; right?

3    **A.**  Correct.

4    **Q.**  Do you know, looking back, like, did the spray actually hit

5    your eyes, or was it the residues and you walked into it?  Do

6    you know which one it was?

7    **A.**  I don't remember.

8    **Q.**  Okay.  And when you walked towards Sean Moore, did you end

9    up making any contact with him, or did the pepper spray hit your

10   eyes so fast that you had to walk down?

11   **A.**  I don't remember.  It happened too quickly that incident of

12   me grabbing him, I don't remember.

13   **Q.**  Okay.

14   **A.**  I remember getting sprayed and knowing that I had to get it

15   off immediately.

16   **Q.**  Yeah.  Yeah.  That makes sense.

17       Do you remember if Sean Moore made any physical contact with

18   you after Cha deployed his pepper spray?

19   **A.**  I don't know, maybe.  At this time right now, I don't

20   remember.

21   **Q.**  That's okay.

22       As you walked down the stairs dealing with the pain of the

23   pepper spray, the restraining order is dropped from your hands;

24   right?

25   **A.**  Right.

26   **Q.**  And as you were walking down the stairs -- I know that the

27   pain of the pepper spray was very distracting -- but did you see

28   Sean Moore make any physical contact with Officer Cha?

1  A.  I don't remember if there was any contact; but I remember as

2  I was running away -- that sounds cowardly -- as I was

3  retreating down the stairs, I remember -- because I still wanted

4  to have some sort of eye contact with the subject who I was

5  attempting to place under arrest.

6  Q.  Yeah.

7  A.  I do remember a motion that he made -- that I don't remember

8  what motion it was -- towards Officer Cha.

9  Q.  Okay.  Did Officer Cha ever tell you whether Sean Moore made

10  any contact with him?

11  A.  I don't remember.

12  Q.  Did Officer Cha ever tell you that the pepper spray hit his

13  eyes also?

14  A.  I don't remember.

15  Q.  Okay.  So at this point, I think Sean Moore picked up the

16  restraining order papers that you had dropped on the stairs now

17  right; is that correct?

18  A.  Yes.

19  Q.  You told him to give you back the papers; right?

20  A.  I ordered him to give back the papers.

21  Q.  And at this point, Officer Cha called Sean Moore a

22  motherfucker.

23    Do you remember that?

24  A.  I remember hearing the term motherfucker.  I don't remember

25  when he said motherfucker or -- the words motherfucker coming

26  out of his mouth.

27  Q.  And you already stated this, but it was directed to Sean

28  Moore?

1    **A.**  I don't know.  Because like I said earlier, the

2    motherfucker, you can just be yelling, ah, motherfucker,

3    right -- or calling someone a motherfucker.  I didn't ask Ken if

4    he --

5    **Q.**  That's fine.

6       Would it refresh your recollection to just look at that

7    clip?

8    **A.**  Sure.

9         **MS. LACAMBRA:**  Again, we're playing from Exhibit 4 at

10    5:25.  The time in the upper corner is 5:21:50.

11              (Whereupon, video played, unreported.)

12  **BY MS. DRUSINSKY:**

13    **Q.**  Okay.  Did that refresh your recollection who Officer Cha

14    was calling motherfucker?

15    **A.**  Yes.

16    **Q.**  Did it seem like he was calling Sean Moore a motherfucker?

17    **A.**  Yes.

18    **Q.**  Okay.  And then Officer Cha says, "What's up, come on," to

19    Sean Moore.

20       We heard that right there?

21    **A.**  Yes.

22    **Q.**  Now, when Officer Cha said, "What's up, come on," did you

23    take that to mean Officer Cha was kind of challenging Sean Moore

24    to a fight?

25    **A.**  Looking at in the video now --

26    **Q.**  Yeah.

27    **A.**  -- it could be seen that way.

28    **Q.**  Yeah.

1   **A.**   And I don't know what he was doing.

2   **Q.**   Yeah.

3   **A.**   I never asked him what the -- why he was using those words.

4   It seems like a reaction that someone would have after trying to

5   harm you.

6   **Q.**   Say that again.

7        It's a reaction?

8   **A.**   A reaction, a comment, that would come after -- that would

9   come out of someone's mouth after someone tried to harm you.

10  **Q.**   Okay.

11  **A.**   I don't know the intent of his words.

12  **Q.**   And fair enough.  You're not Officer Cha, so --

13  **A.**   I know.  I get that.

14  **Q.**   Yeah, yeah, yeah.

15       But just to the best of your ability -- yeah.  Thank you for

16  answering that.

17       Do you believe -- did Sean Moore appear to interpret those

18  words as challenging him to a fight?  Specifically the words,

19  "What's up, come on?"

20  **A.**   I don't know.

21  **Q.**   Okay.  Do you agree calling Sean Moore a "motherfucker" and

22  saying, "What's up, come on," likely antagonized Sean Moore?

23  **A.**   I don't know.

24  **Q.**   But you agree those words are inconsistent with the training

25  you received by January 6, 2017?

26  **A.**   Yes.

27  **Q.**   And those words are definitely inconsistent with any

28  deescalation training?

1   **A.**  Correct.

2   **Q.**  And so you then asked for the papers again; right -- the

3   restraining order papers?

4   **A.**  I asked and I requested.

5   **Q.**  And then Sean Moore answered with, "Fine.  Are you going to

6   go."

7      Do you recall that?

8   **A.**  I do remember him saying, "Let's get this resolved."

9   **Q.**  And you told him you were not going to leave, but he needed

10  to give you those papers back?

11  **A.**  I said that, yes.

12  **Q.**  And you told him he was under arrest; right?

13  **A.**  Yes.  I think twice.

14  **Q.**  You told him several times, I think.

15     And you just specified right now, but I just want to

16  confirm, this was specifically to arrest him for violation of

17  Penal Code 69, threat against an officer?

18  **A.**  Correct.

19  **Q.**  So this is not for the restraining order?

20  **A.**  Yes.

21  **Q.**  At least, in your mind at the time?

22  **A.**  Correct.

23  **Q.**  Okay.  Okay.

24     Now, I do want to know -- I know that you talked about,

25  since this incident, you received a lot more training; you're

26  now a crisis-intervention-trained officer; right?

27  **A.**  Field training officer.

28  **Q.**  You're a field training officer.

1      And you've gone over this case a lot at this point?

2  **A.**  Uh-huh.

3  **Q.**  Is that a "yes," for the record?

4  **A.**  Yes.

5  **Q.**  Can you tell us, looking back, do you believe you had a

6  basis to arrest him at this point?

7  **A.**  Yes.

8  **Q.**  And you still believe you had a basis to arrest him for

9  PC 69?

10  **A.**  Absolutely.

11  **Q.**  Okay.  Now, Sean Moore said that he needed medical

12  attention; right?

13  **A.**  Yes.

14  **Q.**  And Officer Cha told Sean Moore to come out several times?

15  **A.**  Correct.

16  **Q.**  And Sean Moore tossed the papers back to you through the

17  gate?

18  **A.**  Correct.

19  **Q.**  Officer Cha said, "Come on out or I'm going to kick the gate

20  open"; right?

21  **A.**  Correct.

22  **Q.**  Based on your experience working with Officer Cha, do you

23  believe Officer Cha would have kicked the gate open if Sean

24  Moore didn't come out?

25  **A.**  No.

26  **Q.**  Okay.

27  **A.**  I believe he did say he's going to kick the door in after he

28  did say that he did need medical attention and after requesting

257

1    an ambulance.

2    Q.  I just want to clarify what you're saying.

3         So Officer Cha had -- after he deployed the pepper spray, he

4    radioed in that he needed an ambulance; right?

5    A.  Correct -- because I was pepper sprayed and Sean Moore was

6    sprayed.  And it's a "shall" that you get them immediate medical

7    attention.

8    Q.  And all this conversation we're talking about right now, you

9    asking for the papers back, all this stuff, that happened after

10   Officer Cha had radioed in that he needed an ambulance; right?

11   A.  I don't remember the exact sequence, but I know that, at a

12   certain time, whether that's one second or ten seconds after

13   this interaction, he requested an ambulance.

14   Q.  Okay.  So -- but you're staying that Officer Cha would not

15   have kicked the gate open?

16   A.  I don't believe he would have.

17   Q.  So would you have kicked the gate open if Sean Moore didn't

18   come out?

19   A.  No.

20   Q.  So he was just saying that to try to get him out, basically?

21   A.  I don't know why he said that.

22   Q.  Yeah.

23   A.  I'm not going to speculate.

24   Q.  Okay.  And so Sean Moore at this point said he couldn't see;

25   right?

26   A.  Uh-huh -- yes.

27   Q.  And he still did not come out of his house; right?

28   A.  Correct.

1  Q.  Okay.  So at this point when Sean Moore was inside the house
2  after being pepper sprayed, and you were on the sidewalk -- and
3  at this point, I think he actually pushed the restraining order
4  papers through the gate and dropped them; right?
5  A.  Uh-huh -- yes.
6  Q.  And you're on the sidewalk on the bottom of the staircase.
7      Do you agree at this point, you're not in any imminent
8  danger at that point?
9  A.  At that point, correct.
10  Q.  There's certainly no weapon being pointed at you; correct?
11  A.  Correct.
12  Q.  And, you know, I think you already told us this yesterday,
13  but you agree it was feasible at this point -- and, you know, we
14  are asking these questions a lot, but we keep talking about a
15  different timeframe.  So right now I'm talking about this very
16  point where you're on the sidewalk after having been pepper
17  sprayed and Sean Moore is in his home not coming out.
18      At this point, it was feasible to create time and distance
19  by just staying on the sidewalk for a while and waiting for
20  things to calm down; right?  Just asking the feasibility.
21  A.  Feasible at that time, in my mindset, I didn't believe that
22  it was feasible at that time.
23  Q.  And can you tell us why.
24  A.  Well, I knew that a felony had just been committed in my
25  presence; I knew he needed medical attention; and I know we
26  needed to get him help; and he was still under arrest.  Looking
27  back on it, obviously we would have done something differently.
28  Q.  Yeah.

1    **A.**   I don't think -- knowing what I know now, I believe the

2    training that I've received, the experience that I've

3    experienced since then -- I mean, it's one of the most traumatic

4    days of my life.   I didn't realize going into this what was

5    going to happen.   I mean, if I had known now, yeah, absolutely

6    we would have done something differently.   But in that

7    timeframe, that's not what I believed to be feasible.

8    **Q.**   So can you explain what is it that you know now that tells

9    you, like, it actually was feasible?

10   **A.**   I think more training -- the more training that I've

11   received, the experience that I've experienced.

12   **Q.**   So what is it that you didn't know back then, do you think?

13   **A.**   I don't know.

14   **Q.**   Okay.   And you had already kind of answered this question,

15   but another deescalation technique you were trained on was to

16   request additional resources, like crisis intervention, officers

17   with extended-range impact weapons; right?

18   **A.**   Correct.

19   **Q.**   And that was the training you received at the time on

20   January 6, 2017?

21   **A.**   Correct.

22   **Q.**   And when you were on the sidewalk --

23   **A.**   Should we explain what an EIW is?

24   **Q.**   Sure.

25   **A.**   Extended range impact weapon is a beanbag.   So it's an

26   orange shotgun that shoots out a beanbag.

27   **Q.**   Thank you.

28       When you were standing on the sidewalk after the pepper

1    spray, did you believe it was feasible to take the time and

2    check and in with your supervisor to see when additional units

3    would arrive?

4    **A.**  At that time, I was worried about my safety and Cha's

5    immediate safety because I'd just been pepper sprayed.  I didn't

6    know if Sean was going to come out of the house and attack us.

7    So at that time and in that second, no.

8    **Q.**  And I think you kind of answered this question.

9         But one of the training you received is if you believe there

10   could be imminent danger, the response -- the appropriate

11   response -- is to take cover; right?

12   **A.**  Correct.

13   **Q.**  Okay.  And then can you explain -- so after Officer Cha

14   dispatches on the radio that pepper spray was deployed, does

15   that automatically trigger backup units to come and support you?

16   **A.**  Yes.

17   **Q.**  It does?

18   **A.**  Absolutely.

19   **Q.**  And did you know that at the time?

20   **A.**  Yes.

21   **Q.**  So you were expecting backup units to arrive momentarily?

22   **A.**  Correct.  So putting it out on the radio would have just

23   increased the anxiety of the responding officers, obviously

24   making them go faster when they shouldn't be going faster, and

25   that had already expedite and already exacerbate the situation

26   at that time.

27   **Q.**  Wait.  Can you explain that.

28        Exacerbating and increasing the anxiety for who?

1   **A.**   Responding officers.  So if you're saying where are you,

2   where are you, where are you, it's going to make them go faster.

3   **Q.**   Oh, I see.  So that's why you didn't radio in, "Where are

4   you?"

5   **A.**   Correct.

6   **Q.**   Okay.  I understand.

7        But you were expecting them to arrive?

8   **A.**   Absolutely.  And Taraval district, it's a big district.  In

9   the City, it covers a third of the City.  And where Taraval

10  station is, it's at 24th and Taraval.  And Kenny and I were

11  pretty much on the border of Daily City.  So it was pretty far.

12  **Q.**   At the time, how long did you think it might take for backup

13  to arrive?

14  **A.**   I don't know.

15  **Q.**   Okay.  Had you ever been in a situation where something like

16  that had happened, pepper spray was deployed, and you knew

17  backup would arrive?

18  **A.**   Yes.

19  **Q.**   How long has it taken in the past for backup to arrive?

20  **A.**   It depends based on the time of day, the station you're

21  working at.  If you're work at a downtown station, you're going

22  to have less than 30 seconds.  One of the outlying stations down

23  the avenues, it could take as long as two, three minutes.

24  **Q.**   Okay.

25  **A.**   And that doesn't sound like a long time but --

26  **Q.**   Fair enough.  Fair enough.

