EUSTACE DE SAINT PHALLE, SBN 179100
RAINS LUCIA STERN ST. PHALLE & SILVER, PC
2300 Contra Costa Blvd., Suite 500
Pleasant Hill, CA 94523
Tel: (925) 609-1699
Fax: (925) 609-1690
E-mail: PersonalInjuryGroup@RLSlawyers.com

ATTORNEYS FOR PLAINTIFF
KENNETH CHA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH CHA, | CASE NO. 24-CV-04700-PHK |
| Plaintiff, | **DECLARATION OF EUSTACE DE SAINT PHALLE IN SUPPORT OF PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE; CHESA BOUDIN; DANA DRUSINSKY; STEPHANIE LACAMBRA; LATEEF GRAY; REBECCA YOUNG; ANDREW KOLTUNIAK; and DOES 1-100, | Judge:       Peter H. Kang<br>Hearing Date: April 10, 2025<br>Place:        Courtroom F, 15th Fl.<br>Time:         1:00 p.m. |
| Defendants. | |

I, Eustace de Saint Phalle, declare as follows:

I am the lead counsel for Plaintiff Kenneth Cha in the above-captioned action. I am admitted to practice law in California and to appear before this Court. I am familiar with the procedural developments and filings at issue in this matter. I have personal knowledge of the facts of this declaration. If called to testify, I could and would competently testify to the statements and facts contained herein.

This Declaration is offered in support of plaintiff's Opposition to Defendants' Section 12(b)(6) Motion. Courts have held that the plaintiff enjoys more flexibility than a defendant in this regard and "may submit evidence to illustrate allegations without turning that motion into a Rule 56(a) motion for summary judgment." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021); *see Bell v. Publix*

*Super Markets, Inc.*, 982 F.3d 468, 480 n.2 (7th Cir. 2020). Plaintiff's counsel understands that while the Court is supposed to accept on its face the facts stated in the Complaint with regard to the Motion to Dismiss, Defendants have included extrinsic evidence in their own Motion. Therefore, due to this and because the matters relevant to the complaint and motion are complex, plaintiff wants the Court to be provided an explanation of what we believe exists from an evidentiary standpoint and what the evidence shows at this time, prior to any discovery or deposition testimony.

In this Declaration I will refer to factual assertions and opinions found in the attached documents. I do not intend by these references to attest to the truth of the matters stated therein. Rather, I am describing the evidence and testimony currently available to plaintiff, in order to demonstrate the evidentiary foundations for plaintiff's claims, as relevant to the Motion before the Court.

**Attached Documentary Exhibits**

1.  Attached to this Declaration are true and correct copies of the following documents:

Exhibit 1.     *People v. Cha*, Motion to Dismiss, filed June 30, 2023.

Exhibit 2.     Selection of emails regarding the Moore shooting investigation, where Lateef Gray was a sender or a recipient.

Exhibit 3.     Declaration of Jeffrey Pailet re Ethic Complaints & Whistleblower Complaints.

Exhibit 4.     *Pailet v. CCSF*, et al, First Amended Complaint (FAC).

Exhibit 5.     Declaration of Magen Hayashi in Support of Whistleblower Complaints, July 14, 2022.

Exhibit 6.     Search Warrant Draft dated October 28, 2020.

Exhibit 7.     Excerpts of Testimony of Investigator Magen Hayashi in *People v. Stangel*, January 27, 2022.

Exhibit 8.     *United States v. Brugnara*, No. CR 14-0306 WHA, 2015 U.S. Dist. (N.D. Cal. Oct. 9, 2015).

Exhibit 9.     *People v. Tran*, Court Proceedings Transcript, September 1, 2023.

Exhibit 10.    *People v. Tran*, Court Proceedings Transcript, October 13, 2023.

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS

Exhibit 11.    Complete Investigative Grand Jury Transcript, Vol. I., July 20, 2021 to July 27, 2021.

Exhibit 12.    Pailet Ethics Complaint re Boudin, includes Declaration of Jeffrey Pailet, April 21, 2022.

Exhibit 13.    *People v. Cha* matter (S.F. Superior Ct. No. 21010958): People's Opposition to Defendant's Motion to Compel Discovery, p. 10:6-11, Declaration of Rebecca Young, May 20, 2022.

Exhibit 14.    Pailet Ethics Complaint re Cindy Elias & Lateef Gray, includes Declaration of Jeffrey Pailet, April 5, 2022

Exhibit 15.    Declaration of Expert Senior Deputy District Attorney Douglas Pipes, July 14, 2022

Exhibit 16.    Email from ADA Darby Williams to IIB, August 19, 2022.

**Facts At Issue In This Matter as Attested in the Attached Documents**

2.    As discussed in the Complaint, on January 6, 2017, Officer Kenneth Cha shot Sean Moore. Compl. p. 6. At the time, the DA's Office was helmed by DA George Gascon, who assigned the IIB Unit to investigate whether charges should be brought against Off. Cha.

3.    Sean Moore, deceased, was 43 years old at the time of the officer-involved shooting (OIS) incident on January 6, 2017. Moore is estimated to have been six-feet-four inches tall and weighing 275 pounds. Pursuant to police reports and affidavits in temporary restraining orders, Moore has a history of violent conduct, including aggressive speech, violent outbursts, and assaults on police officers, neighbors, and innocent strangers. Moore had been subject to a series of restraining orders in the years prior to the OIS incident. Compl. p. 6

4.    Christopher Choy lived next to Sean Moore at the apartment complex on Capitol Avenue in the Oceanview neighborhood of San Francsico, California. Pursuant to affidavits by Choy in applications for restraining orders, Moore had harassed Choy and his family for several years prior to the incident. Choy had complained that Moore would make noise and shout, mostly at night. Moore had been restrained previously because Moore had assaulted Choy's son in 2011. Moore was charged in that incident, and was under a restraining order from 2011 to 2014. Choy reported that in 2014,

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

when the restraining order expired, Moore's nuisance behavior began again. Compl. p. 6

5.      In December 2016, Choy obtained a further temporary restraining order prohibiting Moore from harassing him. The restraining order sought by Choy was to prevent Moore from disturbing the family's peace as well to prevent further violence against him or his family. A court hearing on the matter was scheduled for January 11, 2017. Compl. p. 6

**Ofc. Cha's Encounter with Moore Prior to Moore's First Exit Through the Gate**

6.      During the very early morning of January 6, 2017, San Francisco Police Officers Kenneth Cha and Colin Patino responded to a call for service. Caller Christopher Choy had complained of a violation of a Restraining Order by the caller's neighbor, Sean Moore. Ofc. Patino met with Choy, while Cha went to the next-door neighbor's residence to inquire of that resident about the possible violation. Choy provided Patino with a copy of a judicially signed temporary Restraining Order which was set for hearing in five days (January 11, 2017) and named the next-door neighbor, Sean Moore, as the person to be restrained. Compl. p. 7.

7.      Meanwhile, Ofc. Cha climbed a stairway to Moore's front gate and rang the doorbell. The stairway was walled on both sides and ended in a landing that extended to the front door. A floor-to-ceiling metal gate separated the landing area in front of the door from the rest of the landing and stairway. Moore, who Cha estimated was six feet four inches tall and weighed 275 pounds, opened the door and stepped partway onto the landing behind the gate. Compl. p. 7.

8.      Moore made repeated hostile, belligerent and profane comments to Cha insisting he leave the premises. Videotapes show Moore berating, yelling at, arguing, and threatening the two officers. Moore also repeatedly demanded that the officers leave, to which officers respond that they are not going to do so until their investigation into the Restraining Order complaint was completed. Moore made repeated hostile, belligerent, and profane comments to both officers for several minutes before the officers were able to determine Moore's identity, which caused Moore to become even more irate.  Compl. p. 7.

