**EXHIBIT 5**

Christopher J. Shea (SBN 182739)
Attorney at Law
255 Kansas St., Ste. 340
San Francisco, CA 94103
(t) 415-565-9600
(f) 415-565-9601
email: christopherjshealaw@gmail.com

Attorney for Declarant
MAGEN HAYASHI

| | |
|---|---|
| IN RE: WHISTLE BLOWER COMPLAINTS AGAINST THE CITY AND COUNTY OF SAN FRANCISCO'S DISTRICT ATTORNEY; | Nos.  Officer of the Controller Complaint #XuLY3NLx<br><br>DECLARATION OF MAGEN HAYASHI IN SUPPORT OF WHISLTE-BLOWER COMPLAINTS; |

I, Magen Hayashi, declare as following:

1.    I prepare this Declaration to provide sworn testimony in support of my whistleblower complaints against the City and County of San Francisco and its District Attorney.

2.    On September 24, 2017, I was hired by the San Francisco District Attorney's Office as a District Attorney (DA) Inspector for the Independent Investigations Bureau (IIB), which investigates police use-of-force, officer involved shootings and in-custody deaths for the City and County of San Francisco(CCSF).

3.    Starting in 2020, I observed several San Francisco Assistant District Attorneys (ADAs) acting in an improper and unethical manner and I reported it to my supervisors. Since then, I have been subjected to hostility, retaliation,

1

1   intimidation and slander by various ADA's and District Attorney

2   Chesa Boudin.

3        4.   In June 2020, I was assigned to an investigation

4   handled by the IIB unit. The underlying matter investigated

    concerned a January 2017 officer-involved shooting (OIS)

5   wherein a man, Sean Moore, was shot by a San Francisco Police

6   Department (SFPD) officer during a violent altercation. The

7   case was investigated by IIB attorneys and IIB Inspector York

8   Tsuruta. Ultimately, prosecution against the officers was

9   declined by IIB and District Attorney George Gascon.

10       5.   Mr. Moore survived the gunshot wound but died in

11   January 2020, while incarcerated at San Quinten State Prison

12   for unrelated offenses. The Marin County Coroner declared his

13   death was partly related to the gunshot wound he incurred in

14   2017 and ruled the manner of death as a homicide.

15       6.   In January 2020, based in part on the Marin County

16   Coroner's finding of homicide, newly elected DA Chesa Boudin,

    re-opened the Sean Moore case for prosecution.  DA Boudin

17   assigned non IIB attorney's ADA Stephanie Lacambra and Dana

18   Drusinsky to the case who in turn supervised IIB Inspector York

19   Tsuruta.  Inspector Tsuruta provided them with a comprehensive

20   summary documenting the incident, historical actions and

21   declinations by the prior ADA's and the DA, and detailed

22   substantial litigation risks associated with a criminal

23   prosecution of the officer.

24       7.   In June 2020, ADAs Lacambra and Drusinsky requested

    Managing Attorney (MA) of IIB, Lateef Gray remove Inspector

25   Tsuruta from the case and requested a new Inspector be

assigned.  Inspector Tsuruta related to me on several occasions
there were significant conflicts between his opinions about the
case and the misguided interpretations of the novice ADAs
Lacambra and Drusinsky.

8.    On June 23, 2020, I was assigned as the new DA
Inspector to the Sean Moore case. It was my understanding that
MA Gray and my supervisor, Lt. Jeffrey Pailet assigned me to
this position.  As I understand it, MA Gray was to be walled
off from this case.  Mr. Gray, before joining the DA's office,
represented Sean Moore in his litigation against CCSF.

9.    Further, I also learned that ADA Lacambra and
Drusinsky emailed Lt. Pailet on June 22, 2020.  They informed
Lt. Pailet that they would personally brief me on the case.
They told him to withhold the case summary by Inspector Tsuruta
and not share it with me.  I reviewed the case summary; it is
factually accurate and its analysis is sound.  It does not
comport with the views of Lacambra and Drusinsky.  In my view,
Lacambra and Drusinsky mischaracterize, manipulate and omit
facts to suit a narrative that is inconsistent with the
realities of the Sean Moore case.

10.    At the time I was assigned, ADA Lacambra and
Drusinsky stated they hoped I "could get along" with them and
to not discuss the case with anyone, including my supervisor
Lt. Pailet.  This was not the policy of IIB and was in direct
conflict with my IIB case review requirements. I advised Lt.
Pailet of their requests and my concerns related to the
probable prosecutorial direction ADAs Lacambra and Drusinsky
were headed in.

3

11.   Specifically I was concerned about future search and/or arrest warrant requests and wanted Lt. Pailet's involvement in the investigation. Like Inspector Tsuruta's, my professional and personal assessment of the case, along with Lt. Pailet's, appeared to be in conflict with their agenda to prosecute.

12.   Over the next several months, I continued to be assigned various investigative tasks by ADA Lacambra and Drusinsky and it became increasingly apparent their intention was to prosecute the involved officers.  Their decision to prosecute was contrary to the professional assessment of all prior IIB attorneys and the IIB managing attorney who had initially investigated the case.  These experienced prosecutors thoroughly investigated and evaluated the case and declined to prosecute.  It was also my understanding the previous DA, George Gascon, declined prosecution.

13.   On September 29, 2020, ADA Drusinsky asked me to compose a search warrant and accompanying affidavit for a search of all personal electronic communication devices (personal and work cell phones and personal home computers) of the involved officers, SFPD Officers Kenneth Cha and Collin Patino. The scope of their search was to range from the date of the January 2017 incident through today's 2020 date.

14.   On October 1, 2020, I emailed ADAs Lacambra and Drusinsky my first draft of the search warrant. In lieu of my affiant summary, I listed numerous questions and concerns largely related to what I felt was a lack of probable cause, an over-reaching scope of inquiry, staleness of the request and

4

possible 4th Amendment rights violations.  Based on my training and experience, I was not opposed to the tactic of executing search warrants.  Based on that same training and experience, I knew that in this case there was insufficient evidence to support one.  As the affiant, I would not be able to swear under oath that I agreed with it since the facts were insufficient.  I reviewed the draft with Lt. Pailet who agreed with my assessment that there was a lack of probable cause.  We discussed the likely frustration I would encounter from ADAs Lacambra and Drusinsky and the best courses of action to manage it.

15.    ADAs Lacambra and Drusinsky did not respond to any of my questions or concerns. Instead, they instructed me to write as my basis of probable cause: "In my training and experience, officers will often communicate about the facts and circumstances of their actions via both their police department issued cell phones and devices as well as their personal phones." ADA Drusinsky advised this would be sufficient probable cause for me to swear to as the affiant. Based on my training and experience, I did not agree with her statement, factually.  Further, I do not believe this was a sufficient basis for probable cause, and I was uncomfortable including this statement in the warrant affidavit.  I advised them I would not perjure myself with statements I felt to be untrue or inaccurate.  I notified Lt. Pailet of their requests and their increasing pressure to swear to statements that I did not agree with.

16.    On October 14, 2020, I submitted a second draft of

1  the search warrant to ADAs Drusinsky and Lacambra. Within this
2  draft, I utilize my extensive training and experience writing
3  warrant affidavits and included all information known to me
4  which I believed to be factual, truthful, and exculpatory
5  regarding the Sean Moore OIS incident. I included all
6  exculpatory information related to Mr. Moore's physical and
7  verbal aggression toward the officers along with the officer's
8  response and actions. I also included the lengthy appellate
9  history by the SFDA defending the officers after Mr. Moore
10 appealed his arrest following the incident. Based on my
11 training, policies in the office, and my understanding of the
12 law this information must be presented to the court

    17.  The ADAs returned my draft to me with significant
13 edits and deletions. Specifically, almost all exculpatory
14 information related to Mr. Moore's aggressive behavior was
15 deleted. Additionally, there were inaccurate and editorialized
16 commentary about the officer's actions. It was my opinion, and
17 that of Lt. Pailet, that the changes to the summary were
18 designed to present the incident favorably to Mr. Moore while
19 highlighting and emphasizing the officers' actions unfavorably.
20 There was also no evidence to demonstrate personal electronic
21 devices were utilized by the officers at any time.

    18.  I was not only concerned the edits by the ADAs
22 would make the warrant and affidavit misleading and false but
23 I, as the affiant, would potentially be subject to criminal and
24 civil violations for perjury. Lt. Pailet agreed with me that
25 the ADAs' edits were improper and their actions did not align
   with SFDA's office policy or California and Federal law.

19.    On October 21, 2020, I was invited to a meeting with ADAs Drusinsky and Lacambra to discuss the search warrant and affidavit. Based on my concerns, I requested that Lt. Pailet join us. ADAs Drusinsky and Lacambra reluctantly agreed. It was my intention that Lt. Pailet, an Inspector with extensive experience in OIS investigations and warrant writing, would be an authoritative voice of reason and help further explain to ADAs Drusinsky and Lacambra the problems with their edits and instructions.

20.    At this meeting, Lt Pailet and I discussed DA Inspector's peace officer duties, training and requirements related to search warrants, and legal requirements to serving as an affiant. Lt. Pailet and I also shared our mutual belief that there was not enough probable cause for this search warrant and the Court would likely find it stale and overbroad in its scope. I reviewed their significant changes to my summary, namely deleting exculpatory information. The meeting became contentious as Lt. Pailet tried to explain our role and the need to provide exculpatory and the pertinent historical information.

21.    Although we attempted to educate the ADAs on the issues, they became visibly frustrated with our position and continued insisting that I draft the warrant as they preferred. They stated if we could not agree and do as they requested, they would report to DA Boudin that we could not work with them. Both Lt. Pailet and I interpreted this comment to be a clear threat to our continued employment.

22.    As a result of this meeting, it was clear to me

1   that  ADAs Lacambra and Drusinsky had decided to prosecute

2   Officer Kenneth Cha even though insufficient evidence had been

3   uncovered in the investigation to support criminal charges.

4   Although I explained to them that if I were to follow their

    directives, they were requesting that I state, under penalty of

5   perjury in the affidavit, facts that were not known to me and

6   that I did not believe to be true. The ADAs continued with

7   these instructions and therefore I believed that they were

8   attempting to have me commit perjury in the affidavit.

9          23.    After this meeting, and with the support of Lt.

10  Pailet, I continued to work on the search warrant and affidavit

11  drafts. Each time I provided another updated draft of the

12  warrant, ADAs Drusinsky and Lacambra made further changes to

13  the facts such that a biased summary was presented and

14  incorporated statements which I found to be wholly false and

    misleading. I ultimately stopped making any changes and simply

15  recorded the continued edits made by ADA Lacambra and

16  Drusinsky.

17         24.    A further meeting was scheduled for November 4,

18  2020, with me and ADAs Drusinsky and Lacambra. I insisted that

19  Lt. Pailet be present. We again discussed the ADAs' repeated

20  edits and my belief that these edits were misleading and

21  presented the incident in a biased fashion. I tried to educate

22  them on what exculpatory information was and how it was

23  required to be included in any affidavit.  I expressed my fears

    about perjury and Brady violations to which I was told by ADA

24  Lacambra that I was being "too sensitive."

25         25.    At the time these actions occurred, I believed that

I was acting as an Inspector during the investigation phase and not in a support role for the ADAs related to litigation in court. As such, it is my understanding that I would serve as a fact witness related to the collection of evidence, assertion of facts, and requests for the issuance of search warrants. It is also my understanding that as a fact witness, when signing an affidavit, my actions and the actions of others related to any factual assertions in the affidavit are not work product and are discoverable if questioned during judicial review or cross-examination. I do not believe at the time that any of these discussions or directions by the ADAs were protected by the work product privilege because they related to my role as a fact witness for a search warrant during the investigative phase of a criminal matter.

26.    As a peace officer, I was very concerned about the demands of my attorney supervisors.  I am required to be honest and complete in the documents I prepare for Court review.  If I fail in that duty, I can be placed on the Brady list and accused of and prosecuted for perjury.

27.    As I increasingly observed the unethical and improper directives by ADA Lacambra and Drusinsky, I analogized it to a witness trying to tell me false information. I believed to be true a person attempting to influence my affidavit as to factual statements would be discoverable no matter who it was, whether done by a victim, defendant, a police officer or even a District Attorney.

28.    On November 2, 2020, I assisted Lt, Pailet with writing and reviewing a comprehensive email detailing legal

1  requirements for warrants, our role as Inspectors, the

2  necessity of including exculpatory information and the legal

3  ramifications of excluding such information. Lt. Pailet sent

4  the email to ADAs Lacambra, Drusinsky and me.  He insisted that

   I not sign my name to the email and to let it come directly

5  from him as we were both under threat of termination.

6      29.    During the November 4, 2020, Lt. Pailet and I were

7  again warned two additional times that if I did not complete

8  this warrant, upper management, including the District

9  Attorney, would be told. I believed this warning was intended

10 as a threat to force me and Lt. Pailet to comply with the ADAs'

11 directives on these search warrants and affidavits for Officer

12 Cha and Officer Patino or face retaliation and/or termination.

13     30.    After this conversation, Lt. Pailet emailed MA Gray

14 and advised him of his concerns with ADA Lacambra and

   Drusinsky, their resistance and ethical violations within the

15 case. I am not aware of any response Lt. Pailet received in

16 return.

17     31.    On November 6, 2020, Lt. Pailet was terminated from

18 the SFDA's Office. I believe that he was terminated because we

19 continued to object to the ADAs directions and edits to the

20 search warrants and affidavits.  ADAs Lacambra and Drusinsky

21 had also openly threatened us with the threat of termination on

22 three occasions.  Lt. Pailet advised me that he emailed our

23 November 2, 2022, email to both DA Boudin and Chief of Staff

   Campos on Novemver 6, 2020.

24     32.    After Lt. Pailet's termination, I was extremely

25 frightened that I would be terminated as well. ADAs Lacambra

10

and Drusinsky proceeded to insist on the same directives at issue and continued to pressure me to commit perjury. Due to my valid concerns of retaliation, I reported this to my interim supervisor Lt. Ray Tang and requested that I be removed from the case.

33.    I advised Lt. Tang of the case history and retaliatory actions towards myself and Lt. Pailet.    I expressed the constant fear of being terminated and continuous pressure to commit perjury was causing significant psychological injury, stress, and depression. I told him I had realistic evidence that Lt. Pailet was fired because of disagreeing with two ADAs and that my job was also at risk if I did not write the warrant they wanted.    Lt. Tang told me I needed to carefully decide how important my job was and if I was willing to make compromises to keep it.    He stated, 'you get along with the attorneys or risk being fired.' I told him I would never do anything illegal and felt I was in an impossible, no-win situation with these ADA's and DA Boudin. He re-emphasized that he could not help me with my "moral dilemma", and it was up to me to decide how important my job was to me.

34.    I followed our conversation with a written whistleblower email summarizing my concerns, his statements, and my fear of retaliation. I did not receive a response from Lt. Tang, and I am not aware of any action taken to address my whistleblower reports. **Attached as Exhibit 1.**

35.    On November 30, 2020, several weeks after requesting that I be removed from the Moore case, Lt. Tang told

11

me he had spoken to MA Gray and Chief of Staff David Campos about my request. He stated MA Grey felt I needed to learn how to "get along with the attorneys" and would not remove me from the case. Lt. Tang refused to report what Chief of Staff Campos stated when he questioned Lt. Tang about me other than to say he wanted his opinion about me.  Following their conversation, Chief of Staff Campos removed me from the case and I was prohibited from briefing my replacement Inspector.

36.    I believe that in retaliation for my continued objections concerning the ADAs' directions, Chief of Staff David Campos specifically removed me and assigned me to other matters. I think this was done in retaliation because I did not agree with ADAs Lacambra and Drusinsky's prosecutorial conclusions and my refusal to include false information and commit perjury.

37.    A non-sworn Inspector, Andrew Koltuniak, newly hired to the DA's Office from the San Francisco Public Defender's Office, was assigned as my replacement.  This Inspector later served as the affiant for the arrest warrant for Officer Kenneth Cha.

38.    In March 2021, I filed my first complaint with the SF Whistleblower office. **Attached as Exhibit 2.**

39.    I submitted the whistle blower complaint anonymously out of fear of retaliation, but I knew a previous submission by Lt. Pailet would identify who I was.  I spoke with whistle blower Inspector Tiffany Wong who stated her office was concerned over our reports, but they were uncomfortable with handling it because it involved the District

Attorney office and their office performed more of an intake
processing function only.  As such, their office would close
the complaint and transfer it to the San Francisco Ethics
Commission and the State Attorney General office. I received no
additional follow-up or interview following the filing of my
first whistleblower complaint and believed the DA's Office was
covering up my concerns and complaint.

40.    In June 2021, I was contacted by a Special Agent
with the CA State Attorney General Office who worked within the
ethics department.  He stated his office was very concerned
about possible ethical violation made by the ADAs and asked me
for a briefing of events.  I am not aware of any further action
taken by the AG's office.

41.    In June 2021, I spoke with Inspector Koltuniak
about his progress in the Moore case.  He became flustered and
stated ADAs Lacambra and Drusinsky were very difficult to work
with and it was causing him tremendous stress. He stated he
told them repeatedly there was no probable cause for a search
warrant, but they wanted him to write the search warrant
regardless.

42.    On or about July 2021, Inspector Koltuniak told me
the search warrant was "dead".  I asked him how he knew this,
and he said the "higher ups" told him so and would not
elaborate further.

43.    On October 7, 2019 I was assigned as the lead
Inspector for a Use of Force incident involving Dacari Spiers
and SFPD Officer Terrance Stangel. The assigned ADA to this
matter was ADA Hans Moore and at the time of trial, ADA Rebecca

13

1    Young and MA Gray were also assigned.

2        44.    From the onset of the investigation, I was

3    instructed by ADA Moore to not share information and case

4    decisions with the San Francisco Police Department. This was a

5    directive I had heard before by other IIB attorneys on

6    unrelated cases.

7        45.    On November 5, 2020, I was instructed by ADA Moore

8    to act as the affiant and compose an arrest warrant for Officer

9    Terrance Stangel.  During a review of the draft, ADA Moore told

10   me to remove a large section of exculpatory information related

11   to a 911 caller's description of domestic violence.  More

12   specifically, I previously conducted an interview with the 911

13   witness caller regarding the events leading up to the use of

14   force incident that would suggest Mr. Spiers was engaging in

15   domestic violence prior to the officers' arrival.  I knew this

16   to be factual, exculpatory information which could be harmful

17   to the prosecution.

18       46.    As with the Sean Moore case, I was concerned that I

19   would be terminated if I did not comply with the changes ADA

20   Moore requested. To avoid perjury, I did not follow his

21   instruction to remove the entire section; instead, I reduced it

22   to a minimally acceptable description which I felt comfortable

23   with as the affiant.  At the time, ADA Moore indicated this

24   section was not relevant to the arrest warrant and did not need

25   to be included.  I now understand this was part of a pattern

     and identical to what I had previously witnessed in the Sean

     Moore matter.

         47.    On January 24, 2022, I received a subpoena request,

*People v. Stangel*, from defense counsel, Nicole Pifari.    I
contacted ADA Moore for clarification and he stated it was for
a 402 Evidentiary hearing. He explained it was "Not a big deal"
and defense wanted more information regarding the 911 witness
callers in the affidavit. I recognized that the reference to
the 911 caller witness statements had to be about the reduced
inclusion of exculpatory information. I was concerned that I
wasn't being given all the information as to the gravity of
this subpoena but relied on ADA Moore's explanation.

48.    On January 25, 2022, I received an updated subpoena
for *People v. Stangel* with an appearance date of January 27,
2022. I again contacted ADA Moore via email and phone
requesting that he send me a copy of the motion so I could
prepare my testimony.    He refused to send me the motion and
again reiterated it was not of serious concern.    I was
distrustful of ADA Moore's statements and felt it was likely I
was being setup to take responsibility for his dismissal of the
911 caller statements.    I knew Moore sought to withhold the
exculpatory evidence and feared he was going to blame his
malfeasance on me.

49.    On January 27, 2022, I testified under oath during
the 402 Hearing in the *People v. Stangel* that I was coerced to
remove certain exculpatory information from an arrest warrant,
was instructed not to turn over exculpatory information to the
SFPD by ADA Moore, and I believed this was done under threat of
my termination.

50.    During a break in the hearing, ADA Young approached
me while still on the witness stand.    She repeatedly jabbed her

15

finger in my face, yelling that my attorney should be representing me more effectively since I was being accused of a crime. I felt her behavior was overt witness intimidation to retaliate against me for my testimony against the SFDA.

51. The actions in the Stangel case to misrepresent the circumstances of the incident, obfuscate an un-biased investigation and remove required exculpatory information was consistent with the similar activity I witnessed in the Sean Moore OIS investigation. As I witnessed these types of activities on at least these two separate matters, with separate ADAs, I believed there was a pattern and practice of prosecutorial misconduct and intimidation occurring within the San Francisco District Attorney's Office.

52. On January 31, 2021, I filed a second complaint with the SF Whistle Blower Office documenting my involvement in the Stangel matter. I was again told by Inspector Wong the case was difficult for their office to handle due to the fact it involved the SFDA, and it would again be forwarded to the Ethics Commission and AG office. This is attached as **Exhibit 3**.

53. On February 4, 2022, DA Chesa Boudin made statements at a press conference in response to my January 27, 2022, testimony. DA Boudin stated that he was "not aware of one iota of evidence, not an email, not a documented conversation, nothing that occurred during my tenure that could possibly suggest that is ever acceptable, under any circumstances, to be less than 100% truthful and candid in affidavits filed under penalty of perjury."

16

54.    Contrary to DA Boudin's statements, it is my opinion that DA Boudin was fully aware of allegations concerning false statements presented in warrant affidavits. I have reported these issues directly to management at the DA's Office and I was informed that Lt. Pailet also reported this directly to DA Boudin and his supervisory staff on multiple occasions. Thus, I believe that DA Boudin had direct knowledge of several claims regarding improper inclusion of false statements within affidavits issued by his office and I believe his statements are false.

55.    On February 10, 2022, DA Boudin was interviewed by multiple news sources regarding the outcome of the Stangel case.  Officer Stangel was found not guilty of all felony counts.  The jury hung in favor of acquittal on the remaining misdemeanor, and it was eventually dismissed in the interests of justice.  In one article he disparaged the two black female witnesses who called 911 to report a domestic violence incident they were watching which ultimately led to the arrival of Officer Stangel and the use of force incident.  By doing so, DA Boudin effectively dismissed their domestic violence report and disparaged the witnesses by calling them "Karens".

56.    In the article below, when asked about my testimony, he slanderously referred to me as a *Pending HR issue*.  https://abc7news.com/amp/sf-police-chief-bill-scott-mou-agreement-district-attorney-chesa-boudin-sfpd/11551099/

57.    On March 9, 2022, DA Boudin was again interviewed by the news media about the Stangel verdict.  In it, he publicly slandered me by calling me a saboteur. He stated,

17

1   *"Stangel's trial showcased significant obstacles to securing a*
2   *guilty verdict. "We saw some internal sabotage within our own*
3   *office,".*   https://www.sfchronicle.com/sf/article/You-can-t-be-scared-to-lose-San-
4   16987769.php

5      58.   On May 19, 2022, DA Boudin publicly slandered me
6   again to the news media by referring to my testimony as,
    "inflammatory things on the witness stand."
7   https://www.youtube.com/watch?v=1pkLkvF9Kbc&t=1083s

8      59.   On January 28, 2022, I took leave from my position
9   at the DA's Office related to the years of stress and emotional
10  toll that accumulated from the coercion, intimidation, threats
11  of termination, and retaliation.

12     60.   As detailed above, I have made at least 6 whistle
13  blower notifications to my superiors and city officials to warn
    administration of what I believe to be misconduct occurring
14  within the SF DA's Office. I believe that myself and Lt. Pailet
15  were retaliated against for our warnings and attempts to ensure
16  that the DA's Office complied with applicable laws. Based on my
17  experiences and the actions I was privy too; I also believe
18  there is a pattern and practice of prosecutorial misconduct and
19  likely illegal activities occurring within the SF DA's Office.

20     61.   I believe ADAs Lacambra and Drusinsky were
21  attempting to improperly influence me, as a fact witness for
22  the search warrant.  The demands of these atttorneys caused me
23  to ponder committing perjury or face termination.  At the time
    of the search warrant, I did not believe the drafting of the
24  documents or the discussions I had with the ADAs related to the
25  search warrants or affidavits was work product.  This work

1  occurred during the investigation phase of the criminal matter

2  and was solely related to me serving as a fact witness when

3  signing an affidavit.  Further, as I understand it, suborning

4  perjury can never be protected by the work product doctrine.

5      62.   I experienced threats to comply with what I

6  believed to be incorrect and improper instructions by ADAs

7  Lacambra and Drusinsky. When I did not agree, and continued to

8  object, I was threatened and then retaliated against by being

9  reassigned. I then experienced a similar pressure in a

10  different case to withhold certain factual information that I

11  believed should be included in warrants and affidavits. I

12  testified as to these experiences in open court on January 27,

13  2022, where I was intimidated by ADA Young.  Since then, I have

14  been publicly retaliated against and slandered by DA Boudin on

15  at least three occasions to the media.

16      63.   I certify under penalty of perjury under the laws

17  of the State of California that the foregoing is true and

18  correct.

Dated: July 14, 2022

By:  Magen Hayashi

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Exhibit
# 1

| | |
|---|---|
| **From:** | Hayashi, Magen (DAT) |
| **To:** | Tang, Raymond (DAT) |
| **Subject:** | Thanks again |
| **Date:** | Wednesday, December 2, 2020 1:30:00 PM |

Ray,

I thought about our conversation on Monday and wanted to thank you again for letting me know that I've been transferred off the Moore case. I've slept well for the first-time in over a month! I didn't realize how much the stress had affected me physically. I am sorry you got thrown into such a tumultuous case on your first day with IIB. Lol I know you are still getting to know me Ray, but it honestly pained me for even bringing up these legal concerns to you as I am very good at my job, a team player and get along with everyone- giving 150% every time I take on a new investigative assignment. I love the IIB unit and work hard to contribute all I can.

I've written many warrants over the years and never in my law enforcement career have I faced such an ethical and legal dilemma as was presented by ADAs Drusinsky and Lacambra. As we talked about, they made major edits to my affiant summary and removed almost all exculpatory information as well as included facts that were not accurate. After I expressed my concerns to Jeff Pailet, he explained to them this is not how we were taught to write warrants nor was that the history in our office. He told them while we were trying to do what they asked, the situation involved criminal and civil liability as well as brady violations for me if I moved forward with the summary they had re-written. Then Jeff Pailet was subsequently fired after expressing his concerns. After witnessing that happen, I was at the point of signing the warrant out of sheer compulsion to avoid termination. Not sure if you knew, but York Tsuruta actually left SFDA because of this case and his identical ethical/legal concerns.

I know you spoke with Chief of Staff Campos and you feel the case transfer did not appear to be punitive. That is a relief to hear and I hope you are right. As you know, I have felt under the spotlight for several weeks in light of Jeff's firing along with the "tone" in the office you and I have spoken about as being one of "get along or you can lose your job." While grateful for being off the case, I cannot help but feel my removal could possibly be retaliatory in some way because it happened after Jeff's notification of legal concerns.

I value your support and trust your opinion and experience Ray and, as my supervisor, I just ask that you do all you can to look out for me and keep me out of harm's way. It would be an extreme hardship for me and my children if I was terminated like Jeff as I do not have a second income. With that in mind, please do not hesitate to give me any advice as to the nuisances of the office, I know you know them well.

Thank you again Ray and if there is anything I need to do or if Andrew needs transition help, I am more than willing to assist. Also, I just completed an arrest warrant for our unit's second SFPD officer criminal case and am working with Hans to get that finalized. I'll let you know if it will involve any overtime.

Have a great afternoon and if you ever want to grab a coffee when I am back in the office let me know.

Stay healthy,
Magen


Inspector Magen Hayashi  #111
San Francisco District Attorney Office
Independent Investigations Bureau
350 Rhode Island Street
North Building, Suite 400N
San Francisco, CA 94103
**(628) 652-4386** Work
(415) 314-5312 Cell


Main SFDA Phone Number: 628-652-4000
Main SFDA Fax Number: 628-652-4001


*Disclaimer*

*The information contained in this electronic message may be confidential and may be subject to the attorney- client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.*

**Please consider the environment before you print.**

# Exhibit

# 2

March 19, 2021

SAN FRANCISCO OFFICE OF THE CONNTROLLER'S WHISTLE BLOWER TRACKING
NUMBER FOR REFERENCE: XuLY3NLx

Where did the incident take place? *- March 2021 Whistleblower submission


Last year in 2020, I was involved in preparing a case for prosecution at the District Attorney's office. The case had been declined for prosecution by at least four ADA's and one prior District Attorney prior to its new review by ADA Stephanie Lacambra and ADA Dana Drusinsky. It was my understanding that both attorneys were directly assigned to the case by DA Chesa Boudin. Early in 2020, the previous investigator on the case briefly worked with Lacambra and Drusinsky and advised them that he wouldn't write an arrest warrant as he didn't feel it was legal or ethically valid. He presented them a great deal of historical case information showing the previous declinations and lack of probable cause and believed they were very displeased with his lack of cooperation for their plan to prosecute. He asked our Lieutenant, Jeff Pailet, to be removed from the case out of retaliatory concerns since they directly reported to DA Boudin at the time. Both attorney's contacted Lt. Pailet via email and told him not to share this previous investigator's opinion or work product with me. They advised him they would take charge of bringing me up to speed on the case. On 6/23/2020, Lt. Pailet assigned me as the new investigator. They both asked me if I could "get on board" with their goals which I clearly interpreted as their displeasure with the previous investigator.

After several weeks working with Lacambra and Drusinsky, they asked me to write an affidavit for a search warrant. I spoke with Lt. Pailet and advised him I was beginning to feel ethically uncomfortable and could he please help me. I did not agree with all but one of their multi-item requests in the search warrant, felt it was stale (almost 5 years old), had no probable cause, was too far reaching and I believed a gross violation of the subject's 4th amendment rights. Nevertheless, in an attempt to appear cooperative, we agreed that I should write a warrant draft and include in it a list of questions that they needed to help address before I wrote any sort of summary.

On 10/1/20, I emailed Drusinsky and Lacambra the preliminary warrant draft with only questions and request for advice. Namely, I asked if they could please help me identify the probable cause and review the broad scope of their requests. On 10/14/20, they stated my experience and training was PC enough to obtain the items and did not address the other questions I submitted. They again asked that I write a draft of the affidavit summary. I spoke with Lt. Pailet and we agreed that I should write the summary and simply write it as we are trained- include all factually accurate information and all known exculpatory information. I wrote the affidavit as an independent, unbiased, factual summary of the case, thus meeting my legal and brady obligations.

On 10/20/20, I gave Lacambra and Drusinsky the draft of my warrant and affiant summary. I also asked that Lt. Pailet be allowed to join us on the video call to review it. I knew they would have issues with its content and I wanted Lt. Pailet, as my highly experienced supervisor, to be a witness and a support for me. On the video call, Lacambra shared with me a newly edited version of the warrant I had just sent them. It was almost entirely re-written to include erroneous facts and withheld a great deal of the exculpatory information I had included per my legal and brady obligations. When I told them I had concerns, the meeting became contentious and Drusinsky stated 'we needed to speak to Chesa if we couldn't work with them.' We both repeatedly told them 'no, that was absolutely not the case, we just needed basic information for establishing probable cause which we were required to have to be able to fulfill our legal obligations as the affiant.' We explained this was necessary on any case we would ever investigate. Drusinsky and Lacambra implied we were biased and not treating this case as any other investigation. We corrected them stating we absolutely were and sincerely wanted to work with them. Lt. Pailet stated this was not how we were taught to write warrants nor was it the history in the office. He politely explained to them this involved criminal and civil liability for me along with brady violations. We agreed to review their changes and meet again in a week.

Lt. Pailet and I felt Drusinsky's directive to "go meet with Chesa if we couldn't get along with them" was an overt threat and we were both beginning to have viable concerns of being fired. I was also aware of a quiet, unspoken understanding in the office that you "agree with DA Boudin or you are out" as we had seen several respected and quality attorneys fired since he took office. Like my predecessor, I had a genuine fear I could be retaliated against for not agreeing to sign the affidavit they re-wrote.

During the next several days, both attorneys continued to make edits and new drafts to my original warrant and produced several draft versions of the warrant. Each version had more questionable legality issues: inaccurate information, legal conclusions (which was not my role to make) and withheld more exculpatory information. At this point, they had changed over 90% of my original warrant. Lt. Pailet and I agreed this was now incredibly serious and discussed the realistic possibility of being fired if we didn't agree to their versions. He was concerned that I was a single mother with two small kids and no other source of income. He stated if the office was to be totally reckless and fire one of us, he would rather it be him. As such, Lt. Pailet determined it was best for him, and him alone, to write a comprehensive email outlining the legal concerns and brady ramifications should we proceed with their versions of the warrant. Despite helping him write the email, he insisted that as my supervisor, he did not want me to sign the email with him nor send it from my email address as he wanted to be seen as the only one involved in the extreme chance they chose to retaliate against us. He sent the email on 11/2/20.

On 11/4/20, we met with both attorneys again. Lt. Pailet advised me beforehand to let him do the majority of the talking. Both Lacambra and Drusinsky were visibly displeased during the entire conversation. Lt. Pailet discussed concerns over their eradication of all exculpatory information and addition of legal opinions. Lacambra stated I was being too sensitive to brady violation possibilities and was irritated we would make legality suggestions since we were not

attorneys. Drusinsky expressed irritation it was taking too long to complete and for a second time, directed us to review our concerns with DA Boudin. She eventually told us their new direct boss was Chief of Staff David Campos. Before terminating the call, they reiterated for a third time that we should speak to DA Boudin if we disagreed with them.

On 11/6/20, Lt. Pailet was fired.

On 11/9/20, I was still the assigned investigator and I begged my temporary supervisor to take me off the case. I told him I was past an emotional breaking point and could not continue on with the stress of this case, their illegal requests, and the realistic fear of retaliation and being fired if I didn't sign the warrant they wanted. He stated that the current office was a horrible place to work in, but we needed to get along with the attorneys and I needed to decide carefully how important my job was and if I was willing to make compromises to keep it. I told him I knew how to compromise and would always try work with the attorneys, but I would never do anything illegal and this was beyond "not getting along." I had realistic evidence that Lt. Pailet was fired as a result questioning and contradicting these attorneys on my behalf.

Later on that same day, during a large team meeting with all of DA Investigations (over 30 people) a totally unrelated supervisor spontaneously brought up that Lamcambra and Drusinsky are highly respected and we needed to get along with all the attorneys. This was confusing for everyone but me as no investigators are familiar with these two attorneys. The only explanation I had was that the directive was punitive and entirely aimed at me.

On 11/12/20, my temporary supervisor called me to state Chief of Staff Campos had asked him about me and wanted his opinion on the case. This supervisor would not tell me more than that, other than to say Campos agreed to remove me from the case and he didn't feel my removal was punitive. I spoke with my union rep who advised me to send a whistle blower email to that supervisor summarizing the illegal and ethical concerns with Drusinsky and Lacambra, my fears that I was retaliated against by removing me from the case and my involvement with Lt. Pailet. I have attached that email in this complaint to you.

I am a highly respected investigator who was submitted for employee of the year for 2020 and is now being asked to be apply for a senior position by my new supervisor. Despite this, I still live with a tremendous amount of anxiety and fear of being retaliated against. I believe Lacambra and Drusinsky had me removed from the case and my removal was retaliatory. Despite the fact that I was removed as their investigator, they have continued to contact me for help on this case. Even though I have a heavy case load with my actual assigned cases, I have been cooperative and agreeable to anything they ask out of fear they will retaliate further against me. I live and work in a constant state of anxiety and it completely affects me both professionally and personally.

I unquestionably believe that Lacambra and Drusinsky demonstrated illegal, unethical and improper behavior and had a direct role in the retaliation and firing of Lt. Pailet and my removal from the case. I have kept my name confidential in this complaint since I am 100% positive I

will be fired if my office finds out I am contacting you or associated with any other WB complaints.

# Exhibit

# 3

February 1, 2022

SAN FRANCISCO OFFICE OF THE CONNTROLLER'S WHISTLE BLOWER TRACKING NUMBER: XuLY3NLx

## What did the subject(s) do or not do that was wrong?

I have been an investigator with the DA's office since September 2017. Up until August 2021, I was working exclusively with the Independent Investigation Bureau (IIB). I have previously spoken to Tiffany Wong in your office about a separate complaint I made on 3/19/21 regarding the DA's office and related fired employee Jeff Pailet. Unfortunately, this is a new complaint both directly and indirectly related to the first complaint made in March 2021. In summary, I was the lead investigator and arresting officer on case involving an SFPD officer's use of force during an arrest. During the period of investigation through January 27, 2022, lead ADA Hans Moore committed a number of unethical and prosecutorial misconduct acts during this investigation of which I was instructed to play a role in. This also involves multiple IIB attorney's and DA Chesa Boudin. As a result of my role in both cases, I have been subject to an unfair, hostile work environment for almost 2 years and am now experiencing overt retaliation and intimidation for my sworn, whistleblower testimony I provided on 1/27/21.

## When did the incident occur?

Arresting incident of the suspect/victim occurred on 10/6/19, SFPD Report #190752749. This began our IIB investigation into the incident involving the SFPD officer, Terrance Stangel. The arrest of the officer was made on approximately 12/14/20.

## When were you made aware of the problem? *

Since the beginning of 2019, when the DA's office obtained a new MOU with the SFPD department making the DA's office the lead investigating unit, I was instructed on numerous occasions by IIB attorneys that our office would not share information with the SFPD and it was to be a one way street of information. This is in direct contrast to the MOU which stated it "Shall be" a collaborative relationship. Throughout my tenure at IIB, I was instructed by several IIB attorney's that I was not to share any information on a case when asked for status updates by SFPD. Even if I knew what the prosecutorial plan was, I was not to share the information. Again, in opposition to the MOU. There was a common understanding among investigators that while we personally agreed we should be sharing information, we had to go along with the attorneys or else face retribution. I have witnessed several attorneys in the overall DA office fired or quit for disagreeing with DA Boudin. I know of 4 investigators who were fired under similar circumstances under both DA Gascon and Boudin. It is a shared understanding among many investigators that you "agree or you are out." I have also been told this directly by my administration.

Where did the incident take place? *

During the course of my investigation, I openly collaborated with SFPD to conduct the investigation of the use of force. In December 2019, I interviewed one of the 911 callers that had seen the suspect/victim Dacari Spiers assaulting a woman. She called the incident into SFPD 911 dispatch as an active domestic violent incident, thus making it a high priority call for officers to respond. Officer Stangel and his partner responded first on the scene and Spiers subsequently resisted detention and a fight ensued wherein Officer Stangel struck Spiers with his baton several times in order to overcome resistance. The 911 callers did not witness the police involvement, only what they felt was assaultive behavior by Spiers to a female prior to the police arrival. I did not ask SFPD to join me at my interview with one of the 911 callers because I had been repeatedly instructed by the IIB attorneys that our investigative steps would not be shared.

SFPD continued to contact me for updates on the case and I was instructed by IIB attorneys to not provide any updates. Much of the time, I did not know what the prosecution plan was as it was never communicated to investigators.

On November 4, 2020, I was instructed by ADA Moore to write a DA warrant for Officer Stangel. Over a two-week period, I wrote at least 12 different iterations of the warrant with continuous collaborative input by ADA Moore. He had a particular style he wanted as well as verbiage and critique of my formatting. Most importantly, I had included an extensive summary of the statements made by the 911 callers, as I felt it was not only exculpatory, but relevant as to explaining the context of why the call originated and why Officer Stangel and his partner had to arrive with a sense of urgency. ADA Moore highlighted this entire section and stated it was not relevant to the DA's case and it was not needed. I personally disagreed so I agreed to make a smaller summary of it and eventually kept this in the final affidavit. I signed the affidavit believing I had all the facts as I knew them but only after I asked ADA Moore multiple times via email if the 911 caller information was indeed not considered exculpatory. I personally felt it was but deferred to ADA Moore's judgment as the attorney. He was also increasingly irritated with me via email for not producing the warrant fast enough despite the fact he made dozens of corrections and iterations that I had to review and apply. As a result, I was concerned he would try to have me fired since I was hesitant about excluding the 911 caller statements as well as not having the affidavit prepared to his liking. This was a legitimate fear based on my experience the previous six months with ADA Lacambra and Drusinsky on the Sean Moore case. See my previous report to your office in March 2021. In summary, I had been experiencing severe anxiety and fear of retribution from DA Boudin, after my Lieutenant Jeff Pailet and I were repeatedly threatened with being reported to DA Boudin for questioning an affidavit which contained false information and copious amounts of deleted exculpatory information. Lt. Pailet, who intervened for me after I notified him of Drusinsky and Lacambras refusal to include exculpatory information and pressure to sign an illegal search warrant, was fired on November 5, 2020. I was assigned the Stangel warrant on November 4, 2020.

Based on my simultaneous experience with Lacambra and Drusinsky and witnessing them fire my boss who had intervened for me when I refused to sign an illegal affidavit, I had every belief IIB would do the same to me if I didn't comply with every future attorney directive. When ADA Moore presented me with such a heavily edited version of my arrest warrant for Officer Stangel and was increasingly irritated with me for questioning the deletion of exculpatory information, I felt I was again being targeted for termination. I signed the warrant under duress.

After the arrest of Officer Stangel, I repeatedly asked my administration to move me out of IIB into a new unit. The hostile environment was taking such a significant toll on my mental and physical health, that I sought medical and psychological counsel to help deal with my anxiety and depression as a result. I continue to do so to this day.

On Monday, January 24th, I opened a subpoena by Officer Stangel's counsel in my work email, requesting that I testify in a 402 hearing in the near future. It had been emailed to me on the evening of Friday, January 21st. Having no familiarity with a 402 hearing, I immediately called ADA Moore asking what the hearing was about. He stated it was "not a big deal" and that defense counsel "just wanted more information about the lack of 911 caller and DV information in the arrest warrant." He said he was also given a subpoena but had gotten rid of it and would speak to the judge that day to dismiss this motion. Not knowing what this motion was, nor having seen it yet, I believed ADA Moore when he indicated it was not serious.

On the evening of Tuesday, January 25th, I received another subpoena from defense counsel stating I had to appear on Thursday, January 27th. I emailed ADA Moore on the morning of January 26th and asked him to provide me with a copy of the motion so I could prepare for court the next day. He immediately called me and again reiterated the same information from January 24th and did not send me the motion to review despite my written request. He stated he had to leave but would call me later in the afternoon with MA Gray and Lt. Friedman to discuss testimony strategies. After this, I felt convinced that ADA Moore had no intention of notifying me of this hearing based on the facts: it was filed a week earlier and he never contacted me to let me know it was happening, he failed to disclose the severity of the accusations and its contents and he refused to provide me with the motion to review after I specifically asked him to do so. I felt I was being set up to take the fall for his prosecutorial misconduct. I retained counsel, per my rights, and they were able to obtain the 402 motion. In the motion, there were many accusations about ADA Moore, ADA Gray and DA Boudin that I was not told about. It also included serious accusations toward me that ADA Moore did not reveal to me at any time despite my repeated questions. I knew this to be evidence of a deliberate effort by IIB to set me up for failure in court and to evade the prosecutorial misconduct charges he was charged with in the motion.

On Thursday, January 27th, I appeared in court with my counsel. No one from the DA office was there with the exception of three IIB attorneys: ADA Moore, Gray and Young. I answered every question presented to me by defense counsel with absolute honesty despite the fact I knew I would likely be fired for my whistleblower statements which would be very unfavorable for the DA's office. Under oath, I revealed that there was a general assumption and direction for noncompliance with the MOU. I stated I did not contact SFPD re my interview with the 911 caller per this directive. I also stated that I had been instructed to remove exculpatory information in the affidavit by ADA Moore. The judge asked me to explain what information was removed. I described the detailed 911 caller statements and my belief it was not only highly relevant to the incident but very exculpatory. Defense asked me if I had ever been pressured to sign an affidavit. I said yes and referred to my experience in 2020 with ADAs Lacambra and Drusinsky when they threatened to report me to DA Boudin for not signing an affidavit that held illegal and misleading information and DA Boudin eventually fired my lieutenant, Jeff Pailet when he intervened on my behalf– see previous report from March 2021.

Defense asked me if I was worried about being fired if I didn't sign the warrant and I said "yes."

During a break in questioning when the judge and court reporter left the courtroom, ADA Young began to yell at me, jabbing her finger in my direction on the stand and stated I was accused of committing a crime. My attorney told her to stop intimidating me and a verbal altercation ensued between ADA Gray, Young and my attorney Chris Shea. This occurred in the courtroom and in the court hallway. It was witnessed by dozens of police officers and reporters in the courtroom.

The judge did not rule on the motion on this day, but defense counsel repeatedly argued there was significant corruption, prosecutorial misconduct and unethical behavior occurring in the DA office which affected her client's right to due process.

What law, rule, regulation, or policy or do you believe was violated?

Gross prosecutorial misconduct, witness intimidation, whistleblower retaliation.

I am intimately familiar with the IIB office having been there for 4 years. Since DA Boudin was elected, I have been witness to a clear, deliberate effort made by IIB attorneys, including ADA Moore, to prosecute officers at all costs, despite openly admitting that they may be innocent but felt examples needed to be made of officers. In this particular case, after the preliminary hearing, ADA Moore told me that he did not think he would win a jury trial but had to go through with it since he had already started the process.

DA Boudin has perpetuated a highly prejudicial attitude and bias in the office. The attorneys he has hired in IIB are blindly focused on prosecuting law enforcement by whatever means necessary. Investigators openly discuss the fact that if you disagree with attorneys, you are at grave risk of retaliation. This topic has also been presented by DA Investigative administrators in unit meetings as a warning to comply.

Since this hearing, I have been told by eyewitnesses: DA admin has already gone to personnel to ask them about me and my position in the office; There have been countless all-hands on deck meetings with DA administration about me and this case; and I have been advised by fellow investigators that DA admin are actively calling investigators to see if they are talking to me and questioning what I am saying. This is clear, overt retaliation for my whistleblower testimony. The level of hostility and threats toward me that I encountered in the courtroom by my own IIB attorney's, the current overt attempts to find some sort of administrative reason to fire me since my testimony and the history of intimidation and firing I have witnessed and been subjected to by other ADA's in the office has created such a retaliatory, hostile, stressful environment I feel totally unsafe to return to my job.

Briefly state how our office can help you regarding your complaint.

I would like this complaint to be added to my previous anonymous one, of which Tiffany Wong is familiar with, and sent forth to the AG office in the same manner. As an unprotected civil service employee, I am 100% positive I will be fired in due course for any number of administrative reasons in retaliation for my testimony. Based on historical knowledge of other past fired investigators, I believe I will be placed on a Brady List as well which will prevent any future employment in my law enforcement career. The extensive media coverage on this case has already damaged my reputation and will also prevent me from finding future law enforcement opportunities. I would like to speak with Tiffany about my very valid retaliation claims and what recourse I have at this time.

1

**PROOF OF SERVICE**

2

I declare that I am a citizen of the United States, over 18 years old, and not a party to this cause. My business address is 255 Kansas Street, Suite 340, San Francisco, CA 94103. Me e-mail address

3

is christopherjshealaw@gmail.com. On the date listed below, I served a true copy of the forgoing:

4

**DECLARATION OF MAGEN HAYASHI IN SUPPORT OF WHISTLEBLOWER COMPLAINTS; COMPLAINT: #XuLY3NLx**

5

6

on the interested parties in said action:

7

**Tiffany Wong**
Audit Manager
Office of the Controller
City Services Auditor Division
Phone: (415) 636-8578
Email: tiffany.b.wong@sfgov.org

8

9

as marked below:

10

[ ]    **BY UNITED STATES MAIL:** I caused a true and correct copy of the above document, by filing ordinary business practices, to be placed and sealed in an envelope addressed to the addressee and for collection and mailing with the United States Postal Service in the ordinary course of business, correspondence collection on a particular day, which is deposited with the United States Postal Service that same day.

11

12

[ ]    **BY OVERNIGHT MAIL:** I caused a true and correct copy of the above document, by following ordinary business practices, to be placed and sealed in an envelope addressed to the addressee and for collection and mailing with United States Postal Service in the ordinary course of business, correspondence placed for collection on a particular day, which is deposited with the United States Postal Service that same day.

13

14

[X]    **BY ELECTRONIC MAIL:** I caused a true and correct copy of the above document, by following ordinary business practices, to be scanned as a PDF and sent to the email address listed above from my email address listed above.

15

16

[ ]    **BY PERSONAL SERVICE:** I caused a true and correct copy of the above document to be delivered to the parties in such cause by hand delivery by placing same in a sealed envelope addressed to the addressee and providing it to a professional messenger for service.

17

18

[ ]    **BY FACSIMILE TRANSMISSION:** I caused a copy of such document to be transmitted via facsimile machine. The facsimile number of the machine to which the document was transmitted is:

19

The facsimile transmission was reported as complete and without error.

I declare under penalty of perjury, under the laws of the State of California, that the forgoing

20

is true and correct. Executed at _San Francisco_, California on _July 18_, 2022.

21

22

_____

23

CHRISTOPHER J. SHEA

24

25