**EXHIBIT 11**

1          SUPERIOR COURT OF CALIFORNIA

2          CITY AND COUNTY OF SAN FRANCISCO,

3                  ---o0o---

4

5    PEOPLE OF THE STATE OF CALIFORNIA,)
                                        )
6              Plaintiff,              )
                                        )
7    vs.                               )   CTN No.
                                        )
8    KENNETH CHA,                      )   **GRAND JURY**
                                        )      GJT-8
9              Defendant.              )   Grand Jury Number: 2021-A
     _____)

10

11

12       **Reporter's Transcript of Grand Jury Proceedings**

13          * **INVESTIGATIVE HEARING TRANSCRIPT** *

14

15              Tuesday, July 20, 2021

16              Volume 1 of 4

17

18              Pages 1 - 168

19

20

21   **APPEARANCES OF COUNSEL:**

22       For the People:

23          OFFICE OF THE DISTRICT ATTORNEY
            County of San Francisco
24          850 Bryant Street, 3rd Floor
            San Francisco, California 94103
25          By: **Stephanie Lacambra, Assistant District Attorney**
            By: **Dana Drusinsky, Assistant District Attorney**
26          By: **Brian Bringardner, Grand Jury Legal Adviser**

27

28   Reported By: JULIE L. BOZAICH, CSR No. 13604

                                                                    1

SFDA 004221

# I N D E X

Tuesday, July 20, 2021

| PEOPLE'S WITNESSES | | PAGE | VOL. |
|---|---|---|---|
| **PATINO, COLIN** | | | |
| (SWORN) | | 15 | 1 |
| Direct Examination by Ms. Drusinsky | | 16 | 1 |
| **TINDALL, ERIC M.** | | | |
| (SWORN) | | 17 | 1 |
| Direct Examination resumed by Ms. Drusinsky | | 18 | 1 |
| **DOMIN, PATRICK** | | | |
| (SWORN) | | 58 | 1 |
| Direct Examination by Ms. Drusinsky | | 58 | 1 |
| **BODISCO, RICHARD** | | | |
| (SWORN) | | 62 | 1 |
| Direct Examination by Ms. Lacambra | | 63 | 1 |
| Direct Examination by Ms. Drusinsky | | 87 | 1 |
| **PATINO, COLIN (RECALLED)** | | | |
| (PREVIOUSLY SWORN) | | 109 | 1 |
| Direct Examination by Ms. Drusinsky | | 110 | 1 |
| Direct Examination by Ms. Lacambra | | 146 | 1 |

# E X H I B I T S

| PEOPLE'S EXHIBITS | | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1 | Body-Worn Camera Clip [Tindall] | 29 | | 1 |
| 1A | Transcript [Body-Worn Camera, Exhibit 1] | 39 | | 1 |
| 1B | Transcript [Body-Worn Camera, Exhibit 1] | 39 | | 1 |
| 1C | Transcript [Body-Worn Camera, Exhibit 1] | 80 | | 1 |
| 2 | Thumb Drive | 61 | | 1 |
| 3 | Body-Worn Camera Footage | 119 | | 1 |
| 3A | Transcript [Body-Worn Camera, Exhibit 3] | 119 | | 1 |

SFDA 004222

## I N D E X

## E X H I B I T S

| PEOPLE'S EXHIBITS | | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 4 | Body-Worn Camera Footage | 122 | | 1 |
| 4A | Transcript [Body Worn Camera, Exhibit 4] | 122 | | 1 |

---oOo---

SFDA 004223

1    **Tuesday - July 20, 2021**                          **9:10 a.m.**

2                    P R O C E E D I N G S

3                         ---o0o---

4        **MR. BRINGARDNER:**  So we're on the record, and I'm going

5    to ask the foreperson to administer the oath to the court

6    reporter.  It's the last oath on the last page of the handbook.

7        **THE GRAND JURY FOREPERSON:**  Okay.

8            (Whereupon, the court reporter was sworn.)

9        **MR. BRINGARDNER:**  I'm going to ask the secretary to take

10   a formal roll call at this time.

11           (Whereupon, roll call was taken.)

12       **MR. BRINGARDNER:**  And, Madam Secretary, can you tell us

13   how many grand jurors are present.

14       **THE GRAND JURY SECRETARY:**  Seventeen.

15       **MR. BRINGARDNER:**  Thank you.

16       Ladies and Gentlemen, I'm Brian Bringardner, Assistant

17   District Attorney.  And here today with us is Dana Drusinsky,

18   who is going to present this case to you and Stephanie Lacambra,

19   who will also be presenting this case to you for investigation.

20   Our court reporter, Julie, is here as well; and you've already

21   been introduced -- or had a chance to meet each other.

22       You've all been given notebooks, and you've been given an

23   agenda for this case.  Please do not take those items out of

24   this room.  At the end of each day, please leave your notebooks,

25   question forms, agenda, any other paperwork related to this case

26   on your chair, and it will be there for you the following day.

27   At the end of the case, it will be destroyed.

28       We expect you will hear evidence today, tomorrow,

                                                            4

SFDA 004224

1    Thursday, and Friday, and then the last day of evidence for this

2    case will be Tuesday of next week, which I believe is the 27th

3    of July.

4         So, folks, there are two functions of a criminal grand

5    jury in California.  One is to consider evidence and decide

6    whether a person should be charged with a crime; the other is to

7    conduct an investigation.  For this case, we have chosen to use

8    the grand jury to conduct an investigation.  You will not be

9    asked so decide whether anyone should be charged with a crime

10   because we will not yet have all the evidence needed to make a

11   decision for this case.  Do not speculate why this case has been

12   brought to the grand jury.  It is not relevant to your

13   investigation.

14        At this point, I'm going to ask the foreperson to read

15   the agenda aloud while the grand jurors follow along with their

16   copies of the agenda.

17        **THE GRAND JURY FOREPERSON:**  Okay.  Subject of the

18   investigation, Kenneth Cha.  The nature of the allegation,

19   violations of Penal Code Section(s) 187, first- or second-degree

20   murder with malice aforethought; number 192, voluntary

21   manslaughter; and 245(b), assault with a deadly weapon or force

22   like to produce great bodily injury.

23        It is alleged that on January 6, 2017, Kenneth Cha shot

24   Sean Wendell Moore on the front stairwell of Moore's home that

25   ultimately resulted in Moore's homicide three years later from

26   the gunshot wounds to his stomach.

27        Witnesses -- we have seven witnesses:  Colin Patino,

28   No. 1310, partner of the target Officer Kenneth Cha and witness

5

SFDA 004225

1  to the shooting; number two, Sergeant Richard Bodisco, No. 883,

2  witness to the aftermath of the shooting; number three, Eric

3  Tindall, No. 2030, witness to the aftermath of the shooting;

4  number four, San Francisco Police Department custodian of

5  records; number five, Wallace Kresley, No. 1826, partner of

6  Wasserman and officer with prior conduct with Moore that did not

7  result in violence; number six, Sergeant Eric A. Anderson,

8  No. 4232, Officer Supervisor on the scene; and number seven,

9  David Wasserman, No. 4360, officer with prior conduct with Moore

10 that did not result in violence.

11      Presentation:  Stephanie Lacambra, Assistant District

12 Attorney; Dana Drusinsky, Assistant District Attorney; and Brian

13 Bringardner, Assistant District Attorney.

14      **MR. BRINGARDNER:**  Thank you.

15      Would you please read the Admonition No. 1, and inquire

16 if any jurors need to be asked to be excused by the foreperson.

17      **THE GRAND JURY FOREPERSON:**  The grand jury is about to

18 consider the charges that were just read to you in the agenda.

19 I direct any member of the grand jury who has a state of mind in

20 reference to the case or in reference to either party -- any of

21 the parties -- which will prevent him or her from acting

22 impartially and without prejudice to the substantial rights of

23 either party to retire.

24      **MR. BRINGARDNER:**  Is there any response from any grand

25 jurors to that?  Thank you.

26      Folks, during this hearing, do not talk about the case or

27 about any of the people or the subjects involved in the case

28 with anyone.  Grand jury hearings are secret.  You all took an

SFDA 004226

1   oath to keep this hearing secret, and it is a violation of law

2   to reveal to anyone the names of the targets or the witness,

3   what cases are being considered, the evidence you heard, the

4   questions that were asked, or what you thought about the case.

5        The secrecy oath is for life.  You may not talk about

6   this investigation even when it is over.  You may not talk about

7   who testified in this investigation or what they said, even if

8   the case becomes public knowledge.

9        Keep an open mind throughout this hearing.  Do not let

10  bias, sympathy, prejudice, or public opinion influence your

11  investigation.

12       You may not use any form of research or communication,

13  including a mobile phone or the Internet to research, share,

14  communicate, or allow someone else to communicate with you

15  regarding this case or any subject relating to this

16  investigation.  Once again, do not look up anything on the

17  Internet relating to this case.

18       And during this and all hearings, please keep your phones

19  turned off.  You are welcome to use your phones during any of

20  the breaks when we are off the record.  But during the hearings,

21  you should not be looking at your phones.

22       The fact that the District Attorney is investigating an

23  incident is not evidence that anyone committed any crime.  You

24  must not be biased against anyone --

25       Hi, sir.  Are you hear for grand jury service?

26       **GRAND JUROR:**  Yes.

27       **MR. BRINGARDNER:**  We have already started.  Come on in

28  and take a seat, okay.  So the for the record, a grand juror who

7

SFDA 004227

1  was initially marked absent just walked in.

2      Is he on your attendance sheet?

3      Could you please step outside, please, and I'll come and

4  talk to you in just a moment.  Thank you very much.

5      For the record, that person has left the room, and we're

6  back with just the initial 17 jurors and the parties who I

7  already addressed.

8      Do not speculate on the reasons why this case is being

9  presented to a grand jury.  You will be given the opportunity to

10  ask questions of the witnesses.  This is done by you writing the

11  question on a form.  Questions will be reviewed by the

12  prosecutor and will be asked of the witness, if appropriate.  If

13  your question is not asked, please do not feel slighted or

14  disappointed.

15      Your question may not be asked for a variety of reasons.

16  For example, the question may call for an answer that is not

17  legally permitted to be used as evidence.  If your question is

18  not asked, please do not speculate as to the reason why it was

19  not asked or guess as to what the answer might have been.

20  However, it is our experience that grand juror questions are

21  generally very good at clarifying important issues.  So please

22  not hesitate to write out a question if you have one.

23      The opening statement you are about to hear is not

24  evidence, but is intended to help you listen to the testimony

25  and formulate relevant questions for the witness in this

26  investigation.

27      And Ms. Lacambra and Ms. Drusinsky would like to give an

28  opening statement.

SFDA 004228

1    **MS. LACAMBRA:**  We would.

2    **GRAND JUROR:**  I had a question on the agenda, if I may

3    ask it.

4    **MR. BRINGARDNER:**  Yes, please.

5    **GRAND JUROR:**  It's confusing because it says -- I don't

6    know if there's a separate incident -- "Resulted in Moore's

7    homicide three years later from gunshot wounds to his stomach."

8    Does that indicate there was another shooting three years

9    later, or are you trying to say it resulted in his death from

10   the original shooting?

11   **MR. BRINGARDNER:**  The latter, sir.

12   **GRAND JUROR:**  The latter, okay.  That is confusing the

13   way it's worded.  Now I understand.

14   **MS. LACAMBRA:**  Thank you so much, all of you, for being

15   here.  My name is Stephanie Lacambra.  I'm one of the Assistant

16   District Attorney's presenting this case to you.  And we are

17   here to investigate -- can we dim the lights.

18   Is that all right?

19   So we are here investigating the homicide of Sean Wendell

20   Moore.  Mr. Moore died on January 20, 2020, as a result of

21   internal injuries caused by a gunshot wound to his stomach that

22   happened on January 6, 2017.  The Coroner's Office ruled

23   Mr. Moore's death a homicide on June 1 of 2020.

24   On January 6, 2017, at approximately 3:51 in the morning,

25   Christopher Choy, Mr. Moore's nextdoor neighbor, called the

26   non-emergency line to report a noise complaint.  San Francisco

27   Police Department Officers Kenneth Cha and Colin Patino

28   responded to Mr. Moore's home located a 515 Capitol Avenue in

9

SFDA 004229

1  San Francisco, California, to investigate the report by Mr. Choy

2  that his neighbor Sean Moore had violated a no-harassment order

3  by banging on their shared wall.

4      This incident is being investigated by our office

5  because, during the investigation, Officer Cha pepper sprayed

6  and shot Sean Moore at least two times, once in the stomach and

7  once in the leg, ultimately resulting in his death three years

8  later from internal injuries.

9      The incident began when Officer Cha and Patino arrived at

10  the neighboring residence's of Mr. Choy and Mr. Moore at

11  approximately 4:20 in the morning on January 6, 2017.  Officers

12  Cha and Patino initially split up at the scene, with Officer

13  Patino going to 521 Capitol Avenue to speak with Mr. Choy about

14  the noise complaint, and Officer Cha going to 515 Capitol Avenue

15  to speak with Mr. Moore.

16      Now, Mr. Choy confirmed his identity and gave Officer

17  Patino a copy of the temporary, no harassment order but did not

18  get a chance to speak further about the incident because Officer

19  Patino decided to go next door to join his partner Officer Cha

20  in confronting Mr. Moore.  Mr. Choy did not request Officer

21  Patino to conduct a citizen's arrest of Mr. Moore.

22      Now, the Moore residence is located on the second floor

23  at the top of a narrow wall concrete stairway.  The front door

24  was located behind a gated security door, and you are about to

25  see what was captured on the body-worn camera footage of both

26  officers as they confronted Mr. Moore.

27      There will be some violence, and so just be prepared to

28  witness that from the videos.  We are displaying the two

10

SFDA 004230

1    body-worn camera footage from both Officer Cha on the right-hand

2    side, and then later the (synched) footage of Officer Patino on

3    the left-hand side.

4           And it will take a few moments for the sound to kick in.

5           And, Madam Court Reporter, you are not obligated to

6    report any of this.  We have a transcript of this.

7                  (Whereupon, video played, unreported.)

8           **MS. LACAMBRA:**  So we're investigating three possible

9    charges in connection with this case.  The first is murder, a

10   violation of Penal Code Section 187; the second a manslaughter,

11   a violation of Penal Code Section 192; and the third is assault

12   with a deadly weapon, a violation of Penal Code Section 245(b).

13          Now, there are jury instructions that will explain what

14   the law requires for someone to be found guilty of these types

15   of crimes.  We're going to go over these CALCRIM jury

16   instructions so they can help inform the questions that I ask of

17   the witnesses.

18          CALCRIM 520 covers the crime of murder, a violation of

19   Penal Code Section 187.  To prove that a defendant is guilty of

20   murder, the People must prove that the defendant committed the

21   act that caused the death of another person; when the defendant

22   acted, he had a state of mind called malice aforethought; and he

23   killed without lawful excuse or justification.

24          Now, an act causes death if the death is the direct,

25   natural, and probable consequence of the act; and the death

26   would not have happened without the act.  A natural and probable

27   consequence is one that a reasonable person would know is likely

28   to happen if nothing unusual intervenes.

SFDA 004231

1    In deciding whether a consequence is natural and
2    probable, you're supposed to consider all of the circumstances
3    established by the evidence.

4    There may be more than one cause of death. An act causes
5    death only if it was a substantial factor in causing the death.
6    A substantial factor is more than a trivial or remote factor;
7    however, it does not need to be the only factor that causes the
8    death.

9    There are two kinds of malice aforethought: Express
10   malice and implied malice. Proof of either is sufficient to
11   establish the state of mind required for murder. Malice
12   aforethought does not require hatred or ill will toward the
13   victim. It is a mental state that must be formed before the act
14   that causes death was committed. It does not require
15   deliberation or the passage of any particular amount of time.

16   The defendant had express malice if he unlawfully
17   intended to kill. The defendant had implied malice if he
18   intentionally committed the act; the natural and probable
19   consequences of the act were dangerous to human life; and at the
20   time he acted, he knew his act was dangerous to human life; and
21   he deliberately acted with a conscious disregard for human life.

22   CALCRIM 571 governors voluntary manslaughter and
23   imperfect self-defense. So a killing that would otherwise be
24   murder is reduced to voluntary manslaughter if the defendant
25   killed a person because he acted in imperfect self-defense. If
26   you conclude the defendant acted in complete self-defense, his
27   action was lawful, and you must find him not guilty of any
28   crime. The difference between complete self-defense and

12

SFDA 004232

1    imperfect self-defense depends on whether the defendant's belief
2    in the need to use deadly force was reasonable.

3         So the defendant acted in perfect self-defense if the
4    defendant actually believed that he or Colin Patino were in
5    imminent danger of being killed or suffering great bodily
6    injury, and the defendant actually believed that the immediate
7    use of deadly force was necessary to defend against the danger,
8    but at least one of those beliefs was unreasonable.

9         For imminent danger, belief in future harm is not
10   sufficient no matter how great or how likely the harm is
11   believed to be.  In evaluating the defendant's beliefs, you are
12   to consider all the circumstances as they were known and
13   appeared to the defendant.

14        A danger is imminent if, when the fatal wound occurred,
15   the danger actually existed or the defendant believed it
16   existed.  The danger must seem immediate and present so that it
17   must be instantly dealt with.  It may not be merely prospective
18   or in the near future.

19        Great bodily injury means significant or substantial
20   physical injury.  It is an injury that is greater than minor or
21   moderate harm.

22        Imperfect self-defense does not apply when the defendant,
23   through his own wrongful conduct, created circumstances that
24   justified his adversary's use of force.

25        CALCRIM 505 governs self-defense.  The defendant is not
26   guilty of murder or manslaughter if he is justified in killing
27   someone in defense or defense of another.  The defendant acted
28   in lawful self-defense or defense of another if the defendant

                                                          13

SFDA 004233

1    reasonably believed that he or Colin Patino were in imminent

2    danger of being killed or suffering great bodily injury; the

3    defendant reasonably believed that the immediate use of deadly

4    force was necessary to defend against that danger; and the

5    defendant used no more than force than was reasonably necessary

6    to defend against that danger.

7         CALCRIM 875 governs assaults with a deadly weapon or

8    force likely to produce bodily injury, Penal Code Section

9    245(b).  To prove that the defendant is guilty of this crime,

10   the People must prove that defendant did an act with a firearm

11   that by its nature would directly and probably result in the

12   application of force to a person; the defendant did not act

13   willfully; when the defendant acted, he was aware of facts that

14   would lead a reasonable person to realize that his act by its

15   nature would directly and probably result in the application of

16   force to someone; when defendant acted, he had the present

17   ability to apply force with a firearm to a person; and the

18   defendant did not act in self-defense or in defense of someone

19   else.

20        So you have the agenda with all of witnesses we intend to

21   call in connection with this case.  And the first witness we

22   intend to call is Colin Patino, Officer Cha's partner.

23        **MR. BRINGARDNER:**  Thank you, Ms. Lacambra.

24        Are you ready to call evidence at this time?

25        **MS. DRUSINSKY:**  Let me turn on the lights.

26        **MR. BRINGARDNER:**  Thank you.

27        **THE GRAND JURY SECRETARY:**  I have a question.

28        **MR. BRINGARDNER:**  Yes.  We're still on the record.  Go

SFDA 004234

1    ahead.

2        **THE GRAND JURY SECRETARY:**  It says I'm supposed to record

3    the names of the witnesses.

4        Where do I record this in my notebook.

5        **MR. BRINGARDNER:**  On the attendance sheet -- I'm sorry.

6    Can you repeat the question.

7        You're supposed to what?

8        **THE GRAND JURY SECRETARY:**  It says I'm supposed to record

9    the names of witness examined.  I just want to know where I

10   should record those.

11       **MR. BRINGARDNER:**  One moment.

12       You can go ahead.

13       **MS. DRUSINSKY:**  Take a seat right there.  Keep your mask

14   on.  She's going to give you a clear one.

15       Do you want to give him the clear mask, please.

16       **THE GRAND JURY FOREPERSON:**  Could you wear this one

17   instead.  This goes underneath your chin -- there you go.

18                          <u>COLIN PATINO</u>,

19   called as a witness for the People, having been duly sworn,

20   testified as follows:

21       **THE WITNESS:**  Yes.

22       **THE GRAND JURY SECRETARY:**  Then, sir, please be seated,

23   and then please state your name and spell it, for the record.

24       **THE WITNESS:**  My name is Colin Patino; C-O-L-I-N,

25   P-A-T-I-N-O.

26       **MR. BRINGARDNER:**  Thank you, sir.  I'm Brian Bringardner,

27   Assistant District Attorney.  I just wanted to let you know who

28   is in the courtroom before we start.

SFDA 004235

1    **THE WITNESS:**  Yes.

2    **MR. BRINGARDNER:**  This is Stephanie Lacambra, Assistant

3    ADA; this is Dana Drusinsky, Assistant DA.  The only other

4    people in this courtroom are the grand jurors, including the

5    grand jury foreperson, who's on the bench, and the secretary of

6    the grand jury who is here -- hold on, could you step outside,

7    please.  Also in the courtroom is the court reporter.  Those are

8    the only people present here at this time.

9          I do want the record to reflect the witness is wearing a

10   clear face mask so you can see his mouth while he's testifying.

11   **MS. DRUSINSKY:**  Yes.

12                          **DIRECT EXAMINATION**

13   BY MS. DRUSINSKY:

14   **Q.**  Good morning, Officer.

15   **A.**  Good morning.

16   **Q.**  Officer, do you recall the events that occurred on January

17   6, 2017, at 5-1-5 Capitol Street?

18   **A.**  On advise of counsel, I assert my Fifth Amendment privilege

19   against self-incrimination not to answer.

20   **Q.**  Is it your intention to invoke the Fifth Amendment for all

21   questions regarding the events that took place on January 6,

22   2017, at 5-1-5 Capitol Street?

23   **A.**  Yes, ma'am.

24   **Q.**  Okay.  Great.

25   **MS. DRUSINSKY:**  So you can come on down.  So the witness

26   is excused for now.

27   **MR. BRINGARDNER:**  Yeah.  So excuse, me -- just we made

28   prior arrangements, because this was anticipated.  And so we are

SFDA 004236

1  going to ask that at 1:30 this afternoon, you report to Judge

2  Bank's courtroom, which is 206.  You can bring your attorney

3  with you.  I will be there as well as the other two attorneys.

4  The Grand Jurors will not be there.  So for the moment you are,

5  excused, but we would ask that at 1:30, you report to Judge

6  Banks.

7          THE WITNESS:  Yes, sir.  I will be there.

8          MR. BRINGARDNER:  Thank you very much.

9          MS. LACAMBRA:  Thank you so much.

10                  (Witness excused.)

11          MS. DRUSINSKY:  All right.  You can go sit at the witness

12  stand.

13          THE GRAND JURY FOREPERSON:  I need you to be sworn.

14          This one goes under your chin.

15  THE WITNESS:  Like this?

16          THE GRAND JURY FOREPERSON:  There you go.

17          THE WITNESS:  Like this.  All right.

18          THE GRAND JURY FOREPERSON:  Okay.

19                  ERIC M. TINDALL,

20  called as a witness for the People, having been duly sworn,

21  testified as follows:

22          THE WITNESS:  Yes.

23          THE GRAND JURY FOREPERSON:  Please be seated, and please

24  state your name and spell it, for the record.

25          THE WITNESS:  It's Eric M. Tindall; E-R-I-C, M, Tindall,

26  T-I-N-D-A-L-L.

27          MR. BRINGARDNER:  And, Mr. Tindall, I'm Brian

28  Bringardner.  I work in the District Attorney's Office.  Also in

17

SFDA 004237

1  the courtroom today is Stephanie Lacambra, Assistant DA and

2  Assistant DA Dana Drusinsky.  In front of you is our court

3  reporter.  The remainder of the people in this courtroom,

4  including the folks in the gallery are our grand jurors.  Our

5  foreperson is seated at the bench in front of you and the

6  secretary is seated at this table.

7      I do want the record to reflect, this witness is wearing

8  a clear mask so all the jurors are able to see the witness' face

9  and mouth while he testifies.

10     Also, for the record, I am leaving the room, and

11 Ms. Lacambra and Ms. Drusinsky will continue guiding you through

12 this investigation.  Thank you very much.  I will see you again,

13 but probably not today.

14     **MS. DRUSINSKY:**  Thanks, Brian.

15              **DIRECT EXAMINATION** (resumed)

16 BY MS. DRUSINSKY:

17 **Q.**  Okay.  Good morning, Officer.

18 **A.**  Good morning.

19 **Q.**  How are you doing today?

20 **A.**  Good.

21     How are you doing?

22 **Q.**  I'm doing good.  Thanks.

23     So I'd like to start off by going through what you reviewed

24 before testifying today.

25     What did you review in preparation for this hearing?

26 **A.**  A supplemental that I wrote as well as my body-worn camera

27 video.

28 **Q.**  Okay.  How many times do you think you've seen the body-worn

SFDA 004238

1    camera at this point -- and just to specify, that's you're

2    body-worn camera that you wore on that day?

3    A.   Correct.

4    Q.   And the day in question is January 6, 2017?

5    A.   Yes.

6    Q.   And how many times do you think you've seen your body-worn

7    camera?

8    A.   Maybe two or three times.

9    Q.   Okay.  Have you discussed this grand jury proceeding with

10   anyone?

11   A.   Just a lawyer.

12   Q.   Have you heard of any reference of this grand jury from

13   anyone?

14   A.   No.

15   Q.   Okay.  And you stated that you wrote a supplemental report

16   in this case; right?

17   A.   Correct.

18   Q.   Did you document this incident in writing in any other way?

19   A.   No.

20   Q.   Okay.  So to give jurors some context, can you tell us what

21   your current job is.

22   A.   I'm employed by the City and County of San Francisco as a

23   police officer.

24   Q.   What was your job on January 6, 2017?

25   A.   Regular patrol.

26   Q.   So you were a police officer at that time?

27   A.   Correct.

28   Q.   And that's for the City and County of San Francisco?

SFDA 004239

1   **A.** That is correct.

2   **Q.** How long had you been a police officer as of January 6,

3   2017?

4   **A.** I think 11 years at that point.

5   **Q.** Okay. How long have you had the assignment of patrol?

6   **A.** Fifteen years.

7   **Q.** Wait. So say that again. So how long have you -- oh, as of

8   now you've had the assignment of patrol for 15 years?

9   **A.** Fifteen years as of today.

10  **Q.** So how long had you had the assignment as of January 6,

11  2017?

12  **A.** Eleven years --

13  **Q.** Yeah. Okay.

14  **A.** -- or so.

15  **Q.** When did you graduate from the academy?

16  **A.** Sometime in 2007.

17  **Q.** And who was your field training officer, do you remember?

18  **A.** Yeah. There was three of them. First one was Glen Sherry,

19  second one was Officer Simmons, and the third one was Cesar

20  Perez.

21  **Q.** Does court reporter need him to spell any of those?

22       **THE COURT REPORTER:** The first one.

23  **BY MS. DRUSINSKY:**

24  **Q.** That was, I think, Glen Sherry.

25  **A.** Glen Sherry; G-L-E-N, S-H-E-R-R-Y.

26  **Q.** Okay. Have you ever meet Sean Wendell Moore prior to

27  January 6, 2017?

28  **A.** Yes.

SFDA 004240

1    Q.   When?

2    A.   It was a few years prior.

3    Q.   Do you recall where?

4    A.   At his residence.

5    Q.   Do you remember how you came to meet him?

6    A.   Yes.  It was a call for service.

7    Q.   What kind of call?  Do you remember?

8    A.   Um, it was a call where somebody called the police because,

9    as he walked by the residence, a person sitting on the porch of

10   the residence started yelling profanities at him, I believe

11   racial slurs, and was aggressive towards him.

12   Q.   So did you appear that day to investigate the incident?

13   A.   Yes, I did.

14   Q.   Okay.  What did you do to investigate the incident?

15   A.   I went to the address with my partner at that time.

16   Q.   Do you remember who your partner was?

17   A.   Yes, it was Alan Mulliken.

18   Q.   Can you spell that for the court reporter.

19   A.   A-L-A-N, M-U-L-L-I-K-E-N.

20   Q.   Okay.  So continue.

21        What did you do to investigate the incident?

22   A.   We rang the doorbell or knocked on the door -- I don't

23   remember which one -- and a gentleman answered the door.  And --

24   Q.   Do you recall who that gentleman was?

25   A.   It was -- later I found out his name was Sean Moore.

26   Q.   Okay.  And what happened when he answered the door?

27   A.   He was cussing and belligerent.

28   Q.   And this, you said, was a few years before 2017?

21

SFDA 004241

1   **A.**   Yes.

2   **Q.**   Okay.  Do you remember, like, what time of day this was?

3   Was it at night?  Was it during the day?

4   **A.**   It was probably around 6:00 p.m.

5   **Q.**   Okay.  So how did you deal with the situation?

6   **A.**   Um, seeing that he was aggressive and he didn't seem right,

7   I just told him:  Just leave people alone if they're walking

8   down the street.  Just leave people alone and don't yell names

9   at them, and -- you know.  Then we left.

10  **Q.**   And then you left?

11  **A.**   Yes.

12  **Q.**   You said the sentence that he didn't seem right.  Can you

13  tell us a little bit more about what you mean by that.

14  **A.**   When he answered the door -- you know, lots of times when we

15  go to people's addresses or we bang on the door and we talk to

16  someone, you know, they kind of question why we are there,

17  what's going on.  They want to know why police are at their

18  door.  And you are able to communicate with them and have

19  conversation back and forth.

20       With him, he just -- as soon as he opened the door, he just

21  started screaming and yelling and getting really aggressive.  He

22  was still behind a gate, I believe, so we were between him and

23  the gate.  And that's not normal behavior when we encounter

24  people.

25  **Q.**   Can I just clarify.

26       So he was behind the gate --

27  **A.**   Yes.

28  **Q.**   -- and you were on top of the stairway on the other side of

22

SFDA 004242

1  the gate?

2  **A.**  Yeah.  So we were on the stoop.  There was a gate, and

3  behind the gate he was there.

4  **Q.**  Okay.  And I think what you're getting at, you're kind of

5  saying he wasn't exhibiting normal behavior.

6      Did you come to suspect that he might suffer from some sort

7  of mental illness?

8  **A.**  At the time -- at the time, no.

9  **Q.**  Okay.

10 **A.**  We didn't know what his issue was.

11 **Q.**  Okay.  Now, how long do you think that whole interaction

12 lasted?

13 **A.**  About 20 to 30 seconds.

14 **Q.**  Can you tell us, like, how did your training and experience

15 inform how you dealt with Mr. Moore?

16 **A.**  At that time?

17 **Q.**  Yeah.  I know it was a long time ago.  To the best of your

18 knowledge.

19 **A.**  I don't think -- I don't really remember what our training

20 was at that time.

21 **Q.**  Okay.  So as soon as you told him to kind of leave people

22 alone, you felt like the scene was safe enough for you to leave?

23 **A.**  Yeah.  We didn't have a witness who was willing to come and

24 meet us.  They were gone, and there was nothing more to do.

25 **Q.**  Okay.  Any other time that you met Sean Wendell Moore?

26 **A.**  Prior to the --

27 **Q.**  Prior to January 6, 2017.

28 **A.**  That's the only time.

SFDA 004243

1    Q.  Okay.  And when you arrived to the incident on January 6,

2    2017, did you recall that you had met Sean Moore in the past?

3    A.  I didn't know it was his address.

4    Q.  Okay.  Now, I want to turn to Officers Cha and Patino.

5    A.  Uh-huh.

6    Q.  Have you worked with Officer Cha in the past?

7    A.  As a partner?

8    Q.  Ah --

9    A.  Or...

10   Q.  -- just in the scene, have you ever worked together?

11   A.  I've arrived on scenes, and he's been there.

12   Q.  Okay.  So never as a partner?

13   A.  Not that I can recall, no.

14   Q.  Have you worked with Officer Patino in the past?

15   A.  When I arrived on scenes, he's been there.

16   Q.  And never as a partner?

17   A.  Never as a partner that I can recall.

18   Q.  Would you consider yourself close with either of them?

19   A.  We're close as far as a work relationship goes, but I don't

20   go hang out at his house or anything like that.

21   Q.  And which officer are you referring to?

22   A.  Both of the them.

23   Q.  Both of them.

24   A.  We have a work relationship, but I don't hang out with him

25   after work or go to his birthday parties or anything.

26   Q.  Okay.  Okay.

27       So did you respond to 515 Capitol Street on January 6, 2017?

28   A.  Yes.

24

SFDA 004244

1  **Q.**  Okay.  Now, did you respond to the scene as soon as you

2  heard shots were fired by Officer Cha, or did you respond

3  earlier in time?

4  **A.**  After we heard shots were fired.

5  **Q.**  Did you drive over with your siren on?  Do you remember?

6  **A.**  I wasn't driving.

7  **Q.**  Do you recall if the police vehicle you were in had its

8  siren on?

9  **A.**  I don't recall.

10  **Q.**  Okay.  And what other officers were in the police vehicle

11  with you?

12  **A.**  Officer Simon Wong and Officer John Lee.

13  **Q.**  And do you recall which one of them was driving?

14  **A.**  I don't recall at this time.

15  **Q.**  Okay.  Do you recall if you were in the backseat?

16  **A.**  I was in the back.

17  **Q.**  Okay.  And you don't recall which one was in the passenger's

18  seat, I assume?

19  **A.**  I don't recall.

20  **Q.**  Okay.  Do you recall how long it took for you to arrive once

21  dispatch stated that shots were fired, approximately?

22  **A.**  Maybe two to three minutes -- four minutes.

23  **Q.**  Can you describe the scene to us when you arrived.

24  **A.**  Ah, from what I recall, there were already marked units

25  on-scene.  They were close to the house, and we parked maybe a

26  block away, and I stayed at that position for traffic control.

27  **Q.**  Is that -- so did you help maintain a perimeter with

28  Officers Wong and Lee?

SFDA 004245

1  **A.**  I was by myself.  Officer Wong and Officer Lee left to do

2  whatever they were doing, and I maintained the perimeter, I

3  believe, at the request of Sergeant Mannix.

4  **Q.**  Can you tell us what it means to maintain a perimeter?

5  **A.**  You kind of guard an area to make sure people don't

6  interfere or enter the perimeter, assist with traffic should a

7  fire engine need to come in or an ambulance arrive to guide them

8  in.

9  **Q.**  Do you recall approximately how long you did that for?

10 **A.**  Maybe half an hour.

11 **Q.**  At around 4:30 a.m., Sergeant Mannix requested that you

12 transport Officer Cha back to Taraval Station.

13     Do you recall that?

14 **A.**  I do.

15 **Q.**  Do you recall making contact with Officer Cha at Minerva and

16 Capitol?

17 **A.**  Yes.

18 **Q.**  Do you recall if Officer Cha was near an ambulance at this

19 point?

20 **A.**  I don't recall.

21 **Q.**  Do you recall what Officer Cha's demeanor was like when you

22 first saw him?

23 **A.**  Frightened.

24 **Q.**  Say that again.

25 **A.**  Frightened.

26 **Q.**  Okay.  Frightened.

27     Was he standing up?

28 **A.**  Yes.

26

SFDA 004246

1   Q.   Was he able to walk?

2   A.   He was kind of hobbling.

3   Q.   You transported him back to the station in a police vehicle?

4   A.   Correct.

5   Q.   And at Taraval Station, you took photos of his injury?

6   A.   Correct.

7   Q.   Had one of the sergeants directed you to do that, or did you

8   decide that was the correct next step to take?

9   A.   I believe a sergeant requested I take photographs.

10  Q.   If you recall -- well, can you describe the injuries you

11  recall observing on Officer Cha at the station.

12  A.   There was blood all over his clothes and face.  I just

13  remember kind of like streams of blood on his face and various

14  parts of his clothing.  You could see it.

15  Q.   At some point, did you ask him if it was his blood or

16  someone else's blood?

17  A.   No.

18  Q.   Okay.  Did he ask you to call for an ambulance?

19  A.   No.

20  Q.   Okay.  What made you decide to call for an ambulance?

21  A.   Somebody directed me to call an ambulance.  Either it was a

22  sergeant -- it was probably a sergeant.

23  Q.   Okay.  Do you recall anything else of significance occurring

24  that was related to the incident that day?

25  A.   Not that I can think of at this time.

26  Q.   Okay.  So going back to when you were in the car, the patrol

27  vehicle with Officers Wong and Lee, do you recall listening to

28  dispatch about the events that led up to the shooting?

27

SFDA 004247

1    A.   Yes.

2    Q.   What is the first thing you recall hearing?

3    A.   Oh, I don't remember what they were saying; I just remember

4    hearing it and then just kind of picturing it in my head.  But

5    nothing specific that I can absolutely recall hearing.

6    Q.   When you say picturing it in your head, are you saying,

7    like, you were picturing what was probably happening based on

8    what you were hearing?  Or what do you mean by that?

9    A.   Yeah.  Like, you kind of -- like, if you hear a radio, you

10   know, story or something, and you're kind of listening to it

11   kind of picturing what's going on.

12   Q.   Yeah.

13   A.   Okay.  Like, listening to the Lone Ranger back in the day.

14   Q.   Yeah.

15   A.   You're listening to something, and you're picturing, oh,

16   that's must be what's going on.

17   Q.   When you first heard what was happening on the radio for

18   this incident --

19   A.   Right.

20   Q.   -- and you learned that Officers Cha and Patino were

21   involved, were you surprised that this incident escalated?

22   A.   Yeah.

23   Q.   Were you surprised this confrontation happened at all?

24   A.   Yeah.

25   Q.   On the body-worn camera that you reviewed --

26   A.   Uh-huh.

27   Q.   -- so it was your body-worn camera -- you and another

28   officer are captured saying, "I knew it.  Fucking A, dude.

28

SFDA 004248

1    We're sitting here listening to it.  Those two guys are always

2    fucking too hot for their shit.  Goddamn it."

3         Do you recall saying that?

4    A.  Yes.

5    Q.  Why did you say that?

6    A.  I think it was kind of the excitement at the moment, like an

7    OIS, officer-involved shooting.  Um, there is no real reason to

8    say it.  I think it's kind of, you just realize something

9    happened, and you're just kind of reacting to it.

10   Q.  Okay.  Would recognize your voice if you heard it on the

11   body-worn camera?

12   A.  Sure.

13   Q.  And you stated you were wearing a body-worn camera when you

14   responded to the call at 515 Capitol Street on January 6, 2017?

15   A.  Yes.

16   Q.  Okay.  And did you turn the camera on shortly before

17   arriving at 515 Capitol Street?

18   A.  I turned it on as soon as we started rolling.

19   Q.  Okay.  So I'm going to pass out the transcript for this

20   clip.

21        And, Court Reporter, you do not need to transcribe the audio

22   portion of this.

23        MS. LACAMBRA:  And for the record, this is going to be

24   Exhibit 1.

25                         (Grand Jury Exhibit 1 was marked for

26                          identification.)

27        MS. DRUSINSKY:  And I'm going to give you a copy of the

28   transcript.  And there's two of you.  There you go.  Thank you

SFDA 004249

1    so much.

2            You can play it.

3                (Whereupon video played, unreported.)

4    BY MS. DRUSINSKY:

5    Q.  Does that appear to be the footage from the body-worn camera

6    you were wearing when responding to the scene at 515 Capitol

7    Street on January 6, 2017?

8    A.  Yes, it is.

9    Q.  And does this video fairly and accurately depict the scene

10   in the police vehicle as you observed it that day?

11   A.  Yes.

12   Q.  So you agree you and another officer made the comment,

13   "Unbelievable.  I knew it.  Fucking A, dude.  We're sitting here

14   listening to it.  Those two guys are always too hot for their

15   shit.  Yeah.  Goddamn it."

16           Do you agree you and another officer made those comments?

17   A.  Yes.

18   Q.  Do you remember who the other officer is who made that

19   comment?

20   A.  Well, it had to be either Simon Wong or Officer John Lee.

21   Q.  Does the video refresh your recollection at all as to who it

22   was?

23   A.  Maybe if I heard it again.

24   Q.  We can play it again, sure.

25   A.  All right.

26       MS. DRUSINSKY:  Madam Court Reporter, you do not need to

27   transcribe it.

28            (Whereupon, video played, unreported.)

SFDA 004250

1  BY MS. DRUSINSKY:

2  **Q.** Does that refresh your recollection about who the other

3  officer was who made the comment?

4  **A.** You know, I'm not sure which officer it was.

5  **Q.** Now, specifically you said, "Unbelievable. I knew it.

6  Fucking-A, dude. We're sitting here listening to it." And it

7  was the other officers who started saying, "Those two guys are

8  always fucking," and then you finished his sentence and said,

9  "Too hot for their shit."

10      Is that correct?

11  **A.** Yes.

12  **Q.** To clarify, when you said "those two guys," were you

13  referring to Officers Cha and Patino?

14  **A.** Yes.

15  **Q.** And you made the comment, "Those two guys are always too hot

16  for their shit," in response to the events you heard transpiring

17  on the radio the this incident; is that correct?

18  **A.** I think that was just said because of what had just

19  transpired.

20  **Q.** Right. I guess I'm just clarifying, you weren't at the

21  incident yet; right?

22  **A.** Yes.

23  **Q.** So as you know about what was happening was what you heard

24  over the radio; right?

25  **A.** Correct.

26  **Q.** So what you heard over the radio led you to make the

27  comment, "Those two guys are always too hot for their shit"; is

28  that right?

31

SFDA 004251

1    **A.**    I think that was just said because there was just a

2    situation, and now we were going to have to deal with something

3    that was serious.    And I think when you hear something over

4    that, and you know the people involved, and you realize it's

5    serious, you just kind of react and may say things that are not

6    necessarily true to them personally.

7    **Q.**    Okay.

8    **A.**    I think that's what I'm getting to.

9    **Q.**    I understand.

10        Is it fair to say you're a little uncomfortable answering

11    these questions right now about the comment you made about them?

12    **A.**    No, absolutely not.

13    **Q.**    Okay.    So I just want the record to be clear then, when you

14    made that comment it was about what you had heard on the radio?

15    I just need that -- for the record, I need to clarify.

16    **A.**    Well, if you hear something on the radio and it's something

17    serious, you may verbally respond to what is being broadcast.

18    **Q.**    So it sounds like, yes, you were saying that in response to

19    what you heard on the radio?

20    **A.**    From what I just heard, yes.

21    **Q.**    If you recall, was there something specific that you heard

22    on the radio that led to this frustration -- led to you making

23    this comment?

24    **A.**    An officer-involved shooting, which is never good.

25    **Q.**    Okay.    Anything specific or just the fact that there were

26    shots fired?

27    **A.**    Well, an officer discharged his firearm.    It's never good

28    for anybody, really.

SFDA 004252

1  **Q.**  Yeah.

2  **A.**  So.

3  **Q.**  Is it fair to say you made the comment, "Those two guys are

4  always too hot for their shit," because you weren't surprised

5  that Officers Cha and Patino escalated the incident?

6  **A.**  No.

7  **Q.**  No.

8      Do you know why the other officers would have said, "Those

9  two guys are always fucking," and you finished the sentence and

10  said, "too hot for their shit"?

11  **A.**  Do I know why that other officer said that?

12  **Q.**  Yeah.

13  **A.**  No.  You'll need to ask him.

14  **Q.**  But you finished his sentence; right?

15  **A.**  Yeah.  It seems like I did finish his sentence.

16  **Q.**  So what did you mean by that, that they are "too hot for

17  their shit"?

18  **A.**  I don't know.  Maybe I was just thinking -- trying to finish

19  the other officer's sentence.

20  **Q.**  What did you mean when you said "too hot for their shit"?

21  **A.**  I don't think it really meant anything.  Like I said, it's

22  due to the situation, and you just heard something serious had

23  happened and the officer discharged his firearm at somebody.

24  You're kind of hyped up because now you've got to go to the

25  scene and deal with it and figure out what's going on.

26  **Q.**  Had you ever had to go to the scene for these two officers

27  in the past because of their use of force?

28  **A.**  No, not that I can recall.

33

SFDA 004253

1    **Q.** So you have no idea why you would have finished the

2    sentence, "Those two guys are always fuckin' too hot for their

3    shit"?

4    **A.** I don't know.  Maybe I just had a lot of coffee that night.

5    **Q.** And it led you to make that specific comment?

6    **A.** Yeah, maybe just spontaneous, finishing somebody's sentence.

7    Some people do it.

8    **Q.** Is it fair to say that when you said, "Those two guys were

9    too hot for their shit," what you were saying you know them to

10   be the type of officers who would not pass up an opportunity to

11   have a confrontation.

12   **A.** Definitely not.

13   **Q.** Definitely not.

14       Officer, did you watch any of the George Floyd trial?

15   **A.** No.

16   **Q.** Do you know who he is?

17   **A.** I do know who he is.

18   **Q.** Okay.  Are you aware that one of the key issues in that case

19   is that officers nearby had a responsibility to not stand by

20   silently?

21   **A.** Yes.

22   **Q.** Okay.  Would you agree officers have a duty to stop

23   injustice even if it means going against their coworkers?

24   **A.** Absolutely.

25   **Q.** Well, I'm going to give you a chance to reflect on it, and

26   I'm going to ask why did you and another officer make the

27   comments that these Officers Cha and Patino, "are always too hot

28   for their shit"?

34

1    **A.**   I told you it was because of the situation, and it just kind

2    of escalated there.  We heard an officer-involved shooting, and

3    I think we were maybe just -- we were just -- I'm trying to

4    think of the word -- I don't want to say excited, but just all

5    of a sudden our blood just kind of -- we were just relaxing, and

6    then all of a sudden we heard this, and all of a sudden we went

7    from a calm scene to all of a sudden hearing this.  And we just

8    kind of blurt stuff out.

9    **Q.**   Okay.  I'll just ask just a couple more questions.

10   **A.**   Sure.

11   **Q.**   What about your prior experience with these officers led you

12   to say, "They always do this type of thing"?

13   **A.**   Oh, I don't -- they don't always do this type of stuff.

14   **Q.**   So what did you mean by, "too hot for their shit"?

15   **A.**   I think it was just -- I was just finishing a sentence that

16   another officer had started without really knowing what he was

17   going to say.

18   **Q.**   Okay.  Do you know Officers Cha and Patino as the type of

19   officers who overreact in incidents?

20   **A.**   Not that I can recall.

21   **Q.**   Do you know them as the type of officers who provoke

22   incidents?

23   **A.**   Not that I remember or recall.

24   **Q.**   What is Officer Cha's reputation in the field regarding his

25   use of force?

26   **A.**   I don't even think he has a reputation that I'm aware of.

27   **Q.**   Okay.  Are you aware that there was a second

28   officer-involved shooting that he was involved in?

SFDA 004255

1    **A.**  Are you talking about Officer Patino or Officer Cha?

2    **Q.**  Officer Cha.

3    **A.**  Yes.  I was aware of that.

4    **Q.**  So he doesn't have any reputation in the field regarding his

5    use of force?

6    **A.**  Not that I'm aware of.  I'm not a sergeant so I don't deal

7    with uses of force for disciplinary or anything like that.

8    **Q.**  Do officers ever speak to one another about their coworkers'

9    reputation for use of force, even if they are not sergeants?

10   **A.**  They do, but I never heard or spoke of or heard any

11   complaints or anything about Officer Cha's -- any type of use of

12   force from him.

13   **Q.**  Had you observed Officer Cha use force on any civilians on

14   any occasion?

15   **A.**  Not that I can recall.

16   **Q.**  What is Officer Cha's repetition in the field regarding how

17   he treats individuals who suffer from mental illness?

18   **A.**  What is his reputation?

19   **Q.**  Yeah.

20   **A.**  I don't think he has a reputation.

21   **Q.**  Have you observed Officer Cha interact with people who

22   suffer from mental illness?

23   **A.**  Have I --

24   **Q.**  Have you observed Officer Cha interact with people who

25   suffer from mental illness?

26   **A.**  No, I have not.

27   **Q.**  Have you observed Officer Cha deal with civilians who speak

28   back to him?

SFDA 004256

1  A.  No.

2  Q.  Do you know anything about -- does he have a reputation for

3  getting angry when civilians talk back to him?

4  A.  Not that I can recall or remember.

5  Q.  Does Officer Cha have a reputation for escalating incidents?

6  A.  Not that I can recall or remember.

7  Q.  Have you ever observed Officer Cha escalate an incident?

8  A.  No.

9  Q.  Does Officer Cha have a reputation for overreacting to

10  incidents?

11  A.  Not that I can recall or remember.

12  Q.  Have you ever observed him overreact to incidents?

13  A.  No.

14  Q.  What is Officer Patino's reputation in the field regarding

15  his use of force?

16  A.  I don't think he has a reputation.

17  Q.  Have you ever observed Officer Patino use force on any other

18  occasion?

19  A.  No.

20  Q.  What is Officer Patino's reputation in the field for how he

21  treats individuals who suffer from mental illness?

22  A.  I haven't seen him.

23  Q.  You've never seen him interact --

24  A.  No.

25  Q.  -- with individuals who suffer from mental illness?

26  A.  No.

27  Q.  Have you ever observed Officer Patino deal with civilians

28  who talk back to him?

SFDA 004257

1    A.   No.

2    Q.   No one talked back to him?

3    A.   I don't remember anything that sticks out or ever seen

4    him --

5    Q.   Have you seen either Officer Cha or Officer Patino dealing

6    with civilians?

7    A.   Yes.

8    Q.   Okay.  About how many times have you seen it?  Let's start

9    with Officer Cha.

10        How many times have you seen him interacting with civilians?

11   A.   I mean, this is four years ago, and there was nothing that

12   stands out.  I've gone to hundreds and thousands of calls in my

13   15 years, and nothing sticks out at all with Officer Cha or

14   Patino acting inappropriately with any civilian, anybody with

15   mental illness, or anybody who has talked back to him -- or them

16   or...

17   Q.   Okay.  Do you also recall commenting that Officer Cha should

18   not have explained why he shot Moore over dispatch?

19   A.   Why he?

20   Q.   I can ask the question again.

21        Do you recall you commenting that Officer Cha should not

22   have explained why he shot Mr. Moore on dispatch?

23   A.   I do recall saying -- I mean, telling dispatch that?

24   Q.   Making a comment on the scene he should not have explained

25   why he shot Mr. Moore on the radio?

26   A.   Well, he should have a lawyer present for one.

27   Q.   Is that just for officer-involved shootings or any use of

28   force?

SFDA 004258

1    **A.**   I think with anybody, if you think you've done something

2    criminally, you have the right to remain silent, and you

3    shouldn't make any spontaneous statements -- to protect

4    yourself.

5    **Q.**   Okay.  So I think you're answering the question that I'm

6    about to ask you.

7         But first, do you recall making that comment?

8    **A.**   I think you're referring to when he was saying over the air

9    something about what happened, and I made the comment that he

10   should be quiet or -- yeah.

11   **Q.**   Okay.  So let's play the clip.  And I'm going to play the

12   beginning of your clip.  I'm going to pass out a transcript.

13   The court reporter can stop transcribing when we play the video.

14        And you'll recognize your voice if you hear it; right?

15   **A.**   Uh-huh.

16   **Q.**   Okay.  So just one second.

17        **MS. LACAMBRA:**   For the record, this transcript will be

18   marked Exhibit 1B, and the first transcript is marked

19   Exhibit 1A.

20                        (Grand Jury Exhibits 1A and 1B were

21                        marked for identification.)

22        **MS. DRUSINSKY:**   Okay.  So we're going to play the video.

23                   (Whereupon, video played, unreported.)

24   **BY MS. DRUSINSKY:**

25   **Q.**   Okay.  Does there appear to be footage from the body-worn

26   camera you were wearing when responding to the scene of 515

27   Capitol Street on January 6, 2017?

28   **A.**   Yes, it is.

SFDA 004259

1    Q.  And does this video fairly and accurately depict the scene

2    about 20 minutes after you arrived as you observed it that day?

3    A.  Yes.

4    Q.  Did you hear yourself say, "I know.  I know.  I was, like,

5    quiet, quiet.  Don't tell us, dude"?

6    A.  Yes.

7    Q.  And you were referring to Officer Cha describing on the

8    radio why he shot Sean Moore?

9    A.  Yes.

10   Q.  And is it fair to say you didn't think Officer Cha should

11   have explained on the radio why he shot Sean Moore?

12   A.  Yes.

13   Q.  And I think you started explaining this, but can you explain

14   why you didn't think Officer Cha should have explained on the

15   radio why he shot Sean Moore?

16   A.  Well, that he should remain silent until he contacts a

17   lawyer or get a POA rep.

18   Q.  Okay.  And have you responded to incidents of shootings

19   between civilians?

20   A.  Where I question the suspect?  Is that what you're trying to

21   get to?

22   Q.  Well, have you responded to incidents involving shootings?

23   A.  Yes.

24   Q.  That are not officer-involved shootings?

25   A.  Yes.

26   Q.  And have you ever seen somebody making a spontaneous

27   statement who was a suspect?

28   A.  Not that I can recall.

40

SFDA 004260

1   Q.  Okay.  And if you had heard that, would you tell them not to

2   make that statement?

3   A.  No.

4   Q.  You wouldn't?

5   A.  No.

6   Q.  So what's the difference with an officer-involved shooting?

7   How come the officer shouldn't make statements about why they

8   shot someone?

9   A.  Well, I think they should contact a POA rep first.

10  Q.  Can you just tell the jurors what a POA rep is.

11  A.  It's a police officer union rep; that you should talk to the

12  POA rep first before making any statements, because you're

13  comparing an officer-involved shooting versus two people

14  shooting each other.  You know, it's very vague when you say two

15  people shooting each other.  I mean, if it's a burglary where

16  someone is doing a home invasion and they shoot the person

17  that's coming into their house to protect their family, or are

18  you talking about just some guy just walks up to a random person

19  and shoots them in the head or something like that?

20  Q.  So any shooting.

21  A.  Right.

22  Q.  Just like any officer-involved shooting.  It's just not an

23  officer that's committing the shooting.

24  A.  Not necessarily.  I think -- if someone breaks into your

25  house, and you shoot them to protect yourself and your family --

26  Q.  Okay.  So I'm going to go back.

27  A.  -- that's kind of.

28  Q.  Did you finish your answer?

41

SFDA 004261

1  **A.**  No.   Go ahead.

2  **Q.**  No.   I wanted to let you finish.

3  **A.**  I'm thinking -- you know, the way I see it, if someone comes

4  into your house and breaks in and they have a weapon and they're

5  threatening you and you shoot them and then the police arrive,

6  and they say to you, oh, this guy broke into my house -- but

7  knowing how California is, sometimes the cities will turn around

8  and prosecute the homeowner, which to me is not right.  So...

9  **Q.**  So are you referring to incidents where you inherently

10  believe the shooter is innocent?

11  **A.**  Well, when it's obvious the normal person, an intelligent,

12  reasonable person, and a reasonable person would say if someone

13  is breaking into my house and they have a weapon, to protect my

14  family, I'm going to use deadly force against this person.  And

15  then let's say they shoot them, okay.  But sometimes in

16  California or -- the District Attorney will go after the wrong

17  person.  Instead of going after the suspect that broke into the

18  house, they go after the homeowner, because they say something

19  like, oh, they should have gave them a warning shot or shot them

20  in the leg -- or some far-out crazy thing.  And with something

21  like that, I was, like, hey, you have the right to remain

22  silent --

23  **Q.**  So if they started explaining why they shot, you'd be, like,

24  hey, hey, don't tell us, get a lawyer first.

25        That's what you would say?

26  **A.**  Yeah -- no, I wouldn't say it -- you know, at some point,

27  you have to read them the Miranda rights.  They have the right

28  to remain silent --

42

SFDA 004262

1   Q.   Right.

2   A.   -- because --

3   Q.   But I'm just referring to spontaneous statements.

4   A.   Right.

5   Q.   Would you tell your buddy, hey, you shouldn't make a

6   statement; he should call his lawyer first?

7   A.   Yeah.

8   Q.   You would?  You would say that?

9   A.   Yeah.

10  Q.   In all cases where you think the time person is inherently

11  innocent?

12  A.   Well, no, with a police officer, it's -- that's what we are

13  told --

14  Q.   I see.

15  A.   Yes.

16       -- from the POA.  And any time you're involved in an

17  officer-involved shooting, questions are not to be asked.

18  Q.   Who tells you that?

19  A.   The POA.

20  Q.   Okay.

21  A.   That's the written rule.  You can only answer certain

22  questions:  One, is anybody hurt?  Where did the bullets go,

23  just to make sure there aren't any victims.  Other than that,

24  bam, no other statements.

25  Q.   Okay.  Thank you for sharing that with us.

26       So the police union instructs its officers, don't ask any

27  questions in officer-involved shootings?

28  A.   Correct.

SFDA 004263

1   Q.  Okay.  So I'm just going to go back just to clarify a couple

2   things and then maybe the jurors may have some questions, and

3   then we are done --

4   A.  Uh-huh.

5   Q.  -- okay.

6       Do you have any opinion about Sean Moore's mental health

7   now?  Maybe you don't, but I'm just asking if you do.

8   A.  Do I know --

9   Q.  Like, now, have you formed an opinion about what Sean

10  Moore's mental health was, whether or not he was suffering from

11  some sort of mental illness?

12  A.  I don't know what he's suffering from.  I don't know if he's

13  suffering from mental illness, or if he's just a habitual drug

14  user.  You know, sometimes they show the same symptoms --

15  similar symptoms.

16  Q.  So you believe now that he exhibited symptoms that could

17  reflect mental illness; is that what you're saying?

18  A.  I don't know what he was suffering from, if that's what

19  you're asking me.

20  Q.  Well, I'm asking if you believe that he might have been

21  suffering some sort of cognitive disorder?  Mental illness?

22  A.  Possibly.

23  Q.  Possibly, okay.

24      Now, did you ever watch the body-worn camera of the actual

25  incident that occurred on January 6, 2017, at 515 Capitol

26  Street?

27  A.  Yes.

28  Q.  So either Officer Cha's body-worn camera or Officer

44

SFDA 004264

1  Patino's?

2  **A.**  I saw the thing that Jeff Adachi put out, so if that's what

3  you're asking me.

4  **Q.**  So, yeah, so you watched their body-worn camera?

5  **A.**  Yeah.

6  **Q.**  Okay.  So do you recall Officer Cha calling Sean Moore

7  names?

8  **A.**  No.  I don't remember that at all.

9  **Q.**  Do you remember Officer Cha calling Moore a "motherfucker"?

10  **A.**  I don't.  Again, this was four years ago --

11  **Q.**  That's okay.

12  **A.**  The last time I watched that was four years ago, and a lot

13  has transpired since then.

14  **Q.**  Do you recall Officer Cha telling Sean more:  Come on, come

15  on, come out, come out?

16  **A.**  I don't recall any verbal interaction on the video at all.

17  I mean, last time I watched it was four years ago, four and a

18  half, or whenever it happened.

19  **Q.**  Knowing that he said this, would that be -- well, would that

20  change your opinion about Officer Cha's reputation for

21  escalating incidents?

22  **A.**  No.

23  **Q.**  No.

24  **A.**  I don't remember hearing that, so, you know...

25  **Q.**  If you did hear him say that, would it change your opinion

26  about his reputation?

27  **A.**  No.

28      **MS. DRUSINSKY:**  Okay.  Okay.  So I think now if jurors

45

SFDA 004265

1    have any questions, let us know, and we will pass out the juror

2    question forms, but only if you have any questions.

3          MS. LACAMBRA:  And if you need more than one form, please

4    let us know.  We have additional forms.  Everyone should have

5    extra forms.

6          MS. DRUSINSKY:  Any others?  No, okay.

7          Okay.  I'm going to ask a few questions from the jurors.

8    Q.  Is the use of language like "motherfucker" by officers

9    typical in confrontations, and would you say -- so let's do that

10   question first.

11         Is the use of language like "motherfucker" by officers is

12   typical in confrontations?

13   A.  No, it's not.

14   Q.  Would you say using language like that is advised by police

15   training?

16   A.  Definitely not.

17   Q.  Okay.  Is the use of phrases like "motherfucker" pretty

18   typical in encounters in situations where emotions run high and

19   escalate?

20   A.  No, it's not -- yeah, it's -- typically we don't use those

21   words.

22   Q.  You seem not to consider drug use to be mental illness;

23   although drugs impact mental health.

24         Please elaborate.

25   A.  Can you rephrase that again.

26   Q.  You seem not to consider drug use to be mental illness;

27   although drugs impact mental health.

28         Please elaborate.

46

SFDA 004266

1    **A.**  I'm not understanding the question.

2    **Q.**  Okay.  Well, I think what you were saying is that sometimes

3    symptoms from mental illness and symptoms from drug use are very

4    similar?

5    **A.**  Yes.

6    **Q.**  Okay.  Did you observe those symptoms, or those indicators,

7    on Sean Moore at any point in your interaction with him?

8    **A.**  When I first met him, that time when he was, I guess,

9    accosting the person walking by his house, we didn't know

10    what -- we knew something was wrong with him, either he had a

11    mental illness possibly, or possibly he could have been on

12    drugs, or maybe he was just a person that hated police.  You

13    know, we didn't know what his issue was, but we knew he was

14    really agitated, and continuing to speak to him further agitated

15    him.  So I thought best thing to do was remove myself from the

16    scene to deescalate -- or just leave him alone.

17    **Q.**  Okay.  Are officers required to cite and/or arrest a subject

18    due to a violation of a temporary restraining order?

19    **A.**  Yes, they are required to because it's a court order -- a

20    judge issues the order -- and therefore it would be a violation

21    of a court order.

22    **Q.**  What happens if the violation did not occur in your

23    presence -- in the officer's presence?

24    **A.**  It still would be a violation based on the testimony of the

25    complainant or the person the restraining order -- you know,

26    that made the restraining order against that person.

27    **Q.**  Can officers arrest someone for misdemeanor that did not

28    occur in their presence?

SFDA 004267

1   A.   Without a citizen's arrest?  No.

2   Q.   So an officer has to have a citizen's arrest to arrest for a

3   misdemeanor that did not occur in their presence?

4   A.   Correct.

5   Q.   Can officers use judgment to leave the scene when they are

6   called to an incident involving a violation of a temporary

7   restraining order?

8   A.   I think nowadays it's required -- or it's -- it's more

9   pushed because of deescalation.

10  Q.   Can you just clarify what do you mean by "push"?

11  A.   I'm sorry.  What?

12  Q.   Can you just clarify, nowadays what is pushed?

13  A.   Deescalation is now, I guess, preferred.

14  Q.   Back then deescalation wasn't preferred?

15  A.   Not as much -- it's -- it's all based on, you know, what the

16  restraining order is for, how serious the crime is.  I mean,

17  definitely if there's a, you know, a stalking or something of

18  that matter, a serious -- could be a sex crime or something like

19  that, then definitely -- you would definitely take action on

20  that.

21  Q.   What about a noise complaint at 4:00 in the morning?

22  A.   It's all up to the officer.

23  Q.   So an officer can use judgment to leave a scene?

24  A.   Nowadays.  I'm not sure about back then.

25  Q.   So not sure about 2017?

26  A.   Yeah.  A lot of things have changed with police policies in

27  the last couple of years --

28  Q.   Do you agree --

SFDA 004268

1   A.   -- past 2017 -- after 2017.

2   Q.   Do you agree that general -- the San Francisco Police

3   Department's general orders for use of force was revised at the

4   end of 2016?

5   A.   Okay.

6   Q.   Do you agree?

7   A.   You can read it to me.  I don't know -- I don't recall.

8   Q.   Would it refresh your recollection --

9   A.   Yeah, yeah.  Please.

10  Q.   -- to look at the general orders use of force manual.

11       Let me know if that refreshes your recollection about when

12  the use of force general orders were published.

13  A.   Okay.

14  Q.   Does that refresh your recollection?

15  A.   Yeah.

16       And the question again was?

17  Q.   Was the use of force general orders published at the end of

18  2016?  So the manual specifically about the use of force?

19  A.   Yes.

20  Q.   Okay.  And there's a whole section in here about

21  deescalation?

22  A.   Correct.

23  Q.   I didn't hear your answer.

24  A.   Correct.  Yes.

25  Q.   Okay.  Were the comments in the patrol vehicle that you

26  made, were they made prior to seeing the footage of the actual

27  event, not after reviewing the footage?

28  A.   Yes.  It was -- yeah, before we even arrived on-scene.

SFDA 004269

1  Q.  What exactly did you know about the shooting before making
2  the comments about the officers being "too hot for their shit"?
3  A.  Nothing.
4  Q.  Well, you knew what you heard on the radio; right?
5  A.  Yeah, which was there was just an OIS.
6  Q.  They don't know the acronyms.
7  A.  Officer-involved shooting.
8  Q.  But you actually heard through dispatch Officer Cha saying:
9  Pepper spray was deployed.
10      Do you remember that?
11  A.  I don't remember that.
12  Q.  Okay.
13  A.  Going back to that -- and this is, again, four years ago
14  when we were just sitting there.  We weren't really fully -- we
15  weren't fully listening to the radio.  It was kind of in the
16  background a little bit.
17  Q.  What were you doing, do you remember?
18  A.  We were taking a break when that happened.  We were all in a
19  car, three of us.
20  Q.  Do you remember Officer Cha saying anything on the radio
21  other than shots fired?
22  A.  I don't even remember that.  I don't know how it all came
23  together.
24  Q.  Okay.
25  A.  Again, four years ago, I don't know exactly what the radio
26  chatter was at the time.  I just knew is something serious that
27  was kind of going on once we heard, you know, the
28  officer-involved shooting.

SFDA 004270

1        **MS. DRUSINSKY:**  Okay.  I have no further questions.

2    Do you have any?

3        **MS. LACAMBRA:**  I just want to make sure, do we have any

4    follow-up questions by any of the jurors?

5        **MS. DRUSINSKY:**  Okay.  I think we're good.

6        **THE GRAND JURY FOREPERSON:**  You are admonished not to

7    discuss or impart at any time outside of this jury room the

8    questions that have been asked of you in regard to this matter

9    or your answers until authorized by this grand jury or the court

10   to discuss or impart such matters.  You will understand that a

11   violation of these instructions on your part may be the basis

12   for a charge against you of contempt of court.  This admonition,

13   of course, does not preclude you from discussing your legal

14   rights with any legally employed attorney should you feel that

15   your own personal rights are in any way in jeopardy.

16       **THE WITNESS:**  Understood.

17       **THE GRAND JURY FOREPERSON:**  Okay.

18       **MS. DRUSINSKY:**  Thank you so much, Officer.  You can keep

19   the mask.

20       **THE WITNESS:**  I have an overtime card for --

21       **MS. DRUSINSKY:**  For us to sign?

22       **THE WITNESS:**  Yeah.

23       **MS. DRUSINSKY:**  No problem.  And then we're going to take

24   a break.  We have been here for a while, so let's do 15 minutes.

25   So let's come back 11:10.

26       Is that okay?

27       And before you guys leave, just remember don't discuss

28   the case with each other or with anyone else or don't look

51

SFDA 004271

1    anything up on the Internet, okay.

2                    (Recess taken at 10:55 a.m.)

3                    (Proceedings resumed at 11:10 a.m.)

4        **MS. LACAMBRA:**  Back on the record.  To confirm, all 17

5    jurors are present in the courtroom along with Ms. Drusinsky and

6    myself, the court reporter.  And these are all of the people

7    that are in the courtroom.

8        We have had a few questions from jurors.  I wanted to

9    take them, if you want to raise your hands.

10       **GRAND JUROR:**  Was this a noise complaint or restraining

11   order violation or both?

12       **MS. LACAMBRA:**  It was an allegation of a noise complaint

13   that was the basis for a violation of a restraining order that

14   was a known last order, so it's a don't-bother order between

15   neighbors.

16       **GRAND JUROR:**  So according to the restraining order,

17   making the noise is a violation of that restraining order?

18       **MS. LACAMBRA:**  Yes.  Had it been confirmed, it could have

19   been the basis of a citizen's arrest.

20       **GRAND JUROR:**  Okay.  Thank you.

21       **GRAND JUROR:**  So I had two questions.

22       Is this all the witnesses we'll be hearing from this

23   whole case or just today?

24       **MS. LACAMBRA:**  For this whole case.

25       **GRAND JUROR:**  So I wanted to know more.  So I guess all

26   the witnesses are officers primarily, but the gunshot wound to

27   the stomach resulted in a homicide three years later.  I was

28   wondering how it was determined that it was due to the gunshot

                                                              52

SFDA 004272

1  wound, if it was three years after the fact.

2      MS. LACAMBRA:  It was due to the autopsy report on

3  Mr. Moore.  That's uncontested.

4      GRAND JUROR:  Are we to assume that Sergeant Bodisco is

5  not going to testify or is he going to testify later?

6      MS. LACAMBRA:  We expect that he will be testifying at

7  some point today.

8      GRAND JUROR:  Just out of order.

9      MS. LACAMBRA:  Yes.

10     GRAND JUROR:  There was some mention of 45-feet distance

11  somewhere, was it in the restraining order?  Because you were

12  also describing how high the stairs went up to the top where the

13  door was.

14     MS. DRUSINSKY:  I don't remember that.

15     MS. LACAMBRA:  The 245 was one of the Penal Code Sections

16  for assault.  If you heard "45," it was probably Penal Code

17  Section 245.  I believe at some point during the video, the

18  officers were looking at the restraining order; and it said he

19  was to stay 25 feet away.

20     GRAND JUROR:  Oh, 25.

21     MS. LACAMBRA:  Yes.  That's my recollection of the video.

22     GRAND JUROR:  Can I ask, does the police officer

23  association have a standard protocol that any officer-involved

24  shooting, incident, whatever, always -- they recommend that

25  their officers always contact them first before making any kind

26  of statement, is that a standard thing?

27     MS. LACAMBRA:  I'm not privy to what the police officers

28  association actually tells its members.  That could be part --

SFDA 004273

1  it's not officially part of any training that -- the officers --

2  and you'll hear this through the testimony -- but the officers

3  are required to not talk about the incident among themselves

4  after a shooting, but I don't know what the POA tells its

5  members.  It would not surprise me if they were all told to --

6      **GRAND JUROR:**  That would be outside of their formal

7  training?

8      **MS. DRUSINSKY:**  It's not part of any guidelines or the

9  SFPD training or anything like that.

10     **GRAND JUROR:**  But it wouldn't necessarily have to be?

11     **MS. DRUSINSKY:**  Right.

12     **MS. LACAMBRA:**  Yeah.  The POA it's the police union, so

13 they have their own kind of rules and privileges that are there

14 to help their members.

15     **GRAND JUROR:**  And lawyers always warn you not to say

16 anything until they get in the middle of it, so...

17     **MS. LACAMBRA:**  Any other questions?

18     **GRAND JUROR:**  There seems to be mental illness issues.

19     Are we going learn anything more about the mental health?

20     **MS. DRUSINSKY:**  Is there a concern for you?

21     **GRAND JUROR:**  Oh, no, no, no.  It just seems like it may

22 have been implied maybe so I was just wondering if that would be

23 elaborated on further.

24     **MS. DRUSINSKY:**  Yeah.  And I think a lot of those

25 questions will be answered probably this afternoon.

26     **MS. LACAMBRA:**  This is why we are having the

27 investigation is to find out what -- to what level indicators

28 that they are trained to detect were present and how that's

SFDA 004274

1   supposed to affect a reasonable officer interacting with someone

2   who is presenting with those cues.  So that's part of the

3   investigation we're conducting.

4       **GRAND JUROR:**  Actually, the response is to someone else's

5   question.

6       Are they required to do different things if they suspect

7   drug use versus mental illness?

8       **MS. LACAMBRA:**  Well, that is a really good question that

9   you should bring down because we should absolutely ask that.

10      **MS. DRUSINSKY:**  Yeah.  We might not know all the answers.

11      **MS. LACAMBRA:**  Because, I mean, you will see that a lot

12  of the training will overlap, because a lot of the cues overlap

13  as this last officer alluded to.  So it's kind of completely

14  within their discretion how they choose to approach it based

15  upon their training.  But how a reasonable officer should

16  approach the situation that they're presented with is a pivotal

17  question for this case, which is why we are investigating.

18      **GRAND JUROR:**  So, again -- and you can tell me to ask it

19  later -- but did Officer Cha have access to any other weapons

20  beside his baton, pepper spray, and --

21      **MS. DRUSINSKY:**  You'll find that out.

22      **GRAND JUROR:**  Okay.

23      **GRAND JUROR:**  So I heard implications that -- and maybe I

24  didn't listen carefully but the only time we saw the tape, it

25  sounded like almost all the profanity was coming more towards

26  the officers.  They may have said some words back to them, I

27  can't really remember.  But I think it was somewhat incidental

28  in the reply to what he was saying.  I'm not saying it didn't

55

SFDA 004275

1    happened.  So if you ask questions about the officer in regard

2    to profanity, which I didn't really hear.

3         MS. DRUSINSKY:  Did you have a question?

4         GRAND JUROR:  I was just saying that I hadn't heard it.

5         MS. DRUSINSKY:  You'll hear it.  Don't worry.  We'll get

6    to it.

7         GRAND JUROR:  And actually, Officer Tindall that Jeff

8    Adachi released something.

9         MS. DRUSINSKY:  Yeah.

10        GRAND JUROR:  There will be more discussion on that?

11        MS. DRUSINSKY:  No.

12        MS. LACAMBRA:  So you have already been admonished not to

13   look up this case on the Internet.  When this case occurred,

14   there was a release of -- a press release that included some of

15   the body-worn camera footage -- not all of it, but some of it --

16   and I believe that is what he was alluding to.  But are

17   prohibited from looking that up yourself on the Internet.

18        GRAND JUROR:  Sure.

19        MS. LACAMBRA:  You actually are getting to see a lot more

20   than anything you're going to find on the Internet.

21        GRAND JUROR:  How long has this investigation been going

22   on?

23        MS. LACAMBRA:  So this investigation has been going on

24   for a while, but there was new evidence because the homicide

25   occurred last year; and then it (wasn't) ruled a homicide; and    *— Ct reporter error*

26   then the coroner's report wasn't released until in the middle of

27   last year.  So it's been about a year that we've been conducting

28   this investigation.

SFDA 004276

1      **MS. DRUSINSKY:**  And there was a pandemic.

2      **MS. LACAMBRA:**  The dying from unnatural causes.

3      **GRAND JUROR:**  How are these witnesses selected?

4      **MS. LACAMBRA:**  Based on our review of all of the

5   evidence, we have chosen the witnesses that we believe will be

6   able to shed the most light on this issue of the reasonableness

7   of the officer's actions, because that's the pivotal element in

8   what we're investigating and will dictate the severity of any

9   potential charges.

10     **MS. DRUSINSKY:**  That's what we want to investigate

11  basically.

12     **GRAND JUROR:**  Will there be another chance to look at

13  that opening video again that actually shows the encounter?

14     **MS. DRUSINSKY:**  Oh, yeah.  You definitely will, over and

15  over.

16     Okay.  I'm going to call a witness, if that's okay.

17     **MS. LACAMBRA:**  We do have a question.  We are planning on

18  taking a break for lunch either at 12:30 or 1:00 o'clock.  The

19  return time will be 2:00 here in this courtroom.  Would you

20  prefer to break at 12:30 or break at 1:00?  We'll be back at

21  2:00, so just how long do we have this morning to call, like,

22  our couple witnesses.  But anyone that's not done, we will

23  continue with in the afternoon.  We just wanted to know do you

24  want an hour or hour and a half for lunch?

25     **GRAND JUROR:**  An hour.

26     **MS. LACAMBRA:**  Okay.  So 1:00 o'clock.  We will take a

27  break at 1:00 o'clock.

28     **GRAND JUROR:**  Along with kind of the police camera

SFDA 004277

1  footage, is someone going to pick apart what was happening?  I

2  couldn't tell if Mr. Moore had, like, a revolver in his

3  waistband or of he, in fact, pulled it.

4          Is someone going to go into it?

5          **MS. DRUSINSKY:**  We'll go into it for sure.

6          All right.  We're good?  Yeah, okay.

7          So I'm going to call the next witness.

8          You can take a seat over there at the witness stand, and

9  she's going give you a clear mask.

10          **THE GRAND JURY FOREPERSON:**  Have you ever worn one of

11  these before?

12          **THE WITNESS:**  No, I have not.

13          **THE GRAND JURY FOREPERSON:**  Okay.  These go behind your

14  head, and this part goes underneath your chin.  This way we can

15  see your face.

16          **THE WITNESS:**  All right.

17                          **PATRICK DOMIN**,

18  called as a witness for the People, having been duly sworn,

19  testified as follows:

20          **THE WITNESS:**  Yes, I do.

21          **THE GRAND JURY FOREPERSON:**  Okay.  You are seated.

22  Please state your name and spell it --

23          **THE WITNESS:**  Patrick Domin, P-A-T-R-I-C-K; D, as in

24  David, O-M-I-N.

25                      **DIRECT EXAMINATION**

26  BY MS. DRUSINSKY:

27  **Q.**  Good morning.

28          Can you tell us your name again.

SFDA 004278

1    **A.**   Patrick Domin.

2    **Q.**   Patrick Domin.

3         Okay.   And for the record, Mr. Domin has put on a clear mask

4    for us, so thank you.

5    **A.**   You're welcome.

6    **Q.**   Mr. Domin, can you tell us what your occupation is.

7    **A.**   Yes.   I'm a paralegal and a custodian of records for the San

8    Francisco Police Department Legal Division.

9    **Q.**   How long have you worked in this capacity?

10   **A.**   About six-and-a-half years.

11   **Q.**   And you stated that one of your duties as being the

12   custodian of records for the San Francisco Police Department?

13   **A.**   Yes.   My duties include responding to criminal/civil

14   subpoenas for records, juvenile petitions, DMV subpoenas for

15   records.   Pretty much any venue where you can issue a subpoena

16   for records to the police department, I handle those.

17   **Q.**   And did you bring some items with you to court today?

18   **A.**   Yes, I did.

19   **Q.**   What are they?

20   **A.**   Okay.   There's a thumb drive containing six body-worn camera

21   videos from Officer Patino and one body-worn camera video from

22   Officer Cha on the date in question.

23   **Q.**   Okay.   So let me go through it.

24        How did you come to receive these body-worn camera footages?

25   **A.**   I received them via e-mail from our body-worn camera unit as

26   a link, and then I downloaded the videos to the thumb drive to

27   bring it today.

28   **Q.**   Is that the normal process that you take in order to respond

SFDA 004279

1    to a subpoena?

2    A.  Yes.

3    Q.  And so were these body-worn camera footages provided to you

4    or to the San Francisco Police Department in the regular course

5    of business?

6    A.  Yes.

7    Q.  Okay.  To your knowledge, were these body-worn cameras

8    provided to you or to San Francisco Police Department at or near

9    the time required?

10   A.  Yes.

11   Q.  To your knowledge, were these provided to you or to San

12   Francisco Police Department at or near the time of the incident,

13   which was January 6, 2017?

14   A.  Yes, they were.

15   Q.  Okay.  Can you testify that these are the body-worn cameras

16   for the incident that occurred at 515 Capitol street on January

17   6, 2017?

18   A.  Yes.

19   Q.  And can you tell us how you know.

20   A.  The date and timestamps appear on the videos.  And also

21   included along with the thumb drive is a letter from our

22   body-worn camera unit that provides a summary of the date and

23   time recorded pertaining to the incident.

24   Q.  Okay.  And is all this in the normal process of responding

25   to a subpoena?

26   A.  Yes, it is.

27   Q.  Were these videos manipulated in any way before being

28   brought to court?

SFDA 004280

1  A.  No.  There were no redactions made to the videos.

2  Q.  Is there anything about these videos that makes you believe

3  them not to be trustworthy copies?

4  A.  No.

5  Q.  And did you review them before testifying today?

6  A.  I reviewed them in as far as making sure that they played

7  correctly.  I did not watch them all in their entirety.  I did

8  not have an opportunity to do that.

9  Q.  Is it your opinion that the footages capture the scene

10  accurately as it was depicted on January 6, 2017, at 515 Capitol

11  Street?

12  A.  Yes.  I believe they did.

13  Q.  Okay.  And then you have the thumb drive with you today?

14  A.  I do.

15      **MS. DRUSINSKY:**  Okay.  Great.  I will take that, and we

16  can mark that as Exhibit 2.  And normally we would admit that

17  into evidence but this is an investigatory grand jury.

18                    (Grand Jury Exhibit 2 was marked for

19                    identification.)

20      **MS. DRUSINSKY:**  Okay.  Thank you so much.  I will put it

21  in front of the secretary.

22      Do we have any questions from the grand jurors?

23      **MS. LACAMBRA:**  No.

24      **THE GRAND JURY FOREPERSON:**  I do have one admonition to

25  give you, which is:

26      You are admonished not to discuss or impart at any time

27  outside of this jury room the questions that have been asked of

28  you in regard to this matter or your answers until authorized by

SFDA 004281

1  this grand jury or the court to discuss or impart such matters.

2  You will understand that a violation of these instructions on

3  your part may be the basis for a charge against you of contempt

4  of court.  This admonition, of course, does not preclude you

5  from discussing your legal rights with any legally employed

6  attorney should you feel that your own personal rights are in

7  any way in jeopardy.

8        THE WITNESS:  I understand.

9        THE GRAND JURY FOREPERSON:  Good.  Thanks.

10       THE WITNESS:  Thank you.

11       MS. DRUSINSKY:  Thank you so much.  And if we didn't

12  already put it on the record, the witness' mouth was visible

13  through the clear mask during the entirety of his testimony.

14       THE WITNESS:  I have a souvenir.

15       MS. LACAMBRA:  Exactly.

16       MS. DRUSINSKY:  Thank you so much.

17            (Witness excused.)

18       MS. LACAMBRA:  Please take the witness stand.

19            **RICHARD BODISCO**,

20  called as a witness for the People, having been duly sworn,

21  testified as follows:

22       THE WITNESS:  I do.

23       THE GRAND JURY FOREPERSON:  Please be seated.  And will

24  you please state your name and spell it, for the record.

25       THE WITNESS:  Richard Bodisco; R-I-C-H-A-R-D, B, as in

26  boy, O-D-I-S-C-O.

27       THE GRAND JURY FOREPERSON:  And I have to give you one of

28  these.

SFDA 004282

```
 1        Have you worn one of these before?
 2        THE WITNESS:  No.
 3        THE GRAND JURY FOREPERSON:  These go behind your head.
 4   This part goes underneath your chin like this.
 5        THE WITNESS:  Okay.
 6        MS. LACAMBRA:  And so for the record, we have given the
 7   witness a clear mask that permits the jury to be able to see his
 8   mouth while testifying.
 9                      DIRECT EXAMINATION
10   BY MS. LACAMBRA:
11   Q.   Thank you, Sergeant Bodisco, for coming in today.
12        Can you tell us where you currently work.
13   A.   Ingleside Police Station.
14   Q.   And for what agency?
15   A.   San Francisco Police Department.
16   Q.   And was that also your job on January 6, 2017?
17   A.   Yes.
18   Q.   And so how long have you been a police officer?
19   A.   Twenty-five years -- twenty-six.
20   Q.   And back on January 6, 2017, how many years had you served
21   as an officer?
22   A.   Twenty-one.
23   Q.   And were you at the same rank, a sergeant, at that time as
24   well?
25   A.   Yes, I was.
26   Q.   Now, you said your assignment was Ingleside?
27   A.   Ingleside Station.
28   Q.   When did you graduate from the academy?
```

SFDA 004283

1    **A.**   March of 1996.

2    **Q.**   And back on January 6, 2017, who was your partner?

3    **A.**   No one.

4    **Q.**   Oh, you didn't have a partner at all?

5    **A.**   No.

6    **Q.**   When you responded on January 6, 2017, to 515 Capitol

7    Avenue, you didn't have anyone with you?

8    **A.**   No.

9    **Q.**   Did you respond to 515 Capitol Avenue on January 6, 2017?

10   **A.**   Yes, I did.

11   **Q.**   And at around what time did you respond to the scene?

12   **A.**   Approximately, a little after 4:00 in the morning.

13   **Q.**   Okay.  And why did you respond?  What was the purpose of

14   your response to that scene?

15   **A.**   I heard officers put out that there was an officer-involved

16   shooting, that shots has been fired.

17   **Q.**   Do you know which officers were involved in that shooting?

18   **A.**   Not at that exact moment.

19   **Q.**   Did you later come to know who was involved in that

20   shooting?

21   **A.**   Yes.

22   **Q.**   And who were the others that were involved?

23   **A.**   Officer Cha, and I'm not too familiar with his partner.  It

24   began with a P.  Refresh my memory or...

25   **Q.**   Do you know what the initial call was about that Officer Cha

26   and his partner were responding to.

27   **A.**   Initially, it was some kind of a restraining order violation

28   between neighbors.

SFDA 004284

1   **Q.**  And were you listening on the radio to what was happening on

2   the scene?

3   **A.**  Yes, I was.

4   **Q.**  And what did you hear?

5   **A.**  I probably was not paying too much attention until things

6   began to escalate on the radio.  And specifically, I don't

7   remember what was said, but it went from a call of service to

8   somebody resisting arrest to an escalation of force.  Like, I

9   believe they said they used pepper spray.  And just the

10  situation was escalating.  And then the momentary period of

11  silence, and then it came on the the radio that shots had been

12  fired.

13  **Q.**  So when you say -- what were specifically the things that

14  gave you the impression that things were escalating?  Did you

15  hear anything before hearing that pepper spray had been

16  deployed?

17  **A.**  I do not specifically remember what was being said.  What I

18  remember is, over the police radio, you could just hear an

19  escalation of what would be a routine call for service to pepper

20  spray and shots being fired.

21  **Q.**  So when you're listening to the police radio, can you

22  actually hear what the officers are hearing as they were

23  encountering the subject that they are contacting or is it just

24  what they call in on their radio?

25  **A.**  No.  Sometimes you can hear the background noise, if there's

26  a lot of commotion.  Sometimes it's -- you can just make out

27  what it was, and sometimes you can't.  But it's not specifically

28  just the officer's voice.

SFDA 004285

1    **Q.**  Okay.  Do you recall hearing any background noise or any

2    other sounds that gave you the impression that things were

3    escalating?

4    **A.**  Yeah.  There was background noise -- yelling.

5    **Q.**  Yelling.

6        Could you tell where the yelling was coming from or who was

7    doing the yelling?

8    **A.**  No, absolutely not.

9    **Q.**  So did you form the impression that things were escalating

10   prior to hearing the report of shots fired?

11   **A.**  Oh, yeah.  Absolutely.

12   **Q.**  And so when would you say you formed that opinion that

13   things were escalating?

14   **A.**  That would be hard for me to say.  I -- I -- thinking back

15   four years, I was not paying attention to that call for service.

16   It just wasn't anything that was on my radar.  It could have

17   been a period of a minute; it could have been several minutes,

18   but things were coming over the radio, and it was escalating.

19   **Q.**  Do you recall what drew your attention?  You said you

20   weren't paying attention to it; but at some point, you turned

21   your attention to what was happening.

22       Can you tell us what drew your attention to it.

23   **A.**  Yeah.  I'm sitting in a car by myself at 4:00 in the

24   morning.  There is nothing going on.  I mean -- and I don't say

25   that to be sarcastic.  It's, you know, all of a sudden, there's

26   commotion on the radio.  It grabs your attention.

27   **Q.**  Okay.  And do you recall when you arrived where were Officer

28   Cha and Patino located?

SFDA 004286

1   **A.**   I found them curled up on the ground behind a car -- a

2   parked car -- in front of the house.

3   **Q.**   And do you recall the address of that house?  Was it 515

4   Capitol Avenue?

5   **A.**   It could have been 515.

6   **Q.**   Okay.  But you don't recall?

7   **A.**   Well, because I think the original call was to the neighbor

8   at, like, 521, so whichever -- one of those houses.

9   **Q.**   I'm going to to show -- all right.  So how far away were

10  Officers Cha and Patino away from one another when you arrived?

11  **A.**   I remember them pretty close together.  I mean, they were --

12  wouldn't say they were huddled together, but they were within

13  inches of each other.

14  **Q.**   And so within inches.

15      Less than a foot from one another?

16  **A.**   Yeah.

17  **Q.**   Did you make contact with either Officer Cha or Officer

18  Patino upon arriving at the scene?

19  **A.**   Yes.  I walked up to them.  Yeah.

20  **Q.**   And what did you do after you walked up to them?

21  **A.**   So I -- as I walked up to them, I don't think they realized

22  that I walked up to them.  I think they were kind of still in a

23  state of shock to a certain extent.  So I verbally told them who

24  I was.  I know Officer Cha knew me.  I knew him.  And then I

25  reached out and I touched Officer Cha on the shoulder, you know,

26  because I didn't know how they would react, nor did I exactly

27  know what had played out, you know.  And that's how I got their

28  attention.

SFDA 004287

1   **Q.**  Now, you said you knew Officer Cha.

2       How did you know Officer Cha?

3   **A.**  We were assigned at the Richmond Station together.

4   **Q.**  And how long had you worked together at the Richmond

5   Station?

6   **A.**  I was assigned to Richmond Station I think for approximately

7   a year, and I knew Officer Cha there for at least several

8   months.

9   **Q.**  Would say that you -- how would you characterize your

10  relationship with Officer Cha?  Was it professional?  Was it

11  personal?  Or was it both?

12  **A.**  Professional.

13  **Q.**  Did you ever interact with him outside of the workplace?

14  **A.**  No, not to my recollection.  No.

15  **Q.**  And you said that you touched Officer Cha on the shoulder

16  because you didn't know how he was going to react.

17      What were your concerns?  What gave you the impression that

18  you needed to be careful with approaching him?

19  **A.**  Both of the officers were bloodied.  Officer Cha had blood

20  on his head.  The other officer had a bloody nose.  I knew that

21  they were in a struggle.  I knew that at least one of them had

22  discharged their firearm.  So I just didn't really know what

23  state of mind they were going to be in, how -- you know...

24  **Q.**  Now, were you fearful that they might react to you with

25  violence based on what you were observing?

26  **A.**  No.  I was just more concerned for their mental state.

27  **Q.**  And so what did you do after you touched Officer Cha on the

28  shoulder?

68

SFDA 004288

1    **A.**  I asked them if they were hurt.  You know, and they -- I

2    believe they kind of both told me kind of superficially "no,"

3    even though they were bloodied and battered.  And then I said:

4    Well, let's move you out of the way.  Because the house that the

5    shots were fired into was right in front of us.  And they had

6    trouble getting up.  I had to help them up.  And I walked them

7    down the street, and there was either an ambulance already

8    waiting, or I had called for it or somebody had called for it.

9    **Q.**  So when you say you helped them up, how did you help them

10   up?  Like, what did you physically?

11   **A.**  I physically grabbed them and dragged them onto their feet.

12   **Q.**  And you did that for both officers?

13   **A.**  Yep.

14   **Q.**  So who did you start with?  Who did you first drag to their

15   feet?

16   **A.**  I don't recall.

17   **Q.**  Okay.  And once you dragged them to their feet, where were

18   you once you dragged them to their feet?  Were you still in

19   front of the house?

20   **A.**  We were in the street, and I walked them down to the corner.

21   **Q.**  So after you dragged them to their feet, you were still on

22   the street in front of the house where they were huddled?

23   **A.**  Yes.

24   **Q.**  And then you walked them to the corner of the street?

25   **A.**  Yes.

26   **Q.**  You didn't have to physically drag them from the street to

27   another place away from the house?

28   **A.**  No.  No.  They were ambulatory.

SFDA 004289

1    **Q.**  So they were both able to walk?

2    **A.**  More or less.

3    **Q.**  Okay.  And when you say "more or less," what does and "less"

4    mean?  Were they able to walk away or?

5    **A.**  I think Officer Cha was limping.

6    **Q.**  Okay.  And once you had them walk away to the corner, how

7    far away were they from one another?

8    **A.**  I don't recall.

9    **Q.**  Were you with them at the corner after you walked them?

10   **A.**  Yes, for a very brief period of time.

11   **Q.**  Were they within earshot of one another?

12   **A.**  Probably.

13   **Q.**  And after you escorted them -- do you remember the street

14   corner where you escorted them?

15   **A.**  No, not exactly.

16   **Q.**  Would it refresh your recollection to review a copy of your

17   report?

18   **A.**  Sure.

19   **Q.**  Go ahead.  And just take a moment and review that; and then

20   after you have had a moment to review it, let me know when

21   you've refreshed your recollection.

22   **A.**  Yeah.  I guess we went down to the cross street of Minerva.

23   **Q.**  Minerva and Capitol?

24   **A.**  Capitol.

25   **Q.**  So you escorted Officer Cha and Patino to the corner of

26   Minerva and Capitol Avenue?

27   **A.**  Correct.

28   **Q.**  When you were there, did you take an inventory of their

SFDA 004290

1  department-issued weapons?

2  **A.**  Yeah.  I asked them if they had all their equipment.  You

3  know, I asked them if they had been shot or stabbed.  I kind of

4  looked them over.

5  **Q.**  And during that inventory, what did you find?  Did they have

6  all of their department-issued weapons?

7  **A.**  As far as I knew, yes.

8  **Q.**  Do you recall seeing -- for Officer Cha -- do you recall

9  seeing if he had his gun?

10  **A.**  Yes.

11  **Q.**  He had his baton?

12  **A.**  Yes.

13  **Q.**  And he had his pepper spray?

14  **A.**  I believe so, yes.

15  **Q.**  And for Officer Patino, he too also had his gun?

16  **A.**  Yes.

17  **Q.**  And his baton?

18  **A.**  Yes.

19  **Q.**  And his pepper spray?

20  **A.**  I believe so, yes.

21  **Q.**  Do you recall where these weapons were located on Officer

22  Cha's person?

23  **A.**  I don't know how they wear their equipment.  You know, I

24  don't know if they are right-handed or left-handed.

25  **Q.**  When you were at the corner with them, could you see where

26  their weapons were, do you recall?

27  **A.**  I don't recall.

28  **Q.**  And that's -- so you don't remember as to Officer Cha where

71

SFDA 004291

1  his weapons were on that evening -- or early morning?

2  A.  Well, I'm not exactly sure what you're asking.  But, I mean,

3  basically his issued equipment was on his belt, on his person.

4  Q.  Okay.  But I guess, in your recollection, do you recall

5  seeing, like, where the holster was on his belt?  When you were

6  looking at him, was it on his right?  Was it on his left?

7  A.  I don't know.

8  Q.  And then as to Officer Patino, do you remember the same

9  thing?

10  A.  I do not know.

11  Q.  Okay.  Now, after taking the inventory of the weapons, you

12  had another officer remain with Officer Cha and Patino?

13  A.  Yeah.

14  Q.  Why did you do that?

15  A.  As far as I know, I was the first supervisor to get

16  on-scene.  I did not know the totality of exactly what had

17  happened.  I didn't know how injured the officers were.  The

18  person that had been shot, I had no idea if they had been shot,

19  if they were dead.  There was a lot of unknowns.  So this whole

20  situation was unfolding.  At this time, sergeants from the

21  Taraval district showed up.  They then took the public safety

22  statement from the officers.  They -- specifically Sergeant

23  Mannix -- said:  I'm in charge, I'm taking over, I'm going to

24  get the public safety statement.

25      And at that point, I was able to walk away, and I

26  essentially assisted in surrounding the house in question until

27  we were able to arrest the individual.

28  Q.  Now, do you recall who you assigned to stay with Cha and

72

SFDA 004292

1  Patino?

2  **A.**  No, I don't.  Not at all.  It was just a chaotic, unfolding

3  situation, and I simply just grabbed the first uniformed officer

4  and said:  That's what you're doing.

5  **Q.**  And what did you tell them to do?

6  **A.**  Stay with those officers, period.

7  **Q.**  And what was the purpose of him staying with the officers?

8  **A.**  To keep track of them.

9  **Q.**  Did you give him any other specific instructions?

10  **A.**  Yeah.

11  **Q.**  What were those instructions?

12  **A.**  To do it -- no.  Again, I'm not being sarcastic.  I go:  Do

13  not be distracted.  Do not let somebody give you another job to

14  do.  This is your job.

15  **Q.**  So his job was just to stay present with the two officers?

16  **A.**  Yes.

17  **Q.**  And was he supposed to make sure about anyone else or just

18  be present with the two officers and make sure they didn't

19  leave?

20  **A.**  Again, I'm not exactly sure how to answer that question

21  because a lot of things kind of simultaneously happened.  What

22  needed to occur -- and I was about to do it -- was to get a

23  public safety statement from the officers.  I never ended up

24  doing it because, like I said, the supervisors from the Taraval

25  Station, specifically Sergeant Mannix.  He arrived, and I

26  briefed him on what little information he knew.  And he asked

27  me, you know, did you get the statement from the officers?  I

28  said:  No, I have not had the opportunity yet.  And he relieved

SFDA 004293

1    me of that responsibility.  He took that over.

2    Q.  So when you, I guess, left the officer with Officers Cha and

3    Patino, they were all within earshot of one another?

4    A.  Yeah, absolutely.  Yes.

5    Q.  To your knowledge, did anyone -- did you or did the officer

6    that you left with Officers Cha and Patino instruct them not to

7    talk to each other?

8    A.  I don't know if I gave an instruction like that or not.  I

9    don't know.  I could have.  Maybe I didn't.  My primary concern

10   at the time was to have an ambulance look over their injuries.

11   Q.  And did you call the ambulance or did someone else?

12   A.  I specifically do not recall.  I very well could have;

13   somebody else could have.

14   Q.  Now, what did you know about Officers Cha and Patino before

15   you arrived on the scene?

16   A.  Officer Patino, I don't think I've ever met him before.

17   Q.  So then what has your experience been like with Officer Cha?

18   A.  Ah, Officer Cha was a hard-working, proactive police

19   officer.  I supervised him for several months, maybe six months,

20   maybe longer.  He was professional.

21   Q.  And do you recall what year that was that you supervised him

22   for those several months?

23   A.  It would have been 2016.

24   Q.  And how long had Officer Cha been on the force by that time

25   when you were supervising him?

26   A.  Not long.  I don't recall exactly.  He could have had a

27   year -- maybe more, maybe less.

28   Q.  Okay.  But your -- I mean, when in contrast to the length of

74

SFDA 004294

1    your career, he was a relatively new officer?

2    A.  He was relatively very new, yes.

3    Q.  Now, during that time, did you witness Officer Cha engage in

4    other uses of force against civilians?

5    A.  Witness?  No.   Investigate?  Yes.

6    Q.  Okay.  And so how many incidents did you investigate during

7    your year supervision of Officer Cha?

8    A.  I don't know.

9    Q.  Can you -- I -- you know, we don't have to have an exact

10   number, but can you count it on one hand?  Or is it tens?

11   Hundreds?

12   A.  Somewhere between maybe five and ten.

13   Q.  Okay.  And --

14   A.  Approximately, maybe.

15   Q.  Is that typical for a new officer, or would you say that's

16   less than normal, about the same, or more than what you would

17   have seen from other officers that are at the same level?

18   A.  It's not that it's typical or not typical.  You know,

19   Officer Cha is a proactive, hard-working officer.  He's going

20   out there, and he's looking for crime.  So he definitely found

21   crime.  Did he have more uses of force than other officers at

22   that time on that shift?  Yeah.  But he was probably doing twice

23   the work.

24   Q.  Thank you.

25        So when you were investigating these other incidents, what

26   was the result of your investigation?

27   A.  I found that his uses of force were within policy.

28   Q.  And has policy changed since 2016?

75

1    A.   Policy has changed, yes.

2    Q.   If those same investigations had been judged with the same

3    standards that are now in place, would they still have been

4    within policy?

5    A.   I don't think I could answer that question without reviewing

6    each incident in detail.

7    Q.   Well, why don't you tell us about one of the most egregious

8    investigations that you've had -- of the handful that you did

9    investigate -- as an example?

10   A.   You're asking to remember a specific egregious use of force?

11   Q.   Well --

12   A.   I don't remember specifically how many times he used force,

13   how many uses of force I investigate, or the specific nature.

14   Q.   So there were so many that none of them, kind of, stick in

15   your mind as an example?

16   A.   None of them -- no, they don't stick in mind.  Because a use

17   of force could be, you grabbed somebody, put them in handcuffs,

18   and if they complain of pain and say that they're hurt.  Whether

19   you see a visible injury or not, that's is a reportable use of

20   force that I have to investigate.  I don't think twice about

21   that after it's done.  A reportable use of force may be pointing

22   a firearm; shots are not fired, nobody is hurt, nobody is

23   injured, just a firearm is pointed.  It's just paperwork.  I

24   don't think twice about this stuff.

25   Q.   Do you recall how many times you had to investigate Officer

26   Cha pointing a firearm at someone?

27   A.   No.  I'm sorry.  I can't speculate to a number.  No, I can't

28   do that.

SFDA 004296

1    **Q.**  Was there at least one in the handful that you did

2    investigate?  I mean, did any of them involve a firearm?

3    **A.**  I believe he had pointed a firearm in the past, yes.

4    **Q.**  And you just can't recall how many times that happened?

5    **A.**  No.  I cannot.

6    **Q.**  But it's fair to say because it's a reportable use of force

7    when an officer points their firearm at someone, every time

8    Officer Cha points his firearm at someone, that needs to be

9    investigated; is that correct?

10   **A.**  That would be correct.

11   **Q.**  Now, do you trust Officer Cha to maintain the peace without

12   using unreasonable force?

13   **A.**  I'm sorry.  Could repeat the question.

14   **Q.**  Do you trust Officer Cha to maintain the peace without using

15   unreasonable force?

16   **A.**  Yeah, absolutely.

17   **Q.**  Okay.  And that opinion is based upon the handful of months

18   that you supervised him back in 2016, or is that based on

19   something in addition to that?

20   **A.**  My opinion is based on the period of time that I supervised

21   him in 2016.

22   **Q.**  Having, you know, responded to the scene here in 2017, does

23   that change your opinion at all?

24   **A.**  No.

25   **Q.**  Have you become aware of the fatal shooting that happened

26   just three or four months after this incident in, I believe it

27   was, May of 2017, when Officer Cha fatally shot a civilian by

28   the name of Nicholas Flusche.

77

SFDA 004297

1    Are you aware of that incident?

2  **A.**  Yes, I am.

3  **Q.**  Does that incident change your opinion at all about Officer

4  Cha's ability to maintain the peace without using unreasonable

5  force?

6  **A.**  I do not know the details of that incident, no.

7  **Q.**  So just the fact that, you know, there had been two fatal

8  shootings by Officer Cha within a handful of months, that

9  doesn't affect your opinion at all?

10  **A.**  I'm very much aware of some of the controversy surrounding

11  Officer Cha.  I don't have a problem with his decision-making.

12  **Q.**  Okay.  Now, can you describe a little bit more about your

13  working relationship with Officer Cha.

14    How well would you say you know him?

15  **A.**  I just knew him professionally at work, supervising him.

16  You know, I don't have any -- I don't believe we ever associated

17  outside of work, because I don't routinely associate with

18  coworkers outside of work.  I did work with him for a period of

19  several months on a daily basis; and then beyond that, you know,

20  not necessarily on a daily basis.

21  **Q.**  And so you said you worked with him on a daily basis.

22    Aside from the incidents that you had to investigate, did

23  you receive any civilian complaints about Officer Cha's

24  performance?

25  **A.**  Not that I recall, no.

26  **Q.**  Okay.  Did you receive any civilian complaints with regard

27  to any of the incidents that you did investigate?

28  **A.**  No, not that I recall.  No.

SFDA 004298

1  Q.  Were you wearing -- or actually -- yes, on January 6, 2017,

2  were you wearing a body-worn camera?

3  A.  I believe so, yes.

4  Q.  You were, okay.

5      And are you required to turn the body-worn camera on when

6  you're investigating a crime?

7  A.  Yes.  I mean, those things were, like, brand new at that

8  time.  So if we were issued them, I was wearing it.  I would

9  have turned it on.

10  Q.  And would you have turned it on before going to the scene?

11  Or at the scene?  Do you recall when you turned on your camera?

12  A.  Probably upon arrival or shortly thereafter.  I mean, we

13  didn't really have policy on -- it was all -- it was just brand

14  new.  Whether I turned it on -- I mean, I might have turned it

15  on, and it didn't turn on.  I don't know.  I've never looked at

16  it.

17  Q.  You've never reviewed your footage --

18  A.  Nope.

19  Q.  -- for this case?

20  A.  Nope.

21  Q.  And you didn't have a partner.

22      But the other officers on the scene, they also would have

23  had their body-worn cameras turned on, and they would have been

24  wearing them because that's policy at that time, even if they

25  were new?

26  A.  Yes.

27  Q.  Now, I'd like to play a little bit of a body-worn camera

28  clip.  It appears to depict you.  I just want you to be able to

79

SFDA 004299

1    see it.

2         **MS. LACAMBRA:**  And I'll pass out that transcript so folks

3    can follow along.

4         So we're going play a clip from Exhibit 1, and the

5    transcript will be marked Exhibit 1C.

6                              (Grand Jury Exhibit 1C was marked for

7                              identification.)

8         **MS. LACAMBRA:**  So we're going to play this; and if it

9    will help you, we'll dim the lights a little bit.

10   **Q.**  Officer, can you see the screen?

11   **A.**  Yeah, I can see it.

12                   (Whereupon, video played, unreported.)

13        **MS. LACAMBRA:**  Can you pause it for a second.

14   **Q.**  So, Officer, I'm just going to ask you, does that appear to

15   be you in the left side of the screen?

16   **A.**  Yes, it was.

17   **Q.**  And is that a fair and accurate representation of the scene

18   as you viewed it when you were on-scene on January 6, 2017?

19   **A.**  Yes.

20   **Q.**  So this is a fair and accurate representation of what you

21   saw?

22   **A.**  Yes.

23        **MS. LACAMBRA:**  You can go ahead and continue playing.

24                   (Whereupon, video played, unreported.)

25   **BY MS. LACAMBRA:**

26   **Q.**  So, Officer -- I'm sorry -- Sergeant, when you say, "I

27   fucking knew this was going to go to shit; I was listening to it

28   on the radio; I fucking knew it," what were you referring to

SFDA 004300

1  when you said, "going to shit"?

2  A.  I think I was referring to what I was testifying to earlier,

3  the evolution of how it sounded over the radio.

4  Q.  So what was it that you overheard on the radio that gave you

5  that impression of the escalation, the evolution?

6  A.  Like I said, you could hear the person's not cooperating,

7  there's a struggle, there's pepper spray being used, and then

8  there's shots fired.

9  Q.  And at about what point would you say you knew things were

10  going to shit?

11  A.  I think it's a figure of speech.  I don't know exactly when

12  I knew anything.

13  Q.  Well, I mean, you're making the statement on the scene.

14       What were you referring to when you made the statement?

15  A.  I think I was referring to how the situation was evolving

16  over the radio.  I knew it was going to go bad because I could

17  hear the progression of the incident unfolding over the radio.

18  Q.  Did it surprise you that a noise complaint call had

19  escalated into Cha using his gun?

20  A.  No, it doesn't surprise me.

21  Q.  So you would say it would be normal to expect, where Officer

22  Cha is involved, an incident that involves a noise complaint to

23  escalate to the use of deadly force.

24  A.  I'm not exactly sure what that question was.

25  Q.  You said it didn't surprise you.

26       So is it normal for a noise complaint to escalate to the use

27  of deadly force?

28  A.  No, it's not normal.

SFDA 004301

1    Q.  How many, would you say reports, of calls of noise

2    complaints -- or between neighbors -- like a neighbor dispute --

3    has erupted into the use of a firearm being discharged?

4    A.  How many neighbor calls for service result in the

5    discharging of a firearm?

6    Q.  In your experience.  I mean, you've been on the force for

7    over 25 years.  So I imagine this --

8    A.  I am not qualified to speculate on statistics like that.  I

9    wouldn't have the slightest -- I could not give you the

10   slightest --

11   Q.  Have you ever been involved in responding to a noise

12   complaint where you had to either point your gun or use your

13   gun?

14   A.  I do not specifically recall going to a noise complaint and

15   having to point any gun, no.

16   Q.  And you've been on the force how many years?

17   A.  Twenty-five, going on twenty-six.

18   Q.  Now, had you ever met Sean Wendell Moore prior to January 6,

19   2017?

20   A.  No.

21   Q.  And you worked at Ingleside Station?

22   A.  Yes.

23   Q.  Were you aware of any other calls to 515 Capitol while you

24   worked at Ingleside?

25   A.  Specifically, no.  I do have a recollection that there was

26   an individual in a household -- who was at 515 -- and Mr. Moore

27   that Taraval had numerous repeated calls regarding; but as to

28   the specific address and the specific individuals, no.

SFDA 004302

1   Q.  So how did you come to know that it was, like -- I guess my

2   question actually first is, so is that -- are those calls having

3   to do with Sean Moore at 515 Capitol Avenue?

4   A.  I'm sorry?

5   Q.  You said you became aware that there had been several calls

6   made about a specific residence.

7       Did you later come to know that that residence was 515

8   Capitol?

9   A.  I would later come to know, yes.

10  Q.  And when did that happened?  How did you get that knowledge?

11  A.  I have a vague recollection -- because we shared the same

12  border and radio channel with Taraval.  They repeatedly went to

13  a house and dealt with the same neighbors over and over again in

14  that area.  After this incident, I became aware that that's

15  exactly who and the address that it was, yes.

16  Q.  And how did you become aware of that?  How did you figure

17  out the identity; that it had to do with these two neighbors?

18  A.  Because just start hearing through talk through the police

19  department that there was history of calls for service.  It's

20  just information that comes out after the fact, whether you're

21  part of the investigation or not.

22  Q.  So was that common knowledge prior to January 6, 2017?

23  A.  That I would not know.

24  Q.  And did that later inform department policy on how to

25  approach calls to that residence?

26  A.  I'm sorry?

27  Q.  Like, the reputation is that there's a particular residence

28  that has multiple calls that have been made by neighbors.

83

1    Did that then inform the department's position on how to

2    respond to calls to that particular residence?

3  **A.**  Okay.  Department policy has changed, not just from this

4    incident but from a lot of incidents and, quite frankly, case

5    law as it evolves, and how we deal with a lot of different

6    things.  Specifically to that address?  I'm not sure how you

7    want me to tie that -- I can't answer that question.  I don't

8    understand it.

9  **Q.**  I guess for officers from your station, from Ingleside

10   Station, that were asked to help with or respond to calls at 515

11   Capitol Avenue, were they given any special kind of, you know,

12   be on the lookout or be aware that this individual has had

13   multiple calls and that, you know, perhaps you need to approach

14   with more caution?

15 **A.**  Not to my knowledge.

16 **Q.**  Now, I'd like to talk to you about Officer Cha's reputation

17   in the field regarding use of force.

18     Are you aware of what his reputation is in the field for how

19   he treats individuals who may exhibit symptoms of mental

20   incapacity or mental illness?

21 **A.**  I am not aware of what his reputation is.

22 **Q.**  Okay.  Then I guess, let's go back to the months that you

23   supervised him.

24     What is your opinion about how Officer Cha's reputation

25   would be for the time that you worked with him on how he

26   interacted with individuals from the community who presented

27   with cues that might indicate either a mental incapacity or

28   mental illness?

84

SFDA 004304

1    A.    I never saw a problem with him interacting with members of

2    to public.

3    Q.    Do you recall if any of the incidents of use of force that

4    you investigated involved individuals who presented with mental

5    incapacity, disability, or illness?

6    A.    I don't remember the specific details of any use of force

7    investigation I conducted.

8    Q.    So you don't know if any of them involved someone who could

9    have presented with mental incapacity, disability, or illness.

10   A.    I wouldn't know.

11   Q.    Have you ever seen Officer Cha exhibit anger while on duty?

12   A.    Not to to my recollection.

13   Q.    Have you ever received complaints by other officers that

14   Officer Cha exhibited anger when interacting with civilians

15   while on duty?

16   A.    No.

17   Q.    Does Officer Cha have a reputation for escalating incidents?

18   A.    I am not aware of his reputation.  I've never seen him do

19   that, no.

20   Q.    You've never seen him do that.  You at least heard one

21   incident over the radio, this incident, that you reacted to;

22   right?  Is that correct?

23   A.    Yeah.

24   Q.    And you're aware at least of the other fatal shooting

25   incident that happened just months later?

26   A.    Yes.

27   Q.    So based on that, do you have an opinion as to whether or

28   not Officer Cha has a reputation for escalating incidents?

SFDA 004305

1    **A.**   I do not have an opinion on Officer Cha.

2    **Q.**   Would you say it's normal for an officer to be involved in

3    two fatal civilian shootings within a few months of one another?

4    **A.**   No, that's not normal.

5    **Q.**   Is it normal to even have one officer-involved shooting?   I

6    mean, are there officers who go through their entire career

7    without ever drawing their weapon against a civilian?

8    **A.**   I would say it's normal to -- you asked a couple of

9    different questions in that question.

10        There are officers that have never discharged their firearm

11   in the course of their career; there are officers who have

12   multiple times.   As -- I mean, it's kind of a case-by-case

13   basis.   Is it normal to have two shootings in a short period of

14   time?   No, that's not normal.

15   **Q.**   But even having that outlier be a fact in this situation,

16   you are still unprepared or unwilling to come to any kind of

17   opinion based on those facts about Officer Cha's reputation for

18   escalating?

19   **A.**   I don't know what Officer Cha's reputation is.   And then

20   you're asking me to take a future incident that occurred later

21   and speculate as to --

22   **Q.**   I'm asking you, do you have an opinion -- based on at least

23   those two discrete points of reference -- do you have an opinion

24   about Officer Cha's reputation -- your opinion of his reputation

25   in the community?

26   **A.**   My opinion is Officer Cha is a good, hard-working,

27   professional police officer.   He's new.   I think he's got a lot

28   of maturing and grooming ahead of him.   But I don't think he's

SFDA 004306

1  reckless; I don't think he's dangerous; I don't think he's

2  malicious.  I think he's a hard-working, professional police

3  officer.

4  Q.  Who has been involved in at least two incidents where things

5  went to shit?

6  A.  Yes.

7        MS. LACAMBRA:  One moment.

8        Do the jurors have questions?  If you can start writing

9  them down.

10        MS. DRUSINSKY:  And while we're collecting them, I just

11  have a few clarifying follow-up questions.

12                    **DIRECT EXAMINATION**

13  BY MS. DRUSINSKY:

14  Q.  You spoke about the public safety statement.

15        Can you just explain to the jurors what that is.

16  A.  Yeah.  So a public safety statement is, when an officer is

17  involved in a shooting, there's a whole investigation -- well,

18  multiple investigations -- criminal, civil; and basically the

19  responding supervisor, once it becomes appropriate, needs to ask

20  him simple, basic questions for public safety like, you know,

21  how many people were in the shootout, was anybody shot, how many

22  shots were fired, in what direction did they go, could there be

23  somebody behind a wall that was shot by a ricocheted bullet.

24  Things of that nature that you just need to ask them for public

25  safety purposes.  You're not then supposed to talk to them

26  beyond that because then there will be the criminal,

27  administrative aspects that will be handled by other entities.

28        When I said I did not take a public safety statements, it's

87

SFDA 004307

1  because they were injured; they were bloodied and battered; and

2  we were standing in front of this house where shots had been

3  fired.  I didn't know who else was around.  This was information

4  that needed to be gathered.  I walked away from the scene; and,

5  like I said, I was prepared to take a statement once we walked

6  away from the scene; but once Officer Cha's and his partner's

7  supervisor showed up, they took that over.

8  Q.  And just to clarify, so when a sergeant takes a public

9  safety statement, they don't -- do they go into the details of

10 what happened or no?

11 A.  I have never taken one yet in my career as a sergeant.

12 Q.  Okay.  Fair enough.  Okay.

13      Then I just had some follow-up questions regarding the -- I

14 think you were saying -- the five to ten use of force

15 investigations that you conducted on Officer Cha.

16      Do you recall if any involved an injured civilian?

17 A.  I do not recall specific details of those investigations.  I

18 just don't.

19 Q.  Do you recall if any of them involved the use of pepper

20 spray?

21 A.  Perhaps.  I don't recall.

22 Q.  Did any of them involve the use of a baton?

23 A.  I do not recall.

24 Q.  And were all of these in 2016?

25 A.  Could have been an overlap of 2015 or 2017.

26 Q.  So at or near 2016?

27 A.  Yes.

28 Q.  Okay.  And were there police reports written about the

SFDA 004308

1    investigation?

2    **A.**   Yeah, absolutely.

3    **Q.**   Okay.   Did you author any of those reports?

4    **A.**   Author?   No.

5    **Q.**   Okay.

6    **A.**   No.

7    **Q.**   Who would have authored the reports?

8    **A.**   Either the officer that used the force or another unit.

9    **Q.**   And since you were conducting the investigation, did you

10   document your investigation in any way in writing?

11   **A.**   It's very likely that I may have signed and approved a

12   report --

13   **Q.**   I see.

14   **A.**   -- and then I would conduct my own investigation.   There

15   would be a written record of that, yes.

16   **Q.**   Is that in the form of a police report?   How does that work?

17   Can you explain it.

18   **A.**   No.   It's an internal document that would go down to

19   probably our legal division, and then we have the early

20   intervention team that -- they collect the data, right.   And

21   then if you accumulate X-amount of uses of force in a certain

22   period of time, it triggers an additional investigation.

23   **Q.**   Oh, really?

24   **A.**   Yes.

25   **Q.**   So if you have a certain amount of use-of-force incidents,

26   that triggers an investigation just based on the number alone?

27   **A.**   To see if there's a pattern.

28   **Q.**   Oh, I didn't know that.

SFDA 004309

1      Okay.  So is it fair -- and let me know if you don't know

2  the answer to this -- is it fair that police legal would have in

3  their possession internal documents, many of them authored by

4  you, related to the use-of-force investigation of Officer Cha?

5  **A.**  Yes.

6  **Q.**  And then you stated that you're aware of the controversy

7  surrounding Officer Cha.

8      Can you just clarify what controversy you're referring to.

9  **A.**  Ah, what I meant by that is I know there's been news

10  stories.

11  **Q.**  Just about the officer-involved shootings or something else?

12  **A.**  About officer-involved shootings.

13      **MS. DRUSINSKY:**  I may be done.  Let me just check.

14      **MS. LACAMBRA:**  I did want to address one juror's

15  question.  The transcripts are incorrect.  I apologize.  It

16  should read Bodisco where it says Mannix.  And we'll correct

17  that on the transcript and on the exhibit.

18      **MS. DRUSINSKY:**  Okay.  I don't have anything further.

19      **MS. LACAMBRA:**  We still have more questions for you.

20  These are just questions from the jurors.  If we could just have

21  a moment.

22  **Q.**  So Officer Bodisco -- I'm sorry, Sergeant Bodisco -- you say

23  you don't have an opinion on Officer Cha's reputation, yet you

24  describe him as hard-working and professional.  That sounds like

25  an assessment of his reputation.  Please explain.

26  **A.**  When you say "his reputation," I'm thinking, like, what does

27  everyone else think of him.  I don't know what other people

28  think of him, and I've never asked and I'm not really inclined

SFDA 004310

1    to.  As far as what I think of him, I told you.  I think he's

2    hard-working, I think he's professional, I think he's new, and I

3    think he has the potential of being a very good cop.  He needs

4    to be developed like any new employee in any business.

5    Q.  I see.

6        Is that an opinion as a snapshot back in 2017, or is that

7    your opinion now?

8    A.  That's an opinion of me supervising him in 2017 -- or 2016.

9    Q.  Okay.  So then let me clarify -- I'll add this follow-up

10   question, because a lot of my questions earlier about Officer

11   Cha's reputation were with regard to your opinion about his

12   representation based upon your experience with him -- does that

13   change your answers because you said that you didn't have an

14   opinion as to whether or not --

15   A.  Right.  Right.  I completely misunderstood you.

16   Q.  So now that we have this clarifying question, what is your

17   opinion about his reputation based on your experience with

18   regard to escalating incidents with civilians?

19   A.  In regard to escalating incidents with civilians?

20   Q.  Interactions with civilians.

21   A.  How would I know if I wasn't there?

22   Q.  I'm not asking about a specific incident, but you actually

23   investigated multiple incidents that Officer Cha had engaged in

24   during the course of your supervision of him.

25       So I'm asking, based on your experiences, have you formed an

26   opinion -- what is your opinion of his reputation, based on your

27   experience, of his escalating incidents with civilians?

28   A.  I don't think he has a problem with escalating incidents

SFDA 004311

1   with civilians at that time -- or if there's a different time.

2   I think he is a professional, hard-working police officer.

3   **Q.**   And do you have an opinion as to Officer Cha's reputation on

4   using force?  Is he more likely the same or less likely to use

5   force than the average officer?

6   **A.**   My opinion on his likelihood to use force?

7   **Q.**   Yes.

8   **A.**   Well, that kind of sounds like a speculative question and

9   speculative response.

10  **Q.**   Well, I'm asking you, based on your experience with him, in

11  your experience, does he have a reputation of using more, the

12  same --

13  **A.**   He -- he used force more than other officers and

14  subordinates that I supervised.

15  **Q.**   And you've tried to explain that because you had mentioned

16  that you thought that he was has hard-working officer and

17  responded to more calls.

18      If the average officer responded to the same amount of calls

19  as Officer Cha, you would expect them to exhibit the same level

20  of force?

21  **A.**   Not necessarily.

22  **Q.**   Okay.  Can you explain that.

23      Why not?

24  **A.**   One of the things that I do as a supervisor when I go out

25  and I investigate an officer's use of force is -- is it within

26  legal, is it legal and lawful, and is the within policy?  And

27  what I would do as a veteran officer and what a rookie officer

28  would do might be the same, or it might be totally different.

SFDA 004312

1    Quite often, there's an appropriate use of force that, if it was

2    me who responded, might have been a totally different outcome.

3    It doesn't mean that it was wrong or unlawful.  It's just

4    perhaps unnecessary.  Does that answer our question?

5    **Q.**  It does.  Thank you.

6        Sergeant, would you say the more incidents an officer

7    reports to, the officer will be involved in more investigations?

8    For example, does the more incidents an officer shows up to

9    equal more chances for investigations?

10   **A.**  I mean, mathematically speaking, I guess, yes.  I think I

11   kind of answered that the last time.  I mean, everyone has a

12   different personality, right.  I mean, not everything has to

13   result in the use of force.  Sometimes no amount of

14   proportionality can avoid it.  I mean, it's -- it kind of is

15   what it is.  You take each one as an individual incident and

16   look at the facts to that incident.

17       Does that answer the question?

18   **Q.**  I believe so.  And if it doesn't, I'm sure we'll get a

19   follow-up question.

20       Who reports use-of-force incidents to be investigated?

21   **A.**  Nobody reports them to be investigated.  So it's incumbent

22   on me as a patrol supervisor to know what's going on in the

23   street.  If a use of force occurs, the officer will tell me.

24   I've never had an officer not.  I'm sure it's happened, but I'm

25   not aware of any incident where an officer concealed a use of

26   force from happening.

27       But more often than not, I will be out there at the scene,

28   usually after the fact.  So I'm not a witness to what happened.

SFDA 004313

1    Once again, my job is was the force lawful under the law, and

2    was it within department policy?  You know, as for whether or

3    not I would have done it that way, that's not relevant.  So it's

4    my job then to -- the officer or another officer will document

5    the details of it in their incident report.  I will have my own

6    report that I fill out everybody's information from all parties

7    involved.  And that's a separate report.  It's just an

8    administrative thing, and it works its way through the chain of

9    command, and the department keeps records on this.

10        And if you accumulate multiple uses of force, it triggers

11   what we call the Early Intervention System.  And at that point,

12   I will have to go back and review all these uses of force,

13   whether I investigated it, whether another sergeant investigated

14   it, to see whether there's a pattern.  That's sort of how it

15   works -- or that's pretty much how it works at my level.

16   Q.  Did you recognize any patterns in Officer Cha's reputation

17   and work experience?

18   A.  No, I did not see a pattern because I did have to do an

19   early intervention on him.  So I reviewed six months of reports,

20   most of which occurred before I supervised him.  And I did not

21   find a pattern at that time.

22   Q.  And when you said you had to do an early intervention, what

23   does that mean?

24   A.  It's just what it's called, EIS, Early Intervention System.

25   It's an administrative program that the department has to track

26   uses of force to look for and identify if there's a pattern.

27   Q.  And does everyone undergo that?

28   A.  If you accumulate enough incidents.

SFDA 004314

1    Q.   How many incidents do you have to accumulate before getting

2    flagged for EIS?

3    A.   I don't know.  And it's not just uses of force.  It can --

4    you know -- you could be subject to a civil litigation.  That

5    might trigger it.  Citizen complaints will -- if it's -- you

6    accumulate points and some have bigger triggers than others.  I

7    don't know the details of how that works.

8    Q.   But you said you did review six months of prior reports on

9    Officer Cha?

10   A.   Yeah.

11   Q.   Did you become aware of what it was that triggered the EIS

12   flagging of his performance?

13   A.   A shooting will automatically trigger an early intervention

14   system response automatically.

15   Q.   But you said this happened in 2016?

16   A.   Yeah.

17   Q.   So there had to have been -- are you saying there was a

18   shooting prior to 2016?

19   A.   No.

20   Q.   So what was it, based on your review of the records of

21   Officer Cha, are you aware of what triggered the Early

22   Intervention System?

23   A.   Not specifically.  It could have been uses of force -- and

24   it was.  There were multiple uses of force.  I think he was in

25   the Field Training Program at that time.  There could have been

26   civilian complaints.  There were uses of force.  I read the

27   reports.  I did not see a pattern.

28   Q.   Okay.  Now, you used "proactive" to describe Officer Cha's

SFDA 004315

1   type of police work.

2       Can you be more specific and give examples of what you mean

3   by "proactive"?

4   **A.**  Yeah.  Proactive -- you know, it's usually the younger

5   officers, they're going to be eager to go to all the calls for

6   service, particularly the high-priority calls for service.

7   They're going to be eager to be there first.  But beyond calls

8   for service, they really like to engage in what we call

9   self-initiated activity, so that would be, like, traffic stops

10  or, you know, approaching citizens on the street.  Whether you

11  approach it consensually or whether you have reasonable

12  suspicion of probable cause, they just like to initiate

13  proactive police work.

14  **Q.**  You mentioned while previously supervising Officer Cha, he

15  was a hard-working and proactive police officer.

16      What does it mean to be a proactive police officer?  Is

17  looking for crime different than looking for trouble?

18  **A.**  Well, I think I kind of answered the question what proactive

19  means.  Is looking for crime different than looking for trouble?

20  Yes.

21  **Q.**  And how are they different?

22  **A.**  Looking for crime is what police officers do.  Looking for

23  trouble, that's just looking for trouble.  I mean, I'm not

24  exactly sure how to elaborate on that.  You know, I mean --

25  **Q.**  How do you tell the difference between looking for crime and

26  looking for trouble when it's a police officer?

27  **A.**  Well, that's a good question.  That requires a little bit of

28  thought.  I don't have a fast, immediate answer for that.  You

SFDA 004316

1    know, what type of reputation does the officer have; you know,

2    do his coworkers approach you and tell you that there's a

3    problem; you know -- I mean, are people coming to the station

4    and saying, you know, just five minutes ago, this officer said

5    and did this, you know; does he seem to have a chip on his

6    shoulder; is he respectful of, you know, my rank and my

7    authority, or does he have a problem with supervision?

8         These are just all things that you look for, and they're

9    things that they might be there right in front of you, and you

10   don't see until somebody else helps point it out.  You know,

11   it's --

12   **Q.**  How many times would you say coworkers of Officer Cha have

13   approached you with concerns about his behavior on the beat?

14   **A.**  No officer ever told me they had an issue with Officer Cha.

15   **Q.**  Now, what general steps are involved, or taken, in

16   investigating use of force by an officer?

17   **A.**  An officer does not investigate use of force.  A sergeant or

18   a lieutenant does, and it's usually the sergeant.  And then I

19   told you -- I already explained it -- if a use of force occurs,

20   I will respond to the scene.  Usually it happens after the fact,

21   usually I am not there to witness the use of force, so my

22   investigation will be I'm going to talk to the officers; I'm

23   going to talk to citizens; I'm going to talk to the person whose

24   force was used against them; I'm going to review body-worn

25   camera, you know.  And from there, like I said, was it lawful

26   under the law?  Was it within policy?

27   **Q.**  In instances where you investigate use of force, do you ever

28   advise or require further training, counseling, or leave of

SFDA 004317

1    absence?

2    **A.**    I'm sorry.  Please reread the question.

3    **Q.**    In instances where you investigate use of force, do you ever

4    advise or require further training, counseling, or leave of

5    absence -- and I believe it's implied -- of the officer that you

6    are investigating?

7    **A.**    Yeah.  So for a routine use of force, let's just say

8    whatever, you wrestled somebody into handcuffs and they got

9    hurt, that investigation, no, I would not make a recommendation.

10   If it came back later through the Early Intervention System and

11   I reviewed all the incidents, and I did find a pattern, then,

12   yes, essentially, if there is a pattern, then you are going to

13   start a program of retraining.  But then that has to be approved

14   through the chain of command.  I mean, if there's a pattern, it

15   could result in something more serious -- at a minimum

16   retraining up to further investigation beyond my authority.

17   **Q.**    And did you ever order that retraining for Officer Cha while

18   you supervised him?

19   **A.**    No, because the one investigation of early intervention that

20   I did, I not see a pattern.

21   **Q.**    Are you aware if any of these -- or other corrective

22   actions -- so these further training, counseling, or leave of

23   absence or corrective action was advised for Officer Cha for

24   this incident?

25   **A.**    I don't know anything about this incident other than what

26   I've been -- right?  I was there.  I found him.  I was not a

27   part of any administrative or criminal investigation.

28   **Q.**    So these are three questions pertaining to the batons.

98

SFDA 004318

1        Can you please describe what a baton looks like.

2    A.   Yeah.  The department issues a wooden baton.  It's just a

3    straight stick, 26 inches in length.  Officers can wear

4    different batons if they get authorization and training to carry

5    a different type of a baton.  Some batons are made out of

6    plastics or metals, and they, like, telescope in size; and

7    officers like to carry them as a matter of convenience and

8    comfort.  But generally speaking, it's a wooden, 26-inch long

9    stick.

10   Q.   When you say telescope in size, are you talk the

11   collapsable --

12   A.   Collapsable.

13   Q.   And do you recall if the batons that Officer Cha and Officer

14   Patino had on them on January 6, 2017, were the 26-inch, wooden

15   baton or the collapsible baton?

16   A.   I have no idea.

17   Q.   Is there a standard location on the belt where the baton is

18   stored?

19   A.   Generally speaking, it's carried opposite of your strong

20   hand.  So I'm right-handed, it would be carried on my left-hand

21   side.

22   Q.   And is it possible that if a person was standing in front of

23   you and you had a baton in your belt, the other person might not

24   be able to see it?

25   A.   Um, I heard the question.  I'm not sure I understand it.

26   Q.   Maybe I'll just read it as it is.

27        Is it possible that if I was standing in front of you and

28   you had a baton in your belt, I might not see it?

SFDA 004319

1    **A.**   It's possible.

2    **Q.**   Officer Cha reported having lost his baton before firing

3    shots.   You said that Officer Cha had his baton when your

4    inventory was taken.

5           When did Officer Cha get his baton back?

6    **A.**   I don't know.   You didn't ask those questions.

7    **Q.**   Do you know if anyone asked those questions?

8    **A.**   No, I don't.

9    **Q.**   From the time that you pulled Officer Cha up and then walked

10   him to the corner, did you separate from him at all before you

11   finally -- before you took the inventory of the weapons?

12   **A.**   I remember asking him, "Do you have all your equipment,

13   specifically like gun, radio, baton," I remember them telling

14   me, yes, they had all their equipment.   I don't specifically

15   remember visually accounting for it.   I just kind of took their

16   word for it.

17   **Q.**   My question though was, from the moment that you kind of

18   picked them up to stand on the scene and then walked them to the

19   corner and then took the inventory, did you leave him at any

20   point, or did you stay with him from the moment you lifted him

21   up?

22   **A.**   No.   By the time I found him behind the car and walked him

23   down to Minerva Street, I would have been with him.

24   **Q.**   Okay.   So there was no interruption between when you lifted

25   him up and when you took the inventory?

26   **A.**   Not to my knowledge, no.

27   **Q.**   So for clarification, Richmond Station, where you worked

28   with Officer Cha, is in San Francisco, California, and not

SFDA 004320

1   Richmond, California?

2   **A.**   Correct.

3   **Q.**   Thank you for that clarifying question.

4        When you arrived at the scene, you mentioned officers

5   huddled and you attended to them.

6        Do you know where was Mr. Moore at that time?

7   **A.**   Specifically, no.

8   **Q.**   Did you feel there might still be a threat -- did you not

9   feel there might still be a threat, if at all?

10  **A.**   Yeah, no, I thought there potentially could be a threat.

11  Yeah, absolutely.

12  **Q.**   Did officers offer an explanation or comments when you were

13  with them?

14  **A.**   No, they did not.

15  **Q.**   When you say you were not surprised that this noise

16  complaint ended in a shooting, is that referring to Officer

17  Cha's involvement or to the idea that anything can happen on any

18  call for service?

19  **A.**   The latter.  Anything can happen at any time.

20  **Q.**   Who arrested Mr. Moore?  What was the charge?

21  **A.**   I wasn't -- he surrendered to the tactical unit.  Who

22  actually took him into custody physically, I don't know.  As for

23  the charges, I don't know.  And it might help to explain, all of

24  this happened in the Taraval district.  I'm assigned to the

25  Ingleside.  We share a border, so we go over to help back and

26  forth.  As far as all the investigation stuff, that's Taraval.

27  So, like, I just -- it wasn't my responsibility.  I don't know.

28  **Q.**   When was the ambulance called?

SFDA 004321

1    A.   I don't specifically know.  It could have been -- I don't

2    know.

3    Q.   What was the nature of the officers' injuries?

4    A.   So Officer Cha had blood on his head.  It looked like he had

5    a laceration.  I don't know if that's ultimately what it was.

6    And the other Officer -- Patino was it -- he had a bloody nose,

7    and I think he later -- it was -- his nose was broken.

8    Q.   Were the large amounts of blood their own, if you know?

9    A.   It wasn't large amounts of blood.  I mean, they were

10   bloodied, yeah.  It wasn't like a pool of dripping blood.  Was

11   it their own?  It was consistent with the injuries, yeah, I

12   believe so.

13   Q.   And I think you already answered this, but is 515 Capitol in

14   the jurisdiction of Taraval Station?

15   A.   In the what?

16   Q.   In the jurisdiction of Taraval Station?

17   A.   Yes.

18   Q.   What is the protocol to handle a situation where an

19   individual is especially aggressive even though they were not

20   provoked?

21   A.   What is the protocol?  I'm sorry.  Please read the question.

22   Q.   What is the protocol to handle a situation where an

23   individual is especially aggressive even though they were not

24   provoked?

25   A.   Well, the protocol then as well now was basically the same

26   even though they have rewritten the policy.  It's -- you attempt

27   to get compliance and to deescalate the situation by talking to

28   the person and establishing some kind of calming dialogue.  We

SFDA 004322

1    didn't really have an official name for that policy back then.

2    Now we call it "deescalation."

3        And then it depends on exactly why you're there, right.

4    What is the nature of the call. You know, I don't think anyone

5    at that time legally was thinking about, you know, are we

6    creating our own exigency. I don't even think that was a factor

7    in how people thought back then. I guess it just -- you know,

8    the nature of the call, and if you can calm the situation down

9    and abate it, or is there a crime involved and an arrest has to

10   be made, you know. These are all just factors you take into

11   consideration.

12   Q.   You required now to take into account whether or not you're

13   creating your own exigency?

14   A.   For that incident?

15   Q.   I'm asking now. You said back then, that wasn't necessarily

16   something that people were thinking about. Now are officers

17   required to take into account whether or not they are creating

18   their own exigency?

19   A.   Yeah. It's brought up in training. It's part of

20   deescalation tactics.

21   Q.   And you said a lot of this depends on the situation that

22   you're responding to.

23       Would an officer be, I guess, investigated for neglect of

24   duty or held at fault in some way if they exercise their

25   discretion to retreat from an encounter with an aggressive

26   individual and create time and distance and perhaps to

27   investigate at a later date and time?

28   A.   Yeah. That's a tough one, and that's kind of evolving. We

SFDA 004323

1    get calls all the time where it's, like, you know, should we

2    walk away from this -- usually mental-health-type calls --

3    should we walk away from it, or are we obligated to stay until

4    there's some kind of peaceful resolution.  And that's a question

5    that gets batted around.  You know, certainly, it seems like

6    policy on a national level is starting to go that way.  Yeah,

7    it's -- as for whether an officer would be in trouble if he were

8    to, like, deescalate and come back later, they want us to do it

9    if it's appropriate; but, you know, if it wasn't appropriate and

10   something bad happened, yeah, you might be in trouble.  These

11   policies aren't totally clear.  They're certainly not black and

12   white.  And, unfortunately, too many officers have too many

13   questions and not enough answers.

14   Q.  Is it part of the training that an officer won't actually be

15   considered in neglect of duty if they choose not to further

16   investigate an incident that is nonviolent?

17   A.  I'm not sure I know how to answer that.  I'm not even sure

18   if I understand the question.

19       Can you ask it again.

20   Q.  I will shortly.  One moment.  We'll ask the remaining juror

21   questions first.

22       Okay.  Are people with known mental illness and/or

23   problematic behavior made known to the police department and

24   their officers?

25   A.  Yes.

26   Q.  Is everyone in San Francisco that has a mental illness or

27   problematic behavior made known to the police department?

28   A.  No.

SFDA 004324

1    **Q.**  But there are some people who are known?

2    **A.**  Yes.

3    **Q.**  In the officer's body-camera footage from the scene, they

4    report they lost their batons -- I think you kind of answered

5    this question, so let me just clarify.

6       Do you know if the officers carry multiple batons?

7    **A.**  I've never seen that happen.

8    **Q.**  Okay.  I think that's it.

9       **MS. LACAMBRA:**  And we are just double-checking if anyone

10   has any follow-up questions.

11   **Q.**  But with regard, Officer, to general order 5.01 -- and this

12   was the version that was in place in December of 2016 -- is it

13   true that officers who act to deescalate an incident which can

14   delay taking a subject into custody while keeping the public and

15   officers safe will not have been found to have neglected their

16   duty.

17   **A.**  That sounds familiar.

18   **Q.**  Would it refresh your recollection to review the general

19   order?

20   **A.**  Yeah, please.

21   **Q.**  Okay.  So, Officer, after having an opportunity to review

22   the training manual for General Order 5.01, is it true that

23   officers are trained that officers who act to deescalate an

24   incident which can delay taking a subject into custody while

25   keeping the public and officers safe will not be found to have

26   neglected their duty; they will be found to have fulfilled it?

27   **A.**  That is what the general order says, yes.

28   **Q.**  Is that consistent with what your understanding of the

SFDA 004325

1  department policy and training is with regard to deescalation

2  that was in effect in December of 2016?

3  **A.**  That would be my understanding, yes.

4  **BY MS. DRUSINSKY:**

5  **Q.**  And just one follow-up.

6      Do you agree that the general orders that were in place from

7  December 21, 2016, included a policy about deescalation?

8  **A.**  That's my understanding, yes.

9  **Q.**  And then another follow-up:  Was Sean Moore known to have a

10  mental illness by the police force prior to the incident with

11  Officer Cha, as far as you are aware?

12  **A.**  I don't know because I didn't know Sean Moore.

13      **MS. DRUSINSKY:**  Okay.  Anyone else?

14      Seeing no other questions, thank you so much, Sergeant.

15      **THE GRAND JURY FOREPERSON:**  You are admonished not to

16  discuss or impart at any time outside of this jury room the

17  questions that have been asked of you in regard to this matter

18  or your answers until authorized by this grand jury or the court

19  to discuss or impart such matters.  You will understand that a

20  violation of these instructions on your part may be the basis

21  for a charge against you of contempt of court.  This admonition,

22  of course, does not preclude you from discussing your legal

23  rights with any legally employed attorney should you feel that

24  your own personal rights are in any way in jeopardy.

25      **THE WITNESS:**  Understood.

26      **THE GRAND JURY FOREPERSON:**  Thank you.

27      **THE WITNESS:**  Thank you.

28      **MS. DRUSINSKY:**  Thank you so much, Sergeant.

SFDA 004326

1    (Witness excused.)

2    **MS. DRUSINSKY:**  Okay.  So I think we're going to break

3 until 2:00 so.  As a reminder, don't discuss this case with each

4 other and with anyone else, and do not look anything up on the

5 Internet.  Okay.  Thank you, everyone.  We'll see you at 2:00.

6    (Whereupon, jurors exited the courtroom.)

7    **MS. LACAMBRA:**  For the record, all the jurors have left

8 the courtroom.  The only people present are ADA Bringardner,

9 Drusinsky, and Lacambra.

10    And these are the two questions -- juror questions --

11 that were not asked of witness Richard Bodisco:

12    Was he convicted -- referring to Mr. Moore?

13    And in the officer's body-worn-camera footage from the

14 scene, they report they lost their batons while confronting Sean

15 Moore, yet you report the officers had their batons.

16    Do they carry multiple baton or does this indicate the

17 officers retrieved their batons from the scene?  Or perhaps they

18 never lost them?  This was not asked because it was duplicative

19 of a prior question.

20    **MR. BRINGARDNER:**  And while we're still on the record, I

21 just want to state that I left the room earlier when I -- I

22 indicated so on the record, and I have not been back in the room

23 until just this moment, which was after the jurors took their

24 lunch break and had left the courtroom.  Thank you.

25    **MS. LACAMBRA:**  Back on the record, still with no jurors

26 in the courtroom.  And one other question that was not asked

27 because it was asked by ADA Drusinsky already was, you mentioned

28 you knew about controversies surrounding Cha.  Can you

SFDA 004327

1  elaborate.

2      And that was duplicative, so it was not asked.  Thank

3  you.

4          (Luncheon recess was taken at 1:08 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SFDA 004328

1    **AFTERNOON SESSION**                                **2:02 p.m.**

2                    (Whereupon, roll call was taken.)

3         **THE GRAND JURY SECRETARY:**  We have all 17.

4         **MS. LACAMBRA:**  For the record, all 17 jurors are present

5    and in court along with the two District Attorneys,

6    Ms. Drusinsky and myself, Ms. Lacambra.  At this time, we are

7    prepared to recall witness Colin Patino.

8                         **COLIN PATINO**,

9    called as a witness for the People, having been previously duly

10   sworn, testified further as follows:

11        **THE WITNESS:**  Yes, ma'am.

12        **THE GRAND JURY FOREPERSON:**  Please be seated.  Please

13   state your name and spell it, for the record.

14        **THE WITNESS:**  My name is Colin Patino; Colin, C-O-L-I-N,

15   P-A-T-I-N-O.

16        **MS. DRUSINSKY:**  Good afternoon, Officer.  Before I get

17   into your question, I'm just going admonish the jurors really

18   quickly.

19        So Colin Patino was given use immunity in order to

20   testify fully in this grand jury investigation.  Use immunity

21   prevents the prosecution from using a witness' statements

22   against him or her in a criminal prosecution.  As a result of

23   this order, no testimony or other information compelled under

24   the order may be used against him in a criminal case.  Do not

25   make any negative or positive inferences from the fact that

26   Colin Patino invoked his Fifth Amendment right against

27   self-incrimination or the fact that he was given immunity.

28   ///

SFDA 004329

## DIRECT EXAMINATION

BY MS. DRUSINSKY:

**Q.** Okay. So good afternoon again.

**A.** Good afternoon.

**Q.** Okay. So, Officer, can you tell us what you do for a living.

**A.** I am a police officer for the City and County of San Francisco.

**Q.** How long have you been a police officer for?

**A.** I've been employed with the police department since the academy, which was September of 2014; and I've been a sworn member as a police officer with the City and County of San Francisco since May of 2015, so a little over six years.

**Q.** Thank you. What did you review in preparation for this hearing?

**A.** I reviewed the police report; I reviewed body-worn camera footages; I reviewed depositions and interviews -- transcripts -- of my interviews from the difference agencies.

**Q.** And when you said body-worn camera footages, are those -- is that your body-worn camera footage and Officer Cha's body-worn camera footages?

**A.** That's correct. Both mine and Officer Cha.

**Q.** Any others?

**A.** No.

**Q.** Can you estimate how many times you've seen the footage from your body-worn camera before coming in here today?

**A.** I could not. It's been four-and-a-half-plus years since, so I don't know.

110

SFDA 004330

1    **Q.**   Okay.  Did you review the body-worn camera footage with

2    anyone other than your attorney?

3    **A.**   No.

4    **Q.**   Did you review any other police reports prepared in

5    connection with this shooting of Sean Moore?

6    **A.**   No.

7    **Q.**   And did you review any recording of notes you took, or have

8    in your possession, regarding the incident from January 6, 2017,

9    at 515 Capitol Street?

10   **A.**   No, because I don't have any notes from that night.

11   **Q.**   Okay.  And have you discussed this grand jury proceeding

12   with anyone other than your attorney?

13   **A.**   No.

14   **Q.**   And have you heard of any reference of this grand jury from

15   anyone other than your attorney?

16   **A.**   No.

17   **Q.**   Okay.  I want to ask about the weapons placement on your

18   utility belt.

19       Can you describe your utility belt for us, like what weapons

20   you carry on your person.

21   **A.**   Yes.  Specifically, weapons on our utility belt/gun belt --

22   it's a Sam Browne belt -- it's the belt that we use that was

23   given to us in the academy.  It's department-issued.  We all are

24   issued a firearm .40 caliber, SIG SAUER, model 226; we're issued

25   a baton, and we're able to use a wood baton or a metal baton, if

26   we're trained in that; we are given an OC spray, which is a

27   really, really effective pepper spray; and we're also given two

28   magazines for additional ammunition.  That's 12 bullets per

SFDA 004331

1    magazine, plus the magazine, that's in our gun belt.  So we have

2    12 in the gun, plus one in the chamber, plus another 24.

3    Q.  Can you describe where all of the items are located on your

4    belt.

5    A.  Yes.  Depending if you're right-handed or left-handed, the

6    firearm will be on that side.  For me personally, I'm a

7    right-handed shooter; my firearm was on my right hand.  They

8    trained us to keep the baton on the other side; they also train

9    us to keep the OC on the other side; and our magazine is towards

10   the front because it's easier to gravitate to, if you need to do

11   a magazine change.

12   Q.  And at the time of this incident, you didn't have Tasers;

13   right?

14   A.  We've never had Tasers.  San Francisco Police Department has

15   refused to give us Tasers.

16   Q.  Okay.  So your specific arrangement is gun on the right side

17   and then baton and OC on the left side; correct?

18   A.  Correct.  And that night, I was using a retractable, metal

19   baton, not the wood baton.

20   Q.  Okay.  So I take it you took extra training to be able to

21   use that baton?

22   A.  That's correct.

23   Q.  Do you happen to know Officer Cha's utility belt

24   arrangement?

25   A.  I don't remember what his -- no, I don't remember what it

26   was.  But I remember it was something similar.  Same amount of

27   weapons.

28   Q.  Do you know if Officer Cha is right- or left-handed?

SFDA 004332

1    A.   I believe he's right-handed.

2    Q.   Okay.  Do you have a San Francisco Police Department, like,

3    department-issued cell phone?

4    A.   I do.

5    Q.   Okay.  Did you ever use either your department-issued cell

6    phone or your personal cell phone to discuss this incident with

7    Officer Cha?

8    A.   No.  We were ordered to not talk about the incident.  And

9    through prior training in our academy through our DGOs, it

10   explicitly states you shall not talk about this incident with

11   anybody else unless it's an investigator or your lawyer.

12   Q.   Do you remember when you were given the order to not discuss

13   the case with Officer Cha?

14   A.   I think -- I don't remember.  I do know when I did speak to

15   my lawyer for the first time at Taraval Station, he said --

16   Q.   Okay --

17   A.   -- do not speak to this.  And it is a running general order.

18   Just because no one has explicitly said, don't talk about this,

19   is a DGO, a general order.

20   Q.   Okay.  Great.

21        Do you know or have any reason to believe that Officer Cha

22   discussed this incident with anyone other than his attorney on

23   his department-issued cell phone?

24   A.   No.

25   Q.   Do you have any reason to believe that he discussed this

26   incident with anyone other than his attorney on his personal

27   cell phone?

28   A.   I do not.

SFDA 004333

1  Q.  And so I take it you've never discussed this case with

2  Officer Cha?

3  A.  Absolutely not.

4  Q.  Did you ever author an incident report for this case?

5  A.  No.

6  Q.  You didn't author any report related to this case; right?

7  A.  That's correct.  We are strictly prohibited from writing

8  reports if you are involved in an incident like an

9  officer-involved shooting.

10  Q.  And when you say you're strictly prohibited, is that, like,

11  a general order?  Who prohibits you?

12  A.  I don't know.  I just know you're not going to write that --

13  if there's a shooting, you're not going to write that report.

14  Q.  I take it you did not document your use of force in writing

15  in this case?

16  A.  That's correct.

17  Q.  Did you complete any writing at all related to this case

18  aside from privileged materials from your attorney?

19  A.  I provided an initial written statement to homicide --

20  Q.  Okay.

21  A.  -- and that's it.

22  Q.  So you provided the initial statement?

23  A.  So because of our general orders --

24  Q.  Yeah.

25  A.  -- the first step in that during a homicide investigation

26  is -- a written statement of your recollection is given to

27  homicide prior to viewing the body-worn camera -- your own

28  body-worn camera footage; and in order to do that -- well, my

114

SFDA 004334

1   lawyer provided a statement.  So I told my lawyer what I
2   recalled, what I remembered of that incident, and he wrote down
3   what I said.  I read that statement, and I believed that
4   statement was factual in what I had said.  I believed it, I
5   signed it, and that's what was given to my -- or that's what I
6   gave to the homicide investigators.
7   **Q.**  To homicide, okay.
8       Okay.  So I take the answer to this is, no, but to your
9   knowledge, did Officer Cha document his use of force in writing
10  for this incident?
11  **A.**  I don't know what Officer Cha did.
12  **Q.**  To your knowledge, did he ever write a report in this
13  incident at all?
14  **A.**  I don't know.
15  **Q.**  Can you let us know the dates of all the interviews you
16  participated in for this case with the San Francisco Police
17  Department as well as who interviewed you -- approximately.
18  **A.**  A day or two after we had the initial homicide, I believe it
19  was Sergeant Watts and Sergeant Delaney, they asked me; and then
20  they followed up on the injuries that I received.  And I know
21  that was in the latter of that month.
22      I spoke to -- specifically San Francisco Police Department
23  personnel; correct?
24  **Q.**  Yeah.
25  **A.**  I also spoke to our Internal Affairs Administration Bureau.
26  **Q.**  You don't have to tell us who you spoke to there.
27  **A.**  And I believe there were two investigator sergeants who
28  interviewed us there.

SFDA 004335

1   **Q.**  Anything else?

2   **A.**  That's it.

3   **Q.**  Okay.  Can you let us know the dates of all interviews you

4   participated in for the San Francisco District Attorney's

5   Office.

6   **A.**  I did not.

7   **Q.**  Okay.  So on January 6, 2017, what was your job?

8   **A.**  I was assigned uniform patrol, San Francisco Police

9   Department, Taraval Station.

10  **Q.**  And at that point, how long had you been a police officer?

11  **A.**  Sworn?

12  **Q.**  Yeah.

13  **A.**  A little over a year and a half.

14  **Q.**  How long have you had the assignment of patrol?

15  **A.**  Since I graduated the academy, so a year and a half.

16  **Q.**  Do you remember who your field training officer was?

17  **A.**  I had two field training officers.

18  **Q.**  Do you remember them?

19  **A.**  Yes.  Kenyon Bowers and --

20  **Q.**  Do you think you can spell it for the court reporter.

21  **A.**  I'm sorry.  Officer Kenyon Bowers.  That's going to be

22  K-E-N-Y-O-N, Bowers, B-O-W-E-R-S.  My second field training

23  officer was Michael Grande; Michael, common spelling, Grande,

24  G-R-A-N-D-E.  And my third training officer was now Sergeant

25  Donald Jackson, common spelling.

26  **Q.**  And on January 6, 2017, who was your partner?

27  **A.**  Officer Kenny Cha.

28  **Q.**  How long had he been your partner at that time?

SFDA 004336

1    A.  About five, six months.

2    Q.  Can you estimate how many calls you responded to with him as

3    your partner by January 6, 2017?

4    A.  Hundreds.  Probably close to a thousand.

5    Q.  Do you feel like you worked well together?

6    A.  Yes.

7    Q.  Do you trust Officer Cha?

8    A.  Yes.

9    Q.  Can you describe your relationship with Officer Cha now.

10   Are you still close?  Still partners?

11   A.  We are not -- we don't have a relationship.  Due to the fact

12   of this investigation, it's -- we can't talk.

13   Q.  So I take it you did not stay partners after the incident?

14   A.  That's correct.

15   Q.  Did your opinion or trust of Officer Cha change after the

16   shooting?

17   A.  No.

18   Q.  Did you learn anything about the second fatal shooting that

19   he had with -- a few months later with Nicholas Flusche,

20   F-L-U-S-C-H-E?

21   A.  No.

22   Q.  Did that change your opinion or trust of Officer Cha?

23   A.  No.

24   Q.  So on January 6, 2017, when did your shift begin?

25   A.  It began at 2100, so at 9:00 p.m.

26   Q.  Is that generally when your shift began during that

27   assignment?

28   A.  Yes.

117

SFDA 004337

1  Q.  How many hours of sleep did you get before your shift that
2  day?
3  A.  I don't remember.
4  Q.  Does it sound familiar that you went to bed at 7:00 a.m. and
5  woke up at 6:00 p.m -- or do you need me to refresh your
6  recollection?
7  A.  If that's written down and I can read that -- I don't
8  remember how many hours of sleep I got.
9  Q.  Fair enough.
10  A.  Generally, that sounds like a lot of sleep for a midnight
11  officer -- for any officer on the beat.
12  Q.  Let me know if this refreshes your recollection.  And I'm
13  just showing you a transcript of your interview with homicide.
14  A.  Okay.
15  Q.  So I'll turn to page 8.
16  A.  I believe -- I don't -- sitting here right now
17  four-and-a-half years later, I don't remember; but I believe if
18  that's what I said then, then that's how many hours of sleep I
19  got.
20  Q.  Okay.  So it sounds right that you woke up at approximately
21  6:00 p.m., and you went to bed at approximately 7:00 a.m?
22  A.  Yes.
23  Q.  And you stated that you got a lot of sleep.
24      Do you agree with that statement?
25  A.  That sounds like a lot of sleep, yes.
26  Q.  Okay.
27  A.  For anybody.
28  Q.  Yeah.  All right.

SFDA 004338

1    So were you wearing a body-worn camera when you responded to

2    the call at 515 Capitol Street on January 6, 2017?

3    **A.**  Yes.

4    **Q.**  Did you turn the camera on -- so your body camera on --

5    immediately after arriving at 515 Capitol Street?

6    **A.**  It was -- I didn't activate it until I started hearing Sean

7    Moore yell.

8    **Q.**  How long did that take?

9    **A.**  I don't remember, maybe 15, 20 seconds.

10   **Q.**  Okay.  And are you required to turn a body-worn camera on

11   when you're investigating a crime?

12   **A.**  Yes.

13   **Q.**  And did your partner, Officer Cha, wear a body-worn camera

14   as well on January 6, 2017?

15   **A.**  He did.

16   **Q.**  Okay.  So I'd like to play the body-worn camera for the

17   jurors now.  So I'm going to pass out a transcript, so the court

18   reporter does not need to transcribe this.  So just give me a

19   moment.  I'm going to give you a transcript also.

20   **A.**  Okay.

21       **MS. LACAMBRA:**  For the record, we are marking this as

22   Exhibit 3, and the transcript, Exhibit 3A.

23                        (Grand Jury Exhibits 3 and 3A were

24                        marked for identification.)

25       **MS. LACAMBRA:**  I apologize.  What was previously marked

26   as 3A will actually be 4A, the transcript.

27       We're now playing what has been previously marked as

28   Exhibit 3.

SFDA 004339

1      (Whereupon, video played, unreported.)

2      **MS. DRUSINSKY:**  Can you pause it.  So we just started the

3  beginning of the body-worn camera footage that you were wearing

4  on that?

5  **Q.**  Does this appear to be the video of the body-worn camera

6  that you wore when you arrived at the scene of 515 Capitol

7  Street on January 6, 2017 -- Officer?

8  **A.**  I'm sorry.

9  **Q.**  I'll play it again.  I don't think you were watching.

10  **A.**  Do you mind if I stand up?

11  **Q.**  Of course you can stand up.  You can move.

12      **MS. LACAMBRA:**  Can you now see the screen?

13      **THE WITNESS:**  I'm good.

14      **MS. DRUSINSKY:**  Can you pause.

15      **THE WITNESS:**  Yeah, that's my video.

16  BY MS. DRUSINSKY:

17  **Q.**  Does that appear to be the video from the body-worn camera

18  you wore when you arrived at the scene of 515 Capitol Street on

19  January 6, 2017?

20  **A.**  Yes.

21  **Q.**  Does this video fairly and accurately depict the scene as

22  you saw it that day?

23  **A.**  Yes and no -- if I could explain.

24  **Q.**  Okay.

25  **A.**  So what you have here is a body-worn camera.  It's not -- it

26  captures only what it can see.  It's not going to capture me

27  looking to my left, looking to my right.  It's not going to

28  capture the spit that's hitting my face.  It's not going to

SFDA 004340

1  capture -- there's a lot that it doesn't capture.  It's grainy.

2  It would be like taking a picture of a sunset, right; so that

3  picture of a sunset is never going to look at beautiful in your

4  iPhone or a nice camera as in your own eyes and your own

5  experience.  So, yes, this is the body-worn camera footage that

6  was on me that captured the incident, but it's not going to

7  capture everything that I saw, that I felt, that night.

8  Q.  Of course.  And I understand.  I just need to clarify, for

9  the record, so that we can use this video.

10      So this was the video that you wore, and did it fairly and

11  accurately depict the scene with the limitations of a body-worn

12  camera that we all understand as you saw it that day?

13  A.  Correct.

14      MS. DRUSINSKY:  Okay.  So we can play it.

15      (Whereupon, video played, unreported.)

16      MS. LACAMBRA:  We're stopping the video at time 12:25:26

17  in the top right corner, for the record.

18  BY MS. DRUSINSKY:

19  Q.  Let me turn on the lights.

20      Okay.  So in the beginning of the video -- so specifically

21  your body-worn camera --

22  A.  Uh-huh.

23  Q.  -- did you notice that something was kind of blocking the

24  vision of the camera a little bit?

25  A.  It was my jacket.

26  Q.  It was your jacket, okay.

27      Okay.  And then you stated that you've also seen Officer

28  Cha's body-worn camera footage?

SFDA 004341

1    A.    Yes.

2    Q.    So we're going to play that as well.    So I'm going to turn

3    the lights off again.

4          MS. LACAMBRA:    And, for the record, we have marked this

5    as Exhibit 4, and the transcript you have is of this video,

6    Exhibit 4A.

7                              (Grand Jury Exhibits 4 and 4A were

8                              marked for identification.)

9                (Whereupon, video played, unreported.)

10   BY MS. DRUSINSKY:

11   Q.    Okay.    I waited until the part where it appears like you

12   arrived on the scene.

13         So does the video fairly and accurately depict the scene

14   from the angle of Officer Cha's body-worn camera as you observed

15   it that day?

16   A.    Yes.

17         MS. DRUSINSKY:    And specifically, I'm referring to

18   Officer Cha's body-worn camera.

19         Okay.    So we can play the video.    And the court reporter

20   does not need to report the transcript.

21                (Whereupon, video played, unreported.)

22         MS. LACAMBRA:    For the record, we have stopped the

23   recording at 12:27:26 in the upper right corner.

24   BY MS. DRUSINSKY:

25   Q.    Okay.    So going from the beginning, around 3:51 a.m. on

26   January 6, 2017, did you receive a dispatch call to respond to

27   515 Capitol Street in San Francisco, California?

28   A.    Yes.

SFDA 004342

1  **Q.**  Were you informed that a man named Christopher Choy had a

2  temporary restraining order against his neighbor?

3  **A.**  I didn't realize that until we read the CAD.

4  **Q.**  Can you just tell us a timeframe.

5      Were you reading the CAD?  When would that have happened?

6  **A.**  When we got into the radio car, or patrol vehicle, every

7  patrol vehicle has a computer -- it's called the CAD system --

8  and every call that you're on, you're able to read the details

9  of that call.  So I do recall on the CAD -- it's like a

10  message -- stating Christopher Choy has a restraining order

11  against his -- an active restraining order -- against his

12  neighbor Sean Moore, gave a description, and said "active."

13  Just because you see it in CAD -- you know, there's a lot of --

14  we get a lot of calls that where just because something says

15  something doesn't actually mean it is.  That's why we go there

16  to investigate it.

17  **Q.**  Okay.  So by the time you got in the patrol car to head over

18  to 515 Capitol Street, you were informed a man named Christopher

19  Choy had a temporary restraining order against his neighbor?

20  **A.**  Yes.

21  **Q.**  And the neighbor's name was Sean Moore?

22  **A.**  Yes.

23  **Q.**  Was Christopher Choy living at 521 Capitol Street?

24  **A.**  Yes.

25  **Q.**  And Sean Moore was living at 515 Capitol Street?

26  **A.**  Yes.

27  **Q.**  And Christopher Choy called the non-emergency line to

28  complain that Sean Moore was hitting the wall between

SFDA 004343

1   residences; is that right?

2   A.  I don't know if he called 911 or he called the non-emergency

3   line, but all I know is we got a call for service.  I don't

4   remember what it said on CAD, whether it was a 911 call or not.

5   Q.  Would it say that on the CAD?

6   A.  Sometimes.

7   Q.  Would it refresh your recollection to look at the CAD?

8   A.  Sure.

9   Q.  I don't know that it says that, so you can look at the CAD.

10  A.  Okay.

11  Q.  So I'm approaching with the CAD.  It's several pages.  Don't

12  mind the highlight.

13  A.  Right.

14  Q.  Just let me know if that refreshes your recollection.

15        MS. LACAMBRA:  And for the record, if you could explain

16  what CAD stands for.

17        THE WITNESS:  Computer Automated Dispatch.  Every time

18  you call the police, or you call dispatch, it automatically

19  generates a number.  And that's the -- that is the call log, I

20  guess.  Not every CAD is going to have an associated case

21  number, which would be the report number.  So sometimes you call

22  the police and say, hey, can you talk to my neighbor?  Sure.

23  Talk to neighbor.  If there's no report, then there's no case

24  number, just to clear up "CAD" and "case."

25  BY MS. DRUSINSKY:

26  Q.  Yep.

27  A.  I don't see where it would say "non-emergency."

28  Q.  Okay.  Does it say emergency, or does it just not say either

                                                              124

1  way?

2  **A.**  It doesn't say either.

3  **Q.**  Okay.  I'll just grab the binder back.  Thank you very much.

4  **A.**  Uh-huh.

5  **Q.**  Okay.  So when you went into the patrol vehicle, were you

6  aware that Christopher Choy basically called to complain that

7  Sean Moore was hitting the wall between residences?

8  **A.**  Yes.

9  **Q.**  Okay.  This is more or less, like, a noise complaint, would

10  you agree?

11  **A.**  It's more than a noise complaint, if there is a served

12  criminal order restraining someone's freedom, which isn't taken

13  lightly.  There's a lot that goes through trying to get a

14  restraining order, essentially restricting someone's freedom.

15  And there has to be documented instances why somebody may have a

16  restraining order against someone.  It may be because of

17  harassment, it may be because of violence, it may be because of

18  both.  And then a judge has to issue the order.  So I would say

19  it's a higher priority than a noise complaint.

20  **Q.**  Okay.  So a regular noise complaint -- how would you respond

21  to a regular noise complaint?

22  **A.**  Contact the person who is calling, contact the alleged noise

23  complaint person, ask them to turn your music down or whatever

24  you're doing.  And that's it.

25  **Q.**  And how would you respond to a violation of a restraining

26  order?

27  **A.**  You get statements from both parties, if time allows it.  If

28  you're able to, try to get both statements; verify that there is

125

SFDA 004345

1  a restraining order, and see if one party has been served or

2  not. And if not, we'll take that restraining order -- I believe

3  it's a 200 form, I'm not sure -- and you read the admonishment

4  to the person who is being restrained. You tell them, hey, do

5  not harass, strike, talk to this person at this date until this

6  time, signed by this judge. And then give both parties a copy

7  of the served restraining order, and then tell the courts that

8  you served it.

9  **Q.** Would you agree that there is different levels of severity

10  for just a violation of a restraining order?

11  **A.** There's different steps, yes.

12  **Q.** So for example, there could be a violation of a restraining

13  order that's violent, would you agree?

14  **A.** Yes.

15  **Q.** Like an act of violence is violating the restraining order?

16  **A.** Correct.

17  **Q.** There could be an instance of stalking; that's a violation

18  of a restraining order?

19  **A.** Correct.

20  **Q.** Those two instances are pretty severe in nature; right?

21  **A.** Uh-huh.

22  **Q.** Is that a "yes"?

23  **A.** Yes.

24  **Q.** Now, on a noise-complaint basis, for a violation of a

25  restraining order, would you agree that that is less severe?

26  **A.** On the face of it, yes.

27  **Q.** So when you arrived -- or before you arrived -- what your

28  understanding was -- the basis of the request for service -- let

126

SFDA 004346

1    me ask this differently.

2         There was no violence alleged that you were aware of --

3    A.   That I was aware of.

4    Q.   -- before you even got to the scene?

5    A.   Correct.

6    Q.   There was no information that anyone's life was at risk;

7    correct?

8    A.   Correct.

9    Q.   You arrived at the location at, like, 4:15 a.m?

10   A.   Yes, approximately.

11   Q.   And you arrived with your partner, Officer Cha?

12   A.   Yes.

13   Q.   Would agree at that time, there was no urgency to the call?

14   A.   It's hard to judge someone's urgency when you're calling at

15   4:15 -- or what time did the call come out, 3:51 -- so there's

16   some act of desperation for someone.  It's not a big deal for

17   me; but for someone calling at 3:51 in the morning, I would say

18   that's a big deal.  I wouldn't take it lightly.

19   Q.   And if you were called for a loud party at 3:51 a.m., would

20   that be urgent to you?

21   A.   If it was a loud party and there was a restraining order, I

22   would -- it would be a lower-priority call.

23   Q.   Now, when you arrived at the scene, the street was quiet?

24   A.   Yes.

25   Q.   Were there any loud sounds coming from 515 Capitol Street?

26   A.   I don't remember.

27   Q.   Did watching the body-worn cameras refresh your recollection

28   at all?  There was, like, a part before Sean Moore opens the

127

1    door, does that refresh your recollection as to whether or not

2    you heard any loud sounds coming from 515 Capitol?

3    **A.**  I heard yelling from 515 Capitol while I was speaking to

4    Choy --

5    **Q.**  Okay.

6    **A.**  -- from 521, and that yelling was not my partner's voice.

7    **Q.**  Right.

8       And I guess I'm asking if the body-worn camera refreshes

9    your recollection about the noise coming from 515 Capitol before

10   Officer Cha knocked on the door?

11   **A.**  No, because there's no sound.  There's no audio associated

12   with this prior to us.

13   **Q.**  Okay.  So it doesn't refresh your recollection?

14   **A.**  I don't remember any sound.

15   **Q.**  Okay.  Do you recall hearing any banging sounds coming from

16   515 Capitol?

17   **A.**  I don't remember.

18   **Q.**  Do you remember any loud sounds from 521 Capitol Street?

19   **A.**  Other than the interaction with Sean Moore -- oh, I'm sorry.

20      You said 5-2-1?

21   **Q.**  Yes.

22   **A.**  Where Choy's lives?

23   **Q.**  Yes.

24   **A.**  No.

25   **Q.**  So would it be fair to say that whatever the basis for the

26   restraining order, by the time you arrived, as far as you could

27   tell, was no longer present?

28   **A.**  Correct.

128

SFDA 004348

1    **Q.**  Now, immediately after you arrived, you split from your

2    partner Kenneth Cha; correct?

3    **A.**  Yes.

4    **Q.**  So Officer Cha went to 515 Capitol Street to talk to Sean

5    Moore at the same time that you went over to 521 Capitol Street

6    talk to Christopher Choy?

7    **A.**  Correct.

8    **Q.**  Do you and Officer Cha usually split up when you first

9    arrived at the scene to investigate a possible crime?

10   **A.**  Yes.  That is common tactic used in law enforcement for

11   scenes that are -- where there isn't an active crime happening,

12   where there isn't any exigency, one partner will talk to party

13   one, the other partner will talk to party two; and then

14   hopefully everything is good.  We switch.  We figure out both

15   sides of the story so both can hear party one, party two, each

16   officer.  And then we can try and get a conclusion based on the

17   information that we get from both party one and party two.  It's

18   just basic investigative techniques.

19   **Q.**  And shortly after arriving at the scene, had you or Officer

20   Cha discussed, like, what strategy or tactics you were going to

21   employ to investigate the complaint?

22   **A.**  Other than saying -- and I don't remember, but I do believe

23   I said, "I'm going to talk to Choy," and Kenny goes, "I'm going

24   to go talk to the guy at 515 Capitol" -- Sean Moore.

25        That's all I remember.

26   **Q.**  Okay.  So we kind of went over that you turned on your

27   body-worn camera within 15 to 20 seconds of arriving at the

28   scene; right?

SFDA 004349

1    A.   Yes.

2    Q.   And did you speak with Mr. Choy before turning on your

3    body-worn camera?

4    A.   I did.

5    Q.   Do you recall for about how long you spoke to him before

6    turning on your body camera?

7    A.   I don't, no.

8    Q.   I'm sorry?

9    A.   I don't recollect, no.

10   Q.   Okay.  So on your body-worn camera, it shows you speaking to

11   Mr. Choy for about 13 seconds.

12        Can you estimate how long you spoke to him that day?

13   A.   More than 13 seconds.  More than that.

14   Q.   Was it around 30 seconds?  Was it less than that?

15   A.   Maybe 45 seconds.  I don't know.

16   Q.   Yeah, okay.

17   A.   Yeah.  I don't know, and I don't remember.

18   Q.   Okay.  And Mr. Choy indicated to you that he heard a banging

19   noise from next door?

20   A.   Correct.

21   Q.   And did Mr. Choy say whether he saw Sean Moore do this

22   banging?

23   A.   Whether he saw him banging through the wall?

24   Q.   Yes.

25   A.   No.

26   Q.   Okay.  Did he tell you any other details about the banging

27   noise?

28   A.   He said -- I said:  Hey, are you Mr. Choy?  Yes.  What's

                                                              130

1   going on?  Man -- and I'm repeating what I remember him

2   saying -- man, I just want to get some sleep.  I'm tired.  My

3   neighbor Sean Moore he's banging on the door.  I just want him

4   to stop.  Can you please get him to stop.

5        And I asked him, "Do you have a restraining order?"  He

6   grabbed it, gave it to me, and then I heard Sean Moore yelling.

7   And I didn't have to ask Choy, and Choy said, "Yeah, that's

8   probably him yelling."  I said," Okay.  I'll be right back."

9        And that was the last thing that happened.

10  **Q.**  Thank you for that.

11       Did he tell you if it was one bang or more than one?

12  **A.**  He said "banging," so he didn't specify how many bangs there

13  were.

14  **Q.**  And you didn't hear any banging while you were on-scene;

15  right?

16  **A.**  I didn't hear any banging.  That's correct.

17  **Q.**  Did you learn whether -- and maybe the answer is no -- did

18  you learn whether the banging was coming from inside or outside

19  Sean Moore's house?

20  **A.**  No, I don't remember.

21  **Q.**  Okay.  And then you stated that Choy told you he had a

22  temporary restraining order against his neighbor Sean Moore;

23  right?

24  **A.**  Correct.

25  **Q.**  And he told you he complained that Sean Moore violated the

26  order by banging on the wall; is that right?

27  **A.**  Correct.

28  **Q.**  And that was basis of his complaint --

SFDA 004351

1    **A.**   Yes.

2    **Q.**   -- right?

3       As far as you know, he had not been injured in any way?   And

4    by "him," I'm referring to Christopher Choy.

5    **A.**   At that time, I had no knowledge of him being injured or

6    not.

7    **Q.**   Christopher Choy didn't indicate his life had been

8    threatened in any way?

9    **A.**   No -- I don't remember.

10   **Q.**   You don't remember him indicating that --

11   **A.**   I do not remember him indicating that his life was in any

12   threat.

13   **Q.**   And as far as you are aware, no one was at risk of being

14   hurt in that moment; right?

15   **A.**   Correct.

16   **Q.**   Okay.   I think you kind of summarized your conversation with

17   Mr. Choy, but is there anything else you recall Mr. Choy saying

18   while you spoke to him?

19   **A.**   Not saying, but I remember his appearance.   He looked tired;

20   he looked frustrated, sad, and like he needed some sleep.   He

21   looked desperate.

22   **Q.**   And at that point, you didn't ask Mr. Choy if he wanted you

23   to arrest Sean Moore; right?

24   **A.**   No.   I remember that was probably my next question, but due

25   to me hearing a voice yelling -- and it not being my partner I

26   was concerned about that.   So I said, "I'm going to be right

27   back."   So my intention was, we're going to talk about this

28   after; I'll be right back; we are going to handle this.

132

SFDA 004352

1    Q.  So you did not ask Mr. Choy to sign a citizen's arrest form?

2    A.  Correct.

3    Q.  But you said Mr. Choy had a copy of the temporary

4    restraining order?

5    A.  Which he gave me.

6    Q.  Which he gave you.

7        And so you took it?

8    A.  Yes.

9    Q.  Then you headed over next door and --

10   A.  I didn't take it.

11   Q.  You received it?

12   A.  I received it, yes.

13   Q.  Then you headed over next door to Officer Cha to investigate

14   the order?

15   A.  Yes.

16   Q.  And when you went next door, you saw Officer Cha at the top

17   of the stairway to Sean Moore's house?

18   A.  Uh-huh.

19   Q.  Is that a "yes"?

20   A.  Yes.

21   Q.  Sean Moore was standing behind the metal gate to his front

22   porch while speaking to Officer Cha when you arrived?

23   A.  Yes.

24   Q.  Is it fair to say Sean Moore appeared to be upset or

25   agitated?

26   A.  Yes.

27   Q.  Moore was ordering you both to leave his house?

28   A.  He was -- yeah, requesting that we leave.

133

SFDA 004353

1  Q.  He raised his voice?

2  A.  Yes.

3  Q.  And he was using curse words to emphasize his demand that

4  you leave his stairwell; right?

5  A.  That's correct.

6  Q.  On January 6, 2017, you had been trained on making contacts

7  with people who are mentally ill; correct?

8  A.  I was not trained under the 40-hour CIT program until a year

9  and a half after that.  We had some general training in the

10  academy.  The rest was life experience of trying to talk to

11  people and calm them down.

12  Q.  And through the academy, you had received training on how to

13  deal with people who are mentally ill; correct?

14  A.  Yes.  It was minimal training.  It was more of an exposure

15  to -- there are people who have mental health issues, and that's

16  a basic list of what type of mental health issues people may --

17  that you might talk to you.  It lists how you should act with

18  people.  And then there is an 40-hour advance class, which I

19  wasn't enrolled in or wasn't able to take until a year and a

20  half after this incident.

21  Q.  And the 40-hour class you're referring to is the crisis

22  intervention training?

23  A.  That's correct.

24  Q.  And you gave a statement in a deposition in this case;

25  correct?

26  A.  I did.

27  Q.  And in the deposition, you were asked:  Have you received

28  training on making contacts with people who are mentally ill;

134

SFDA 004354

1  right?

2  **A.**  I did, yes.

3  **Q.**  And you were specifically asked about your training back on

4  January 6, 2017?

5  **A.**  Yes.

6  **Q.**  And you said, yes, you had received training; right?

7  **A.**  The training that I'm explaining to you from the academy.

8  In that same deposition, I also made clear that during that

9  deposition in September of 2019, I believe, I explained, hey, I

10  hadn't been to the crisis intervention team training yet as

11  well.

12  **Q.**  I understand.

13      But as of January 6, 2017, you had been trained to

14  recognize, based on behavioral cues and other indicators, people

15  with mental illness; correct?

16  **A.**  Yes.

17  **Q.**  And one indicator you were trained to consider when

18  determining whether someone is mentally ill is whether a person

19  becomes aggressive without apparent provocation; is that right?

20  **A.**  Yes.

21  **Q.**  And another indicator you were trained to consider is a

22  person who is easily frustrated; right?

23  **A.**  Yes.  Those are all indicators.  People -- I mean, we come

24  in contact with people who are angry all the time; people who

25  exhibit those exact behaviors every single day.  It's not

26  necessarily that they are, you know, bipolar, schizophrenic, or

27  any other disability; it's that people are just angry.  So, yes,

28  I was trained in that.

135

SFDA 004355

1    Q.  You're not a doctor, I understand.

2    A.  I'm not a clinician.  I'm a police officer who is trying to

3    deescalate each situation to the best of my ability.

4    Q.  Okay.  I appreciate that.

5        And then another indicator that you were trained on is short

6    temper and argumentative speech.

7    A.  I don't recall that.

8    Q.  Okay.  Would it refresh your recollection to look at the

9    student domain you were trained on in the academy?

10   A.  Yes.

11   Q.  Okay.  I'm approaching with Learning Domain 37, People with

12   Disabilities.  And, specifically, I'll refer to chapter 4,

13   page 4-7.  You can look at the date too.  It's over here.  Just

14   let me know if that refreshes your recollection.

15   A.  Okay.

16   Q.  Does that refresh your recollection?

17   A.  Yes.

18   Q.  Okay.  Thank you.

19   A.  Uh-huh.

20   Q.  Okay.  So you agree that short temper and argumentative

21   speech is another indicator of someone who could be mentally

22   ill?

23   A.  That is one indicator, correct.

24   Q.  Do you agree that several indicators were present,

25   suggesting Mr. Moore suffered from mental illness at the time of

26   the incident?

27   A.  Okay.  Looking back on it, I can absolutely see that.  At

28   the time that -- I didn't see it, and I don't know why.  But

SFDA 004356

1   that wasn't going through my head at that time.

2   **Q.**  Okay.  So at the time, as you observed Mr. Moore in his

3   agitated state, did you believe he could be suffering from

4   mental illness?

5   **A.**  No.

6   **Q.**  At any point during your interaction that day, did you come

7   to believe he might be suffering from cognitive impairment or

8   mental illness?

9   **A.**  At that time, January 6, 2017, no, I did not.

10  **Q.**  But now you say that you can see it?

11  **A.**  Having the training that I've had, having the experience

12  going on probably close to tens of thousands of calls regarding

13  mental health, people with mental health issues, and receiving

14  the training, I can see that, at that time, he was probably

15  suffering from a mental health crisis.

16  **Q.**  Okay.  That makes sense.  And at the time, you had responded

17  to quite a few incidents involving people suffering from mental

18  illness; right?

19  **A.**  Yes.

20  **Q.**  I believe you stated something like hundreds in your

21  deposition; is that right?

22  **A.**  Yes.

23  **Q.**  Okay.  Okay.  So the first thing you heard Sean Moore say

24  when you arrived at his stairwell was to get off his stairs;

25  right?

26  **A.**  Can you repeat the question.

27  **Q.**  Yeah.  Yeah.

28      The first thing you heard Sean Moore say when you arrived at

SFDA 004357

1    his stairwell was to get off his stairs; right?

2    **A.**    Uh-huh, yes.

3    **Q.**    And you told him, no, you were not going to leave; right?

4    **A.**    Yes.

5    **Q.**    At this point, when Sean Moore told you to leave his stairs

6    and you said you were not going to leave, were you detaining

7    Mr. Moore in your mind?

8    **A.**    Well, detain means that someone is not free to go, and we

9    have control over them.    At this point, we just wanted to --

10   we're investigating, we're trying figure out what we have

11   because all I had was an unknown amount of time with Mr. Choy,

12   which was under a minute; and then on the other hand, we have

13   Sean Moore who is yelling at us, telling us to get off the

14   stairs.    We wouldn't be doing our job if we didn't try to ask

15   him some more questions.

16   **Q.**    Was he detained at that point?

17   **A.**    At that point, no.

18   **Q.**    Do you agree you were standing in front of this threshold to

19   Mr. Moore's home?

20   **A.**    Threshold?

21   **Q.**    You were standing in front of his doorway?

22   **A.**    We were standing in front of his security gate.

23   **Q.**    And his doorway is right before his security gate; right?

24   **A.**    Yeah.    So you had a door, a security gate, and then you had

25   a couple steps, and then you have had Officer Cha and myself.

26   **Q.**    So you were standing in the entryway to his house; right?

27   **A.**    Yes.

28   **Q.**    And you were at the top of the staircase between Mr. Moore

138

SFDA 004358

1    and the street; correct?

2    **A.**  Yes.

3    **Q.**  Mr. Moore would have had to walk past you to get down his

4    front steps and reach the street?

5    **A.**  You can also go back -- yes.  He could also go back into his

6    house, through the house, to the garage.

7    **Q.**  So were you blocking him from leaving through his front

8    door?

9    **A.**  No.

10   **Q.**  So he could have just left, and you would have been okay

11   with that?

12   **A.**  I don't understand the question.  And I'm not trying to be

13   difficult.

14   **Q.**  Yeah, yeah, yeah.

15   **A.**  I just don't understand the question.

16   **Q.**  I guess I'm just trying to figure out, if you're standing in

17   front of an entryway and you're telling him you're not going to

18   leave, was he free to leave?

19   **A.**  He can go back in his house, yes.

20   **Q.**  Could he leave his house?

21   **A.**  He could leave his house.

22   **Q.**  Just through the garage though?

23   **A.**  Correct.

24   **Q.**  Okay.  So then he again told you to get off his stairs;

25   right?

26   **A.**  Yes, numerous times.

27   **Q.**  Numerous times.

28        And you asked if he was going to listen to what you had to

139

SFDA 004359

1    say; right?

2    **A.**    Correct.

3    **Q.**    And he told you to, "Say your shit and get the fuck on";

4    right?

5    **A.**    Correct.

6    **Q.**    And at that point, you tried to gather information related

7    to the restraining order; correct?

8    **A.**    Is this when we get down to the street for the first time?

9    **Q.**    No.

10    **A.**    Okay.

11    **Q.**    This is before.

12        If you want, I can refer you to page 2, line 10.

13    **A.**    Two, line ten, okay.

14    **Q.**    So you asked him to confirm his name?

15    **A.**    Yes.

16    **Q.**    He confirmed his name for you?

17    **A.**    Yes.

18    **Q.**    You asked if he had violated the restraining order that day?

19    **A.**    Yes.

20    **Q.**    He denied violating the order?

21    **A.**    Correct.

22    **Q.**    Mr. Moore repeatedly ordered you to leave his stairs, like

23    you just said?

24    **A.**    Yes.

25    **Q.**    Mr. Moore said he would call and remove you?

26    **A.**    Yes.

27    **Q.**    You asked him who he was going to call?

28    **A.**    Yeah -- yes.

SFDA 004360

1    **Q.**  He walked inside and closed his front door?

2    **A.**  Yes.

3    **Q.**  And after he walked inside and closed his front door,

4    Officer Cha for the first time asked you what the order said;

5    right?

6    **A.**  Yes.

7    **Q.**  And you told him, "Let's get out of here"; right?

8    **A.**  That's correct.

9    **Q.**  Both of you walked down the stairs to the sidewalk?

10   **A.**  Correct.

11   **Q.**  Was this the first time you read the order to yourself?

12   **A.**  Yes.

13   **Q.**  And as you were standing on the sidewalk, aside from the

14   garbage truck, the neighborhood was quiet?

15   **A.**  Yes.

16   **Q.**  No one's life had been threatened?

17   **A.**  To the best of my ability and from what I remember that

18   night, no.

19   **Q.**  No one had been injured?

20   **A.**  Correct.

21   **Q.**  And no one was yelling for help; right?

22   **A.**  Correct.

23   **Q.**  You had confirmed Mr. Moore was a restrained party in the

24   restraining order?

25   **A.**  Yes.

26   **Q.**  And he had denied violating the restraining order; right?

27   **A.**  Correct.

28   **Q.**  And like you told us, you had not personally observed any

SFDA 004361

1  banging on Mr. Choy's wall; right?

2  **A.**  Correct.

3  **Q.**  You had not personally observed Mr. Moore harass, annoy, or

4  molest Mr. Choy; correct?

5  **A.**  Yes.

6  **Q.**  And by the point in time where you walked downstairs from

7  Moore's house and were standing on the sidewalk, Moore had told

8  you to leave 16 times.

9      Is that somewhat consistent with your memory?

10  **A.**  Yes.

11  **Q.**  Okay.  At this point, do you agree it was feasible for you

12  to leave the scene and return at a different time?

13  **A.**  Well, so I understand that at the time, my partner and I, we

14  didn't believe we were trespassing.  We were there to

15  investigate a possible crime.  And I understand that since then,

16  it's been litigated heavily; but at that time, Officer Cha --

17  well, I can't speak for him, but I can speak for myself -- that

18  due to the significance, because there was a restraining order,

19  because we wanted to investigate -- you know, just because

20  someone says, get off my fucking steps, calls me a bunch of

21  slurs, is yelling at me, that doesn't mean now the investigation

22  is over, right.  It would be a dereliction of duty if we were to

23  leave at that point.

24  **Q.**  Why do you say that?

25  **A.**  Because of the fact that there is a restraining order on

26  file.  I don't know why there was a restraining order.  But like

27  I said earlier, restraining orders are not given lightly.

28  Restraining orders restrict our freedom, which means that

SFDA 004362

1    someone must have done something in order to get that

2    restraining order.  I don't know what the reason was.  I still

3    don't know what the reason is.  But at that time, I still needed

4    and wanted more information from both parties, both Choy, both

5    Sean Moore, in order to complete this investigation.

6    Q.  But can you tell us what other information you were seeking

7    at this time?

8    A.  What other information I was seeking?

9    Q.  Yeah, to complete your investigation.

10   A.  I was trying to get just an honest conversation without

11   somebody yelling, spitting at me, banging the gate at me, and

12   calling me epithets.  That's what I -- like, we went there

13   with -- doing our best to be with the utmost respect, trying to

14   be professional, trying to investigate something.  Hey, we know

15   it's late, we know you want to get to sleep; but your neighbor

16   is accusing you of doing something that could land you in jail.

17   So let's talk like adults.  That's what my intention was at

18   least.

19   Q.  Okay.  So you wanted to continue conversing with Sean Moore

20   until he, kind of, showed you more respect, and you were able to

21   have a discussion with him?

22   A.  Maybe not respect.  Just have a discussion.

23   Q.  Okay.  Is there any specific information you were still

24   seeking, or did you get all the information you needed?

25   A.  Maybe his ID to ensure that he was Sean Moore.

26   Q.  Okay.  But he had told you he was Sean Moore?

27   A.  Correct.

28   Q.  Other than that, anything else?

SFDA 004363

1   **A.**  I can't remember at this time.

2   **Q.**  Okay.  No problem.

3       And so at this point in time, you're telling us you don't

4   believe it was feasible for you to leave the scene and return at

5   a different time because you were dealing with a restraining

6   order situation?

7   **A.**  Correct.

8   **Q.**  Okay.  So in any call with a restraining order, you're not

9   just going to leave the scene --

10  **A.**  Correct.

11  **Q.**  -- even after the investigation is complete?

12  **A.**  I haven't been in a situation like that, since or before

13  that.

14  **Q.**  Okay.

15      So on January 6, 2017, you have been trained that when you

16  receive a call about a violation of a restraining order, you

17  need so speak with the complainant and verify about the

18  complaint and restraining order; right?

19  **A.**  Yes.

20  **Q.**  And here, you spoke to Mr. Choy, the neighbor?

21  **A.**  Correct.

22  **Q.**  And you verified the restraining order?

23  **A.**  Yes.

24  **Q.**  And you verified the complaint; right?

25  **A.**  Correct.

26  **Q.**  So aside from maybe seeing his ID, you're saying there was

27  basically nothing left to investigate regarding the violation of

28  the restraining order after you verified those things?

SFDA 004364

1    A.   There's -- a citizen's arrest at least needs to be signed by

2    the complaining party.  We are peace officers, we can't have our

3    peace disturbed no matter how foul someone's language is or what

4    they're going -- a misdemeanor not committed in our presence, we

5    cannot arrest.  So if it's a misdemeanor outside of our

6    presence, we have to have either verbal agreement or, in this --

7    with our agency -- it has to be a signed, written form which we

8    call a citizen's arrest form.  So if we were able to complete

9    our investigation, that's what would have been one of the

10   checkmarks to complete this investigation.

11   Q.   Well, that would have just been a way for you to arrest

12   Mr. Moore?

13   A.   That's correct.

14   Q.   But in terms of the investigation, there was nothing left to

15   investigate --

16   A.   Um --

17   Q.   -- other than maybe seeing his ID?

18   A.   I don't know.  You know what?  There's a lot that you got to

19   do.

20   Q.   Can you think of anything else that you needed to do?

21   A.   I can't think of anything.

22        Do you mind if we take a break?

23   Q.   Yeah, we could take a break.

24        MS. DRUSINSKY:  Five minutes for everyone?  Okay.

25   Five-minute break.

26                    (Recess taken at 3:21 p.m.)

27               (Proceedings resumed at 3:27 p.m.)

28        MS. DRUSINSKY:  Are we ready?

SFDA 004365

1          THE WITNESS:  Yes.

2          **MS. LACAMBRA:**  Back on the record.  We have all returned

3      to the courtroom.  The 17 grand jurors are present; the witness,

4      Officer Patino, is present as well as counsel Ms. Drusinsky and

5      myself.  We're resuming the questioning of Officer Patino.

6          And, Officer Patino, you understand you're still under

7      oath?

8          **THE WITNESS:**  Yes.

9                         <u>**DIRECT EXAMINATION**</u>

10     BY MS. LACAMBRA:

11     **Q.**  Now, Officer Patino, I have a couple of follow-up questions.

12     I'm going to go all the way back to --

13     **A.**  Can I finish my last answer about further investigative

14     reasoning why we were still there?

15     **Q.**  Oh, sure.

16     **A.**  Looking back on the video, looking back on the incident

17     four-and-a-half years later, at this time, oh, you've got all

18     the information.  At that time in my frame of mind, he's yelling

19     at us.  So when people are yelling at you, you're not really

20     getting a lot of information.  You're, kind of, getting bits and

21     pieces of the whole picture.  So the reason why we stayed was

22     because we didn't have the whole picture.  Like I said, we're

23     investigators.  We need to figure out what's going on.  You

24     know, maybe this guy is angry because -- who knows why.  But I

25     needed to stay to figure out his side of the story and get more

26     information.  Because at that time, I've got the paper; I'm

27     reading it; I'm listening to this guy; I'm making sure this guy

28     isn't banging on the wall.  There's a lot going on.  So there's

SFDA 004366

1  a lot that's going in one ear and going out the other.  There's

2  a lot that I'm not comprehending.  At the same time, I've got my

3  radio going on, got my partner next to me talking as well.  So

4  we still needed to gather more information.  When you

5  investigate a crime, when you interview somebody, you ask people

6  typically at least three times for the same story because their

7  stories can change; their stories can say, oh, you know what, I

8  do remember that, I do remember this, this is why.

9      So our investigation wasn't over then because there was

10  still a lot of pieces missing.  At that point, my frame of mind,

11  all I hear is some guy yelling epithets at me.  And, yeah, he

12  says he identifies himself, but there's really not a clear

13  picture of his side of the story.  And it would be unfair to

14  leave at that time with an incomplete investigation and story

15  from him.

16      That's it.

17  Q.  Thank you.  I appreciate that.

18      And I -- well, that's actually a great segue because I do

19  want to talk to you about your training from the academy

20  specifically with regard to TROs.

21      There's a difference between a temporary restraining order

22  and a criminal protective order; right?

23  A.  Yes.

24  Q.  So a temporary restraining order is by definition

25  temporary --

26  A.  Uh-huh.

27  Q.  -- is that correct?

28  A.  Yes.

147

SFDA 004367

1  **Q.**  Just for record, an "uh-huh" can't be recorded, so I need

2  you to you say "yes" or "no."

3  **A.**  Yes.

4  **Q.**  So a temporary restraining order is actually that one party

5  can get without having to present, or confront, any evidence

6  from the other party; right?  They can just tell their side of

7  the story, and a judge will review their affidavit and provide

8  one, and then actually set a hearing to see if a permanent

9  criminal protective order should be issued; is that correct?

10  **A.**  To my understanding, yes.

11  **Q.**  So when you were talking about, you know, how serious this

12  TRO is -- the temporary restraining order -- it is -- again,

13  this is basically an order that's issued with only the story

14  from one side; right?

15  **A.**  Yes.

16  **Q.**  And you heard on the video; and if you recall in your

17  interaction with Mr. Moore, he actually said:  There's a future

18  court date.  I know that there's a future court date?

19  **A.**  Right.

20  **Q.**  Okay.  And that would be when he would present whatever his

21  side of the story is to the Court, and the Court would decide

22  whether to issue an actual permanent protective order?

23  **A.**  Correct.

24  **Q.**  Now --

25  **A.**  During that night, during my whole interaction, what I

26  recall is Choy just saying "restraining order."  So there was

27  no -- from what I remember no -- I don't remember reading

28  temporary restraining order on it.  My memory right now from

SFDA 004368

1    that night is just seeing restraining order, him -- Choy --

2    saying, "I have a restraining order against my neighbor."

3         And all I remember is "restraining order." I don't remember

4    if it was a temporary restraining order or permanent restraining

5    order. All I remember was "restraining order."

6    Q. Okay. So what did you think it meant when Mr. Moore said,

7    there is a court date on January 11?

8    A. Um, I honestly don't remember thinking about that.

9         Are you asking me what I thought then, or what I think now?

10   Q. Well, first, what you thought then. And I think you

11   answered that question; but if you have anything to add, please

12   do so.

13   A. Now, listening to it, it's him acknowledging that there is a

14   restraining order -- or a temporary restraining order -- and

15   that there will be a future date, because everything has an

16   expiration date; right. I mean, even from what I believe, even

17   a permanent restraining order, there is some sort of expiration

18   date, so I'm not aware of what kind of restraining order it is.

19   Q. Okay. And when you -- you actually didn't read through the

20   restraining order in its entirety until you came down the stairs

21   the first time; is that fair to say?

22   A. When I came down the stairs the first time.

23   Q. Came down Mr. Moore's stairs the first time.

24   A. Yes. When I came down Mr. Moore's stairs, that is the first

25   time I read the restraining order -- in hand.

26   Q. I'm sorry. What was that?

27   A. In hand. The first time that I had read the restraining

28   order was when I walked down Mr. Moore's stairs the first time.

149

SFDA 004369

1  **Q.**  And that was the restraining order that you received from

2  Mr. Choy?

3  **A.**  Correct.

4  **Q.**  And were you reading it, and it had, like, a distance -- you

5  know, in the order Mr. Moore was to stay, was it 25 feet or

6  45 feet?

7  **A.**  I believe it was 25 feet, 2-5.

8  **Q.**  Twenty-five feet.

9      And you were on the scene, so you saw that they were

10  next-door neighbors; like, literally their homes were adjoining

11  each other?

12  **A.**  Yes.  The typical San Francisco house where the single

13  family homes are right next to each other, so you're sharing the

14  same wall.

15  **Q.**  So as the crow flies, it's actually less than 25 feet

16  between Mr. Moore's staircase and Mr. Choy's staircase?

17  **A.**  Crow flies, yes; walking feet, more.

18  **Q.**  So but technically speaking, technically speaking, if

19  Mr. Moore was on his front staircase or front stoop, he would be

20  in violation of the temporary restraining order, as written, if

21  it wasn't by walking feet?

22  **A.**  Are you asking me?

23  **Q.**  Yes.

24  **A.**  I disagree with that, because I don't think anyone would

25  reasonably give a restraining order for 25 feet for someone that

26  lives next to them and think that just because you're walking

27  outside of your house, that you're in violation of a restraining

28  order.  I don't think any police officer would arrest anybody

SFDA 004370

1    just because they are walking outside their front step and there

2    is a 25-foot restraining order.  You would have to be banging,

3    yelling, calling someone an epithet to actually do that.  So,

4    no, I don't think it would be -- if you were outside of his

5    first step, no, I don't think he is.

6    Q.  Well, so I guess -- I'm not asking what an officer might do

7    in response to the restraining order; I'm asking if,

8    technically, as written, it said 25 feet away, right --

9    Mr. Moore was ordered under the temporary restraining order that

10   you've read, he was to stay 25 feet away from Mr. Choy; is that

11   correct?

12   A.  Yes.

13   Q.  And so technically, if Mr. Choy's house is less than 25 feet

14   away from his neighbor Mr -- I'm sorry -- Mr. Moore's house is

15   less than 25 feet away from his neighbor Mr. Choy, who was the

16   person that's protected by the restraining order; is that

17   correct?

18   A.  I guess technically, that's less than 25 feet.

19   Q.  So it could be that the temporary restraining order was

20   actually illegal, as written, because there was no way for

21   Mr. Moore to be at his home and not be in violation of this

22   restraining order?

23   A.  Like I said, I don't believe that, because --

24   Q.  I'm not asking what you believe.

25       I'm just asking, technically, as written, is that a

26   possibility?  Like, have you -- in your hundreds -- at this

27   time -- of calls, did you encounter restraining orders that were

28   later shown to be illegal or invalid?

SFDA 004371

1    **A.**  No.

2    **Q.**  Okay.  Have you ever in your training heard of orders that

3    were issued that were later to be found to be illegal or

4    invalid?

5    **A.**  I don't know.

6    **Q.**  How many cases would you say that you've investigated where

7    there was a search warrant involved?

8    **A.**  Where a search warrant was involved?

9    **Q.**  Yes.  Just ballpark, just an estimate.

10   **A.**  A dozen.

11   **Q.**  A dozen.

12       And of those dozen cases, were any of those search warrants

13   later held invalid?

14   **A.**  That I don't know, because I've never written a search

15   warrant.

16   **Q.**  But you, in the course of your investigation, never came to

17   know what happened in court; whether -- I mean you've testified

18   at motion to suppress?

19   **A.**  Oh, absolutely.

20   **Q.**  Well, there is a hearing where the person that is being

21   accused of having violated a court order is saying, hey, this

22   order is not valid; right?

23   **A.**  I understand what you're saying.  But to the best of my

24   ability, I don't know if there's anything that's been -- that

25   I've worked on that said this is invalid.

26   **Q.**  Yes, I understand that.  I'm just saying that you -- at the

27   time that you were investigating this, you were trying to figure

28   out --

SFDA 004372

1    **A.**  Uh-huh.

2    **Q.**  -- what was happening, but as you were looking at this

3    order --

4    **A.**  Uh-huh.

5    **Q.**  -- technically it could have been held -- someone could be

6    held in violation, as it was written, for being within 25 feet

7    of Mr. Choy.  And Mr. Moore's house was within 25 feet of

8    Mr. Choy's house?  That's all I'm asking.

9    **A.**  Right.  But if the distance -- it's different if there's a

10   wall.

11   **Q.**  Did it say that on the order?

12   **A.**  You're absolutely right.  It didn't say.

13   **Q.**  I'm just asking if -- I think Mr. Moore could have been in

14   his home and be held in violation of the order, as it was

15   written; true?

16   **A.**  I don't think he could be because he's in his own house.  I

17   apologize, I'm not trying to be difficult.

18   **Q.**  I know that you don't think it would be a violation of it,

19   but I'm just saying if, under the language of the order, it's a

20   technical violation, as the order was written and as you read it

21   that evening?

22   **A.**  Yes.  But I wouldn't -- I don't think any reasonable person

23   would think that he would be in violation because he was in his

24   house, even if he's within 25 feet of an order that says don't

25   be within 25 feet.

26   **Q.**  Okay.  Now, you also said that you didn't have a clear

27   enough picture -- and that's why you state -- you said that the

28   reason that you said was because you wanted to get Mr. Moore's

SFDA 004373

1  side of things; right?

2  **A.**  Uh-huh.

3  **Q.**  Now, would it be fair to say that you were able to develop a

4  good enough rapport with Mr. Moore that you felt that he was

5  actually willing to answer your questions after you were told 16

6  times to leave his house?

7  **A.**  I didn't know that then, because I think if we were to have

8  left at that time, we wouldn't have got an answer.  Sometimes

9  there's is a little cooling-off period.  People get into

10  arguments, people get a little bit of space, a little bit of

11  time, he may be ready to talk.  I didn't know Sean Moore up

12  until this point.  This is the only time I've ever come in

13  contact with him, so at that point, let's say, hey, let's just

14  step down, let's read these orders, and we'll talk to him again.

15  **Q.**  Well, so at that point, the first time that you came down

16  the stairs, would it have been feasible to create time and

17  distance to return at a later time to further investigate?

18  **A.**  It's feasible, yes.  Looking back on it now, it's feasible.

19  **Q.**  And on January 6, 2017, had you been trained that a detained

20  person is not obligated to answer any questions an officer may

21  ask during a lawful detention?

22  **A.**  Correct.

23  **Q.**  Okay.  So even if you felt at the time that you had the

24  right to detain Mr. Moore, his refusal to answer your questions

25  is not evidence one way or the other of anything further for you

26  to investigate; he can just make the choice not to talk to you?

27  **A.**  Absolutely.

28  **Q.**  Now, I want to talk to you about your training on

SFDA 004374

1  establishing effective communication.

2  **A.**  Okay.

3  **Q.**  Okay.  And so this is part of the training that you received

4  at the academy.

5      And the academy is a police academy?

6  **A.**  Correct.

7  **Q.**  And it's the Police Officer's Standards and Training

8  academy, and it lasts -- approximately, how many hours is that?

9  **A.**  I don't remember.

10  **Q.**  Do you recall how many days?  Weeks?

11  **A.**  Almost nine months.

12  **Q.**  Almost nine months, okay.

13      And you said -- well, we'll get back to that actually later.

14      Now, according to your understanding of San Francisco Police

15  Department General Order 5.01:  Communication with a

16  non-compliant subject is often most effective when officers are

17  able to establish a rapport; is that true?

18  **A.**  Yes.

19  **Q.**  And communication is most effective when you use the proper

20  voice intonation?

21  **A.**  Yes.

22  **Q.**  When you ask questions versus giving commands?

23  **A.**  Correct.

24  **Q.**  And communication is most effective when you provide advice

25  and try to defuse the conflict and try to achieve voluntary

26  compliance before resorting to the use of force?

27  **A.**  Yes.

28  **Q.**  Now, were you trained to employ deescalation techniques to

155

1  decrease the likelihood of the need to use force during an

2  incident and to increase the likelihood of voluntary compliance?

3  **A.**  Yes.

4  **Q.**  Were you trained that officers shall attempt to understand

5  and consider the possible reason why a subject may be

6  noncompliant?

7  **A.**  Yes.

8  **Q.**  Were you trained that a noncompliant subject may not be

9  capable of understanding or acting as expected in a particular

10  situation because of mental, physical, or even a hearing

11  impairment?

12  **A.**  That's true.

13  **Q.**  Were you trained that a subject may not be capable of

14  understanding or acting as expected in a particular situation

15  because of an emotional crisis?

16  **A.**  Yes.

17  **Q.**  And were you trained that a subject may not be capable of

18  understanding or acting as expected in a particular situation

19  because of a mental health issue?

20  **A.**  Yes.

21  **Q.**  Now, were you trained that officers who deescalate an

22  incident by delaying arrest while keeping the public and

23  officers safe will not be found to have neglected their duty?

24  **A.**  That's correct.

25  **Q.**  Unfortunately, that's not what Officer Cha chose to do.

26  Instead, Officer Cha, when you were at the bottom of the

27  staircase, he continued to shine his flashlight into the home of

28  Mr. Moore.

SFDA 004376

1    A.  We both had our flashlights shined in the area of a home

2    that we don't know if there's any weapons.  It's not to

3    intimidate, not to harass, annoy; it's to light up potential --

4    where there may be a threat.

5    Q.  So Officer Patino, I'm talking specifically about when you

6    were at in the bottom of Mr. Moore's staircase the first time;

7    the first kind of retreat down the staircase, you're reading the

8    temporary restraining order with your flashlight.  So that's

9    where your flashlight is pointed.

10   A.  At that point.

11   Q.  At that point.

12   A.  Yes.

13   Q.  At the time that you're reading the restraining order -- the

14   temporary restraining order, Officer Cha, instead of looking at

15   it with you, is shining his light up the staircase into the home

16   of Mr. Moore?

17   A.  Correct.

18   Q.  Now, after that, Mr. Moore came out and said, "You better

19   get your fagot asses on."

20   A.  Yes.

21   Q.  Did Moore's use of this insult appear to upset Officer Cha?

22   A.  I don't know how that affected him emotionally.  I never

23   asked Officer Cha.

24   Q.  Well, I'm asking, based on your observations -- because

25   Officer Cha was either in front of or right next to you at that

26   time --

27   A.  Can you point to me the page and line number.

28   Q.  I would refer you in the transcript --

157

SFDA 004377

1   A.   Right.

2   Q.   -- to page 5, line 23.

3   A.   Ah, got it.

4   Q.   So at that point, you hear Mr. Moore say, "You better get

5   your fagot asses on."  And then Officer Cha responded with,

6   "What's that," and then appears to ask him about the racial

7   slurs.

8        Do you see that part?

9   A.   Yeah, I see it.

10  Q.   So based on Officer Cha's behavior at that point in time, so

11  right after you were at the bottom --

12  A.   Uh-huh.

13  Q.   -- did he appear to be upset by Mr. Moore's use of the

14  epithet against him?

15  A.   Did he appear to be upset by being called a homophobic

16  epithet?

17  Q.   Yes.

18  A.   They are upsetting, but I don't know if it upset him.

19  Q.   Well, based on your memory, how did Officer Cha react at

20  that point?

21  A.   He asked, "Excuse me.  What did you say?"

22  Q.   But then he proceeded back up the stairs.  You'd already

23  created time and distance, but he chose to reengage Mr. Moore by

24  going back up the staircase?

25  A.   Correct.

26  Q.   What did that indicate to you?  How does that reflect on

27  what your opinion was of how he reacted?

28  A.   At this time?

SFDA 004378

1    **Q.**   Yes.

2    **A.**   I believe he was trying to continue to engage in a

3    conversation.

4    **Q.**   Okay.  So his charging back up the steps was trying to

5    engage Mr. Moore in conversation despite the experience you had

6    already had at the top of the stairs with Mr. Moore?

7    **A.**   Right.  So like you said, our main goal is to end every

8    single encounter without ever having to use force.  We were

9    doing our best to communicate stuff to him no matter how violent

10   or upsetting -- or no matter how, even sometimes, assaultive

11   they can be.

12   **Q.**   Now, as part of your training, were you taught that

13   uncontrolled fear and anger tend to decrease an officer's

14   ability to make sound judgment and decisions?

15   **A.**   Yes.

16   **Q.**   Were you taught that uncontrolled fear and anger tend to

17   increase verbal abuse by the officer?

18   **A.**   I don't know.

19   **Q.**   Were you taught that uncontrolled fear and anger tend to

20   increase the use of unreasonable force by an officer?

21   **A.**   I don't know where this training is coming from.

22   **Q.**   So you're trained as part of your academy training --

23   **A.**   Correct.

24   **Q.**   -- that, you know, you are going to encounter situations

25   that will cause a normal person, an average person, to react or

26   feel anger or fear --

27   **A.**   Uh-huh.

28   **Q.**   -- is that fair to say?

SFDA 004379

1    **A.**  Yes.

2    **Q.**  I mean, you are expected to sometimes engage in situations

3    that are inherently dangerous, and it would be normal for

4    someone to react with either fear or anger when threatened in a

5    certain situation?

6    **A.**  Yep.  Fight or flight.

7    **Q.**  But you're also trained to try to control those emotions

8    because you understand that you're, as an officer, given a lot

9    of privilege and power in maintaining public peace and safety?

10   **A.**  That's correct.

11   **Q.**  So you're trained that you need to recognize the onset of

12   these emotions in order to control them so that you do not react

13   with uncontrolled anger or fear because of the special privilege

14   and power that you have as an officer?

15   **A.**  We are trained to do our best in that situation.

16   **Q.**  Yes.  But you're trained, to the extent that you can

17   recognize the onsets of anger or other uncontrollable fear, and

18   to have tools to try and manager that anger or fear so that you

19   do not abuse the power that has been invested in you as an

20   officer; is that fair to say?

21   **A.**  It's fair to say that -- it's fair to say that we're held to

22   a higher standard, and we are trained to control our emotions

23   and to be aware of certain situations.  But there are some times

24   where things may happen that we may do unconsciously.  So, yes,

25   we are told to keep those things in mind; but when stressful

26   situations happen, our senses kind of tunnel vision and we focus

27   on one thing.

28   **Q.**  And that's precisely why you receive this training, right,

SFDA 004380

1   is to try and prevent you from getting into that tunnel vision

2   so that you can still have the mindfulness to try and control

3   the situation, most of all your own reaction to it?  I mean,

4   that's part of the training?

5   **A.**  Yes.

6   **Q.**  Now, you were taught that there are two types of fear:

7   There's reasonable fear and unreasonable fear; right?

8   **A.**  I don't remember that.

9   **Q.**  So this is part of Learning Domain 20.

10      Would it refresh your recollection to review Learning Domain

11  20, which is part of the training that you receive at the POST

12  academy, the police academy?

13  **A.**  Yes.

14  **Q.**  And I would refer you to page 5-9.

15  **A.**  Right.  Okay.

16  **Q.**  Great.

17      So having reviewed that, do you recall that, in the academy,

18  you are taught that there are two types of fear:  Reasonable

19  fear and unreasonable fear?

20  **A.**  That's correct.

21  **Q.**  And you're taught that reasonable fear is a controlled and

22  legitimate fear?

23  **A.**  That's correct.

24  **Q.**  And you're taught that an unreasonable fear is fear with no

25  direct correlation to the facts and situation?

26  **A.**  Correct.

27  **Q.**  Now, were you taught that unreasonable fear includes

28  overreactions to potentially true threats?

SFDA 004381

1    **A.**   Yes.

2    **Q.**   And were you taught that unreasonable fear also includes

3    overreactions to unreal threats that may be based on prejudice

4    or poor application of past experience?

5    **A.**   Yes.

6    **Q.**   Were you trained that some situations may generate

7    unreasonable fear?

8    **A.**   Yes.

9    **Q.**   And were you trained that you may experience unreasonable

10   fear as a result of personal prejudice?

11   **A.**   Yes.

12   **Q.**   Or as a result of explicit or implicit bias?

13   **A.**   Yes.

14   **Q.**   Or as the result of bias against people of a particular

15   race?

16   **A.**   Yes.

17   **Q.**   Now, were you trained that you might experience unreasonable

18   fear as a result of -- actually, I'll withdraw that.

19        Were you trained that unreasonable fear may be responsible

20   for inappropriate responses made by officers?

21   **A.**   Yes.

22   **Q.**   And inappropriate response by at that officer may be using

23   unreasonable force?

24   **A.**   Yes.

25   **Q.**   An inappropriate response by an officer may be unreasonable

26   anger or aggression?

27   **A.**   Yes.

28   **Q.**   Inappropriate response by an officer may be goading a

SFDA 004382

1  suspect or a subject or escalating the tension of the situation?

2  **A.**  Yes.

3  **Q.**  Now, were you trained that when anger is inappropriate or

4  out of control, it becomes a liability and may result in poor

5  decision-making?

6  **A.**  That's correct.

7  **Q.**  Were you trained that you should not be influenced by anger

8  in your decision-making as an officer?

9  **A.**  Yes.

10  **Q.**  And were you trained that few people can exercise effective

11  emotional self-control when they are extremely angry?

12  **A.**  Yes.

13  **Q.**  Were you trained that to avoid becoming extremely angry, you

14  need to prepare yourself for dealing with situations that make

15  you angry?

16  **A.**  Yes.

17  **Q.**  Were you trained that you can manage your anger by not

18  internalizing what people say or do?

19  **A.**  Yes.

20  **Q.**  By identifying anger-inducing scenarios?

21  **A.**  Anger-inducing scenarios?

22  **Q.**  Yes.  Were you trained that you can manage your anger by

23  identifying anger-inducing scenarios?

24  **A.**  Correct.

25  **Q.**  Were you trained that you can manage your anger by

26  developing problem-solving solutions?

27  **A.**  Yes.

28  **Q.**  And one of those might be to create time and distance

SFDA 004383

1   between you and whatever the source of that ager or anxiety

2   might be?

3   **A.**  Yes.

4   **Q.**  And were you trained that you can manage your anger by

5   recognizing the onset or unreasonable or uncontrolled ager?

6   **A.**  Yes.

7   **Q.**  I actually -- well -- we have a couple of follow-up

8   questions, but we might be ready to break very shortly.

9       With regard to Officer Cha's weapons placement, you said

10  that he is right-handed?

11  **A.**  I believe he's right-handed.

12  **Q.**  And you're trained at the academy that you should have your

13  gun on your dominant side.

14  **A.**  Absolutely.

15  **Q.**  So if your right-handed, it would be reasonable -- you're

16  trained, if you're right-handed, to have your gun on the right

17  side?

18  **A.**  More than reasonable.  It's "you shall."

19  **Q.**  Well, is it fair to say that Officer Cha have been trained

20  to have his belt aligned the same way you do because you're both

21  right-handed?

22  **A.**  Correct.

23  **Q.**  And then -- oh, you said earlier in your questioning about

24  mental health -- dealing with people with mental health, you had

25  very limited training with regard to that; right?

26  **A.**  Correct.  Just if I recall, just the learning domain from

27  the academy.

28  **Q.**  Well, the academy was nine months long; right?

164

SFDA 004384

1  **A.**  Yes, but the mental health -- correct.  The academy was nine

2  months long.

3  **Q.**  So how many days or weeks of that nine months was devoted to

4  interacting with individuals who present with mental health or

5  cognitive impairment or disability?

6  **A.**  I don't remember.

7  **Q.**  Do you recall if it was, like, a day?  A week?

8  **A.**  I'm not going to speculate.  I don't remember.

9  **Q.**  Okay.  Okay.  I think this is a good place to stop for

10  today.  We are going to have ask you to return tomorrow to

11  finish the question.

12  **A.**  I have two doctor's appointments tomorrow.

13     **MS. LACAMBRA:**  Okay.  If we can take a short break, and

14  we can talk about scheduling.  But we do need the admonition

15  about secrecy.

16     **THE GRAND JURY FOREPERSON:**  So we're taking a break?

17     **MS. LACAMBRA:**  Yes.  We're going to take a break and

18  determine questioning for when you should return.

19     **THE GRAND JURY FOREPERSON:**  All right.  So you've heard

20  this one before.

21     You are admonished not to discuss or impart at any time

22  outside of this jury room the questions that have been asked of

23  you in regard to this matter or your answers until authorized by

24  this grand jury or the court to discuss or impart such matters.

25  You will understand that a violation of these instructions on

26  your part may be the basis for a charge against you of contempt

27  of court.  This admonition, of course, does not preclude you

28  from discussing your legal rights with any legally employed

165

SFDA 004385

1    attorney should you feel that your own personal rights are in

2    any way in jeopardy.

3         **THE WITNESS:**  I agree.

4         **THE GRAND JURY FOREPERSON:**  Okay.  Thank you.

5         **MS. LACAMBRA:**  And, for the record, the witness did have

6    a clear mask on the entire time of his testimony so that the

7    jurors could see the entirety of his face, including his mouth.

8    So if we could take a short break off the record, let's talk

9    about scheduling.

10        **MS. DRUSINSKY:**  Does everyone want to come back in about

11   five minutes again, and then we'll be done for the day after

12   that.

13        So just remember, don't talk to each other or anyone else

14   about the cases and don't look anything up on the Internet.

15                   (Recess taken at 4:00 p.m.)

16              (Proceedings resumed at 4:08 p.m.)

17        **MS. LACAMBRA:**  Thank you, all.  Back on the record.  By

18   my headcount, we have all 17 jurors present; the witness,

19   Officer Patino; ADA Drusinsky and myself, Stephanie Lacambra.

20        At this time, we're going ask the witness, Officer

21   Patino, return to us on Thursday, January 22nd, at 9:30, in the

22   morning -- or sorry -- July 22nd.  And, yes, I believe we need

23   that to officially come from our foreperson.

24        **MS. DRUSINSKY:**  You need to order him to come back

25   Thursday at 9:30.

26        **THE GRAND JURY FOREPERSON:**  Okay.  Yes.

27        Will you, please, come back at 9:00 to continue this.

28        **THE WITNESS:**  I'll be here.  I acknowledge I'll be here.

                                                              166

SFDA 004386

1     MS. LACAMBRA:  Thank you so much.  You are excused until

2 Thursday.

3     THE WITNESS:  Thanks so much and I understand.

4     MS. LACAMBRA:  You understand you're still --

5     THE WITNESS:  Absolutely.  Yeah.  Seriously, totally.

6     MS. LACAMBRA:  Thank you.

7     MS. DRUSINSKY:  Okay.  Great.

8     (Whereupon, the witness exited the courtroom.)

9     MS. LACAMBRA:  So the witness has left the courtroom.

10 Thank you so much.  We have done a lot of good work today.

11 We're going ask that you return tomorrow morning at 9:30, and we

12 still have another witness to question.  But if all goes well,

13 there's every reason to think that you will have the afternoon

14 to yourselves tomorrow.

15     GRAND JUROR:  9:00 or 9:30?

16     MS. LACAMBRA:  Let me double-check.  9:30 tomorrow

17 morning.  And that's if everyone can get here at 9:20 so we can

18 call roll and everything, but be ready to start at 9:30.

19     I believe there's an admonition for everyone.

20     We'll give you another reminder.  You are all under oath

21 not to reveal any of the information that you've heard, any of

22 the evidence that you've heard in court today.  You are not to

23 talk about the proceedings with anyone else, including your

24 fellow jurors; and you must not look up anything on the Internet

25 regarding this case.  Thank you so much for your time, and we'll

26 see you tomorrow at 9:30.

27     (Whereupon, proceedings were concluded at 4:12 p.m.)

28                      ---o0o---

SFDA 004387

1                    COURT REPORTER'S CERTIFICATE

2    State of California          )
                                  )  ss.
3    County of San Francisco      )

4

5        I, Julie L. Bozaich, hereby certify that I am a Certified

6    Shorthand Reporter and that I recorded verbatim in shorthand the

7    Investigative Hearing, had Tuesday, July 20, 2021, in the matter

8    of The People of the State of California, Plaintiff, versus

9    Kenneth Cha, Defendant, completely and correctly to the best of

10   my ability; that I have caused said shorthand to be transcribed

11   into typewriting and the foregoing pages, 1 to 168, volume 1,

12   constitute a complete and accurate transcript of said shorthand

13   writing taken in the above-mentioned proceedings.

14

15       Dated at Oakland, California, this 27th day of September,

16   2021.

17

18

19

20   JULIE L. BOZAICH, CSR No. 13604

21

22                    ---o0o---

23

24

25

26

27

28

168

SFDA 004388