**EXHIBIT 15**

1  EUSTACE DE ST. PHALLE, SBN 179100
   JOSEPH R. LUCIA, SBN 278318
2  OLIVIA K. LEARY, SBN329145
   RAINS LUCIA STERN ST. PHALLE & SILVER, PC
3  2300 Contra Costa Blvd., Suite 500
   Pleasant Hill, CA 94523
4  Telephone: (925) 609-1699
   Facsimile: (925) 609-1690
5  Email: PersonalInjuryGroup@rlslawyers.com

6  ATTORNEYS FOR PLAINTIFF,
   JEFFREY PAILET
7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF SAN FRANCISCO

10                                          )
                                            )
11  JEFFREY PAILET,                         )    CASE NO.   CGC-21-596176
                                            )
12          Plaintiff,                      )
                                            )    DECLARATION OF L. DOUGLAS
13                                          )    PIPES
                                            )
14          v.                              )
                                            )
15                                          )    Date:  NOT SET
    CITY AND COUNTY OF SAN FRANCISCO, DISTRICT )    Time:
16  ATTORNEY'S OFFICE, DISTRICT ATTORNEY CHESA )    Dept:
    BOUDIN, DAVID CAMPOS, DANA DRUSINSKY,    )
17  STEPHANIE LACAMBRA, AND DOES 1-50.       )
                                            )
18          Defendants.                      )
                                            )
19                                          )
                                            )
20  _____)

21          I, L. DOUGLAS PIPES, hereby declare:

22          The facts contained in this Declaration are known to me to be true and correct and are of my

23  own personal knowledge, except those matters stated on information and belief, and to those matters I

24  believe that they are true. If called as a witness, I am competent to testify to the facts stated herein.

25  This Declaration has not been ghostwritten for my signature; I have written this Declaration on my own

26  personal computer and in my own words.

27

28                                          -1-

DocuSign Envelope ID: 9E2F05E1-7DA3-4E9B-B819-B08A7509E357

## I.    EXPERT CREDENTIALS

I am a member of the California State Bar and have been licensed to practice law in California since January of 1969.   From June of 1973 to March of 2004 I was a Deputy District Attorney for Contra Costa County.  I retired as a Contra Costa County Senior Deputy District Attorney on March 31, 2004.

I am licensed to practice law before the Supreme Court of the United States, the United States Court of Appeals for the Ninth Circuit, the United States District Court for the Northern District of California, and the United States Court of Appeals for the Armed Forces.

After my retirement as an employee of Contra Costa County I was employed from May of 2011 to June of 2018 as a Special Deputy District Attorney for the Contra Costa County District Attorney's Office, representing that office in lifer parole hearings conducted by the California Board of Parole Hearings.

While employed as a prosecutor for Contra Costa County, I handled hundreds to thousands of criminal prosecutions, most of which were felony prosecutions.  I jury-tried scores of cases, including five special circumstance capital murder trials.   I personally reviewed search warrants and affidavits for warrants written by law enforcement investigators and litigated defense motions to quash those warrants and suppress evidence seized pursuant to those warrants.   I initiated People's appeals and writs in the California Courts of Appeal and briefed and orally argued those appeals and writs in the Courts of Appeal and in the California Supreme Court.

While supervising the Law and Motion Unit of the Contra Costa District Attorney's Office in 1993, I determined that the prosecutors of that office needed training on the discovery provisions enacted by the California electorate in Proposition 115 in June of 1990.  I wrote a lengthy training manual on discovery in criminal cases, and in June of 1994 I made a presentation on that subject to a semiannual meeting of the elected District Attorney members of the California District Attorneys Association.  That presentation resulted in a decision to expand the scope of the training manual and to engage a publisher to publish it as a text.

DocuSign Envelope ID: 9E2F05E1-7DA3-4E9B-B819-B08A7509E367

In 1995 William E. Gagen, Jr., a criminal defense attorney, and I published the first edition of a treatise entitled *California Criminal Discovery*.   We then published a Second Edition of that treatise in 1999, a Third Edition in 2003, and a Fourth Edition in 2007.  In between these hardbound editions of our book, we published yearly pocket parts updating each edition as appropriate.   The last pocket part I wrote was published in 2013, when I decided to retire from legal writing.   The published text, *California Criminal Discovery*, has been cited numerous times in published opinions of the California appellate courts.

In 1994 I began to train California prosecutors through training programs conducted by the California District Attorneys Association.  Over the next 23 years between 1994 and 2017 I conducted 85 trainings on the subject of discovery in criminal cases, focusing primarily on the *Brady* Rule and on the California Criminal Discovery Statute.   My first training was in December of 1994 when I conducted a training entitled "Discovery After Proposition 115" for the California District Attorneys Association.   My last training was conducted for the Contra Costa County District Attorney's Office in January of 2017 when I trained the attorneys of that office in two sessions on the subject of "The *Brady* Rule and Ethically Mandated Discovery."

Many of my trainings were done for the California District Attorneys Association.   I also provided discovery training for the National College of District Attorneys at their college headquarters at the University of South Carolina in Columbia, South Carolina, for the California Attorney General's Office, for the California Police Chiefs Association, for the California State Sheriffs' Association, and for the California District Attorneys Investigators Association.  In addition, I performed training on criminal discovery for 11 midsize and large California county prosecutors' offices, several of them on multiple occasions, and for the state prosecutors' associations in Washington State, Idaho, Kansas, and Missouri.  I also presented two discovery trainings to the Public Law Section of the California State Bar.

From 2003 until the present date I have worked as an expert consultant in 16 civil cases involving discovery questions and issues in criminal prosecutions.   I have testified in eight of these cases as an expert witness on discovery.

## II.  SCOPE OF CONSULTATION.

I have been retained as an expert consultant in this case by the attorneys for the Plaintiff, Jeffrey Pailet, to review case materials in this action and to render opinions on the legal issues which I believe are presented in this case and on which I believe I am qualified to opine.

Those issues include the following: (1) Did the assigned Assistant District Attorneys of the San Francisco District Attorney's Office attempt to draft an affidavit for a search warrant to search the personal and work-provided cellular telephones, computers, and other electronic devices of San Francisco Police Officers Kenneth Cha and Colin Patino that complied with the constitutional and ethical obligations of prosecutors?  (2)  Did San Francisco District Attorney Inspector Magen Hayashi and San Francisco Lt.  of Inspectors Jeffrey Pailet lawfully decline to agree to edits to the draft search warrant affidavit made by the assigned Assistant District Attorneys?  (3) Did San Francisco Lt. of Inspectors Jeffrey Pailet lawfully report constitutional and ethical defects in the edits of the drafts of the search warrant affidavit written by the assigned Assistant District Attorneys?  (4) Were the drafting and editing efforts of the assigned Assistant District Attorneys protected from disclosure by the California Work Product rule?

## III.    MATERIALS REVIEWED.

As a consultant to the attorneys for the Plaintiff, I have reviewed the following documents provided to me by the Plaintiff's attorneys:

1.  Transfer Memo e-mail from Inspector York Tsurata re Sean Moore case, June 22, 2020.

2.  E-mail from ADA Stephanie Lacambra to ADA Dana Drusinsky, Inspector York Tsurata, and Lt. Jeffrey Pailet re Inspector Tsurata's Transfer Memo in Sean Moore case, June 23, 2020.

3.  E-mail from ADA Dana Drusinsky to Lt. Jeffrey Pailet re Pailet's access to Sharepoint information in Sean Moore case, October 23, 2020.

DocuSign Envelope ID: 9E2F05E1-7DA3-4E9B-B810-B08A7509E357

4.   First draft written by Inspector Magen Hayashi of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officer Kenneth Cha and Officer Colin Patino, October 1, 2020.

5.   Second draft written by Inspector Magen Hayashi of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officer Cha and Officer Patino, October 14, 2020.

6.   Third draft written by ADA Dana Drusinsky and ADA Stephanie Lacambra of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officer Cha and Officer Patino, October 21, 2020.

7.   Fourth draft written by ADA Dana Drusinsky and ADA Stephanie Lacambra of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officers Cha and Patino, October 23, 2020.

8.   Fifth draft written by ADA Dana Drusinsky and ADA Stephanie Lacambra of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officers Cha and Patino, October 23, 2020.

9.   Sixth draft written by ADA Dana Drusinsky and ADA Stephanie Lacambra of Search Warrant and Affidavit for Search Warrant for search of electronic devices of Officers Cha and Patino, October 28, 2020.

10.  E-mail from Lt. Jeffrey Pailet to ADA Dana Drusinsky and ADA Stephanie Lacambra re draft search warrant affidavit for electronic devices of Officers Cha and Patino, November 2, 2020.

11.  Release from Permanent Appointment Notice from District Attorney Chesa Boudin and Chief of Staff David Campos to Lt. Jeffrey Pailet, November 6, 2020.

12.  E-mail from Lt. Jeffrey Pailet to District Attorney Chesa Boudin re his Release from Permanent Appointment, November 6, 2020.

13.  Whistleblower Complaint filed by Jeffrey Pailet with San Francisco Office of the Whistleblower Program, March 10, 2021.

14.  Written Appeal of Jeffrey Pailet re his Release from Permanent Appointment, March 12, 2021.

15. Memorandum from Chief of Programs and Initiatives Simin Shamji to District Attorney Chesa Boudin re hearing on Appeal of Jeffrey Pailet re his Release from Permanent Appointment, April 20, 2021.

16. Decision of District Attorney Chesa Boudin on Appeal of Jeffrey Pailet re his Release from Permanent Appointment, April 23, 2021.

17. Claim submitted by Jeffrey Pailet to San Francisco County re his Release from Permanent Appointment, April 30, 2021.

18. *People v. Kenneth Cha*, San Francisco Superior Court No. 21010958, Felony Complaint and Arrest Warrant, November 1, 2021.

19. Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, November 2, 2021.

20. Online Written Notice filed by Jeffrey Pailet with Labor and Workforce Development Agency pursuant to Labor Code Section 2699(c), November 3, 2021.

21. Amended Online Written Notice filed by Jeffrey Pailet with Labor and Workforce Development Agency pursuant to Labor Code Section 2699(c), November 4, 2021.

22. Reporter's Transcript of testimony at 402 Hearing, *People v. Terrance Stangel*, January 27, 2022.

23. Demurrer of Defendant City and County of San Francisco, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, January 31, 2022.

24. Memorandum of Points and Authorities in Support of Demurrer of Defendant City and County of San Francisco, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, January 31, 2022.

25. Request for Judicial Notice of Defendant City and County of San Francisco, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, January 31, 2022.

26. Declaration of Ian H. Eliasoph in Support of Demurrer of Defendant City and County of San Francisco, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, January 31, 2022.

27. Proposed Order of Sustaining Demurrer of Defendant City and County of San Francisco, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, January 31, 2022.

*28.* First Amended Complaint and Demand for Jury Trial, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, March 17, 2022.

29. Response to Meet and Confer Re: Demurrer/Motion to Strike, letter from Ian H. Eliasoph, Deputy City Attorney, April 5, 2022.

30. Ethics Complaint Concerning San Francisco Police Commission Vice President Cindy Elias filed with the City and County of San Francisco Ethics Commission by Jeffrey Pailet, April 5, 2022.

31. Ethics Complaint Concerning District Attorney Chesa Boudin filed with the City and County of San Francisco Ethics Commission by Jeffrey Pailet, April 21, 2022.

32. Meet and Confer Letter, *Pailet v. City and County of San Francisco et al.,* filed by attorneys for Jeffrey Pailet, April 22, 2022.

33. Claim Against the +City and County of San Francisco filed by Jeffrey Pailet, April 29, 2022.

34. Demurrer of Defendant City and County of San Francisco to First Amended Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, May 19, 2022.

35. Memorandum of Points and Authorities in Support of Demurrer of Defendant City and County of San Francisco to First Amended Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, May 19, 2022.

36. Request for Judicial Notice of Defendant City and County of San Francisco to First Amended Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al*., Case No. CGC-21-596-176, May 19, 2022.

37. Declaration of Ian H. Eliasoph in Support of Demurrer of Defendant City and County of San Francisco to First Amended Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al.,* Case No. CGC-21-596-176, May 19, 2022.

38. Proposed Order of Sustaining Demurrer of Defendant City and County of San Francisco to First Amended Complaint, *Jeffrey Pailet v. City and County of San Francisco, et al.*, Case No. CGC-21-596-176, May 19, 2022.

In addition to the materials provided by the Plaintiff's attorneys, I have read the unpublished opinion of the Court of Appeal in *People v. Moore, A151276* (May 1, 2018), which I obtained on my own initiative.    I reference this unpublished opinion in this Declaration "to explain the factual background of the case and not as legal authority," a procedure authorized by the published opinion of the Court of Appeal in *K.G. v. Meredith,* 204 Cal.App.4th 164, 172, fn.9 (2012).  From the unpublished opinion of the Court of Appeal in *People v. Moore,* I am informed of the facts of the incident that initially generated this civil action.  I accept the facts stated in the Court of Appeal opinion as true for the purpose of this Declaration and state these facts based on information and belief.

## IV.    FACTUAL BACKGROUND OF THIS CASE.

In December of 2016 Christopher Choy, a resident of San Francisco, obtained a temporary restraining order against Sean Moore, his nextdoor neighbor, prohibiting Moore from harassing him. On January 6, 2017, Mr. Choy called the San Francisco Police Department to report that Moore had struck the common wall between their residences.  At 4:15 a.m. San Francisco Police Officers Kenneth Cha and Colin Patino responded to Mr. Choy's call.  Choy told Officer Patino that Moore had been hitting the wall of his house, and Choy gave Officer Patino a copy of the restraining order with a proof of service on Moore.   Neither officer obtained more information about the alleged restraining order violation or asked Mr. Choy to authorize a citizen's arrest of Moore.

Officer Cha climbed a stairway to Moore's front gate and rang Moore's doorbell.  The stairway was walled on both sides and ended in a landing that extended to Moore's front door.   A floor-to-ceiling metal gate separated the landing area in front of Moore's door from the rest of the landing and the stairway.   Moore opened the door and stepped partway onto the landing behind the gate.   Officer Cha estimated that Moore was six feet four inches tall and weighed 275 pounds.

Moore made repeated hostile, belligerent, and profane comments to Officer Cha, insisting that Officer Cha leave the premises. Officer Patino arrived at the landing about one minute into the encounter. Moore insulted both officers and demanded they leave. Officer Patino confirmed with Moore that he was the person subject to Mr. Choy's restraining order. After about three minutes of this confrontation, during which Moore made multiple demands that the officers leave his stairway, Moore said that he was going to make a telephone call remove the officers, and he walked back inside his home. The officers descended the stairs to the sidewalk while discussing the restraining order.

Moore then stepped back onto the landing carrying what appeared to be a phone and stood behind the gate. He insulted the officers again. Officer Cha asked Moore why he called him "those slurs." The two officers once again ascended the stairway. Moore asked for Officer Patino's badge number, which Officer Patino provided. While Moore appeared to dial his phone and remained behind his gate, he continually demanded that the officers leave his stairs. Officer Patino attempted to read to Moore from the restraining order. Moore banged on the gate and gestured in a cross-wise fashion with his forearms while saying, "I'm through talking to you, bitch. Get off. Get off my stair." Moore remained behind the gate, and the officers said they would not leave.

Moore then pulled open and stepped through the metal gate onto the landing, while waving his right hand telling the officers to get off his stairs. One of the officers said, "You wanna get sprayed?" Moore replied, "Fuck your spray." Officer Cha then sprayed pepper spray in Moore's direction. Moore turned and stood sideways in the gateway with his left foot raised as if kicking. Officer Cha stated in a later interview that Moore kicked him in the face. The officers then partially descended the stairs. Officer Cha made a radio report of the incident. Moore re-entered his house.

After a minute and a half, Officer Patino ordered Moore to return outside because he was under arrest and ordered him to return the restraining order papers that Moore had apparently picked up from the landing outside his doorway. Officer Patino told Moore he would get Moore medical attention for the effects of the pepper spray. Moore then exited his house, tossed papers through the metal gate, and re-entered his house. The officers again insisted that Moore come out of his house or they would "kick

the gate open." Moore then suddenly opened the gate, stepped forward, squatted, clenched his fists, and then said, "Fuck you" several times, and stated "I'ma kick your ass, punk."

Moore bent over to pick up something that appeared to fall from his hand and took a step down toward the papers on the stairs. Moore did not comply with the officers' order to get on the ground. The officers thought this was a good opportunity to arrest Moore and advanced toward Moore. Officer Patino swung his night stick at Moore at least twice, reached for Moore, and then fell backward down the stairs. Officer Patino later stated that Moore had tried to block his baton and had punched him in the face with a fist, breaking Officer Patino's nose. Officer Patino in fact suffered a broken nose.

Officer Cha pointed his service firearm at Moore and fired twice, hitting Moore in the abdomen and the leg.

Moore was charged with felonious assaults on the two officers. A magistrate held Moore to answer on most of the charges. Moore brought a Penal Code Section 995 motion to set aside the charges, and the Superior Court found insufficient evidence that the officers were lawfully performing their duties when Moore committed the alleged crimes and set aside the charges. The People appealed the dismissal of the charges to the Court of Appeal. The Court of Appeal affirmed the order of dismissal.

## V.    PROCEDURAL BACKGROUND OF THIS CASE.

From written case materials supplied to me by the attorneys for Mr. Pailet, I am informed of the following events that followed the shooting of Mr. Moore on January 6, 2017. Although I do not know whether these facts are true from my own knowledge, for purposes of expressing and explaining my opinions in this Declaration I accept the facts contained in the written case materials as true and state them on information and belief.

### A.  The Initial Officer-Involved Shooting Investigation.

Because the incident of January 6, 2017, consisted of an officer-involved shooting, the Independent Investigations Bureau (IIB) of the San Francisco District Attorney's Office conducted an investigation to determine whether criminal charges should be initiated against either of the two San

Francisco Police Department officers for the shooting of Moore.  The Independent Investigations Bureau is a unit devoted to investigating officer-involved shootings, in-custody deaths, and significant use of force incidents to determine if officers' actions were lawful, and if not lawful, the potential criminal culpability of the involved officers.   That investigation led to a decision by the then District Attorney, George Gascon, not to file charges against Officer Cha.

**B.  The Opening of the District Attorney Investigation.**

In January of 2020 Sean Moore died while in custody at San Quentin State Prison on unrelated charges.   The medical examiner concluded that Moore died as a result of the injuries he suffered when he had been shot by Officer Cha on January 6, 2017.  Shortly after Mr. Moore's death, District Attorney Chesa Boudin, the newly elected District Attorney of San Francisco County, decided to re-institute the investigation into the Sean Moore shooting incident.  Assistant District Attorney Aaron Zisser, who had previously been assigned to the Sean Moore officer-involved shooting case, briefed District Attorney Boudin on the investigation of the Sean Moore shooting incident.   ADA Zisser told District Attorney Boudin that neither Officer Cha nor Officer Patino should be prosecuted, citing the lack of evidence that the officers had acted improperly in the face of Sean Moore's aggressive actions during the incident.

District Attorney Boudin then removed ADA Zisser from the Sean Moore officer-involved shooting investigation and from the Independent Investigations Bureau and assigned Assistant District Attorneys Dana Drusinsky and Stephanie Lacambra to that investigation.  In June of 2020 the two prosecutors requested District Attorney Lt. Inspector Jeffrey Pailet, who managed a team of inspectors within the Independent Investigations Bureau, to assign a new inspector to the Sean Moore case to replace Inspector York Tsuruta, who had been assigned to the case since the day of Officer Cha's shooting of Moore.   Lt. Pailet assigned Inspector Magen Hayashi to the re-opened Sean Moore shooting incident.  ADA Lacambra advised Lt. Pailet that there was no need to share with Inspector Hayashi a transfer memo that Inspector Tsuruta had written for the transfer of the case to Inspector Hayashi.

**C.  The Search Warrant Affidavits.**

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B010-D08A7509E357

ADA Drusinsky and ADA Lacambra requested Inspector Hayashi to draft search warrants to search the personal and work-issued cell phones and computers of Officers Cha and Patino.   Inspector Hayashi consulted Lt. Pailet regarding this request because of a concern she had that there was insufficient probable cause to justify such broad search warrants due to the passage of time from the January 6, 2017, shooting of Mr. Moore.   Inspector Hayashi also informed the two prosecuting attorneys of the legal and ethical concerns she had about the requested search warrants.  Lt. Pailet agreed with Inspector Hayashi's concerns about the requested search warrants.  Lt. Pailet expressed the following reservations, among others, about the drafted search warrant and the edits to the affidavit for the search warrant in an e-mail sent to ADA Drusinsky and ADA Lacambra dated November 2, 2020: (1) Deletion of/failure to disclose exculpatory evidence in the search warrant affidavit; (2) Use of language in the search warrant affidavit indicating bias/advocacy instead of objectivity; (c) An overbreadth in time and scope of the proposed search pursuant to the search warrant; and (4) Failure of the affidavit to establish probable cause to search the officers' electronic devices.  [E-mail from Jeffrey Pailet to ADA Stephanie Lacambra and ADA Dana Drusinsky re Moore affidavit, dated November 2, 2020].

ADA Drusinsky and ADA Lacambra directed Inspector Hayashi to continue her writing the search warrants and the underlying affidavit for those warrants.  Inspector Hayashi prepared two drafts of the proposed affidavit for the search warrants on October 1, 2020, and October 14, 2020, and submitted those drafts to ADA Drusinsky and ADA Lacambra.  Thereafter, ADA Drusinsky and ADA Lacambra prepared four edited versions of Inspector Hayashi's draft affidavits which added some language and deleted other language.  These edits concerned Inspector Hayashi, who felt that the attorneys' edits had misstated facts, excluded exculpatory evidence, and were legally insufficient to establish probable cause for the issuance of the search warrants.   Inspector Hayashi brought her concerns to Lt. Pailet's attention.   The differences of opinion regarding the proposed contents of the search warrant affidavits and the proposed edits to them resulted in several meetings involving Inspector Hayashi, Lt. Pailet, ADA Drusinsky, and ADA Lacambra in which the affidavits and the proposed edits were discussed.

The meetings were contentious.   The two Assistant District Attorneys insisted that their edited versions of the search warrant affidavit be signed by Inspector Hayashi and stated that if not signed by the Inspector, the conduct of Inspector Hayashi and Lt. Pailet would be reported to District Attorney Boudin.   Inspector Hayashi testified in a different case on January 27, 2022, that she was threatened by the two attorneys that she would be reported to the District Attorney and that she was looking at the possibility that Lt. Pailet's and her employment with the District Attorney's Office would be terminated.   Reporter's Transcript of Testimony at 402 Hearing, *People v. Terrance Stangel*, January 27, 2022, page 102, lines 22-28.

### D.    Plaintiff Pailet's Termination of Employment.

On November 6, 2020, District Attorney Chesa Boudin served Lt. Pailet with a notice terminating his at-will employment with the San Francisco District Attorney's Office.   In response to his notice of termination, Lt. Pailet wrote an e-mail to District Attorney Boudin requesting a meeting and providing a copy to District Attorney Boudin of his November 2, 2020, e-mail to the assigned assistant prosecutors.   When that e-mail did not produce a response from District Attorney Boudin, Lt. Pailet appealed his termination, requesting an administrative review of the case.   The administrative appeal hearing was held and the appeal denied.   This civil action by Lt. Pailet followed.

## VI.   OPINIONS CONCERNING THE SEARCH WARRANT AFFIDAVIT DRAFTS.

I have carefully studied the six draft versions of the proposed affidavit for the search warrants for Officer Cha's and Officer Patino's electronic devices and the proposed drafts of the search warrants. Based on the language written by the two Assistant District Attorneys, and my knowledge of relevant decisional law governing the constitutional, statutory, and ethical duties of prosecuting attorneys and law enforcement investigators, it is my opinion that the edited versions of the search warrant affidavit for the electronic devices of the two officers violated accepted constitutional and ethical standards imposed on affiants for search warrants.

### A.   Standards for Search Warrant Applications/Affidavits.

An affiant making an application for issuance of a search warrant "has a duty to disclose to the magistrate all material facts relevant to the issue of probable cause." *People v. Neusom,* 76 Cal.App.3d 534, 539 (1977); *People v. Barger*, 40 Cal.App.3d 662, 668 (1974).   Probable cause to issue a search warrant requires proof of probable cause to believe that an offense has been committed. Penal Code Section 1524(a)(4); *Illinois v. Gates,* 462 U.S. 213, 234 (1983) ["the probability . . . of criminal activity is the standard of probable cause."]; *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990) ["A search warrant may be issued only if it appears from the complaint or affidavit filed in support of it that there is probable cause to believe that an offense has been committed and that the defendant has committed it."]

In addition to probable cause to believe that an offense has been committed, probable cause for issuance of a warrant "requires a showing that makes it 'substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought.'" *People v. Carrington,* 47 Cal.4th 145, 161 (2009).

An affiant who makes false statements in an affidavit for a search warrant, or who intentionally or recklessly withholds material exculpatory information from a probable cause affidavit, thereby engages in judicial deception that violates the Fourth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *Rainsberger v. Benner,* 913 F.3d 640, 647 (7th Cir. 2019); *Benavidez v. County of San Diego,* 993 F.3d 1134, 1146 (9th Cir. 2021); *Marshall v. County of San Diego,* 238 Cal.App.4th 1095, 1112-1113 (2015).

It is unlawful for a law enforcement officer to employ judicial deception to obtain a search warrant. *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004).   A search warrant obtained by material false statements, or a statement made with reckless disregard for the truth, that was knowingly and intentionally included in the affidavit for the warrant, is subject to quashing and exclusion of evidence obtained thereby. *Franks v. Delaware,* 438 U.S. 154, 155 (1978).

The prudent affiant, like the prudent prosecutor, has been repeatedly admonished by the United States Supreme Court to not play "materiality games" when deciding whether to disclose facially exculpatory evidence that works against a finding of probable cause to issue a search warrant. *Cone v.*

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B010-D08A7509E357

*Bell,* 556 U.S. 449, 470, fn.15 (2009) ["[T]he prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure."]; *Kyles v. Whitley,* 514 U.S. 419, 440 (1995) ["[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence . . . This is as it should be."]; *United States v. Agurs,* 427 U.S. 97, 108 (1976).

### B.  Factual Inaccuracies of Affidavit Draft Edits.

Applying the accepted standards for affidavits for a search warrant to this case, it is my opinion that the actions of the two San Francisco assistant prosecutors violated their constitutional and ethical duties.   The two prosecutors added the following five important statements to the search warrant affidavit for which I can find no factual basis in the materials supplied to me.

(1) The prosecutors changed the language that Moore was "actively violating" the protective order to instead state that Moore "violated" the protective order.  (Draft Affidavit #3, October 21, 2020, page 2, paragraph 2).   This language change converted a statement that Moore's violation of the protective order was ongoing at the time the officers arrived at the scene to a statement that read that he had violated the protective order prior to their arrival, and thus not in their presence.

(2) The prosecutors added language that Moore "responded by defending himself."  (Draft Affidavit #3, October 21, 2020, page 3, paragraph 4).  I could find no evidence in the materials provided me that Moore was "defending himself" in his confrontation with the officers.

(3) The prosecutors added language that Officer Patino injured his nose while falling down the stairs.  (Draft Affidavit #3, October 21, 2020, page 3, paragraph 4).   I could find no evidence in the materials provided me that Officer Patino's nose injury occurred from his falling down the stairs. Indeed, the facts in the case materials stated that Officer Patino's nose was broken by Moore's hand punches and/or foot kicks.

(4) The prosecutors added language that Officer Cha "panicked" into firing two rounds at Moore.  (Draft Affidavit #3, October 21, 2020, page 3, paragraph 5).   I could not find any evidence in the case materials that Officer Cha discharged his weapon at Moore because the officer had panicked.

(5) Finally, the prosecutors added language that Officer Cha "fell backward" down the stairs "from the recoil" of the firing of his weapon.  (Draft Affidavit #3, October 21, 2020, page 3, paragraph

5).   I could not find any evidence in the case materials that it was the recoil of the firing of Officer Cha's weapon that caused him to fall down the staircase.

While each of these factual misstatements might individually be deemed unimportant and thus immaterial errors, when considered as a whole, in my opinion they contributed to the creation of a distorted narrative that painted a false picture that Moore was the victim of assaultive conduct by the officers.   But these false or unsupported factual statements are not the only defects I see in the edits of the search warrant drafts in this case.

**C.  Deleted Exculpatory Evidence from Draft Affidavits.**

I have concluded that the misleading picture painted by the false or unsupported factual statements listed above was exacerbated by the prosecutors' deletion of facts from the draft affidavit that exculpated the officers - because the deleted facts were evidence showing that Moore was the initiator and aggressor in the incident.   I found nine significant deletions of exculpatory evidence in the prosecutors' edits of the search warrant affidavit.

(1) The prosecutors deleted language that stated that when the officers arrived Moore "was audibly yelling inside his residence." (Draft Affidavit #4, October 23, 2020, page 2, paragraph 4).  This deleted evidence showed that Moore was violating the protective order at the time that the officers arrived at the scene.

(2) The prosecutors deleted language that stated that during the incident Moore "stood above the officers on the narrow staircase." (Draft Affidavit #3, October 21, 2020, page 3, paragraph 4).  The deleted evidence that Moore was standing above the officers showed that Moore had a tactical physical advantage during the altercation.

(3) The prosecutors deleted language that Officer Cha estimated that Moore was six feet four inches in height and weighed 275 pounds (Draft Affidavit #4, October 23, 2020, page 2, paragraph 5), deleted evidence which showed that Moore was a challenging physical specimen.

(4) The prosecutors deleted language that the officers were dressed in full uniform.  [Draft Affidavit #3, October 21, 2020, page 2, paragraph 4).   This deleted evidence showed that Moore knew or had reason to know that the two officers were on-duty law enforcement officers.

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B010-908A7509E357

(5) The prosecutors deleted language that Officer Patino repeatedly tried to read the elements of the temporary protective order to Moore. (Draft Affidavit #4, October 23, 2020, page 2, paragraph 5). This deleted evidence showed that instead of attacking Moore the officers attempted to reason with him.

(6) The prosecutors deleted language that Moore "verbally berate[d] the officers with obscenities and derogatory racial slurs," including Moore's statement that "I am through talking to you bitch." (Draft Affidavit #3, October 21, 2020, page 2, paragraph 5). This deleted evidence showed that Moore was the verbal aggressor in the incident.

(7) The prosecutors deleted language that Moore "attacked Patino with hand punches" to Officer Patino's head and body. (Draft Affidavit #3, October 21, 2020, page 3, paragraph 4). This deleted evidence showed that Moore was the physical aggressor in the incident.

(8) The prosecutors deleted language that "Moore then lunged at Officer Cha." (Draft Affidavit #3, October 21, 2020, page 3, paragraph 5). This deleted evidence further showed that Moore, and not the officers, was the physical aggressor.

(9) The prosecutors deleted language that Officer Cha stated that he fired two rounds at Moore in "self-defense." (Draft Affidavit #3, October 21, 2020, page 5, paragraph 5). This deleted evidence showed that Office Cha felt that he fired his weapon in self-defense.

It is my opinion that all of these deleted exculpatory statements, when considered together and when considered along with the false statements which I have listed earlier in this Declaration, constituted the employment of judicial deception in an effort to obtain a search warrant.

### D. Pejorative and Inflammatory Language in Draft Affidavits.

The false statements and exculpatory evidence which I have listed above must also be considered in the context of pejorative and inflammatory language which the prosecutors inserted as edits to the draft affidavits. The following five examples are the most egregious of the numerous provocative and emotive language which the prosecutors inserted into the search warrant affidavit drafts.

(1)  A claim that the San Francisco District Attorney investigation was for the "murder" of Sean Moore by Officer Cha.  (Draft Affidavit #4, October 23, 2020, page 2, paragraph 1).  This statement replaced earlier language that stated that the District Attorney investigation was for the officer-involved "shooting" of Sean Moore by Officer Cha.   Stating that the investigation was a "murder" investigation carried a strong implication that the homicide had been determined to be a "murder" instead of simply a "shooting."

(2)  A statement that Officer Patino "beat" Moore at least twice with his baton, replacing the prior statement that the officer twice "struck" Moore with his baton.  (Draft Affidavit #3, October 21, 2020, page 3, paragraph 4).   The pejorative word "beat" carried with it a strong inference that the officer used unnecessary and excessive violence on Moore, rather than simply describing Officer Patino's action of striking Moore with his baton.

(3)  A statement that Officer Patino "taunted" Moore by "jeering" at him and by calling Moore a "freak." (Draft Affidavit #5, October 23, 2020, page 2, paragraph 5).  I found no evidence in the case materials that Officer Patino taunted or jeered at Moore or called him a derogatory name.

(4)  A statement that the two officers "joked" among themselves when talking about Moore. (Draft Affidavit #5, October 23, 2020, page 2, paragraph 5, to page 3, paragraph 1).  I have found no evidence in the case materials that the officers considered their confrontation with Moore to be a joking matter.

(5) A statement that the two officers attempted to "goad [Moore] into combat by yelling at him and encouraging him to fight by jeering at him."   (Draft Affidavit #5, October 23, 2020, page 3, paragraph 5, and page 4, paragraph 2).  I have found no evidence in the case materials that either officer tried to goad Moore into fighting them or that the officers "jeered" at Moore.

It is my opinion that the use of this pejorative language that disparaged the two officers had the effect of creating a distorted narrative of the events of January 6, 2017, and thereby constituted a further use of judicial deception for the purpose of obtaining a search warrant.

I believe that the sum total of false and factually unsupported statements, deleted exculpatory evidence, and repeated pejorative language that disparaged the two officers created a distorted narrative

of the events of January 6, 2017, and constituted judicial deception in the effort to obtain a search warrant of the two officers' electronic devices.

### E. Failure of Draft Affidavits to Establish Probable Cause for Requested Searches.

#### 1. The "Presently Located" Requirement.

A search warrant affidavit must establish probable cause for the magistrate to believe that "it is substantially probable that there is specific property lawfully subject to seizure **presently located** in the particular place for which the warrant is sought." *People v. Carrington,* 47 Cal.4th 145, 161 (2009) [emphasis added]; *People v. Bryant, Smith and Wheeler*, 60 Cal.4th 335, 369-370 (2014). This is a hornbook statement of an accepted principle of search and seizure law that is not subject, in my opinion, to reasonable dispute. The emphasized language in this statement is the requirement that the affidavit must establish probable cause to believe that the items sought to be seized are "presently located" in the place sought to be search.

#### 2. "Staleness in a Search Warrant Affidavit."

"Stale information in a search warrant affidavit does not establish present probable cause for a search." *People v. Hirata,* 175 Cal.App.4th 1499, 1504 (2009). While the courts have not established a bright line rule defining when information becomes "stale," "delays of more than four weeks are generally considered insufficient to demonstrate present probable cause." *People v. Hulland,* 110 Cal.App.4th 1646, 1652 (2003). The question of staleness turns on the facts of each case. *Alexander v. Superior Court of Los Angeles County,* 9 Cal. 3d 387, 393 (1973). But the affidavit in support of the search warrant "must provide probable cause to believe the material to be seized is still on the premises to be searched when the warrant is sought." *People v. Mesa,* 14 Cal.3d 466, 470 (1975).

The affidavits written to apply for a search warrant of the electronic devices of Officer Cha and Officer Patino were drafted almost four years after the shooting of Sean Moore on January 6, 2017. I could find no language in the draft affidavits that would lead a reasonable person to believe that (1) the officers possessed personal cellular telephones and/or personal laptop computers at the time of the shooting; (2) even if they possessed such electronic devices, the officers communicated with someone regarding the shooting of Sean Moore on those electronic devices; (3) even if they communicated with

-19-

someone regarding the shooting of Mr. Moore on those electronic devices, their communications remained on their electronic devices 45 months after the shooting incident in January of 2017; and (4) that the officers remained in possession of the same electronic devices in October 2020 that they had owned in January of 2017.

In fact, the evidence known to Inspector Hayashi was to the contrary. Inspector Hayashi wrote in her draft affidavits that "[t]he investigation to date, has uncovered no video or written evidence that Officer Cha or Patino used a work cellular phone directly after or within any determined time frame from which this incident occurred." (Draft Affidavit #1, October 1, 2020, page 4, paragraph 2; Draft Affidavit #2, October 14, 2020, page 4, paragraph 1).

Lt. Pailet further informed ADA Drusinsky and ADA Lacambra on November 2, 2020, that based on his training and experience, including information from experienced law enforcement officials familiar with phone forensics, the telephone records of interest in the Sean Moore shooting incident would have been destroyed.   He advised the prosecutors that most cellular telephone companies keep text messages for only 10 to 90 days.  (E-Mail from Lt. Pailet to Stephanie Lacambra and Dana Drusinsky, November 2, 2020, page 4).

I conclude that even if the two officers used electronic devices during or after the Sean Moore shooting incident to communicate regarding that shooting, the affidavit language edited by the assigned Assistant District Attorneys did not contain any facts that would lead a reasonable person to believe that such communications would be found on those electronic devices almost four years later.

### 3.   Evidence that the Officers Did Not Communicate on Electronic Devices Regarding the Sean Moore Shooting Incident.

Inspector Hayashi's draft affidavit stated that "[t]he investigation to date, has uncovered no video or written evidence that . . . Officer Cha or Patino used a work cellular phone directly after or within any determined time frame from which this incident occurred."  (Draft Affidavit #1, October 1, 2020, page 5, paragraph 4).

Lt. Pailet further advised the two prosecutors that Officer Cha's body-worn camera recorded the entire Sean Moore shooting incident and for a lengthy period after the shooting.   He advised the

prosecutors that the body-worn camera showed that Officer Cha communicated in person and via police radio during the Sean Moore incident, and that there was no indication that Officer Cha used a work or personal cell phone or a work or personal laptop computer during or after the incident.  (E-Mail from Lt. Pailet to Stephanie Lacambra and Dana Drusinsky, November 2, 2020, page 4).

Finally, Lt. Pailet informed the prosecutors that from his years of training and experience, officers are advised and trained to provide an initial Public Safety statement after being involved in a critical incident.   The officers are then separated from other witnesses and participants in the incident and directed to not talk about the incident except to involved investigators and their attorneys.  He advised that a monitor is assigned to the involved officers to prevent a prohibited discussion between the officers about the incident.  Lt. Pailet informed the two prosecutors that written incident reports on the Sean Moore shooting showed that two different officers had been assigned to stay with Officer Cha and Officer Patino directly after the incident, and that nowhere in the written incident reports or in the officers' body-worn camera was there any evidence that either officer used an electronic device or discussed the officer- involved shooting.   (E-Mail from Lt. Pailet to Stephanie Lacambra and Dana Drusinsky, November 2, 2020, page 4).

The assigned prosecutors, however, deleted this exculpatory evidence from the draft affidavit written by Inspector Hayashi.   In its place, the attorneys substituted language stating that "officers use their department-issued devices, such as cell phones, laptops, and desktop computers to communicate regarding incidents," and that it is reasonable to "assume" that the officers would have communicated "regarding the shooting on their digital devices, including department-issued and personal cell phones and laptops." (Draft Affidavit #1, October 1, 2020, page 5, paragraph 5).

The substitution of group "habit and custom" language that directly contradicted the affiant's factual statement of the officers' actual conduct during and after the Sean Moore shooting incident constituted a removal of exculpatory evidence from the draft of the affidavit and the insertion of language that while literally true, created a false and misleading statement of the events of the Sean Moore shooting and its aftermath.

Evidence that an officer had a "habit and custom" can be admissible pursuant to Evidence Code Section 1105 to prove that the officer "acted in conformity with that habit or custom on a given occasion." *People v. Hughes,* 27 Cal.4th 287, 337 (2002).  However, I have not found any California decisional authority that extends the reach of "habit and custom" evidence beyond the habit and custom of the person to whom the habit and custom is to be attributed.

In this case, the language inserted by the assigned prosecutors into Inspector Hayashi's draft affidavit constituted the claimed habits and customs of law enforcement officers generally, without any showing that either Officer Cha or Officer Patino followed that habit and custom.  It is my opinion that in the face of evidence to the contrary (Inspector Hayashi's and Lt. Pailet's reports), the inserted language was legally insufficient to establish that Officer Cha or Officer Patino used electronic devices during or after the Sean Moore shooting incident and that they communicated with each other regarding that incident after the incident had ended.

## VII.    PLAINTIFF'S REPORTS OF THE SEARCH WARRANT AFFIDAVIT IMPROPRIETIES.

Lt. Jeffrey Pailet initially reported directly to the two involved prosecutors, ADA Drusinsky and ADA Lacambra, his concerns that the edits they had made to the search warrant affidavit violated the law and would produce a search warrant that would not pass constitutional muster.   When his efforts to persuade the two prosecutors to correct their unlawful edits were unavailing, Lt. Pailet sent his written concerns directly to the District Attorney himself, in whose name all prosecutions in the City and County of San Francisco are conducted.   Lt. Pailet's efforts appear to have resulted in his being fired, instead of producing corrections to the warrant affidavit that would have rectified the legal problems created by the ADAs' edits.

### A.  The Duties of a Law Enforcement Affiant for a Search Warrant.

As I have previously described in this Declaration, an affiant who applies to a magistrate for issuance of a search warrant "has a duty to disclose to the magistrate all material facts relevant to the issue of probable cause."  *People v. Neusom*, 76 Cal.App.3d 534, 539 (1977); *People v. Barger*, 40

Cal.App.3d 662, 668 (1974).   An integral part of this duty is the duty to refrain from judicial deception by providing false or misleading material information to the magistrate.  *KRL v. Moore,* 384 F.3d 1106, 1117 (9th Cir. 2004).   An affiant may not "deliberately paint[] a misleading picture of the facts in order to procure a warrant."  *Jordan v. Town of Waldoboro,* 940 F.3d 532, 548 (1st Cir. 2019).

The affiant's duty to refrain from painting a false picture of the facts includes the duty to avoid intentional or reckless *omission* of material information from the affidavit.  *People v. Scott,* 52 Cal.4th 452, 484 (2011).   The rule announced in *Franks v. Delaware,* 438 U.S. 154 (1978), has been applied by the California Supreme Court to "deliberate omissions of material facts from an affidavit for a search warrant."  *People v. Beck and Cruz,* 8 Cal.5th 548, 593 (2019); *People v. Sandoval,* 62 Cal.4th 394, 409 (2015).

An officer applying for a search warrant is "required to exercise reasonable professional judgment."  *People v. Bradford,* 15 Cal.4th 1229, 1292 (1997).

**B.  The Constitutional Duty of an Investigating Officer to Disclose Exculpatory Evidence.**

A law enforcement officer has constitutional duties that extend beyond the duty to disclose all material facts to a magistrate when that officer is an affiant for a search warrant.   The officer also has a constitutional duty to disclose material exculpatory evidence to the prosecutors assigned to that case.   The constitutional duty of an investigating officer to disclose exculpatory evidence to the prosecutor has its roots in the rule of *Brady v. Maryland,* 373 U.S. 83, 87 (1963)*,* in which the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

While by its explicit terms the holding of *Brady v. Maryland* applied only to prosecutors, *Haley v. City of Boston,* 657 F.3d 39, 48 (1st Cir. 2011), the United States Supreme Court has made clear in its more recent opinions that the *Brady* rule also applies to investigating officers who withhold material exculpatory evidence from prosecutors.  *See, Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam) ["*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." (internal quotation marks

1    omitted)]; *Kyles v. Whitley*, 514 U.S. 419, 438, (1995) [rejecting rule that would not hold the State

2    responsible for failing to disclose exculpatory evidence in the possession of police investigators but not

3    known to prosecutors at the time of trial].

4         A significant number of the United States Circuit Courts of Appeals, notably including the Ninth

5    Circuit, have extended the *Brady* rule to require investigating officers in criminal cases to disclose

6    exculpatory evidence to prosecutors.   *See, e.g., Carrillo v. City of Los Angeles*, 798 F.3d 1210, 1213

7    (9th Cir. 2015); *Tennison v. City & County of San Francisco,* 570 F.3d 1078, 1087 (9th Cir. 2008);

8    *Moldowan v. City of Warren,* 573 F.3d 309, 349 (6th Cir. 2009); *Carvajal v. Dominguez,* 542 F.3d 561,

9    566 (7th Cir. 2008); *Russo v. City of Bridgeport,* 479 F.3d 196, 209-210 (2d Cir. 2007); and *Sanders v.*

10   *English*, 950 F.2d 1152, 1162 (5th Cir. 1992).

11        **C.   Investigating Officer's Civil Liability for Withholding Material Exculpatory Evidence**

12             **and for Engaging in Judicial Deception.**

13        An investigating officer who withholds material exculpatory evidence and who thereby

14   damages another person exposes himself or herself to civil liability under the Civil Rights Act of 1871

15   [42 U.S. Code Section 1983].  Such an officer is not entitled to absolute immunity from suit for

16   withholding exculpatory evidence from prosecutors.   *Tennison v. City and County of San Francisco,*

17   570 F.3d 1078 (9th Cir. 2009); *Carrillo v. County of Los Angeles,* 798 F.3d 1210, 1213 (9th Cir. 2015).

18        An investigating officer who as an affiant on an application for a search warrant engages in

19   judicial deception thereby violates the Due Process Clause of the United States Constitution, *Benavidez*

20   *v. County of San Diego,* 993 F.3d 1134, 1146 (9th Cir. 2021), and "similarly violates the Fourth

21   Amendment if he intentionally or recklessly withholds material information from a probable cause

22   affidavit." *Rainsberger v. Benner,* 913 F.3d 640, 647 (7th Cir. 2019).  *Accord, Brown v. Miller,* 519

23   F.3d 237, 238 (5th Cir. 2008).

24        Withholding material exculpatory evidence is not protected by absolute immunity. *Sornberger*

25   *v. City of Knoxville,* 434 F.3d 1006, 1029 (7th Cir. 2006).  And such conduct extends to the officer the

26   protection of qualified immunity only where "a reasonable officer can conclude that a withheld fact is

27

28

irrelevant to probable cause" in a probable cause affidavit for a search warrant. *Olson v. Tyler,* 825 F.2d 1116, 1121 (7th Cir. 1987).

Because of these principles of law, I believe that Lt. Pailet would have exposed himself to potential liability in a civil action brought by San Francisco Police Officers Cha and Patino if he had failed to notify ADA Drusinsky, ADA Lacambra, and ultimately District Attorney Boudin of his concerns about false statements in the search warrant affidavit prepared by the two assistant prosecutors and the deletion from that affidavit of exculpatory evidence that would have worked against the magistrate's finding of probable cause to issue the search warrants for the officers' electronic devices.

It is my opinion that because his failure to call these defects in the draft search warrant affidavits to the attention of the prosecutors in their investigation of Officer Cha's and Officer Patino's use of force against Sean Moore would have exposed him to possible personal civil liability, Lt. Pailet had the right, if not the duty, to report the conduct of the two assistant prosecutors to their supervising attorneys and to District Attorney Boudin in the San Francisco District Attorney's Office.

**D.  Prosecutor's Civil Liability for Engaging in Judicial Deception While Investigating Possible Criminal Activity.**

A prosecutor normally enjoys absolute immunity from civil liability when performing his or her role as an advocate for the State exercising powers that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976).  When, however, "a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks," the prosecutor is not protected by absolute immunity. *Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009).

Thus, absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, *Burns v. Reed*, 500 U.S. 478, 492 (1991), or when the prosecutor *appears in court* to present evidence in support of a search warrant application. *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997).  But absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, *Burns v. Reed*, 500 U.S. 478, 496 (1991), or when a prosecutor acts as a complaining witness in support of a warrant application. *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Justice Scalia, concurring).

I am informed and believe that prior to the drafting of the search warrant affidavits in question no criminal charges had been filed against Officers Cha and Patino.

It is my opinion that during the time of the San Francisco District Attorney's investigation of the officer-involved shooting of Sean Moore, the two assistant prosecutors assigned to that case acted in an investigative, and not in a prosecutorial, capacity in preparing edits to the search warrant affidavit drafts written by Inspector Hayashi.  It is my further opinion that Lt. Pailet had an obligation  to advise ADA Drusinsky and ADA Lacambra that their edits to the draft search warrant affidavits violated constitutional principles and could have subjected them to liability in any civil action brought against them by Officer Cha or Officer Patino.

**E.  Prosecutor's Ethical Violations for Failure to Include Exculpatory Evidence in Search Warrant Affidavit.**

In addition to their constitutional duty to disclose material exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), prosecutors have an ethical duty to disclose exculpatory evidence even when that evidence is not material.  The Supreme Court declared in *Cone v. Bell,* 556 U.S. 470, fn.15 (2009) that "[a]though the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations."   Several United States Circuit Courts of Appeals have quoted this statement of *Cone v. Bell.  United States v. Morales,* 746 F.3d 310, 314 (7th Cir. 2014); *Brooks v. Tennessee,* 626 F.3d 878, 893 (6th Cir. 2010) ["[T]he *Brady* standard for materiality is less demanding than the ethical obligations imposed on a prosecutor."]

California prosecutors have a statutory duty under the California Criminal Discovery Statute to disclose all exculpatory evidence, including exculpatory evidence that is deemed to be immaterial. *Barnett v. Superior Court*, 50 Cal.4th 890, 901 (2010); *People v. Lewis*, 240 Cal.App.4th 257, 266 (2015) ["California's criminal discovery statutes require the prosecution to disclose "[a]ny exculpatory evidence" to the defense (§ 1054.1, subd. (e)), which our Supreme Court has explained is not limited to evidence that is ultimately determined to be material."]

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B010-D08A7509E357

A prosecutor who knowingly violates a California statutory duty may be found to have violated Business and Professions Code Section 6068, subdivision (a), which provides that "[i]t is the duty of an attorney . . . (a) To support the Constitution and laws of the United States and of this state."  The duty of subdivision (a) of Section 6068 of the Business and Professions Code is the duty to uphold the law and to follow the Rules of Professional Conduct of the State Bar of California.  *Hoffman v. Municipal Court*, 3 Cal.App.3d 621, 628 (1970).

Rule 5-110 [Special Responsibilities of a Prosecutor], approved by the California Supreme Court, effective Nov. 2, 2017, provides that "[t]he prosecutor in a criminal case shall . . . (D) Make timely disclosure to the defense of all evidence or information known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal. . . ."  Rule 5-110 does not limit the prosecutor's ethical and professional duty to disclose only material exculpatory evidence.

It is my opinion that Lt. Pailet had the right to advise ADA Drusinsky and ADA Lacambra that their edits to the draft search warrant affidavits, by excising exculpatory evidence that could have vitiated the probable cause for the issuance of search warrants for the electronic devices of Officers Cha and Patino, violated their ethical and professional duties under the California Rules of Professional Conduct, and that this conduct could have thereby subjected them to disciplinary action by the State Bar of California.

I conclude that Lt. Jeffrey Pailet had the legal right, as well as the legal duty, to report to the assigned Assistant District Attorneys and ultimately to District Attorney Chesa Boudin that the edits made by the two prosecutors violated their constitutional, statutory, and ethical duties as California prosecutors.

## VIII.    STANDARDS FOR DISCLOSURE BY A PROSECUTOR'S OFFICE WHEN INVESTIGATING POSSIBLE CRIMINAL ACTIVITY.

### A.  The Public Prosecutor's Duty and Powers to Investigate Suspected Criminal Activity.

In order to understand the disclosure duties of the Prosecutor's Office, it is essential to understand the multi-faceted role of the Public Prosecutor. The Legislature has designated the District Attorney as the "public prosecutor," Government Code Section 26500, upon whom is imposed the duty to "initiate and conduct on behalf of the people all prosecutions of all public offenses." Government Code Section 26500. The Public Prosecutor's duty to prosecute all public offenses includes the duty to investigate and gather evidence relating to criminal offenses, since investigation of crimes is inseparable from prosecution. Government Code Section 25303.

"It is . . . clear that the district attorney's duties as public prosecutor embrace more functions than the prosecution of criminal actions." 64 Ops.Cal.Atty.Gen. 418, 422 (1981). The investigation and gathering of evidence relating to criminal offenses is a responsibility inseparable from the district attorney's prosecutorial functions, even though no criminal charges have been filed. *People v. Superior Court (Aquino),* 201 Cal.App.3d 1346, 1349-1350 (1988); *Rauber v. Herman,* 229 Cal.App.3d 942, 948 (1991). Thus, the Public Prosecutor's expenses incurred in the detection of crime (as distinct from the Prosecutor's expenses in the prosecution of criminal cases) are declared to be "necessarily incurred expenses" that are county charges. Government Code Section 29601(b)(1).

The Public Prosecutor's duty to investigate suspected criminal activity has constitutional underpinnings. Government Code Section 25303 provides, in pertinent part, that the power of the Board of Supervisors to supervise all County officers "shall not be construed to affect the independent and **constitutionally and statutorily designated investigative** and prosecutorial **functions** of the sheriff and **district attorney** of a county." [emphasis added] Section 25303 reaffirms "the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a county." *Venegas v. County of Los Angeles,* 32 Cal.4th 820, 834 (2004); *Goldstein v. City of Long Beach,* 715 F.3d 750, 757 (9th Cir. 2013).

The District Attorney's constitutionally designated investigative functions are referenced in California Constitution Article V, Section 13. That constitutional provision states, in pertinent part: "The Attorney General shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties

of their respective offices, and may require any of said officers to make reports concerning the **investigation**, detection, prosecution, and punishment **of crime** in their respective jurisdictions as to the Attorney General may seem advisable." [emphasis added]

"The **investigation** and prosecution of public offenses is, of course, the responsibility and prerogative of the Attorney General and the several district attorneys (Cal. Const., art. V, § 13; Gov. Code, § 26500)." *Los Angeles City Ethics Com. v. Superior Court*, 8 Cal.App.4th 1287, 1302 (1992) [emphasis added].

"Investigation and the gathering of evidence relating to criminal offenses is a responsibility which is inseparable from the district attorney's prosecutorial function. That the district attorney is charged with the duty of investigating as well as prosecuting criminal activity has been recognized by an unbroken line of California cases," *Hicks v. Board of Supervisors*, 69 Cal.App.3d 228, 241 (1977), that has extended over one hundred years. *County of Yolo v. Joyce*, 156 Cal. 429, 432 (1909) ["The district attorney is an executive officer charged with the detection of crime and the prosecution of criminal cases."]  In *Cunning v. County of Humboldt*, 204 Cal. 31, 37 (1928), the Supreme Court held that under Section 4307 of the Political Code (since repealed) a district attorney had authority to employ persons to assist in the detection of crime and the gathering of evidence to be used in the prosecution of criminal cases.

To carry out his or her investigative function, the Public Prosecutor has the authority to hire investigators "to assist in the detection of crime and the gathering of evidence to be used in the prosecution of criminal cases . . . ."  *Hicks v. Board of Supervisors*, 69 Cal.App.3d 228, 241 (1977). Plaintiff Pailet was an investigator hired by the San Francisco County District Attorney's Office pursuant to this authority.

Although investigation of crimes is part of the prosecutor's duty to prosecute public offenses, investigation of suspected criminal activity is a separate action within that duty from the criminal prosecution of those offenses.   Were that not true, there would be no reason for Government Code Section 25303 to speak of the investigation of crime and the prosecution of crime as separate actions of the Public Prosecutor.

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B910-D08A7509E357

California decisional authority additionally confirms this distinction by recognizing that the Public Prosecutor's duty to investigate criminal activity is a function that is in addition to the Prosecutor's duty to prosecute that activity.   *Hicks v. Board of Supervisors*, 69 Cal.App.3d 228, 241 (1977) ["the district attorney is charged with the duty of investigating as well as prosecuting criminal activity. . . ."]

The Public Prosecutor's duty to investigate criminal offenses is of such importance that the California Government Code prohibits interference with that duty by the Board of Supervisors of the County in which the Public Prosecutor has jurisdiction.  Government Code Section 25303 provides that the power of the Board of Supervisors "shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a county. The board of supervisors shall not obstruct the investigative function of the sheriff of the county nor shall it obstruct the investigative and prosecutorial function of the district attorney of a county."   Government Code Section 25303, *People v. Superior Court (Laff),* 25 Cal.4th 703, 739 (2001).

"The district attorney's discretionary functions extend from the investigation and gathering of evidence relating to criminal offenses [citation omitted], through the crucial decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor makes at trial. . . . ." *People v. Eubanks,* 14 Cal.4th 580, 589 (1996); *Gananian v. Wagstaffe*, 199 Cal.App.4th 1532, 1542-1543 (2011).

## B.    The Public Prosecutor's Investigative Role and the Work Product Doctrine.

Although the Public Prosecutor's investigation of suspected crimes is inseparably linked to the prosecution of those crimes, the role of the Public Prosecutor when conducting pre-charging investigation of suspected criminal activity is different from the Prosecutor's role after the prosecutor has initiated criminal charges and prosecution on those charges is pending.  The disclosure rules and standards that apply to the prosecutor's actions when investigating suspected criminal activity differ in at least one important respect from the disclosure rules and standards that apply to the prosecutor's actions when handling the prosecution of criminal charges that have already been filed.

Prior to the filing of criminal charges, the prosecutor's investigatory actions, including the preparation of documents utilized in the investigation and the prosecutor's discussions surrounding the preparation of those documents, do not fall within the protection of the Work Product Doctrine. The Prosecutor's assistants and the Prosecutor's sworn law enforcement personnel who conduct investigations that precede the initiation of criminal proceedings can become percipient fact witnesses whose actions fall outside the protection of the Work Product Doctrine.

## C. The Work Product Doctrine Protects from Disclosure an Attorney's Impressions, Conclusions, Opinions, or Legal Research or Theories.

The Work Product Doctrine protects from disclosure the mental impressions, conclusions, opinions, and legal research and theories of an attorney. This rule was first articulated by the courts and was explained by the United States Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 511 (1947). The California Legislature codified the Work Product Doctrine in Code of Civil Procedure Section 2018.030. Section 2018.030 assigned attorney work product either absolute or qualified protection, depending on the type of material at issue. Subdivision (a) of Section 2018.030 provides that "[a]bsolute protection is afforded to writings that reflect 'an attorney's impressions, conclusions, opinions, or legal research or theories.'" All other work product "receives qualified protection; such material 'is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice.' (§ 2018.030, subd. (b).)" *People v. Superior Court (Jones),* 12 Cal.5th 348, 362 (2021); *Coito v. Superior Court*, 54 Cal.4th 480, 485 (2012).

## D. The Prosecutor's Work Product Protection Does Not Extend to Excusing the Prosecutor's Duty to Disclose Exculpatory Evidence.

With one important exception, the impressions, conclusions, opinions, and legal research and theories of prosecutors are generally entitled to the same Work Product protection afforded to all other attorneys by subdivision (a) of Code of Civil Procedure Section 2018.030. Penal Code Section 1054.6 provides that, under the statutory discovery rules of the Criminal Discovery Statute, "[n]either the defendant nor the prosecuting attorney is required to disclose any materials or information which are

work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure."   The kind of work product described in Code of Civil Procedure Section 2018.030(a) is best characterized as "opinion work product."   *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000). Opinion work product is protected by the Work Product Doctrine from disclosure.   *People v. Seaton,* 26 Cal.4th 649 (2001).

The important exception to this general Work Product protection is this: the Work Product protection afforded to prosecutors does not extend to exculpatory evidence that is constitutionally required to be disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83, 87 (1963).   The type of work product that is not protected from disclosure by the Work Product Rule can be characterized as "fact work product."   *People v. Angel,* 277 P.3d 231, 235 (Colo. 2012). Work Product protection "cannot be invoked by the prosecution to preclude discovery by the defense of material evidence, or to lessen the state's obligation to reveal material evidence even in the absence of a request therefor."   *People v. Collie,* 30 Cal.3d 43, 59, fn.12 (1981). When the prosecutor's opinions contain exculpatory evidence or facts, that factual evidence is not protected from disclosure by the Work Product Doctrine.   *Morris v. Ylst,* 447 F.3d 735, 742 (9th Cir. 2006) ["a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady* unless they contain underlying exculpatory facts."]

Given that "[t]he animating purpose of *Brady* is to preserve the fairness of criminal trials . . . [e]xtending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials."   *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006).

It is my opinion that the *fact* that the assigned prosecutors edited the draft versions of the Probable Cause Affidavit for a Search Warrant of the electronic devices of Officers Cha and Patino, and the language itself of those edits, are fact evidence and fact work product, not "opinion work product."   Accordingly, I conclude that these edits by the two prosecutors constitute arguably exculpatory evidence that is not protected from disclosure by the California Work Product Doctrine.

**E.   A Prosecutor's Investigatory Actions That Do Not Constitute Preparation for Trial Are Not Protected by the Work Product Doctrine.**

1     Code of Civil Procedure Section 2018.020 sets forth the policies underlying the Work Product

2  Doctrine codified in Code of Civil Procedure Section 2018.030.    Section 2018.020 states: "It is the

3  policy of the state to do both of the following: (a) Preserve the rights of attorneys to prepare cases for

4  trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to

5  investigate not only the favorable but the unfavorable aspects of those cases.   (b) Prevent attorneys

6  from taking undue advantage of their adversary's industry and efforts."   A key component of the Work

7  Product Doctrine is the need for an attorney to be able to prepare a case *for trial.*

8     It is conceivable to me that disclosure of facts involved in the investigation of suspected criminal

9  activity might result in a disclosure of the impressions, conclusions, opinions, or legal research or

10  theories of the attorney supervising that investigation.   However, an attorney resisting discovery of a

11  witness statement based on absolute privilege "must make a preliminary or foundational showing that

12  disclosure would reveal his or her 'impressions, conclusions, opinions, or legal research or theories.'

13  (Sec. 2018.030, subd. (a).)"   *Coito v. Superior Court*, 54 Cal.4th 480, 495-496 (2012).

14     It is significant to me that in this case the District Attorney's Office apparently had never filed

15  a criminal complaint against or sought a criminal indictment of Officer Cha or Officer Patino prior to

16  the time that the District Attorney's office decided to seek a search warrant for the officers' electronic

17  devices.  In fact, I am advised that the District Attorney of San Francisco County did not file a criminal

18  complaint against Officer Kenneth Cha until November 1, 2021.  If that is true, I do not believe that the

19  search warrant drafting actions in which the District Attorney's Office engaged in the fall of 2020 were

20  preparations for trial of the two officers.   The actions of drafting search warrant affidavits seeking a

21  judicially authorized search warrant were clearly an investigative tool of the District Attorney to assist

22  that office in making a decision *whether* to file criminal charges against the officers.

23     As previously discussed, an investigative action by the prosecutor, as contrasted with a

24  prosecutorial action by the prosecutor, is not an action by the prosecutor acting as an "officer of the

25  court."   *Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009).  Such an investigative action is not

26  entitled to the absolute immunity from civil liability under the Civil Rights Act of 1871. *Van de Kamp*

27  *v. Goldstein, supra.*

28

DocuSign Envelope ID: 9F2E05E1-7DA3-459B-B010-D08A7509E357

Since the District Attorney's Office actions prior to the filing of a criminal complaint against either Officer Cha or Officer Patino were investigative and not prosecutorial in character, and do not appear to have been intended to be preparation for trial of a criminal case that had not been filed, I have concluded that the Work Product Doctrine does not extend to protecting the disclosure of the actions of the Assistant District Attorneys of San Francisco County in editing the search warrant affidavits for the search of the electronic devices of Officers Cha and Patino.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.   Executed this 14th day of July, 2022 in Fairfield, California.

DocuSigned by:

L. Douglas Pipes

83B79CD10C944E2...

L. DOUGLAS PIPES