# EXHIBIT 1

REPORT ON THE NON-FATAL OFFICER-INVOLVED SHOOTING OF

SEAN WENDELL MOORE ON JANUARY 6, 2017



INDEPENDENT INVESTIGATIONS BUREAU

CITY AND COUNTY OF SAN FRANCISCO

DECEMBER X, 2019

# TABLE OF CONTENTS

| | |
|---|---|
| **INTRODUCTION** | 3 |
| **SCENE DESCRIPTION** | 3 |
| **FACTUAL SUMMARY** | 4 |
|    1. Officers' Initial Encounter with Mr. Moore | 4 |
|    2. Mr. Moore is Pepper Sprayed and Kicks Officer Cha | 5 |
|    3. Mr. Moore Punches Officer Patino and Officer Cha Shoots Mr. Moore | 8 |
|    4. Immediate Aftermath | 10 |
| **LEGAL STANDARD** | 12 |
| **LEGAL ANALYSIS** | 13 |
| **CONCLUSION** | 15 |

## INTRODUCTION

The San Francisco District Attorney's Office (SFDA) has completed its investigation of the non-fatal officer-involved shooting of Sean Wendell Moore in San Francisco, California, on January 6, 2017. The investigation was conducted by the office's Independent Investigations Bureau (IIB) and focused exclusively on determining whether criminal charges related to the officers' conduct are warranted. It did not examine issues such as officers' compliance with the San Francisco Police Department's (SFPD) policies or procedures or issues related to civil liability. This report should not be interpreted as expressing any opinion on such non-criminal matters.

At approximately 4:00 a.m., SFPD officers Kenneth Cha, Star #1206, and Colin Patino, Star #1310, responded to the 500 block of Capitol Avenue regarding a complaint from Mr. Moore's neighbor, who had a restraining order against Mr. Moore. The officers attempted to speak with Mr. Moore, who stood at the top of a flight of stairs behind a metal gate that separated the stairway's landing from his front door. After the officers identified themselves and why they were there, he began shouting and cursing, repeatedly telling the officers to leave.

At one point during the encounter, Mr. Moore abruptly exited through the gated door and approached the officers. Officer Cha pepper sprayed Mr. Moore, who took a few steps toward his home before advancing on Officer Cha and kicking him. Mr. Moore retreated into his home behind the metal gate as the officers backed down the stairs. The officers repeatedly ordered Mr. Moore to surrender so they could arrest him. Eventually, Mr. Moore opened the door, walked back onto the stairway, and bent down to pick up an item he had dropped.

The officers quickly approached Moore with their batons drawn. Officer Patino, who was at the top of the stairs, attempted to subdue Mr. Moore with baton strikes to his leg area. Mr. Moore punched Officer Patino in the face, breaking his nose and causing Officer Patino to fall down the stairs. Mr. Moore then turned to Officer Cha, who had lost his baton during the struggle, and kicked at him, prompting Officer Cha to shoot Mr. Moore twice. Officer Cha later said that, given Mr. Moore's attack on his partner and then him, he feared for his safety. Mr. Moore was provided with medical care and survived his injuries.

Before bringing criminal charges, it is a prosecutor's duty to evaluate the evidence and determine if it shows beyond a reasonable doubt the potential defendant committed a crime. Here, the evidence would have to show beyond a reasonable doubt that Officer Cha did not reasonably believe in the need to defend himself and/or others from the threat of great bodily injury. Given the available evidence, we cannot meet this burden. As detailed below, the District Attorney therefore declines to pursue criminal charges against Officer Cha relating to this incident.

## SCENE DESCRIPTION

The officer-involved shooting occurred outside Mr. Moore's residence on the 500 block of Capitol Avenue, near the top of a narrow stairway. This stairway has 11 steps that lead from the street to a small landing immediately outside the front door of Mr. Moore's home. A metal security gate blocks the front door of Mr. Moore's house. The stairway is situated between Mr. Moore's home and a neighbor's home.

3

*Figure 1: Stairwell leading up to Mr. Moore's front door between Mr. Moore's residence on the left and a neighbor's residence on the right. Source: Officer Cha's BWC.*

## FACTUAL SUMMARY

### 1. Officers' Initial Encounter with Mr. Moore

At approximately 3:57 a.m., Mr. Moore's neighbor called 911 to report a fight with "no weapon." The neighbor said he had a restraining order against Mr. Moore and Mr. Moore was "hitting the wall in the middle of the night."[1] Upon arrival, Officer Patino briefly spoke to the complaining neighbor. Their conversation was cut short because Officer Patino left to assist Officer Cha as he contacted Mr. Moore.

Officers Cha and Patino both had their body-worn cameras (BWCs) activated throughout the incident. The footage shows that Mr. Moore immediately began shouting and cursing at the officers through the security gate. Using expletives, he repeatedly told the officers to leave. Officer Cha told Mr. Moore he was there in response to a call for service and asked Mr. Moore if he was okay. Mr. Moore responded, "I don't give a fuck, I didn't call you; quit showing up at my house and I didn't call you." Officer Cha told Mr. Moore to "chill out," but Mr. Moore continued to tell the officers to get off his stairs and insist he did not call the police. Officer Patino accused Mr. Moore of spitting on him. Mr. Moore denied spitting and said, "Bullshit, fuck your face!"

When the officer indicated there was a restraining order against Mr. Moore, Mr. Moore stated, "Do you know you're a fucking liar, nigger?" Approximately one minute into their interaction,

---

[1] Based on 911 dispatch records.

4

Mr. Moore said, "I'm going to remove your ass." The officers then accused Mr. Moore of threatening them. Mr. Moore said he was "through talking" to the officers. The officers told him to relax and tried to quiet him. Mr. Moore said, "fuck your order," "fuck your court," and "fuck your call, bitch."

Officer Patino asked if Mr. Moore was high. Mr. Moore stated, "Get your fucking ass off my stair." One of the officers stated he was on the stairs to investigate a crime. Mr. Moore responded that there was no crime to investigate and said, "You ain't investigating shit. . . . I'm gonna call and remove you."

Mr. Moore continued cursing until he went back into his house, closing the door behind him. The officers asked who Mr. Moore was going to call and said, "Jeez. What is up with this week, man? . . . Let's get out of here before he blasts us with a shotgun." They went down the stairs and read the restraining order.

Mr. Moore re-emerged at the top of the stairs behind the screen door, saying, "You better get your faggot asses on." Mr. Moore then directed the term "gay ass" at the officers, still yelling to them to get off the stairs. He repeated the epithets. The officers were still on the sidewalk but then went back upstairs. Officer Patino objected to the use of "those slurs." Mr. Moore told the officers, "I ain't gonna tell you no more, bitch."

Officer Patino stated, "No, I'm not gonna leave yet." Mr. Moore stated, "You're done." Officer Cha asked what Mr. Moore meant by this, and Mr. Moore began asking for Officer Patino's star number and apparently calling on his phone. Officer Patino told Mr. Moore that eventually he would leave, but Mr. Moore responded, "I ain't gonna tell you no more!"

### 2. **Mr. Moore is Pepper Sprayed and Kicks Officer Cha**

The incident escalated when Officer Patino began reading aloud the restraining order conditions. Mr. Moore emerged from the screen door, cursing and shouting for the officers to get off his stairs. The officers backed up away from the screen door as Mr. Moore took three steps toward the officers.

Officer Cha twice warned Mr. Moore he was "gonna get sprayed." Waving his right hand around, Mr. Moore said, "Fuck your spray." Approximately five seconds after Mr. Moore approached the officers, Officer Cha pepper sprayed him. Mr. Moore turned around and went toward the gate. He then turned again to face the officers, approached the officers, and kicked at Officer Cha with his left foot. Officer Cha later told investigators Mr. Moore's kick hit him in the face.

5



*Figure 2: Mr. Moore approximately two seconds before being pepper sprayed. Source: Officer Cha's BWC.*

The officers retreated partway down the stairwell as Mr. Moore picked up the restraining order papers, which had fallen to the ground. Mr. Moore reentered his home and then briefly reemerged out of the gate. The officers retreated further as Officer Cha said, "motherfucker, what's up . . . come on." Mr. Moore reentered his home, and the officers retreated back to ground level.

Officer Cha requested an ambulance and reported to dispatch that Mr. Moore made "aggressive movements" towards him and his partner even after being pepper sprayed.

From inside of his house, Mr. Moore complained about the effects of the pepper spray. Officer Patino twice told Mr. Moore he was under arrest and repeatedly ordered Mr. Moore to return the restraining order papers and surrender. Mr. Moore responded, "No. Fuck your arrest," and, "You're gonna leave from here. Fuck your paper."

Approximately two minutes after Mr. Moore grabbed the papers and went inside with them, Mr. Moore came back out, saying, "Here's your papers!" From behind the security gate, he pushed a crumpled set of papers through the bars that fell onto the second stair below the landing. The officers repeatedly ordered him to come out. Officer Cha told Mr. Moore he would kick the door open if Mr. Moore did not come out. Officer Cha also offered Mr. Moore an ambulance for medical attention. Again, Mr. Moore responded by cursing.

Officer Patino approached on the stairwell and tried to grab some of the papers from the stairs. At the same time, Mr. Moore suddenly re-emerged from behind the gate. Officer Patino was able to grab some of the papers as Mr. Moore stood on the landing, pounded his right fist into his left hand, and repeatedly screamed, "Fuck you!" Officer Cha said, "Hey, you! Come on!" Officer Patino had his baton out and walked towards Mr. Moore. Mr. Moore said, "Come on," and that

6

he was going to "kick your ass." Officer Cha again told Mr. Moore, "Let's go, come out." The officers continued to order Mr. Moore to surrender, but Mr. Moore continued to refuse to comply.

In the BWC footage, Mr. Moore held an object that appeared to be a phone in his hand and dropped something onto the stairwell – it is not clear what the object was, though it appears to be a plastic piece. Officers once again issued orders, instructing him three times to get on the ground. Officer Patino told Mr. Moore he would "get batoned" if he did not get on the ground. Once again, Mr. Moore refused, repeating, "I ain't getting on shit."[2]



*Figure 3: Mr. Moore bending over to pick up an item he dropped on the stairwell. Source: Officer Cha's BWC.*

---

[2] Officer Cha reported on the radio that Mr. Moore had "something in his hand," repeating this information. In an on-scene "public safety statement," Officer Cha likewise said Mr. Moore had something in his hand, but Officer Cha said he did not know what the object was. In his interview later, Officer Cha stated he remembered Mr. Moore "coming out of the house with something in his hand. And I just remember thinking, like, 'What is that? . . . Like what is he holding?'" In his interview, Officer Patino stated, "I guess he was holding a phone or some dark object one of those times he was coming . . . in and out of the house."

### 3. **Mr. Moore Punches Officer Patino and Officer Cha Shoots Mr. Moore**

During the last part of the incident, Mr. Moore punched Officer Patino, breaking his nose and causing him to fall down the stairs. Mr. Moore then moved toward Officer Cha, who shot him. Because this was the critical part of the incident, after discussing the BWC footage, this section separately discusses the officers' description of what occurred.

### A. **BWC Footage**

Mr. Moore came part-way down the stairs and reached down for the unknown object he had dropped. The officers advanced up the stairs, and Mr. Moore backed up toward the landing. Officer Cha told Mr. Moore to "come out" and "get over here." Officer Patino instructed him to "get on the ground." When Mr. Moore did not comply, Officer Patino approached Mr. Moore at the top of the stairs and hit him with the baton twice near Mr. Moore's upper leg area.

Mr. Moore punched Officer Patino's face, breaking his nose. Officer Patino audibly grunted as he fell down the stairs immediately following the punch, which is captured on Officer Cha's BWC.



*Figure 4: The circled portion shows Mr. Moore's right fist, indicated by the blue arrow. Source: Officer Cha's BWC.*

8

In response, Officer Cha drew and pointed his gun at Mr. Moore as Mr. Moore approached the officer. Mr. Moore raised his right leg and, in the BWC footage, appears to kick at Officer Cha. Officer Cha, who was near the top of the stairs, fired his gun twice at Mr. Moore as Officer Cha fell down the stairs. Approximately four seconds elapsed from the moment Mr. Moore punched Officer Patino until Officer Cha fired the first round.





*Figures 5a and 5b: Mr. Moore as he steps forward and prepares to kick at Officer Cha with his*

9

*right leg. Officer Cha's gun is visible on the right side of the images. Source: Officer Cha's BWC.*

### B. Officer Statements[3]

Officer Patino said he struck Mr. Moore with his baton at least once in the leg, though he did not know specifically how many times. He reported this was the first time he had used a collapsible baton in the field. When struck, Mr. Moore "didn't move at all. He just looked at me." Officer Patino said Mr. Moore tried to block the strike and was perhaps even trying to grab his baton.

Officer Patino said he remembered Mr. Moore punching him in the face and "the punch forced me to go back." Officer Patino fell backwards down the stairs and landed at the bottom. He did not remember if he lost consciousness.

Officer Cha described the struggle between Mr. Moore and Officer Patino as a "violent melee" and "violent physical attack." He said Mr. Moore "charged" at them and overwhelmed Officer Patino. Although Officer Cha did not see Mr. Moore's fist hit Officer Patino's face, he heard his partner "drop" and saw him roll down the stairs. He knew Officer Patino was "done" and had sustained great bodily injury. Officer Cha lost his baton at that point, either because Mr. Moore attacked him or because of Officer Patino rolling down the stairs.

Officer Cha said Mr. Moore shifted his attention to him after he punched Officer Patino off the landing. Mr. Moore was "so enraged coming at me in a violent manner, throwing his hands and his feet towards me. And I just remember retreating down the stairs. I'm about to fall down, and I had nothing else to do but I was in fear . . . for my life. It was a knee-jerk, you know, great bodily injury or death. I don't even know what happened to Colin. And so I – so I shot him."[4] He further stated, "I thought I was going to die. I thought this guy was going to just go to town on me. Like the look on his face . . . . His huge eyes. . . . [W]hen he was coming down the stairs, it was like this big tidal wave. In my heart, I knew that Colin and I, our lives were in . . . great bodily harm or we were going to die."[5]

### 4. Immediate Aftermath

Once both officers were on the bottom of the stairs, both officers called in, "Shots fired." After both officers checked one another's welfare, they radioed for backup. Still pointing his gun towards the stairwell, Officer Cha radioed that the scene was not safe and repeatedly directed Officer Patino to get cover. He radioed for backup to his location, announcing Mr. Moore was

---

[3] Mr. Moore declined to be interviewed by IIB.

[4] Officer Patino said after he fell, "the next thing I remember, I'm on the ground." His baton, camera, and flashlight were on the ground. He then heard two gunshots but did not know whether Mr. Moore or Officer Cha had fired the gunshots.

[5] Per SFPD policy, before officers who are involved in a shooting can view any video recordings of the incident, they are required to provide an initial statement describing the incident and the decision to shoot. In this case, the two officers provided separate written statements that used virtually the same words as one another to describe the events leading up to the shooting. While we have concerns about the virtually identical summary statements, we are reassured by the detailed, specific answers they gave in response to investigators' questions; these answers did not repeat the same words or phrases used by the other officer when also answering direct questions.

"barricaded" and had assaulted Officer Patino "with fists and feet. He came at me. We lost the batons in the fight. I was getting overpowered, so I discharged my weapon."

When responding units arrived, Officer Cha repeatedly asked for cover and asked to be dragged away. He continued to direct Officer Patino to take cover and told the other responding officer he would not put his gun away. Footage from the body-worn camera worn by Sergeant Anderson, Star #4232, shows other officers helped Officer Cha, who was on his back, re-holster his weapon and then drag him away.

Sergeant Anderson began negotiations with Mr. Moore, who had re-entered his home. Over his vehicle's loudspeaker, Sergeant Anderson offered medical help and an ambulance. Mr. Moore refused aid and asked the police to leave. Because negotiations failed, Officer Patrick Griffin, Star #1835, and a team of officers approached the front door. Mr. Moore opened the door almost immediately but refused to voluntarily exit his house. The officers entered and were able to secure his arms, handcuff him, and take him into custody without incident. Mr. Moore immediately received medical attention from medics waiting on scene and was transported to the San Francisco General Hospital. Mr. Moore survived gunshot wounds to his abdomen and his pelvis. Both officers received medical attention.[6]



*Figure 6: Officer Patino following the incident involving Mr. Moore.*

The Crime Scene Investigation report indicated two casings from Officer Cha's weapon were found, one on the stairwell and one on the sidewalk at the bottom of the stairs.

---

[6] Officer Cha reported experiencing pain in his face and leg after the incident, as well as swelling and bruising to his leg and numbness in his foot. In addition to a broken nose, Officer Patino reported having scraped knees.

11

## **LEGAL STANDARD**

The question presented is whether Officer Cha committed a criminal act by shooting Mr. Moore. A prosecutor must be satisfied the evidence shows beyond a reasonable doubt that no legal justification existed for the person's actions. When an act is legally justified, a person is not criminally liable even though the act would otherwise constitute a crime. The legal justifications raised by this case are self-defense and defense of others.

A person may lawfully use deadly force "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person." Cal. Pen. Code § 197 ("justifiable homicide"); *see also Kortum v. Alkire* (1977) 69 Cal.App.3d 325, 333. "Since a homicide is justifiable under the circumstances specified in section 197, a fortiori an attempt to commit a violent injury upon another under those circumstances is justifiable." *People v. Ceballos* (1974) 12 Cal.3d 470, 477; *see also* CALCRIM No. 505 (jury instruction regarding "justifiable homicide" includes "attempted" murder and "attempted" manslaughter).

Specifically, self-defense or defense of others serves as a complete defense to charges related to the use of deadly force so long as the person (1) subjectively believed in the need to resort to force in order to avert a threat of imminent and great bodily injury, and (2) the person's perceptions and actions were objectively reasonable under the circumstances. *See People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-83; *People v. Viramontes* (2001) 93 Cal. App.4th 1256, 1262.

In this context, a "reasonable person" refers to an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him or her to be. *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519. One must consider all the "facts and circumstances . . . in determining whether the [person] acted in a manner in which a reasonable man would act in protecting his own life or bodily safety." *People v. Humphrey* (1996) 13 Cal.4th at 1083. There is "a reasonable margin within which one may err on the side of his own safety, and so long as he is found to have done so reasonably, no abuse of the right of self-defense should be found to have occurred." *People v. Ross* (2007) 155 Cal.App.4th 1033, 1057.

California law also provides a peace officer has no legal duty to retreat when faced with imminent danger. *See* Penal Code § 835(a).

Finally, the United States Supreme Court specifically rejected a rule that would hold officers liable for any reasonable force resulting from a situation where the officers "intentionally or recklessly provoke a violent confrontation, if the provocation is an independent Fourth Amendment violation." *Cty of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1546 (2017). The court explained this "rule's fundamental flaw is that it uses another constitutional violation to manufacture an excessive force claim where one would not otherwise exist." *Id.*

Criminal law similarly provides that while "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force," CalCrim 3472, this "generally correct statement of law . . . might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 (dicta referring to *People v. Ramirez* (2015) 233 Cal. App. 4th 940). "A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby forfeit his right to live. Instead, he may defend

12

himself even when the defendant set in motion the chain of events that led the victim to attack the defendant." *People v. Ramirez* (2015) 233 Cal. App. 4th 940, 943 (internal citations, alterations, and quotations omitted). *See also* CalCrim No. 3471 ("[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting.").

## LEGAL ANALYSIS

As noted at the beginning of the report, our task is to determine whether the officers violated any criminal laws and does not address civil or administrative issues such as whether officers used appropriate tactics or followed protocol. We reiterate that here because in 2018 an appellate court addressing criminal charges brought against Mr. Moore related to this incident found that the officers' failure to leave Mr. Moore's residence once Mr. Moore directed them to do so constituted a Fourth Amendment violation.

The appellate court acknowledged that this initial constitutional concern would not "immunize Moore from criminal liability for subsequent conduct, including his alleged acts of physical violence."[7] *People v. Moore*, 2018 Cal. App. Unpub. LEXIS 2966, 2018 WL 2016792.

Indeed, Mr. Moore would not be justified in assaulting officers to get them to leave, and it cannot be shown that Officer Cha's use of pepper spray was an unreasonable response to Mr. Moore's aggressive approach toward the officers. Therefore, once Mr. Moore responded to the pepper spray by kicking at the officers, it would not be demonstrably unreasonable for the officers to then seek to arrest Mr. Moore or to use force (e.g., batons) to effectuate such an arrest. Moreover, because we cannot prove that Mr. Moore did not use force likely to cause Officer Cha great bodily injury, we also cannot prove that Officer Cha acted unreasonably in counteracting that force with his own deadly force.

We therefore focus our analysis on Officer Cha's use of deadly force. As discussed more fully below, it cannot be shown Officer Cha acted unreasonably or was not genuinely in fear of suffering great bodily injury when he fired his weapon.

**Subjective belief**

We first examine Officer Cha's subjective belief as to the existence of a threat of great bodily injury. Officer Cha made several statements explaining his decision to shoot Mr. Moore. At the

---

[7] The court noted, however, that it did not consider whether officers were detaining or arresting him for violation of a restraining order based on a citizen's arrest. Instead, the court considered only whether the officers were conducting a proper investigatory detention. The court dismissed the charges that related to the officers' status as peace officers (e.g., assault on a peace officers) based on the finding of a Fourth Amendment violation because those charges required the officers be performing their duties as peace officers and the court found they were no longer doing so once Mr. Moore demanded they leave. The court permitted the District Attorney to proceed on the one remaining charge relating to Mr. Moore's battery of Officer Patino resulting in great bodily injury. *People v. Moore*, 2018 Cal. App. Unpub. LEXIS 2966, 2018 WL 2016792. The District Attorney later dismissed that charge.

13

scene of the incident – approximately two minutes after shooting Mr. Moore – Officer Cha reported over the radio that he shot Mr. Moore because Mr. Moore had assaulted the two officers and was overpowering them. He described the struggle between Mr. Moore and Officer Patino as violent and said Mr. Moore overwhelmed Officer Patino. Once he punched Officer Patino, Mr. Moore then directly approached Officer Cha. Officer Cha said he thought he was about to fall down the stairs, he believed Mr. Moore was going to attack him, and he was afraid for his life.

Officer Cha said Mr. Moore was aggressive and violent throughout their encounter: Mr. Moore "ripped" the restraining order from Officer Patino's hand, "came out violently" and "like a monster," "rip[ped] open" the door and front gate, and "threaten[ed] us." These characterizations are generally consistent with the BWC footage.

Officer Cha's approach to Mr. Moore throughout the encounter also supports his claim that he used deadly force only out of a fear of great bodily injury or worse. Specifically, Officer Cha negotiated with Mr. Moore throughout the encounter, repeated verbal commands and when Mr. Moore assaulted him, tried to subdue him with pepper spray and baton before resorting to deadly force, which he did only after Mr. Moore punched Officer Patino, causing Officer Patino to fall down the stairs. Officer Patino also unsuccessfully used his baton to control Mr. Moore before Officer Cha fired his gun.

Officer Cha's behavior immediately after the shooting was consistent with someone who genuinely feared for his safety: he remained frozen on the ground, pointing his weapon towards Mr. Moore's house, repeatedly directing Officer Patino to take cover, and needed help from other officers to re-holster his weapon and leave the scene. (Officer Cha attributed some of this behavior after he had fallen down the stairs to his fear that Mr. Moore might arm himself.)[8] Moreover, as discussed below, the objective circumstances also support Officer Cha's claim that he feared Mr. Moore would cause him great bodily injury.

**Objective reasonableness**

The remaining question is whether it was objectively reasonable for Officer Cha to believe he was in imminent danger of great bodily injury and to use deadly force as a response. The BWC footage show Mr. Moore physically resisted officers' efforts to arrest him after he reacted violently to being pepper sprayed. Mr. Moore's resistance escalated when he punched Officer Patino in the face, breaking his nose and causing him to fall down the stairs. A reasonable officer would know at the time that Mr. Moore had punched his partner with enough force to cause his partner to fall down the stairs. Mr. Moore then immediately turned to Officer Cha, who was in a vulnerable position near the top of the stairs, advanced toward the officer, and kicked towards him, at which point Officer Cha fired his weapon. The BWC video captures a violent situation in which Officer Cha was in a vulnerable position against an advancing Mr. Moore. Officer Cha's positioning near the top of a stairwell is critical to our analysis.

Given these circumstances, we cannot show it was unreasonable for a person in Officer Cha's position to believe he faced a threat of great bodily injury when he fired his weapon. Moreover,

---

[8] As discussed above, Officer Cha also stated that Mr. Moore was holding "something," though he never explicitly indicated he believed Mr. Moore was holding a weapon. Our analysis assumes that Officer Cha was not claiming he believed Mr. Moore was armed.

14

Officer Cha had already unsuccessfully attempted using pepper spray and lost his baton during the fight with Mr. Moore and therefore was left with no weapon other than his gun when he fired. Mr. Moore's behavior throughout the encounter, including punching and kicking and statements that could be considered verbal threats, further demonstrated his unpredictability and his willingness to use violence in response to the officers' attempts to bring him under control. The officers had no duty to retreat under long-established California law, and we cannot prove beyond a reasonable doubt that Officer Cha's use of deadly force was an objectively unreasonable response under the circumstances.

As discussed above, even if Officer Cha, along with Officer Patino, were not justified in seeking to arrest Mr. Moore and to use force to effectuate such arrest, we cannot prove that it was not Mr. Moore who escalated the struggle by using force likely to cause Officer Cha great bodily injury. Officer Cha had the right to defend himself against such escalation, even if he provoked the violence.[9] We cannot prove beyond a reasonable doubt that Officer Cha approached Mr. Moore with the intent to provoke anything other than a nondeadly confrontation.

### **CONCLUSION**

For the reasons discussed above, the District Attorney's Office declines to file criminal charges against Officers Cha related to the incident with Mr. Moore.

---

[9] Therefore, we need not determine whether Officer Cha was the initial aggressor – even if he was the initial aggressor, we cannot prove beyond a reasonable doubt that Mr. Moore did not then escalate to deadly force. That said, a felony charge against Officer Cha for his use of pepper spray would be improper here – Mr. Moore came out of his house abruptly and was using aggressive language, and Officer Cha warned Mr. Moore that he would use spray if Mr. Moore continued to confront the officers. The statute of limitations for a misdemeanor charge has lapsed. Regarding the use of batons to effectuate an arrest, it cannot be shown that it was unreasonable to seek an arrest for Mr. Moore's earlier reaction to the pepper spray and, in light of Mr. Moore's behavior, to equip themselves in anticipation of Mr. Moore being combative.