# EXHIBIT 4

1  BROOKE JENKINS (SBN 276290)
   District Attorney
2  Darby M. Williams (SBN 183580)
   Assistant District Attorney
3  350 Rhode Island Street
   North Building, Suite 400N
4  San Francisco, California 94103
   Telephone: 628-652-4307
5  Facsimile: 628-652-4001
   Email: Darby.Williams@sfgov.org
6
7  *Attorneys for the People*
8
9

**ENDORSED**
**F I L E D**
San Francisco County Superior Court

JUN 3 0 2023

CLERK OF THE COURT
BY: _____
Deputy Clerk

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 CITY AND COUNTY OF SAN FRANCISCO

12

13  PEOPLE OF THE STATE OF CALIFORNIA,        Case No. 21010958

14            Plaintiff,

15       v.                                   **MOTION TO DISMISS**
                                              **(Pen. Code, § 1385)**
16  KENNETH CHA,
                                              Date:  July 18, 2023
17            Defendant.                      Time:  09:00 a.m.
                                              Dept.: 20
18

19  TO DEFENDANT KENNETH CHA BY AND THROUGH HIS ATTORNEY SCOTT BURRELL
    AND TO THE HONORABLE COURT:
20

21       Under Penal Code section 1385, subdivision (a) and to further the interests of justice, the

22  People move the Court to dismiss this matter against Defendant Cha. This motion to dismiss is

23  based on the attached Memorandum of Points and Authorities, the included factual summary,

    chronological record of events, witness statements, included exhibits, and the Court's file in this
24
    matter.  In essence, the People cannot meet their burden to prove beyond a reasonable doubt a crime
25
    was committed because the People cannot show beyond a reasonable doubt that Defendant did not
26
    lawfully exercise the right of personal self-defense and the right to defend another.  The death of
27
    Sean Moore over three years later did not change the legal analysis done during George Gascon's
28
    administration.  The only thing that changed was the hiring of personnel that did not adhere to

*People v. Cha,* Court No. 21010958, Motion to Dismiss, p. 1

1   traditional norms of prosecutorial ethics. Given the inadequate proof that a crime was committed

2   and the substantial ethical failures, the interests of justice demand the dismissal of the case.

3   Dated: June 30, 2023

4                                            Respectfully submitted,

5

6                                            BROOKE JENKINS
                                             DISTRICT ATTORNEY
7
                                             BY
8                                            _____
                                             Darby M. Williams
9                                            Assistant District Attorney
                                             *Attorneys for the People*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

EXHIBITS IN SUPPORT OF MOTION ............................................................................6

3

MEMORANDUM OF POINTS AND AUTHORITIES.....................................................7

4

CHRONOLOGICAL RECORD OF EVENTS ..................................................................7

5

    A.  *People v. Sean Moore*, Court No. 17000423 .........................................7

    B.  *People v. Sean Moore*, 17011409 ...............................................................8

6

    C.  *People v. Kenneth Cha*, Court No. 21010958 (the Moore/Cha OIS currently pending)....8

7

STATEMENT OF FACTS OF THE MOORE/CHA OIS ...............................................15

8

    A.  The Calls for Service and Assault on Officers Patino and Cha by Moore. ....................15

9

    B.  Body Worn Camera Video ..........................................................................18

    C.  Injuries: Patino...........................................................................................18

10

    D.  Injuries: Cha ...............................................................................................19

11

    E.  Physical Evidence.......................................................................................19

12

    F.  Original Injuries from Incident and Medical History: Moore ...........................19

    G.  Statements of Involved Officers and a Civilian Witness............................19

13

ARGUMENT ....................................................................................................................22

14

I.    The Prosecution Cannot Satisfy Its Burden of Proof and the Interests of Justice Support

15

    Dismissal of the Pending Matter. ..................................................................22

II.   The Use of Deadly Force Is Justified When Based on a Reasonable Belief that Deadly Force

16

    Is Necessary to Defend Self or Others. ..........................................................22

17

III.  The Prosecution Has an Affirmative Duty to Not Breach Ethical Walls. ..............................28

18

IV.  Grand Jury Proceedings...................................................................................31

    A.  The Prosecution Has the Obligation to Present Exculpatory Evidence to an Investigative

19

    Grand Jury. ....................................................................................................31

20

    B.  The Prosecution Has the Obligation to Not Mislead the Investigative Grand Jury. ........33

CONCLUSION .................................................................................................................34

21

DECLARATION OF SERVICE........................................................................................35

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

3                                                                          **Page**

**Cases**

*Breceda v. Superior Court* (2013) 215 Cal.App.4th 934 .............................................32, 33
*Brovelli v. Superior Court of Los Angeles County* (1961) 56 Cal.2d 524 .......................33
*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839 .........28, 29
*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018 ...............................................32
*Graham v. Connor* (1989) 490 U.S. 386 .....................................................................32, 33
*Greenburg v. Superior Court* (1942) 19 Cal.3d 31 ...............................................25
*Hayes v. County of San Diego* (2013) 57 Cal.4th 622 .............................................32
*In re Charlisse C.* (2008) 45 Cal.4th 145 ...............................................................24
*In re Christian S.* (1994) 7 Cal.4th 768 ....................................................................30
*Johnson v. Superior Court* (1975) 15 Cal.3d 248 ..................................................23
*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776 .........................32
*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909 ......................................28, 29
*M.B. v. Superior Court* (2002) 103 Cal.App.4th 1384 ...........................................24
*McGill v. Superior Court* (2011) 195 Cal.App.4th 1454 ........................................33
*Parks v. Superior Court* (1952) 38 Cal.2d 609 ......................................................31, 32
*People v. Aris* (1989) 215 Cal.App.3d 1178 ............................................................32
*People v. Backus* (1979) 23 Cal.3d 360 ...................................................................24
*People v. Banks* (1976) 67 Cal.App.3d 379 .............................................................32
*People v. Bates* (2019) 35 Cal.App.5th 1 ................................................................25
*People v. Becerra* (2008) 165 Cal.App.4th 1064 .....................................................23
*People v. Brady* (2018) 22 Cal.App.5th 1008 ..........................................................32
*People v. Clark* (1982) 130 Cal.App.3d 371 ............................................................23
*People v. DelRio* (2020) 54 Cal.App.5th 47 .............................................................24
*People v. Frye* (1992) 7 Cal.App.4th 1148 ...............................................................34
*People v. Hardin* (2000) 85 Cal.App.4th 625 ..........................................................25
*People v. Humphrey* (1996) 13 Cal.4th 1073 ...........................................................24
*People v. Lopez* (2011) 199 Cal.App.4th 1297 .........................................................23
*People v. Randle* (2005) 35 Cal. 4th 987 ..................................................................23, 24
*People v. Rowland* (1968) 262 Cal.App.2d 790 ........................................................23
*People v. Sotela-Urena* (2016) 4 Cal.App.5th 732 ..................................................34
*People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403 .....................22
*People v. Viramontes* (2001) 93 Cal.App.4th 1256 .................................................32, 33
*People v. Winkler* (2020) 56 Cal.App.5th 1102 ........................................................23
*United States v. Morton Salt Co.* (1950) 338 U.S. 632 ............................................33
*Younger v. Superior Court* (1978) 77 Cal.App.3d 892 ............................................30

**Statutes**

Pen Code, §148...........................................................................................................
Pen. Code § 243 ..........................................................................................................7
Pen. Code § 939.7 .......................................................................................................7
Pen. Code § 939.71 .....................................................................................................32
Pen. Code, § 148.10 ....................................................................................................32
Pen. Code, § 166 .........................................................................................................7

28

Pen. Code, § 197.................................................................................................
Pen. Code, § 243.........................................................................................22
Pen. Code, § 245...........................................................................................7
Pen. Code, § 422...........................................................................................7
Pen. Code, § 69.............................................................................................7
Pen. Code, § 835a..........................................................................................7

**Other Authorities**
CALCRIM 3470.........................................................................................24, 25

**Constitutional Provisions**
Cal. Const. art. I, §14....................................................................................22
.........................................................................................................32

1

**EXHIBITS IN SUPPORT OF MOTION**

| Exhibit | Details |
|---------|---------|
| 1 | Redacted JUSTIS printout for *People v. Sean Moore*, Court No. 227235, Case No. 17000423 |
| 2 | Redacted JUSTIS printout for *People v. Sean Moore*, Case No. 17011409 |
| 3 | Declination Report (Final) |
| 4 | Motion to Compel Order of Court Transcript |
| 5 | Memorandum |
| 6 | ECF 62 Order Motion to Continue |
| 7 | ECF 63 Letter from Christine DeBerry re DA Charging Decision and Status |
| 8 | ECF 64 Dist. Court J. Ilston Grants SFDA Request |
| 9 | Coroner Report (Lodged under seal-HIPAA Protected) |
| 10 | 11/02/2021 Boudin Press Release re Charging SFPD Officers |
| 11 | Email (Lodged under seal) |
| 11A | ECF 7 Notice of Appearance Lateef Gray |
| 12 | Email (Lodged under Seal) |
| 13 | Letter (Lodged under seal) |
| 14 | Memo (Lodged under seal) |
| 14A | Notice (Lodged under seal) |
| 15 | ECF 74 Notice of New Counsel |
| 16 | Memo (Lodged under seal-HIPAA Protected) |
| 17 | Record (Lodged under seal) |
| 18 | Volume I, Investigative Grand Jury Proceedings |
| 18A | Volume II, Investigative Grand Jury Proceedings |
| 18B | Volume III, Investigative Grand Jury Proceedings |
| 18C | Volume IV, Investigative Grand Jury Proceedings |
| 19 | Redacted Felony Complaint Arrest Warrant Request with Affidavit |
| 20 | Arrest Warrant (executed) |
| 21 | Patino/Cha Body Worn Camera Video (synchronized) |
| 22A | Redacted Patino Voluntary Statement Transcript OIS Interview |
| 22B | Redacted Cha Voluntary Statement Transcript OIS Interview |

| Exhibit | Details |
|---------|---------|
| 23 | Medical Records (Lodged under seal-HIPAA Protected) |
| 24 | Court Order (Lodged under seal) |
| 25 | Moore Transcript from Patino/Cha BWC |
| 26 | Redacted CSI Report from SFPD Investigation |
| 27 | Medical Records (Lodged under seal-HIPAA Protected) |
| 28 | Exhibit Omitted |
| 29 | Criminal History (Lodged under seal) |
| 30 | Redacted Emails Previously under Protective Order Submitted |

## MEMORANDUM OF POINTS AND AUTHORITIES

## CHRONOLOGICAL RECORD OF EVENTS

### A. *People v. Sean Moore*, Court No. 17000423

On January 6, 2017, Sean Wendell Moore was shot after assaults committed against Cha and his partner, Officer Colin Patino. Three days later, out of that incident, Moore was charged with following criminal violations (Peo.'s Exh. 1, Redacted QCA Printout for 17000423):

- Battery/Injury on a Peace Officer, Pen. Code, § 243, subd. (c)(2), felony, one count;
- Assault with Force, Great Bodily Injury, Pen. Code, § 245, subd. (a)(1), felony, two counts;
- Criminal Threats, Pen. Code, § 422, felony, two counts;
- Resisting Executive Officer, Pen. Code, § 69, subd. (a), felony, two counts;
- Resisting Arrest, Pen Code, §148, subd. (a)(1), misdemeanor, one count;
- Violation of a Court Order, Pen. Code, § 166, subd. (a)(4), misdemeanor, one count;
- Assault on a Peace Officer, Force Likely to Cause Great Bodily Injury, Pen. Code, § 245, subd. (c), felony, two counts;
- Battery on a Peace Officer, Pen. Code, § 243, subd. (c)(2), felony, two counts;
- Battery with Serious Bodily Injury, Pen. Code § 243, subd. (d), felony, one count; and
- Resist Peace Officer causing Death or Serious Bodily Injury, Pen. Code, § 148.10, subd. (a), felony, one count.

A preliminary hearing was held between March 7 and March 10, 2017, after which Defendant Moore was held to answer on most counts.

The defense filed a motion to set aside the information, which the superior court granted in part, resulting in the dismissal of 8 of the 14 counts. The People appealed and dismissed the

remaining 5 counts. As to the 8 counts dismissed by the superior court, the Court of Appeal for the First Appellate District issued an unpublished opinion on the hearing and the limited record before it.[1] (Peo.'s Request for Judicial Notice (RJN) at Pg. 6:11, First District Appellate Decision, unpublished.)

The Court of Appeal expressly stated that Moore's later assaultive conduct was grounds for a lawful arrest by the officers. [2] With the ruling by the Court of Appeal, the People were precluded from refiling the charges against Moore that were previously set aside by the superior court. The People did not refile the other 5 counts.

**B. *People v. Sean Moore*, 17011409**

Moore was again arrested and charged in August 2017 with crimes of violence that took place on August 4, 2017. Moore was charged by Complaint with assault and threat-based crimes (Peo.'s Exh. 2, Redacted QCA Printout for 17011409). Moore pleaded guilty on July 12, 2018, to a felony violation of section 243, subdivision (d) of the Penal Code. After the plea of guilty, Moore was placed on mandatory supervision. After multiple failures to comply with the terms of supervision, Moore was sentenced to state prison on October 31, 2019. (*Id.*)

During this period, the officer involved shooting portion of the January 6, 2017, event continued being handled in the District Attorney's Office.

**C. *People v. Kenneth Cha*, Court No. 21010958 (the Moore/Cha OIS currently pending)**

**1.    The Prepared Declination Report**

In 2019, a declination report, detailing why there was no viable way to prosecute Kenneth Cha or Colin Patino (Peo.'s Exh. 3, Declination Report (Final)), was finalized under the Gascon administration by then Managing Attorney for the IIB Unit, Andrew Lah. (Tsuruta Dec. at Pg. 4:12-24.) This final version of the declination report was presented to former DA Gascón, but former DA Gascón was preparing to leave office at that time and the declination was not posted on the public website. During the time of this declination presentation to Gascón, Moore had a civil case pending against the City and County of San Francisco and the San Francisco Police Department.

---

[1] This decision is unpublished and not relied on for authoritative value. The reference is offered only for the historical value of the procedural outcome of the criminal matter that was pending against Moore originating from the events at issue.

[2] Defendant Cha was not a party to the preliminary hearing, the motion to attack sufficiency, or that hearing in any way, nor was his counsel, Scott Burrell.

*People v. Cha*, Court No. 21010958, Motion to Dismiss, p. 8

1

### 2.    IIB Memorandum to Boudin's Administration

The federal court in which Sean Moore was suing the San Francisco Police Department asked the SFDA if there would be a prosecution in the Moore/Cha OIS. On November 7, 2019, the District Court ordered the San Francisco District Attorney's Office (SFDA) to provide the status about a charging decision "no later than January 10, 2020." (Peo.'s Ex. 6, ECF 62, Order Mot. to Continue; Peo.'s Exh.7, ECF No. 63, "Letter from Cristine Soto DeBerry.") Christine Soto DeBerry was George Gascon's Chief of Staff, a position she retained after the election of Chesa Boudin. DeBerry responded to the court order in a letter dated December 18, 2019- informing that Court that the SFDA is "willing to decide expeditiously whether to charge the defendants in this case," but requested 30 days to make that determination, given the anticipated inauguration of DA-elect Chesa Boudin. (Peo.'s Ex. 7, ECF 63 Letter.) The Court granted the SFDA's request for a 30-day continuance on December 19, 2019. (Peo.'s Exh. 8, ECF No. 64.)

In January 2020, newly-elected DA Chesa Boudin's (Boudin) administration included then-continuing Chief of Staff Cristine DeBerry and Managing Attorney Andrew Lah of the IIB Unit.

On January 16, 2020, former ADA Aaron Zisser, who was assigned to the case after DA Gascón's departure, prepared a memorandum regarding the OIS. (Peo.'s Exh. 5, Memorandum.)[3] It appears this memorandum was prepared in response to the order from the federal District Court in the civil case filed by Sean Moore in the U.S. District Court, Northern District. (See Peo.'s RJN, *Sean Moore v. City County of San Francisco, et al.*, Case 3:18cv00634 SI at Pg. 5:12.) The January 2020 memorandum addressed four points: (1) whether to continue efforts to interview Sean Moore, (2) collateral estoppel/res judicata issues, if any, created by the unpublished May 1, 2018, opinion from the First Appellate District in *People v. Sean Moore,* SCN 227235, (3) applicability of relevant CALCRIM Jury Instructions; (4) and what barriers existed to charge because of the applicable

---

[3] It is not the intention of this motion or the disclosures herein of internal documents or communications to waive any work product privilege as to all times and purposes or to operate as a blanket waiver of all work product generated. It is because these circumstances are unique, and the mandates of due process are placed at issue by the conduct of prior ADAs in this matter, that these documents are being shared with the Court, except as to those documents that the People seek to be placed under seal until further order of the Court.

1   statute of limitations.[4] (*See* Peo.'s Ex. 5.)[5] It is important to note that, in context, the memorandum

2   appears to clarify what final steps or legal analysis should be done. For example, former ADA

3   Zisser wrote that efforts to further interview Moore at that juncture would be unproductive as the

4   case was approaching "near certainty of declination." (*Id.* at pg. 2, item no. 5.) The memorandum

5   also references the legal analysis in what Zisser termed the "draft declination" and offers that as far

6   as the legal analysis regarding self-defense, provocation, and issues around the use of deadly force,

7   a path to prosecution is without legal authority or support. (*Id.*, at pg. 7, ¶ "IV. CALCRIM No.

8   3471: Escalation,"; fn.1.) The memorandum concludes that charges that were "not reasonable in

9   this case," notwithstanding any ability to extend the time to file. (*Id.*, at pg. 9, ¶ "V-Statute of

10  Limitations.") ADA Zisser ultimately offered that the chargeable offenses had mostly lapsed due to

11  the delay because more than three years passed since the incident date. (*Id.*) At some point, ADA

12  Zisser ceased to handle the case and two former public defenders hired by Chesa Boudin, Stephanie

13  Lacambra and Dana Drusinsky, were assigned to the Moore/Cha OIS. And while Zisser handled

14  the Moore/Cha OIS case, the Boudin administration appeared to be in negotiations to hire one of

15  Moore's civil attorneys. (*See* Peo.'s Exh. 11, Email [lodged under seal].)

16          Sometime before January 21, 2020, DA Boudin offered, Lateef Gray, who had been

17  Moore's counsel on his civil lawsuit for over two years by this time, a job at the SFDA as an

18  assistant district attorney. (Peo.'s Exh. 11[lodged under seal], Email and Peo.'s Exh. 11A.) On

19  January 27, 2020, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Peo.'s Ex. 12, Email [lodged under seal].) By January 30, 2020, the

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮ (Peo.'s Exh. 13, Letter [lodged under seal].) Gray's first day in the

    SFDA's IIB unit was February 24, 2020. (Peo.'s Exh. 14, Memorandum [lodged under seal].) ▮▮▮

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Peo.'s Exh.

    14A, Notice [lodged under seal].)[6]

---

[4] Because Sean Moore was still alive, charging options only included offenses which had
determinate dates by which those charges could be filed.
[5] This memorandum is lodged under seal and a privileged core-attorney work product
document. It is lodged with the Court for purposes of judicial review, and is not intended to be a
blanket waiver of attorney-work product privilege.
[6] Each of these email communications with subject matter of employment for Lateef Gray
are lodged under seal with the Court as they contain confidential employment information.

1        From Gray's first day of employment through March 2020, per available online records

2  derived from the Public Access Court Electronic Records (PACER-ECF) system, Gray was both an

3  assistant district attorney in the IIB Unit and remained one of the named counsel of record in the

4  matter of *Sean Moore v. City and County of San Francisco, et al.*, California Northern District Case

5  No. 3:18cv00634 SI.[7] (Peo.'s RJN, at Pg. 5:12.) Gray would remain as counsel of record on that

   matter, appear on the matter, and file papers until March 23, 2020.  (Peo.'s Exh.15, ECF No. 74,

6  Notice of Appearance by Patrick Matthew Buelna.)  There is sparse evidence that any ethical wall

7  existed to prevent Moore's civil counsel, Lateef Gray, from being involved in the prosecution of an

8  officer for what had happened to his civil client. And in any event Gray violated the wall on

9  numerous occasions. (See Peo.'s Exh. 30, Emails (redacted).) [8]

10      One hundred days after being hired, and once Gray was promoted to manager of the IIB unit

11  (Peo.'s Exh. 14A, Notice [lodged under seal]), email exchanges show virtually daily involvement

   by Gray on the case of his former client.  As the IIB Managing Attorney he remained a supervisor

12  of the work of ADAs Drusinsky and Lacambra. (Peo.'s Exh. 30 (redacted).)

13      Gray was never "walled off" from the Moore/Cha OIS.  Gray's emails show he made

14  decisions in the Moore matter such as hiring and payment to expert witnesses (Peo.'s Exh. 30.)

15  6/24/2020 and 7/6/2020) and discussions of strategy (*Id* ███████████████████████

16  ████████████████████████████████████████

17  ███████████████████████ (Peo.'s Exh. 30, 06/17/2020.)

18      Most pointedly, Gray was also involved in the removal of the DA Inspector who had

   investigated the Moore case from the beginning. (Peo.'s Exh. 30 (redacted).) Three years after the

19  incident, Gray negotiated, proposed, and authorized the substitution of a new DA Investigator.

20  (Peo.'s Ex. 30, Emails 6/17/20; 6/22/2020; Tsuruta Dec. at Pg. 5:14-20.)

21      Further, former DA Inspectors Jeffrey Paillet and Megan Hayashi who worked in the IIB

22  Unit during the Boudin administration were both terminated. (Peo.'s RJN, at Pg. 6:4; Superior

23  Court Case No. CGC21596176, *Jeffrey Paillet v. City and County of San Francisco, et al.*)

24

25       [7] With Sean Moore's death, the Burris Law Firm and Gray successfully moved to substitute
Moore's surviving beneficiaries, his parents Cleo and Loyce Moore, as Plaintiffs. (*Sean Moore v.*

26  *CCSF, et al.*, 3:18cv00634-SI; Order Granting Unopposed Motion to Substitute Party Per FRCP 25
granting ECF No. 68, Notice Motion and Motion to Substitute Party, *See* PACER ECF No. 71.)

27  [8] The email communications in this exhibit were the subject matter of a motion to compel in this
case. The Court granted the Peo.'s request to lift the protective order in place and thereafter

28  provided the emails in their unredacted form to defense counsel. (Williams Dec. at Pg. 4:12-14.)

Former Lieutenant Paillet filed a lawsuit and alleged wrongful termination by DA Boudin and ADAs Drusinsky and Lacambra. (*Id.*) The claims were, among others, that Drusinsky and Lacambra and others in the Boudin Administration engaged in unethical and illegal conduct in the pursuit of investigations as well as authored warrants. (*Id.*) Plaintiff Paillet alleged retaliation and retribution by DA Boudin and his assistant district attorneys stemming their roles as the attorney/investigators in the instant matter.[9]

### 3.    Investigative Grand Jury

Between July 20, 2021, and July 27, 2021, over four days, an Investigative Grand Jury was empaneled and received evidence. (*See* Peo.'s Request to Unseal Grand Jury Transcript; Peo.'s Exhs. 18 (Vol.1), 18A (Vol. 2), 18B (Vol. 3), and 18C (Vol.4), Grand Jury Proceedings, Investigative Hearing Transcript, Volumes I through IV.) At those hearings, evidence was presented to the Grand Jury about the events of January 6, 2017, which were summarily connected to Moore's death three plus years later. (*Id.*) Seven witnesses were called, all of whom were sworn employees of the San Francisco Police Department. (*Id.*) No expert witnesses or witnesses with medical training were called. (*Id.*)

During the Grand Jury investigation, jurors indicated that they had questions about the issues surrounding Moore's death and its cause. (Peo.'s Exh. 18A, Grand Jury Proceedings, Investigative Hearing Transcript Vol. 2, Pg. 172:3-26.) A juror expressed confusion about the cause of Moore's death and attributing it to the events three years prior. (*Id.*) Lacambra responded to the juror's concerns by telling the juror the "[cause of death] …it's not within the scope of this investigation…like [sic] there's a coroner's report; there are a bunch of medical records [a]nd those will be presented if this case goes forward." (*Id.*) The juror continued to ask questions about the effect of Moore's death and their role as investigators and asked if "the coroner's report instigate[d] [the grand jury's empaneling]." (*Id.*, at 173:1-6.) Lacambra offered to the juror's question at this point a perplexing response: "The severity—because—like, the severity of the offense didn't occur until much later. So once—it's basically, that's what elevated the crime of what would have been attempted murder to murder." (*Id.*, at pg. 173:7-10.) The juror then asked: "But the coroner ruled it was a homicide?" (*Id.* at pg. 173:11.) Lacambra only responded: "Yes." (*Id.* at pg. 173:12.)

---

[9] Those allegations will not be further detailed here. (*Id.*)

The questions from grand jurors continued. They asked why they were hearing about a shooting that occurred "four months later" that involved Defendant Cha and surmised that the later occurred shooting appeared to be presented "as part of the considerations as to how [the jurors] feel [sic] about [Cha's] action on the 6th of January." (*Id.* at pg. 173:17-28.)  The juror then said: "It would be nice to know if it was something obviously, there are no charges against him on that other incident that I am aware of, so if he was well within his rights, then, you know, it shouldn't even have been mentioned." (*Id.* at pg. 173:23-28; 174:1.)  Lacambra continued and claimed to the juror that an incident of Defendant's involvement in a later occurred shooting was offered to jurors "for the limited purpose of seeing if that [later shooting] affects [the witnesses] opinion about [Cha's] reputation." (*Id.* at pg. 174:2-12.)

The colloquy with the Grand Jury continued with another juror about the purpose of reputation evidence elicited from a witness July 20, 2021[10] (*See* Peo.'s Exh. 18, Vol. 1 at pg. 84-87; Peo.'s Exh. 18A, Vol. 2, at pg. 175-178.):

> **Grand Juror**: I have a question based on that—in relation to that. We keep talking about reputation. How is that valid or relevant to the situation?
> **Ms. Lacambra**: So when we're evaluating the reasonableness, I think the officer's reputation and habit are factors you can consider.
> **Grand Juror**: Habit, possibly. But reputation has nothing to do with the person; it has to do with what other people think, like kind of a hearsay situation.
> **Ms. Lacambra**: Well, you can actually rely on a person's reputation when you're evaluating whether or not they acted reasonably. So that's one of the factors that you get to look at—it's one of many. You are to look at the totality of the circumstances, and that's just one of the circumstances.
> **Ms. Drusinksy**: It's legally considered reputation in the community. So, legally a lot of times that can be brought into court. So in the community, do you have a reputation for a certain—
> **Grand Juror**: Within just the police community—
> **Ms. Drusinksy**: Right.
> Grand Juror: --or just the community at large?
> **Ms. Drusinsky**: It's usually within that particular community.

But Drusinsky and Lacambra never told the jurors that Sean Moore had a reputation for violence and assaultive behavior and the many instances during which he was the aggressor. (See Peo.'s Exhs. 18, *et seq.*)  The attorneys also failed to tell the jurors when asked, about the history

---

[10] The superior court has issued an order unsealing the entire investigative Grand Jury transcript.

between Moore and the neighbor, who sought and obtained the restraining order and called police the morning of the shooting.  (*Id.*, at pg. 178:4-25.)

> **Grand Juror**: Do we know what Moore had done to [C.C.] to get the restraining order, temporary restraining order, as we've been told now, because that may have a lot to do with the whole situation; how he'd been harassing him; for what reason he was harassing his next-door neighbor?
>
> **Ms. Drusinsky**: So we're looking at the reasonableness of the officer. So what's important is what the officer knew and the officer didn't—he said that he didn't know the underlying reason for the restraining order. So that's why we're asking these questions to see exactly what he knew; and then based on that—did you see a body (speaking to someone other than the juror)?
>
> **Ms. Lacambra**: We have our witness. Have all the questions been asked?
>
> **Grand Juror**: Almost. Thank you. You brought up some things about George Floyd. I'm just saying that would be a contributing factor, even though the officer didn't know about---
>
> **Ms. Drusinsky**: He didn't know about it, right.
>
> **Grand Juror**: --if Mr. Moore had some feelings about Mr. C. because of his ethnic—

Drusinsky then continued and said that "…[if] the officers knew Sean Moore…[was] really violent, and they have to act a certain way, that would be relevant…; if they never met this guy before, what this guy had previously done in his life or his relationship with the neighbor isn't that relevant." (Peo.'s Exh. 18A, Vol. 2. at pg. 179:5-12.)

No new material evidence was discovered during this investigative grand jury, either in the form of witnesses nor in the subpoenaing of records. (Williams Dec. at Pg. 3:13-21.) And what was clear was that the civilians who were hearing the evidence were confused by the theories being propounded.

### 4.    The Application for an Arrest Warrant for Officer Cha on Manslaughter

On October 29, 2021, District Attorney Inspector Andrew Kolutniak submitted a request for an arrest warrant to the Honorable Harold Kahn, Judge of the Superior Court. (Peo.'s Exh. 19, Redacted Request to Issue Felony Arrest Warrant.) Judge Kahn signed the warrant the same day thereby effectuating power to arrest Officer Kenneth Cha on manslaughter charges for the January 6, 2017, shooting that had occurred more than three years before Sean Moore's death. (Peo.'s Exh. 19 Redacted Request to Issue Felony Arrest Warrant; Peo.'s Exh. 20, Arrest Warrant Executed.)

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5. Press Announcement regarding Charges

November 2, 2021, former DA Boudin issued a press release to announce the decision to charge Officer Cha with voluntary manslaughter. (Peo.'s Exh. 10, Boudin Press Release 11/2/2021.)

### 6. Post Charging Proceedings

Years later, a copy of the Gascon administration's finalized declination report became the subject of a contentious proceedings initiated by a motion to compel filed by defense counsel and vigorously opposed by then-assigned ADA Rebecca Young. (Peo.'s RJN at Pg.5:23, Motion to Compel.) The Court ordered that a redacted version of the declination report, among other things, be disclosed to the defense on July 12, 2022. (Peo.'s RJN at Pg. 5:23, Peo.'s Exh. 4, Mot. To Compel Order of Court, pg. 4:12-21.) Also, at the demand of Cha's defense attorney, emails showing Gray's involvement in the prosecution were produced over the Boudin administration's objections in redacted form only.  Again, the People recently sought and obtained permission from the Court to share the same emails in a minimally redacted form with defense counsel.[11] (Williams Dec. at Pg. 4:15-17; Ex. 1, *People v. Cha*, 6/29/2023.)

## STATEMENT OF FACTS OF THE MOORE/CHA OIS

### A. The Calls for Service and Assault on Officers Patino and Cha by Moore.

During the very early morning of January 6, 2017, San Francisco Police Officers Kenneth Cha and Colin Patino responded to a call for service complaining of a violation of a restraining order. (Peo.'s Exhs. 22A, Redacted Patino Voluntary Statement Transcript and 22B, Redacted Cha Voluntary Statement Transcript.)

Patino met with the caller, WITNESS, while Cha went to the next-door neighbor's residence to inquire of that resident about the possible violation.[12] (Peo.'s Exh. 22A, Redacted Patino Statement 8:18-22.) WITNESS provided Patino with a copy of a judicially signed temporary restraining order which was set for hearing in five days (January 11, 2017) and named next door neighbor, Sean Moore, as the person to be restrained. (*Id.*, and Peo.'s Exh. 24, Order [lodged under seal].) While Patino attempted to get background information from WITNESS to determine what had taken place, Sean Moore could be heard yelling next door. (Peo.'s Exh. 22A. at 8:23-27.) Patino, out of concern for Cha, left WITNESS abruptly to meet up with Cha and render assistance if

---

[11] Privileged conversations are redacted.

[12] Sean Moore's neighbor is referred to as "witness" throughout this motion to protect their privacy.

*People v. Cha*, Court No. 21010958, Motion to Dismiss, p. 15

needed. (*Id.*) Patino ascended the stairs to Moore's home where Cha was already standing on the landing. At that time of the morning, it was still very dark requiring both officers to use their flashlights to illuminate the area where Moore stood behind the security gate at the top of his stairs (landing). (*Id.* at pg. 9:3-9.)

The following is taken from the transcript provided as People's Exh. 25 and the Body Worn Camera audio capture of both officers.

Moore can be heard clearly on the audio portion of the BWC as he berates, yells at, argues, and threatens the two officers. (Peo.'s Exh. 21, Patino/Cha BWC synchronized.) Moore also repeatedly tells officers that they are to leave, to which officers respond that they are not going to do until their investigation into the restraining order complaint made by C.C. is completed. (*Id.*) The refusal by officers to leave displeased Moore who became more and more irate with the officers' attempts to inform him of the restraining order's requirements as well as their efforts to determine if they are addressing the person who was ordered restrained. (*Id.*) Moore made repeated hostile, belligerent, and profane comments to both officers for several minutes before the officers were able to determine Moore's identity, which caused Moore to become even more irate. (*Id.*) Moore also appears to be irrational and speaking at times nonsensically. (*Id.*)

After about three minutes of alternating between yelling at the officers and multiple demands that the officers leave his stairway, Moore enters his home muttering the statement about how he is going to "call and remove" the officers. (*Id.* at pg. 5:26.) Moore then walks into his home while officers descend the stairs to read the restraining order more closely. (*Id.* at pg. 5:27-28; 6:1-6.) Patino later told interviewers at that time, he believed he had enough probable cause to arrest Moore for violating the restraining order at that point. (Peo.'s Exh. 22A 10:16-18; 11:7-8; 12:2, 11-27; 20:6-7.)

Moore emerged from his home with a dark object in his hand that the officers were unsure of, but the object was later determined to be a portable phone. (Peo.'s Exhs. 22A at pg. 15:1-5; and 22B at pg. 14:1-5.) Moore launched back into insults towards the officers who ascended the stairs a second time. (Peo.'s Exhs. 21and 25 at Pg. 6.) Moore again demanded the officers leave his stairwell and up to this point, had remained behind the security gated portion of the landing area of the stairs. (Peo.'s Exhs. 21 and 25 at pg. 8:15-25.) At the same time, officers remained solely on the area of the stairs leading up to the landing that would be accessible to any member of the public. (See Peo.'s 21, Synchronized BWC.) Moore demanded Patino's badge number, muttered that Patino was "done" and proceeded to dial on the phone in his hand. (Peo.'s Exh. 21 and 25, at pg.

1    6:12-27.) Moore also continued to demand officers leave his stairs from where he was, behind the
2    security gate. (*Id.*)

3       Patino attempted at this point to advise Moore of the restraining order's contents, to which
4    Moore responded even more aggressively while simultaneously banging his hand on the gate and
5    yelling "It's a [sic] goddamn court date on the 11th!"[13] (Peo.'s Exh. 25 at pg. 8:1-10; Peo.'s Exh. 21
     at 4:59.) Moore again demanded the officers leave ("Get off my stair!") and gestured in an
6    aggressive way with his hands and arms while stating: "I'm through talking to you, bitch! Get off!
7    Get off my stair!" (Peo.'s Exh. 21 at 5:06.) Moore still was behind the gate and officers remained on
8    the stair and repeated that they would not leave. (*Id.*)

9       Moore then aggressively pulled open the security gate door and stepped through the gateway
10   but remained on the landing. (Peo.'s Exh. 21 at 5:16.) Officers both moved back slightly as Moore
11   advance and waved his right hand, and ordered they again leave. (*Id.*) Cha had removed his pepper
     spray cannister as Moore approached and warned Moore that he would be sprayed to which Moore
12   responded, "Fuck your spray!" (Peo.'s Exh. 21 at 5:22.) Moore continued to make aggressive
13   waving gestures with his hand, at which point Cha deployed his pepper spray towards Moore who
14   kicked outward toward Cha and then retreated into his home. (Peo.'s Exh. 21 at 5:26.) The pepper
15   spray contacted all three men. (*Id.* at 5:31) Cha later told interviewers it was at this point that
16   Moore's foot contacted his face. (Peo.'s Exh. 22B at pg.16:9-21.) Cha and Patino retreated partway
17   down the stairs, during which time Patino dropped the copy of the restraining order provided to him
     by WITNESS (Peo.'s Exh. 21 at 5:26.) Moore reemerged and picked up the dropped paper while
18   standing on the stairwell and then re-entered his home. (Peo.'s Exh. 21 at 5:33.) At the base of the
19   stair, Cha and Patino both try to clear their eyes of the pepper spray and Cha calls on his radio for
20   an ambulance for pepper spray exposure ("I'm gonna need a 408") to Patino and Moore. (Peo.'s
21   Exh. 21 at 5:53-6:45.) Moore then opened the window and yelled at the officers that he was
22   interested in getting the matter "resolved." Patino yelled to Moore to return the paper and Cha
23   yelled that Moore should come out so that the officers could get him help for the pepper spray
     exposure. (Peo.'s Exh. 21 at 7:30-7:46) Moore again asked police if they would leave. (Peo.'s Exh.
24   21 at7:12.)

25

26

27   _____

28      [13] This is inaccurately reflected in the transcript as Sean Moore saying "left." The audio
     controls, and Moore can be heard saying "It's the goddamn court date on the eleventh!" (See Peo.'s
     Exh. 21 at 4:59.)

1  Moore exited the home, tossed the paper back towards officers, and again reentered his
2  home. (Peo.'s Exh. 21 at 7:30) It is then that Moore suddenly re-appeared and in an even more
3  aggressive angry manner stepped forward, squatted, clenched his fists, and yelled irately "Fuck
4  you…fuck you…I'm-a kick your ass, punk!" (Peo.'s Exh. 21 at 7:44.) Moore then bent over to pick
   up a part of his cell phone that dropped and Patino charged up the stair. (Peo.'s Exh. 21 at 7:58-
5  8:16.) Cha followed Patino. (Peo.'s Exh. 21 at 8:20.)  Both officers would later tell interviewers
6  they thought this was an opportunity to try to arrest Moore. (Peo.'s Exh. 22A at 12:21-27; 22B at
7  18:3-7.) But Moore retreated as the officers advanced with Patino in the lead with his baton, which
8  he used to strike Moore at least twice as he reached for Moore. (Peo.'s Exh.21 at 8:21.) Moore also
9  reached for Patino with a closed fist and struck Patino in the face. (Peo.'s Exh. 21 at 8:24.) The
10  contact caused Patino to fall backwards down the stair past Cha. (Peo.'s Exh. 21 at 8:26.) Cha, left
11  to face Moore who had positional/height advantage, had limited force options as the pepper spray
   and baton failed to prevent Moore from attacking.  (Peo.'s Exh. 21 at 8:26.) Cha drew his issued
12  firearm and fired striking Moore twice. (*Id.*)

13  **B.    Body Worn Camera Video**[14]

14  The events described above are nearly completely captured on body worn camera video
15  (BWC) worn by both officers. (See Peo.'s Exh. 21, Patino/Cha Body Worn Camera Video
16  Synchronized.)

17  To aid the reader, synchronized BWC video is provided to show different perspectives of the
18  events observed by Patino and Cha. (*Id.*) Only Cha's BWC captures the entire incident because
19  Patino's BWC was dislodged after he was struck by Moore, and collected some audio. (*Id.* at 8:33.)
20  Patino's BWC camera landed on the ground and remained with an upward vantage point of the sky
   for the duration after he was punched by Moore. (*Id.*) Only Cha's BWC captured the shooting and
21  the events that transpired after.  (*Id.*)

22  **C. Injuries: Patino**

23  Officer Patino was transported to San Francisco General Hospital (SFGH) and seen by
24  physicians. Doctors gave a primary diagnosis of a nasal fracture with possible chemical burns due
25  to pepper spray exposure and documented injuries to Patino's left knee.  (Peo.'s Exh. 23; Med.
26  Records-Patino [lodged under seal].)

27  _____

28  [14] Additional BWC was obtained but is not provided as it only depicts the aftermath of the
   events described.

*People v. Cha,* Court No. 21010958, Motion to Dismiss, p. 18

### D. Injuries: Cha

Officer Cha reported minor injuries consisting of scrapes and bruises with some pain. (Peo.'s Exh. 22B at pg.16:8-11.)

### E. Physical Evidence

Physical evidence discovered on scene consisted of mostly a debris field which contained Patino's baton, flashlight, and a BWC, as well as casings. (Peo.'s Exh. 26, Redacted CSI Report.) Fresh blood-stain evidence was observable at the base of the stairs and the street area immediately adjacent to the residence at 515 Capitol where Moore barricaded himself for approximately two hours until convinced by SFPD officers on scene to surrender and transported for medical care. (*Id.*) A three-page temporary restraining order document was located with the Proof of Service page in the front yard of another nearby home on Capitol Avenue. (*Id.*)

### F. Original Injuries from Incident and Medical History: Moore

After the incident above, Moore was treated for two gunshot wounds to the abdomen, a liver laceration, and traumatic injury to the area of the right colon. (Peo.'s Exh. 27, Moore Medical Records [lodged under seal].) Post abdominal surgery left Moore with a prominent scar that extended from the base of his rib cage to his groin. (*Id.*)

Moore died in San Quentin State Prison January 20, 2020. (Peo.'s Exh.9, Coroner's Report [lodged under seal].) Because the cause of death was primarily attributed to acute intestinal obstructions and severe abdominal adhesions from the gunshot injury three plus years prior, the cause of death was listed as "homicide." (*Id.*)

### G. Statements of Involved Officers and a Civilian Witness

#### 1. Officer Patino

Patino provided a voluntary statement the day after the incident with Moore. (Peo.'s Exh. 22A.) Patino stated that he heard Moore make "numerous threats of violence" to both he and Cha and that he "charged at [them]" twice and during the second charge "engaged in a violent physical attack" with the officers. (*Id.*) Patino recounted that he "deployed [his] baton in self-defense, but that it did not stop [Moore]." (*Id.*) That Moore "attacked [him] by reaching for [his] baton, assaulted [him] by punching [him] in the face and knocking [him] down a flight of stairs on a [sic] sidewalk." (*Id.*) That after these events occurred, Patino stated he "heard at least two gunshots go off." (*Id.*) Patino gave this initial statement without having viewed his BWC. (*Id.*)

Patino gave a more detailed statement after he viewed his BWC and responded to questions from the officers who conducted the interview. (*Id.*) Patino elaborated on the events that took place prior to Moore's punch to his [Patino's] face and again told interviewers that he was always at a physical disadvantage with Moore. Efforts to gain Moore's compliance were met with aggression from Moore. Patino deployed baton strikes to effectuate the arrest of Moore. (*Id.*) It was at the point where Patino struck Moore that Moore punched Patino and knocked him backwards. (*Id.*) Patino told interviewers that he was afraid of Moore and that Moore was a threat to officer safety and intended to hurt both officers.

### 2.    Officer Cha

Cha also provided a voluntary statement the next day following the events with Moore. (Peo.'s Exh. 22B.)  Cha described Moore's emotional demeanor during the entire encounter as a "10 out of 10 in terms of…anger." (*Id.*) From the first moment Cha encountered Moore, Cha told interviewers that he was "irate" and combative verbally. (*Id.*) Cha told interviewers that he tried to de-escalate the encounter and to "calm [Moore] down" by maintaining a "normal" voice while Moore yelled at him. (*Id.*)  Cha feared throughout out the encounter that based on the cursing by Moore, body language, posturing, and never ceased anger, that Moore was a physical threat to the officers. (*Id.*) Cha pepper sprayed Moore when he "tried to attack" the officers. (*Id.*)  But it was when Cha saw Moore assault Patino, to which Patino responded as he rolled down the stairs "Oh fuck," that he feared his "partner [officer] was done." (*Id.*)  Cha had lost his baton during the struggle, but also witnessed that Patino's baton strikes were ineffective against Moore. (*Id.*) With only one force option left and Moore's aggression and advancement, Cha felt he had no other options other than to exercise deadly force in defense of himself as well as his partner who was now bleeding at the base of the stairs. (*Id.*)

Cha told interviewers (See Peo.'s Exh, 22B, at Pg. 10-11):

> So [unintelligible] so as we come up to make the arrest, um, he sees us. He backs up a little bit to -- what I think he backed up to get more of an advantage on us because the higher you are on someone, you have a tactical advantage. I see Officer Patino, um, conduct a-a [unintelligible] a baton strike to the guy's lower extremity, and it-it [unintelligible]; it just made him [unintelligible]. And, uh, he, uh, he's like, um -- then, uh, he just overwhelms Officer Patino. And, uh, uh, and I hit his mouth, but I didn't see him, uh, make impact with, uh, Officer Patino's face with his hand. And I just hear Officer Patino drop [unintelligible] like, "Oh fuck." And I knew at that point that my partner was done. [Sniffs] And I see him rolling down the stairs.

And, uh, at that point, I lose my baton somehow. I'm not sure if it was -- if it was when the suspect tried to attack me or, uh, um, Officer Patino's, uh, body rolling down the stairs, uh, making me lose it. And, uh, I just see him -- I just see this guy just so enraged coming at me in a violent matter, throwing his hands and-and-and his feet towards me.

And, uh, I just remember retreating down the stairs. I'm about to fall down, and I had nothing else to do but I was in fear for my, uh, for my life. [It was a knee-jerk], you know, [unintelligible]. I don't even know [what happened to call them]. And so I -- so I shot him. And, uh, when I discharged the firearm, it was like, uh, it was like he, uh -- it was like he had hit a-an invisible wall. Like I was like, "Holy shit. That-that fucking worked." Like he's not coming towards me anymore. I remember him saying, "Oh fuck." And he ran back in the house. And, uh, at that point, I just remember laying on the -- on the sidewalk on my back. I don't know how I got on my back.

(*See* also Peo.'s Exh. 22B, at Pg. 20:10-16.)

I thought I was going to die. I thought -- I thought this guy was going to just-just go to town on me. Like the-the look on his face, like if I close my eyes, it's like literally burned in my eyeball. Like the -- his huge eyes, his -- Sergeant, when he was coming down the stairs, it was like this big tidal wave. I -- in my heart, I knew that Colin and I, our lives were in -- were in -- were-were in great bodily harm or we were going to die. And I already-already know, just hearing Colin, that he was already in great bodily harm. And—[sic].

### 3.    Statement of Civilian Witness C.C.

C.C. lives in the house directly next to the Moore home. The C.C. family pursued and received a temporary restraining order with Moore as the restrained party.

In the early morning hours of January 6, 2017, C.C. called for police assistance and to report that Moore was violating the restraining order. C.C. informed the operator that Moore was hitting [the] wall and that this just was one of the ways [Moore] harassed the family. When interviewed by SFPD Inspectors following the incidents, C.C. told police were called to avoid Moore "getting away" with disturbing their sleep. C.C. could hear Moore yelling at police that morning and demanding they get off of his steps. From the front window, he could see parts of the events as they unfolded.

C.C. heard the officers yell to Moore that he was under arrest. C.C. called Moore's parents and tried to briefly explain what had happened after he heard shots fired.

Moore had "harassed" C.C. and his family for quite a while. Whether it be name calling or noise making, Moore would habitually engage in these behaviors mostly at night. C.C. told interviewers that on June 27, 2016, Moore had hit him in the shoulder. C.C. called police and

reported that incident. But because Moore claimed to police that C.C. had hit him first, C.C. decided not to file charges. The restraining order sought by C.C. was to alleviate the ability of Moore to disturb the family's peace as well to prevent further violence against him or his family.

Moore had been restrained previously because Moore assaulted C.C.'s son in 2011. Moore was charged in that incident and was restrained from 2011 to 2014; C.C. was able to reclaim some peace during the three years of the order connected to that criminal case. But in 2014, when the restraining order expired, the noise and nuisance behavior began again. On one prior occasion, Moore appeared at the C.C. home with a crowbar. C.C. also told interviewers that other neighbors had filed restraining orders against Moore due to his violent behavior and that he was not the only one who feared Moore.

## ARGUMENT

### I. The Prosecution Cannot Satisfy Its Burden of Proof and the Interests of Justice Support Dismissal of the Pending Matter.

The People now move the Court to dismiss the Complaint filed against Defendant Kenneth Cha under section 1385 and in the "furtherance of justice" because neither a legal nor evidentiary basis existed to prove beyond a reasonable doubt in 2017 or any year thereafter, that Officer Cha did not act in lawful and reasonable self-defense or defense of his partner Officer Colin Patino when he discharged his firearm at Sean Moore. Further complicating an already unprovable case are the circumstances surrounding the review and ultimate filing of this matter by DA Boudin with Moore's prior civil counsel at the helm of the unit that investigated the matter. Ultimately no new material evidence ever emerged to change the legal analysis regarding Cha's right to self-defense or defense of Patino.  The interests of justice support a dismissal as the only proper remedy in this action.

### II. The Use of Deadly Force Is Justified When Based on a Reasonable Belief that Deadly Force Is Necessary to Defend Self or Others.

Self-defense is a complete defense to the crime of assault. This defense is not unique to peace officers and is a right held by all citizens. Lawful exercise of self-defense serves as a complete defense to homicide and assaultive crimes.  (*People v. Sotela-Urena* (2016) 4 Cal.App.5th 732, 744; CALCRIM 3470 [Right to Self Defense or Defense of Another] (2023); Pen. Code, § 197 (1).)  In cases where a claim is made that a killing or conduct that amounted to the use of physical or deadly force was used to prevent harm to self or another, that killing, or use of deadly force is not

1   unlawful. (*Id.*) In cases where the claim of self-defense (or defense of others) is made, the
2   prosecution must prove beyond a reasonable doubt that the force used was not committed in self-
3   defense. (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1167.)

4       Put another way, the claim of lawful self-defense will require the prosecution to *disprove by*
5   *proof beyond a reasonable doubt* that such was unreasonable under the circumstances. And
    although the use of deadly force may not result in the killing of another human being, the analysis
6   with respect to the justification to use deadly force in self-defense or in defense of others is the
7   same. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014-1015.)

8       The right to self-defense arises when a person actually and reasonably believed in the
9   necessity of defending against imminent danger of death or great bodily injury. (*People v. Randle*
10  (2005) 35 Cal. 4th 987, 994 [overruled on instructional error; merger claim for assaultive felony and
    felony murder rule].) Thus, there is both a subjective and objective component to a self-defense
11  claim. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

12      The subjective element of self-defense requires that the person who exercised force actually
13  believed in the need to defend against imminent peril or great bodily injury. (*People v. Viramontes*
14  (2001) 93 Cal.App.4th 1256, 1262.) The objective element also requires that the person's belief be
15  objectively reasonable. In assessing the objective element, the factfinder must consider what would
16  appear to be necessary to a reasonable person in a similar situation with similar knowledge by
    assuming the point of view of a reasonable person in the position of the accused. (*Brady, supra,* 22
17  Cal.App.5th at p. 1014, citing *Humphrey, supra,* 13 Cal.4th at pp. 1082-1083.)

18      When considering the objective reasonableness of a person's belief, it is worth noting that
19  reasonableness is assessed in terms of a person of ordinary and normal mental and physical
20  capacity. A person's individual background is not the standpoint from where reasonableness is
21  considered. (*Brady, supra,* 22 Cal.App.5th at pp. 1014-1015.) But a jury may consider the
22  knowledge that a person had, which might increase his or her ability to accurately predict the risk of
    impending violence. (*Id.* at p. 1017.) For example, knowledge of another person's prior threatening
23  or violent conduct or reputation for dangerousness may provide evidence to support reasonable
24  belief in imminent harm. (*People v. Bates* (2019) 35 Cal.App.5th 1, 9-10.)

25      Another aspect of self-defense is the assessment of whether danger was imminent. Mere fear
26  that a danger will become imminent is not sufficient. (*People v. Lopez* (2011) 199 Cal.App.4th
27  1297, 1305.) Fear of future harm, regardless of how great the fear or the likelihood of the harm, will
28  also not suffice. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Whether that danger was

"imminent" has been defined as appearing to a person as "immediate and present and not prospective or even in the near future. An imminent danger is "one, that from appearances, must instantly be dealt with." (*Lopez, supra*, 199 Cal.App.4th at p. 1306, quoting *People v. Aris* (1989) 215 Cal.App.3d 1178, 1187.)

The amount of force used by a person is also something that must be found to be reasonable by the factfinder. "[O]nly that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified." (*People v. Hardin* (2000) 85 Cal.App.4th 625, 629, quoting *People v. Clark* (1982) 130 Cal.App.3d 371, 380.) In a related vein, "deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury." (*Id.* at pp. 629-630.) Even if an individual was in actual and reasonable belief of imminent danger, the use of force may not exceed what is reasonably necessary to repel the attack. (*Ibid.*)

Penal Code section 196 provides a justification for homicide committed by a peace officer when the use of force complies with Penal Code section 835a. Effective January 1, 2022, Penal Code section 835a was amended to further refine when an officer's deadly use of force is justified. Under section 835a, subdivision (a)(2), peace officers may lawfully use deadly force "only when necessary, in defense of human life." To determine whether deadly force is necessary, "officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer." (Pen. Code, § 835a, subd. (a)(2).) Tactical conduct and decisions preceding the use of deadly force are relevant, as part of the totality of circumstances, when determining whether the use of deadly force was reasonable. (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 637-639; *Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 935.)[15]

When an officer's use of force is evaluated, it must be considered "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force." (Pen. Code, § 835a, subd. (a)(4).)

---

[15] Statutorily, Defendant is entitled to the law in effect in 2017 with respect to any analysis of self-defense or defense of another.

An officer may use deadly force only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary: (1) to defend against an imminent threat of death or great bodily injury to the officer or another person; or (2) to apprehend a fleeing person who has committed a felony that threatened or resulted in death or great bodily injury and the officer reasonably believes the person will cause death or great bodily injury if not immediately apprehended. (Pen. Code, § 835a, subds. (c)(1)(A), (B).)

A threat of death or serious bodily injury is imminent when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or to another person. Totality of the circumstances means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. (Pen. Code, § 835a, subd. (e).)

Finally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham v. Connor* (1989) 490 U.S. 386, 396.) "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Id.* at pp. 396-397.) "[T]he question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Id.* at p. 397.)

In all instances where a self-defense claim is made, by civilian or peace officer, the People have the burden of proving beyond a reasonable doubt that the killing was not justified. It is not a defendant's burden to prove that force was necessary or reasonable. The People must prove beyond a reasonable doubt that a defendant did not have an actual or reasonable belief in the need for self-defense or the defense of others. (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1158; *People v. Banks* (1976) 67 Cal.App.3d 379.)

Here, the issue presented was and is whether the deadly force used by Officer Cha was lawful. A detailed fact-based analysis shows that both officers subjectively believed in the need to use force in self-defense and defense of others. The belief in the need to use deadly force to defend against Moore's assault became acute as Moore became more aggressive and struck Patino in Cha's presence which made Cha's belief objectively reasonable.  Based on the evidence, the People

1    cannot show beyond a reasonable doubt that Cha did not act in reasonable self-defense or defense of

2    Patino when he shot Moore.

3         Both Officer Patino and Officer Cha explained their mental state at the time of the assaultive

4    behavior by Moore. And Cha explained that he shot Moore (used deadly force) when all other

5    options to communicate and or subdue Moore, whom they intended to arrest failed, and Cha feared

6    for both of their lives. The evidence shows that Moore intended to harm the officers and was

7    impervious to their efforts to try to stop his attack, which aggression was initiated simply by the

8    officers' presence and investigation to determine if Moore was the person restrained. And while

9    Moore was not armed with a gun, knife, or other traditional weapon, with his physical size (height

10   6'2" and weight over 200 pounds) and positional advantage, he was more than capable of inflicting

11   great bodily injury and did so with his fists and feet when he struck Patino and then advanced on

12   Cha.

13        The body worn camera video reveals multiple efforts by officers to try to communicate with

14   Moore and to use less than lethal means (baton, pepper spray, commands) to convince Moore as the

15   encounter progressed to submit to their investigation that then turned into an arrest process. Based

16   on the BWC and witness statements, as well as the documented injuries suffered by the officers, it is

17   evident that Moore assaulted and injured both.

18        Patino told investigators he thought there was a moment where he could arrest Moore when

19   he ascended the stairs for the last time. But Moore struck Patino which caused Patino to fly

20   backwards. Cha witnessed the fact that Moore overwhelmed Patino physically and now with Patino

21   being "done" as far as Cha could tell, Cha was left to defend himself and what remained of Patino.

22   Patino suffered significant injury to his face (a fractured nose), as well as injuries connected to the

23   blow to his face which forced him backwards down a flight of stairs. It is also important to note that

24   Cha told investigators he did not know how seriously Patino was injured when he realized Moore

25   was coming for him next.

26        Assault on a police officer is a felony crime and Moore assaulted Patino in Cha's presence.

27   It was at this moment that Cha thought he might be Moore's next victim and given what he saw

28   Moore do to Patino, that fear was objectively reasonable. It is also this moment that Cha is faced

     with the lack of less than lethal options to defend himself as the pepper spray did not work, the

     baton strikes by Patino were useless, and Moore who has all physical advantage continued to

     advance. Cha, with his firearm drawn and trained on Moore, used deadly force to save his own life

     and that of his partner.

*People v. Cha*, Court No. 21010958, Motion to Dismiss, p. 26

1    The right of self-defense is a personal one and allows the person under assault or threat of it,

2    to determine for themselves the nature of the threat they are imminently facing and what response is

3    necessary to preserve life. But the burden the prosecution must satisfy is further complicated

4    admissible character evidence–even if it is unknown to a defendant.  Evidence of the violent

5    character of an individual is circumstantial evidence of how that individual behaved on the incident

6    in question. (*Del Rio, supra,* 54 Cal.App.5th at p. 55.) If the violent character was known to the

7    defendant, the evidence tends to show the defendant's apprehension of danger, but if it is not

8    known, the evidence nevertheless tends to show that the victim was probably the aggressor.  (*Id.,*

9    citing to 1 Witkin, Cal. Evidence (5th ed. 2012), Circumstantial Evidence Sec. 59, p. 437.) Where

10   self-defense is admissible in a homicide prosecution, evidence of the victim's violent character is

11   admissible to show the victim was the likely aggressor.  (*Id.,* citing to *People v. Rowland* (1968)

12   262 Cal.App.2d 790, 797-98.)  And California law accords with the national rule concerning

     evidence of character and habit in that it is not required the defendant prove that he was aware of

     the victim's violent reputation or acts. (*Id.*) The failure to so instruct in *Del Rio* was error. (*Id.*)

13        Part of the analysis in this case must also include the fact that Cha's counsel would be

14   legally entitled to introduce decedent Sean Moore's history of violence. Multiple neighbors pursued

15   restraining orders against Moore after enduring threats to their lives and those of their family and

16   pets.  He had caused violent damage to C.C.'s home and physically assaulted C.C's son. Moore was

17   also charged and convicted with repeated instances of criminal threats that involved his threats to

18   kill others. (Peo.'s Ex. 2, Redacted QCA 17000423.)  This criminal history for violent threats and

19   actual acts that involved weapons as well as physical violence, committed with hands and feet,

20   would be legally admissible to show that Moore was a violent man and as circumstantial evidence

     that Moore, not Cha, was the aggressor in this instance.

21        Under all these circumstances, the shooting of Sean Moore was lawful and justified, and a

22   criminal prosecution is not supported by the evidence.  The death of Moore did not change the

23   analysis of self-defense or defense of another and no other facts changing the analysis were

     discovered even after the empaneling of an investigative grand jury.

24        Given that there was no change in the facts, the defense has a colorable claim that this

25   prosecution was brought for improper reasons.  The evidence surrounding improper prosecution

26   motives include the failure to create and maintain ethical walls and the inappropriate handling of

27   proceedings as detailed below.

28   //

III.    **The Prosecution Has an Affirmative Duty to Not Breach Ethical Walls.**

Lateef Gray should not have been involved in the handling of his former client's case.  In California, vicarious disqualification rules for attorneys are the result of decisional law. (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847.) Promulgated by the State Bar, the California Rules of Professional Conduct provide guidance for lawyers who move between public and private practice and their obligations towards former clients and those confidences.

Rule 1.11, subdivisions (a) through (d) provides mandates when issues of potential conflict arise, require that the lawyer under subdivision (d) "shall not participate in a matter in which the lawyer participated personally and substantially while in private practice or non-governmental employment unless the appropriate government agency gives its informed written consent." Personal participation includes both direct participation and supervision of a subordinate's participation. (*Id.*, Comment [3].) Participation may be "substantial" even when it does not determine the outcome of a matter. (*Id.*) However, participation requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. (*Id.*)  Key to this rule is the following: "Personal and substantial participation may occur when for example, a lawyer participates through decision, approval, disapproval, recommendation, investigation, or the rendering of advice in a particular matter." (*Id.*)

Ethical screens are used to avoid the imputation to other lawyers of knowledge and information held by the lawyer who has made the move from the private firm to the government one. The lawyer who is to be "screened" or "walled off" from the matter is to avoid the disqualification of the newly joined government agency and the lawyers within it by the creation of this ethical screen. (See Rule of Prof. Conduct 1.10, Comment [6].)  But ethical screens are only as good as the individual who honors it.

True, the claim of imputed knowledge from the to-be screened attorney to the new firm may be rebutted by evidence of an effective ethical screen.  (*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776.) But the paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. (*Id.* at p. 808.) Therefore, the Bar has established that the elements of an effective ethical wall are: (1) physical, geographic, and department separation of attorneys; (2) prohibitions against and sanctions for discussing confidential matters; (3) established rules and procedures preventing access to confidential information and files; (4) procedures preventing profit sharing by the disqualified attorney; and (5)

continuing education in professional responsibility. (*Id.* at p. 811.) This is a case-by-case inquiry, however, to satisfy the court that the tainted attorney has not had and will not have any improper communication with others at the firm concerning the litigation. (*Id.*)

The first factor is physical isolation. Close proximity of the tainted attorneys to the rest of the firm is highly problematic because inadvertent disclosure may occur regarding the subject matter of the litigation and former client at issue. (*Id.*) Small firms or small offices must be cognizant of this hazard. The second factor is setting up prohibitions and sanctions for breach of the ethical wall. An express prohibition is a "basic first step." (*Id.*) The third factor is to avoid shared access to the documents in the litigation; the *Kirk* court discussed storing files in a location inaccessible to the disqualified attorney, electronic files that require password activation, warnings posted on file room doors or simply a directive not to access the information. But this will be for the firm of the disqualified attorney to show these safeguards exist to rebut the presumption of taint. (*Id.*) The fourth factor is no profit sharing by the disqualified attorney. (*Id.* at p. 812.) While not totally applicable in the scenario where a private attorney joins a government firm (where there are not profits to be shared), there exists the appearance of impropriety where the private attorney stood to share profits were his former client to be successful in the lawsuit the former attorney handled. But in the context of a case where the attorney could better that former client's legal posture, the appearance of impropriety is clear.

Finally, the additional element favorably acknowledged in case law is that the disqualified attorney has no supervisory powers over the attorneys involved in the litigation that he is to be ethically screened from. (*Kirk*, supra, 183 Cal.App.4th at p. 813.) The court in *Kirk* explained: If the tainted attorney is supervising the attorneys involved in the litigation, there could be concerns that the tainted attorney sets policies or has influence that might bear on the subordinates handling of the litigation. (*Cobra Solutions, Inc.*, supra, 38 Cal.4th at p. 850.) Ideally, the former client should be notified of these precautions and affirmative efforts in writing. Written notice increases the public perception of integrity of the bar which is paramount to the maintenance of public and private trust. (*Id.*) Primarily the ethical wall must ultimately be judged by whether it is sufficient to meet its purpose: satisfying the trial court that the tainted attorney has not had and will not have any involvement with, or communication concerning, the litigation that would a support a reasonable inference that confidential information was or will be disclosed. (*Id.*)

A managing attorney, who heads a government law office occupies a unique position because of their ability to make policy-based decisions about resources and efforts that will be used.

(*In re Charlisse C.* (2008) 45 Cal.4th 145,167-168.) Courts have held that in this scenario where the lawyer to be disqualified is a supervisor, ethical screens may be insufficient. (*Younger v. Superior Court* (1978) 77 Cal.App.3d 892, 894-897.) "The power to review, hire and fire is a potent one" and the attorneys who serve under the boss "cannot be entirely insulated from policy decisions, nor can they be freed from real or perceived concerns as to what their boss wants." (*In re Charlisse, supra*, 45 Cal.4th at p. 165.)

Even after a cursory review of the substantial email communications, directives given, and clear hands-on role that Lateef Gray maintained in the Moore matter after he left the Burris Law Firm and joined the SFDA, it is clear that Gray never honored any ethical walls. (Peo.'s Exh. 30, at Pg. 22-23.) As such there is no actual formal declaration that the undersigned has found to support a claim that an ethical wall was indeed established within the guidelines as outlined in the *Kirk* case cited above. (Williams Dec. at Pg. 3:25-27.)

The emails reviewed by this writer were only produced to the defense in redacted form after a motion to compel which the Boudin administration aggressively opposed. (Peo.'s RJN at Pg. 5:23.) The email conversations sought by the Defense, and now discovered to the defense in unredacted form, show virtually daily involvement by Gray, as manager of the IIB unit since June 30, 2020, and overseer as the IIB Managing Attorney of ADAs Drusinsky and Lacambra (Peo.'s Exh. 30 (redacted).). Gray's involvement is amply documented and shows he made pivotal decisions in the Moore matter such as hiring and payment to expert witnesses, discussions around strategy, and the removal of the DA Inspector who had investigated the Moore case from the beginning. (*Id.*, at pgs. 27, 31-32, 38, 39-40, 41, 42, 43-44, 47, 51, 53, 54-55, 56-57, 58, 69.).) Based on these email records, it was Gray who negotiated, proposed, and authorized the substitution of a new DA Inspector. (*Id.*, and Tsuruta Dec. at Pg. 5:17-20.)

Additionally, the record from the District Court shows that Gray remained on the Moore civil matter for *more than 60 days* after he was offered a job by DA Boudin and began work with the SFDA IIB unit on February 14, 2020. (Peo.'s Exhs.11 and 14 [both lodged under seal]; Request for Judicial Notice (RJN) at Pg. 5:12, District Court Case 3:18cv00634 SI.) Specifically ███████ ████████████████████████████████████████████. (Peo.'s Exh.11 [lodged under seal].) Yet Gray continued to appear on pleadings in the District Court until March 23, 2020, well after starting in the IIB Unit. (Peo.'s RJN at Pg. 5:12, District Court Case 3:18cv00634 SI.) Gray is predominant on the pleadings in the Moore matter in federal court and

1  ostensibly integral in the conversations about the strategic posture of the matter after Moore's death

2  in January 2020 because he remained as counsel of record into March 2020.

3      The pecuniary interest for work done in the civil lawsuit by Moore against the SFPD,

4  coupled with the clear interest surrounding prosecution of the Moore/Cha matter by the Federal

5  Court, means that Gray should have been walled off of the Moore/Cha prosecution in a

6  demonstrable way to avoid any appearance of impropriety.  Whether or not it could be established

7  that Gray personally profited from the settlement that occurred of $3.25 million dollars, which was

8  lauded in DA Boudin's press release, is something the defense would exploit in a motion for

9  dismissal and at any trial, and further casts doubt on the ethics of any prosecutor involved. (See

10 Peo.'s Exh. 10.)

11 ## IV.    Grand Jury Proceedings

12 ### A. The Prosecution Has the Obligation to Present Exculpatory Evidence to an Investigative Grand Jury.

13     The grand jury's investigative function, much like its role when empaneled to determine

14 whether to indict a targeted individual, is one of independence. (*McGill v. Superior Court* (2011)

15 195 Cal.App.4th 1454, 1504.)  Where the deficiency of disclosures such as material omissions or

16 gross mischaracterizations of evidence occurred, serious interference likewise took place with the

17 grand jury's investigative function, and the grand jury's independence is undermined. (*Id.*)  A grand

18 jury charged with investigation of a criminal charge, like a grand jury empaneled to indict, is

19 entitled to the presentation of exonerative or exculpatory evidence. (*Id.*)  Where there is serious

20 doubt as to whether the failure to present exculpatory evidence affected the result, substantial

21 prejudice exists from the omissions and failures by the prosecution.  (*Id.*) If the disclosures are

22 "inadequate and inaccurate" substantial prejudice exists to the target of the investigation. (*Id.*) The

23 lack of fundamental fairness and due process at the investigatory stage (like the indicting stage) is

24 cause to invalidate a grand jury proceeding. (*Id.* at p. 1508.) It is the obligation of the prosecution to

25 assure independence, procedural regularity, and fairness in grand jury proceedings compelled by

26 due process. (*Id.*)

    "The grand jury's ability to safeguard accused persons against felony charges
which it believes unfounded is an attribute of due process of law inherent in the
grand jury proceeding; this attribute exists for the protection of persons accused of
crime before the grand jury, which is to say that is a 'constitutional right;' *any
prosecutorial manipulation which substantially impairs the grand jury's ability to
reject charges which it may believe unfounded is an invitation of the defendant's*

*constitutional right.* [ . . . ] When the prosecutor manipulates the array of evidence to the point of depriving the grand jury of independence and impartiality, *the courts should not hesitate to vindicate the demands of due process.*"

(*McGill, supra,* 195 Cal.App.4th at p. 1508, quoting *People v. Backus* (1979) 23 Cal.3d 360, 392, italics added in *McGill.*)

When a district attorney is aware of evidence reasonably tending to negate guilt, the district attorney is obligated to inform the grand jury of its nature and existence. (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 251; Pen. Code, § 939.7.) Because the "adversary system does not extend to grand jury proceedings…if the district attorney does not bring exculpatory evidence to the attention of the grand jury, [they] are unlikely to learn of it." (*Id.* at p. 255.) And if the district attorney "is aware of evidence reasonably tending to negate guilt," the district attorney is obligated to "inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced." (*Id.*)

Should the prosecution fail to adhere to this affirmative duty and that failure results in "substantial prejudice," the violation is so serious that due process demands the portion of the indictment related to that evidence shall be dismissed. (Pen. Code, § 939.71, subd. (a); see also, *Breceda v. Superior Court* (2013) 215 Cal.App.4th 934, 959; *People v. Becerra* (2008) 165 Cal.App.4th 1064, 1070.) The definition of "exculpatory evidence" is both one of legal construction and common sense and is defined in *Johnson* as "evidence reasonably tending to negate guilt." (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 251.) This duty is not discretionary—it is part of the prosecution's obligation to ensure the grand jury process was fundamentally fair. (*McGill, supra,* 195 Cal.App.4th at p. 1508, citing to *Backus, supra,* 23 Cal.3d at p. 392 [stressing that "the obligation of the prosecutor to assure independence, procedural regularity, and fairness in grand jury proceedings is compelled by due process."].)

In sum, California law provides that a defendant has a due process right to a grand jury acting independently and impartially in its protective role. (*People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403, 424, citing *Greenburg v. Superior Court* (1942) 19 Cal.3d 31; *Parks v. Superior Court* (1952) 38 Cal.2d 609; Cal. Const. art. I, §14; *Johnson, supra,* 15 Cal.3d at p. 253; *Backus, supra,* 23 Cal.3d at p. 393; *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1022, fn. 1.) While a traditional challenge to a denial of this right is through a motion under section 995 post indictment, courts may also consider "relevant nontestimonial portions of the

record of the grand jury proceedings" when reviewing the merits of such a challenge. (*Mouchaourab, supra,* 78 Cal.App.4th at pp. 424-425.)

As has been said by the United States Supreme Court: the power of a grand jury... does not depend on a case or controversy in order to get evidence but can investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." (*United States* v. *Morton Salt Co.* (1950) 338 U.S. 632, 642-643, cited by *Brovelli v. Superior Court of Los Angeles County* (1961) 56 Cal.2d 524, 529.) The grand jury is not an arm of the prosecution to do as it pleases, but rather may operate as a check on a zealous prosecutor. But to do so, the grand jury must depend on the scrupulous prosecutor to bring them the information from which they may expand their investigative function as they serve as part of the charging process of criminal procedure. (*Cummiskey, supra,* 3 Cal.4th at p. 1026; see also *Breceda, supra,* 215 Cal.App.4th at p. 954, citing to *Johnson, supra,* 15 Cal.3d 248.)

Investigative grand juries have the power to compel both documents and persons as part of their investigative role. Because the grand jury is a grand inquest into the possibility of a crime's occurrence, the grand jury is a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of a crime. (*M.B. v. Superior Court* (2002) 103 Cal.App.4th 1384, 1395.)

**B. The Prosecution Has the Obligation to Not Mislead the Investigative Grand Jury.**

Without caveat, a prosecutor has an affirmative obligation to not mislead the grand jury as it performs its investigative duties. In evaluating the prejudice to a targeted individual in the grand jury process, one relevant consideration is the extent to which the prosecution's disclosure deficiency interfered with the grand jury's independent investigatory function. (*Breceda, supra,* 215 Cal.App.4th at p. 956.) Any deficient disclosure to the grand jury, intentional or not, impairs the grand jury from operating independently. (*Id.*)

Nowhere in the grand jury proceedings is this deficiency and interference better exemplified than when a prosecutor fails to present the law and evidence accurately related to the claim of self-defense as an affirmative one.

Here, Lacambra and Drusinsky explained to the Grand Jury the purpose behind the provision of evidence that Cha's reputation within the police community for violence or a particular type of response would be relevant to the juror's determination that he did nor did act reasonably

1    (lawfully) and in self-defense or consistent with his training. While it may be debated as to whether
2    this statement was legally correct, the mandate to present exculpatory evidence as to a self-defense
3    claim is without debate.

4         In presenting only a single side of a coin, the prosecutors failed to comply with the law.
5    Here, the propensity for violence by the decedent and most importantly acts of violence to the C.C.
     family would be highly relevant in establishing that Cha's responses to Moore were reasonable and
6    that it *was* Moore who was likely the aggressor, supporting Cha's claim of lawful self-defense or
7    defense of his partner. Indeed, the Grand Jurors asked about this history. (See Peo.'s Exh. 18A, at
8    Pg. 178:4-24; see also Ex. 29, Record [lodged conditionally under seal].) The failure to present this
9    exculpatory evidence, or to tell the jurors that they had the power to investigate this concern so as to
10   evaluate Moore's violent character was a significant omission. It is reasonable to presume that this
     evidence could have been ordered produced by way of documents or live witnesses, both of which
11   the Grand Jury had the power to summon had they known.

12        That Defendant Cha did not know of Moore's tendency to violence and assaultive behavior
13   is of no import. (*People v. DelRio* (2020) 54 Cal.App.5th 47, 55-56.) Where self-defense is raised in
14   a homicide prosecution, evidence of the victim's violent character is admissible to show the victim
15   was the aggressor, regardless of whether it was known to the defendant. (*DelRio, supra,* 54
16   Cal.App.5th at pp. 55-56, citing *People v. Rowland* (1968) 262 Cal.App.2d 790, 797-798.)
     Instead, the Grand Jury was only provided with evidence of Defendant Cha's "character" to be
17   aggressive within the context of policing. From the questions posed by the grand jurors, this was an
18   area of inquiry that required the prosecutors to do substantially more than they did.

19        Ultimately, and most importantly, this "investigative grand jury" did not uncover any new
20   evidence to change the legal analysis through multiple attorneys that this case was not prosecutable.

21
                    **CONCLUSION**
22
23        Based on prosecutorial ethics, the substantial evidence that Moore was the aggressor in this
     instance, and the interests of justice, the People move to dismiss this matter.
24   Dated: June 30, 2023
                                    Respectfully submitted,
25                                       BROOKE JENKINS
                                    District Attorney
26
27                                       By
                                    Darby M. Williams
28                                       Assistant District Attorney

1

## DECLARATION OF SERVICE

2          I, Darby M. Williams, state:

3          That I am a citizen of the United States, over eighteen years of age, an employee of the City
4    and County of San Francisco, and not a party to the within action; that my business address is 350
     Rhode Island Street, North Building, Suite 400N, San Francisco, California 94103. I am familiar
5    with the business practice at the San Francisco District Attorney's Office (SFDA) for collecting and
     processing electronic and physical correspondence. In accordance with that practice,
6    correspondence placed in the internal mail collection system at the SFDA is deposited in the United
     States Postal Service with postage thereon fully prepaid that same day in the ordinary course of
7    business. Correspondence that is submitted electronically is transmitted using electronic mail.
     Participants will be served through electronic mail at the email addresses listed below. Participants
8    will also receive hard copies through the mail via the United States Postal Service.

9

10          That on June 30, 2023, I electronically served the **MOTION TO DISMISS (Pen. Code, §
     1385)** by transmitting a true copy via E-mail. I also placed a true copy thereof enclosed in a sealed
11   envelope in the internal mail collection system at the SFDA at 350 Rhode Island Street, North
     Building, Suite 400N, San Francisco, California 94103, addressed as follows:

12

13       Scott Burrell, Esq.
         Burrell Law Office
14       1306 Pine Street
         Walnut Creek, California 94596
15       Scott@lawburrell.com

16       Via E-service and hard copy sent U.S. Mail.

17

18          I declare under penalty of perjury that the foregoing is true and correct. Executed June 30,
     2023, at San Francisco, California.

19

20                                                   Darby M. Williams

21

22

23

24

25

26

27

28

*People v. Cha,* Court No. 21010958, Motion to Dismiss, p. 35