EUSTACE DE SAINT PHALLE, SBN 179100
OLIVIA K. LEARY, SBN 329145
RAINS LUCIA STERN ST. PHALLE & SILVER, PC
2300 Contra Costa Blvd., Suite 500
Pleasant Hill, CA 94523
Tel: (925) 609-1699
Fax: (925) 609-1690
E-mail: PersonalInjuryGroup@RLSlawyers.com

ATTORNEYS FOR PLAINTIFF
KENNETH CHA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH CHA, | CASE NO. 3:24-cv-4700 PHK |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DAMAGES** |
| vs. | **First Claim for Relief - Violation of Civil Rights (42 U.S.C. §1983) - Municipal Policy Resulting in Deprivation of Rights (Monell) – Inadequate Administrative Policies for the Re-Evaluation of Declined Cases** |
| CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE; CHESA BOUDIN; DANA DRUSINSKY; STEPHANIE LACAMBRA; LATEEF GRAY; ANDREW KOLTUNIAK; and DOES 1-100, | |
| | **Second Claim for Relief - Violation of Civil Rights (42 U.S.C. §1983) - Municipal Policy Resulting in Deprivation of Rights (Monell) Inadequate Administrative Policies for Assessing and Managing Attorneys' Conflicts of Interest and/or Improper Bias** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff KENNETH CHA complains against defendants CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE; CHESA BOUDIN; DANA DRUSINSKY; STEPHANIE LACAMBRA; LATEEF GRAY; ANDREW KOLTUNIAK; and DOES 1-100, as follows:

///

**PRELIMINARY STATEMENT**

1.      This is a civil action for damages brought pursuant to the United States Constitution and 42 U.S.C. § 1983 resulting from deprivations, under color of law, of Plaintiff's rights under the Fourth and Fourteenth Amendments and for tortious behavior under California state law. Plaintiff, San Francisco Police Department Officer Kenneth Cha, alleges that the San Francisco District Attorney's Office ("SFDAO") and other City employees violated his civil rights.

2.      On January 6, 2017, Ofc. Cha and his colleague Ofc. Colin Patino attempted to enforce a restraining order against Sean Moore based upon a complaint. Moore was a belligerent individual with a history of violence and criminal convictions. He had been subject to several prior restraining orders due to his harassment and abuse of neighbors. When these uniformed officers approached Moore on the staircase outside his unit, he screamed racial epithets at them, threatened them with bodily harm, and assaulted Cha and his partner. Cha and Patino tried to protect themselves by dousing Moore with pepper spray and striking him with a baton, to no avail. Moore punched Patino in the face, breaking his nose. As a last resort (with his partner injured and unable to help) and after shouting warnings, Ofc. Cha shot Moore in the stomach and leg. As is standard protocol in such incidents, several agencies investigated Cha's use of force. Each reviewing entity, including the SFDAO, found that Cha's shots were justified, reasonable, and in keeping with police department training and regulations: Cha shot Moore in lawful self-defense in order to protect himself and his partner from death or great bodily injury.

3.      Moore was later imprisoned at San Quentin on unrelated violent felonies. He died there three years after being shot. Newly-elected District Attorney Chesa Boudin (a self-avowed radical anti-police activist) disregarded the findings of the prior investigations and charged Cha with crimes, failing to adhere to standard prosecutorial policies and procedures safeguarding against conflicts of interest and bias.

4.      At a bare minimum, a prosecutor must determine that there is probable cause to believe that all elements of a criminal offense have been met in order to file criminal charges based on evidence that would be admissible in court. In manslaughter and other assault cases, the prosecutor must carefully weigh the prospect of the assertion of self-defense. Reasonable self-defense is a

complete bar to conviction, not merely an affirmative defense. Rather, the *absence* of lawful self-defense is an element of such charges that the prosecution must prove beyond a reasonable doubt and in keeping with the presumption of innocence. Moreover, the Fourth Amendment mandates that uses of force by peace officers be assessed with "allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." (*Graham v. Connor* (1989) 490 U.S. 386, 388.)

5.    Model district attorney policies require that evidence of a crime should be of such convincing force that it would warrant conviction by a fact finder after hearing all the evidence available to the prosecutor at the time of charging and after assessing the most plausible reasonably foreseeable defense that could be raised. The evidence should be sufficient to prove the charges beyond a reasonable doubt, unanimously, to a jury.

6.    At the time of the shooting (2017), George Gascon[1] was the elected District Attorney of San Francisco. His office investigated Cha's use of force and determined that there was not probable cause to pursue a criminal case against him. Moore's death over three years after the incident did not change Gascon's legal determination. The SFDAO wrote a declination letter and was prepared to end the investigation of the Moore case without prosecution.

7.    Under Gascon's administration, the SFDAO adhered to necessary standards regarding declined cases. Where a case had been deemed non-viable and a declination report had been drafted, the office had administrative policies and procedures that prohibited cases from being re-opened unless new evidence drastically altered the legal analysis.

8.    After January 2020, newly-elected District Attorney Chesa Boudin abandoned these policies and procedures, and permitted declined cases to be re-opened with no new evidence to support further investigation or prosecution. As a result of this improper change in policy, no declination letter in the Moore officer-involved shooting ("OIS") matter was issued. Boudin re-opened the case and Cha was subjected to unlawful prosecution.

---

[1] Gascon was no police apologist: after his stint in Northern California, he returned to Los Angeles as their District Attorney and was eventually recalled and lost a reelection bid. Both campaigns to remove him from office focused on the perception that he was "soft on crime" and "anti-police."

9.      Further, during Gascon's administration, like any other office operating within the bounds of the law and professional standards, the SFDAO maintained policies and adhered to necessary legal standards regarding employees' improper bias and conflicts of interest. Law offices, including district attorney's offices, have an ethical responsibility to determine whether attorneys or other employees have any ethical conflicts, such as prior or current representation of an opposing party. District attorney's offices must establish policies and procedures to monitor their employees' conflicts of interest, and monitor for improper bias for or against parties to their office's cases. District attorney's offices must exclude conflicted or biased employees from participation in such cases. Under Boudin, the SFDAO failed to adhere to established policies and procedures regarding biased or conflicted personnel, and permitted such personnel to work on cases where conflicts existed.

10.     As a result of these inadequate policies, Boudin and the SFDAO permitted Moore's attorney in the lawsuit filed against Cha for the shooting (defendant Lateef Gray) to actually supervise the prosecution of Cha as the head of the ironically named Independent Investigation Bureau ("IIB"). This failure constituted a clear conflict of interest and an ethical breach.

11.     Furthermore, the SFDAO hired an investigator, Andrew Koltuniak, who was unqualified for the position, had consistently expressed and demonstrated bias against police officers, and had made material misrepresentations to courts in other cases. The SFDAO's failure to adhere to effective policies to screen for bias and conflicts of interest allowed the involvement of these individuals and was a substantial factor in the SFDAO's failure to issue a declination letter in the Moore OIS.

12.     The Boudin SFDAO arrested Cha and subjected him to criminal proceedings. The citizens of San Francisco later removed Boudin as District Attorney. The successful campaign to "recall" Boudin from office was an overwhelming repudiation of his policies including his bias against peace officers. Boudin's successor, Brooke Jenkins, found that Boudin and his office had not adhered to the norms of prosecutorial ethics in the Cha matter, in that they had re-opened the case without any new evidence and despite inadequate proof that a crime was committed. Further, Jenkins found that Boudin had permitted Gray (Moore's civil lawyer) to actively manage the Cha investigation—an obvious and egregious conflict of interest that further injected bias into the case.

13.     As a result of the inadequate policies and procedures of the SFDAO, its high-profile investigation and prosecution of Ofc. Cha violated his civil rights, and caused damage to Cha's reputation, emotional distress, and financial burdens. Ofc. Cha claims damages for these losses, as set forth below.

## JURISDICTION

14.     Jurisdiction is vested in this Court under 28 U.S.C. § 1331 (cases arising under the Constitution and laws of the United States), 28 U.S.C. § 1343 (actions to recover damages under an Act of Congress providing for the protection of civil rights), and 42 U.S.C. § 1983 (actions to recover damages for the deprivation of any Constitutional right).

## VENUE

15.     A substantial part of the events giving rise to this action occurred in the City and County of San Francisco, California. Venue lies in the Northern District of California, the judicial district in which the claim arose pursuant to 28 U.S.C. §1391(a) and (b).

## DIVISIONAL ASSIGNMENT

16.     A substantial part of the events giving rise to this action occurred in the City and County of San Francisco, California. Pursuant to Northern District of California Civil Local Rules, Rules 3-2(c) and 3-2(d), this case should be assigned to the San Francisco Division or the Oakland Division of this Court.

## PARTIES

17.     At all times relevant to this Complaint, Plaintiff Kenneth Cha was a resident of the City and County of San Francisco, California. Plaintiff Kenneth Cha is and was a police officer employed by the San Francisco Police Department. Plaintiff Kenneth Cha currently resides in South Pasadena, California.

18.     Defendant City and County of San Francisco is a public entity in the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued.

19.     Defendant San Francisco District Attorney's Office ("SFDAO") is a regional government agency located in the City and County of San Francisco, California and tasked with investigating and prosecuting alleged criminal violations (when warranted) for the Defendant City and

County of San Francisco.

20.     Defendant Chesa Boudin is, and at all relevant times has been, a resident of the State of California. Defendant Boudin is being sued in his official capacity as the former San Francisco District Attorney ("DA"). At all times relevant to this Complaint, Defendant Boudin was acting in the course and scope of his employment with Defendant City and County of San Francisco.

21.     Defendant Lateef Gray is, and at all relevant times has been, a resident of the State of California. Defendant Gray is being sued in his official capacity as the former Managing Attorney for the IIB of the SFDAO. At all times relevant to this Complaint, Defendant Gray was acting in the course and scope of his employment with Defendant City and County of San Francisco.

22.     Defendant Dana Drusinsky is, and at all relevant times has been, a resident of the State of California. Defendant Drusinsky is being sued in her official capacity as a San Francisco Assistant District Attorney ("ADA"). At all times relevant to this Complaint, Defendant Drusinsky was acting in the course and scope of her employment with Defendant City and County of San Francisco.

23.     Defendant Stephanie Lacambra is, and at all relevant times has been, a resident of the State of California. Defendant Lacambra is being sued in her official capacity as a San Francisco ADA. At all times relevant to this Complaint, Defendant Lacambra was acting in the course and scope of her employment with Defendant City and County of San Francisco.

24.     Defendant Andrew Koltuniak is, and at all relevant times has been, a resident of the State of California. Defendant Koltuniak is being sued in his official capacity as an Investigator with the IIB of the SFDAO. At all times relevant to this Complaint, Defendant Koltuniak was acting in the course and scope of his employment with Defendant City and County of San Francisco

25.     Plaintiff does not know the true names and capacities of defendants sued as DOES 1 through 100. Plaintiff will amend the complaint to show the true names of each such defendant when their identities have been ascertained. Each of the DOE defendants encouraged, participated in, and/or ratified and approved the conduct complained of herein.

26.     Plaintiff is informed, believes, and therefore alleges that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency,

employment and/or conspiracy and with the permission and consent of other co-Defendants.

<u>**E**VENTS **G**IVING **R**ISE TO THIS **C**OMPLAINT</u>

**Background**

**Neighbor Christopher Choy's Prior Restraining Order against Sean Moore**

27.    In 2017, Moore was 43 years old and estimated to have been six-feet-four inches tall and 275 pounds (significantly larger than Officers Cha and Patino). According to police reports and affidavits in temporary restraining orders, Moore had an extensive history of violent conduct, including aggressive speech, physical attacks and assaults on police officers, neighbors, and innocent strangers. Moore had been subject to a series of restraining orders in the years prior to the OIS and had been frequently reported to police. He was a dangerous menace to the community before and after this event.

28.    One of the many victims of Moore's conduct was Christopher Choy, who lived next to Moore at an apartment complex on Capitol Avenue in the Oceanview neighborhood of San Francsico. Moore had harassed Choy and his family for several years. Choy complained that Moore would make noise and shout, mostly at night through their shared wall. Moore had been restrained previously because Moore physically assaulted Choy's son. Moore was charged criminally in that incident and was subject to a restraining order from 2011 to 2014. Choy reported that when the restraining order expired, Moore renewed his campaign of harassment and threats.

29.    In December 2016, based on Moore's continued unlawful conduct, Choy obtained a new temporary restraining order protecting him and his family. Choy sought to make the order permanent to prevent Moore from disturbing the family's peace and to stop Moore from engaging in further violence against them. A court hearing on the matter was scheduled for January 11, 2017.

30.    On January 6, 2017, Choy called the police to report that Moore was continuing to harass and threaten him in violation of the existing temporary order. Uniformed patrol officer Kenneth Cha and his colleague Colin Patino were assigned to investigate and drove to Moore's residence.

**Officer Cha & Officer Patino's Initial Encounters with Moore**

31.    While his partner spoke to the victim, Ofc. Cha rang Moore's doorbell to get his "side of the story." Moore's apartment unit was located at the top of a narrow stairway that was enclosed by

solid-wall balustrades and topped with an iron gate protecting the landing adjacent to the front door. The officers were wearing body-worn cameras ("BWCs") as department rules require. Moore was immediately hostile and belligerent. Moore harangued the officers with a barrage of racist and homophobic epithets, including "bitch," "faggot," and "nigga." Moore continually demanded that the officers leave the premises, despite the fact that they were investigating a potential crime.

32.     After about three minutes of talking to the officers Moore said, "I'm gonna call and remove you," and walked inside his unit. Cha and Patino descended the stairs to the sidewalk to discuss the terms of the restraining order. Both officers were interviewed by criminal investigators in the aftermath of the incident. Ofc. Patino said he believed he had probable cause to arrest Moore for violating the restraining order based on the observed behavior, the terms of the restraining order and the information provided by the victim.

33.     Moore stepped back onto the landing carrying what appeared to be a phone and stood behind the gate. He hurled more insults, continuing with the homophobic and racial slurs. Ofc. Patino attempted to read the restraining order to Moore. Moore responded more aggressively, banging his hand on the gate gestured in an aggressive way with his hands and arms while stating: "I'm through talking to you, bitch! Get off! Get off my stair!"

34.     After another five minutes, Moore quickly pulled open the gate and advanced toward them at a fast pace. The officers warned him they would squirt pepper spray at him, but Moore continued to advance and threaten them. Ofc. Cha doused Moore with pepper spray so that he and Patino could retreat down the narrow stairs without the larger Moore chasing and attacking him. Moore turned and stood sideways in the gateway. He held onto the frame of the gate for leverage and kicked Cha in the face. The officers retreated partway down the stairs, inadvertently dropping the hard copy of the restraining order as they did so. Moore bent over to pick up the restraining order, closed the gate and went back inside. After a time, Moore came out of his unit and tossed the restraining order on the stairs.

35.     Patino walked up the stairs to retrieve the restraining order documents. As he bent down to pick up the papers, Moore suddenly opened the gate and rushed towards him. The officers again descended the stairs as Moore clenched his fists, banged his fists together and screamed very loudly

"Fuck you! Fuck you! Fuck you! . . . . I'm a kick your ass, punk." Ofc. Patino drew his baton.

**Final Altercation and Shooting**

36.     Officers Cha and Patino ordered Moore to get on the ground, but he did not comply, responding "I ain't getting on shit." Moore took a few more steps down and reached to pick up an object that had fallen, descending about halfway down the stairway and closer to the officers' position.

37.     The officers believed this was a good opportunity take Moore into custody. Moore retreated up the stairs as the officers advanced forward, yelling commands for him to get down on the ground. Patino swung his baton at Moore at least twice and reached for Moore. Moore punched Patino in the face with a closed fist, breaking Patino's nose. Patino fell backwards down the stairs toward Cha. Cha heard Patino drop and saw him "roll down the stairs." Ofc. Cha stated he knew immediately that Ofc. Patino had been significantly injured and was out of the fight.

38.     Ofc. Cha was left to face Moore alone. The 6'4", 275-pound Moore was looming above him. Moore had already demonstrated his intent, motive and ability to inflict great bodily injury multiple times. Cha drew his pistol and pointed it at Moore. Brandishing the firearm did not deter Moore. Moore moved towards Cha and raised his right leg and kicked down at him. Cha fired his pistol as he fell backwards down the stairs. Cha struck Moore twice, once in the abdomen and once in the leg.

39.     Cha believed that if he did not use force, he would suffer great bodily injury or even death at the hands of Moore. At that point, pepper spray had done nothing to subdue Moore, the baton had no effect, and Moore was still enraged, aggressive and dangerous. After Ofc. Patino was disabled, Ofc. Cha became the sole focus of Moore's attention and rage. Moore came toward him in a "violent manner." Ofc. Cha recounted, "I thought I was going to die. I thought this guy was just going to go to town on me." "I knew that Colin and I, [would face] …great bodily harm or we were going to die." Cha radioed for emergency backup, broadcasting that, "I was getting overpowered; so I discharged my weapon." Of course, if Moore would have rendered Cha unconscious or otherwise unable to defend himself, he would have also had access to Cha's gun.

40.     Moore survived the shooting and was treated for the two gunshot wounds.

41.     Ofc. Patino was transported to San Francisco General Hospital and treated for a broken

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

nose. Ofc. Cha reported injuries consisting of scrapes and bruises with some pain.

42.    Moore was later incarcerated related to other charges, which included felony assault on two minors with a hate crime enhancement and making death threats. Moore died in San Quentin State Prison on January 20, 2020, three years after his encounter with Cha and Patino. The coroner's report stated that Moore suffered numerous medical conditions that contributed to his death, including injuries related to the gunshot to his abdomen. Thus, the gunshot wound was not the sole proximate cause of Mr. Moore's death.

43.    Because the Coroner determined that Moore's death was primarily attributed to acute intestinal obstructions and severe abdominal adhesions from the gunshot three plus years prior, the cause of death was listed as "homicide."[2]

**SFDAO's Assessment of the Cha/Moore OIS Matter Under DA George Gascon**

44.    The SFDAO under former DA George Gascon investigated the Moore case thoroughly, focusing on Cha and Patino's conduct. The SFDAO's IIB was created to investigate complex law enforcement matters, including officer-involved shootings, in-custody deaths and significant uses of force.

45.    Gascon's office investigated the Moore matter and did not find justification to pursue further investigation or prosecution. The investigation found that Ofc. Cha's use of deadly force against Moore was legally justified.

46.    A person is entitled to use force, including deadly force, if the force is used in self-defense or in defense of others when there is an imminent threat of death or great bodily injury. (Cal. Pen. Code section 197; CALCIM 505) It is the prosecution's burden to prove beyond a reasonable doubt that the deadly force was *not* used in lawful self-defense or defense of another. (CALCRIM 505.)

47.    Here, the IIB found, based on uncontradicted evidence, that Ofc. Cha believed that if he did not use force, he would suffer serious bodily injury or even death at the hands of Moore. Cha's

_____

[2] The term "Homicide" as a manner of death merely means "death at the hands of another" and does not have any evidentiary weight regarding criminal culpability pursuant to Cal. Gov. Code section 27502.2.

belief that he or his partner would suffer imminent serious bodily injury or death if he did not use deadly force was reasonable under the circumstances. Officers Cha and Patino were in imminent danger of great bodily injury or death (and Patino in fact had already suffered great bodily injury). Cha had the right to defend himself and defend his partner.

48.     In December 2019, a declination report in the Moore matter was finalized. (See Exhibit 1, a true and correct copy of the December 2019 Declination Report.) After detailing the evidence, this report concluded there was no lawful basis to prosecute Officers Kenneth Cha or Colin Patino, and that the facts supported a finding of self-defense. Specifically, the declination report identified the standard of review as "a prosecutor must be satisfied the evidence shows beyond a reasonable doubt that no legal justification existed for the person's actions." (*Id*. at p. 12.) The report stated that, "it cannot be shown Officer Cha acted unreasonably or was not genuinely in fear of suffering great bodily injury when he fired his weapon." (*Id*. at p. 13.) Therefore, charges would not be supported against Ofc. Cha. (*Id*. at p. 15.)

49.     The declination report was finalized under the administration of DA Gascon by then-Managing Attorney for the IIB Unit, Andrew Lah. This final version of the declination report was presented to Gascon for signature in December 2019. However, since Gascon was preparing to leave office at that time, he did not sign the letter.

**Necessary Administrative Policies and Procedures for District Attorney's Offices**

50.     In order to conduct an investigation into these cases, the SFDAO had internal policies and procedures in place to ensure that investigations, and subsequent prosecutions, were conducted properly and lawfully, and with due regard for the constitutional rights of potential suspects. Specifically at issue in this matter, the administrative policies and procedures that were enforced under the Gascon administration related to:

      a.  **Reopening of investigations into declined cases** – In OIS cases where declination reports were drafted previously, a declination report represents a clear finding that the SFDAO has already made an assessment of the evidence in the case and deemed that the case lacked probable cause and/or would not be successfully prosecuted at trial. Therefore, to proceed with re-

opening such cases, the SFDAO and its employees should assess whether any new evidence exists to support a change in status, such that investigation and prosecution would be justified. When cases have been deemed to be closed due to a lack of probable cause, the SFDAO should not re-open the investigation unless they have received new evidence that would justify retracting the declination and asserting the existence of probable cause.

b. **Conflicts of interest and improper bias** – The SFDAO had an ethical responsibility to determine whether SFDAO attorneys and investigators had any ethical conflicts with current cases, such as prior or current representation of an opposing party. (Cal. State Bar Rules of Prof. Conduct, Rule 1.7, Conflict of Interest – Current Clients) Further, the SFDAO had responsibilities to avoid situations where its attorneys had ethical conflicts with past cases. (Cal. State Bar Rules of Prof. Conduct, Rule 1.9, Conflict of Interest – Duties to Former Clients) To comply with ethical rules, the SFDAO had the responsibility to:

- **Identify conflicts or bias**: Identify employees who may have potential ethical or other conflict of interests with SFDAO's past and/or present cases, or had any bias against potential parties to past or present cases.

- **Exclusion of personnel with conflicts of interest on conflicted matters or improper bias**: When conflicts of interest or improper bias were identified on certain cases, the person shall be excluded by an "ethical wall" from the matter, precluding directing actions, making determinations, and even receiving information. Such ethical walls shall be publicized to all involved personnel and maintained to ensure that those who have a conflict are properly screened and if any lapse occurs, it is quickly corrected.

51. In order to ensure that the above policies are effective, the SFDAO and its supervisory

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

personnel must monitor and assess the conduct of SFDAO employees for their compliance with these policies, and must correct and/or discipline employees who are not in compliance with these policies.

**Under Chesa Boudin, the SFDAO Failed to Adopt or Enforce Necessary Administrative Procedures To Require Sufficient New Evidence to Re-Open Declined Cases**

52.    On or about January 2020, Defendant Chesa Boudin assumed office as San Francisco's District Attorney. Under Boudin's administration, the pre-existing policies under the Gascon administration, with regard to the re-assessment of declined cases, were not followed, enforced, or replaced by new policies. Boudin's administration did not follow the established guidelines and rules in place, and did not establish or implement any rules or guidelines at the SFDAO to ensure that, on a previously declined matter, the re-opening of an investigation had new evidence to justify an investigation or prosecution.

53.    Further, under Boudin, the SFDAO did not enforce the policy to assess evidence of self-defense in assault cases before re-opening such cases (evidence of self-defense would negate probable cause).

54.    With respect to the prior SFDAO policy to require new evidence to justify re-opening a declined case, the SFDAO under Boudin failed to assess the conduct of its attorneys in seeking to re-open declined cases, and failed to take disciplinary action for any violations of the established policy regarding the need for new evidence to justify re-opening declined cases.

55.    As a result of these administrative failures, the SFDAO re-opened several declined OIS cases, including the Moore OIS, as well as other declined cases involving Ofc. Terrence Stangel and Ofc. Christopher Samoyoa.

**The SFDAO Failed to Assess or Properly Remediate Conflicts of Interest and/or Problematic Employee Bias, Particularly as to Lateef Gray and Andrew Koltuniak**

56.    As noted, the SFDAO was required under State Bar rules to properly identify conflict of interests involving SFDAO personnel and any active SFDAO cases, and to wall off any employees from cases where a conflict potentially existed.

57.    However, the SFDAO under Boudin, with participation by Gray and Chief of Staff David Campos, failed to continue or enforce prior SFDAO policy related to identifying and protecting

against conflicts of interest, and failed to institute any effective policy on conflicts of interest.

58.     Further, under Boudin, the SFDAO did not adequately enforce conflict(s) of interest policies, and failed to create effective ethical walls around conflicted attorneys or other conflicted SFDAO personnel. The SFDAO did not discipline its employees when conflict of interest rules were violated.

59.     Sometime before January 21, 2020, Boudin offered attorney Lateef Gray a job at the SFDAO. Boudin soon elevated Gray to Managing Attorney for the IIB. Gray, as Managing Attorney of the IIB, would oversee all IIB investigations, including that of the Moore OIS case. This assignment was highly improper. Gray was an obvious, profound conflict of interest with respect to this investigation.

60.     Before working for the Boudin SFDAO, Gray worked at the John Burris Law Firm ("the Burris Firm"). The Burris Firm specializes in suing police departments. Gray initiated a civil lawsuit on behalf of Sean Moore against the City and County of San Francisco, the SFPD and Ofc. Kenneth Cha. In case it is not self-evident, events such as the filing of criminal charges, a holding order after a preliminary hearing, conviction(s) at a trial and the publicity that surrounds a case such as this are of a substantial benefit to plaintiffs counsel in these lawsuits. These actions create leverage for plaintiffs and their lawyers.

61.     For several months following his hiring at the SFDAO, Gray remained named counsel of record in the matter of *Sean Moore v. City and County of San Francisco* [Case No. 3:2018cv00634]. Gray remained as counsel of record, made court appearances and filed papers until March 23, 2020—a date that overlaps with his tenure at the SFDAO.

62.     Because of Gray's active conflict with the Moore matter, Gray should not have had any connection with the Moore OIS investigation. Ethical requirements regarding conflicts of interest would require Gray to be "walled off" from the Cha/Moore criminal case. Gray should not have provided information to any SFDAO personnel working on the case; should not have managed a unit of ADAs and investigators tasked with investigating the matter; should not have had any involvement with decision making in the case; and should not have been able to determine or suggest personnel assignments related to the case.

63.     However, although a conflict of interest between Gray and the Moore OIS investigation was well known in the IIB, there was no effective "ethical wall" to prevent Gray from being involved in the prosecution of a party whose case directly related to his client's civil claims.

64.     Over one hundred days after being hired and even after being promoted to head the IIB, Gray had virtually daily involvement in his client Sean Moore's case. As the IIB Managing Attorney, Gray remained a supervisor of the work of ADAs and investigators assigned to the Sean Moore OIS matter. It is clear that Gray was never effectively "walled off" from the Moore/Cha OIS investigation. Documents show Gray was making strategic decisions in the Moore matter, such as the assignment of various investigators to the case, issues involving expert witnesses, and discussions of strategy.

65.     Throughout this time, Gray apparently still had an open financial interest in the Sean Moore civil lawsuit while he was supervising the same unit that would write arrest warrants for SFPD officers in OIS cases. In June of 2021, while Gray was still employed in Boudin's SFDAO as Managing Attorney of IIB, the San Francisco Board of Supervisors awarded the Moore family $3.25 million. Gray therefore had a bias against Cha and an interest in helping his prior law firm due to his prior representation of Sean Moore, and later, Sean Moore's family. The Burris Firm (Gray's former firm) would have received a significant portion of that award as attorneys' fees and costs. Potentially, Gray could have received, or had a claim on, a portion of those fees. Gray therefore potentially had a direct financial interest in the Moore civil case, constituting a further conflict of interest for Gray's involvement in any OIS investigation related to Moore's death.

66.     Gray's involvement with the Sean Moore OIS investigation of Ofc. Cha and subsequent prosecution, despite Gray's obvious and serious conflicts of interest, was the result of Boudin, Campos, and the SFDAO's failure to institute and/or follow proper and effective policies and procedures for the walling off of attorneys from cases where they had a conflict of interest.

67.     Further, as part of the investigatory team prosecuting criminal conduct at the SFDAO, and as Managing Attorney of the IIB, Lateef Gray had a duty to ensure that the Moore OIS investigation was pursued in an unbiased manner in accordance with State Bar rules regarding conflicts. Gray had an independent duty to exclude himself from the investigation based on his clear conflict of interest due to his representation of Moore and the Moore family.

68.     Despite Lateef Gray's known conflicts of interest, Gray participated in the Cha/Moore matter, by supervising the work of ADAs and investigators assigned to the matter. Further, Gray changed the personnel involved with the case. Gray removed ADA Zisser and investigators Tsuruta, Hayashi, and Pailet from the case, and hired defendant ADAs Dana Drusinsky and Stephanie Lacambra, as well as investigator Koltuniak.

69.     As a result of the absence or ineffectiveness of administrative structures at the SFDAO related to conflict-of-interest requirements, the SFDAO tolerated the conduct of Gray, Koltuniak, and other employees who violated conflict of interest rules and who showed improper bias regarding parties in SFDAO's cases. The SFDAO did not discipline the offending employees; did not correct improper conduct or behavior; and did not remove and/or wall off employees who were in a conflict of interest with current or former clients. The SFDAO did not correct or discipline employees who committed ethical violations related to the prosecution of police officers.

70.     The failure of the SFDAO to issue any declination letter in the Sean Moore OIS investigation was caused in part by the SFDAO's administrative failure to enforce conflict of interest rules and to permit improper bias. This failure negligently allowed the improper involvement of Gray and Koltuniak with the Moore OIS investigation and led to the continuation of the investigation, rather than the signing of the letter ending the investigation.

**Winter 2020: The SFDAO Failed to Issue Declination Letters on Several Declined Cases, Including the Cha/Moore Matter**

71.     As noted, the December 2019 Declination Report by ADA Andrew Lah had concluded there was no viable way to prosecute Officers Kenneth Cha or Colin Patino regarding the Moore OIS incident.

72.     On January 16, 2020, former ADA Aaron Zisser, who was hired by Boudin and Campos and assigned to the Moore case, was asked to reopen the Moore OIS investigation. Zisser prepared a memorandum that references what Zisser termed the "draft declination" by Andrew Lah, and gave a legal analysis regarding self-defense, provocation, and issues around the use of deadly force.

73.     The memorandum opined that the criminal prosecution of Ofc. Cha was without legal

authority or support, concluding that charges were "not reasonable in this case." ADA Zisser also noted that any potentially chargeable offenses had mostly lapsed due to the delay, because more than three years passed since the incident date

74.     Despite the initial declination recommendation by Andrew Lah, and the concurring findings by ADA Zisser confirming that charges were not reasonable, the SFDAO did not sign the existing declination letter, or issue any new declination letter, regarding the Cha/Moore case.

**The SFDAO's Employees Provided Multiple Reports Recommending Declination, Yet the SFDAO Refused to Issue a Declination Letter**

75.     At some point, Boudin and Campos removed ADA Zisser from the Moore OIS case. Lateef Gray assigned Stephanie Lacambra and Dana Drusinsky to the case.

76.     York Tsuruta was the original assigned IIB investigator during the Gascon administration. Tsuruta had prepared a transfer memorandum regarding the Moore OIS concluding that prosecution of Cha was not supported by the evidence.

77.     At this point, the SFDAO should have authorized a declination letter regarding the Moore OIS case in light of standard policies and accepted past practices. They did not.

78.     In June of 2020, Gray (acting as head of the IIB) removed York Tsuruta from the Cha/Moore case and assigned investigator Magen Hayashi.

79.     The SFDAO initially pursued a search warrant for Cha and Patino. ADA Dana Drusinsky requested that Hayashi draft a search warrant and warrant affidavit for Cha and Patino's cellular telephones.

80.     On June 23, 2020, Hayashi's supervisor, Lt. Jeffrey Pailet, was instructed by ADA Lacambra and ADA Drusinky to withhold the transfer memorandum (previously prepared by Tsuruta) from Hayashi, and not permit Hayashi to see the analysis of her predecessor.

81.     In preparing the search warrant affidavit, Hayashi was obligated to present all relevant facts to the magistrate. In drafting and signing such declarations under penalty of perjury, the investigators became affiants, who must declare under penalty of perjury that the facts in the declarations were true and complete to their knowledge. The warrant affidavit should not be misleading, and should include all relevant inculpatory and exculpatory evidence bearing on issues

related to the commission of a crime, including the required element that the shooting was not in self-defense or defense of others.

82.     In her initial work on the case, Hayashi drafted a search warrant affidavit that did, in compliance with her legal and ethical duties, include relevant exculpatory evidence related to Cha's right to self-defense.

83.     SFDAO personnel, including Hayashi and the assigned attorneys Drusinsky and Lacambra, were aware that, after assessing the evidence in the Cha/Moore matter (including exculpatory evidence of self-defense), all of the SFDAO's reviewing investigators and ADAs had concluded that a declination letter should have been signed. However, no declination letter was signed or issued after Hayashi's concurring assessment.

84.     After Hayashi and attorneys Drusinsky and Lacambra assembled various draft search warrants, the SFDAO did not seek any search warrant against Cha or Patino.

85.     In July 2021, the SFDAO empaneled an Investigative Grand Jury to hear evidence regarding the Moore OIS. ADAs Lacambra and Drusinsky made presentations to the Grand Jury with the approval and supervision of DA Boudin, Managing Attorney Gray and Chief of Staff Campos.

86.     The Investigative Grand Jury concluded on July 27, 2021, without charges against Cha or any new evidence implicating Cha. The lack of criminal findings or new evidence at the Grand Jury should have been yet another event that caused the SFDAO to issue a declination letter, which would have ended the investigation into Ofc. Cha. However, after the Grand Jury concluded, the SFDAO did not issue a declination letter regarding the Moore OIS matter.

## Conflicts of Interest And Improper Bias in the SFDAO's Hiring and Assignment of Andrew Koltuniak

87.     At some point in the summer of 2021, Andrew Koltuniak was hired by Boudin and Gray as an IIB investigator. Koltuniak was working in the Public Defender's Office. He had no law enforcement experience and in fact harbored a deep-seated bias against police officers. For the vast majority of his career, he had been employed by the SF Public Defender's Office as a private investigator from 2004 to 2012, and 2018 to 2020.

88.     At the time of his hiring, Koltuniak was not qualified to work in the IIB, due to his lack

of law enforcement experience or experience prosecuting criminal matters. Further, Mr. Koltuniak was not eligible to write warrants, an essential duty of an IIB investigator.

89.     Since Koltuniak was not eligible to write arrest warrants, Boudin and Gray sent Koltuniak through an accelerated police academy, so that he would gain "sworn" status and have the minimal qualifications to draft a warrant. His bias against police officers is demonstrated in the journal style 75-page missive that he published about his experience at the academy entitled, "Cop Factory," in which he hardly veiled his disdain for police and complete lack of professionalism (to include stating that some of his classmates looked like sex offenders, commenting on their appearance, weight and body parts and making allegations that instructors were essentially teaching cadets that they should exterminate people just because they are, "Bad Guys."

90.     Koltuniak has demonstrated a pattern of unethical behavior throughout his career. He has been formally and publicly admonished for his misconduct. In 2015, Koltuniak served as investigator on behalf of a defendant. A jury found the defendant guilty and he appealed. One of the grounds for his appeal was the allegedly post-verdict discovery that a juror had not revealed a prior criminal history. The timing of this revelation was supported by a declaration by Koltuniak. Koltuniak suggested (under oath) that he had uncovered this information after the verdict. However, in a published opinion, the Federal District Court found that Koltuniak had uncovered the juror's criminal history prior to the verdict and had likely intentionally withheld it from the Court to create an issue for an appeal. The Court admonished Koltuniak and the defense for this intentional misrepresentation. (*United States v. Brugnara* (N.D. Cal. Oct. 9, 2015) No. CR 14-0306 WHA, 2015 U.S. Dist.)

91.     Koltuniak would later be hired by the Alameda District Attorney's Office as an investigator under Pamela Price, an ally of Chesa Boudin and former civil rights attorney, much like Gray. Price would also be later recalled. Just like he did in the Cha matter, consistent with his prior conduct, background and bias, as to another warrant affidavit, a judge made findings that Koltuniak had included a "blatant falsehood," that he mislead the judge in his affidavit, made misleading statements and the misrepresentations he made were material. Unsurprisingly, Koltuniak made these misrepresentations in a case where a police officer was criminally charged.

92.     Andrew Koltuniak had both bias and a conflict of interest with respect to the Moore

OIS matter. Koltuniak was assigned to the case without being a sworn police officer, and only obtained sworn status to assist in the prosecution of police officers. He had and continues to demonstrate a bias against police officers.

93.    Lateef Gray, as Managing Attorney of the IIB, should have identified Koltuniak's bias and conflict of interest with OIS cases and with the Cha case. Gray should have implemented conflict of interest procedures, and refrained from hiring Koltuniak due to his conflicts of interest. Alternatively, Gray should have created ethical walls around Koltuniak to prevent Koltuniak from working on the Cha matter or other OIS cases. Instead, Gray (along with Drusinsky and Lacambra) gave Koltuniak assignments in the Cha matter.

**The SFDAO's Criminal Case Against Ofc. Kenneth Cha**

94.    By October 2021, Defendants Gray, Lacambra, Drusinsky, and Koltuniak had uncovered no additional evidence relating to the circumstances of the underlying OIS case. Defendants found nothing to change the initial determinations regarding a lack of probable cause and the inability to establish that the shooting was not in self-defense or defense of others, and knew that charges would be unreasonable in this matter. Despite the knowledge of these SFDAO employees, the SFDA still refused to sign a declination letter.

95.    On October 29, 2021, Koltuniak submitted a request for an arrest warrant for Ofc. Kenneth Cha to Judge Harold Kahn. The warrant submitted charges of voluntary manslaughter (Cal. Pen. Code section 192) and assault with a semiautomatic firearm (Cal. Pen. Code section 245(a)(2)). The request for a warrant was granted that same day.

96.    On or about November 2, 2021, pursuant to the arrest warrant, Ofc. Cha was arrested on charges of voluntary manslaughter and assault with a semiautomatic firearm. The SFDAO then instituted criminal proceedings against Ofc. Cha, with ADA Rebecca Young as lead prosecutor.

**New Managing Attorney of IIB Darby Williams, After Reviewing the IIB Unit and Cha Matter, Moved to Dismiss Charges Against Cha**

97.    On July 8, 2022, the voters of San Francisco recalled Boudin and removed him from office. On January 8, 2023, Brooke Jenkins assumed the role of San Francisco District Attorney. Following this change, the attorneys prosecuting the Cha matter were removed from the case, and

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

ADA Darby Williams was assigned as Managing Attorney of IIB.

98.     As Managing Attorney of IIB, Darby Williams did an internal investigation regarding the SFDAO's handling of several cases, including the Moore OIS. Williams identified the SFDAO's failure to enforce administrative rules and procedures in the Moore OIS. In particular, Williams determined that the SFDAO had failed to enforce SFDAO rules regarding conflicts of interest, specifically with Lateef Gray's involvement. Further, Williams found that the SFDAO had proceeded to re-open OIS cases (such as the Cha/Moore matter) without obtaining new evidence to support further investigation. Williams also found that the SFDAO had repeatedly impaneled grand juries on declined cases, which Williams found to be improper and a waste of SFDAO resources.

99.     On August 19, 2022, Williams sent an email correspondence to the IIB that documented Williams's concerns with the administrative lapses in the unit. (See Exhibit 2, a true and correct copy of the Darby Williams Email.) This email identified specific issues with the IIB under Boudin and Gray, including:

a)  "Multiple attorneys were employed in this Unit who were unqualified to work in it, unaware or uneducated as to what the role of IIB-ADA required, or simply uncommitted to the role of being an ethically based prosecutor." (*Id.*)

b)  "Multiple grand juries impaneled on cases in which prior declinations were issued under prior District Attorney Gascon." (*Id.*)

c)  "Grand juries impaneled to 'test the water' on cases in which an internal determination re the quantum of proof could have been easily made and reached." (*Id.*)

d)  "An attitude of 'choose your own adventure' as cases were investigated not because the facts warranted those investigations, but because of 'mission-like' perspectives that were left completely unchecked." (*Id.*)

e)  "Baseless reopening of cases previously fully investigated and in which declination statements were already authored." (*Id.* at p. 2.)

100.     Due to the administrative failures identified by Williams, the declination letter in the Cha/Moore matter had been rejected, and the case continued through investigation and prosecution.

101.     On June 30, 2023, Williams filed a Motion to Dismiss criminal charges against Ofc.

Cha. In this motion, Williams cited the need for dismissal "in the interest of justice". (See Exhibit 3, a true and correct copy of the Motion to Dismiss.)

102.    Williams stated that the SFDAO was unable to show beyond a reasonable doubt that Ofc. Cha did not act in self-defense, since Moore was the apparent aggressor in this incident and had already caused physical harm. The Motion cited Penal Code section 835, subdivision (a): "A threat of death or serious bodily injury is imminent when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or to another person." (Exhibit 3, Motion to Dismiss, p. 25.)

103.    The Motion stated, "[a] detailed fact-based analysis shows that both officers subjectively believed in the need to use force in self-defense and defense of others. The belief in the need to use deadly force to defend against Moore's assault became acute as Moore became more aggressive and struck Patino in Cha's presence which made Cha's belief objectively reasonable." (*Id.*, at p. 25.) The Motion noted that, just prior to the shooting, "Cha thought he might be Moore's next victim and given what he saw Moore do to Patino, that fear was objectively reasonable. It is also this moment that Cha is faced with the lack of less than lethal options to defend himself as the pepper spray did not work, the baton strikes by Patino were useless, and Moore who has all physical advantage continued to advance." (*Id.*, at p. 26.)

104.    Williams's Motion also identified a clear conflict of interest with respect to Lateef Gray's involvement with the Cha/Moore matter. With regard to the lack of probable cause to support charges against Cha, Williams wrote that there is a "colorable claim that this prosecution was brought for improper reasons. The evidence surrounding improper prosecution motives include the failure to create and maintain ethical walls and the inappropriate handling of proceedings." (*Id.*, at p. 27.) The Motion noted the conflict of interest presented by Gray's continuing involvement with the case: "The pecuniary interest for work done in the civil lawsuit by Moore against the SFPD, coupled with the clear interest surrounding prosecution of the Moore/Cha matter by the Federal Court, means that Gray should have been walled off of the Moore/Cha prosecution in a demonstrable way to avoid any appearance of impropriety." (*Id.* at p. 31.) However, contrary to this "[t]he emails reviewed by this

writer were only produced to the defense in redacted form after a motion to compel which the Boudin administration aggressively opposed…show virtually daily involvement by Gray, as manager of IIB unit since June 30, 2020 and overseer as the IIB Managing Attorney of ADAs Drusinsky and Lacambra." (*Id.* at p. 30.) Williams wrote that these emails show "he made pivotal decisions in the Moore matter such as hiring and payment to expert witnesses, discussions around strategy, and the removal of the DA investigator who had investigated the Moore case from the beginning." (*Id.*)

105.     The Motion also noted serious ethical lapses by ADAs Lacambra and Drusinsky in their presentation to the Grand Jury, particularly the exclusion of exculpatory evidence of the decedent's violence: "[w]hen a district attorney is aware of evidence reasonably tending to negate guilt, the district attorney is obligated to inform the grand jury of its nature and existence." (*Id.* at p. 32.) "Here, the propensity for violence by the decedent and most importantly acts of violence to the C.C. [Choy] family would be highly relevant in establishing that Cha's responses to Moore were reasonable and that it was Moore who was likely the aggressor, supporting Cha's claim of lawful self-defense or defense of his partner." (*Id.* at p. 34.) The Motion continued that the "failure to present this exculpatory evidence, or to tell the jurors that they had the power to investigate this concern so as to evaluate Moore's violent character was a significant omission." (*Id.*) The Motion summarized the outcome of the Grand Jury as such "Ultimately, and most importantly, this 'investigative grand jury' did not uncover any new evidence to change the legal analysis through multiple attorneys that this case was not prosecutable." (*Id.*)

106.     Based on the many serious problems with the case, the Motion then concluded dismissal was required in the interests of justice. (*Id.* at p. 35)

107.     The statements of fact, expressions of opinion, and conclusions in SFDAO's Motion to Dismiss constitute party admissions by the SFDAO.

108.     On July 18, 2023, the Court granted the Motion to Dismiss all charges against Ofc. Cha.

109.     Because of the SFDAO's inadequate administrative procedures and enforcement regarding management of conflicts of interest and improper bias involving its employees, the SFDAO permitted Lateef Gray and Andrew Koltuniak to work on the Moore OIS case despite their conflicts of interest.

110.    Because of the SFDAO's inadequate administrative procedures and enforcement regarding the need for new evidence to justify re-opening declined cases, the SFDAO failed to issue any declination letter in the Moore OIS case.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

111.    On December 28, 2024, Plaintiff Kenneth Cha timely filed a claim against Defendants pursuant to Government Code section 910, regarding the matters set forth herein.

112.    On February 7, 2024, Defendant City and County of San Francisco sent a letter to Plaintiff's counsel, advising that Defendant believed there was "no indication of liability on the part of the City and County," and further advising that, "your claim is DENIED."

113.    Pursuant to Government Code section 945.6, Plaintiff hereby files the instant Complaint within six months of Defendant City and County of San Francisco's denial of Plaintiff's claims.

### FIRST CLAIM FOR RELIEF – VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) – MALICIOUS PROSECUTION – ADMINISTRATIVE POLICIES CAUSING DEPRIVATION OF RIGHTS (MONELL) - INADEQUATE ADMINISTRATIVE POLICIES FOR THE RE-EVALUATION OF DECLINED CASES

### (AGAINST DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE; CHESA BOUDIN; AND LATEEF GRAY)

114.    Plaintiff incorporates the preceding paragraphs of this Complaint as if the facts in each paragraph were set forth in full in this Claim for Relief.

115.    On or about November 2, 2021, Defendants City and County of San Francisco ("CCSF") and the SFDAO charged Plaintiff Kenneth Cha with voluntary manslaughter (Penal Code section 192) and assault with a semiautomatic firearm (Penal Code section 245(a)(2)) in the criminal courts in the Superior Court of California, City and County of San Francisco, case number 21010958. The prosecution of Plaintiff Cha was conducted by the SFDAO, based on the investigation, actions, and statements of Defendants CCSF; SFDAO; Chesa Boudin; Lateef Gray; Dana Drusinsky; Stephanie Lacambra; Andrew Koltuniak; and DOES 1-100, as described herein.

116.    At all times relevant to this Complaint, while Defendants Chesa Boudin; Lateef Gray; and DOES 1-100 were creating and promulgating the SFDAO administrative policies as described in this First Claim for Relief, these defendants were acting in the course and scope of their employment with Defendants CCSF and/or the SFDAO.

117.    As to this Claim for Relief, Plaintiff names individual Defendants Chesa Boudin; Lateef Gray; Dana Drusinsky; and Stephanie Lacambra, in their official capacities. Defendants' conduct as described herein was performed pursuant to the policy, custom, or practice of Defendants CCSF and the SFDAO.

118.    As to the conduct described herein, Defendants, and each of them, acted under color of law.

119.    Plaintiff Cha was subjected to a violation of his right to be free of unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution, as a result of the customs, practices, and policies of defendants CCSF and SFDAO, as described herein.

120.    During the prior administration of the SFDAO under DA Gascon, the Sean Moore shooting was investigated by SFDAO personnel. In December 2019, Managing Attorney for the IIB, Andrew Lah, finalized a declination report. Based on the facts discovered in this investigation, SFDAO personnel concluded that there was no probable cause to prosecute Cha and made a decision to decline to prosecute Cha.

121.    The prior SFDAO assessment, to decline further prosecution, was rationally based on 1) evidence of Cha's need for self-defense in the face of imminent attacks from Sean Moore that could reasonably cause great bodily harm or death; and 2) lack of clear evidence to support causation of death, since the shooting incident was over three years prior to the decedent's death, and there were other potential medical causes of death.

122.    In order to preserve the constitutional rights of the accused, and pursuant to the standard of care for District Attorney's offices regarding declined cases, there must be some new evidence or some compelling rationale to re-open cases that were evaluated for declination. A District Attorney's office should set up a system of evaluation for declined cases, that requires new evidence or some compelling rationale to re-open declined cases.

123.    In order to preserve the constitutional rights of the accused, and pursuant to the standard of care for District Attorney's offices regarding assault and/or manslaughter cases, a District Attorney office should institute policies and procedures that require the assessment of any potential evidence of self-defense, as a defense that would negate probable cause.

124.    The administrative policies and procedures stated herein are necessary to prevent an injury to the constitutional rights of the accused to be free from unconstitutional searches and seizures. A reasonable District Attorney's office would have instituted necessary policies and procedures, and enforced such policies and procedures by *inter alia* correcting and/or disciplining ADA's who violated procedures by re-opening cases without new evidence

125.    On or about January 2020, Defendant Chesa Boudin assumed the office of District Attorney for the City and County of San Francisco. Defendant Boudin, on becoming the DA, had the power to set administrative policy at the SFDAO. With respect to the policies of the SFDAO office described herein, Defendant Chesa Boudin exercised substantial independent authority and judgment in decision-making such that these defendants' decisions ultimately determined policy at the SFDAO.

126.    Under Boudin, the SFDAO did not follow established policy and procedure regarding re-opening declined cases. The SFDAO did not properly institute or implement any system of evaluation that required new evidence or some compelling rationale to re-open declined cases.

127.    Defendant SFDAO did not establish proper and effective procedures to assess whether there was any new evidence that would support a change in status from the prior declination, or any procedures for assessing the new evidence against the previous determination of no probable cause.

128.    Defendant SFDAO did not enforce any policy regarding the re-evaluation of declined cases, and did not correct or discipline those of its employees who re-opened declined cases without any new evidence to justify the re-opening of the case.

129.    Prior to Boudin's tenure, the SFDAO had made decisions to decline to prosecute several cases against police officers, including the Cha/Moore OIS matter as well as cases involving Ofc. Terrence Stangel and Ofc. Christopher Samayoa.

130.    During Boudin's tenure, and due to the improper administrative policies and procedures at the SFDAO relating to evaluating declined cases, the SFDAO failed to sign or issue the draft declination letter regarding the Cha/Moore matter.

131.    Due to the improper administrative policies at the SFDAO relating to evaluating declined cases, the SFDAO also failed to issue declination letters in the Stangel and Samoyoa cases.

132.    Due to the improper administrative policies at the SFDAO relating to evaluating

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

declined cases, the SFDAO failed to correct or discipline employees who instituted investigations of declined cases without new evidence or theories of liability.

133.    Defendant SFDAO did not correct or discipline any of its employees for re-opening the Cha/Moore matter, despite the absence of any new evidence to justify re-opening the case.

134.    On July 8, 2022, Boudin was recalled and left office. On January 8, 2023, Brooke Jenkins assumed the role of San Francisco District Attorney.

135.    On July 18, 2023, the Court granted Managing Attorney Darby Williams's Motion to Dismiss regarding all charges against Ofc. Cha.

136.    Had the SFDAO implemented proper administrative policies and procedures for the evaluation of declined cases, the declination letter regarding Cha would have issued, and there would not have been any further investigation or prosecution in the Cha matter.

137.    As a result of the SFDAO's failure to implement proper administrative policies and procedures for the evaluation of declined cases, the SFDAO failed to issue a declination letter, and Plaintiff Cha was instead subjected to an investigation and prosecution for voluntary manslaughter and assault with a deadly weapon.

138.    The customs, practices, and policies of defendant SFDAO described in this First Claim for Relief amounted to deliberate indifference to the rights of persons, such as the plaintiff, whose Fourth Amendment rights were violated by improper investigations, arrests, and prosecutions.

139.    As a result of the customs, practices, and policies of Defendants CCSF and/or the SFDAO, which constituted municipal policy, as aforesaid, Plaintiff Kenneth Cha was subjected to a violation of his right to be free from improper investigation and malicious prosecution, under the Fourth and Fourteenth Amendments to the United States Constitution.

140.    As a result of the customs, practices, and policies of Defendants CCSF and/or SFDAO, and DOES 1-100, and each of them, resulting in the improper investigation, arrest, and criminal prosecution of Plaintiff Kenneth Cha, Plaintiff has been damaged by reason thereof in at least the following respects:

A.    Loss of personal freedom;

B.    Payments necessary for bond and expenses of defense, including attorneys' fees;

C.     Pain and suffering, both physical and emotional; and

D.     Loss of reputation in the community of the City and County of San Francisco, California, and in the State of California generally.

141.    Plaintiff has been compelled to employ the undersigned attorneys to represent him in this matter, and is entitled to recover reasonable attorneys' fees for the services of his attorneys herein.

WHEREFORE, Plaintiff Kenneth Cha prays for relief against Defendants CCSF; the SFDAO and DOES 1-100, and each of them, as hereinafter set forth.

**SECOND CLAIM FOR RELIEF – VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) - MUNICIPAL POLICY RESULTING IN DEPRIVATION OF RIGHTS (*MONELL*) - INADEQUATE ADMINISTRATIVE POLICIES FOR ASSESSING AND MANAGING ATTORNEYS' CONFLICTS OF INTEREST AND/OR IMPROPER BIAS**

**(AGAINST DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE; CHESA BOUDIN; LATEEF GRAY; DANA DRUSINSKY; STEPHANIE LACAMBRA)**

142.    Plaintiff incorporates the preceding paragraphs of this Complaint as if the facts in each paragraph were set forth in full in this Claim for Relief.

143.    As to this Claim for Relief, Plaintiff names individual Defendants Chesa Boudin; Lateef Gray; Dana Drusinsky; and Stephanie Lacambra, in their official capacities. Defendants' conduct as described herein was performed pursuant to the policy, custom, or practice of Defendants CCSF and the SFDAO.

144.    With respect to the policies, customs, and/or practices of the SFDAO described herein, Defendant Chesa Boudin, as the District Attorney of San Francisco, exercised substantial independent authority and judgment in decision-making such that these defendants' decisions ultimately determined policy at the SFDAO.

145.    On or about January 21, 2020, DA Boudin offered Lateef Gray the position of Managing Attorney for the IIB. Plaintiff is informed and believes that, with respect to the policies of the SFDAO described herein, relating to the identification of attorney conflicts of interest and the maintenance of ethical walls to mitigate conflicts, Defendants Lateef Gray exercised substantial independent authority and judgment in decision-making, such that these defendants' decisions ultimately determined policy at the SFDAO. The SFDAO policies and procedures described in this Claim for Relief were established in part by decisions by Defendant Gray, who acted together with

Boudin related to these policies.

146.    As to the conduct described herein, Defendants, and each of them, acted under color of law.

147.    Plaintiff Cha was subjected to a violation of his right to be free of unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution, as a result of the customs, practices, and policies of Defendants CCSF and the SFDAO, as described herein.

148.    As a law office, the SFDAO had an ethical responsibility to determine whether prospective SFDAO attorneys or other employees had any ethical conflicts with current cases, such as prior or current representation of an opposing party. (Cal. State Bar Rules of Prof. Conduct, Rule 1.7, Conflict of Interest – Current Clients.) Further, the SFDAO had responsibilities to avoid situations where its attorneys had ethical conflicts with past cases. (Cal. State Bar Rules of Prof. Conduct, Rule 1.9, Conflict of Interest – Duties to Former Clients.)

149.    Pursuant to State Bar rules, and pursuant to accepted standards at District Attorney's Offices throughout the State of California, the SFDAO was required to adopt effective policies and procedures 1) to identify conflicts of interest between its attorneys and any past and current cases; and 2) to exclude attorneys who had conflicts of interest from any responsibility or contact with matters where the SFDAO represented a conflicted party.

150.    Defendant Lateef Gray had a direct conflict with the Sean Moore investigation, as Gray was involved with the representation of Moore and Moore's family regarding the same incident. However, as a result of the SFDAO's deficient policies regarding ethical screening, Defendant Boudin hired Lateef Gray and assigned him as the Managing Attorney of the IIB. In that position, Gray managed a unit that was investigating the Sean Moore shooting, despite Gray's involvement with the Sean Moore civil case. The SFDAO's hiring of Gray created a direct conflict of interest with the Cha/Moore matter.

151.    Defendants SFDAO, Boudin, and Gray did not establish proper procedures to ensure that all SFDAO employees with potential conflicts of interest with certain cases were prevented from having contact or influence on the investigation or prosecution of the conflicted cases (an "ethical wall"). Defendants did not set up procedures to make sure that the "ethical walls" would be monitored

and maintained while the conflict existed, to ensure that employees remained separated from conflicted cases. Gray had an independent duty as an attorney, and as the Managing Attorney of the IIB unit, to ensure effective ethical walls were in place regarding his own conflicted cases, including the Cha matter.

152.     As a result of the inadequate SFDAO policies and procedures related to conflict screening and necessary ethical walls, Defendant Gray was not effectively screened off from the Cha matter. Gray was in fact involved with the Cha matter, by communicating with SFDAO personnel regarding the Cha matter, and directing the conduct of SFDAO employees Dana Drusinsky, Stephanie Lacambra and Andrew Koltuniak

153.     Defendants Dana Drusinsky and Stephanie Lacambra were aware of Lateef Gray's conflict of interest with the Moore OIS matter. Despite this knowledge, Drusinsky and Lacambra did not maintain any ethical wall between Gray and the Moore OIS matter. Drusinsky and Lacambra took direction from Gray regarding the case, and shared information regarding the case with Gray.

154.     The lack of proper procedures at the SFDAO to maintain an ethical wall around conflicted attorneys enabled Defendant Gray, who was biased against Cha and other officers in OIS cases due to his conflict of interest, to exert a biased influence and direction on the SFDAO's handling of the Cha/Moore matter.

155.     Andrew Koltuniak had a conflict of interest with respect to the Moore OIS matter. Koltuniak was assigned to the Moore OIS case without being a sworn peace officer. He had an emotional bias against police officers, and had demonstrated prior unethical behavior related to police.

156.     Lateef Gray, as Managing Attorney of the IIB, should have identified Koltuniak's conflict of interest with OIS cases including the Cha case. Gray should have implemented conflict of interest procedures, and refrained from hiring Koltuniak due to his conflicts of interest and bias. Alternatively, Gray should have created ethical walls around Koltuniak to prevent Koltuniak from working on the Cha matter or other OIS cases.

157.     The lack of proper procedures at the SFDAO to maintain an ethical wall around conflicted attorneys enabled Defendant Koltuniak, who was biased against Cha and other officers in OIS cases due to his conflict of interest, to exert a biased influence and direction on the SFDAO's

1    handling of the Cha matter.

2    158.    As a result of the absence or ineffectiveness of administrative structures at the SFDAO

3    related to conflict-of-interest requirements, the SFDAO tolerated the conduct of Gray, Koltuniak and

4    other SFDAO employees who violated conflict of interest rules. The SFDAO did not discipline the

5    offending employees; did not correct improper conduct or behavior; and did not remove and wall off

6    employees who were in a conflict of interest with current or former clients. The SFDAO did not

7    correct or discipline employees who committed ethical violations related to the prosecution of police

8    officers.

9    159.    As a result of the SFDAO's failure to implement and/or to enforce proper

10    administrative policies and procedures for the assessment and management of its attorneys' conflicts of

11    interest, a declination letter was not issued in the Cha/Moore matter, and Cha was subjected to an

12    investigation and prosecution for voluntary manslaughter and assault with a deadly weapon.

13    160.    The customs, practices, and policies of Defendant SFDAO described in this Second

14    Claim for Relief amounted to deliberate indifference to the rights of persons, such as the plaintiff,

15    whose Fourth Amendment rights were violated by improper investigations, arrests, and prosecutions.

16    161.    As a result of the improper administrative policies of Defendants CCSF, SFDAO, Chesa

17    Boudin, Lateef Gray and DOES 1-100, as described herein, Plaintiff has been damaged by reason

18    thereof in at least the following respects:

19        A.    Loss of personal freedom;

20        B.    Payments necessary for bond and expenses of defense, including attorneys' fees;

21        C.    Pain and suffering, both physical and emotional; and

22        D.    Loss of reputation in the community of the City and County of San Francisco,

23        California, and in the State of California generally.

24    162.    Plaintiff has been compelled to employ the undersigned attorneys to represent him in

25    this matter, and is entitled to recover reasonable attorneys' fees for the services of his attorneys herein.

26    WHEREFORE, Plaintiff Kenneth Cha prays for relief from Defendants CCSF, SFDAO, Chesa

27    Boudin, Lateef Gray and DOES 1-100, and each of them, as hereinafter set forth.

28    ///

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

### PRAYER

WHEREFORE, with respect to each claim for relief listed above, Plaintiff Kenneth Cha prays for relief against Defendants CCSF, SFDAO, Chesa Boudin, Dana Drusinsky, Stephanie Lacambra, Lateef Gray, Andrew Koltuniak, and DOES 1-100, and each of them, as follows:

1.    Compensatory and general damages in an amount according to proof;

2.    Statutory damages, treble damages, and penalties pursuant to California Civil Code §52(b);

3.    Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 USC §1988; California Civil Code §51.7, 52, and 52.1; and California Code of Civil Procedure §1021.5;

4.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 USC §§1983 and 1988, Cal. Code of Civ. Proc. §§377.20 et seq. and 377.60 et seq. and as otherwise may be allowed by California and/or federal law;

5.    Pre- and post-judgment interest as permitted by law; and

6.    Such other and further relief as this Court may deem appropriate.

Further, as against Defendants Chesa Boudin; Dana Drusinsky; Stephanie Lacambra; Lateef Gray; and Andrew Koltuniak only, Plaintiff prays for exemplary and punitive damages under 42 U.S.C. §1983 and California Civil Code section 3294, in an amount according to proof.


Dated: October 30, 2025                             Respectfully submitted,

                                                    **RAINS LUCIA STERN**
                                                    **ST. PHALLE & SILVER, PC**


                                                    /s/ *Eustace de Saint Phalle*
                                                    By: Eustace de Saint Phalle
                                                    Attorneys for Plaintiff Kenneth Cha

///

///

///

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

As to the matters complained of herein against Defendants CCSF; SFDAO; Chesa Boudin; Dana Drusinsky; Stephanie Lacambra; Lateef Gray; Andrew Koltuniak; and DOES 1-100, and each of them, Plaintiff Kenneth Cha demands a trial by jury.


Dated: October 30, 2025                    Respectfully submitted,

                                           **RAINS LUCIA STERN**
                                           **ST. PHALLE & SILVER, PC**


                                           /s/ *Eustace de Saint Phalle*
                                           By: Eustace de Saint Phalle
                                           Attorneys for Plaintiff Kenneth Cha

SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL