United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

KENNETH CHA,
Plaintiff,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al.,
Defendants.

Case No. 24-cv-04700-PHK

**ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. 55

## INTRODUCTION

This is a Section 1983 lawsuit in which Plaintiff Kenneth Cha (a San Francisco police officer at the times relevant to this case) alleges that the Defendants violated his civil rights. The Court previously granted Defendant's Motion to Dismiss the First Amended Complaint ("FAC"). Plaintiff filed his Second Amended Complaint ("SAC") on October 30, 2025. Now before the Court is Defendants' Motion to Dismiss Plaintiff Cha's SAC. [Dkt. 55]. After carefully reviewing the Parties' briefing, all accompanying submissions and materials, and holding a hearing on these matters, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Motion to Dismiss the SAC for the reasons discussed herein.

## RELEVANT BACKGROUND

The factual summary herein is based on the facts as alleged in the SAC. [Dkt. 54]. Familiarity with the facts and background is also assumed, based on the Court's previous Order dismissing the FAC.

**The Officer-Involved Shooting**

This lawsuit arises out of the San Francisco District Attorney's investigation into and

ultimate prosecution of Plaintiff Cha in connection with Cha's involvement as a police officer in a shooting of a third-party, Sean Moore. *See* Dkt. 55. Plaintiff Cha "is and was a police officer employed by the San Francisco Police Department," although he now apparently resides in South Pasadena, California. *Id.* at ¶ 17. In 2017, Plaintiff Cha responded to a call and encountered Mr. Moore. *Id.* at ¶¶ 30–37. At some point during this encounter, Plaintiff Cha discharged his firearm, leaving Mr. Moore with multiple gunshot wounds. *Id.* at ¶ 38. On January 20, 2020, Mr. Moore died. *Id.* at ¶ 42. The coroner ruled Moore's death a homicide since it "was primarily attributed to acute intestinal obstructions and severe abdominal adhesions from the gunshot three plus years prior." *Id.* at ¶¶ 40–43.

**<u>The Investigation of Plaintiff Cha in 2017</u>**

Plaintiff Cha was not immediately prosecuted in connection with the 2017 shooting incident. At the time of the 2017 incident, the San Francisco District Attorney ("DA") was George Gascon. As detailed further herein, DA Gascon's office started an investigation into the shooting of Mr. Moore by Plaintiff Cha. That investigation included preparation of a December 2019 report on the incident. Ultimately, during DA Gascon's tenure (which ended in December 2019), Plaintiff Cha was not charged in connection with the shooting of Mr. Moore.

More specifically, during DA Gascon's tenure subsequent to the January 6, 2017 shooting, the SFDAO's Independent Investigation Bureau ("IIB") investigated the incident between Plaintiff, Mr. Moore, and another San Francisco Police Officer present at the time, Officer Colin Patino. *Id.* at ¶¶ 44, 47. After this 2017 investigation, the SFDAO found no cause for initiating a criminal case against Plaintiff or Officer Patino. *Id* at ¶ 45. York Tsuruta was the original assigned Investigator and remained on the case until June 2020. *Id.* at ¶¶ 76, 78.

In December 2019, Andrew Lah, the then-Managing Attorney for the IIB allegedly "finalized" a declination report, which allegedly "concluded there was no lawful basis to prosecute Officers Kenneth Cha or Colin Patino, and that the facts supported a finding of self-defense." *Id.* at ¶¶ 48–49. The "finalized" declination report was presented to then-District Attorney George Gascón to sign in December 2019, but because "Gascon [*sic*] was preparing to leave office at that time, he

did not sign the [declination] letter."[1] *Id*. at ¶ 49.

**The Investigation and Prosecution of Plaintiff Cha in 2020**

When Defendant Chesa Boudin took office as the newly elected San Francisco DA in January 2020, the San Francisco District Attorney's Office ("SFDAO") investigated the events surrounding Plaintiff Cha and the shooting of Mr. Moore. In November 2021, Plaintiff Cha was charged with voluntary manslaughter and assault with a semiautomatic firearm in connection with the shooting of Mr. Moore.

In January 2020, Defendant Boudin assumed office as District Attorney. *Id*. at ¶ 52. Defendant Boudin is now the former DA for San Francisco and is being sued in his official capacity. *Id.* at ¶ 20. Plaintiff identifies "Boudin's administration" as responsible for not following, enforcing, or replacing existing policies for the Re-Opening Theory. *Id.* Relatedly, "under Boudin, the SFDAO did not enforce the policy to assess evidence of self-defense" for the Re-Opening Theory. *Id.* at ¶ 53. Additionally, the SFDAO is alleged to have failed to adequately enforce or create an effective Conflict of Interest Theory, and "did not discipline its employees when conflict of interest rules were violated." *Id.* at ¶ 58. Plaintiff alleges at no time did SFDAO correct or discipline any employees for violating the Re-Opening Theory, Conflict of Interest Theory, or professional ethics rules such as California State Bar Conflict of Interest Rules. *Id.* at ¶¶ 51, 58, 69, 128, 132–33, 158.

The SAC alleges that the SFDAO re-opened "several" previously declined cases, for himself, Officer Terrence Stangel, and Officer Christopher Samayoa.[2] *Id.* at ¶ 55. The SAC alleges that the SFDAO decided to decline to prosecute Officers Stangel and Samayoa, but due to the Re-Opening Theory under Defendant Boudin, SFDAO "also failed to issue declination letters in the Stangel and Samoyoa cases." *Id.* at ¶¶ 129, 131.

Plaintiff identifies Defendants Gray and Koltuniak as the only Defendants with "conflicts of interest and improper bias." *Id.* at ¶ 109. Defendant Andrew Koltuniak is being sued in his official capacity as an Investigator within the IIB of the SFDAO. *Id.* at ¶ 24. *Id.*

On January 16, 2020, Assistant DA Aaron Zisser, "who was hired by [Defendant] Boudin

[1] The SAC uses "letter" and "report" interchangeably to refer to the declination document.
[2] Plaintiff variously spells Officer Samayoa's name as "Samoyoa."



United States District Court
Northern District of California

and Campos and assigned to the Moore case, was asked to reopen" the Moore investigation and at some point prepared a memorandum, in which he referred to the prior document prepared by Mr. Lah as a "draft declination." *Id.* at ¶ 72. ADA Zisser opined that charges against Plaintiff were "not reasonable" and noted statute of limitations issues. *Id.* at ¶ 73.

Plaintiff alleges that Defendants Boudin and Lateef Gray, as well as Chief of Staff David Campos, "failed to continue or enforce" existing SFDAO policy related to identifying and protecting against conflicts of interest, and failed to institute an effective policy regarding conflicts. *Id*. at ¶ 57. Defendant Lateef Gray is the former Managing Attorney of the Independent Investigation Bureau ("IIB") of the SFDAO, and is being sued in his official capacity. *Id*. at ¶ 21. Sometime before January 21, 2020, Defendant Boudin hired Defendant Gray in the SFDAO, and Boudin "soon elevated [Defendant] Gray to Managing Attorney for the IIB." *Id*. at ¶ 59. In this role, Defendant Gray oversaw all IIB investigations, including that of Plaintiff's shooting of Mr. Moore. *Id.*

Before joining the SFDAO, Defendant Gray represented Mr. Moore in a civil lawsuit against the City and County of San Francisco, the San Francisco Police Department, and Plaintiff while at the John Burris Law Firm. *Id*. at ¶ 60. Plaintiff alleges that while employed at the SFDAO, Defendant Gray "remained named counsel of record" in *Sean Moore v. City and County of San Francisco* [Case No. 3:2018cv00634], and that he "made court appearances and filed papers until March 23, 2020." *Id*. at ¶ 61. Defendant "Gray had virtually daily involvement in his client Sean Moore's case," while supervising ADAs and investigators assigned to Plaintiff's matter. *Id*. at ¶ 64. "Documents show [Defendant] Gray was making strategic decisions in the Moore matter, such as the assignment of various investigators to the case, issues involving expert witnesses, and discussions of strategy." *Id.* Specifically, Defendant Gray removed ADA Zisser and Investigators Tsuruta and Magen Hayashi and assigned Defendants Dana Drusinsky, Stephanie Lacambra, and Andrew Koltuniak to the investigation into Plaintiff Cha. *Id*. at ¶¶ 68, 75.[3] Defendant Dana Drusinsky is being sued in her official capacity as a San Francisco Assistant District Attorney. *Id.*

[3] There is a discrepancy in the Second Amended Complaint, where at paragraph 68, Plaintiff alleges Defendant Gray was solely responsible for these staff assignments, while at paragraph 75, Plaintiff alleges Defendant Boudin and David Campos removed ADA Zisser, and Defendant Gray assigned Defendants Lacambra and Drusinsky.

at ¶ 22. *Id.* Defendant Stephanie Lacambra is being sued in her official capacity as a San Francisco Assistant District Attorney. *Id.* at ¶ 23.

In June 2020, Defendant Gray removed the original IIB investigator, York Tsuruta, from the Moore case, and assigned Investigator Magen Hayashi. *Id.* at ¶¶ 76, 78. On June 23, 2020, Defendants Lacambra and Drusinsky instructed Investigator Hayashi's supervisor[4] to withhold a transfer memorandum prepared by Investigator Tsuruta from Investigator Hayashi. *Id.* at ¶ 80. Defendant Drusinsky instructed Investigator Hayashi to draft search warrants and supporting affidavits for the cell phones of Plaintiff and Officer Patino, though SFDAO did not end up seeking any search warrants. *Id.* at ¶¶ 79, 84.

In June 2021, Mr. Moore's family received $3.25 million from the San Francisco Board of Supervisors. *Id*. at ¶ 65. Defendant Gray had a potential financial interest in this money. *Id.* The SAC alleges Defendant Gray's financial interest in Mr. Moore's civil case created bias against Plaintiff "and an interest in helping his prior law firm." *Id.* SFDAO did not wall off, discipline, or correct Defendants Gray, Koltuniak, or others for violating conflict of interest or ethical rules. *Id*. at ¶ 69.

In July 2021, an investigative Grand Jury was empaneled and received evidence of Mr. Moore's shooting by Plaintiff. *Id*. at ¶ 85. At the Grand Jury hearings, under the supervision of Campos and Defendants Boudin and Gray, Defendants Drusinsky and Lacambra presented evidence about the January 6, 2017 shooting. *Id*. The Grand Jury "concluded on July 27, 2021, without charges against [Plaintiff] Cha or any new evidence implicating [Plaintiff] Cha." *Id.* at ¶ 86.

At some point in summer 2021, Defendant Koltuniak was hired by Defendant Boudin and Defendant Gray as an IIB Investigator. *Id.* at ¶ 87. To make him eligible to write arrest warrants, which he could not do upon hiring "due to his lack of law enforcement experience or experience prosecuting criminal matters," which Plaintiff alleges made him "not qualified," Defendants Boudin and Gray sent Defendant Koltuniak to an "accelerated police academy." *Id.* at ¶¶ 88–89.

Plaintiff alleges Defendant Koltuniak had "a deep-seated bias against police officers"

[4] It is unclear from the alleged facts whether Investigator Hayashi's supervisor, Lt. Jeffrey Pailet, was also assigned to the Moore matter.

because he worked at the San Francisco Public Defender's Office as a private investigator for about ten years beginning in 2004, and because he published a "75-page missive" called "Cop Factory" in which he expressed "disdain for police and complete lack of professionalism" by making critical comments about the training he received, as well as negative personal comments about police officers. *Id.* at ¶ 87, 89.

Plaintiff alleges Defendant Koltuniak had a "pattern of unethical behavior throughout his career." *Id.* at ¶ 90. First, Defendant Koltuniak was admonished in 2015 for making a misrepresentation in a sworn declaration in *United States v. Brugnara*, No. CR 14-0306 WHA, 2015 WL 5915567 (N.D. Cal. Oct. 9, 2015). *Id.* The SAC also alleges that a judge made findings that Defendant Koltuniak made misrepresentations and a "blatant falsehood" in an affidavit in a matter where a police officer was criminally charged by Alameda County District Attorney's Office under Pamela Price (although the SAC does not identify the judge, the court, or case name or docket number). *Id.* at ¶ 91. Plaintiff identifies former DA Price as "an ally of [Defendant] Chesa Boudin and former civil rights attorney, much like [Defendant] Gray." *Id.* Plaintiff alleges Defendant Koltuniak had "both bias and a conflict of interest" against Plaintiff because he "was assigned to the case without being a sworn police officer, and only obtained sworn status to assist in the prosecution of police officers." *Id.* at ¶ 92.

On October 29, 2021, Defendant Koltuniak submitted an application for an arrest warrant to California Superior Court Judge Harold Kahn seeking an arrest of Plaintiff Cha. That arrest warrant was granted later the same day. *Id*. at ¶ 95. On or about November 2, 2021, Plaintiff was arrested on charges of voluntary manslaughter and assault with a semiautomatic firearm, and criminal charges were brought against Plaintiff with ADA Rebecca Young as lead prosecutor. *Id*. at ¶ 96.

**<u>The End of the Prosecution of Plaintiff Cha in 2023</u>**

On July 8, 2022, Defendant Boudin lost a recall election and was replaced by Brooke Jenkins as DA. San Francisco DA Jenkins took office on January 8, 2023. Under the tenure of DA Jenkins, the charges against Plaintiff Cha were ultimately dismissed on July 18, 2023.

As noted, on July 8, 2022, Defendant Boudin was recalled and later left office. *Id*. at ¶ 97. On January 8, 2023, Brook Jenkins assumed the role of SFDAO. *Id*. The attorneys prosecuting

United States District Court
Northern District of California

Plaintiff were removed and ADA Darby Williams replaced Defendant Gray as Managing Attorney of IIB. *Id.* ADA Williams investigated SFDAO's handling of "several cases," including Plaintiff's, and determined there was a failure to enforce a policy to identify and address conflicts of interest (referred to herein as the Conflict of Interest Theory) due to Defendant Gray's involvement, as well as a violation of the alleged procedures and policies regarding reopening cases which had previously been declined prosecution (referred to herein as the Re-Opening Theory). *Id.* at ¶ 98. ADA Williams sent an email on August 19, 2022 to the IIB documenting "administrative lapses." *Id.* at ¶ 99; Dkt. 54-2.

On June 30, 2023, ADA Williams filed a Motion to Dismiss the charges against Plaintiff. [Dkt. 54 at ¶ 101; Dkt. 54-3]. On July 18, 2023, the California Superior Court granted the Motion to Dismiss all charges against Plaintiff. *Id.* at ¶ 108.

**Procedural History**

On December 28, 2023,[5] Plaintiff Cha "timely filed a claim against Defendants pursuant to Government Code section 910." *Id.* at ¶ 111. On February 7, 2024, Defendant City and County of San Francisco sent a letter to Plaintiff Cha's counsel, advising that Defendant City and County of San Francisco "believed there was 'no indication of liability on the part of the City and County,'" and further advising that, "your claim is DENIED." *Id.* at ¶ 112.

Plaintiff filed the original Complaint in this action in August 2024. [Dkt. 1]. Plaintiff filed the FAC on May 23, 2025. [Dkt. 34]. As noted, the Court granted Defendants' motion to dismiss the FAC in September 2025 with leave to amend as to the *Monell* claims. [Dkt. 53]. Plaintiff then filed the currently operative Second Amended Complaint ("SAC") in October 2025. [Dkt. 54].

As a general matter, the SAC alleges two distinct policies, practices, or customs underlying two claims for relief. The SAC styles the First Cause of Action as "Malicious Prosecution–Administrative Policies Causing Deprivation of Rights (*Monell*) – Inadequate Administrative Policies for the Re-Evaluation of Declined Cases." [Dkt. 54 at 24]. Throughout the SAC, Plaintiff

[5] Plaintiff's Second Amended Complaint states this date as December 28, 2024, but due to context and the fact that responses from the City were sent in February 2024, the Court interprets this pleading as a typographical error and that the intended date is December 28, 2023.

characterizes this theory of liability as based on a policy (or lack thereof) of "re-opening" an investigation which had been previously closed or "re-opening declined cases." *Id.* at ¶¶ 7–8, 12, 50–55, 98, 110, 122–133. For ease of reference, the Court refers to this theory of liability under the First Cause of Action as the "Re-Opening Theory".

Plaintiff styles the Second Cause of Action as "Inadequate Administrative Policies for Assessing and Managing Attorneys' Conflicts of Interest and/or Improper Bias." *Id.* at 28. Throughout the SAC, Plaintiff characterizes this theory of liability as based on a policy (or failure to enforce such a policy) for identifying whether SFDAO employees have a conflict of interest or "improper bias" and then addressing that conflict of interest by erecting an ethical wall. *Id.* at ¶ 50. For ease of reference, the Court refers to the theory of liability based on alleged policies or procedures to identify and address conflicts of interest and alleged "improper biases" under the Second Cause of Action as the "Conflict of Interest Theory".

**LEGAL STANDARDS**

The Rule 12(b)(6) standards on a motion to dismiss are well-known and not subject to dispute for the instant motion. "The Rule 12(b)(6) standard requires a complaint to 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2000)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The Court accepts as true all well-pled allegations of material fact and construes them in the light most favorable to the non-moving party. *Manzarek v. St. Paul Fire and Marine Ins. Co.*, 519 F.3d 1025, 1031–32 (9th Cir. 2008). While detailed factual allegations are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations." *Id.* at 679. In analyzing a motion to dismiss under Rule 12(b)(6), courts "do not accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562 (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). In other words, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 555.

The standard to permit amendment is a liberal one and leave must be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may deny leave to amend where a movant shows "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party [or] . . . futility," among other reasons. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

**DISCUSSION**

Under *Monell* and its progeny, a plaintiff must allege and prove that a government's action in relation to municipal policy "caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691). To show *Monell* liability under section 1983, "a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [the plaintiff] was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691.

Under *Monell*, the "policy" element may consist of a policy, custom, and/or practice. *Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1028 (N.D. Cal. 2022). An affirmative policy includes a "policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell*, 436 U.S. at 690. Yet, a "policy" also includes inaction or omission if the plaintiff establishes the inaction or omission was effectively deliberate

indifference to a constitutional right, and the municipality had notice that such omission would likely result in violating a right. *Mitchell*, 600 F. Supp. 3d at 1028. A custom or practice consists of the informal practices of officials, not authorized by written law, which nevertheless is "so permanent and well settled" that it has the effect of force of law. *Id.* at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (a plaintiff may show actual policies differ from announced policies). No matter whether the alleged municipal theory is based on a policy, custom, practice, or lack thereof, such "government's policy or custom . . . [must be] made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," an authority requirement made in order to distinguish employee decisions (*respondeat superior* liability) from actual decisions of the municipality. *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).

The Ninth Circuit accepts three theories of municipal liability under section 1983. *Mitchell*, 600 F. Supp. 3d at 1027. First, a municipality incurs liability where the affirmative policy, or a failure to take remedial steps, directly caused the constitutional injury. *Id.*; *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 1991). Such failure to take remedial steps includes failing to investigate constitutional violations and/or failing to discipline employees for causing constitutional violations. *See, e.g. Hunter v. Cnty. Of Sacramento*, 652 F.3d 1225, 1234–35 (9th Cir. 2011) (widespread failure to investigate and discipline officers for excessive force can establish proof of practice or custom); *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018) (appellees provided substantial evidence to show a custom of ignoring or condoning excessive force, inferred from widespread practices including that supervisors observed practices but did nothing).

Plaintiffs may show a policy of deliberate inadequacy by evidence of a "purely formalistic investigation" without evidence taken or stored, perfunctory conclusions by investigators, or a pattern of complaints by others. *Piotrowski v. City of Houston*, 237 F.3d 567, 581–82 (5th Cir. 2001); *see also Cheatham v. City of Chicago*, No. 16-CV-3015, 2016 WL 6217091, at *6 (N.D. Ill. Oct. 25, 2016) (plaintiff adequately alleged at the pleading stage that Chicago had an official policy or custom of inadequately training, supervising, and disciplining officers rising to deliberate indifference, because she alleged it knew of several public complaints of excessive force for the

police in general and constitutional violations of a particular officer). However, allegations of patterns of misconduct and failure to discipline for them must go beyond merely listing similar incidents; a plaintiff must specifically allege why earlier events are their own injury and why any failure to discipline was improper. *Sartor v. Cnty. of Riverside*, No. 5:22-CV-01410-MRA-SP, 2025 WL 1752139, at *9 (C.D. Cal. Mar. 14, 2025).

Second, municipalities may incur liability for failure to train employees, and "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that it becomes deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Mitchell*, 600 F. Supp. 3d at 1027; *Chaidez v. Alameda Cnty.*, No. 21-CV-04240-RS, 2023 WL 6466385, at *7 (N.D. Cal. Oct. 3, 2023) (plaintiff plausibly alleged nine lawsuits regarding inadequate medical care for detainees at Santa Rita Jail constitutes deliberate indifference to consequences for failure to train). "Mere negligence in training or supervision does not give rise to a *Monell* claim." *Dougherty*, 654 F.3d at 900.

A "failure to train" theory is significantly limited by *Connick v. Thompson*, which requires more than one occurrence of a constitutional injury to show "obvious" need for training. 563 U.S. at 64. *Connick* limits failure to train liability for prosecutors, because they are attorneys trained "to find, understand, and apply legal rules" by law school, subject to mandatory continuing education, on-the-job training, and character and fitness standards, and because prosecutors are subject to unique American Bar Association rules to pursue justice, competencies are enforced by local bars and courts. *Id.* at 64–67. All this training, according to the Supreme Court, means constitutional violations cannot be the "obvious consequence" of failing to train prosecutors on a particular municipal policy. *Id.* at 66.

Third, under the ratification theory, a municipality may incur liability when an official with final policy-making authority knowingly approves a subordinate's unconstitutional decision or action and the basis for it. *Mitchell*, 600 F. Supp. 3d at 1032; *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (citing *Praprotnik*, 485 U.S. at 127); *Hammond v. County of Madera*, 859 F.2d 797, 801–02 (9th Cir.1988) *(superseded on other grounds as stated by L.W. v. Grubbs*, 92 F.3d 894, 897–98 (9th Cir. 1996)). A failure to discipline alone, however, does not establish a valid

ratification claim. *Peck v. Cnty. of Orange*, 501 F. Supp. 3d 852, 871 (C.D. Cal. 2020) (*reversed in part on other grounds*) (citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir. 2010) (*overruled in part on other grounds*)).

When a district attorney is the final policymaker, a question arises as to whether they act in their capacity as a county or state employee, because "[s]tates and state officials acting in their official capacities cannot be sued for damages under Section 1983." *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013) (*citing Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). A function-by-function approach to analyzing the organizational structure and control of the district attorney under state law determines the question. *Id.* When acting in an administrative capacity, California district attorneys are considered local policymakers subject to section 1983 liability, but in their prosecutorial capacity, they are state officials possessing Eleventh Amendment immunity. *Id.* at 755 (district attorneys are "local policymakers when adopting and implementing internal policies and procedures related to the use of jailhouse informants").

Under *Monell*, "[t]he plaintiff bears the burden of showing 'the injury would have been avoided' had proper policies been implemented." *Chaidez*, 2023 WL 6466385, at *6 (N.D. Cal. Oct. 3, 2023) (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1196 (9th Cir. 2002)). However, the burden is low in the pleading stage. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) ("In the past, our cases have not required parties to provide much detail at the pleading stage regarding such a policy or custom."). "In this circuit, a claim of municipal liability under § 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Id.* (quoting *Whitaker*, 486 F.3d at 581). The key is whether a plaintiff provides fair notice to the defendant to defend itself and articulates a plausible claim for relief. *Id.* at 637.

## I. THE ALLEGED CONSTITUTIONAL INJURY

A properly pled *Monell* claim must allege a cognizable constitutional injury. 42 U.S.C. § 1983; *Connick*, 563 U.S. at 60–61 (citing *Monell*, 436 U.S. at 692). Here, the SAC makes passing reference at various points that Plaintiff suffered unreasonable searches and seizure under the Fourth and Fourteenth Amendments, [Dkt. 54 at ¶¶ 119, 124, 147], including his arrest, *id.* at ¶¶ 95–96;

improper investigation and malicious prosecution, *id.* at ¶¶ 139 and 159; and "loss of personal freedom", incurring the costs of bond payments and criminal defense attorneys' fees, physical and emotional pain and suffering, loss of reputation, and attorneys' fees for bringing this civil action. *Id.* at ¶¶ 140–41, 161–62.

However, at oral argument on the instant motion to dismiss, Plaintiff clarified the constitutional right (and the constitutional injury) claimed is malicious prosecution, relying on *Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987), *abrogated by Hartman v. Moore*, 547 U.S. 250, 255-56 (2006). [Dkt. 66 at 47-48 ("THE COURT: So, specifically, what is the constitutional -- what is the constitutional requirement? MR. DE SAINT PHALLE [Plaintiff's Counsel]: [W]hat I am articulating is what our Honor articulated and what Haynesworth articulated. And that is these things can collectively lead to a malicious prosecution. So, the damage and harm can be the malicious prosecution."]. Accordingly, based on Plaintiff's admission at the hearing, for the purposes of this Order, the Court analyzes the claimed constitutional injury as malicious prosecution.

For completeness, to the extent the SAC makes passing reference to other potential Constitutional injuries (such as unreasonable search and seizure under the Fourth and Fourteenth Amendments or loss of personal freedom), the Court **DISMISSES WITH PREJUDICE** those pleadings. First, Plaintiff disclaimed asserting any such theories of liability on the record, as noted. More importantly, the SAC does not adequately plead causes of action for unreasonable search and seizure or loss of freedom, because the mere passing reference to these terms is conclusory and not supported by factual allegations or substantive pleading. Mere assertion of legal conclusions is not an adequate pleading for a cause of action. *See Rovi Sols. Corp. v. Lenovo (United States) Inc.*, No. C 12-04209 RS, 2012 U.S. Dist. LEXIS 199280, at *6 (N.D. Cal. Nov. 15, 2012) (citing *Iqbal*, 556 U.S. at 678) ("While the line between facts and legal conclusions is not always easy to draw, this pleading falls within the prohibition against 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'").

"[T]he gravamen of the Fourth Amendment claim for malicious prosecution, … is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges

without probable cause is likewise the gravamen of the tort of malicious prosecution." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). To adequately plead a Fourth Amendment claim for malicious prosecution under Section 1983, a plaintiff must plead, among other things, that they obtained a favorable termination of the underlying criminal prosecution. *Id.* at 39. To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction. *Id.*

To adequately plead a section 1983 malicious prosecution claim, "a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024) (*citing Thompson v. Clark*, 596 U.S. 36, 43, and n.2 (2022)).

The elements of a malicious prosecution claim under Section 1983 derive from the state law elements of malicious prosecution. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561–62 (9th Cir. 1987). Under California law as identified by the Ninth Circuit, to adequately plead a Section 1983 claim of malicious prosecution, a plaintiff must adequately plead that the defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right. *Ciria v. Gerrans*, 178 F.4th 491, 515 (9th Cir. 2026). The complaint must adequately plead the absence of probable cause where "[t]he probable cause inquiry is objective, asking whether a reasonable person would have thought that the claim was legally tenable." *Est. of Tucker ex rel. Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031 (9th Cir. 2008).

"A malicious prosecution action, in California, has three elements: (1) the prosecution 'was commenced by or at the direction of the defendant and was pursued to a legal termination' in the plaintiff's favor; (2) 'was brought without probable cause'; and (3) 'was initiated with malice.'" *Myles v. United States*, 47 F.4th 1005, 1014 (9th Cir. 2022) (*citing Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 341 (2004)). Malice is not hostility or ill will towards a Plaintiff, but "exists when proceedings are instituted primarily for an improper purpose," such as knowingly prosecuting a false claim, or a claim without probable cause. *Id.* (*quoting Albertson v. Raboff*, 46 Cal. 2d 375, 383

(1956)).

Where there are multiple charges, courts assess the presence of probable cause on a charge-by-charge basis and probable cause for one charge cannot bar a Fourth Amendment malicious prosecution claim for other baseless charges. *Chiaverini*, 602 U.S. at 563.

**II. Claims Related to the Arrest Warrant and Investigation**

The Court first considers the theory asserted in the SAC that the process by which the arrest warrant for Plaintiff Cha was procured was part of the malicious prosecution, and thus actionable under both the First Cause of Action (relying on the alleged "Re-Opening Theory") and the Second Cause of Action (relying on the alleged "Conflict of Interest Theory"). As with the original and First Amended Complaint, the pleading as set forth in the SAC is both repetitive and overlapping (where both causes of action here incorporate by reference lengthy pleadings of alleged background facts, including facts relating to causes of action which were dismissed with prejudice in the Order dismissing the FAC).

A malicious prosecution claim fails when the prior action was supported by probable cause, even if it was filed with malicious intent. *Moore v. City of Oakland*, 242 F. Supp. 3d 891, 905 (N.D. Cal. 2017) (quoting *Sheldon Appel*, 47 Cal.3d at 875); *see also Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (citation omitted) ("[P]robable cause is an absolute defense to malicious prosecution.").

As a threshold matter, Plaintiff's reliance on Sixth Circuit law for the proposition that the existence of probable cause is a jury question is unpersuasive as a matter of law. *See* Dkt. 60 at 6 (*citing Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003)). Under Ninth Circuit law, the issue of probable cause is evaluated as a matter of law under an objective standard. *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1164 (9th Cir. 2011) (citing *Sheldon Appel Co. v. Albert Oliker*, 47 Cal.3d 863, 881 (1989)). The Court therefore finds unpersuasive as a matter of law Plaintiff's arguments opposing dismissal on the issue of probable cause to the extent Plaintiff argues they are legally entitled to a jury decision on the issue and to the extent Plaintiff's arguments rely on non-Ninth Circuit law. The Court analyzes the probable cause issue as a matter of law under an objective standard, as required by the Ninth Circuit.

Here, the SFDAO obtained a valid judicial warrant from a Superior Court Judge to arrest Plaintiff. [Dkt. 53 at 13–20]. As such, the judicial warrant breaks the chain of causation between any purported misconduct by Defendants and the alleged malicious prosecution. *Id.* at 17; *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) ("a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation") (appeal of summary judgment); *Erazo Machado v. Boyd*, No. 4:24-CV-03525-KAW, 2025 WL 1359064, at *7 (N.D. Cal. May 9, 2025) (same) (motion to dismiss). The SAC makes no allegations whatsoever that the Superior Court Judge here was deceived. "A finding of probable cause at a preliminary hearing is only reviewable in a subsequent civil proceeding when the plaintiff argues that the officers engaged in judicial deception." *Nieves Martinez v. United States*, 997 F.3d 867, 879 (9th Cir. 2021). No such allegations of deception exist here. Accordingly, to the extent the SAC repeats facts and theories of liability relating to the process leading to the arrest warrant for Plaintiff Cha, such theories of liability based on the arrest warrant are **DISMISSED WITH PREJUDICE** because of the failure to adequately plead how probable cause was lacking (since an independent judicial officer found probable cause). Because probable cause was not lacking with respect to the arrest warrant, under applicable law the chain of causation was broken and thus there can be no malicious prosecution stemming from the arrest warrant or the procedure followed for obtaining the warrant.

Defendants argue the SAC should be dismissed for the same reasons the Court dismissed the FAC's claims related to "improper" or "malicious investigation." [Dkt. 62 at 6, n. 1]. As discussed in the Court's Order dismissing the FAC, Plaintiff previously conceded that the investigation into Plaintiff Cha, by itself, does not independently give rise to cognizable constitutional harms under the facts of this case. [Dkt. 5 at 9]. Absent a claim of falsification of evidence or other specific constitutional tort, "[o]rdinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). To the extent the SAC repeats and realleges facts previously pled in the FAC to support the previously dismissed theory of a

"malicious investigation", the Court dismisses that theory and those bases for alleged liability repeated here in the SAC for the same reasons dismissed with prejudice in the FAC (including in particular Plaintiff's previous admission that there is no separate claim for "malicious investigation" cognizable under the facts of this case). Further, the SAC nowhere alleges that the process of obtaining the arrest warrant for Plaintiff Cha was the result of falsification of evidence.

At oral argument, Plaintiff's counsel admitted that Plaintiff is not arguing that Defendant Koltuniak submitted forged or counterfeit evidence to the Superior Court judge in connection with the arrest warrant application for Plaintiff Cha's arrest. [Dkt. 61 at 22-23]. The SAC's passing references to "fabricated evidence" are conclusory assertions which Plaintiff's counsel admitted at oral argument are not intended to allege that Defendant Koltuniak presented false evidence to obtain the warrant, but rather is a rhetorical characterization of Koltuniak's submissions based on counsel's arguments (not allegations of facts).

Further, the fact that Plaintiff Cha was arrested, alone, is not a cognizable constitutional injury. *Baker v. McCollan*, 443 U.S. 137, 145 (1979). Additionally, the Court previously dismissed with prejudice in the FAC those theories of liability related to the conduct of the prosecution by ADA Young and the impaneling of the Grand Jury. [Dkt. 53 at 9–10]. Again, to the extent the SAC repeats and realleges facts previously pled in the FAC to support the previously dismissed theories of liability based on ADA Young's conduct of the prosecution or based on ADA's Lacambra and Drusinsky's presentation to the Grand Jury, the Court dismisses with prejudice those theories and those bases for alleged liability repeated here in the SAC for the same reasons these were dismissed with prejudice in the FAC. *Id.*

Plaintiff relies on *Haynesworth* for the proposition that "municipalities act collectively, and will be liable for civil rights violations due to their collective conduct that would not be viable as to individuals." [Dkt. 60 at 18]. Based on *Haynesworth*, Plaintiff argues broadly that "administrative conduct" of an office as a whole may result in liability and avoids prosecutorial and Eleventh Amendment immunity. *Id.* at 6, 13, 19-22. Plaintiff argues that a wide range of conduct at the investigative stage (including the obtaining of the arrest warrant and facts relating to the previously dismissed theory of "improper or malicious investigation") constitutes "administrative conduct"

which somehow led ultimately to the malicious prosecution here. As Defendants point out, the Supreme Court abrogated *Haynesworth*. *See Hartman v. Moore*, 547 U.S. 250, 255-56 (2006) (cited by Defendants' Motion to Dismiss [Dkt. 55 at 16]). Plaintiff provides no compelling arguments why, as a matter of law, this Court should rely on *Haynesworth* and as such Plaintiff's arguments opposing dismissal which are based on *Haynesworth* are legally unpersuasive.

Accordingly, the Court **DISMISSES WITH PREJUDICE** the theories of liability pled with respect to both the First and Second Causes of Action based on or relying on (a) facts pled relating to the arrest warrant (including the process leading to the issuance of the warrant) for and the actual arrest of Plaintiff Cha and (b) facts pled relating to the conduct of the prosecution by ADA Young, the presentation to the Grand Jury by ADA's Lacambra and Drusinsky, and the previously dismissed allegations regarding "malicious investigation".

## III. THE "RE-OPENING THEORY"

*The SAC Does Not Plausibly Allege a "Re-Opening" Implicating the Policy*

Turning next to the First Cause of Action (which is titled in part "Malicious Prosecution … Inadequate Administrative Policies for the Re-Evaluation of Declined Cases"), the Court finds that the SAC does not allege facts sufficient to adequately or plausibly plead a cause of action under the so-called "Re-Opening Theory" because the facts as pled admit that the investigation and prosecution of Plaintiff Cha for the shooting incident was never actually finalized, closed, and then re-opened. [Dkt. 54 at 24]. Instead, the SAC's pleading admits that the investigation *never* closed and no prior decision on prosecution was ever finalized during the tenure of DA Gascon. [Dkt. 54 at ¶ 110].

Thus, even assuming there existed a cognizable set of "policies and procedures" regarding reopening of investigations (as asserted in the SAC [Dkt. 54 at ¶ 50]), that alleged policy is not causally connected to Plaintiff's alleged injury. Since the investigation into Plaintiff Cha never closed, the ongoing investigation and assessment about whether to prosecute Plaintiff during the tenure of DA Boudin were subject to Eleventh Amendment prosecutorial immunity. As previously discussed in greater detail in the Court's Order dismissing the FAC, in California a district attorney for a county acts as a state official, and thus has Eleventh Amendment immunity as a state officer,

United States District Court
Northern District of California

when determining whether to proceed with the prosecution of an individual. *See* Dkt. 53 at 23–24 (*discussing Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1030–31 (9th Cir. 2000)). Because the constitutional injury alleged here is malicious prosecution, and because the SAC alleges various SFDAO attorneys and investigators made assessments about whether to prosecute Plaintiff without ever formally closing that investigation, prosecutorial immunity applies. *See also Imbler v. Pachman*, 424 U.S. 409, 430–31 (1976) (state prosecutors absolutely immune from section 1983 liability for activity related to the judicial phase of a prosecution, like initiating prosecution, investigative activities, and presenting the state's case); *Pitts v. County of Kern*, 17 Cal.4th 340, 359–60, 362–63 (1998) (district attorneys are state officials under California law for purposes of section 1983 liability, and immune, when preparing to prosecute and prosecuting criminal violations, and when training employees and developing policy relating to preparing to prosecute and prosecuting; but not "administrative" acts like hiring and firing, workplace safety, procuring office equipment, or other acts unrelated to prosecution); *Van de Kamp*, 555 U.S. 335, 344 (2009) (district attorneys have absolute immunity for errors of administrative obligations directly related to a particular trial).

To attempt to plead that the investigation closed and that the SFDAO improperly "re-opened" it, the SAC alleges that "[i]n December 2019, a declination report in the Moore matter was finalized," and quotes excerpts of the report's conclusions. [Dkt. 54 at ¶ 48]. Plaintiff attaches a copy of the relied-upon "declination report" (titled "Report on the Non-Fatal Officer-Involved Shooting of Sean Wendell Moore on January 6, 2017") as Exhibit 1 to the SAC. *Id.*; [Dkt. 54-1]. "A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

On its face, the December 2019 report is a draft and is not final. The report's date on the cover page is incomplete (and in draft form) as "December X, 2019." [Dkt. 54-3 at 1]. The report has no signature page or signature block for then-DA Gascon (or any DA). [Dkt. 54-1 *passim*]. The

report has indicia that it is still in draft form, such as a highlighted section. *Id.* at 14. The SAC admits that the ADA who drafted the report (ADA Lah) presented the report to then-DA Gascon, "who did not sign the letter." *Id.* at 11. Indeed, the SAC admits that, one month after the draft report was prepared, another prosecutor (ADA Zisser, newly assigned to the Cha matter by then-new DA Boudin) wrote a memorandum referring to the December 2019 declination as a "draft declination". [Dkt. 54 at 16].

The SAC further alleges that "[d]espite the initial declination recommendation by Andrew Lah, and the concurring findings by ADA Zisser confirming that charges were not reasonable, the SFDAO did not sign the existing declination letter, or issue any new declination letter, regarding the Cha/Moore case." *Id.* at ¶ 74. Thus, the SAC concedes that the declination report is a draft that the SFDAO never actually finalized or issued. [Dkt. 60 at 5, 6, 9, 18].

The plain reading of the SAC's own narrative facts about the December 2019 declination report shows that this report was not, in fact, final. First, the SAC concedes that DA Gascón never signed the report. An executed signature by the highest officer in the SFDAO would have made the declination report the "final, legally enforceable form" of the report. *United States v. Biden*, 728 F. Supp. 3d 1054, 1072 (C.D. Cal. 2024) (quoting *Execute*, *Black's Law Dictionary* (11th ed. 2019)). The SAC does not plausibly allege why this unsigned report should be regarded as final and binding on the SFDAO, or why an open matter should fall under the asserted Re-Opening Theory.

Second, while the SAC alleges ADA Zisser "was asked to reopen" the investigation January 16, 2020, days after Defendant Boudin took office, there are no allegations of facts showing how or why, specifically, the case was "re-opened" as opposed to merely continuing. Indeed, the SAC attaches as Exhibit 3 a copy of the SFDAO's motion to dismiss the criminal prosecution against Plaintiff (filed on June 30, 2023). [Dkt. 54-3]. In that motion to dismiss the prosecution against Plaintiff Cha, the SFDAO characterized the so-called "declination report" as a memorandum which addressed, among other matters, "whether to ***continue*** efforts to interview [shooting victim] Sean Moore". [Dkt. 54-3 at 10 (emphasis added)]. That SFDAO's motion to dismiss further states that "[i]t is important to note that, in context, the memorandum [the so-called declination report] appears to clarify what final steps or legal analysis should be done." [Dkt. 54-3 at 11].

United States District Court
Northern District of California

Even construing the SAC in the light most favorable to Plaintiff, the decision of whether to prosecute Plaintiff was not "finalized" by the December 2019 declination draft. To the extent the SAC alleges conclusorily that the Cha prosecution was somehow "declined" or closed during the tenure of DA Gascon, the Court is not required to take as true conclusory pleadings particularly where more detailed pleadings in the SAC itself facially demonstrate that labelling the prosecution as closed or declined is not supported. *Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."). Thus, Defendants' subsequent (and continuing) investigations into Plaintiff and the shooting incident were continuing investigatory and prosecutorial functions subject to Eleventh Amendment immunity. As such, the SAC does not plausibly allege that there was a "reopening" of the criminal case against Plaintiff here and thus does not plausibly allege a constitutional injury based on the so-called "Re-Opening Theory".

*Administrative Policy*

A further issue regarding the legal adequacy of the First Cause of Action is whether the alleged Re-Opening Theory is based on an administrative policy (exempt from Eleventh Amendment immunity) or is based on a policy implicating prosecutorial functions (and thus subject to immunity). As noted, the SAC alleges that prior DA Gascon had "enforced" certain "administrative policies and procedures" under which "to proceed with re-opening [previously declined] cases, the SFDAO and its employees should assess whether any new evidence exists to support a change in status…. [T]he SFDAO should not re-open the investigation unless they have received new evidence that would justify retracting the declination and asserting the existence of probable cause." [Dkt. 54 at 11-12].

Plaintiff argues that the Re-Opening Theory is based on an administrative policy, rather than a prosecutorial policy related to preparing to prosecute, and therefore outside the scope of prosecutorial immunity. [Dkt. 66 at 4–9, 29–30]. In other words, Plaintiff argues that re-opening a file in which a final decision not to prosecute had been made by the proper official is merely administrative, and not a reflection of prosecutorial judgment.

Plaintiff's reliance on *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) is

United States District Court
Northern District of California

distinguishable. *Goldstein* concerned administrative policies and procedures related to the failure by the local prosecutors to use an index of jailhouse informants to identify informants with credibility issues. *Id.* at 752. The Ninth Circuit recognized that various district attorney offices had varying policies about such an index, and the State of California did not require a statewide uniform policy on this issue. *Id.* at 759. The Ninth Circuit held that the index policy was a local, not State, function because the Attorney General lacked the authority to dictate an office policy about use of jailhouse informants generally. *Id.* at 757. The index policy was outside "the decision to prosecute an individual" and thus Eleventh Amendment immunity did not apply. *Id.* at 760–61. Also, the failure to train prosecutors to create and use the index in general was not an administrative obligation "directly connected with the conduct of [his] trial" for which absolute immunity applies. *Id.* at 752, 762 (citing *Van de Kamp*, 555 U.S. 335, 344 (2009)).

Plaintiff argues that SFDAO made a final, legally binding decision to decline prosecution of Plaintiff in December 2019, and all subsequent actions reflect administrative, office-related needs that are not prosecutorial. At oral argument, Plaintiff argued that these administrative issues include "rules and procedures within an office about how declination letters are supposed to be signed and whether or not a case can be reopened and what is sufficient to reopen a case, administrative issues that are akin to and can lead to a prosecution or a non-prosecution, but they're not prosecution." [Dkt. 66 at 8]. Plaintiff's argument to analogize the Re-Opening Theory to the policies at issue in *Goldstein* is not persuasive. The policies at issue in *Goldstein* were administrative because they were not directly tied to any prosecution or investigation, but merely related to a ministerial action to provide and use an index of informants generally (unrelated to any cases). Here, by contrast, the asserted policies are directly tied to the decision whether or not to prosecute and are not directed to organizing information about potential witnesses who might be involved in any number of cases. By definition, a decision to decline prosecution is a prosecutorial decision because it is logically one of only two possible answers to the question of whether or not to prosecute. The decision not to take action is the flip side of the decision to take that action. *See Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997) (holding that "a prosecutor is entitled to absolute immunity for the decision not to prosecute").

Further, Plaintiff's attempt at the hearing to raise (for the first time) an argument that the Re-Opening Theory is based on a policy or procedure for signing declination letters is unavailing. First, the SAC itself does not allege that there was failure to follow a policy regarding the signing or execution of declination letters that caused the constitutional harm here – the SAC focuses on the re-opening of the investigation as the policy at issue. [Dkt. 54 at 50]. The argument that there was a policy regarding executing or signing of declination letters is unsupported by any factual allegations in the SAC, nor does the SAC explain how any such policy was violated. The SAC admits that DA Gascon failed to sign the declination letter or report in December 2019, and therefore undercuts the premise of the SAC that the successor DA Boudin was somehow responsible for the constitutional harms here. Further, Plaintiff nowhere explains why any DA (as the ultimate decision maker in the SFDAO) would be subject to an administrative policy for signing or executing declination letters, when the decision to decline prosecution is self-evidently a matter of prosecutorial discretion and ultimate decision making within the DA's discretion.

Further, the SAC alleges that former DA Gascon had a set of rules in place for reopening an investigation where "they have received new evidence that would justify retracting the declination and asserting the existence of probable cause." [Dkt. 54 at 11]. The SAC alleges that DA Boudin (the successor to DA Gascon) "did not follow the established guidelines and rules in place, and did not establish or implement any rules of guidelines at the SFDAO to ensure that, on a previously declined matter, the re-opening of an investigation had new evidence to justify an investigation or prosecution." *Id.* at 13. The SAC alleges that under DA Boudin "the SFDAO did not enforce the policy to assess evidence of self-defense in assault cases before re-opening such cases (evidence of self-defense would negate probable cause)." *Id.* As the plain text alleges therefore, the SAC's formulation of the Re-Opening Theory inherently includes prosecutorial functions such as receiving new evidence, evaluating that evidence, determining if that new evidence justified an investigation or prosecution, justified retracting a previously finalized declination, and justified asserting the existence of probable cause (including assessing evidence of self-defense to see whether or not such evidence negates probable cause). All of these functions are prosecutorial functions and require the exercise of a prosecutor's judgment. *See Thompson v. Scully,* No. 2:13-CV-1539 LKK AC, 2014

WL 1400858, at *3 (E.D. Cal. Apr. 10, 2014), *report and recommendation adopted,* No. 2:13-CV-1539 KJM AC, 2014 WL 5503381 (E.D. Cal. Oct. 2, 2014), *aff'd sub nom. Thompson v. Davis*, 623 F. App'x 895 (9th Cir. 2015) (explaining that the "gathering and review of evidence for purposes of case preparation is a core prosecutorial function"); *see also del Campo v. Kennedy,* 491 F. Supp. 2d 891, 899 (N.D. Cal. 2006), *aff'd*, 517 F.3d 1070 (9th Cir. 2008) ("Deciding not to prosecute is also considered within the realm of the district attorney's prosecutorial power."). Accordingly, as alleged in the SAC, the Re-Opening Theory is based on a prosecutorial policy subject to Eleventh Amendment immunity and not merely a local administrative policy.

Plaintiff cites *Haynesworth* for the proposition that "a constellation of administrative issues" could lead to *Monell* liability, totally independent of whether such issues cause the office to subsequently prosecute. [Dkt. 66 at 8]. Plaintiff relies on *Haynesworth* to argue that municipalities may "be held liable for civil rights violations, even where the individual prosecutors are not liable." [Dkt. 60 at 22]. As noted above, *Haynesworth* has been abrogated on the issue of whether a § 1983 plaintiff alleging a retaliatory prosecution claim must plead and prove lack of probable cause. *See Hartman*, 547 U.S. at 255-56. Further, *Haynesworth* is a D.C. Circuit opinion, and not a binding Ninth Circuit opinion. Finally, *Haynesworth*'s discussion of municipal liability makes clear that such liability hinged on whether the individual prosecutor "was responsible for the establishment and implementation of policies" of the D.C. Corporation Counsel's office and whether that prosecutor himself "pursued a policy of retaliatory prosecution, as did other District attorneys acting under his direction". *Haynesworth*, 820 F.2d at 1274. The *Haynesworth* opinion then concluded that these allegations, if proven, "could supply an adequate foundation for attribution of [prosecutor] Miller's conduct to the District." *Id.*

Fundamentally then, Plaintiff's arguments based on *Haynesworth* amount to nothing more than arguing that, in appropriate factual situations, a prosecutor who has absolute prosecutorial immunity may act in such a way to establish and implement policies which could support a *Monell* claim against the municipality. This is at best a recognition that some cases present facts which can give rise to *Monell* municipal liability for retaliatory prosecution, and not a rule of law (as apparently asserted by Plaintiff) that a "constellation of administrative issues" could lead to *Monell* liability.

As such, for all these reasons, Plaintiff's arguments opposing dismissal which are based on *Haynesworth* are legally unpersuasive.

At oral argument, Plaintiff asserted that, if the declination letter had been signed, and the file had been re-opened in accordance with the Re-Opening Theory (such as a requirement of new evidence), then Plaintiff would not have been prosecuted. [Dkt. 66 at 9]. Here, the SAC's formulation of the alleged Re-Opening Theory (and the constitutional violation) posits that prosecutors must only re-open a previously declined matter after receiving new evidence in order to assess such evidence to determine whether probable cause now exists (including evaluating evidence of self-defense). Under the formulation of the Re-Opening Theory, the SAC fails to plausibly allege how this is an administrative policy, how SFDAO could ever close a file administratively without exercising any prosecutorial judgment, or how a file could ever be re-opened without exercising any prosecutorial judgment. As formulated, the Re-Opening Theory fails to plausibly allege the existence of an administrative policy which is exempt from Eleventh Amendment immunity.

Accordingly, for all the reasons discussed herein, the Court **DISMISSES WITH PREJUDICE** the First Cause of Action which alleges Constitutional injury based on the Re-Opening Theory.

## IV. THE CONFLICT OF INTEREST THEORY

The Court turns now to the Second Cause of Action for malicious prosecution based on the Conflict of Interest Theory. The Second Cause of Action is titled in part "Municipal Policy Resulting in Deprivation of Rights (*Monell*) – Inadequate Administrative Policies for Assessing and Managing Attorneys' Conflicts of Interest and/or Improper Bias." [Dkt. 54 at 28]. The malicious prosecution alleged in this cause of action is based on the allegation that Defendants Andrew Koltuniak and Lateef Gray worked on the investigation and prosecution of Plaintiff, despite those Defendants having alleged conflicts of interest and/or improper bias. The SAC's theory of liability is premised on SFDAO (under DA Boudin) having violated alleged policies or procedures "enforced under" the previous DA Gascon to "[i]dentify employees who may have potential ethical or other conflict of interests with SFDAO's past and/or present cases, or had any bias against potential parties

United States District Court
Northern District of California

to past or present cases" and "[w]hen conflicts of interest or improper bias were identified on certain cases, the person shall be excluded by an 'ethical wall' from the matter". *Id.* at 12.

Other than Defendants Koltuniak and Gray, the SAC does not allege that any other Defendant had a conflict of interest or "improper bias" with regard to Plaintiff Cha. The Court analyzes the theories of liability as to each Defendant in turn.

***A. Defendant Koltuniak***

Plaintiff alleges that the SFDAO failed "to adhere to effective policies to screen for bias and conflicts of interest" when Defendant Koltuniak was hired as an investigator for the IIB, because he "was unqualified for the position, had consistently expressed and demonstrated bias against police officers, and had made material misrepresentation to courts in other cases." [Dkt. 54 at ¶ 11].

The SAC alleges that Defendant Koltuniak "harbored a deep-seated bias against police officers" in general because he "had been employed by the SF Public Defender's Office . . . from 2004 to 2012, and 2018 to 2020." [Dkt. 54 at ¶ 87]. Similarly, the SAC alleges that Defendant Koltuniak at a later time worked for Alameda County District Attorney Pamela Price, "an ally of Chesa Boudin and former civil rights attorney, much like [Defendant] Gray." [Dkt. 54 at ¶ 91]. There is no plausible pleading of the conclusory theory asserted here that simply working for a public defender's office or a former civil rights attorney is somehow sufficient to demonstrate a generalized bias against police officers. Public defenders (and their investigative staff) serve an important and proper role in our system of justice. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *Betschart v. Oregon*, 103 F.4th 607, 620, 620 n. 9 (9th Cir. 2024) (Sixth Amendment confers a continuous right to competent and zealous advocacy, including in counsel's investigation of lines of defense). Similarly, the fact that Defendant Koltuniak worked for a former civil rights attorney (whether Alameda DA Price or Defendant Gray) is, alone, not sufficient basis to allege that he had a bias here against this Plaintiff. Alleging that a person is biased simply based on the types of employer they worked for, or the types of clients they represented, ignores the structural realities of our adversarial system of justice. *See United States v. Aponte,* No. CRIM. A. 96-137-1, 1996 WL 612839, at *3 (E.D. Pa. Oct. 25, 1996) ("Merely working for the large prosecutor's office… does not mean that a witness is biased.")

Indeed, under Plaintiff Cha's legally unsupported theory, President John Adams (one of our nation's Founding Fathers) would be considered biased against citizens of Massachusetts simply because President Adams previously served as defense counsel for British troops who fired upon citizens of Massachusetts during the Boston Massacre of 1770. *See Reid, John Phillip*. "A Lawyer Acquitted: John Adams and the Boston Massacre Trials." *The American Journal of Legal History* 18, no. 3 (1974): 189–207. This demonstrates the legal defect in Plaintiff's theory of liability.

Furthermore, these bases for alleging a conflict of interest are both conclusory and untethered to Plaintiff Cha. There is no allegation that Defendant Koltuniak had a bias against this Plaintiff or a conflict of interest with regard to the investigation and prosecution of Plaintiff. The assertion that Koltuniak has an improper bias because he worked for certain previous employers is conclusory. *See Hong v. RugsUSA, LLC,* 810 F. Supp. 3d 1050, 1057 (N.D. Cal. 2025) (explaining that a court "need not accept legally conclusory statements unsupported by factual allegations"). Accordingly, the Court need not credit conclusory allegations of bias based on the pleading here regarding Defendant Koltuniak's prior or later work experience. *Id.*

The SAC next alleges that Defendant Koltuniak wrote a "journal style 75-page missive" about his police academy training "in which he hardly veiled his disdain for police" and made rude comments about his classmates' "appearance, weight and body parts." [Dkt. 54 at ¶ 89]. In his writings, Defendant Koltuniak criticized the training as "essentially teaching cadets that they should exterminate people just because they are, 'Bad Guys'". *Id.* As with the theory of liability discussed above regarding Koltuniak's other employers and prior work experience, the pleading here is conclusory and suffers from the same logical gap or leap. The fact that Defendant Koltuniak wrote negative comments about other cadets' appearances or critical of the teachings of instructors at the academy does not logically mean that he harbored a bias against *all police officers*. Even reading the SAC in the light most favorable to Plaintiff, there is simply no basis to imply from these factual recitations that Defendant Koltuniak had an improper bias against the police generally.

Further, the pleading here is devoid of any allegation linking Defendant Koltuniak's writings or views to Plaintiff Cha. Simply because Defendant Koltuniak possessed views which were critical of police training is not logically or factually connected to bias against Plaintiff Cha – who is neither

United States District Court
Northern District of California

alleged to have been a trainer nor a person who participated in any of Defendant Koltuniak's own training sessions. Further, simply because Defendant Koltuniak had negative opinions of individual cadets' appearances, that does not reasonably or logically link to a bias which impacted Koltuniak's views of Plaintiff Cha. Fundamentally, the SAC alleges no facts linking Defendant Koltuniak's personal views about the training or other cadets with actual misconduct in handling Plaintiff's file.

The SAC next alleges that Defendant Koltuniak was "not qualified to work in the IIB, due to his lack of law enforcement experience or experience prosecuting criminal matters" and that Defendant Koltuniak could not perform the duty of writing warrants without further training. [Dkt. 54 at ¶ 88]. The fact that Defendant Koltuniak was not eligible to write warrants at the time of his hiring is not logically or factually linked to any bias against anyone. The fact that a person is not qualified to perform job functions at the time of hiring (before being trained for that job) is not logically linked to any alleged bias – there is another logical leap in the pleading here which the SAC does not plausibly explain. Even reading the SAC in the light most favorable to Plaintiff, there is no basis to infer bias from an alleged lack of experience or need for training. Under Plaintiff's theory of liability, every new employee at SFDAO would somehow be biased simply because they lack sufficient experience and have not received training yet. There is no reasonable basis to infer bias from these facts.

Indeed, to the extent the SAC admits that Koltuniak received accelerated training on warrants undercuts the theory of liability here. There is no allegation that Koltuniak's work on any warrants preceded this training or that his lack of experience at the time Koltuniak was hired had any impact on Plaintiff Cha directly. [Dkt. 54 at ¶¶ 87-89]. The SAC's pleading indicates that Defendant Koltuniak had completed his training by the time he wrote the warrant application for Plaintiff Cha's arrest. [Dkt. 54 at ¶¶ 89 and 95].

Further, the conclusory allegation that Defendant Koltuniak lacked law enforcement and criminal prosecution experience is undercut by the SAC's pleading elsewhere that Defendant Koltuniak had work experience in California criminal investigations (for the Public Defender's office) from as early as 2004. [Dkt. 54 at ¶ 87]. As with the pleadings discussed above, there is a logical leap here that the SAC does not explain – the mere fact that Defendant Koltuniak required

additional training (whether for writing warrants or otherwise) upon being hired is not linked in any way to any alleged bias against anyone, much less Plaintiff Cha. Additionally, the pleading here is devoid of any allegation that links Defendant Koltuniak's alleged lack of law enforcement experience and need to receive training on warrants to any alleged misconduct with regard to Plaintiff Cha.

Next, the SAC alleges Defendant Koltuniak "demonstrated a pattern of unethical behavior throughout his career," because a court admonished him for "intentional misrepresentation" in the *Brugnara* case, and because at some other unknown time, a different judge made findings in an unidentified matter that Defendant Koltuniak, working with Alameda DA Price, made a "blatant falsehood" in an affidavit in a case in which the defendant was a police officer. [Dkt. 54 at ¶¶ 90–91].

Here, the SAC cites the *Brugnara* decision to support the claim against Defendant Koltuniak. [Dkt. 54 at ¶ 90 (citing "*United States v. Brugnara* (N.D. Cal. Oct. 9, 2015) No. CR 14-0306 WHA, 2015 U.S. Dist.")]. As such, the Court may take judicial notice of the *Brugnara* decision. Fed. R. Evid. 201(b)(2); *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1060 (N.D. Cal. 2023); *Minor v. FedEx Office & Print Servs.*, 78 F. Supp. 3d 1021, 1027, 1028 (N.D. Cal. 2015). A straightforward reading of the *Brugnara* order makes clear that the *Brugnara* court never admonished Defendant Koltuniak himself, contrary to the allegations in the SAC. *See United States v. Brugnara*, 2015 WL 5915567, at *19-20 (N.D. Cal. Oct. 9, 2015). In that case, Defendant Koltuniak investigated a juror's criminal history and conveyed that information to Brugnara's attorney. *Id.* The *Brugnara* order makes clear that Brugnara and Brugnara's attorney made the decision not to inform the *Brugnara* court of that juror information, not Defendant Koltuniak. The *Brugnara* court ultimately determined the proper sanction would be to find that Brugnara had waived his argument for a new trial based on alleged juror bias. *Id.* at 19 ("The Court is disappointed that the defense has left the impression that this was newly discovered information."). The *Bruganara* court made no finding of intentional dishonesty by Koltuniak and did not admonish Koltuniak for "intentional misrepresentations" (contrary to the SAC's unsupported and conclusory allegation). *Compare id.* with Dkt. 54 at ¶ 90. The Court is not required to accept as true allegations that contradict matters

properly subject to judicial notice. *Daniels Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citing *Manzarek*, 519 F.3d at 1031).

Finally, the SAC's pleading that an unidentified judge made findings, in an unidentified case, that Koltuniak submitted unidentified "blatant falsehoods" and unidentified "materials misrepresentations" are conclusory on their face. [Dkt. 54 at ¶ 91]. The fact that these events apparently took place while Defendant Koltuniak was working for the Alameda DA's office at an unknown time after the events at issue in this case renders these allegations of even less import for purposes of inferring any grounds for bias here. Accordingly, the Court need not credit conclusory allegations of bias based on the pleading here regarding vague allegations of Defendant Koltuniak's actions which post-date the relevant time period here and involve a completely different DA's office and a completely different case. *See Hong,* 810 F. Supp. 3d at 1057.

As the detailed analysis of the SAC's pleading demonstrates, Plaintiff's allegations never assert that Defendant Koltuniak (who is not a lawyer) had a conflict of interest – the theory of liability here is premised entirely on attempting to show that Defendant Koltuniak somehow had an "improper bias". The SAC does not allege what constitutes an "improper bias" under former DA Gascon's alleged procedures and policies, and does not allege what DA Boudin should have instituted as a policy to identify an "improper bias". In briefing, Plaintiff cites no cases which recognize the theory that failure to enforce an "improper bias" policy (however defined) is a legally cognizable basis for a malicious prosecution claim under § 1983.

Notably, the SAC lacks pleading of any legally recognized or traditional factors which would support an alleged conflict of interest by Defendant Koltuniak with respect to Plaintiff Cha. *See, e.g.*, Cal. Gov't Code §§ 1090, 87500. For example, the SAC does not allege that Defendant Koltuniak had any financial interest, engaged in self-dealing, or mishandled government funds. *Id.* Nor does the SAC allege that Defendant Koltuniak had any personal relationship or prohibited contractual relationship which would create a conflict of interest. *Id.* The SAC does not allege that Defendant Koltuniak worked on behalf of a party adverse to Plaintiff in any prior litigation or case. *Id.* Ultimately, the SAC lacks allegations that Defendant Koltuniak committed any improper acts in violation of California's conflict of interest statutes for government employees. *Id.* The SAC

United States District Court
Northern District of California

conclusorily states that Defendant Koltuniak had a conflict of interest in passing with regard to this cause of action, but nowhere substantiates or supports that conclusory pleading with any factual assertions. [Dkt. 54 at ¶ 157]. Again, the Court need not accept as true a conclusory pleading such as this. *See Hong,* 810 F. Supp. 3d at 1057.

The SAC alleges, again conclusorily, that Defendant Koltuniak was able "to exert biased influence and direction on the SFDAO's handling of the Cha matter." [Dkt. 54 at ¶ 157]. There are again no pleadings of any facts to support this conclusory allegation. To the extent the Second Cause of Action incorporates by reference the entire preceding paragraphs of the Complaint, [Dkt. 54 at ¶ 142] the only factual allegations concerning Defendant Koltuniak's "handling of the Cha matter" center on the procedures undertaken to obtain the arrest warrant for Plaintiff Cha. As discussed above, the Court dismisses with prejudice the theory of liability based on the arrest warrant process here. Further, as noted above, Plaintiff admitted that Plaintiff is not arguing that Defendant Koltuniak submitted falsified evidence to the Superior Court judge in connection with the arrest warrant application for Plaintiff Cha's arrest. [Dkt. 61 at 22-23]. The SAC's allegations regarding "fabricated evidence" are conclusory assertions which Plaintiff's counsel admitted are not intended to allege that Defendant Koltuniak presented fabricated evidence, but rather is a rhetorical characterization of Koltuniak's submissions based on counsel's arguments only (not facts). As such, the Court does not accept as true the conclusory allegations that Defendant Koltuniak somehow exerted "biased" handling of the Cha matter. *See Hong,* 810 F. at 1057.

In light of the analysis of the Second Cause of Action's various bases for alleging Defendant Koltuniak had a conflict of interest or "improper" bias leading to the alleged malicious prosecution, none of Plaintiff's claims related to Defendant Koltuniak survive review. Ultimately, the pleading here contains conclusory allegations and asserts facts from which there are logical leaps without any logical or reasonable link to the alleged bias or conflict of interest here. Further, the SAC fails to allege how a policy or procedure included a definition of "improper biases" under *Monell*. The SAC also fails to allege how Defendant Koltuniak's actions which led to the alleged malicious prosecution should be imputed to the SFDAO under *Monell*. And finally, the SAC fails to allege how any of Defendant Koltuniak's actions should lead to any Defendant's liability in their official

United States District Court
Northern District of California

capacities.

Accordingly, the Court **DISMISSES WITH PREJUDICE** the Second Cause of Action to the extent it relies on any actions by or alleged conflicts of interest or alleged improper biases of Defendant Koltuniak.

***B. Defendant Gray***

The Court next considers the SAC's claim that the Conflict of Interest Theory caused constitutional injury because Defendant Gray had a personal conflict of interest and yet worked on the case involving Plaintiff.

***Immunity***

As a threshold matter, the Court analyzes whether immunity applies here. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("Immunity ordinarily should be decided by the court long before trial."); *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017); *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) ("At the motion to dismiss stage, 'dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies.'"); *Price v. Tamalpais Union High Sch. Dist.*, No. 24-CV-08033-JSC, 2025 WL 3564205, at *5 (N.D. Cal. Dec. 12, 2025).

The Conflict of Interest Theory does not relate to the performance of the SFDAO's work investigating, preparing to prosecute, or prosecuting cases (or hiring, training, or supervising personnel to that end). As discussed above, under a function-by-function analysis, the SAC alleges that the previous DA Gascon enforced procedures and policies for the following functions: screening for conflicts of interest or improper bias in personnel before assigning them to matters, and preventing their assignment to matters in which conflicts existed by erecting ethical walls. [Dkt. 54 at ¶ 50]. None of the above functions are prosecutorial functions by the SFDAO.

First, all members of the California bar must comply with the Rules of Professional Conduct, which are issued and enforced by the State Bar and not the California Attorney General. *See* Cal. State Bar, "Rules of Professional Conduct," https://www.calbar.ca.gov/legal-professionals/rules/rules-of-professional-conduct; *see, e.g.*, Cal. Gov't Code § 87500; Cal. Dep't. of Justice, Attorney General, "Conflict of Interest Code Updates," https://oag.ca.gov/conflict-interest/regs; *see also Weiner*, 210 F.3d at 1029–30 (reviewing California AG's statutory authority,

without identifying enforcement of State Bar Rules among those duties). While the California Attorney General has the authority take over a *particular* prosecution (where conflicts issues may arise), that is not the same as authority to dictate conflicts of interest policy for a given district attorney's office. 715 F.3d at 757. The fact that the Attorney General lacks authority to enforce State Bar Rules regarding conflicts of interest indicates that a set of procedures and policies on conflicts of interest are administrative and not prosecutorial.

Second, a conflicts of interest policy is not prosecutorial because such a policy governs the universe of employees eligible to be assigned to matters, which is a threshold issue to be considered prior to working on the actual prosecution in a specific case. Moreover, considerations of the functions involved in a conflicts of interest policy are not an inherent part of the judicial phase of a case. *See del Campo,* 491 F. Supp. 2d at 900 (explaining administrative matters that "have no bearing on a District Attorney's responsibilities in prosecuting a crime, preparing to prosecute, or creating policies or training officials in [prosecution]") (citation omitted). Further, a conflicts of interest policy is not inherent in training attorneys how to prosecute a case. *Id.*

Furthermore, whether or not the attorneys in a District Attorney's office comply with Rules 1.7 and 1.9 of the California State Bar Rules of Professional Conduct is an issue relating to their status as lawyers in general, and not to their status as prosecutor. The State Bar Rules apply to all lawyers and not merely to prosecutors. The State Bar Rules on conflicts of interest recognize that the appearance of a conflict implicates the duties of "loyalty and independent judgment" underpinning Rule 1.7. *See* Cal. R. of Prof. Conduct 1.7, Comments [1], [4] ("Even where there is no direct adversity, a conflict of interest requiring informed written consent[] under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal."). Accordingly, whether or not the attorneys in a District Attorney's office comply with a conflicts policy is an administrative issue.

Defendants' reliance on *Riese v. Cnty. Of Del Norte*, 2013 WL 5568707 (N.D. Cal. Oct. 9, 2013), is unavailing. In *Riese*, the conduct at issue involved prosecutorial functions: being

physically present on-site where plaintiff encountered police, interviewing witnesses, and seeking recordings of the events under investigation from a nearby grocery store. *Id.* at *1. Here, by contrast, the SAC alleges the assignment of Defendant Gray as Managing Attorney of the entire IIB without preventing him from working on Plaintiff's file represents a conflict of interest, because Defendant Gray was counsel for Mr. Moore in a civil matter directly adverse to Plaintiff, and because Defendant Gray had a possible financial interest in Plaintiff's prosecution.

Defendants argue that reasons for dismissal of the FAC with regard to the Conflicts of Interest Theory are equally applicable to the SAC. [Dkt. 62 at 11]. Plaintiff argues that, unlike the FAC, the SAC now alleges negligent policies, not intentional policies of malicious prosecution, and alleges that Defendant Gray was assigned to the entire IIB as Managing Attorney without proper regard to a conflicts of interest policy. [Dkt. 60 at 4, 14, 15]. The Court finds the SAC sufficiently differs from the FAC to overcome dismissal with regard to the immunity issue. *See* Dkt. 53 at 25. Accordingly, the Court finds that the alleged Conflict of Interest Theory is based on an administrative policy which does not enjoy Eleventh Amendment immunity.

***<u>Elements of Cause of Action for Malicious Prosecution</u>***

Here, the first element for the claim for malicious prosecution is sufficiently pled: the criminal prosecution against Plaintiff was dismissed, which was a termination in his favor without a conviction. *Thompson*, 596 U.S. at 39.

As to the malice element, Plaintiff alleges Defendant Gray was counsel of record for Mr. Moore in a civil action against Plaintiff, both before and after joining the SFDAO. The SAC alleges that Gray remained counsel of record for Mr. Moore in a case adverse to Plaintiff until March 23, 2020, which is approximately one month after Defendant Gray joined the SFDAO. During this period, the SAC alleges that Defendant Gray oversaw personnel assignment and expert witness issues and strategy with "virtually daily involvement." [Dkt. 54 at ¶¶ 61, 64, 68, 75–76, 78].

Further, the SAC alleges Defendant Gray had a potential financial interest in the monetary settlement of Mr. Moore's civil action, and had a personal professional interest in helping his former law firm. *Id.* at ¶ 65.

The SAC alleges that the SFDAO failed to screen, wall off, discipline, or correct Defendant

Gray from working on the criminal case against Plaintiff despite his prior work adverse to Plaintiff. *Id.* at ¶¶ 10–11, 69. The SAC alleges that the SFDAO and Defendant Gray each had a duty to comply with California State Bar Rules 1.7 and 1.9, to identify and exclude from this matter personnel who represented an opposing party. *Id.* at ¶¶ 50–51.

The SAC plausibly alleges facts that Defendant Gray had a conflict of interest with regard to Plaintiff Cha, and plausibly alleges that the SFDAO failed to enforce the State Bar Rules on conflicts and failed to enforce the previous DA's policies and procedures for handling conflicts of interest with regard to Defendant Gray's supervision of the prosecution of Plaintiff Cha. Therefore, the Court **DENIES** the motion to dismiss the Second Cause of Action to the extent the SAC relies on Defendant Gray's conflict of interest and the implicated policy.

*C. Defendants Drusinsky, Lacambra, and Boudin*

The Second Cause of Action alleges that Defendants Drusinsky and Lacambra were aware of Defendant Gray's alleged conflict of interest, but did not erect an ethical wall between themselves and Gray, and took direction from and shared information with Gray regarding the prosecution of Plaintiff Cha. [Dkt. 54 at ¶ 153]. The SAC alleges that a different Assistant DA, Rebecca Young, was the lead prosecutor in the case against Plaintiff Cha. *Id.* at ¶ 96. The SAC's background sections plead actions taken by Defendants Drusinsky and Lacambra to supervise investigators, prepare warrants (which were never issued), and the presentation of evidence to the investigative grand jury. *Id.* at ¶¶ 75, 80, 83-86.

In dismissing the FAC, the Court dismissed all causes of action relating to the presentation to the investigative grand jury. [Dkt. 53 at 12]. As discussed above, the Court herein dismisses all theories of liability regarding the conduct of the prosecution by ADA Young as well. That leaves the theory of liability that Defendants Drusinsky and Lacambra were aware of Defendant Gray's conflict of interest but failed to take steps to address that alleged conflict of interest.

In the Second Cause of Action, there is no allegation that Defendants Drusinsky or Lacambra were in a position to establish, modify, or change a conflicts of interest policy or procedure for the entire SFDAO. Nor is there any allegation that either of these two Defendants was in a policy-setting or policy-approving position within the SFDAO. There is no allegation that their job duties

included authority to establish ethical walls within the SFDAO. As discussed above, Plaintiff relies on the D.C. Circuit's *Haynesworth* opinion to oppose dismissal here – in particular, Plaintiff relies on *Haynesworth* to argue that "SFDAO employees at levels below the District Attorney may also set policy for purposes of *Monell* liability." [Dkt. 60 at 25]. As discussed above, *Haynesworth* was abrogated (on the specific grounds relating to probable cause) and is otherwise distinguishable even to the extent it survives. The Court finds that Plaintiff's arguments that Defendants Drusinsky and Lacambra are somehow responsible for policy-setting to be mere conclusory allegations without any facts to support the claim. *See Hong,* 810 F. Supp. 3d at 1057.

Mere knowledge by these two Defendants of the alleged conflict of interest by their supervisor is insufficient to plead *Monell* liability. The SAC admits that these two named Defendants were not the lead prosecutors for the actual prosecution of Plaintiff Cha. The only specific facts alleged as to these two Defendants relate to the presentation to the grand jury. For purposes of *Monell* liability, there is a lack of plausible pleading of facts with regard to Defendants Lacambra and Drusinsky as it relates to the Second Cause of Action and the Conflict of Interest Theory. Accordingly, the Court **DISMISSES WITH PREJUDICE** all theories of liability against all Defendants under the Second Cause of Action which relate to or rely on any facts alleged with regard to Defendants Drusinsky and Lacambra.

By contrast, as the District Attorney, Defendant Boudin was in a position to approve, set and modify policies for the SFDAO, including the alleged conflicts of interest policy alleged here. A supervisory government official of the department at issue, who is sued in their official capacity and who approved, set, or could modify the policy at issue, is properly named as a defendant in a civil rights action. *See Heller v. Bushey,* 759 F.2d 1371, 1375 (9th Cir.1985), rev'd on other grounds by 475 U.S. 796 (1986) ("The proper individual defendants in [a § 1983] action are those official who were in office before or at the time [the plaintiff's rights were violated] and who may have adopted a plan or policy authorizing or approving the alleged unconstitutional conduct.").

Accordingly, the Court **DENIES** the motion to dismiss as to Defendant Boudin with regard to the Second Cause of Action based on the theory of liability and facts relating to Defendant Gray's conflict of interest under the Conflict of Interest Theory.

**CONCLUSION**

Accordingly, for all the reasons discussed herein, the Court **GRANTS-IN-PART** the Motion to Dismiss and **DISMISSES WITH PREJUDICE** the First Cause of Action in its entirety asserted in the Second Amended Complaint. Further, because Plaintiff has had two opportunities to amend the Complaint already and refine the pleading of the alleged Re-Opening Theory, and because of the substantive legal defects in the First Cause of Action discussed herein, the Court finds that further amendment for the First Cause of Action would be futile. Accordingly, dismissal of the First Cause of Action is without leave to amend.

The Court **GRANTS-IN-PART** the Motion to Dismiss and **DISMISSES WITH PREJUDICE** the theories of liability for the First and Second Causes of Action which rely upon or involve the arrest warrant for Plaintiff Cha (including the process for applying for leading up to the issuance of the warrant and the arrest of Plaintiff Cha itself), rely upon or involve the investigation which preceded the prosecution of Plaintiff Cha, rely upon or involve the conduct of the prosecution by ADA Young, or rely upon or involve the presentation to the grand jury by Defendants Drusinsky and Lacambra. Further, again because Plaintiff has had two opportunities to amend the Complaint already and refine the pleading of these theories, and because of the substantive legal defects in these theories of liability as discussed herein, the Court finds that further amendment would be futile. Accordingly, dismissal of these theories of liability with regard to both the First and Second Causes of Action is without leave to amend.

Next, the Court **GRANTS-IN-PART** the Motion to Dismiss and **DISMISSES WITH PREJUDICE** the theory of liability for the Second Cause of Action which relies upon or involves the alleged conflict of interest or improper bias of Defendant Koltuniak, including the facts pled with regard to his actions in the investigation and prosecution (including his involvement in securing the arrest warrant for Plaintiff Cha). Further, again because Plaintiff has had two opportunities to amend the Complaint already and refine the pleading of theories of liability as to Defendant Koltuniak, and because of the substantive legal defects in the theories of liability asserted based on the actions of Defendant Koltuniak as discussed herein, the Court finds that further amendment would be futile. Accordingly, dismissal of the Second Cause of Action as to the Conflict of Interest

Theory based on Defendant Koltuniak is without leave to amend. As a result, Defendant Koltuniak is dismissed from this case.

The Court **DENIES** the Motion to Dismiss the Second Cause of Action to the extent that cause of action is based on the theory of liability for which relies upon, involves, or is based on Defendant Gray's alleged conflicts of interest and the alleged policies underlying the Conflict of Interest Theory asserted as to Defendant Gray.

Further, the Court **DENIES** the Motion to Dismiss Defendant Boudin (who is only sued in his official capacity) with regard to the surviving portions of the Second Cause of Action relating to Defendant Gray's alleged conflicts of interest under the Conflict of Interest Theory.

Finally, the Court **GRANTS-IN-PART** the Motion to Dismiss and **DISMISSES WITH PREJUDICE** all claims under the Second Cause of Action asserted against Defendants Drusinsky and Lacambra. Further, again because Plaintiff has had two opportunities to amend the Complaint already and refine the pleading of theories of liability as to Defendants Drusinsky and Lacambra, and because of the substantive legal defects in the theories of liability asserted based on the actions of those named Defendants as discussed herein, the Court finds that further amendment would be futile. Accordingly, dismissal of the Second Cause of Action as to the Conflict of Interest Theory based on Defendants Drusinsky and Lacambra's actions is without leave to amend. As a result, Defendants Drusinsky and Lacambra are dismissed from this case.

The net effect of this Order is that the remaining Defendants are the City and County of San Francisco, the SFDAO, and Defendants Gray and Boudin (both sued only in their official capacities), and the only remaining cause of action is that portion of the Second Cause of Action based only on the alleged conflicts of interest asserted as to Defendant Gray and how those conflicts of interests implicate the alleged policy or procedure under the Conflict of Interest Theory. These remaining Defendants are **ORDERED** to file their Answer to the surviving portion of the SAC by **October 30, 2026**.

The Court further **SETS** a Case Management Conference for **December 3, 2026** at 1:30 pm, to be held in-person in Courtroom F. Lead trial counsel **SHALL** attend. The Parties remaining in this case **SHALL** meet and confer and file a Joint Case Management Conference Statement (fully

complying with Section VI of the Court's Standing Civil Order) by **November 19, 2026**.

This Order **RESOLVES** Dkt. 55.

**IT IS SO ORDERED.**

Dated: September 30, 2026

PETER H. KANG
United States Magistrate Judge

United States District Court
Northern District of California