27        So the range that you just described is between 30 seconds

28  and two to three minutes?

```
 1        Is that a "yes"?
 2   A.   Yes.
 3   Q.   What about in Taraval station, is it the same or different?
 4   A.   It could be different.  It could be up towards five minutes.
 5   Q.   Towards five minutes, okay.
 6        Has that happened to you in the past in Taraval station?
 7   A.   I don't remember.
 8   Q.   And I think you just stated that it was feasible for you to
 9   maintain a safe distance until the arrival of the supervisor;
10   but at this time, you didn't think that was necessary; right?
11   A.   Correct.
12   Q.   Okay.
13   A.   Because I'm still standing my ground.  I'm behind I think it
14   was a bush in front of the house.  That's my cover.  And I'm
15   looking to see if the threat, Sean Moore, is going to come out
16   and attack us.
17   Q.   That makes sense.
18        Were you aware -- and maybe you weren't.
19        Were you aware that your supervisor had tried contacting you
20   and Officer Cha to inform you that several units were going to
21   arrive?
22   A.   I don't remember that.
23   Q.   Okay.  So at the time -- I know that you said that you
24   believe it was feasible to maintain a safe distance until the
25   arrival of a supervisor.
26        Did you believe it was feasible to take the time to request
27   additional resources?
28   A.   I believe that because there were additional resources
```

1    responding, that those additional resources were already --

2    **Q.**  On their way.

3    **A.**  -- on their way, so I didn't believe it was necessary.

4    **Q.**  To call anymore?

5    **A.**  To call anymore.

6    **Q.**  Okay.  Fair enough.

7        As far as the backup units that were coming -- that were

8    responding to assist you, did you expect any of those officers

9    to be crisis-intervention trained?

10   **A.**  I believe we had a few that were working that night.  I

11   don't remember which ones were, but there are a certain amount

12   of CIT, crisis-intervention-trained officers.

13   **Q.**  And those are specifically officers that know how to handle

14   someone who is mentally ill or combative; is that fair?

15   **A.**  Correct.

16   **Q.**  And now you are a crisis-intervention-trained officer?

17   **A.**  I am.

18   **Q.**  But at the time, you had not been trained?

19   **A.**  Correct.

20   **Q.**  Okay.  So at this point, Officer Cha said, "Come on out so I

21   can get some medical help for you"; right?

22   **A.**  Right.

23   **Q.**  And Sean Moore said -- you said this -- "Let's get this

24   resolved.  I can't see"; right?

25   **A.**  Correct.

26   **Q.**  And then Officer Cha said, "Then come out"; right?

27   **A.**  Right.

28   **Q.**  And then you went and actually picked up the papers that you

1    had dropped on -- or no -- that Sean Moore had dropped on the

2    steps?

3    **A.**  Correct.  Through his locked gate.

4    **Q.**  Through his gate.  That's right.

5        And you were kind of toward the bottom of the stairway when

6    you started grabbing the papers; right?

7    **A.**  Uh-huh -- yes.

8    **Q.**  And then Sean Moore opened the gate; right?

9    **A.**  Correct.

10   **Q.**  And he opened the gate after Officer Cha had continued

11   yelling at him, "Come out, come out"; right?

12   **A.**  Yes.

13   **Q.**  And once Sean Moore opened the gate though, you kind of took

14   a step back, and I think some of the pages dropped back on the

15   ground; right?

16   **A.**  I believe so.

17   **Q.**  And then Sean Moore continued standing at the top of the

18   stairwell, and he was yelling, "Fuck you" a few times; right?

19   **A.**  Yes.

20   **Q.**  So then you took out your baton, and you held it above your

21   right shoulder; right?

22   **A.**  Right, at a high ready position.

23   **Q.**  Okay.  Can you just, like explain to us the positions?

24   **A.**  So you have a low ready position.  I'll pretend this is my

25   baton.  So low ready is -- so it's a position.  It's called low

26   ready and a high ready.

27   **Q.**  And just for the record, I think the low ready, the baton

28   was --

```
 1   A.   Down by the leg.
 2   Q.   Down by the leg.
 3        And hen high ready is over your left shoulder?
 4   A.   Correct.  But not exceeding your head.
 5   Q.   So it was in the high ready position?
 6   A.   Yes.
 7             MS. LACAMBRA:  For the record, the witness was using --
 8             THE WITNESS:  Clorox.
 9             MS. LACAMBRA:  -- a box of Clorox wipes as a baton.
10   BY MS. DRUSINSKY:
11   Q.   And then you stated that the baton that you had was a metal
12   baton; right?
13   A.   Retractable, collapsible baton, specifically an RCD.
14   Q.   RCD?
15   A.   Correct.
16   Q.   And it was metal; right?
17   A.   Correct.
18   Q.   Can you tell us what size it was, if you know.
19   A.   Maybe 26 inches.
20   Q.   Yeah.  Okay.
21        And so Officer Cha -- I think -- so Sean Moore is already
22   out, and he had just yelled, "Fuck you, fuck you."
23        And Officer Cha continues to yell, "Come out, come out."
24        Do you recall that?
25   A.   Yes.
26   Q.   Do you feel like yelling at a subject, "Come out, come out"
27   is consistent with deescalation training?
28   A.   I think it's consistent with my training to place someone
```

266

1    under arrest.

2    **Q.**  Okay.

3    **A.**  Yes, I do.

4    **Q.**  Do you feel like it's consistent with deescalation training?

5    **A.**  I don't know.  Because -- yeah, I don't know.

6    **Q.**  Okay.  It's definitely not consistent with creating time and

7    distance with a subject; right?

8    **A.**  That's correct.

9    **Q.**  Okay.  Now, at this point, you could see Sean Moore holding

10   his cell phone in his left hand; right?

11   **A.**  I don't remember what hand it was in.

12   **Q.**  Let's go step-by-step.

13      Do you recall seeing Sean Moore holding a cell phone still?

14   **A.**  Yes.

15   **Q.**  Okay.  Do you agree this appeared to be the very same cell

16   phone he had been holding in his hand prior to being pepper

17   sprayed?

18   **A.**  At this time, I didn't know what it was.  Looking back on

19   it, yes, it looks like the same cell phone.  At the time, I just

20   knew there was something in his hand.

21   **Q.**  At the time, you didn't know it was a cell phone?

22   **A.**  No.

23   **Q.**  Okay.

24   **A.**  I don't remember being there looking at it and thinking, oh,

25   that's the same cell phone, if that makes sense.

26   **Q.**  But did you look at it, and you were, like, that's a cell

27   phone?

28   **A.**  Or cell phone -- a phone.

1  Q.  I actually don't know if it was a cell phone or a phone.

2  A.  Looking back on it, I think it was a house phone, so bigger

3  than a cell phone.  So at the time when I had my baton raised, I

4  don't remember saying like, oh, that's a phone.  I just remember

5  there being something in his hand.

6  Q.  Okay.  So looking back, do you agree that this item was the

7  same size of the phone that you had seen earlier; right?

8  A.  Yes.

9  Q.  And looking back, you agree it was the same color as you had

10 seen earlier?

11 A.  It was similar in shape, color, size.

12 Q.  And he was holding it in the same way; right -- more or

13 less?

14 A.  I think he had it down by his side.

15 Q.  Okay.

16 A.  So it was different than having -- dialing it.

17 Q.  Sure.  But he wasn't just holding it; dialing the whole time

18 earlier.

19     He had it down by his side; his was switching it over to his

20 hand; he was doing same kind of thing later after the pepper

21 spray with the phone?

22 A.  He was holding it down by his side.

23 Q.  Okay.  And then did you see that something dropped from his

24 phone?  Do you recall that?

25 A.  I don't remember.

26 Q.  Okay.  I think we should just play it.  So it's at 7:55 --

27     Would it refresh your recollection to see it?

28 A.  Sure.  Yeah.

1      **MS. LACAMBRA:**  Is it 7:55?

2      **MS. DRUSINSKY:**  Yeah.  Maybe a little bit before.

3      **MS. LACAMBRA:**  We're starting at 7:51, and the time in

4  the top corner is 12:24:17 on Exhibit 4.

5          (Whereupon, video played, unreported.)

6  **BY MS. DRUSINSKY:**

7  **Q.**  Do you recognize that something just dropped from the item

8  he was holding?

9  **A.**  Can you play -- I'm sorry.

10  **Q.**  Yeah.  We can play it again -- try it again.  It happened

11  twice.

12     Just try listening to it.

13      **MS. LACAMBRA:**  We're starting again at 7:51, 12:24:17 on

14  Exhibit 4.

15         (Whereupon, video played, unreported.)

16  **BY MS. DRUSINSKY:**

17  **Q.**  Okay.  So did you see something drop twice right there?

18  **A.**  Yes.

19  **Q.**  Okay.  So the first time he bent up to retrieve a piece of

20  the phone while still at the top of the stairwell?

21  **A.**  Yes.

22  **Q.**  You agree it sounds like something plastic; right?

23  **A.**  That's correct.

24  **Q.**  And then he kind of tries to put that object back on his

25  phone or whatever; is that right?

26  **A.**  Yes.

27  **Q.**  Okay.  And then while this is happening, Officer Cha is

28  yelling, "Come out, come out"; right?

1  A.  Yes.

2  Q.  And then Sean Moore dropped a piece of the cell phone again

3  and it starts falling down the stairs?

4  A.  More pieces of what looks like the phone to fall down the

5  stairs.

6  Q.  And you could hear the sound that that object made as it's

7  falling down the stairs; right?

8  A.  Yes.

9  Q.  And that still sounds like plastic; right?

10  A.  Yes.

11  Q.  Certainly not a metal object; right?

12  A.  Correct.

13  Q.  And it sounds light in nature; right?

14  A.  I don't know how to answer that question.

15  Q.  Does it sound heavy?

16  A.  Does it sound what?

17  Q.  Heavy.

18  A.  It sounds like something dropping.

19  Q.  Okay.  All right.

20     So then Officer Cha told Sean Moore to get on the ground;

21  right?

22  A.  Correct.

23  Q.  And Sean Moore was still at the top of the stairwell; right?

24  A.  Correct.

25  Q.  Do you know what Officer Cha meant when he commanded Sean

26  Moore to get on the ground on the top of the stairwell?

27  A.  I do know what --

28     Can you repeat that one more time.

1  **Q.**  Yeah.

2  Do you know what Officer Cha meant when he commanded Sean

3  Moore to get on the ground while at the top of the stairwell?

4  **A.**  I don't know exactly what he meant, but I can -- I don't

5  want to guess, but:  Hey, come down to the ground.  Come towards

6  us, and get on the ground.

7  **Q.**  So your best guess would be:  Walk down the stairs, then get

8  on the ground?

9  **A.**  Yes.

10  **Q.**  Okay.  Do you find that to be a confusing order at all?

11  **A.**  No.

12  **Q.**  Do you think someone could interpret that order as meaning

13  literally lie down on the ground on the top of the stairwell?

14  **A.**  No.

15  **Q.**  So then --

16  **A.**  Because I don't think there's enough room for him to --

17  **Q.**  Right.  Right.

18  **A.**  -- stay at the top and --

19  **Q.**  Right.  Right.

20  **A.**  So, no, I don't think that.

21  **Q.**  You don't think that?

22  **A.**  No, I don't.

23  **Q.**  Okay.

24  So then as Sean Moore was coming down the stairs, Officer

25  Cha's baton was out and raised also; right?

26  **A.**  Yes.

27  **Q.**  Was the position also in that high ready?

28  **A.**  I don't remember.

1    **Q.**  Do you remember when Officer Cha first raised his baton?

2    **A.**  No, I don't.

3    **Q.**  So then Sean Moore started walking down the stairs to grab

4    the plastic item that he had accidentally dropped; right?

5    **A.**  Yes.

6    **Q.**  And he bent down for the item; right?

7    **A.**  Correct.

8    **Q.**  Is that right?

9        So then after he bent down to retrieve the cellphone part

10   and hold it in his hand, Officer Cha yelled at him, "Hey, come

11   out"; right?

12   **A.**  Correct.

13   **Q.**  And then you and Officer Cha then went up the stairs to

14   arrest him; right?

15   **A.**  Correct.

16   **Q.**  You specifically chose this moment to arrest him because

17   Sean Moore was distracted picking this item up; right?

18   **A.**  Yes.  In between this time, he said, "I ain't getting down

19   on shit," meaning, from what I believe, he's resisting.

20   **Q.**  He's not following your orders for sure?

21   **A.**  Correct.

22   **Q.**  So then you and Officer Cha -- at this point, you don't tell

23   him to drop what he's holding though; right?

24   **A.**  I don't remember saying that, no.

25   **Q.**  Yeah.  And you and Officer Cha didn't tell him, like, show

26   your hands, or anything like that; right?

27   **A.**  I don't think we did, no.

28   **Q.**  Because your purpose right then was to effectuate an arrest;

1  right?

2  **A.**  Yes.

3  **Q.**  So your baton was already out over your shoulder as you

4  started going up the stairs?

5  **A.**  Correct.

6  **Q.**  And the reason you had your baton out over you're shoulder

7  as you walked up the stairs to effectuate the arrest for

8  violation of PC 69?

9  **A.**  Correct.

10  **Q.**  Okay.  So I'm asking, that's the reason you had the baton

11  over your shoulder.

12  **A.**  I had the baton over my shoulder to effectuate an arrest, to

13  overcome any resistance that I may have received -- as per

14  training that I received at the academy.

15  **Q.**  And Officer Cha's baton, you already stated, was out as well

16  also as you are walking up the stairs; right?

17  **A.**  Correct.

18  **Q.**  Now, do you agree that, according to your training at the

19  time, that if you had believed that Sean Moore was possibly

20  armed at this point, you would have told him to drop what he was

21  holding; right?

22  **A.**  Correct.

23  **Q.**  You would have told him to show you his hands; right?

24  **A.**  Yes.

25  **Q.**  Can you tell us what you would have done to protect yourself

26  if you had thought Sean Moore had a weapon at this point?

27  **A.**  Ask that question again.

28  **Q.**  Like, I kind of want you to explain, if you thought Sean

1    Moore had a weapon at that point, what are some of the things

2    you would have done to protect yourself?

3    **A.**   If I believed he was armed with a weapon?

4    **Q.**   Yeah.

5    **A.**   Knowing what I know now or at that time?

6    **Q.**   At that time.

7    **A.**   I probably would have not approached him if I believed it

8    was a weapon and pointed my firearm at him.

9    **Q.**   That makes sense.

10       Okay.  Would you have backed up -- so pointing a firearm

11   makes sense.

12       Would you have backed up in order to create time and

13   distance while pointing the firearm?  Does that question make

14   sense?

15   **A.**   Um --

16   **Q.**   No.

17       I guess I'm trying figure out -- so why would you back up?

18   Like, it makes sense logically, but can you explain from your

19   training what the reason would be for you to back up?

20   **A.**   If you're pointing your firearm at someone, you're

21   tunnel-visioned at that point.  And when you're tunnel-visioned,

22   you're not seeing what's up, what's down, what's left, what's to

23   the right if you were behind me.  So what they teach us in the

24   academy, is when you do have your firearm out, just try be

25   mindful of what's behind the target, what's in front of it, who

26   is behind you, what's behind you, what's in front of you for

27   cover.  If you pull out a firearm, you always want to get to

28   cover, if you have cover, just in case if that weapon is used

1  against you -- not matter what type of weapon that is.  And that

2  is what is consistent with my training, if he did have a weapon

3  and I pointed it at him.

4  Q.  That was going to be my next question.

5      Would you have tried to take cover also if you thought he

6  had a weapon?

7  A.  Yes.

8  Q.  And would you have been required to call your supervisor if

9  you thought he had a weapon?

10  A.  Yes.

11  Q.  So is it fair to say, you know, as you're walking towards

12  Sean Moore with nothing but your baton you don't think he's

13  armed; right?

14  A.  At that time, I did not believe he was armed, from what I

15  remember.

16  Q.  Yeah.

17      Okay.  So then as you went back up the stairs to arrest Sean

18  Moore, with your baton over your shoulder, he started kind of

19  retreating back up the stairs; right?

20  A.  Correct.

21  Q.  So he was kind of trying to distance himself from you and

22  Cha as he sees, like, these batons coming at him?

23  A.  No, ma'am.  He was evading and resisting arrest.

24  Q.  That's fine.  And I'm not really trying to get at the legal

25  conclusion.  I understand why you did what you did.

26      But was he backing up from you?

27  A.  Yes.

28  Q.  And at this point, as you were going up the stairs with your

1    baton over your right shoulder, he didn't hit you; right?

2    A.  No.

3    Q.  And he didn't lunge toward you; right?

4    A.  At this time?  No, he had not lunged toward me.  He had

5    before, but not at this time.

6    Q.  Before --

7    A.  So he's already showed acts of violence towards me.

8    Q.  That's okay.  I'm not asking why you ran up the stairs.

9    A.  This specific time, no.

10   Q.  This specific time, and just so the record is clear --

11   A.  Yeah.  I do not remember him lunging forward.

12   Q.  I just want to clarify for the record, we are talking about

13   the time when you and Officer Cha are going up the stairs with

14   the baton over your right shoulder to effectuate an arrest.

15   A.  Correct.

16   Q.  So during this timeframe, he didn't lunge toward you?

17   A.  I do not believe so, no.

18   Q.  So once Sean Moore reached the top of his stairway, you

19   finally caught up with him, and you kind of wound the baton over

20   your shoulder and you struck him; right?

21   A.  I believe before I struck him with my baton, I told him,

22   "You're going to get batoned."

23   Q.  And then after you told him that, you struck him with a

24   baton?

25   A.  Correct.  And I do remember him having one of his fists, you

26   know, clenched -- also another threat given that he's going to

27   strike me.

28   Q.  And so then you wound the baton over the shoulder, and you

276

1    struck him; right?

2    **A.**   Correct.

3    **Q.**   How many times did you strike him with your baton?

4    **A.**   So I remember striking him only once, having watched the

5    video at least twice, three times; but that moment, that day, I

6    just remember giving one strike.

7    **Q.**   Did you know where exactly you struck him?

8    **A.**   I believe it was his -- I was aiming for his legs, so I

9    believe his leg.  I don't remember which one it was.

10   **Q.**   Do you think you hit him anywhere but his leg?

11   **A.**   I don't remember.

12   **Q.**   Okay.  And this was -- okay.

13        So then while you struck him, you said, between two to three

14   times with baton, Officer Cha ordered him to get on the ground;

15   right?

16   **A.**   I don't remember.  At that time, I just remember ordering

17   him, striking him, and then getting hit -- or punched in the

18   face, I believe.

19   **Q.**   What about since watching the video?  Do you recall that

20   while you were striking him, Officer Cha ordered him to get on

21   the ground?

22           **MS. DRUSINSKY:**  This is the right one.

23           **MS. LACAMBRA:**  So we're starting at 8:18 on Exhibit 4,

24   and the time is 12:24 at the top right.

25                (Whereupon, video played, unreported.)

26   **BY MS. DRUSINSKY:**

27   **Q.**   Okay.  So did you hear Officer Cha yelling, "Get on the

28   ground," as you're striking Sean Moore?

1    **A.**  If that sounds like Officer Cha's voice.  I think that

2    sounds like my voice.

3    **Q.**  Oh, really?  So it was you who was yelling, "Get on the

4    ground"?

5    **A.**  That sounds like my voice.

6    **Q.**  Interesting.

7    **A.**  Can you play it again.  And I'm not trying to be difficult.

8    **Q.**  I'm just -- I think just the audio sounded louder.

9    **A.**  Because that's his camera.  It would make more sense that

10   it's louder.

11   **Q.**  This is his camera, so let's do it again.

12          **MS. LACAMBRA:**  It was 8:18 last time?

13          **MS. DRUSINSKY:**  Yeah.  Yep.

14          **MS. LACAMBRA:**  So we're playing from the same place on

15   Exhibit 4.

16                (Whereupon, video played, unreported.)

17          **THE WITNESS:**  One of those is his voice, and one of those

18   is my voice.

19   BY MS. DRUSINSKY:

20   **Q.**  So at least one is Officer Cha yelling, "Get on the ground"

21   while Sean Moore is being struck with the baton; right?

22   **A.**  Yes.

23   **Q.**  So at this point, what do you think Officer Cha meant when

24   he was saying, "Get on the ground"?

25   **A.**  Stop resisting.

26   **Q.**  Okay.  So by saying, "Get on the ground," what he mean was

27   stop resisting?

28   **A.**  Yes.

1    Q.   What do you think Sean Moore was supposed to understand by

2    that command?

3    A.   I mean, we told him numerous times to come down, down on the

4    ground.

5    Q.   So at that point, he should have understood to lay down on

6    ground at the stop of the stairwell?

7    A.   At that point, yes.

8    Q.   And that is while he's being struck with the baton?

9    A.   Yes.

10   Q.   Do you feel like that was a confusing order at all?

11   A.   No.

12   Q.   Okay.

13        So I don't know if you noticed; but after you struck him

14   with the baton, did you then try to grab him?

15   A.   I don't think I would grab him while having a baton in my

16   hand.

17   Q.   I'll let you describe what you were doing.   Let's just play

18   it.

19        Let's go back to 8:18 --

20   A.   So before we go to that, I had already been punched in the

21   face and blacking out and falling back on all fours.

22   Q.   So this is right before then.

23   A.   I understand that.   But whatever the camera is capturing is

24   not capturing what I remember.

25   Q.   So --

26   A.   I remember striking my baton once.   I don't remember

27   striking more than once.   I remember striking my baton, getting

28   hit in the face, and having the worst pain I've ever had in my

1  life.

2  **Q.**  Yeah.

3  **A.**  My nose was broken.  I still have trouble -- I have issues

4  breathing now, and I can't sleep more than a few hours because

5  of that.

6      So you could show me the video -- like, we can watch it, but

7  I'm just tell you, what I remember at this point is going to be

8  different from what we are watching.

9  **Q.**  Certainly.  And I'm not trying to undermine your memory at

10  the time.  But I also want to make sure we know what happened so

11  that we are relying on the video.  It's not any disrespect

12  towards your memory or anything like that.

13  **A.**  Okay.

14  **Q.**  Let's play it again.  And I just want you to look at exactly

15  what happened after you strike him with the baton.

16      **MS. LACAMBRA:**  Replaying from 8:18 on Exhibit 4.  The

17  time is 12:24:44 in the top right-hand corner.

18  **BY MS. DRUSINSKY:**

19  **Q.**  What is it -- do you know what you were doing?

20  **A.**  I mean, I don't know if he -- I don't remember if he grabbed

21  it or blocked it --

22  **Q.**  What's it --

23  **A.**  -- the baton, and I'm trying to pull it back.

24  **Q.**  Okay.

25  **A.**  I don't know what that was because I don't remember that

26  happening.

27  **Q.**  Is it possible you were trying to maybe take him down the

28  stairs?

1   A.  No.

2   Q.  That's not possible?

3   A.  No.  He's huge.

4   Q.  Maybe you were trying to use gravity to help you?

5   A.  No.  I don't think -- no, I wouldn't be able to do that.

6   Q.  You wouldn't be able to --

7   A.  No.

8   Q.  Okay.

9   A.  The whole point of the baton is because I knew physical

10  force isn't going to work.  He's a bigger guy than me.  It's

11  not -- that's why you have the OC spray.  Didn't work.  The City

12  isn't going to give us Tasers, so that's out the question.  So

13  my next use of force is the baton.  And clearly, it didn't work.

14  So I know -- even though I can't remember it -- I know that I'm

15  not bringing him down, especially with the height advantage and

16  the disadvantage of having ground, and because he's bigger than

17  me.

18  Q.  Yeah.

19  A.  I don't remember it, and I certainly don't think I would be

20  pulling away.  If anything, maybe he blocked it and held onto

21  it.  I don't remember.

22  Q.  So you just don't remember what it was that was happening

23  right then?

24  A.  No.

25  Q.  That's fair enough.

26  A.  But grabbing him would have gone against my training and

27  better judgment at that time.

28  Q.  Okay.  So then while you hit him with the baton, he tried to

1  block your use of the baton against him; right?

2  A.  I don't remember, because I remember striking --

3  Q.  Do you recall giving an interview to the Homicide unit a day

4  after this incident?

5  A.  I do, yes.

6  Q.  Do you recall telling them that when you hit him with the

7  baton, he tried to block your use of the baton against him?

8  A.  That may have been my frame of mind then, a day after.  Four

9  and a half years after, I don't remember if he grabbed it or

10  not.

11  Q.  I'm not asking if he grabbed anything.  I'm just saying,

12  while you hit him with the baton, did he try to block your use

13  of the baton against him, or was he just taking it?

14  A.  I think maybe he tried to block it with his arm.

15  Q.  Okay.  And at the time that Sean Moore was trying to block

16  your use of the baton, he actually made contact with your face;

17  right?

18  A.  Oh, yeah.

19  Q.  And you said he hit your nose; right?

20  A.  Correct.

21  Q.  So it was only after you began striking him with your baton

22  that he made contact with you, but it was a heavy contact;

23  right?

24  A.  Yes.

25  Q.  But he never used a weapon against you; right?

26  A.  Yeah -- that I recall, yeah.

27  Q.  And he struck you in the nose; right?

28  A.  Correct.

1  **Q.**  And then you lost you're balance, and you fell down the

2  stairs; rights?

3  **A.**  I was knocked out unconscious, blacked out -- whatever you

4  want to call it.  I fell back however many steps there were, and

5  I remember waking up on all fours on the sidewalk.

6  **Q.**  Do you remember how far you fell down the stairs, or you

7  don't remember?

8  **A.**  No.  I don't remember.

9  **Q.**  Did you see what -- I feel like this might be a really hard

10  question to answer.

11  But do you, if you can estimate, how long you were knocked

12  out for?

13  **A.**  No.

14  **Q.**  No.

15  Okay.  Did you see what happened next with Officer Cha?

16  **A.**  No.

17  **Q.**  Okay.  So did you see the interaction -- did you see the

18  gunshots?

19  **A.**  No.

20  **Q.**  Okay.  So you did not see Officer Cha shoot Sean Moore.

21  **A.**  I did not.

22  **Q.**  So what is the next thing you recall occurring?

23  **A.**  I remember being on all fours, hearing gunshots.  And I

24  remember Kenny was either already on the ground or was falling

25  back.

26  **Q.**  Okay.

27  **A.**  Yeah.

28  **Q.**  When Officer Cha radioed in "shots fired," were you --

1   A.  We both radioed in.  His radio traffic -- because you can

2   only have two people radioing in at the same time.  So even

3   though we both did it at the same time, only his traffic was

4   able to get captured.

5   Q.  But by then, you came to, basically?

6   A.  Came to as in I still had OC on eyes; I've got blood all

7   over my face; I'm coughing up my blood.  As "to it" as I could

8   be.

9   Q.  You were conscious?

10   A.  Yes.

11   Q.  Okay.  Now, after shooting Sean Moore -- I think we later

12   learn in the stomach -- Officer Cha radioed into dispatch that

13   shots were fired; right?  And it was you also who had radioed

14   in?

15   A.  Right.

16   Q.  And he started explaining why he shot Sean Moore; right?

17   A.  Correct.

18   Q.  And he said, "As he was assaulting my partner with fists and

19   feet, he came at me.  We lost our batons in the fight.  I was

20   getting overpowered, so I discharged my weapon."

21      Do you remember him saying that?

22   A.  Something like that, asking for a POA rep and an ambulance

23   as well.

24   Q.  And then you told him not to say that; do you remember?

25   A.  I do.

26   Q.  Why did you tell him that?

27   A.  I believed at this point, it was not pertinent to put it

28   over the air.  It was pertinent for an investigation, not to,

1  hey, we need resources here now.  Because at this point, I

2  believed it was just wasting air time.

3  **Q.**  Okay.  Typically, in officer-involved shooting, are

4  officers -- are you kind of encouraged to tell involved officers

5  not to make a statement?

6  **A.**  Say that again.

7  **Q.**  So in officer-involved shootings, are you encouraged to tell

8  the involved officers not to make a statement?

9  **A.**  As the officer who did not shoot?

10  **Q.**  Yeah.

11  **A.**  Is it my job to --

12  **Q.**  Maybe not your job, but where you're encouraged to --

13  **A.**  No, I wouldn't say encouraged.  I would just say, hey, wait

14  for the sergeant to get to the -- because after every shooting,

15  you have to make a public safety statement.

16  **Q.**  Can you tell us what a public safety statement is.

17  **A.**  Absolutely.  So a public safety statement is whenever an

18  officer gets involved in a shooting, there are a few

19  questions -- I'm not sure what all of them are.  But it's:  Who

20  shot?  How many times did you shoot?  Where did you shoot?  Did

21  the person get hit?

22       And these are all questions that have to deal with, where

23  did you shoot?  Oh, I shot over here, here, and here.

24       Well, let's go to this house and make sure that there's

25  no one shot in this house or -- it's if you just want to say,

26  okay, if you think that he shot five, it's okay, well, we need

27  to find five bullets.  Because every bullet that we discharge

28  out of our firearm, we are held liable for that.  And we just

1  want to ensure -- it's called a public safety statement, so

2  we're making sure the public is safe, and we're just canvassing

3  the area to where any possible casings may have gone -- or

4  bullets, not casings.

5  Q.  Are the arriving sergeants encouraged to find out details

6  about what happened in the officer-involved shooting?

7  A.  I think to a certain point, but they are not the

8  investigating officer, like a sergeant from Homicide.

9  Q.  So at that time in 2017, the agency that was in charge of

10  investigating officer-involved shootings was San Francisco

11  Police Department Homicide Unit; right?

12  A.  That's correct.

13  Q.  So the reason that you told Officer Cha not to explain why

14  he shot Sean Moore on the air was because you felt like that

15  would waste radio time?

16  A.  I believe -- because it wasn't pertinent.  The only time

17  that you're talking over the air is for pertinent information.

18  And that information isn't privy to the radio space; it's privy

19  to investigating officers and to have a thorough and transparent

20  investigation.

21  Q.  Okay.  How long did you stay near Officer Cha before you

22  were separated?

23  A.  Until the next officers came by and pulled us out of the

24  area.  I don't remember.

25  Q.  So once officers arrived and -- do you remember one officer

26  dragging Officer Cha from the scene?

27  A.  Vaguely.

28  Q.  Vaguely.  After that happened, were you near Officer Cha

1  again?

2  **A.**  I remember him opening the ambulance and just telling me

3  that he loved me; that I was okay...

4  **Q.**  So this was after you were in that ambulance, he said that?

5  **A.**  I just remember him saying, "I need to speak with Colin.  I

6  want to make sure he's okay."

7     Because I had blood all over my face.  And that's the only

8  time I remember him saying anything or talking to me.  And other

9  than that, it was very just incommunicado -- or not much

10  communication.

11  **Q.**  So that was the only communication that you had with him?

12  **A.**  That I remember.

13  **Q.**  That you remember.

14     Okay.  Do you need a moment?  I don't have much more, but we

15  can take moment.

16  **A.**  Thank you.

17  **Q.**  Okay.  It sounds like you don't really remember if a

18  specific officer separated you both.

19     It's not something that you remember at this point?

20  **A.**  No.

21  **Q.**  Okay.  Do you recall if you heard anyone else speak to

22  Officer Cha that night?

23  **A.**  (Shaking head.)

24  **Q.**  I'm sorry is that a "no"?

25  **A.**  No.

26  **Q.**  Okay.  Do you recall if you heard Officer Cha speak about

27  the case again within anyone that night?

28  **A.**  No.

1  Q.  Okay.  And then on January 6, 2017, did you give any

2  statements about the incident to anyone?

3  A.  I spoke to my lawyer.

4  Q.  Just to your lawyer?

5  A.  Yeah.

6  Q.  So no one at the scene asked you for details about the case?

7  A.  No -- I mean other than I got punched in the face.

8  Q.  Just for medical treatment?

9  A.  Yeah.

10  Q.  But no one asked, like, why did this happen?

11  A.  No.

12  Q.  Okay.  So just briefly, turning to your experience working

13  with Officer Cha -- thank you for answering all those questions.

14  I know those were really hard.

15      Have you witnessed Officer Cha use force in any other calls?

16  A.  Yes, I do remember one specific call.

17  Q.  Can you tell us about it?

18  A.  We were chasing an individual who had a gun on him.  The

19  person threw the gun -- or took the gun out of his pocket and

20  threw it onto a roof.  And me believing that he could still have

21  a firearm on him, I pointed my firearm at him.  And I believe

22  the individual was still resisting.  And I remember Officer Cha

23  using his baton on that incident.

24  Q.  Do you remember what year that was?

25  A.  That was in 2016.

26  Q.  So was this after this -- no?

27  A.  No, it was before.

28  Q.  It was before?

1    **A.**   January 6, 2017 -- yes.

2    **Q.**   Oh, 2016.

3    **A.**   2016, later on in the year.

4    **Q.**   Okay.

5    **A.**   Because we have never worked again with each other.

6    **Q.**   That's right.

7          So you chase an individual with a gun; that individual threw

8    the gun at the roof, but you suspected he might be armed in some

9    other way so you pointed your firearm at him for your safety?

10   **A.**   In case the guy pulled out another gun.

11   **Q.**   Officer Cha at this point used his baton on him?

12   **A.**   Yes.

13   **Q.**   Okay.  Is there any other incident where you observed

14   officer Cha use force?

15   **A.**   I don't remember any other ones.

16   **Q.**   Okay.  Were you aware that Officer Cha was involved in

17   another fatal shooting a few months after this incident?

18   **A.**   Yes.

19   **Q.**   Do you know anything about that shooting?

20   **A.**   I do.

21   **Q.**   What do you know about it?

22   **A.**   I was one of the first arriving officer.

23   **Q.**   So you were at the scene?

24   **A.**   Yes.

25   **Q.**   But you weren't working with Officer Cha?

26   **A.**   No.  I was working an overtime gig just around the block.

27   **Q.**   So can you tell me who else arrived -- who was the first

28   officer to arrive, do you remember?

1    **A.**  I don't remember.

2    **Q.**  Was there an officer that arrived before you?

3    **A.**  I believe there was.

4    **Q.**  Did Officer Cha arrive before or after you?

5    **A.**  He was there before.  I arrived after because he was the

6    initial officer there.

7    **Q.**  Okay.  So what was your role once you arrived?

8    **A.**  My role was -- I remember Kenny coming out of the Subway

9    where the shooting happened.  And he said:  Hey, I have a

10   witness here.  Hold onto him.  Get a statement.

11   **Q.**  To you?

12   **A.**  I don't remember.  I just remember him pulling out, like --

13   from wherever the guy coming out to me having the witness

14   statement.  I stayed with that witness during the entire

15   investigation.

16   **Q.**  Okay.  So your role at that point once --

17   **A.**  Was to get information from that witness of the shooting.

18   **Q.**  Was the witness an employee or a customer of the Subway?  Do

19   you remember?

20   **A.**  I think he was customer.

21   **Q.**  Okay.  Okay.

22        Did you have any other role that you recall?

23   **A.**  No.

24   **Q.**  Okay.  Did you communicate at all with Officer Cha during

25   that incident?

26   **A.**  No.

27   **Q.**  And just for the record, you're shaking your head "no"?

28   **A.**  No.

1    **Q.**   Okay.  Did this incident affect your opinion at all of

2    Officer Cha's ability to act reasonably under pressure?

3    **A.**   No.

4    **Q.**   Okay.  And then I just want to confirm for the record.

5        So at this point, you do recall losing consciousness from

6    your interaction with Sean Moore; right?

7    **A.**   Correct.

8    **Q.**   There's a medical report that says you denied loss of

9    consciousness, so is that wrong?

10   **A.**   That was -- yes, that is wrong.

11   **Q.**   Okay.  And I want to go over the injuries you received.

12       So your nose was broken; right?

13   **A.**   Correct.

14   **Q.**   And you suffered pain from pepper spray residue in your eye;

15   right?

16   **A.**   Correct.  Black eyes, headaches.

17   **Q.**   Black eyes all associated with the hit to the nose; right?

18   **A.**   Correct.

19   **Q.**   Okay.  Anything else?  I'm sorry.  I'm not trying to say

20   that's nothing.

21   **A.**   No, no.  Lack of sleep; for years, PTSD.

22   **Q.**   And can you describe the injuries you saw on Officer Cha, if

23   you remember?

24   **A.**   I don't remember.

25   **Q.**   Okay.  Let me see if I have anything else.  I just want to

26   confirm one thing.

27       You stated Sean Moore was a really big guy.  He was standing

28   at the top of the stairs, and both those factors were of concern

1    to your safety; right?

2    **A.**    Correct.

3    **Q.**    And when you first arrived -- dispatch actually informed you

4    exactly how big Sean Moore was; right?

5    **A.**    In the initial?

6    **Q.**    Yeah.

7    **A.**    That's more of an approximation.

8    **Q.**    But it was well over 200 pounds that they reported on

9    dispatch; right?

10    **A.**    Yes.

11    **Q.**    And when you came to assist Officer Cha, you observed at the

12    top of the stairwell Sean Moore so you knew exactly how big he

13    was; right?

14    **A.**    I knew exactly how big he was, but I could see he was bigger

15    than both of us.

16    **Q.**    And obviously you observed the stairwell situation, so you

17    kind of knew he had this advantage right from the beginning;

18    right?

19    **A.**    Uh-huh.

20    **Q.**    Is that a "yes"?

21    **A.**    Yes.

22        **MS. DRUSINSKY:**    Okay.    Do you have follow-up questions?

23        **MS. LACAMBRA:**    I do, but let's start gathering the juror

24    questions.

25        **MS. DRUSINSKY:**    I'll start gathering while you ask.

26        **MS. LACAMBRA:**    Sure.    If you already have them ready for

27    us, but obviously we don't want you to be writing your questions

28    while we're asking questions.

1  BY MS. LACAMBRA:

2  **Q.** So I have a number of questions with regard to your

3  training.

4  **A.** Okay.

5  **Q.** So we're going to go back to -- I remember you were speaking

6  a little bit about your training with regard to engaging

7  individuals with mental health issues.

8  **A.** Uh-huh.

9  **Q.** So I want to talk to you about some of that.

10     When did you receive and read department General Order 5.21?

11  **A.** CIT.  When I received the CIT training, or...

12  **Q.** No.  DGO the General Order 5.21 that is part of the academy

13  training for engaging with individuals who might have a

14  cognitive impairment or mental health issue.

15  **A.** I believe I received that in the academy.

16  **Q.** Okay.  And so that would have been back in --

17  **A.** September of 2014 to May of 2015.

18  **Q.** And is that also when you received your training on Learning

19  Domain 37?

20  **A.** Yes.

21  **Q.** And all officers on the police force received the same

22  training at the academy?

23  **A.** I believe so.

24  **Q.** That includes how to interact with individuals with

25  cognitive impairments or disabilities?

26  **A.** Yes.

27  **Q.** I know that you couldn't remember how many hours you spent

28  training, but let's go over some of those factors.

1    So as part of your training as a police officer, you covered

2 Learning Domain 37.

3    What does that include?  Like, what do you recall what your

4 training was with regard to how to interact with individuals

5 with cognitive impairment?

6 **A.**  Yeah.  It's not just people with mental health disorders;

7 it's people who are deaf; it's people who are hard of hearing;

8 people who have other disabilities.  And each -- I think it's,

9 like, 137 pages, so it goes -- you know, it's got bullet points.

10 It goes into depth about what -- people who are on the spectrum

11 of autism, bipolar, schizophrenic, and then it will tell you

12 what each -- or some signs and symptoms of each condition and

13 how to properly communicate with them, how to kind of get on the

14 same level with them.  And that's what I remember from that.

15 **Q.**  Great.

16    As part of your training, do you have to pass, like, a

17 simulation test; right?

18 **A.**  Yes.

19 **Q.**  And what does that entail?  What do you have to do?

20 **A.**  It's a simulation.  You go to a call for service -- it's all

21 simulated at the academy, so it's very stale -- and if you

22 recognize that this person has a mental health disorder, you

23 either get them a clinician, doctor, or you place them on a 5150

24 hold which is an involuntary mental health detention.

25 **Q.**  Is this simulation in person?  Is it on a computer?

26 **A.**  This is all in person.  So we are dealing with role players.

27 A lot of them are actors, and they will come in and pretend to

28 play a role.

1  **Q.** And you're trained in your interactions with these role

2  players how to recognize different, I guess, diagnoses, like

3  depression, bipolar, schizophrenia?

4  **A.** Correct.

5  **Q.** Now, what are the behavioral cues and other indicators that

6  you're trained to look for to determine whether someone might

7  suffer from a mental health or a cognitive impairment?

8  **A.** Can you ask that question one more time.

9  **Q.** What are the behavioral cues that you're trained to look for

10  to be able to recognize and discern whether someone might suffer

11  from a cognitive impairment and/or mental illness?

12  **A.** You ask them questions; you try to engage in conversations

13  to see if they answer the questions normally, look for any

14  abnormal behavior, also personal history, like, if you know this

15  person or you know someone who knows this person, you can

16  contact and say, hey, what is this person's history?

17  **Q.** What would qualify as abnormal behavioral?  Do they give you

18  examples what to look for?

19  **A.** Saying sentences that don't make sense or lack of sleep for

20  no apparent reason, extreme anger, lack of eye contact.  And

21  those are for all -- I'm just going off listing different signs

22  and symptoms of different illnesses.

23  **Q.** And did you notice any of those symptoms that you're trained

24  to look for in your interactions with Mr. Moore?

25  **A.** Looking back on it, yes, I absolutely can see them.

26  **Q.** What are the things that you missed?

27  **A.** What were the things that I see now in 2021?  Of watching

28  that video, I see him being angry at 4:00 o'clock in the morning

1    for no apparent reason.

2    **Q.** Was he making eye contact with you?

3    **A.** Yeah, he was making eye contact.

4    **Q.** Did he --

5    **A.** Making odd statements like "fake cop" and you know.

6    **Q.** Are you trained to also look for, you know, repetitive

7    speech, like if they are repeating something?

8    **A.** I believe that is one.  I didn't think of it at the time

9    during this incident in 2017; but looking back on it, yes, I

10   believe repetitive speech is an indicator.

11   **Q.** Like extreme rigidity or inflexibility, like they can't

12   be --

13   **A.** Their path can't be changed.

14   **Q.** Yes, that's another cue that you look for?

15   **A.** Yes.

16   **Q.** Would that be fair to say that's consistent with the

17   behavior that you witnessed on January 6, 2017?

18   **A.** Yes.

19   **Q.** Now, are you trained on how to use specific tactics to

20   manage contacts with people who might present with mental

21   illness or cognitive impairment?

22   **A.** We're taught to do our best to communicate with people, but

23   we're not clinicians, and we're not doctors.  And -- yes, but

24   it's more the LD, the Learning Domain 37 that she's referring

25   to, it's a guideline to use.  It's like a cheat sheet.  It's not

26   like we have that in our field where we just pull up, you know,

27   page 122, bipolar -- oh, this is -- it's great training.  It's

28   good to know, but it's not something that I'm just going to be

1  able to recite and remember all the time, especially when I feel

2  like I'm being threatened.

3  **Q.**  Okay.  Well, but the whole point of having the training,

4  right, is so that you have the extra tools in your tool belt to

5  deal --

6  **A.**  Correct.

7  **Q.**  -- with individuals who might present with those issues;

8  right?

9  **A.**  Correct.

10  **Q.**  So I just want to go over, like, the tactics that you are

11  trained to try and use to deescalate or when you're engaging

12  with someone who might be suffering from a cognitive impairment.

13      Would those tactics that you were trained on include

14  requesting backup?

15  **A.**  Yes.

16  **Q.**  Stabilizing the scene?

17  **A.**  Correct.

18  **Q.**  Using the passage of time to calm the situation?

19  **A.**  Yes.

20  **Q.**  Like, creating time and distance?

21  **A.**  Yes.

22  **Q.**  And trying to effectively communicate with the person?

23  **A.**  Yes.

24  **Q.**  Sometimes that means trying to get on their same level, like

25  if you were taller, you might, you know, crouch or get on your

26  knees to be able to make eye contact with them?

27  **A.**  I would not ever get on my knees.  It would compromise

28  officer safety.  By I understand what you're saying.  You maybe

1    want to get a shorter officer.

2    Q.  So you might pull another officer who might be able to make

3    proper eye contact?

4    A.  Correct, yes.

5    Q.  And you would refrain from making anything that could be

6    seen as threatening?

7    A.  Correct.

8    Q.  You want to be truthful?

9    A.  Yes.

10    Q.  And you want to actually try and avoid conflicts, especially

11    when you don't know that they'll be able to be reasoned with.

12    A.  Yes.  Trying to avoid conflicts is important, yes.

13    Q.  Are you trained that if no urgent medical care is necessary,

14    you can actually choose not to take any further action once you

15    recognize that there might be some of these cues present?

16    A.  Ask that question one more time.

17    Q.  Are you trained that if no urgent medical care is necessary,

18    and you concluded your investigation, you can actually choose to

19    take no further action?

20    A.  I believe so.  I don't remember that exact line in the

21    training; but if you're reading from the LD, then I assume that

22    training was given.

23    Q.  Are you trained to consider a person's mental impairment and

24    apply deescalation techniques when it's feasible?

25    A.  Absolutely.  When feasible, yes.

26    Q.  And are you trained that closing the distance between you

27    and the potentially mentally ill subject reduces time to react?

28    A.  Yes.

1   Q.   And may provoke a conflict?

2   A.   Correct.

3   Q.   So when encountering a mentally impaired subject, are you

4   trained to speak in a calm voice?

5   A.   Yes.

6   Q.   Are you trained to maintain your composure even in the face

7   of bizarre behavior?

8   A.   Yes.

9   Q.   Are you trained to refrain from calling a mentally impaired

10  person names?

11  A.   Yes.

12  Q.   And are you trained to refrain from cursing out a mentally

13  impaired person?

14  A.   Yes.

15  Q.   Are you trained to refrain from threatening a mentally

16  impaired person with violence because it may escalate the

17  situation?

18  A.   Yes.

19  Q.   And are you trained to refrain from challenging a mentally

20  impaired person to a physical fight?

21  A.   Yes.

22  Q.   Are you trained to call supervisors to the scene when a

23  mentally impaired person presents a weapon?

24  A.   Yes.

25  Q.   Now, have you also been trained in the critical

26  decision-making model with regard to use of force?

27  A.   Please refresh my memory.

28       MS. LACAMBRA:   Yes.   Actually, I'm going to show you --

1  and I don't have the physical exhibit, but we'll mark this later

2  next in line, which --

3        **THE GRAND JURY SECRETARY:**  7.

4        **MS. LACAMBRA:**  -- will be Exhibit 7.  I'll make a note.

5                              (Grand Jury Exhibit 7 was marked for

6                              identification.)

7  **BY MS. LACAMBRA:**

8  Q.  So it will be a page marked Critical Decision-Making Model.

9  I know this is terrible because you can't really see the text on

10  it.

11      But essentially, as part of your training with regard to use

12  of force -- and I'm talking about the physical -- like, you

13  know, the PowerPoint training that you reviewed.

14  A.  Yes.

15  Q.  Do you recognize this slide?  You've seen it before?

16  A.  I remember it vaguely.

17  Q.  Okay.

18  A.  But I do remember it.

19  Q.  Okay.  And you have been trained on this Critical

20  Decision-Making Model, like what it means for being -- well,

21  critical decision-making in your line of work; correct?

22  A.  Yes.

23  Q.  Now, were you trained about the five stages of the Critical

24  Decision-Making Model?  Stage one is to gather the information

25  and intelligence?

26  A.  Yes.

27  Q.  Stage two is to assess the threat and develop a working

28  strategy?

1  **A.**  Yes.

2  **Q.**  Stage three is to consider police powers and departmental

3  policies?

4  **A.**  Yes.

5  **Q.**  Stage four is to identify options and contingencies?

6  **A.**  Yes.

7  **Q.**  And then stage five is to determine the best course of

8  action and review what happened?

9  **A.**  Correct.

10  **Q.**  And were you trained to constantly review and assess the

11  situation using that Critical-Decision Making Model?

12  **A.**  Always reviewing, always reassessing.

13  **Q.**  So that's a "yes"?

14  **A.**  So that is a "yes."

15  **Q.**  And were you trained that all stages of the Critical

16  Decision-Making process need to reflect certain things like the

17  policing ethics and standards?

18  **A.**  Yes.

19  **Q.**  Legal obligations?

20  **A.**  Yes.

21  **Q.**  And protecting human rights?

22  **A.**  Yes.

23  **Q.**  Now, were you trained, as part of this process, to ask

24  yourself, what should the public expect of me?

25  **A.**  Correct.

26  **Q.**  And were you trained that the public should expect you to

27  safeguard the life, dignity, and liberty of all people?

28  **A.**  Absolutely.

1    **Q.** That's basic tenet of your training as a police officer?

2    **A.** Yes.

3    **Q.** Now, were you also trained in the levels of resistance?

4    Like, were you trained that there can be different levels of

5    resistance by a subject?

6    **A.** Yes.

7    **Q.** And were you trained that a compliant subject is when a

8    subject offers no resistance?

9    **A.** Yes.

10   **Q.** And were you trained that a passive non-compliant subject is

11   when a subject does not respond to verbal commands but offers no

12   physical form of resistance?

13   **A.** Yes.

14   **Q.** Were you trained that active resistance is when the subject

15   takes physically evasive movements to defeat your attempt to

16   control or prevent being taken into custody?

17   **A.** Yes.

18   **Q.** Were you trained that assaultive is when a subject is

19   aggressive or combative?

20   **A.** Yes.

21   **Q.** Would the assaultive level include a person that was

22   attempting -- or sorry.

23       Does the assaultive level include a person that was

24   attempting to assault an officer or another person?

25   **A.** Yes.

26   **Q.** And were you trained that a life-threatening level of

27   resistance is likely to result in serious bodily injury or

28   death?

1   **A.**  Correct.

2   **Q.**  So those are the levels.

3       Whereas, there are also different levels of force that you

4   use in response to different levels of resistance?

5   **A.**  Yes.

6   **Q.**  Were you trained that, as an officer, a low level of force

7   is the level of control necessary to interact with a subject who

8   displays passive or active resistence?

9   **A.**  Yes.

10  **Q.**  And were you trained that the low level of force is not

11  intended to and has a low probability to cause injury?

12  **A.**  Correct.

13  **Q.**  Were you trained that an intermediate level of force poses a

14  foreseeable risk of significant injury or harm but is neither

15  likely nor intended to cause death?

16  **A.**  Yes.

17  **Q.**  And were you trained that an intermediate level of force

18  will typically only be acceptable when officers are confronted

19  with active resistance and a threat to the safety of officers or

20  others?

21  **A.**  Correct.

22  **Q.**  Were you trained that the intermediate level of force

23  includes the use of OC spray, impact projectiles, baton strikes

24  likely to result in significant injury?

25  **A.**  Correct.

26  **Q.**  And were you trained that deadly force is any force

27  substantially likely to cause either serious bodily injury or

28  death?

1  A.  Yes.

2  Q.  And were you trained that deadly force includes the pointing

3  of or discharge of a firearm?

4  A.  Yes.

5  Q.  Now, were you trained on the Escalation/Deescalation

6  Pyramid?

7          MS. LACAMBRA:  So that would be and this will be

8  Exhibit --

9          THE GRAND JURY SECRETARY:  Exhibit 8.

10          MS. LACAMBRA:  -- 8.

11                      (Grand Jury Exhibit 8 was marked for

12                      identification.)

13  BY MS. LACAMBRA:

14  Q.  And again, does Exhibit 8 look familiar to you?  You've seen

15  it before in your training?

16  A.  I have seen it before.

17  Q.  Now, the bottom of the pyramid covers the lowest level where

18  no force or very low force is used; right?

19  A.  Yes.

20  Q.  So that would include situations where a verbal command or

21  officer presence is enough?

22  A.  Correct.

23  Q.  And no use of force is required?

24  A.  Correct.

25  Q.  And were you trained that the higher up on the pyramid, the

26  higher the level of force that might be authorized based on a

27  particular situation?

28  A.  Yes.

1    Q.  The next level up in the pyramid would be immediate force?

2    A.  Yes.

3    Q.  And them deadly force is at the top of the pyramid?

4    A.  Uh-huh, yes.

5    Q.  And so you're trained that it's SFPD policy to use deadly

6    force only as a last resort; right?

7    A.  Yes.

8    Q.  You're trained to use deadly force only when reasonable less

9    dangerous alternatives have been exhausted and are not feasible

10   to protect the safety of the public or police officers?

11   A.  Correct.

12   Q.  And were you trained that officers shall consider all other

13   objectively reasonable force options before discharging a

14   firearm or using deadly force?

15   A.  Absolutely.

16   Q.  And at no point did you ever pull your gun out and point it

17   at Sean Moore on January 6, 2017?

18   A.  After I had my nose punched and I was on the ground, yes, I

19   had it pointed in the direction of him, but I don't remember if

20   he ever came back out or not.

21   Q.  All right.  But prior to Officer Cha shooting Sean Moore.

22       At no point before Officer Cha pulled out and discharged his

23   firearm, did you feel it necessary to out your firearm?

24   A.  No.

25   Q.  It was only after Officer Cha had used deadly force that you

26   had then pulled out your firearm?

27   A.  It was after the fact that I got punched in the face.  I

28   lost my baton, and that was my last line of use of force.  I did

1    pull out my gun because I didn't know who shot; and when I heard

2    gunshots, it's, like, I don't know at that point who shot who,

3    what shot, why he shot.  And I knew that my baton had not

4    worked.  And the next level of force is deadly force, to protect

5    myself specifically.  And that's why I pointed my firearm in the

6    direction of the door.

7    **Q.**  Now, actually, I want to go back to your baton.

8        When did you lose your baton?

9    **A.**  I don't know.

10   **Q.**  When did you recover your baton?

11   **A.**  I never recovered my baton.

12   **Q.**  You never got your baton back?

13   **A.**  No.

14   **Q.**  Did you see if Officer Cha ever recovered his baton?

15   **A.**  I don't know.  I know that because of the investigation

16   that's been going on for four-and-a-half years, I know that

17   somewhere both our batons are taken.  So I don't know if he

18   grabbed his baton and put it back in his holster.  I'm not sure

19   if that's what you're asking.

20   **Q.**  Do you remember one of the supervising sergeants taking an

21   inventory of your weapons and asking you if you had all of your

22   department-issued weapons?

23   **A.**  Vaguely.

24   **Q.**  Well, do you recall if you were missing any of your weapons

25   when you took that inventory?

26   **A.**  I believe my baton was missing.

27   **Q.**  Okay.  Do you recall if Officer Cha was missing any of his

28   weapons during that inventory?

1  **A.**  I don't remember what happened to Officer Cha.

2  **Q.**  Okay.  Now, were you trained that there were prohibitive

3  circumstances in which an officer shall not discharge their

4  firearm?

5  **A.**  Yes.

6  **Q.**  Were you trained that an officer shall not discharge a

7  firearm as a warning?

8  **A.**  Yes.

9  **Q.**  Were you trained that an officer shall not discharge a

10 firearm at a person who presents a danger only to themselves?

11 **A.**  Correct.

12 **Q.**  And were you trained that an officer shall not discharge a

13 firearm at a person who does not present a threat of death or

14 serious bodily injury to officers or others?

15 **A.**  That's correct.

16 **Q.**  Now, I want to go back and talk to you about your reason

17 for -- I guess the reason that you felt threatened when you went

18 back up the staircase.

19      When did you first feel like you were being threatened by

20 Mr. Moore in an assaultive way?

21 **A.**  I felt an immediate threat from him when he -- after he

22 said, "You're going to get off my steps," opens the gate, walks

23 towards me, and puts his hand as if he was going -- I recall --

24 like I said, it looked like he was coming towards me or hitting

25 me.  That's when I felt I was threatened.

26 **Q.**  So when you went up the second time after you'd had a chance

27 to read the TRO; and Mr. Moore, after telling you and Officer

28 Cha multiple times to leave, finally opens the gate -- and this

1   is after both you and Officer Cha have told him that you're not

2   leaving?

3   **A.**   Correct.

4   **Q.**   So in response to you and Officer Cha saying you're not

5   going to leave the house, Mr. Moore opens the gate and says,

6   "You're going to leave"?

7   **A.**   Yeah.   I felt threatened at that point.

8   **Q.**   You felt threatened?

9   **A.**   For my safety.

10  **Q.**   So that threat is because you were in close range of

11  Mr. Moore as he came out of the stairwell landing?

12  **A.**   Yes.

13  **Q.**   Right.

14       Now, you could have mitigated that threat by creating time

15  and distance, right, by going back to the bottom of the stairs?

16  That was a feasible thing to do to mitigate the threat; right?

17  **A.**   At that time, I didn't feel -- I don't know why I didn't

18  fall back, but I felt threatened at that point.

19  **Q.**   I understand that that's how you felt.

20       I'm just asking, the immediate threat that you're talking

21  about could have been mitigated --

22  **A.**   Looking back on it, yes, absolutely.

23  **Q.**   And so that threat really wouldn't have existed without your

24  presence on that stairwell; right?

25  **A.**   No.   I disagree.   Even if we were still at the bottom of the

26  steps or even on the sidewalk, and even if he said, you're going

27  to get off my steps or you're gonna get out of here, and he

28  opens the door and he's walking towards us, I could still be

1  threatened.  That didn't happen.  But regardless if I stepped

2  back or not, I'm still feeling threatened by him saying, "You're

3  getting off my steps."

4      He's a bigger guy, and that's -- I don't care if you're a

5  police officer or the garbage man, right.  There's no reason to

6  threaten someone that you're going to get off my steps or else,

7  especially when we're investigating a crime.

8  Q.  So you're saying that, even if you had gotten off his steps

9  and you were on the sidewalk, that the threat of, "You're going

10  to get off my steps," would still have, to you, been a

11  justifiable imminent threat?

12  A.  If he was opening the door, saying, you're going to get out

13  of here, and walked towards me, yes.

14  Q.  Well, no.  Let's go back to what his actual words were,

15  which were, "You're going to get off my steps," that was what

16  signaled to you, hey, he's going to take me off of the steps;

17  right?

18  A.  Yeah.

19  Q.  But it was feasible for you to get off the steps; and had

20  you gotten off the steps --

21  A.  Correct.

22  Q.  -- you're saying you still would have found --

23  A.  Yes, but I also have a right to defend myself.

24  Q.  On someone else's property when they are rejecting you as a

25  trespasser?

26  A.  I did not believe I was a trespasser.

27  Q.  I understand that.

28  A.  So at that time, I didn't think I was trespassing; I

1  believed I was doing my job investigating a crime; and, yes, I

2  felt threatened.  And I have a duty and a right to defend

3  myself.

4  **Q.**  My question is, had you retreated and you were on the

5  sidewalk, would you still -- is it still your testimony that

6  that imminent threat to your safety would have existed with a

7  statement, get off my steps, or I'm going make you get off my

8  steps?

9  **A.**  At this point, I don't know because that didn't happen.

10  **Q.**  Okay.  When you were talking about a motion that Sean Moore

11  made --

12  **A.**  The motion?

13  **Q.**  Yeah, a motion --

14  **A.**  A motion.

15  **Q.**  -- that Sean Moore made toward Officer Cha as you were --

16  this is right after he deploys the OC spray.  You walked into

17  the OC spray and then had to walk down the stairs.

18      You spoke earlier about, you weren't paying attention

19  because your eyes were burning from the OC spray, but that you

20  remembered that Moore had made some motion towards Officer Cha?

21  **A.**  Correct.

22  **Q.**  Can you describe what that motion was, that you recall?

23  **A.**  I can't recall.

24  **Q.**  So what -- like, I guess -- what makes you think that there

25  was any motion?

26  **A.**  Because I saw -- I mean, I remember him making a motion

27  towards Cha.  It's hard to explain what it was because I had

28  pepper spray in my eyes.  I was walking away, looking at him

310

1  moving towards -- I don't remember if it was a punch, a kick.  I

2  just remember it was some sort of motion.

3  Q.  So what gave you the impression that there was any motion at

4  all?  So you couldn't see it, so what sense were you using to

5  detect the motion?

6  A.  My sight.

7  Q.  Oh, so it was --

8  A.  Right.  I remember looking back, seeing some sort of motion

9  coming towards Cha, and that was it.

10  Q.  And you saw some sort of motion coming towards Officer Cha,

11  but you can't describe what that was?

12  A.  No.  This was less than a second while I have pepper spray

13  in my eyes.  I'm walking away, and -- I don't remember what that

14  exact motion was.

15                          **DIRECT EXAMINATION**

16  **BY MS. DRUSINSKY:**

17  Q.  Okay.

18       So I just have a couple follow up, and then I'm going to

19  read the juror questions.

20       So I understand the statement -- and then we're going to

21  take a break soon.

22       So I understand the statement -- so today you told us that

23  you planned to arrest Sean Moore for Penal Code 69; right?

24  A.  Correct.

25  Q.  Do you recall giving a statement to Homicide the day after

26  the incident?

27  A.  I remember giving it -- yes, I do.

28  Q.  And do you recall telling them that you planned to arrest

                                                                311

1    Sean Moore for a violation of the restraining order?

2    A.  I do remember that.

3    Q.  Okay.  So which was it?

4    A.  At this time right now, I remember wanting to arrest him for

5    69 PC.

6    Q.  Okay.  And then PC 69 is defined that:  By every person who

7    attempts by means of threat or violence to deter or prevent an

8    officer from performing a duty imposed upon by law; right?

9    A.  Correct.

10   Q.  So one element of this is that an officer is lawfully

11   performing his duty; right?

12   A.  Correct.

13   Q.  And another element is that the person must be using threat

14   or violence; right?

15   A.  Correct.

16   Q.  And you told us he didn't use any violence; right?

17   A.  I would say the combination of getting off my step, opening

18   up the gate, and coming towards us would be an act of violence.

19   Q.  Did he ever violently make contact with you prior to you

20   planning to arrest him?

21   A.  No.

22   Q.  I just want you to tell us specifically what you thought the

23   threat was.

24       You just told us that his statement, "You're getting off the

25   stairs," you interpreted that to be threatening?

26   A.  When he said, "You're gonna get off my stairs," opens the

27   gate, and comes towards me.  I believe he's going to hit me.

28   That's that use of threat and violence.

1  Q.  Okay.  Is there anything else he did that specifically you
2  interpreted to be a violation of PC 69?
3  A.  At this point -- up until that point, or throughout the
4  whole interaction?
5  Q.  Before you planned to arrest him, right.
6      So at some point you form the intent to arrest him for a
7  violation of Penal Code 69; right?
8  A.  Correct.
9  Q.  And I think you said that after he was pepper sprayed or
10  before?
11  A.  I never out loud said "You're under arrest."
12  Q.  Totally.  I get --
13  A.  Right.  So my initial thought process at that time was, this
14  guy comes towards me, you know, after he threatened me.  And
15  right there, you have the 69 PC.
16  Q.  Got it.
17  A.  I see that he's getting pepper sprayed.  This is a good time
18  hopefully to make the arrest.
19  Q.  That's right.
20      Okay.  So that was the point in time that you first formed
21  the intent to actually arrest him --
22  A.  Correct.
23  Q.  -- was after he was pepper sprayed; right?
24  A.  Yes.
25  Q.  So up until that point, the basis for the arrest was him
26  making the statement, "You're getting off my stairs," opening
27  the gate and walking towards you had?
28  A.  Yes.

1    **Q.**  Any other basis?

2    **A.**  You mean all the threat indicators?

3    **Q.**  I'm just trying to get at, you know, the very specific Penal

4    Code violation with very specific elements.

5        So I'm trying to see exactly what his act was that you were

6    going the arrest him for?

7    **A.**  The 69 PC.

8    **Q.**  Yeah.  So what was the exact -- so, "You're getting off my

9    stairs."  You named one act that he did that you're going to

10   arrest him for, and that's fine.

11   **A.**  Because that is a threat, "You're getting off my steps."

12   **Q.**  I understand you interpreted it that way.  That's fine.

13       I'm just moving on and seeing if there were any other acts

14   that he made --

15   **A.**  Not from what I can remember right now, no.

16   **Q.**  Okay.  I'm going to get to the juror questions in the next

17   five minutes.

18       The first question:  After deploying the OC spray and baton,

19   but a person is still resisting or becoming violent toward

20   officers, what would be the next step for officers?

21   **A.**  After OC and the baton?

22   **Q.**  Yeah.

23   **A.**  Is the question what is the next tool?  What is the next

24   weapon?  What is the next option that we have?  Is it the next

25   level of force that we are allowed to have?

26   **Q.**  I think what is the next step as far as officer training?

27   What next step do you take?

28   **A.**  From OC to --

1    Q.  So after deploying OC spray and baton, and a person is

2    resisting arrest or becoming violent towards officers, what is

3    the next step for officers?

4    A.  The last option we have before use of force specifically a

5    firearm.  We don't have Tasers, unfortunately.

6    Q.  Would it have been feasible to continue the conversation

7    with Mr. Moore from the bottom of the stairs?

8    A.  Looking back on it, yes.  At that time, I did not believe it

9    was feasible to have a conversation with someone down on the

10   stairs.

11   Q.  Do you know why you didn't think it was feasible?

12   A.  I have no idea.

13   Q.  When the pepper spray was deployed on Mr. Moore, what did

14   you feel was the imminent danger coming from him?

15   A.  So at that point, because he had been hit with the pepper

16   spray, I believe the imminent danger was ceased maybe for a

17   second or two because it looked like he had been, you know, hit

18   by the pepper spray; the OC spray was effective; and that's when

19   I went in to make an arrest.

20   Q.  So did you believe that Mr. Moore had a weapon at any point

21   during your interaction with him?

22   A.  I did not believe that he had a weapon.

23   Q.  Would an arrest have -- so would an arrest have been

24   dependent on ███  ████  wishes?  I'm assuming that means an

25   arrest for a temporary restraining order.

26   A.  Yes.  If we're just talking about a restraining order, yes,

27   we needed to see it to actually make that arrest possible -- the

28   citizen's arrest, CA.

1  **Q.**  So just to clarify, if you were going to arrest someone for

2  a violation of a restraining order, that's a misdemeanor --

3  **A.**  That's not in my presence.

4  **Q.**  -- that did not occur in your presence, a violation of a

5  misdemeanor, so you would have had to get a citizen's arrest

6  form from the complainant?

7  **A.**  Correct.

8  **Q.**  Sean Moore was verbally abusive; but after coming down the

9  stairs, was it appropriate to go back up the stairs based on

10  mostly his provocative language?

11  **A.**  Yes.

12  **Q.**  This seemed to escalate the situation.

13      Maybe do you agree -- to make this a question?

14  **A.**  I agree that -- I disagree that we provoked him, but I agree

15  that it was appropriate to continue the conversation to talk to

16  Mr. Moore.

17  **Q.**  Do you disagree that at any point you provoked him?  Like, I

18  understand when you first arrived, he was aggressive, and he was

19  talking back and cursing.

20      Do you disagree that at any point, at least Officer Cha's

21  actions provoked him?

22  **A.**  I don't know.

23  **Q.**  Can you guess what proportion of subjects behaving as

24  Mr. Moore did are mentally ill?

25  **A.**  Ask that question one more time.

26  **Q.**  Can you guess what proportion of subjects behaving similarly

27  to Sean Moore are mentally ill?

28  **A.**  I'm not going to guess, no.  Because there are angry people

1    in that this world that don't have mental health issues.  And

2    when you're with someone for just a few minutes, it's hard to

3    diagnosis something.  Just because they are exhibiting all of

4    these bullet points that someone might be bipolar, guess what,

5    might be an angry uncle or a mad aunt.  I don't know, and I'm

6    not going to guess.

7    **Q.**  Are you to err on the side of caution just in case someone

8    is mentally ill?

9    **A.**  No.

10    **Q.**  No?

11    **A.**  No.

12       In case they are mentally ill?

13    **Q.**  Yeah.  I mean, if you see indicators that are consistent

14    with someone who is mentally ill but could also not be mental

15    illness, are you trained to err on the side of caution and

16    proceed as if they might be mentally ill?

17    **A.**  I don't believe, no.

18    **Q.**  Are there recordings of all radio traffic, and/or do body

19    cameras record the radio?  I'm assuming the dispatch radio

20    between officers.

21    **A.**  Correct.

22    **Q.**  Yes.

23    **A.**  All recordings, all radio traffic are recorded.  However,

24    sometimes when you cue up the mic, it doesn't go over the air;

25    therefore, we're not getting it recorded.  So the only way that

26    you would know if somebody actually said something was if your

27    body camera was recording at the same time you're cueing up the

28    mic.  But typically, dispatch, yes, they will have recordings

1    for every single radio traffic ever.

2    Q.    In the body camera footage, it appears your body camera left

3    your person.

4        How was it removed?

5    A.    How was it removed?

6    Q.    Yes.

7    A.    So the way that that camera was attached has two magnets:

8    One magnet on -- it's a two-bracket system, and both brackets

9    have magnets.  So you have one magnet on this side and one on

10   the inside.  And then the way that you put the camera on is --

11   there's another bracket system that you kind of move

12   counterclockwise, and so it stays on.  Because I was hit so hard

13   and I fell down the stairs, the camera fell off.

14   Q.    Why wasn't it put on again at the bottom of the stairwell?

15   A.    I don't know.  I think -- because I didn't see it -- you

16   gotta realize, I had blood all over my face, my nose was broken,

17   I was in pain.

18   Q.    And you were preoccupied.

19   A.    I was occupied.  I had someone who had just punched me.  I

20   didn't know where he was.  I heard shots fired.  I saw my

21   partner on the ground.  My last inclination -- or prior to at

22   that time -- is looking for my camera, which I didn't even know

23   was off me at the time.

24   Q.    Do you know -- would you know why another officer wouldn't

25   have put the camera back on you or something?

26   A.    No.  I can only speculate that they see that, and it's,

27   like, oh, that's evidence.

28   Q.    And they don't put it back on you; they just preserve it?

1    **A.**  Correct.

2    **Q.**  When responding to a call, what is the standard procedure

3    for when to turn on your body camera?

4    **A.**  We're supposed to turn our camera on when we -- at the time,

5    it was, you turn your camera on when you believe a crime is

6    going on or when you have someone detained.

7    **Q.**  Was this followed for this incident?

8    **A.**  I inadvertently did not turn my camera on immediately when I

9    got to the scene.  I don't know why I didn't.  It's just I

10    forgot.

11    **Q.**  And I just want to -- just tell me if you agree.  So at the

12    time -- so since June 1, 2016, the San Francisco Police

13    Department body-worn camera policy was that a body-worn camera

14    shall activate for all detentions and arrests and also all

15    consensual encounters where the member suspects that the citizen

16    may have knowledge of criminal activity as a suspect, witness,

17    or victim?

18    **A.**  That sounds right.  So I forgot to turn my camera on.

19    **Q.**  You referred to using the words "motherfucker" as a form of

20    verbal persuasion.

21         Persuasive in what way?

22    **A.**  I don't know.

23    **Q.**  Does it serve to deescalate or build rapport in this

24    instance with Sean Moore?

25    **A.**  Looking back on it, it obviously didn't help.

26    **Q.**  What did you mean when you told Officer Cha, "What is up

27    with this week, man?"

28         Do you remember making that comment?

1    **A.** Yes, I do.

2    **Q.** Had it been an unusual week of service in some way?

3    **A.** It had been two days. That was our second day on. We had a

4    crazy rollover crash that miraculously the guy didn't get hurt.

5    **Q.** When was that?

6    **A.** That was the night before. So that was the night of

7    January 4th to January 5th. Because we worked January 5th to

8    January 6th. So that was the shift before. The guy had -- I

9    don't know how he survived that crash, but he didn't have any

10   complaint of pain or anything.

11        We had another subject from the day before who -- I don't

12   remember the specifics, but he was very agitated, he was very

13   upset. We were there for a while, and he came out, and I

14   believe we placed a 5150 hold on him. No force was needed. He

15   just -- yeah, it was just one heck of a week. It was call after

16   call after call after call. I mean, if you guys ever want to do

17   a ride-along to see what we do, it's really interesting work.

18   **Q.** Was it imperative that -- okay.

19        So you told Sean Moore that he needed to give the papers

20   back.

21   **A.** Correct.

22   **Q.** Was it imperative that he give the papers back?

23   **A.** Well, yeah. They weren't his orders. They were his

24   neighbor's orders. They were orders that -- these specific

25   orders that he that had belonged to the person who had the

26   restraining order against him, so absolutely.

27   **Q.** Was he breaking any law by not giving the papers back?

28   **A.** Yes.

1  Q.  Which law?

2  A.  148(a)(1), which is resisting arrest, just not listening to

3  my orders, continuing to the investigation.  And it's theft;

4  it's not his papers.

5  Q.  And just to clarify for the jurors, that's Penal Code 148,

6  resisting arrest; right?

7  A.  Resisting, obstructing, delaying an officer's duties without

8  violence or threat of violence.  And then also the other crime

9  would be theft.  He took those papers, took the orders.  They're

10  not his.

11  Q.  And then he gave the papers back within, like, a minute or

12  two?

13  A.  Correct.

14  Q.  Okay.  So Officer Cha calls on the radio that:  We lost our

15  batons in the fight.

16      Do you remember how and when you got your baton back?

17  A.  I never got my baton back.

18  Q.  Was the shared wall between the houses on the same side of

19  staircase or the other side of the house?

20  A.  Yes.  The same side.  Where you see staircase, that was the

21  shared wall with ██  ██.

22  Q.  When your nose was hit, what had Mr. Moore struck you with?

23  A.  I don't know.

24  Q.  Like -- well, it was his hand, right?  You just don't

25  know --

26  A.  I'm assuming it's his hand.  To this day, no one has really

27  ever told me.  I'm just assuming he punched me in the face.

28  Q.  Okay.  Was the baton ever found with Sean Moore?

1  A.  That I don't know.

2  Q.  Did you ever, like, follow-up with any of the investigation

3  that happened in this case?

4  A.  I don't think -- no, because I don't think I'm privy to that

5  information.

6  Q.  Oh, really.

7  A.  They won't give me my baton back.  It's still evidence

8  because of the ongoing nature of this investigation, so I had to

9  go buy another baton.

10  Q.  Did you know now that San Francisco Police Department had

11  questioned Sean Moore on January 8th, 2015, and continued

12  questioning even after Sean Moore refused to engage them in a

13  similar situation?

14  A.  I have no knowledge of that.

15  Q.  Did you believe Sean Moore could have taken out the garbage

16  but also defied the restraining order by pounding on

17  ██████  ██████ -- I guess it is shared wall?

18  A.  Do I believe that he could have --

19  Q.  Taken out his garbage.

20  A.  And then while taking out the garbage, banging on the door?

21  Q.  I think the question is, could he have taken out the garbage

22  through his front door, walked down the stairwell; and by doing

23  that, it would have --

24  A.  Oh, I see.

25     Inadvertently violated the restraining order?

26  Q.  Yeah.

27  A.  That's never come across my mind until right now, this

28  question that's being asked.

1  **Q.** Sean Moore used many offensive names towards you, such as

2  bitch, the N-word; but when Moore used the word fagot, Cha

3  walked back towards him and says, "He is using slurs."

4      Why would your colleague react to this term but not earlier

5  terms?

6  **A.** I don't know why he would react to fagot as opposed to the

7  N-word or bitch or any other offensive slur.

8  **Q.** Why would Officer Cha go back to Moore's door after you

9  recommended to get out of here before he blasts us with a

10  shotgun?

11  **A.** I believe that he walked up there to continue engaging in

12  the conversation.

13  **Q.** On the transcript, page 11, line 2, you said, "Hey, let's

14  'til" -- maybe we should look at it.

15  **A.** Do you mind if I have a copy?

16  **Q.** Yeah. Okay. It's page 11, line 2, so can you just take a

17  moment to look at that.

18  **A.** Okay. I see it.

19  **Q.** So you see the line, it says -- you told Officer Cha, "Hey,

20  let's wait 'til, ah." And Officer Cha says, "Yeah." And I

21  think Officer Cha continues to engage Sean Moore, trying to get

22  him out.

23      What did you -- how were you going to complete that

24  sentence?

25  **A.** I have no idea.

26  **Q.** Do you think you were maybe wanting to wait for backup to

27  arrive?

28  **A.** I don't remember what I meant in that incomplete sentence.

1  Q.  Now, Officer Cha says that you both lost your batons in the

2  fight; but when Sergeant Bodisco testified, he noted that you

3  both had batons on you.

4      We are you carrying multiple batons?

5  A.  I don't remember that.

6  Q.  You were only carrying one baton; right?

7  A.  Yeah.  We only have one baton.

8  Q.  Okay.  I think you answered this.

9      When Mr. Moore first retreated into his home and you moved

10 to the lawn in case -- I think because you made the comment that

11 Mr. Moore might reemerge with a shotgun -- what did you and

12 Officer Cha intend to do after reading the temporary restraining

13 order?

14 A.  My intention was to hopefully read that in peace without

15 someone yelling at me, read it fully, get a full understanding

16 of the restraining order, and, okay, we'll figure this out which

17 way we're going to go.  But that never happened.  I didn't even

18 have enough time to think about it because the situation

19 escalated.

20 Q.  What if Mr. Moore had not reemerged, what would you have

21 done?

22 A.  I think, looking back on it now, if we probably would

23 have -- if he stayed in his house, well, there's nothing we can

24 do.

25 Q.  I'm sorry?

26 A.  Well, there's nothing we could do if he stayed in his house.

27 We'd be violating his Fourth Amendment right.  So I guess

28 citizen's arrest, write a report, but hopefully to engage and

1  get his side of the story.

2                    **DIRECT EXAMINATION**

3          **MS. LACAMBRA:**  I have a couple of follow-up.

4  **Q.**  So you said, you know, it would be a violation of his Fourth

5  Amendment rights.

6          Even if you had gone next door and gotten a signed citizen's

7  arrest from █████ █████ you recognize that you would still need an

8  arrest warrant to go into Mr. Moore's home?

9  **A.**  I don't think we would have gotten an arrest warrant because

10 there's no felony that occurred, right; it would just be a

11 warrant for his arrest.  We wouldn't be able to go inside of the

12 house.  That would still be a violation of his --

13 **Q.**  A violation of his Fourth Amendment rights.

14 **A.**  Correct.  Even with that, just because we have a valid

15 restraining order, a signed citizen's arrest from the victim

16 does not mean we're knocking on the door and breaking it down.

17 No, this is not how it works.  This is America, and we all have

18 rights and freedoms, and we all get to enjoy them.

19                    **DIRECT EXAMINATION**

20 BY MS. DRUSINSKY:

21 **Q.**  Mr. Moore was at his window after being pepper sprayed.

22         What is the protocol or training that compelled you to

23 insist that Mr. Moore return the papers when he had been pepper

24 sprayed, Mr. Moore was sprayed and retreated to his home;

25 dispatch is being oriented on the deployment of the pepper spray

26 and you were unsure of your safety?

27 **A.**  So in our use of force general order, if a subject gets

28 pepper sprayed, you shall -- shall, meaning you must -- get an

1  ambulance to the scene and make sure that they are okay.  And

2  that's --

3  Q.  You did that.

4  A.  -- what we were doing.

5  Q.  But I guess the question is:  What is the protocol or

6  training that compelled you to insist Moore return the papers

7  when all this stuff had been going on?  So he had been pepper

8  sprayed; he retreated to his home; and dispatch had already

9  known that this was happening; and an ambulance was on the way,

10  and backup was on the way?

11  A.  So I was ordering him to come outside because he was under

12  arrest.

13  Q.  What is the protocol or training that compelled you to order

14  that at that moment?  What training were you following when you

15  made that order?

16  A.  Laws of arrest.

17  Q.  Okay.

18  A.  836, 835.

19  Q.  Now, did you consider Officer Cha climbing up the stairs

20  responding to the insult from Mr. Moore as escalation of the

21  situation?

22  A.  At the time, no.

23  Q.  What about now?

24  A.  Looking back on it, I could see where that would not help

25  our deescalation situation.

26  Q.  Were you aware of Sean Moore prior to January 6, 2017?

27  A.  I had never heard, never seen anybody -- I had no idea that

28  Sean Moore existed.

1    **Q.**  I'm sorry, you did not --

2    **A.**  I did not know.

3    **Q.**  Okay.  On page 5, line 15, you're recorded as saying, "Let's

4    get out of here before he blasts us with a shotgun."

5        Can you explain that comment.

6    **A.**  Yeah, because the nature of our job is dangerous.  I've been

7    shot at before.  I don't like being shot at.  And I don't know

8    what this guy has behind his door.  There's -- officers get

9    ambushed all the time.  That's the sad reality of our job.

10   Someone can just lose it for no reason because we show up at

11   their door, they leave, they come back with a gun and blast us.

12   I wasn't trying to be funny.  I wasn't being -- it's banter,

13   hey, let's retreat.  If this guy comes out again, I want to have

14   some sort of cover.

15   **Q.**  When were you shot?

16   **A.**  I was never shot, but I was shot at.

17   **Q.**  When?

18   **A.**  In July, early July sometime in July 2015, so less than a

19   year before that in the Project.

20   **Q.**  Officer Cha said, "Come on out or we are going to kick the

21   gate open."

22       Doesn't that conflict with what you just said about not

23   entering his house to arrest him?

24   **A.**  Absolutely.

25       **MS. DRUSINSKY:**  Okay.  Anything else?

26       **THE WITNESS:**  What I may add to that is, yes, we would be

27   arresting him, but the kicking of the gate would be, yes, you're

28   under arrest, but we also need to get you the medical attention

1    that you need.

2        **MS. DRUSINSKY:**  Okay.  Thank you so much.  You've been

3    going for a long time, so I really appreciate it.

4        **THE WITNESS:**  So I'm not coming back after lunch.

5        Are you sure?

6        **MS. DRUSINSKY:**  Did you guys need him back?

7        You're good.

8        **THE GRAND JURY FOREPERSON:**  You are admonished not to

9    discuss or impart at any time outside of this jury room the

10   questions that have been asked of you in regard to this matter

11   or your answers until authorized by this grand jury or the court

12   to discuss or impart such matters.  You will understand that a

13   violation of these instructions on your part may be the basis

14   for a charge against you of contempt of court.  This admonition,

15   of course, does not preclude you from discussing your legal

16   rights with any legally employed attorney should you feel that

17   your own personal rights are in any way in jeopardy.

18       **THE WITNESS:**  Yes, ma'am.

19       **THE GRAND JURY FOREPERSON:**  Thank you.

20       **THE WITNESS:**  Thank you.

21       **MS. DRUSINSKY:**  Thank you so much, officer.

22                  (The witness excused.)

23       **MS. LACAMBRA:**  Okay.  So it is now 1:19.  It is now 1:19,

24   we're going to take our lunch break.

25       Do you want to come back at 2:20 or 2:30?

26       **MS. DRUSINSKY:**  We'll do an hour.  I think we'll be fine.

27   So everyone is to be back here at 2:20.

28       **MS. LACAMBRA:**  Don't talk to each other or anyone else.

# EXHIBIT E

1            SUPERIOR COURT OF CALIFORNIA

2           CITY AND COUNTY OF SAN FRANCISCO,

3                    ---o0o---

4

5   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
6              Plaintiff,             )
                                      )   CTN No.
7   vs.                               )
                                      )   **GRAND JURY**
8   KENNETH CHA,                      )   GJJ—8
                                      )   GRAND JURY NUMBER 2021-1
9              Defendant.             )
    _____    )

10

11

12   **Reporter's Transcript of Grand Jury Proceedings**

13        **\* INVESTIGATIVE HEARING TRANSCRIPT \***

14

15            Tuesday, July 27, 2021

16               Volume 4 of 4

17

18              Pages 412 - 437

19

20

21   **APPEARANCES OF COUNSEL:**

22        For the People:

23            OFFICE OF THE DISTRICT ATTORNEY
             County of San Francisco
24            850 Bryant Street, 3rd Floor
             San Francisco, California 94103
25            By:  **Stephanie Lacambra, Assistant District Attorney**
             By:  **Dana Drusinsky, Assistant District Attorney**
26

27

28   Reported By:  JULIE L. BOZAICH, CSR No. 13604

1                              **I N D E X**

2       Tuesday, July 27, 2021

3       **PEOPLE'S WITNESSES**                                    **PAGE**   **VOL.**

4       **SHEARER, AMY**
         (SWORN)                                                   414      4
5       Direct Examination by Ms. Drusinsky                        414      4

6       **WASSERMAN, DAVID**
         (SWORN)                                                   418      4
7       Direct Examination by Ms. Lacambra                         418      4
        Direct Examination by Ms. Drusinsky                        431      4
8       Direct Examination resumed by Ms. Lacambra                 434      4

9

10                             **E X H I B I T S**

11      **GRAND JURY EXHIBITS**                          **IDEN**   **EVID**   **VOL.**

12      10                    SFPD Subpoenaed            417                  4
13                            Records

14      11                    Photograph [515            421                  4
                              Capitol]
15

16

17

18

19

20

21

22

23

24

25

26

27

28                             ---o0o---

1    **THE GRAND JURY FOREPERSON:**  Thank you.

2                    (Witness excused.)

3    **MS. LACAMBRA:**  You're going to go right up to the witness

4    stand.

5    **THE GRAND JURY FOREPERSON:**  Hi, Officer.  I'm going to

6    give you a new mask.

7    **THE WITNESS:**  Okay.

8    **THE GRAND JURY FOREPERSON:**  It's so we can see your face.

9    **THE WITNESS:**  Okay.

10    **MS. LACAMBRA:**  And for the record, the witness is being

11    provided a clear mask in order for the jury to be able to see

12    the entirety of his face, including his mouth.

13                    **DAVID WASSERMAN**,

14    called as a witness for the People, having been duly sworn,

15    testified as follows:

16    **THE WITNESS:**  Yes.

17    **THE GRAND JURY FOREPERSON:**  Please state your name and

18    spell it, for the record.

19    **THE WITNESS:**  Yeah, it's -- first name is David, common

20    spelling; last name is Wasserman, W-A-S-S-E-R-M-A-N.

21                    **DIRECT EXAMINATION**

22    BY MS. LACAMBRA:

23    **Q.**  Good morning, Officer Wasserman.

24    **A.**  Good morning.

25    **Q.**  Can you please tell us what's your current occupation.

26    **A.**  I'm a police officer with the City of Santa Clara.

27    **Q.**  And how long have you held that position?

28    **A.**  I've been working there for about two-and-a-half years.

1    **Q.**  And before you were working as a police officer in Santa

2    Clara, where did you work?

3    **A.**  I worked for the San Francisco Police Department.

4    **Q.**  And how long did you work for San Francisco Police

5    Department?

6    **A.**  I was employed with them just under seven years.

7    **Q.**  Okay.  When did you go to the police academy?

8    **A.**  October -- I started in October 2012.

9    **Q.**  Okay.  And right after you got out of the academy, you

10   started working where?

11   **A.**  I was assigned to Mission Station for my FTO.

12   **Q.**  So you straight out of the academy, you were working in San

13   Francisco?

14   **A.**  Correct.

15   **Q.**  When did you start working -- or did you ever work at

16   Taraval Station?

17   **A.**  I did.

18   **Q.**  And when did you start working there?

19   **A.**  It had to have been -- so I started in Mission in 2013 --

20   probably, like, the end of 2014, beginning of 2017, somewhere

21   around there.

22   **Q.**  Okay.  And how long were you at Taraval?

23   **A.**  I think like six months or so maybe, six to eight months

24   maybe.

25   **Q.**  Have you ever met Sean Wendell Moore?

26   **A.**  Yes.

27   **Q.**  And when did you meet him?

28   **A.**  There was an incident he was involved in, in January 2015

1  that I responded to.

2  Q.  Okay.  Where did you meet him?

3  A.  I'd have to look at the report to look up the address, but

4  it was within the Taraval Station district.

5  Q.  Would it refresh your recollection to review the report you

6  wrote?

7  A.  Yes.  So at 515 Capitol Avenue in San Francisco.

8  Q.  And what is 515 Capitol Avenue?  Is it residential?

9  A.  I believe it was a residential house.

10  Q.  And who lived there?

11  A.  I think him, and I don't know if there's anybody else.

12  Q.  So how did you come to meet Mr. Moore?  What were the

13  circumstances that you came to meet him?

14  A.  What were the circumstances?

15  Q.  Yeah.  How did you come to meet Mr. Moore?

16  A.  So there was a report or a call for service, I think -- I

17  don't know what it came out as, but it eventually ended up being

18  about a battery.  One, I think he was a neighbor somewhere, said

19  that Mr. Moore assaulted him, and so I contacted both parties at

20  that time.

21  Q.  Okay.  So when you got there to 515 Capitol Avenue, what did

22  you do first?

23  A.  I spoke with the, I'll call them, one of the reporting

24  parties to find out what happened.

25  Q.  And who was that?

26  A.  I don't recall his name.  I have to looks at the report.  So

27  I may be pronouncing it wrong, but I believe it's ██  ██

28  ██████.

1   **Q.**  Can you spell that, please.

2   **A.**  Yeah.  That's ████████████  ████████████  ████████  █

3   **Q.**  And so you spoke to ████  ████████, and what happened when you

4   were speaking with him?

5   **A.**  So he only spoke Spanish, so I used the language-line

6   translator at first.  He told me that he was washing his car,

7   and Mr. Moore came down and assaulted him, punched him.  He said

8   he didn't want anything done criminally; he just wanted him to

9   stay away from him.

10  **Q.**  And when you say "him," who wanted to stay away from whom?

11  **A.**  Sorry.  I'll refer to ████  ████████ as the reporting party.

12  So the reporting party asked that Mr. Moore stay away from him.

13  **Q.**  So what did you do after you spoke with the reporting party?

14  **A.**  So if I remember, during this whole time Mr. Moore was

15  either on, like, the front porch of his house or had the door

16  open, was yelling at us the whole time, kind of confrontational.

17  I don't recall specifically what he was yelling.  I do know at

18  one point, we tried to obtain a statement from him to see what

19  his side of the story was, and he wasn't cooperative.

20  **Q.**  I'm going to go ahead and talk about what that means in a

21  moment.  But first I just want to make sure --

22        **MS. LACAMBRA:**  I will mark this next in line, which is

23  Exhibit No. 11.

24                          (Grand Jury Exhibit 11 was marked for

25                          identification.)

26  **BY MS. LACAMBRA:**

27  **Q.**  Okay.  Officer, I'm going to show you what's been previously

28  marked as Exhibit No. 11.

1    Does that appear to be a fair and accurate representation of

2  515 Capitol Avenue in San Francisco?

3  **A.**  I don't really remember specifically.  I just remember there

4  were stairs going up to the house.  I couldn't tell you for sure

5  whether this was the house or not.

6  **Q.**  Okay.  I'm going to show you then what's been previously

7  marked as Exhibit 5.

8    Do you recall that?

9  **A.**  Yeah.  I mean, it looks similar to what I remember, his

10  stairs going up to the landing and the front door.

11  **Q.**  So where was Mr. Moore when he was, I guess, addressing or

12  yelling?  Was he at the top of the stairs?  Was he at the bottom

13  of the stairs?

14  **A.**  He was never at the bottom, that I remember.  He was either

15  at the top or towards the top.  I don't remember if he was

16  inside the gate or inside his front door.  I don't remember

17  specifically.  But I'm pretty sure he was never down at the

18  bottom.

19  **Q.**  And so you said that he was somewhere, I guess, toward the

20  top, or on the top, of the stairs, and he was being

21  uncooperative.

22    What does that mean?

23  **A.**  Just not -- you know, asking him if he'd like to provide a

24  statement.  And it wasn't just, like, a "no," and went back

25  inside.  It was a lot of yelling.  I think he was telling us to

26  leave, leave him alone, things like that.

27  **Q.**  So he was yelling at you?

28  **A.**  Yes, myself and other officers at the scene.

                                                                    422

1  **Q.**  And you were in uniform when you responded?

2  **A.**  Correct.

3  **Q.**  So while you were talking with the reporting party, do you

4  recall where Mr. Moore was at the time you were talking to the

5  reporting party?

6  **A.**  Just somewhere in his house or at the top of his stairs.  It

7  wasn't close enough that I remember, like, being concerned that

8  he was close.  It was kind of, for lack of a better term,

9  background noise at that point, because I knew I would have to

10  go talk to him eventually.  But at that point, I didn't really

11  care what he was saying, per se, because I would go talk to him

12  in a minute.

13  **Q.**  And did you eventually talk to him?

14  **A.**  I did.  So eventually, he provided a statement of what he

15  said happened.

16  **Q.**  And how did you get him to talk to you -- because you said

17  initially he was uncooperative?

18  **A.**  You know, I don't remember.  I should have written it in my

19  report.  I don't remember if that was on the phone or if that

20  was in person or, like, through a window.  I don't remember at

21  all how we were able to talk to him.

22  **Q.**  You can't recall whether it was in person or --

23  **A.**  Yeah.  I don't remember.

24  **Q.**  So do you remember how long after you arrived you were able

25  to get him to talk to you?

26  **A.**  That I don't remember at all either.

27  **Q.**  Well, so when you did talk to him, was -- did he eventually

28  cooperate with you and provide a statement?

423

1    **A.**  Yeah.  He provided a statement.

2    **Q.**  So what did he tell you happened?

3    **A.**  So he said that the neighbor, the reporting party, was

4    washing his car, and the soap was going into the drain and

5    poisoning his drinking water.  And he came out and basically

6    confronted him, and the reporting party punched him and pushed

7    him; but he didn't want any criminal prosecution done for that.

8    **Q.**  And was Mr. Moore hurt as a result of this altercation?

9    **A.**  I don't believe so, no.

10   **Q.**  Now, did any of those statements, or any of that behavior,

11   concern you?  Were any of those -- well, let's start with that

12   question.

13       Did his statement to you or his behavior concern you at all?

14   **A.**  For the whole incident, is that what you're asking?

15   **Q.**  No.  Did it raise questions in your mind as to whether or

16   not Mr. Moore might have been suffering from some kind of

17   cognitive impairment or mental health issue?

18   **A.**  At that point, I was just concerned with his aggressiveness.

19   Like, I was fine with him yelling and stuff as long as he stayed

20   up there.  Obviously, it's a concern.  It could be a pre-assault

21   indicator -- somebody doing that, coming close.  But obviously,

22   I understand, like, people get upset in those situations.  So

23   that was concerning at first, but I wasn't too much concerned

24   because he was far removed from where we were.

25   **Q.**  So at any point, did you feel -- during your investigation

26   of the incident, did you feel that you were in danger from him

27   yelling?

28   **A.**  I mean, it's kind of a hard question to answer.  I would say

                                                                       424

1  my concern was raised a little bit by how he was, like, kind of,

2  like, I need to pay attention to where this person is.  But it

3  wasn't like an imminent threat of some type of danger.

4  Q.  And it didn't cause you to be super angry or fearful that he

5  was yelling at you from his staircase?

6  A.  I wouldn't say super fearful, no, but just an additional

7  thing I needed to pay attention to and watch out for.

8  Q.  Now, Officer, are you trained to look for cues that might

9  indicate that a person might be suffering from some kind of

10  cognitive impairment or mental health issue as part of your

11  training in the academy?

12  A.  I don't remember if they did that or not.  I mean, I have

13  that just experience from being on the street and, you know,

14  dealing with hundreds of people and thousands of people.

15  Q.  Okay.  And so based on your training and experience, when

16  you hear someone who thinks that their drinking water is being

17  poisoned by car runoff from a carwash into the sewer, does that

18  give you any kind of indication that perhaps that person might

19  be suffering from a cognitive impairment or that something might

20  not be right?

21  A.  So I would say, yeah, their grasp on reality is a little bit

22  different, but unfortunately we deal with those kinds of things

23  all the time.  It wouldn't cause me great concern.

24  Q.  And so as part your training and experience, when you're

25  engaging with someone like that, do you take any kind of special

26  precautions, or are you trained to act a certain way to make

27  sure that you deescalate and that you don't antagonize someone

28  who might be suffering from what you'd characterize as not a

425