9.      After about three minutes of talking to the officers and multiple demands that they leave his stairway, Moore said, "I'm gonna call and remove you," and he walked inside his home. The officers descended the stairs to the sidewalk while discussing the Restraining Order. In his interview,

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Patino said he believed by this point he had probable cause to arrest Moore for violating the restraining order. Compl. p. 7.

10.    Moore stepped back onto the landing carrying what appeared to be a phone and stood behind the gate. He insulted the officers again. Cha said, "Why did you call me those slurs?" and ascended the stairs, followed by Patino. Moore said, "You're done," and asked for Patino's badge number, which Patino provided. While apparently dialing his phone, Moore continued to demand the officers get off his stairs and remained behind the gate. Patino attempted to read to Moore from the Restraining Order. Moore responded more aggressively, banging his hand on the gate gestured in an aggressive way with his hands and arms while stating: "I'm through talking to you, bitch! Get off! Get off my stair!" Compl. p. 8.

**Encounter After Moore's First Exit Through Gate**

11.    Moore then pulled open the gate, stepped through the gateway while remaining on the landing, and waving his right hand while telling the officers to get off his stairs. The officers both moved back slightly as Moore advanced and waved his right hand, and ordered they again leave. One of the officers said, "You wanna get sprayed?" and Moore said, "Fuck your spray," while continuing to wave his hand and insist they leave. Ofc. Cha then sprayed pepper spray in Moore's direction. Cha said in his interview it was difficult for him to retreat because the stairway was narrow and the pepper spray was deployed for safety while he retreated. Compl. p. 8.

12.    Moore turned and stood sideways in the gateway with his left foot raised as if kicking. Ofc. Cha said in his interview that Moore then kicked him in the face. The officers partially descended the stairs. Moore bent over to pick up a piece of paper, closed the gate, entered his doorway, then reemerged, holding a paper in his right hand. These papers were the Restraining Order documents. The officers appeared to be on the sidewalk where Cha made a radio report of the incident. Compl. p. 8.

13.    About a minute and a half after the pepper spraying, Moore could be seen inside the home through a window. (Cha said during his interview that he could hear Moore "yelling at the top of his lungs inside the house, pacing back and forth, banging on the wall, banging on the window.") Patino ordered him to return the Restraining Order papers and come outside because he was under arrest. Patino also said he would get Moore medical attention for the effects of the pepper spray.

Moore closed the window. As the officers insisted he come out, Moore exited, tossed papers through the gate, and reentered his home. Compl. p. 8.

**Final Altercation and Shooting of Sean Moore**

14.     After the officers continued to insist Moore come out or they would "kick the gate open," Moore again stepped onto the landing, complaining he could not see. Moore then suddenly opened the gate, stepped forward, squatted, clenched his fists, and then said: "Fuck you. . . . . . . Fuck you. . . . I'm a kick your ass, punk." Compl. p. 8.

15.     Moore bent over to pick something up, which appeared to fall from his hand. He took a step down toward the papers on the stairs. Cha and Patino ordered Moore to get on the ground, but he did not comply. He took a few steps down and reached to pick up something. The officers said in their interviews they thought this was a good opportunity to arrest Moore. Moore retreated up the stairs as the officers advanced toward him. Patino swung his night stick at Moore at least twice and reached for Moore, then fell backward down the stairs. Patino said during his interview that Moore had tried to block the baton and punched him in the face with a fist, breaking Patino's nose. This caused Patino to suddenly fall backwards on the stair, witnessed by Ofc. Cha. Compl. p. 8-9.

16.     Cha, left to face Moore who was standing above him and had a height/weight advantage, had limited force options as the pepper spray and baton had failed to prevent Moore from attacking. Cha then drew his issued firearm and pointed it at Moore. The drawn firearm did not deter Mr. Moore at all. Mr. Moore raised his right leg and proceeded to kick down at Officer Cha. Officer Cha then fired his firearm as he fell backwards down the stairs. Cha struck Moore twice, in the abdomen and the leg. Compl. p. 9.

17.     Officer Cha believed that if he did not use force, he would suffer serious bodily injury or even death at the hands of Mr. Moore. He explained in his interview with criminal investigators that when Mr. Moore punched Officer Patino in the face, Cha heard Patino drop and saw him "roll down the stairs." Ofc. Cha stated he knew immediately that Ofc. Patino had been significantly injured and could no longer assist in the encounter with Mr. Moore. At that point, pepper spray had done nothing to subdue Mr. Moore and the baton had zero effect. After Ofc. Patino was disabled, Ofc. Cha became the sole focus of Mr. Moore's attention and rage. Moore came toward him in a "violent manner." Ofc.

Cha recounted, "I thought I was going to die. I thought this guy was just going to go to town on me." "I knew that Colin and I, [would face] …great bodily harm or we were going to die." When reporting the emergency situation to dispatch, Ofc. Cha stated, "I was getting overpowered; so I dispatched my weapon." Compl. p. 9.

18.     After the incident, Sean Moore was treated for two gunshot wounds, a liver laceration, and traumatic injury to the area of the right colon.  Post abdominal surgery left Moore with a prominent scar that extended from the base of his rib cage to his groin. Compl. p. 9.

19.     Ofc. Patino was transported to San Francisco General Hospital and treated for a broken nose. Ofc. Cha reported minor injuries consisting of scrapes and bruises with some pain. Compl. p. 9.

20.     In 2018, Moore pled guilty on unrelated charges concerning felony assault on two minors with a hate crime enhancement and making death threats. He was sentenced to prison and was serving his sentence at San Quentin. Compl. p. 9.

21.     Following the January 6, 2017 shooting incident, the District Attorney's Office under former DA George Gascon investigated the Sean Moore shooting incident and Cha and Patino's conduct. The Unit that investigated the incident, the Independent Investigations Bureau (IIB), investigates officer-involved-shootings, in-custody deaths and significant use of force incidents for the DA's Office. At this time, an initial declination report was authored by then Managing Attorney of IIB Andrew Lah. The report advised that there was a lack of probable cause that a crime had been committed and advising that no charges should be filed.

22.     One factor in the IIB's initial finding is that Cha's use of deadly force against Moore was legally justified based on the evidence and testimony. A person is entitled to use force, even deadly force, if the force is used in self-defense or in defense of others where the assailant is imminently attempting to kill someone or inflict great bodily injury. (Penal Code section 197; CalCrim 505) It is the prosecution's burden to prove beyond a reasonable doubt that the deadly force was not used in lawful self-defense or defense of another. (CalCrim 505) The question is 1) whether a defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; 2) the defendant reasonably believed that the use of deadly force necessary to defend against the danger; and 3) the defendant used no more than the force reasonably

necessary to defend against the danger. (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1089.) Here, there was uncontradicted evidence that Officer Cha believed that if he did not use force, he would suffer serious bodily injury or even death at the hands of Mr. Moore. Officer Cha's belief that he or his partner would suffer imminent serious bodily injury or death if he did not use deadly force was reasonable under the circumstances. From the facts of the altercation with Moore, Officers Cha and Patino were plainly in imminent danger of great bodily injury or death, and the prosecution could not prove beyond a reasonable doubt, as they would be required to, that this *was not* lawful self-defense or defense of another. Ofc. Cha had every right to defend himself and defend his partner. Compl. p.10-11

23.    Based on this, the Gascon administration declined to prosecute Off. Cha. However, the declination was not formalized by Gascon as he was preparing to vacate the office for the incoming DA, Chesa Boudin. Compl. p.10-11.

24.    In 2019, Moore filed a civil suit against the City and County of San Francisco, the San Francisco Police Department and Officer Cha, regarding the shooting. During the pendency of this civil action, one of the attorneys representing Moore was Lateef Gray. Compl. p. 13; Ex. 1, Motion to Dismiss p. 11.

25.    On January 20, 2020, Moore died while in custody. The coroner ruled that the injuries from the 2017 shooting was a cause of death, along with other contributory co-morbidities.

**The SF DA's Office's Biased Investigation of Cha Under DA Boudin**

26.    In January 2020, Chesa Boudin begins serving as the District Attorney. Compl. p.11.

27.    Once in office, DA Boudin introduced a policy of improper prosecutions of allegations of police misconduct. The San Francisco DA's Office policy under Boudin sought the frequent and improper prosecution of allegations of police officer misconduct, irrespective of the actual case facts and the existence or nonexistence of probable cause. Boudin's DA's Office administration expressed a vocal and public intent to pursue prosecution of police officers, for a myriad of motives other than substantive justice in each case. The primary goal for this policy were twofold - to put pressure on the SF Police Department and the City, in order to coerce them into changing SFPD policies related to SFPD officers' use of force. The policy was also intended to improve the standing of defendants Boudin and the SF District Attorney's Office with certain political interests and communities. Cases

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS

against police officers were pursued in bad faith for the political reasons noted above, even if such cases had no merit, were unlikely to win at trial, and would infringe on the affected officer's rights. In fact, all San Francisco police officer use of force cases brought by the Boudin administration have since been dismissed or acquitted. Compl. p.11.

28.    One of DA Boudin's first actions was to have the Moore shooting investigation re-examined by the IIB Unit for potential charges. ADA Aaron Zisser was assigned to prepare a memorandum, concluding that "charges not reasonable in this case." Compl. p.12.

29.    Defendant DA Boudin's policy, encouraging the aggressive prosecution of SF police officers, ran into difficulty, as the experienced Assistant District Attorneys (ADAs) and DA Investigators resisted pursuing frivolous cases against police officers and objected to unsupported prosecutions. In order to avoid resistance to his policies, DA Boudin intentionally hired inexperienced ADAs and Investigators, and ignored, sidelined, or fired the more experienced ADAs and Investigators, with the explicit goal of pursuing more cases against police officers in bad faith. This included the hiring of attorneys who had no prosecutorial experience, many practicing as public defenders. Compl. p.12.

30.    On January 21, 2020, Lateef Gray was hired by DA Boudin to join the IIB Unit. Compl. p. 12-13, Ex. 1, Motion to Dismiss p. 10. Lateef Gray's background is as a public defendant and then civil attorney focused on police use of force claims. Lateef Gray was supposed to be walled off from the investigation due to his clear conflict of interest in the Moore case. However, later examination showed that as late as March 23, 2020, over two months after he was hired, Gray was still counsel of record, appear on behalf of, and file papers on the Sean Moore civil matter. Even after joining the DA's Office, the Sean Moore civil case was ongoing and identified Gray as an attorney of record. Compl. p. 13.

31.    Ethical requirements regarding conflicts of interest would require Lateef Gray, who was involved in Moore's civil case, to be "walled off" from the Moore criminal investigation. Particularly, Gray should not manage a unit of investigators tasked with investigating the Cha/Moore criminal matter. However, it is later discovered that no ethical wall existed to prevent Lateef Gray from being involved in Sean Moore investigation, case directly that applied to his client's civil claims. Compl. p.

13.

32.    In June of 2020, Gray was promoted by DA Boudin to Managing Attorney of IIB. Compl. p. 13. He then became the supervisor of all cases handled by the IIB Unit, although he should have been walled off from the Moore shooting investigation.

33.    Again, due to Gray's involvement in the Moore civil matter, Gray was supposed to be fully "walled off" from the IIB Moore shooting investigation. However, although not fully made available to Plaintiff's counsel at this time, ADA Darby Williams stated in support of the later Motion to Dismiss "email exchanges show virtually daily involvement by Gray on the case of his former client." Ex. 1, Motion to Dismiss, p. 11; Ex. 2, Emails Involving Lateef Gray. These emails and evidence demonstrates that Gray "made decisions in the Moore matter such as hiring and payment to expert witnesses…discussions of strategy…involved in the removal of the DA Inspector who had investigated the Moore case from the beginning…Gray negotiated, proposed, and authorized the substitution of a new DA Investigator." Ex. 1, Motion to Dismiss, p. 11. ADA Williams continued "As the IIB Managing Attorney, Gray remained a supervisor of the work of ADAs assigned to the Sean Moore matter. It is clear that Gray was never really "walled off" from the Moore/Cha OIS investigation and was actively involved in directing these investigative actions. Documents purportedly show he was making strategic decisions in the Moore matter such as the assignment of various investigators to the case, issues involving expert witnesses and discussions of strategy. IIB Investigator Andrew Koltuniak, who wrote the arrest warrant on Officer Cha, was selected and supervised by Gray. Compl. p. 13; Ex. 1, Motion to Dismiss, p. 30-31

34.    In June of 2021, while Gray was still employed in Boudin's office as managing attorney of IIB, the SF Board of Supervisors awarded the Moore family $3.25 million. John Burris' firm (Gray's former firm) would have received a significant portion of that award. Potentially, Lateef Gray could have received, or had a claim on, a portion of that award. Gray therefore had a financial interest in the Moore civil case, constituting a further conflict of interest for Gray's involvement in any OIS investigation related to Moore's death. Compl. p. 13-14.

35.    Also in early 2020, Dana Drusinsky and Stephanie Lacambra were hired to the DA's Office. Neither Drusinsky nor Lacambra possessed prior experience overseeing prosecutorial criminal

investigations. Compl. p. 12. Like many other hires, Drusinsky had previously worked as a public defender. It is believed that Boudin hired Drusinsky and Lacambra because their personal bias against police officers was likely to be congruent with Boudin's policy of prosecution of police officer misconduct, with or without probable cause.

36.     In June of 2020, ADA Stephanie Lacambra and ADA Dana Drusinsky were assigned to the IIB Sean Moore investigation. Investigator York Tsuruta was removed from the Moore shooting investigation by Gray. Investigator Tsuruta had been assigned to the matter since the beginning of the investigation and prepared a comprehensive transfer memorandum for the newly assigned Investigator, Magen Hayashi. Although Investigator Tsuruta prepared the memorandum, it was determined by the new ADAs that this should not be shared with Investigator Hayashi. Compl. p. 14.

**The Drafting of Improper Search Warrants Against Cha and Patino**

37.     On September 29, 2020, ADAs Lacambra and Drusinsky tasked Investigator Hayashi to draft two search warrants for the cellular devices of Off. Cha and his partner, Off. Patino. Compl. p. 14; Ex. 3, Pailet Dec. re Ethics Complaints, ¶21. This again occurred prior to the development of probable cause and when this matter was still in the "fact-gathering" investigative phase.

38.     Investigator Hayashi began to prepare the supporting affidavit for these search warrants. Throughout October 2020 to November 2020, Investigator Hayashi prepared multiple drafts that she presented to the ADAs.

39.     As Investigator Hayashi began to draft the requested search warrant and affidavit, it appeared that ADAs Lacambra and Drusinsky were attempting to "improperly influence the drafting of the search warrant and affidavit." Ex. 3, Pailet Dec. re Ethics Complaints, ¶¶22-29. The ADAs Drusinsky and Lacambra asked for edits to eliminate exculpatory evidence (evidence tending to defeat criminal charges against Cha) from the warrant affidavits. The edited version deleted important facts of the event at issue that would be exculpatory evidence required by law to be included in the affidavit. This evidence included the suspect's hostile behavior, including attacks on the involved officers prior to the shooting. In later draft revisions sent to the Investigator from these ADAs, the ADAs further altered the context of the incident, made statements that did not have factual support, and removed exculpatory information about how the incident occurred. Compl. p. 14-15.

40.    Specifically, Investigator Hayashi presented her first draft of the search warrant to ADAs Lacambra and Drusinsky on October 1, 2020. This draft also included her questions and concerns related to the potential lack of sufficient probable cause for the scope of the search warrants. Ex. 4, Pailet v. CCSF, et al. FAC ¶31; Ex. 5, Hayashi Dec., ¶14; Ex. 3, Pailet Dec. re Ethics Complaints, ¶22. Investigator Hayashi identified in this initial draft that she believed there was a "lack of probable cause, an over-reaching scope of inquiry, staleness of the request and possible 4th Amendment rights violation." Ex. 5, Hayashi Dec., ¶14. Magen Hayashi further stated that it was her opinion, based on her training and experience that "in this case there was insufficient evidence to support [a search warrant]." Ex. 5, Hayashi Dec., ¶14.

41.    ADAs Lacambra and Drusinsky would repeatedly insist that Hayashi take out exculpatory evidence throughout the drafting of these search warrants. Ex. 5, Hayashi Dec., ¶14-16. Investigation Hayashi has stated that she did not agree with these changes, did not believe that this was a sufficient basis for probable cause. Ex. 5, Hayashi Dec., ¶15. Investigator Hayashi has also stated that she informed ADAs Lacambra and Drusinsky that she would not perjure herself with statements that she believed to be untrue or inaccurate. Ex. 5, Hayashi Dec., ¶15.

42.    These actions eventually made Investigator Hayashi uncomfortable enough that she brought these issues to the attention of her supervisor, Lt. Jeffrey Pailet. Ex. 5, Hayashi Dec., ¶17. Compl. p. 14-15. Although Pailet attempted to explain to the ADAs the serious issues with their actions regarding these search warrants, the actions continued. Ex. 4, Pailet v. CCSF FAC ¶35-40.

43.    On October 23, 2020 and October 28, 2020, Investigator Hayashi submitted updated drafts of the search warrant and affidavit that ADAs Lacambra and Drusinsky edited. Ex. 6, Search Warrant Draft October 28, 2020; Ex. 4, Pailet v. CCSF FAC ¶40. Each time, Investigator Hayashi brought these edits to her supervisor, Pailet, for his review and guidance. Ex. 4, Pailet v. CCSF FAC ¶40.

44.    On review, Pailet noted that each of these drafts, ADAs Lacambra and Drunsinsky had "altered the context of the incident, made statements that did not have factual support and removed exculpatory information about how the incident occurred." Ex. 4, Pailet v. CCSF FAC ¶40. Hayashi felt that the ADAs were requesting that she commit perjury in these documents. Ex. 5, Hayashi Dec.

¶22. Hayashi later testified that during this time, "I was threatened by attorneys three different times that if I didn't agree with their warrant they would report me to D.A. Boudin and that we were looking at termination possibilities." Ex. 7, Reporter's Transcript of Testimony at 402 Hearing, *People v. Terrance Stangel*, January 27, 2022, page 102, lines 22-28.)

**Purposeful Selection & Assignment of New Investigator Andrew Koltuniak to Cha Matter**

45.    In approx. October 2020, Andrew Koltuniak was hired by the SF DA's Office and DA Boudin to the IIB Unit. Def Ex. A, Arrest Warrant, p. 2. The IIB Unit is known as an extremely intensive unit in the DA's Office that previously had only highly experienced investigators assigned to it. In a significant departure from past hiring practices, at the time of his hiring, Koltuniak was not a sworn law enforcement officer. Instead, for the vast majority of his career he had largely been employed by the SF Public Defender's Office as a private investigator from 2004-2012, and 2018 to 2020.

46.    Throughout his career, Andrew Koltuniak has been admonished repeatedly for unethical behavior, included presenting arrest warrant affidavits that misrepresent the facts, exclude exculpatory evidence and other deceptions to the court.

47.    Specifically, in 2015, Koltuniak served as investigator on behalf of defendant Luke Brugnara, a real estate investor. The jury found Mr. Brugnara guilty, which Mr. Brugnara then appealed. One of the grounds for his appeal was the discovery, ostensibly discovered after the verdict, that a juror had not revealed a prior criminal history. This timing was supported by a declaration by Investigator Koltuniak, in which Koltuniak suggestively indicated that he had uncovered this information only after the verdict. In reality, it was discovered that Koltuniak had uncovered this criminal history prior to the verdict, and had likely intentionally withheld it from the court to preserve this ground for a potential future appeal should the jury find against the defendant. The court wrote in its published opinion:

> "The Court is disappointed that the defense has left the impression that this was newly discovered information. The motion for a new trial failed to submit a declaration from the defense's investigator regarding the discovery of Juror C.D.'s criminal history. On its own, the Court had to order the investigator to swear to "all material facts and stat[e] with particularity when the investigator learned the information and when he relayed that information to defendant and/or defense counsel or advisory

counsel" (Dkt. No. 707).

Investigator Koltuniak's first declaration then failed to state the sequence of events with sufficient particularity. He merely stated that advisory counsel James Stevens provided him with the list of jurors on May 17 and that Koltuniak returned the criminal history to Attorney Stevens on May 18 (Dkt. No. 711).

In response, a follow-up order required a supplemental declaration from Koltuniak and asked him to state "with particularity (the date and time) when he actually learned of the information. The declaration shall also specify each communication (including the date and time), whether oral or in writing, by which any aspect of the information relating to Juror C.D.'s criminal history was communicated to defendant or his counsel" (Dkt. No. 712). Only then did the exact timing and sequence of events come forth. In short, the motion left the impression that there had been newly discovered information and only upon studied inquiry did the true sequence come out.

Ex. 8, *United States v. Brugnara*, No. CR 14-0306 WHA, 2015 U.S. Dist. (N.D. Cal. Oct. 9, 2015)

48. Despite this clear record of making false and/or misleading statements to the court, or perhaps because of it, Koltuniak was specially selected by DA Boudin to become a DA Investigator. This was done although he was unsworn at the time of hiring, would need to take a long POST-training course, and lacked any prior law enforcement experience.

49. Koltuniak's ethical lapses have continued in his short career as a DA Investigator. Following the SF DA's Office after the Boudin recall, Koltuniak was hired by the Alameda DA's Office in the same role. Koltuniak was the DA Investigator in another prosecution against an officer, *People v. Tran*. In this matter, Koltuniak's declaration in support of an arrest warrant was discussed in relation to motions before the court. Judge Patton stated on the record with regard to Koltuniak:

THE COURT: All right. So since we're discussing that declaration by your inspector, that declaration says that Officer Tran claimed that, quotation, "The first time he had any contact with Ms. Webber was in September of 2013, dot, dot, dot, when she came down to his department." Correct?

MR. LINOWITZ: Yes, sir.

THE COURT: And that's not true. That is not a quotation from Officer Tran. He never said that. That is a question that was posed to him, but it is written in the affidavit such to suggest it's a direct quotation by Officer Tran. That's a material misrepresentation.

MR. LINOWITZ: Respectfully, Judge, I don't believe it is and I can explain why.

THE COURT: Let me just tell you I was the magistrate that reviewed that specific -- the first part of that search warrant, and I specifically was

mislead. I remember this. I don't need to -- this is not conjecture on my part. This happened on June 1st. This is an unusual case. So I remember reviewing that affidavit, and what I thought was that Officer Tran had perjured himself by making this statement during a trial in 2016, but he didn't make that statement.

Ex. 9, People v. Tran, Court Proceedings, September 1, 2023, p. 4-5.

50.    Following this, in response to the *Pitchess* motion filed for Koltuniak's personnel records regarding other complaints he had engaged in other misrepresentations, the court agreed that the appropriate showing had been made and Koltuniak's file must be produced for review:

[**Judge Patterson**] I think that he has made a prima facie showing as far as Pitchess are concerned for any material misrepresentation.

So complaints in this inspector's files about misrepresentations or misquoting people and affidavits, which we have here, I think that he has made the threshold in his declaration to require an in camera hearing of the inspector's personnel file. So that threshold has been reached.

Ex. 10, People v. Tran, Court Proceedings, October 13, 2023, p. 5.

The *People v. Tran* case continues to be litigated, however based on the clear pattern of behavior by Koltuniak on other matters, additional misrepresentations and falsehoods by Koltuniak are anticipated to be revealed through evidence and testimony.

51.    At some point following his hiring, DA Boudin and Lateef Gray assigned the newly fledged Investigator Koltuniak to the IIB Unit. Investigator Koltuniak was also specifically assigned to the investigation of Sean Moore's death and Off. Kenneth Cha. During his time with the IIB Unit, Investigator Koltuniak worked under IIB Managing Attorney, Lateef Gray, who was Sean Moore's former civil attorney on these same claims. Compl. p. 16.

52.    On November 6, 2020, Pailet was fired by Chief of Staff David Campos at the direction of DA Boudin. Compl. p. 15. That same day, Pailet emailed DA Boudin about his firing, warning that improper activities are occurring in the office and requesting a reconsideration. No response was ever received. Pailet would later appeal his termination.

53.    On November 30, 2020, Investigator Hayashi was removed from the Moore shooting investigation. Compl. p. 15. In December 2020, Investigator Hayashi serves as affiant on the arrest warrant for Off. Terrence Stangel, where she later provides testimony on January 27, 2022 that she was

pressured to exclude exculpatory information on this arrest warrant, and in other cases including the Moore investigation. Ex. 5, Hayashi Dec. ¶46-49.

54.    On March 10, 2021, Pailet filed a whistleblower complaint with the Office of the Controller of San Francisco regarding these issues. The Whistleblower Program is designed to investigate improper activities by City officers and employees, and an investigator was assigned to his case.

55.    On March 12, 2021, the hearing pursuant to Pailet's Gov't Code section 3304 Appeal was conducted with Simin Shamji, a management-level employee of the DA's Office. During this hearing, Pailet's counsel discussed the issues regarding the misconduct of the ADAs Lacambra and Drusinsky with regard to the search warrant issues, lack of exculpatory evidence, and retaliatory termination for his actions as a whistleblower. His appeal was denied and his termination was continued.

56.    On April 30, 2021, Pailet filed a Government Tort Claim with the City Attorney's Office of San Francisco regarding the improper biased investigation occurring in the DA's Office and his retaliatory termination. This claim provided notice of a potential lawsuit for retaliation against a whistleblower under Labor Code §1102.5 and also San Francisco Campaign and Governmental Conduct Code § 4.100. The tort claim requested an investigation by the State Personnel Board regarding the improper and illegal conduct by the defendant ADAs in attempting to draft misleading search warrants.

57.    On May 5, 2021, the City and County of San Francisco denied Pailet's Government Tort Claim.

58.    In June 2021, Andrew Koltuniak graduates from POST training and is sworn in as a peace officer, making him able to issue warrants. (Def. Ex. A, Arrest Warrant, p. 2)

**Investigative Grand Jury – Conducted with Excluding Exculpatory Evidence**

59.    July 20, 2021 to July 27, 2021, an "Investigative Grand Jury" was empaneled and received evidence regarding the Moore shooting and Off. Cha by ADAs Lacambra, Drusinsky and Bringardner. Ex. 11, Grand Jury, Vol. 1, p. 4-5. Based on a review of the Grand Jury transcript, it is abundantly clear that the jurors had significant confusion and sought clarity on important issues in the

Moore shooting and investigation against Plaintiff Cha, as will be detailed below.

60.     Only 7 witnesses were called to testify during these proceedings, none were medical professionals. Instead, the ADAs elected to call 3 police officers who had prior interactions with Moore, focusing the investigation on questions concerning Moore's lack of violent interaction with these officers and mental illness. The transcript shows that the officers were introduced by ADA Lacambra to the Grand Jury as follows: "we have seven witnesses…Eric Tindall, No. 2030, witness to the aftermath of the shooting…Wallace Kresley, No. 1826, partner of Wasserman and officer with prior conduct with Moore that did not result in violence…David Wasserman, No. 4360, officer with prior conduct with Moore that did not result in violence." Ex. 11, Grand Jury Vol I, p. 5-6.

61.     Officer Tindall was called first and was asked about an interaction between himself and Moore a "few years prior" to the shooting. Ex. 11, Grand Jury Vol I, p. 18-17, 20-23. Officer Tindall provided testimony that the call was concerning Moore's yelling, and that when the officers arrived on scene he was "cussing and belligerent". Off. Tindall did not provide testimony regarding any physical violence on the part of Moore.

62.     Following Off. Tindall's testimony, Off. Kresley and Off. Wasserman were called. The officers relayed their prior experience with Moore, during an incident that occurred on January 8, 2015. Off. Kresley testified that the officers were called to the scene following a report that one person had punched the other, however he was not asked to clarify who punched who:

> **A.** Yes. The report we were getting from dispatch is that someone had punched -- the neighbors had gotten into a physical altercation. Someone had punched someone else.
> **Q.** So you were responding to investigate what had been reported to you as a physical altercation?
> **A.** Yes.
> **Q.** But even with that severity of crime being alleged, you still were able to create time and distance in your interaction with Mr. Moore?
> **A.** Yes. Yes. When we're arrived on-scene, there was no physical altercation happening while we were there.

Def. Ex. C, Grand Jury Vol II, p. 187.

63.     Off. Kresley relayed to the grand jury that during this incident Moore was yelling, being uncooperative and wanted to officers to leave. *Id.* p. 181. He confirmed that their response was to "give him space" and was asked a series of pointed questions regarding the indications from Moore's

behavior that he was suffering a mental disability, which he affirmed. Def. Ex. C, Grand Jury Vol II, p. 181-182, 184.

64.    Off. Wasserman also provided testimony regarding this same interaction in January 2015, although this was not explicitly identified for the jury. During Off. Wasserman's testimony, the questions he was asked again focused on the signs he observed that may indicate a mental illness. Def. Ex. E, Grand Jury Vol IV, p. 425.

65.    Off. Wasserman also testified that while the complainant, Moore's neighbor, told the officers Moore had punched him, Moore told them that his neighbor had assaulted him. *Id.* at p. 420, 424. Off. Wasserman was not asked to clarify who he believed was the aggressor in this situation, and confirmed that neither party wanted to seek criminal charges against the other.

66.    We believe the evidence will show that throughout the Moore investigation there was an effort to conduct a biased and unsupported attack against the actions of Off. Cha. Initially, following the lack of probable cause by every experienced reviewing ADA and investigator, newly hired and mission driven ADAs Lacambra and Drusinsky attempted to promote the use of illegal search warrants without the required support, as demonstrated through the anticipated testimony of Hayashi and Pailet. Once it became clear that Hayashi and Pailet would not agree to the search warrants as manipulated by the ADAs, Pailet was fired and Hayashi was threatened and reassigned. Once Pailet's whistleblower complaint was provided to the SF DA's Office management, in 2021, including to DA Boudin and Managing Attorney Lateef Gray, they intentionally changed strategies to conceal the improper actions in the Moore shooting investigation.

67.    In an effort to do so, we believe the evidence will show that DA Boudin and Managing Attorney Gray decided to hire a new investigator who was purposely selected due to his history of unethical behavior, bias against police offices, and inexperience – Andrew Koltuniak. They anticipated correctly that this new investigator, would comply with their improper directives.

68.    As Koltuniak was sent to receive the proper training so that he could actually serve as an affiant on warrants, the ADAs also conducted the Investigative Grand Jury proceeding in order to try to create the appearance of a separate Grand Jury finding into these same issues. This was done in an effort to clean their hands from their actions involving Investigator Hayashi and Lt. Pailet, smooth

the path for Koltuniak, and was part of the coverup to obscure what occurred during the improper investigation previously.

69.    Following this, as explored below, although the Boudin, Gray, Lacambra and Drusinsky attempted to create distance from the events involving Hayashi and Pailet, it is clear based on the evidence that the same unsupported and improper approach continued. This included utilizing almost identical language in the Cha arrest warrant, ostensibly later composed by Koltuniak based on his review of body camera footage, that was actually drafted by ADAs Lacambra and Drusinsky for the earlier search warrants. This is explored in detail further below.

**Arrest Warrant for Kenneth Cha by Investigator Andrew Koltuniak**

70.    On October 29, 2021, Koltuniak submitted the arrest warrant application for Off. Cha. (Def Ex. A, Arrest Warrant) This warrant was later granted that same day by the court.

71.    It appears that Investigator Koltuniak wrote his first ever arrest warrant ever for the arrest of Off. Cha. As is shown by the evidence and anticpated testimony in this matter, Koltuniak was assigned this task only after experienced investigators refused to attest to warrants due to a lack of probable cause. Koltuniak appears to have had no such qualms. The arrest warrant failed to include several salient exculpatory facts. For example, Moore died over three years after he was shot by Officer Cha, which was left out of the arrest warrant.  Per Penal Code section 194, if a person dies more than three years after an incident, the defendant has a rebuttable defense. Further, there were other causes of death besides his abdominal injury ostensibly caused by the 2017 shooting. Moore's death certificate states he died from "hypertensive cardiovascular disease; obesity; slight coronary atherosclerosis; diabetes mellitus; schizophrenia; and chronic substance abuse."  The warrant failed to list these other causes. Compl. p. 16.

72.    Importantly, the arrest warrant also failed to adequately describe the violent encounters preceding Moore's shooting, relevant to the issue of Cha's right to self-defense. As noted, Moore was over six-feet-four inches tall and weighed over 275 pounds, with a history of violent conduct and a succession of restraining orders against him. Pursuant to the video evidence and testimony, during the altercation Moore had punched Cha's partner in the nose and broken it, and had kicked Cha. However, Investigator Koltuniak's arrest warrant significantly downplayed Moore's violent contribution by

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

vaguely describing Sean Moore as merely striking Cha. Without the complete scope of relevant information, including exculpatory evidence known the DA's Office, Judge Kahn signed the warrant allowing for Ofc. Cha's arrest. Compl. p. 16-17.

73.    Koltuniak's lack of experience and competence for the task of drafting the arrest warrant, and the poor training and improper direction by his superiors at the SF District Attorney's office (particularly DA Boudin and Managing Attorney Gray), were significant factors in the improper investigation of Cha and the improper drafting of the Cha arrest warrant. Compl. p. 17.

74.    Additionally, the affidavit supporting the arrest warrant and attested to Investigator Koltuniak is almost word for word the exact draft affidavit ADA Lacambra and ADA Drusinsky heavily edited and pressured Investigator Hayashi to sign in support of the search warrants for Off. Cha and Off. Patino's cellular devices.

75.    The most recent draft available to Plaintiff's counsel, in which Lacambra's edits to Hayashi's work is displayed in purple and Drusinsky's edits are in green "track changes", shows the heavy involvement they had in editing Hayashi's work to exclude pertinent and highly relevant exculpatory evidence. Ex. 6, Search Warrant Draft.

76.    A side by side review of these documents is warranted to appreciate the full breadth of similarities. Plaintiff has highlighted a few examples below.

77.    The summary paragraph of the arrest warrant appears to be pulled almost exactly from the search warrant draft. This was almost completely rewritten by Lacambra on the search warrant:

> "On January 6th, 2017, at approximately 03:51 AM, San Francisco Police Department (SFPD) Officers Kenneth Cha (Star #1206) and Colin Patino (Star #1310), responded to [redacted] San Francisco, California, to investigate a report by [redacted] that his next door neighbor, Sean Moore, had violated a temporary restraining order."

Def. Ex. A, Arrest Warrant, p. 4.

> "On January 6, 2017, at approximately 03:51 AM, San Francisco Police Department (SFPD) Officers Kenneth Cha Star No. 1206 and Colin Patino Star No. 1310, responded to 515 Capitol Avenue, in San Francisco, California, to investigate a report by Christopher Choy that his neighbor, Sean Moore, had violated a temporary protective order."

Ex. 6, Search Warrant Draft, p. 9.

78.    The summary Investigator Koltuniak states is based on his review of the Body Worn

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Camera Footage is also almost exact to the statement edited by the ADAs in the search warrant draft:

> "Upon arrival, Cha rang the doorbell and Moore opened his front door, but remained behind the metal security gate. Moore repeatedly told the officers that he did not want to speak to them and wanted them to leave. Moore demanded the officers get off his stairs and denied any harassment of [redacted]. Moore explained that he had taken out his garbage and swept his staircase. Moore went inside his home, Patino called him back to the front door and began reading the elements of the temporary restraining order to Moore who yelled, 'I heard you', and continued to demand that both officers vacate the staircase. When both officers refused to leave, Moore retrieved a mobile phone and told the officers he was going to call and have them removed."

Def. Ex. A, Arrest Warrant, p. 5.

The related paragraph in the search warrant draft, heavily edited by Lacambra:

> "Upon arrival, Officers rang the doorbell and Moore exited his residence but remained behind the gated security door. Moore repeatedly told the officers he did not want to speak to them and wanted them to leave, and they refused to comply. Moore demanded the officers get off his stairs and denied any harassment toward Choy. Moore explained that he had taken his garbage out and swept his staircase and again ordered the officers to leave. Both Cha and Patino refused to leave despite the repeated orders from Moore to vacate his property. Moore attempted to end the encounter by going inside his home, but Patino called him back to the front door and began reading the elements of the temporary protective order to Moore who yelled over him and demanded both officers vacate the staircase. When both officers still refused to leave, Moore took out his cell phone and told the officers he was going to call to have them removed. Patino then taunted Moore by jeering: 'Who you gonna call?!' and exclaiming: 'What is up with this freak?'"

Ex. 6, Search Warrant Draft, p. 10.

79.    The examples continue, and a side-by-side review of the affidavits to each warrant is recommended:

> "Moore picked up the fallen papers and retreated into his home. Patino demanded Moore return the papers. In response, Moore came out to the stairs from behind his gate with the papers in hand. Cha said: 'Fuck you,' and 'Mother-fucker. What's up? C'mon.' Moore responded by retreating into his home."

Def. Ex. A, Arrest Warrant, p. 6.

The related paragraph in the search warrant draft, again, heavily edited by Lacambra:

> "Moore picked up the fallen restraining order papers and reentered his residence. Patino demanded Moore return the papers. Moore re-emerged from behind his gate with the papers in hand. Cha exchanged insults with Moore and encouraged Moore to fight by jeering: 'What's up?! C'mon!' Moore responded by retreating back into his home."

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Ex. 6, Search Warrant Draft, p. 11.

80.    Also on October 29, 2021, the City Attorney's Office provided a reply to Pailet's Government Tort Claim, explaining that Pailet's claims were denied. The City Attorney's Office advised Pailet's counsel that the SF DA's Office advised that Pailet was terminated for poor work performance, despite receiving largely glowing reviews, and that there was no evidence to support his claims. Clearly, this was later determined to be false.

81.    On November 2, 2021, DA Boudin gave a press conference announcing the decision to charge Off. Cha in the shooting of Moore. This same day, Pailet files his Complaint alleging wrongful termination in violation of whistleblower protections. Various procedural issues and motion filing commence soon thereafter in the Pailet matter, stalling discovery from occurring.

**Investigator Magen Hayashi's Testimony regarding Misconduct on Cha Matter**

82.    On January 27, 2022 Investigator Magen Hayashi testified during the criminal trial of Off. Terrence Stangel that she was pressured under threat of termination to exclude exculpatory information in warrants for multiple matters by ADAs in the DA's Office, including during the Cha case. Hayashi later executed a declaration further detailing her experiences with the ADAs at the SF DA's office in two cases: the OIS case involving Cha, and another similar OIS case (Stangel). Hayashi's Declaration attests to the events described in Pailet's First Amended Complaint, Plaintiff Cha's Complaint at issue here, and substantially corroborates the testimony and evidence regarding the ADAs' attempts to coerce investigators to create misleading search warrants, both in the Stangel case and in the subject case. Further, details regarding the related case demonstrate a pattern and practice by the SFDA's office to create sustained political pressure on the investigators. Ex. 5, Hayashi Dec; Ex. 7, Hayashi Stangel Testimony, p. 101:2-19, 102:2-25.

83.    On February 4, 2022, DA Boudin gave a press conference in response to the Hayashi testimony stating that he is "not aware of one iota of evidence, not an email, not a documented conversation, nothing that occurred during my tenure that could possibly suggest that it is ever acceptable, under any circumstances, to be less than 100% truthful and candid in affidavits filed under penalty of perjury." Ex. 12, Pailet Ethics Complaint re Boudin.

84.    At some point, in 2022, Pailet was interviewed by the City and County of San Francisco

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

regarding his claims. He was advised that there was an internal investigation into improper activities in the DA's Office during the Boudin administration, including the exclusion of exculpatory evidence and lack of probable cause in investigations. Therefore, Defendant City and County of San Francisco is well aware of these issues and has been conducting its own analysis for quite some time prior to Plaintiff's Complaint.

85.    On March 17, 2022, based in part on the new testimony by Magen Hayashi, Pailet filed his Amended Complaint against the City and County of San Francisco, SF DA's Office, Boudin, Campos, Drusinsky, and Lacambra. He also named Simin Shamji, the hearing officer who heard his initial appeal regarding his termination, was informed of the facts regarding the improper activity by the ADAs on the Sean Moore matter and continued his retaliatory firing. Ex. 4, Pailet v. CCSF, et al, FAC.

**The SF DA's Office Attempts to Conceal Gray's Involvement in Cha Matter**

86.    Throughout this time, the Cha criminal prosecution was moving forward. Cha's criminal defense attorney, Scott Burrell, sought to compel documents regarding the involvement of Managing Attorney Lateef Gray on the Cha investigation as well as the drafted search warrants prepared by Hayahshi. Ex. 1, Motion to Dismiss, p. 15. This was highly contested by the DA's Office, who fought extensively to stop discovery of these documents. This effort to cover up the improper influence of Lateef Gray in the Cha matter included the filing of an Opposition to the Motion to Compel that contained a declaration signed by ADA Rebecca Young, one of the prosecutors on the Cha case. Ex. 1, Motion to Dismiss, p. 15; Ex. 13, People v. Cha, Opposition, Declaration of Rebecca Young. Within this declaration, and contrary to the emails the DA's Office was later ordered to produce which showed "almost daily involvement" by Gray in the Cha case, Young declared under penalty of perjury with respect to Lateef Gray's involvement in the underlying case, that "no such documents exist." Ex. 13, People v. Cha, Opposition, Declaration of Rebecca Young, ¶7.

**Pailet's Ethics Complaints**

87.    On April 5, 2022, Pailet filed an ethics complaint to the SF Ethics Commission regarding the public statements made by Cindy Elias, then Vice President of the Police Commission, and her husband, Lateef Gray. The crux of this ethics complaint concerned Lateef Gray's improper

involvement in the Cha matter and his spouse, Cindy Elias' comment that Pailet was a "disgruntled employee". Per Pailet's ethics complaint and attached declaration, Pailet declared:

> "It is my opinion that Cindy Elias' is intentionally and maliciously making these false statements about my status as a "disgruntled employee" to malign my character and reputation. Cindy Elias is married to Lateef Gray, who is currently employed at San Francisco District Attorney's Office. It is my belief that she must have been told of this matter by her husband, Lateef Gray. However, Lateef Gray was not supposed to have information related to the subject of my whistleblower complaint, [Cha], and neither should Cindy Elias…If Lateef Gray, or his wife Cindy Elias, received information regarding [Cha], the underlying matter at issue in my reports, then it appears there was an unethical breach of information regarding Matter A within the San Francisco District Attorney's Office."

Ex. 14, Pailet Ethics Complaint re Elias & Gray; Pailet Dec, p. 4, 22-26.

88.    It appears that Elias' purported knowledge of the sufficiency of Pailet's claims further demonstrated that Gray was not adequately walled off from the Moore shooting investigation, that he was involved in directing the investigation, and that he was improperly informing his spouse of protected information and that Elias' relationship with Lateef Gray and her position on the Police Commission created another conflict of interest. Ex. 14, Pailet Ethics Complaint re Elias & Gray. It is anticipated that Pailet will confirm these statements should be called to provide testimony.

89.    April 21, 2022, Pailet filed an additional ethics complaint with the SF Ethics Commission regarding Boudin's false public statements concerning Hayashi's testimony and issues within the DA's Office regarding improper activities and arrest warrants. This ethics complaint revolved around Boudin's February 4, 2022 statement that he was unaware of any evidence that it was acceptable "to be less than 100% truthful" in affidavits contrary to the evidence that Pailet provided the SF DA's Office and Boudin directly since November 6, 2020. Ex. 12, Pailet Ethics Complaint re Boudin. Within the complaint, Pailet declared:

> "DA Boudin should be very aware of other allegations concerning false statements including in affidavits as this is the central subject at issue in my whistleblower complaints. In fact, I have reported these issues directly to DA Boudin and his supervisory staff on multiple occasions. Thus, DA Boudin must have knowledge of other claims regarding misconduct with the content of affidavits issued by the San Francisco District Attorney's Office because I told him of those issues."

Ex. 12, Pailet Ethics Complaint re Boudin, Pailet Dec, p. 5:23.

> "Additionally, I believe that there is further circumstantial evidence that employees of the San Francisco District Attorney's Office, including DA Boudin, are attempting to conceal misconduct and confuse any formal investigation into my claims."

Ex. 12, Pailet Ethics Complaint re Boudin, Pailet Dec, p. 5:23.

It is anticipated that Pailet will confirm these statements should be called to provide testimony.

90.    Pailet filed an additional Government Tort Claim on April 29, 2022 concerning the new information revealed during the January 27, 2022 testimony of Magen Hayashi. On May 11, 2022, this claim was denied by the City and County of San Francisco.

91.    On June 7, 2022, the results of the recall election are announced, recalling Boudin as District Attorney. On July 8, 2022, Brooke Jenkins is sworn in as interim District Attorney.

**Expert Douglas Pipes regarding the Serious Lapses and Lack of Work Product Protect in the Cha Matter**

92.    On July 14, 2022, Deputy District Attorney Douglas Pipes (retired), the expert retained in the Pailet matter to review the search warrant work product and investigative activities of the SF DA's office personnel during the Moore shooting investigation executed a comprehensive declaration regarding these issues. Mr. Pipes has an extensive background that includes 31 years as a Deputy District Attorney; providing multiple trainings to prosecutorial offices state-wide on the subject of discovery in criminal cases; and authoring a treatise entitled California Criminal Discovery, which has been cited many times in published California appellate court opinions. Ex. 15, Pipes Dec, p. 2:20-3:24.

93.    The Pipes Declaration is intended to explain the standards and practices for District Attorney's offices with respect to issues in this action, particularly: the distinction between a DA's investigation of cases vs. the prosecution of cases; and, DA's participation in drafting search warrants. Pipes explains the statutory and case law that District Attorneys are supposed to know, which dictates how they are supposed to proceed in an investigation, as opposed to a prosecution. Pursuant to Pipes' opinions, ADAs should be aware that their investigative work, such as drafting a search warrant, is not protected as work product. The ADA's awareness of applicable laws should dictate policies and procedures at the DA's office with respect to making claims of work product.

94.    As attested to by Mr. Pipes, Mr. Pipes has conducted a review of the materials related to this case. Ex. 15, Pipes Dec., 4:21-8:11.  Mr. Pipes has provided various opinions concerning the matters at issue.

95.    This declaration specifically details Mr. Pipes' opinions as to the laws, standards and practices for District Attorney's offices with respect to issues in this action, particularly: the distinction between a DA's investigation of cases vs. the prosecution of cases; the DA's participation in drafting search warrants; and, the need for full disclosure in search warrant documents. Pipes also identifies the legal and ethical issues (factual inaccuracies and improper omissions) with the subject draft search warrants, and describes the obligations of the involved ADAs and investigators related to the disclosure and rectification of these problems. Ex. 13, Pipes Dec.

96.    Pipes opines that the DA's involvement with an investigator to draft a search warrant is not protected as absolute work product. Pipes notes the distinction between the District Attorney's work as an investigator, and their work as a prosecutor. (Ex. 15, Pipes Dec. 28:1-19, *citing*, Govt. Code §25303; *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 834 (2004); *Goldstein v. City of Long Beach*, 715 F.3d 750, 757 (9th Cir. 2013).)  Work product protection properly applies to work that reflects the prosecutor's opinions and trial preparation - "opinion work product." (Ex. 15, Pipes Dec. 31:23-32:5) The investigatory phase of the prosecutor's work - "fact work product" - is not subject to work product protection. (Ex. 15, Pipes Dec. 32:20-24) The DA's initial fact-gathering is considered to be investigatory, and is not protected as absolute work product. (Ex. 15, Pipes Dec. 32:6-16, *citing, People v. Angel*, 277 P.3d 231, 235 (Colo. 2012))

97.    Further, where DA investigations uncover some exculpatory evidence that may tend to exonerate the defendant, such evidence must be disclosed to the defense. (Ex. 15, Pipes Dec. 23:14-24:10, *citing inter alia, Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2008)) An ADA's failure to disclose exculpatory evidence is never protected by the work product rule. (Ex. 15, Pipes Dec., p. 32:6-24, *citing, Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006))

98.    With regard to the ADAs' conduct in the Moore shooting investigation that were also at issue in the Pailet matter, (editing drafts of search warrants), Pipes opines that this conduct was

1  conducted during the investigatory phase of the ADAs' work. "The actions of drafting search warrant

2  affidavits . . . were clearly an investigative tool of the District Attorney to assist  the office in making a

3  decision whether to file criminal charges against the officers." Ex. 15, Pipes Dec., p. 33:20-22. The

4  ADAs' conduct with the search warrant drafts was protected neither under absolute prosecutorial

5  immunity, nor as work product. Ex. 15, Pipes Dec., p. 25:16-26:9; 30:21-31:6; 33:14-27, citing, *Van de*

6  *Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).

7       99.    It is anticipated that Mr. Pipes will testify in consistent with his declaration that these

8  activities by the ADAs and Investigators in the Moore shooting investigation were investigatory, rather

9  than prosecutory, in nature and that no absolute work product protection will apply. Further, Mr. Pipes

10 noted concerning ethical and illegal activity occurring within the DA's Office during the Moore

11 investigation. As a well-respected expert in this field, it is anticipated that his expert opinion will be

12 given substantial weight.

13 **New Managing Attorney of IIB Darby Williams Review of IIB Unit and Cha Matter**

14      100.    On August 19, 2022, newly appointed Managing Attorney of IIB ADA Darby Williams

15 send email correspondence to IIB Unit regarding her concerns with activities inside the IIB, including

16 "[t]he lack of oversight and submission of the Unit's members to the political whims of former leaders

17 also deeply corrupted the Unit and contributed to the Unit's gross misuse and abuse of resources."

18 Managing Attorney ADA Williams listed various examples, including: "Multiple grand juries

19 impaneled on cases in which prior declinations were issued under prior District Attorney Gascon.

20 Grand juries impaneled to "test the water" on cases in which an internal determination re the quantum

21 of proof could have been easily made and reached." Ex. 16, Email from Williams to IIB Unit, August

22 19, 2022.

23      101.    On June 30, 2023, the ADA Darby Williams filed a Motion to Dismiss criminal charges

24 against Cha. In this motion, ADA Williams discussed the need for dismissal "in the interest of justice".

25 Ex. 1, Motion to Dismiss. On July 18, 2023, the court granted the Motion to Dismiss, dismissing all

26 criminal charges against Kenneth Cha.

27 / / /

28 / / /

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS

**Settlement of Pailet's Civil Case regarding Wrongful Termination in Violation of Whistleblower Protections**

102.    On May 6, 2023, Pailet and the defendants reached a formal settlement in the case in the amount of $835,000.

103.    On November 30, 2023, Pailet and the defendants reached an agreement on the full terms of the settlement for these claims. This agreement was agreed to by DA Brooke Jenkins and Deputy City Attorney Adam Shapiro on this date.

104.    On March 5, 2024, the City and County of San Francisco Board of Supervisors ratified the Pailet settlement. Thereafter, on March 15, 2024, Mayor London Breed approved the Pailet settlement.

**Plaintiff Kenneth Cha Brings Claims & Later Files Suit**

105.    On December 29, 2023, Kenneth Cha files the Government Tort Claim against defendants regarding the claims contained in his later Complaint.

106.    On February 7, 2024, the City and County of San Francisco advised that it denied Cha's claim.

107.    On August 4, 2024, Plaintiff Cha filed the Complaint at issue.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed this 14th day of February, 2025 in San Francisco, California.

*/s/ Eustace de Saint Phalle*
Eustace de Saint Phalle

DECLARATION OF EUSTACE DE SAINT PHALLE ISO PLAINTIFF KENNETH CHA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS